NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
CATHERINE S. AHN (Cal. Bar No. 248286)
Assistant United States Attorney
General Crimes Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2424
    Facsimile: (213) 894-0141
    E-mail:    catherine.s.ahn@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>             v.<br><br>DANIEL FLINT,<br><br>        Defendant. | No. CR 17-697-SJO<br><br>GOVERNMENT'S MOTION TO ADMIT EVIDENCE RELATING TO DEFENDANT AND DEFENDANT'S CO-CONSPIRATOR DOUGLAS HAMPTON'S ATTEMPTS TO EVADE SECURITY SCREENING OF ALLEGED DIPLOMATIC COURIER POUCHES<br><br>Hearing Date: May 24, 2018<br>Hearing Time: 8:30 a.m.<br>Location:    Courtroom of the Honorable S. James Otero |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Catherine S. Ahn, hereby files its Motion _in Limine_ to Admit Evidence Relating to Defendant and Defendant's Co-Conspirator Douglas Hampton's Attempts to Evade Security Screening of Alleged Diplomatic Courier Bags.

//

//

//

This motion is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: May 8, 2018                Respectfully submitted,

                                  NICOLA T. HANNA
                                  United States Attorney

                                  LAWRENCE S. MIDDLETON
                                  Assistant United States Attorney
                                  Chief, Criminal Division


                                    /s/  *Catherine S. Ahn*
                                  CATHERINE S. AHN
                                  Assistant United States Attorney

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

I.   INTRODUCTION.................................................1

II.  FACTUAL BACKGROUND..........................................2

     A.   Defendant's Attempts to Evade Screening in July 2017......2

          1.   Defendant Attempts to Evade Security Screening at
               Chicago O'Hare Airport on July 20, 2017 and is
               Denied...............................................2

          2.   Defendant Travels to Midway Airport and
               Successfully Evades Screening on July 20, 2017
               and July 25, 2017....................................3

          3.   Defendant's Interception at LAX Terminal 3..........4

     B.   Douglas Hampton's Similar Attempt to Transport and
          Evade Security Screening of Bulk Cash by Falsely
          Asserting Diplomatic Protections in August 2016..........7

III. ARGUMENT....................................................8

     A.   Defendant's July 2017 Interactions with TSA at Chicago
          O'Hare and Midway Airports are Admissible...............9

          1.   Defendant's July 2017 Attempts to Evade Screening
               are Inextricably Intertwined with the Offense.......9

          2.   Defendant's July 2017 Attempts to Evade Screening
               are Admissible Under Rule 404(b) to Prove
               Defendant's Motive, Knowledge, Absence of
               Mistake, and Intent................................13

     B.   Hampton's Unsuccessful Attempt to Evade Security
          Screening for Bulk Cash by Falsely Asserting IHRC
          Diplomatic Immunities is Admissible.....................14

          1.   Hampton's Attempt is Admissible Under Rule 404(b)
               or the Ninth Circuit's Definition of Inextricably
               Intertwined Acts in *Loftis*........................14

          2.   Testimony Regarding Hampton's Prior Statements
               and Attempt is Not Hearsay.........................17

IV.  CONCLUSION.................................................18

i

**TABLE OF AUTHORITIES**

**PAGE(S)**

**FEDERAL CASES**

<u>United States v. Dorsey</u>, 677 F.3d 944 (9th Cir. 2012).........passim

<u>United States v. Lloyd</u>, 807 F.3d 1128 (9th Cir. 2015)..............18

<u>United States v. Loftis</u>, 846 F.3d 1173 (9th Cir. 2016).........passim

**FEDERAL STATUTES**

49 U.S.C. §§ 46314(a), (b)(2).....................................13

**OTHER AUTHORITIES**

Fed. R. Evid. 404(b)..........................................passim

Fed. R. Evid. 801.........................................17, 18

The Fourth Geneva Convention Relative to the Protection of
    Civilian Persons in the Time of War (1949)....................3

The Vienna Convention on Diplomatic Relations (1961)..............6

The Vienna Convention on the Representation of States in their
    Relations with International Organizations of a Universal
    Character (1975)................................................6

ii

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Defendant Daniel Flint ("defendant") is charged with violating 49 U.S.C. §§ 46314(a), (b)(2) on or about July 25, 2017, by knowingly and willfully entering Terminal 3 of the Los Angeles International Airport ("LAX"), a secure and sterile area, carrying an item that had not been screened and inspected by the Transportation Security Administration ("TSA"), with the intent to evade security procedures and restrictions.  (See Clerk's Record ("CR") 15, Indictment.) Defendant was able to enter the secure area of LAX with the item -- a pouch containing approximately $148,145 in U.S. currency -- by using his false claim of diplomatic status to evade full screening of the pouch at his point of entry earlier that day, at Chicago Midway International Airport ("Midway").  Through this motion, the government seeks to admit evidence of defendant's, and his co-conspirator Douglas Hampton's, attempts to evade TSA security screening of bulk cash by falsely asserting diplomatic protections.

The evidence of defendant's attempts is admissible because it is inextricably intertwined with the charged offense, and, to the extent this Court determined they were not inextricably intertwined, are nonetheless admissible pursuant to Rule 404(b) to show defendant's motive, knowledge, absence of mistake or accident, and intent in bringing an unscreened bag into LAX Terminal 3 on July 25, 2017, as charged in the indictment.  The evidence of Douglas Hampton's, defendant's co-conspirator and employer, attempts, to evade TSA security screening is also admissible under Rule 404(b) to show defendant's knowledge, absence of mistake or accident, and intent, as well as pursuant to Ninth Circuit precedent regarding inextricably

1  intertwined acts.  United States v. Loftis, 846 F.3d 1173, 1177 (9th

2  Cir. 2016).

3  **II.  FACTUAL BACKGROUND**

4      **A.  Defendant's Attempts to Evade Screening in July 2017**

5          1.   Defendant Attempts to Evade Security Screening at
              Chicago O'Hare Airport on July 20, 2017 and is Denied
6

7      On July 20, 2017, at approximately 2 p.m., defendant entered the

8  TSA security checkpoint area for the Chicago O'Hare International

9  Airport ("ORD") with a purported diplomatic pouch, a laminated IHRC

10  diplomatic courier identification card, a purported diplomatic

11  courier letter dated July 20, 2017 that was stamped with the

12  purported seal of the IHRC, and his Michigan driver's license.  (See

13  Gov't. Exh. A, ORD TSA Incident Report for July 20, 2017 at 6-10

14  (filed under seal).)  Defendant was booked on a Virgin American

15  Airlines ticket traveling from ORD to LAX that day.  (Id. at 6.)

16  Supervisory Transportation Security Officer ("STSO") Christopher

17  Kotula and supervisory TSA managers reviewed defendant's

18  documentation and ultimately denied defendant's request to exempt his

19  pouch from full screening because defendant lacked proper

20  identification -- specifically, a diplomatic passport.  (Id. at 7-8.)

21      The laminated identification card presented by defendant to TSA

22  personnel included defendant's picture, the IHRC logo, and had the

23  word "DIPLOMAT" printed in large font across the card.  (Id. at 9.)

24  It was not, however, a diplomatic passport, which is a required

25  identification document for the clearance of diplomatic pouches.

26  (Id. at 8; see also Gov't. Exh. B, TSA Standard Operating Procedures

27  at 3 (filed under seal).)  After STSO Kotula informed defendant that

28  his pouch would not be exempt from full screening, defendant asserted

2

1    TSA "does not know the law," referenced the "Geneva Convention"[1] and

2    claimed that "he [had] flown through many airports and has had no

3    issues." (See Gov't. Exh. A at 8.)  STSO Kotula informed defendant

4    that STSO Kotula was following TSA's Standard Operating Procedures,

5    and asked supervisory TSA managers to assist him after defendant

6    continued to insist his credentials were sufficient. (Id.)  The

7    managers confirmed STSO Kotula's determination and escorted defendant

8    to the non-sterile area of the airport. (Id. at 7.)  TSA personnel

9    later learned that defendant had cancelled his flight. (See Gov't.

10   Exh. C, ORD Warning dated July 20, 2017 at 1 (filed under seal).)

11           2.   Defendant Travels to Midway Airport and Successfully
                  Evades Screening on July 20, 2017 and July 25, 2017
12

13       Defendant's attempt to evade security screening at ORD took

14   place at approximately 2 p.m. on July 20, 2017; within an hour-and-a-

15   half defendant had booked a different flight from Midway to LAX and

16   was at the Midway TSA security screening checkpoint asserting

17   diplomatic protections over his pouch. (See Gov't. Exh. D, MDW

18   Incident Summary dated July 21, 2017 and Training Bulletin at 1

19   (filed under seal).)  Defendant still lacked a diplomatic passport,

20   but this time -- in addition to presenting his laminated diplomatic

21   identification card, his purported diplomatic courier letter, and his

22   driver's license -- defendant also identified himself as an attorney

23   by presenting his State Bar identification card. (Id.)  Unlike their

24

25   ─────────────────────

26       [1] It is unclear which Geneva Convention defendant intended to
     reference, but the four Geneva Conventions have generally addressed
27   international humanitarian law as it relates to the law of armed
     conflict. (See e.g., The Fourth Geneva Convention Relative to the
28   Protection of Civilian Persons in the Time of War (1949), available
     at http://www.un.org/en/genocideprevention/documents/atrocity-
     crimes/Doc.33_GC-IV-EN.pdf).)

                                    3

counterparts at ORD, Midway TSA personnel lacked experience with diplomatic couriers and defendant was permitted to enter the secure area of Midway airport without submitting his pouch to full screening.  (Id.)  At approximately 10 p.m. that day -- hours after defendant had successfully circumvented Midway's security screening process -- TSA personnel at ORD sent Midway a "Be On the Lookout" ("BOLO") message warning of defendant's attempted to evade airport security screening procedures at ORD.  (See Gov't. Exh. D at 2-3.) Midway TSA management disseminated a "Training Bulletin" advising its personnel that, among other things, a diplomatic courier must possess a diplomatic passport.  (See Gov't. Exh. D at 5.)

Five days later, on the morning of July 25, 2017, defendant returned to Midway with another diplomatic courier letter, his laminated diplomatic identification card, his purported diplomatic courier pouch, and another ticket to fly from Midway to LAX.  (See Gov't. Exh. E, Midway Email and Statement at 3-4 (filed under seal) and Gov't. Exh. F, Flint Documentation and Images on July 25, 2017 at 1, 3-4 (obtained by LAX personnel and filed under seal.)  Midway TSA again improperly permitted defendant to evade screening of his alleged diplomatic pouch, incorrectly identifying defendant's laminated identification card as a "diplomatic passport card."  (See Gov't. Exh. E at 4.)  After discovering the error, Midway security officials contacted LAX to request a reverse screening of defendant's pouch when defendant landed.  (Id. at 3; see also CR 1, Complaint Aff. at ¶¶ 10-11.)

### 3.   Defendant's Interception at LAX Terminal 3

Law enforcement officers, including Special Agents with the Federal Bureau of Investigation ("FBI"), intercepted defendant when

4

he landed and deplaned at Terminal 3 of LAX.  (See Compl. Aff. at ¶¶ 10-11; see also Gov't. Exh. G at 1.)  Defendant carried the unscreened pouch with him into the secure area of Terminal 3, and consented to an interview with FBI.  (See Gov't. Exh. G at 1-2.)  Defendant informed the agents that, among other things, defendant was an attorney who had worked for Douglas Hampton at the Hampton Law Group since 2010; explained that he was a U.S. national who had been a diplomat for the IHRC representing the U.S. Ambassador for the IHRC, Robert Shumake for the last several months; asserted that defendant was entitled to diplomatic immunity under his "reading" of the "Geneva Convention"; and stated that he was unaware of the diplomatic passport requirement for courier pouches.  (See Gov't. Exh. G at 1-4.)  Defendant further asserted that he did not recall ever being denied entry after presenting his credentials to exempt his diplomatic pouch from screening, noting that his interception at LAX by law enforcement was "a complete shock -- how am I supposed to know?"  (Id. at 3-4.)  Defendant did, however, admit that the pouch he had carried with him into Terminal 3 of LAX had not been subject to full screening, id. at 4-5, and that he had himself laminated his purported diplomatic identification card to protect it from being damaged.  (See Compl. Aff. at ¶ 11(d).)

FBI also obtained a copy of the alleged July 24, 2017 diplomatic courier letter.  The July 24, 2017 letter was substantially similar to the July 20, 2017 letter copied by TSA personnel at ORD.  Both letters: (1) identified defendant as the "General Counsel and Diplomatic Courier" to the "Office the [IHRC]"; (2) identified a diplomatic pouch as containing "content of legal origin" to be "transported . . . to our main offices in San Francisco," despite

5

listing a non-existent Los Angeles address at the bottom of the letter; (3) identified the purpose of the funds as "philanthropic projects . . . in the United States and throughout the Africa and the Caribbean markets" of which a "portion shall be utilized as down payment on real estate transactions in northern California," despite defendant's ticket ending at LAX; (4) cited "Articles 27.3 through 27.6 of the Vienna Convention on Diplomatic Relations[2] (VCDR)," in asserting diplomatic protections over the pouch, despite that convention only applying to nation states, rather than either international or non-governmental organizations; and (5) was signed by "H.E. R.S. Shumake" with the title, "Ambassador at Large, United Nations Representative, International Human Rights Commission, Americas, African Union, and United Nations Designee," and is stamped with the "Seal of the World Chairman" of the IHRC. (See Gov't. Exh. F at 3-4 and Gov't. Exh A at 9-10; see also Gov't. Exh. G at 3, 5-6.)

After asserting attorney-client privilege over the pouch, defendant was permitted to make multiple phone calls to Douglas Hampton, as well as the alleged IHRC Ambassador Robert Shumake, and obtained Shumake's permission to open the pouch. (See Gov't. Exh. G at 4.) The pouch was unlocked to reveal approximately $148,145 in bulk cash loosely wrapped in "Mariano's" and "Walmart" plastic shopping bags. (See Gov't. Exh. F at 5-7.) After a Drug Enforcement

---

[2] The VCDR (1961) governs relationships between states and/or nations; a different convention, the Vienna Convention on the Representation of States in their Relations with International Organizations of a Universal Character (1975) ("VCIO") governs relations between states and international organizations, to include protections for official correspondence. (Compare VCDR, Preamble and Arts. 1 and 27 with VCIO, Preamble and Arts. 1 and 27.)

1   Administration ("DEA") drug canine positively alerted to the funds[3],

2   the cash was seized by DEA and defendant was cited and released.

3   (See Gov't. Exh. G at 6.)

4       **B.   Douglas Hampton's Similar Attempt to Transport and Evade**
        **Security Screening of Bulk Cash by Falsely Asserting**
5       **Diplomatic Protections in August 2016**

6       On August 22, 2016, approximately six years into defendant's

7   employment with Douglas Hampton, and less than a year before

8   defendant's attempts to evade security screening in Chicago, Hampton

9   also attempted to transport and evade security screening of bulk cash

10  by falsely asserting the pouch containing the cash was protected by

11  diplomatic immunities on behalf of the purported Ambassador Robert

12  Shumake and the IHRC.  (See Gov't. Exh. H, Seizure of $170,210 from

13  Douglas Hampton on August 22, 2016, at 1-2 (filed under seal).)  In

14  support of his claim, Hampton presented a "direction letter" to

15  security officers at the Hartfield-Jackson-Atlanta International

16  airport ("ATL") that bore a similar IHRC logo as defendant's July

17  2017 letters, and made similar assertions, but directed questions

18  related to the letter and Hampton's transport of bulk cash to the

19  organization or defendant himself.  (See Gov't. Exh. H at 10-11.)

20      Although Hampton did not have a diplomatic identification card,

21  real or otherwise, his letter: (1) identified Hampton as "Designated

22  Agent pursuant to [his] appointment as General Legal Counsel to the

23  Office of the [IHRC]"; (2) identified $147,000 of the cash Hampton

24  carried as being "of legal origin" that "is being transported [to

25

26          [3] The government does not intend to introduce evidence of the
        positive drug alerts at this time, but notes it in the factual
27      background to highlight the similarity between defendant's and
        Douglas Hampton's attempts to transport bulk cash on behalf of the
28      IHRC by asserting diplomatic protections and provide one of the bases
        for its seizure by investigating authorities.

                                        7

1  fund] philanthropic projects on behalf of the [IHRC] throughout

2  Africa and the Caribbean markets," despite Hampton's statement he was

3  supposed to provide it to an unknown individual in San Francisco;

4  (3) cited "Articles 23 through 30 of the Vienna Convention on

5  Representation of States in their relations with International

6  Organizations of a Universal Character" in asserting diplomatic

7  protections over the funds; and (4) was signed by "H.E. R.S. Shumake"

8  with similar titles as on defendant's letters.  (See Gov't. Exh. H at

9  10-11.)

10     Hampton's letter also identified defendant "Daniel C. Flint,

11  Esq." as the "General Counsel" for the IHRC and instructed that any

12  questions should be directed to the organization or to defendant.

13  (Id. at 10-11.)  After a smell of marijuana was noted by Atlanta's

14  airport security personnel, Hampton asserted that the smell was

15  coming from the pouch, rather than from Hampton, and -- similar to

16  defendant's pouch -- a certified narcotics detection canine

17  positively alerted to the bulk cash being transported by Hampton for

18  Shumake and the IHRC.  (Id. at 6-7.)  The currency referenced in the

19  letter and the additional cash carried by Hampton, totaling

20  approximately $170,000, was subsequently seized.[4]  (Id. at 9.)

21  **III. ARGUMENT**

22     The government seeks to admit the following evidence through

23  this motion; first, evidence related to defendant's interactions with

24  Chicago airport security officials on July 20, 2017 and July 25,

25  2017, which led directly to defendant's use of Midway to board a

26

27     [4] Hampton's statements were apparently recorded, see Gov't. Exh.
   H at 9, but the government is still attempting to obtain a copy for
28  disclosure to defense and use at trial.  If unavailable, the
   government would offer the testimony of the interviewing officer.

flight and ultimately carry an unscreened item into LAX Terminal 3 on July 25, 2017, as charged in the indictment.  Second, the government seeks to admit evidence related to Hampton's unsuccessful attempt to transport bulk currency on behalf of the IHRC, based on a letter from Robert Shumake asserting diplomatic privileges over the funds and directing questions to "General Counsel Daniel C. Flint."  (See Gov't. Exh. H at 11.)  This evidence is admissible because it is inextricably intertwined with the charged offense, and is also admissible pursuant to Rule 404(b) to show defendant's motive, knowledge, absence of mistake or accident, and intent in bringing an unscreened bag into LAX Terminal 3 on July 25, 2017, as charged.

### A.   Defendant's July 2017 Interactions with TSA at Chicago O'Hare and Midway Airports are Admissible

#### 1.   Defendant's July 2017 Attempts to Evade Screening are Inextricably Intertwined with the Offense

As a general matter, other acts evidence needs to fall under one of the permissible bases articulated in Rule 404(b) to be admissible. See Fed. R. Evid. 404(b).  However, as recently reiterated by the Ninth Circuit in United States v. Loftis, when "evidence concerning the 'other' act and the evidence concerning the crime charged are inextricably intertwined," the requirements of Rule 404(b) do not apply.  Loftis, 846 F.3d at 1177 (internal citations omitted).  The Court relied, among others, on the Ninth Circuit's prior precedent in United States v. Dorsey, 677 F.3d 944 (9th Cir. 2012), in which the Court identified "two general categories of other act evidence [that] may be inextricably intertwined and thus exempted from the requirements of Rule 404(b).  First, other act evidence may constitute a part of the transaction that serves as the basis for the criminal charge.  Second, admission of the other act evidence may be

necessary to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." Id. at 952 (internal quotations and citations omitted.)

The evidence related to defendant's July 25, 2017 interactions with Midway TSA personnel is admissible because constitutes a part of the charged transaction and is inextricably intertwined with the charged offense. Id. Defendant's travel on July 25, 2017 did not begin at LAX Terminal 3, where the offense occurred. Rather, defendant initiated his travel to LAX at Midway airport. One of the elements of the charged offense is that defendant knowingly and intentionally carried unscreened items -- the alleged diplomatic pouch -- into the secure area of Terminal 3 at LAX. (See CR 15, Indictment at 1.) Even setting aside the government's obligation to prove defendant's knowledge and intent, evidence of defendant's screening process at Midway on July 25, 2017 is needed to prove whether defendant's pouch was unscreened when he landed at LAX. Therefore, evidence of defendant's prior interaction with TSA at Midway on the date of the charged offense falls squarely within Dorsey's first category of inextricably intertwined evidence. Dorsey, 677 F.3d at 952.

Similarly, the evidence of defendant's unsuccessful attempt to evade TSA security screening at ORD on July 20, 2017, and his near-immediate travel to Midway to successfully evade security screening, is inextricably intertwined with defendant's evasion of security screening five days later. First, under the analysis employed by the Ninth Circuit in Loftis, defendant's acts on July 20, 2017 were part of the same overall scheme that enabled defendant to enter Terminal 3 of LAX with an unscreened, false diplomatic courier bag on July 25,

2017.  Loftis, 843 F.3d at 1177.  In that case, the Ninth Circuit held that "uncharged transactions that are part of an overall scheme are part of the same transaction as the charged transactions" and therefore fall under the inextricably intertwined exception to Rule 404(b).  Id.  In other words, separate, even uncharged acts may be part of the same transaction as the charged act if the charged and uncharged acts are part of the same overall scheme.  If so, such other acts would fall within the first category of inextricably intertwined acts identified by the Ninth Circuit in Dorsey.  Dorsey, 677 F.3d at 951.

On both days, and in all three Chicago airport interactions, defendant presented a false diplomatic courier letter from the IHRC asserting diplomatic protections over a pouch transporting bulk currency for, among other things, philanthropic projects and a cash deposit for real estate in northern California.  (See Gov't. Exh. A at 9-10, Gov't. Exh. D at 2, and Gov't. Exh. F at 3-4.)  On both days, and in all three Chicago airport interactions, defendant presented a false, laminated diplomatic identification card as part of his diplomatic credentials, and used the card to assert that he was a credentialed diplomat exempt from airport security screening requirements, despite possessing no diplomatic passport.  (See Gov't. Exh. A at 8, Gov't. Exh. D at 2, and Gov't. Exh. F at 1.)  Last but not least, on both days, and in all three Chicago airport interactions, defendant attempted to initiate a flight itinerary beginning in the Chicago area and ending in LAX, despite the letters' assertions that the cash was, in part, intended to purchase real estate in northern California.  (See Gov't. Exh. A at 2, Gov't. Exh. D at 2, and Gov't. Exh. E at 3.)  These acts in furtherance of

11

1  defendant's scheme to fraudulently use diplomatic immunity to

2  transport and evade TSA screening and detection of large amounts of

3  bulk cash were all closely related in time, geography, and

4  methodology and directly led to the charged offense at LAX Terminal 3

5  on July 25, 2017.  Even the alleged diplomatic courier letters are

6  nearly identical, providing the same explanations, the same non-

7  existent Los Angeles address, the same reference to diplomatic

8  protections, with the exception of the date gracing the top of the

9  page.  (See see Gov't. Exh. G at 5-6; see also Gov't. Exh. A at 9-10,

10  Gov't. Exh. D at 2, and Gov't. Exh. F at 3-4.)

11      The July 20, 2017 attempt also falls under Dorsey's second

12  category of inextricably intertwined evidence, which provides for

13  admission of evidence that "may be necessary to permit the prosecutor

14  to offer a coherent and comprehensible story regarding the commission

15  of the crime."  Dorsey, 677 F.3d at 951.  Defendant's July 20, 2017

16  unsuccessful attempt to evade screening at ORD directly led to

17  defendant's cancellation of his ORD-LAX ticket and his successful

18  attempt to pass through security screening at Midway less than two

19  hours later.  (See Gov't. Exh. D at 1.)  Defendant's successful

20  evasion of full screening of his purported diplomatic pouch on July

21  20, 2017, after being denied at ORD, also provides a direct

22  explanation for why defendant returned to Midway only five days later

23  with nearly identical credentials and documentation and landed at LAX

24  Terminal 3, as charged in the indictment.  (See Gov't. Exh. A at 8-

25  10, Gov't. Exh. D at 2, and Gov't. Exh. F at 1-4; see also CR 15,

26  Indictment at 1-2.)  The two are directly connected, and evidence of

27  defendant's July 20, 2017 attempts to evade security screening

28  procedures at ORD and Midway are also admissible under the second

1  category of inextricably intertwined acts identified by the Ninth

2  Circuit in Dorsey.

3            2.  Defendant's July 2017 Attempts to Evade Screening are
               Admissible Under Rule 404(b) to Prove Defendant's
4              Motive, Knowledge, Absence of Mistake, and Intent

5       To convict defendant of entering an airport area in violation of

6  security requirements, as charged in the indictment, the government

7  must prove beyond a reasonable doubt that: (1) defendant knowingly

8  and willfully entered an aircraft or airport area that serves an air

9  carrier, in knowing and willful violation of security requirements

10  prescribed by statute; and (2) defendant intended to evade security

11  procedures and restrictions.  See 49 U.S.C. §§ 46314(a), (b)(2).  In

12  the instant case, the government must prove that defendant knowingly

13  and intentionally "entered a secured and sterile area of Terminal 3"

14  at LAX carrying unscreened items -- the alleged diplomatic pouch

15  containing bulk cash -- by intentionally evading security screening

16  for that pouch.  (See CR 15, Indictment at 1-2.)

17       Although a Rule 404(b) analysis is not necessary for the reasons

18  described above, defendant's July 20, 2017 and July 25, 2017

19  interactions with TSA at ORD and Midway would nonetheless be

20  admissible under Rule 404(b) to prove defendant's motive, knowledge,

21  absence of mistake or accident, and intent.  See Fed. R. of Evid.

22  404(b)(2).  The government must be able to show defendant knew that

23  his fraudulent assertion of diplomatic protections to exempt his

24  pouch from screening was an evasion of airport security screening

25  procedures, and that because he intentionally sought to evade

26  required screening of his pouch, defendant knowingly and

27  intentionally carried an unscreened item into a secure and sterile

28  area at his destination airport, LAX, in violation of airport

13

security requirements.  (See CR 15, Indictment.)  TSA's refusal to permit defendant to exempt his purported pouch from screening at ORD on July 20, 2017 because he lacked proper identification documents -- specifically, a diplomatic passport -- is therefore highly probative of defendant's knowledge and intent.  By virtue of his rejection at ORD on July 20, 2017 and his immediate decision to try flying out of Midway, defendant knew that his documents were insufficient but nonetheless knowingly and intentionally took steps to evade the procedures implemented at ORD by seeing if he could evade security at Midway.  When defendant presented the same or nearly identical documents to Midway on July 20, 2017 and July 25, 2017 that ORD had deemed insufficient, defendant did so in knowing and intentional violation of the law.

Furthermore, defendant's denial at ORD provides defendant's motive for his near-immediate and successful attempt to travel out of Midway that same day, and his later return to Midway on July 25, 2017 for the charged offense.  Defendant's denial of entry at ORD on July 20, 2017 also provides evidence of defendant's mental state when he falsely informed FBI agents -- only five days later -- that "he did not recall ever being turned away after presenting his diplomatic documentation and pouch for screening exemption at an airport screening checkpoint." (See Gov't. Exh. G at 3.)

**B.   Hampton's Unsuccessful Attempt to Evade Security Screening for Bulk Cash by Falsely Asserting IHRC Diplomatic Immunities is Admissible**

1.   Hampton's Attempt is Admissible Under Rule 404(b) or the Ninth Circuit's Definition of Inextricably Intertwined Acts in *Loftis*

The letter presented by Hampton to airport security officials in the Atlanta airport on August 22, 2016, and his statements in

14

1  furtherance of the scheme to transport bulk cash, are admissible

2  because they are inextricably intertwined with defendant's acts in

3  furtherance of the same scheme.  See Loftis, 846 F.3d at 1177.

4  Furthermore, if considered under Rule 404(b), Hampton's unsuccessful

5  attempt to evade TSA security screening using a "direction letter"

6  identifying defendant as the "General Counsel" to whom questions

7  about the bulk cash transport should be directed is admissible to

8  prove defendant's knowledge, absence of mistake or accident, and

9  intent with respect to the charged offense.  See Fed. R. Evid.

10  404(b)(2) and Gov't. Exh. H at 10-11.

11      Hampton's unsuccessful attempt to evade security screening of a

12  pouch containing $147,000 in bulk cash took place in August 2016, six

13  years into his employment relationship with defendant and a mere

14  eleven months before defendant's July 2017 attempts in Chicago.  (See

15  Gov't. Exh. G at 2 and Gov't. Exh. H at 1-2.)  Hampton's and

16  defendant's attempts share striking similarities: the transport of

17  approximately $147,000 and $148,000 in bulk cash, respectively, in a

18  locked pouch; the references to diplomatic immunities in a Vienna

19  Convention as a basis for screening exemption; the asserted

20  philanthropic purpose of the funds as well as for the purchase of

21  real property; the defensive assertion that cash was commonly used

22  for real property investments and that the funds were "of legal

23  origin"; and, last but not least, issuance of the letters by alleged

24  Ambassador and "UN Designee" Robert Shumake and their explicit

25  reliance on defendant as the "General Counsel" of the IHRC.  (See

26  Gov't. Exh. H at 10-11; Gov't. Exh. F at 3-4; Gov't. Exh. A at 9-10.)

27  Hampton and defendant's experience even share a positive alert by a

28  narcotics detection canine, which led to the seizure of the bulk cash

15

1   Hampton and defendant were attempting to transport on August 22, 106

2   and July 25, 2017, respectively.  (See Gov't. Exh. H at 10 and Gov't.

3   Exh. G at 6; see also supra at fn. 3.)  Given these similarities in

4   purpose, method, quantity of cash, and even the identities of the

5   individuals involved -- Hampton, defendant as IHRC General Counsel,

6   and Shumake as the alleged IHRC Ambassador -- as well as the

7   closeness in time between the events and the funds' common geographic

8   destinations in California for real estate, Hampton and defendant's

9   acts were done in furtherance of their common scheme to fraudulently

10  assert diplomatic immunity to smuggle bulk cash without screening.

11  (See Gov't. Exh. H at 10-11, Gov't. Exh. F at 3-4, and Gov't. Exh. A

12  at 9-10.)  Hampton's acts are, therefore, inextricably intertwined

13  with defendant's charged offense and are therefore admissible based

14  on Ninth Circuit precedent.

15       Furthermore, if this Court were to determine that Hampton's

16  August 22, 2016 attempt to transport bulk cash is not admissible

17  based on being inextricably intertwined with the charged offense,

18  Hampton's prior attempt is still admissible pursuant to Rule 404(b)

19  to prove defendant's knowledge, absence of mistake or accident, and

20  intent.  The seizure of a total of approximately $170,000 in cash

21  (including Hampton's own fee), see Gov't. Exh. H at 6, based on

22  Hampton's failed assertion of a diplomatic exemption is highly

23  relevant to defendant's knowledge and intent when he attempted to

24  similarly assert diplomatic immunities over the pouches he

25  transported eleven months later.  This evidence is particularly

26  probative given the similarities between Hampton's letter and the

27  letters defendant used in July 2017, and the letter's explicit

28  reliance on "General Counsel Daniel C. Flint" in answering questions

1    related to Hampton's questionable transport of bulk cash.  (<u>Id.</u> at

2    11.)  In sum, Hampton's failed August 2016 attempt is admissible

3    under Rule 404(b) because it helps prove that defendant's later

4    attempts to evade security screening and carry unscreened items into

5    secure areas of the airport -- as charged in the indictment -- were

6    knowingly and intentionally done in violation of the law.

7              2.    <u>Testimony Regarding Hampton's Prior Statements and</u>
                     <u>Attempt is Not Hearsay</u>

8

9         As discussed herein, the evidence related to Hampton's

10   unsuccessful attempt to evade TSA security screening procedures is

11   comprised of his letter, and his statements in furtherance of the

12   scheme to evade screening of bulk cash allegedly transported on

13   behalf of the IHRC on or about August 22, 2016.  (<u>See</u> Gov't. Exh. H.)

14   The government would seek to present Hampton's statements through the

15   testimony of the interviewing officer at trial or through an audio-

16   recording of Hampton's interview, if available.  (<u>See</u> <u>supra</u> fn. 4.)

17   Since the government is not offering Hampton's statements for the

18   truth of the matter asserted (<u>e.g.</u>, that Hampton was, in fact,

19   entitled to diplomatic immunities under a Vienna Convention), but

20   rather its effect on subsequent events, those statements and the

21   letter are not hearsay.  <u>See</u> Fed. R. Evid. 801(c)(2).

22        The interviewing officer's testimony of Hampton's statements is

23   additionally not hearsay because Hampton's statements are a co-

24   conspirator's statement in furtherance of an uncharged conspiracy --

25   specifically, a conspiracy with the alleged Ambassador Robert Shumake

26   and defendant to transport unscreened bulk cash by falsely asserting

27   diplomatic immunities and evading normal TSA screening.  <u>See</u> Fed. R.

28   Evid. 801(d)(2)(E).  In <u>United States v. Lloyd</u>, 807 F.3d 1128 (9th

Cir. 2015), the Ninth Circuit held that that statements may be admitted under Rule 801(d)(2)(E) even if a conspiracy count was not charged, and that "the question is merely whether there was proof of sufficient concert of action to show the individuals to have engaged in a joint venture." Lloyd, 807 F.3d at 1160-1161 (internal citations omitted).   Given defendant's employment with Hampton beginning six years prior to Hampton's denial of entry at Atlanta (see Gov't. Exh. G at 4); defendant's identification in Hampton's letter as responsive to questions regarding the attempted transport of bulk cash and its subsequent seizure (see Gov't. Exh. H at 11); defendant's then-identification and continued identification as the "General Counsel" of the IHRC on the letters asserting diplomatic immunities and protections over the transported bulk cash (see Gov't. Exh. H at 11, Gov't. Exh. F at 4, and Gov't. Exh. A at 9); and defendant's later repeated phone calls to Hampton and Shumake regarding the pouch after he was intercepted at LAX on July 25, 2017 (see Gov't. Exh. G at 9), there is more than sufficient "concert of action" to show engagement in a joint venture. Lloyd, 807 F.3d at 1161.

## IV. CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court find evidence of defendant and Hampton's attempts to evade TSA security screening of bulk cash by falsely asserting diplomatic immunities and protections admissible based on Ninth Circuit precedent regarding inextricably intertwined acts and, if the Court determined they were not inextricably intertwined, based on their proof of defendant's motive, knowledge, absence of mistake or accident, and intent under Rule 404(b).