1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE S. JAMES OTERO, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,          )
                                       )
6                   Plaintiff,         )
                                       )              Case No.
7        vs.                           )       CR 17-00697 SJO
                                       )
8   DANIEL FLINT,                      )       (Pages 1 - 62)
                                       )
9                   Defendant.         )
    _____ )

10

11

12

                        PARTIAL TRANSCRIPT
13
              REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
14                          TRIAL DAY 1
                    TUESDAY, OCTOBER 16, 2018
15                   LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22   _____

23          CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
                 FEDERAL OFFICIAL COURT REPORTER
24               350 WEST 1ST STREET, SUITE 4311
                LOS ANGELES, CALIFORNIA 90012-4565
25                      (213) 894-3539


                    UNITED STATES DISTRICT COURT

1          **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4         NICOLA T. HANNA
          United States Attorney
5         BY:  CHRISTINE M. RO
          BY:  IAN YANNIELLO
6         BY:  MARK AVEIS
               Assistant United States Attorneys
7         United States Courthouse
          312 North Spring Street
8         Los Angeles, California 90012

9    **FOR THE DEFENDANT:**

10        HILARY LEE POTASHNER
          Federal Public Defender
11        BY:  CRAIG A. HARBAUGH
          BY:  GEORGINA WAKEFIELD
12             Deputy Federal Public Defenders
          Central District of California
13        321 East Second Street
          Los Angeles, California 90012

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          **I N D E X**

2          -----------------------------------------------------------

3                     CHRONOLOGICAL INDEX OF WITNESSES

4

5   **EXAMINATIONS**                                                **PAGE**

6    **GOVERNMENT WITNESSES**

7   CHRISTOPHER KOTULA
            DIRECT EXAMINATION BY MS. RO                      5
8           CROSS-EXAMINATION BY MR. HARBAUGH                 20
            REDIRECT EXAMINATION BY MS. RO                    40
9
    CLAY YOKSAS
10          DIRECT EXAMINATION BY MS. RO                      41
            CROSS-EXAMINATION BY MR. HARBAUGH                 50
11          REDIRECT EXAMINATION BY MS. RO                    60

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

## INDEX OF EXHIBITS

2

| NUMBER | FOR IDENTIFICATION | IN EVIDENCE |
|--------|--------------------|-------------|
| 1 | | 12 |
| 2 | | 46 |
| 11 | 13 | 13 |
| 12 through 16 | 17 | 17 |
| 20 | | 44 |
| 21 through 23 | | 48 |
| 218 | | 30 |
| 265 | 52 | |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, OCTOBER 16, 2018

 2                              --oOo--

 3              (Other matters reported, not transcribed herein.)

 4              MS. RO:  Thank you, Your Honor.  The United States

 5  calls Christopher Kotula to the stand.

 6              THE COURTROOM DEPUTY:  Sir, would you please come

 7  forward.

 8              THE WITNESS:  Yeah.

 9              THE COURTROOM DEPUTY:  Thank you.

10       Good afternoon.

11              THE WITNESS:  Good afternoon.

12              THE COURTROOM DEPUTY:  Sir, would you please stop

13  right there, and raise your right hand to be sworn.

14          CHRISTOPHER KOTULA, GOVERNMENT WITNESS, WAS SWORN

15              THE WITNESS:  Yes.

16              THE COURTROOM DEPUTY:  Thank you, sir.  Would you

17  please walk around and have a seat.

18         Sir, for the record, would you please state your name, and

19  then spell your last name.

20              THE WITNESS:  Christopher Kotula, K-o-t-u-l-a.

21              THE COURTROOM DEPUTY:  Thank you.

22              THE COURT:  Your witness.

23              MS. RO:  Thank you, Your Honor.

24                       DIRECT EXAMINATION

25  BY MS. RO:
```

```
 1   Q     Good afternoon, Mr. Kotula.
 2   A     Good afternoon.
 3   Q     What is your occupation?
 4   A     I'm a supervisory transportation security officer.
 5   Q     And where do you work?
 6   A     O'Hare International Airport.
 7   Q     And did you say you worked for the Transportation Security
 8   Administration?
 9   A     Yes, Transportation Security Administration.
10   Q     And is that TSA for short?
11   A     Yes.
12   Q     And how long have you worked at TSA?
13   A     For approximately 13-1/2 years.
14   Q     And how long have you been a supervisor?
15   A     About three and a half.
16   Q     And what does a supervisor do?
17   A     Supervisor -- so in the airport there are multiple
18   checkpoints, so supervisor would oversee the operations at a
19   single-layer checkpoint.
20   Q     Have you held any other positions within TSA?
21   A     Yeah.  I started off as the transportation security
22   officer, which are the individuals who search property on x-ray
23   or do pat-downs, pat people down.  Then I was promoted to a
24   lead transportation security officer, and now I'm a supervisor.
25   Q     And what does a lead do?
```

1    A    Lead basically -- so if a supervisor oversees the whole

2    checkpoint, a lead officer would oversee two lanes.  So when

3    you go through and put your items through on the x-ray machine,

4    that's considered one lane.  So a TSO would oversee operations

5    on two lanes, ensuring officers are rotating every 30 minutes

6    so they are not fatigued, ensuring they are breaking for lunch

7    on time.

8    Q    What does LTSO stand for?

9    A    Lead transportation security officer.

10   Q    Have you worked at other airports?

11   A    I've worked maybe for one day at Midway just assisting

12   when they were short-staffed, but no other airports.

13   Q    And have you worked at various checkpoints at O'Hare?

14   A    I have worked pretty much every single checkpoint.

15   Q    And how many checkpoints are at O'Hare?

16   A    10, I believe.

17   Q    And what does each checkpoint look like?

18   A    They range in size.  So there are four terminals at

19   O'Hare, 1, 2, 3 and 5.  They range from anywhere from nine

20   lanes to two lanes depending on the terminal.  They are spread

21   out pretty randomly.

22   Q    And have you received any specialized trainings as it

23   pertains to your duties as -- from a TSO, or transportation

24   security officer, all the way to being a lead and to a

25   supervisor?

```
 1   A      So when you first start out, you do a two-week training
 2   course, and there's about 80 hours of on-the-job training as an
 3   officer, where you're mentored on the job to pat people down,
 4   check property, run the x-ray.  As a lead there's about a
 5   two-week course ensuring that officers are rotating on time,
 6   breaks, lunches, how to -- they are called rotations, on how
 7   you make sure all the people rotate at the right time.  And
 8   there's also a two-week course for supervisors on discipline,
 9   attendance issues, and checkpoint management.
10   Q      Included in that training -- or based on your experience,
11   have you -- or are you familiar with the term "diplomatic
12   pouch"?
13   A      Yes.
14   Q      And how are you familiar with that term?
15   A      I've had previous experiences with diplomatic pouches.
16   Q      And what are diplomatic pouches?
17   A      Usually a diplomatic pouch is a bag or satchel that has
18   diplomatic mail from a consulate, either from the United States
19   or from a foreign country, either going back to that foreign
20   country or coming into the United States that cannot be
21   screened.
22   Q      And you said "that cannot be screened."  Can you unpack
23   that statement?
24   A      So, basically, if they are traveling with a diplomatic
25   courier, because of the sensitive nature of those contents, we,
```

| | |
|---|---|
| 1 | as TSA, are instructed not to look inside, not to run through |
| 2 | x-ray those bags. |
| 3 | Q    And does that require any additional requirements? |
| 4 | A    Yes.  It requires documentation in the form of a letter |
| 5 | identifying the number of the bag -- the bag should be |
| 6 | tagged -- the specific number, the diplomatic courier's |
| 7 | passport number, the diplomatic courier's name, and I believe |
| 8 | there's some other information I'm not too familiar with. |
| 9 | Q    And did you say they require an identification document? |
| 10 | A    A diplomatic passport. |
| 11 | Q    And based on your experience, have you dealt with -- |
| 12 | firsthand dealt with diplomatic pouches? |
| 13 | A    Yes, on two occasions. |
| 14 | Q    And can you explain the two occasions? |
| 15 | A    On the first occasion, this is maybe two years ago, we had |
| 16 | a diplomatic courier flying from Iran, connecting through |
| 17 | Chicago and then ending up in, I believe, Michigan or |
| 18 | Minnesota.  He had the diplomatic passport, and he had the bag. |
| 19 | The only issue we had with that gentleman was his letter was in |
| 20 | Iranian so we couldn't translate that information. |
| 21 |     So I contacted my manager.  He got in contact with the |
| 22 | state department.  They said we needed an English version of |
| 23 | the letter so we could verify the information.  I believe he |
| 24 | got in touch with his consulate.  And he was waiting in the |
| 25 | airport for like six hours trying to get a translated letter to |

1  us.  And when he finally got it, I got him on his way.

2  Q    And you said you observed a diplomatic passport for this

3  individual?

4  A    Yes, yes.  He had the passport in the bag; he just didn't

5  have the English version of the courier letter that you need.

6  Q    And what was your second occasion with a diplomatic pouch?

7  A    The second one, same thing, the bag -- everything about

8  the bag was correct.  He had the diplomatic passport.  I

9  believe the letter was missing either the bag number, or he was

10  missing the passport number of the individual.  I'm not a

11  hundred percent sure.

12  Q    And what role did you have when you had this experience

13  with diplomatic pouches as a TSO, the security officer?

14  A    I was a supervisor.

15  Q    You were the supervisor?

16  A    Uh-huh.

17  Q    And who makes that call, do you know, of letting someone

18  through with a diplomatic pouch?

19  A    It's ultimately the supervisor's call.  We do have the

20  option to get the managers involved because they either were

21  previously supervisors so they have more experience.  So when

22  I'm not sure, I usually get my managers involved.

23  Q    Were you working as a TSA supervisor on July 20th, 2017?

24  A    Yes.

25  Q    And were you working at the Chicago O'Hare International

1    Airport?

2    A      Yes.

3    Q      And on that date, do you recall where you were working?

4    A      Terminal 2, Checkpoint 5.

5    Q      And on that date did you make contact with an individual

6    named Daniel Flint?

7    A      Yes.

8    Q      Please take a look around the courtroom today.  Please

9    identify an item of -- do you see him in court today?

10   A      Yes.  It's the gentleman over there with the gray tie and

11   gray jacket.

12           MS. RO:  Your Honor, may the witness [sic] reflect

13   that the witness has identified the defendant?

14           THE COURT:  The record will reflect that the witness

15   has identified Mr. Flint.

16   BY MS. RO:

17   Q      What happened when you made contact with the defendant,

18   Mr. Flint?

19   A      So my lead officer, who was running, I believe, Lane 5

20   when the gentleman came through, came up to me and said, "We

21   have a diplomatic pouch."  So he handed me the letter and the

22   ID.  He was holding on to the pouch.  And I started reviewing

23   the ID and the letter.  And I read through the letter first,

24   looked at the ID.

25           Something didn't feel right about it just being an ID or

1   the ID itself.  So then I called one of my managers, Guy

2   Sheridan, let him know that I have an ID that doesn't look

3   right and that I was going to call my other manager, Bill Cane,

4   who had more experience with the state department and

5   diplomatic IDs, and kind of went over, read the whole letter to

6   him, described what the ID looked like.  And he told me

7   basically to double-check the SOP and make sure that if IDs

8   were okay.  So I had my partner, STSO, open up our Standard

9   Operating Procedures.

10  Q    And sorry to interrupt you.

11  A    Uh-huh.

12  Q    Before we get into that, you stated you viewed the ID

13  yourself?

14  A    Yes.

15         MS. RO:  Your Honor, may Agent Simon approach the

16  clerk or the witness with a physical ID which was previously

17  identified as Government's Exhibit 1?

18         THE COURT:  Yes.

19      Is there any objection to the receipt of 1?

20         MR. HARBAUGH:  No, Your Honor.

21         THE COURT:  Then it's received, and you can publish.

22      (Exhibit 1 received into evidence.)

23         MS. RO:  Thank you, Your Honor.

24  Q    Is that the identification card you viewed on July 20th,

25  2017?

```
 1   A     Yes.

 2   Q     Is it the actual card?

 3   A     It looks exactly like the card I saw that date.

 4   Q     And on the screen, is that a photograph of a card that's

 5   in your hands?

 6   A     Yes.

 7              MS. RO:  And the United States moves to introduce

 8   Government 1 into evidence.

 9              THE COURT:  It's already received.

10              MS. RO:  Thank you, Your Honor.

11   Q     And you stated you saw a letter.

12   A     Yes.

13   Q     Showing you what's been previously marked -- if you could

14   turn to your binder -- as Government's Exhibit 11.

15         (Exhibit 11 for identification.)

16   BY MS. RO:

17   Q     And it's in the black binder that's standing upright.

18              THE COURT:  Any objection to 11?

19              MR. HARBAUGH:  No, Your Honor.

20              THE COURT:  11 is received.  You may publish.

21         (Exhibit 11 received into evidence.)

22   BY MS. RO:

23   Q     And what is this letter?

24   A     This is the letter that my LTSO handed me that I made a

25   scanned copy of at that time at the checkpoint.
```

```
 1   Q     And so you mentioned the SOP, standard operating
 2   procedure?
 3   A     Yes.
 4   Q     What is that?
 5   A     Basically they are rules and regulations to help us make
 6   sure we are doing our job correctly, almost like an instruction
 7   manual, per se.  So basically tells us how to do A, B, C, D and
 8   make sure we are doing it in that order.
 9   Q     When you saw the ID that's in front of you --
10   A     Uh-huh.
11   Q     -- what did you think?
12   A     I thought it was, perhaps, like an internal ID, like an ID
13   that we wear at work around our -- you know, like this one.
14   This one was an O'Hare ID, so I thought it was maybe something
15   internal for their building or something.  That's why I was
16   like the ID is not enough, that I know he needed a passport.
17   That's why I was bouncing that thought, and that's why I called
18   my manager so see if this ID was just enough or good enough.
19   Q     So what happened after you thought this ID was not good
20   enough?
21   A     So then I contacted my managers, they told me to look in
22   the Standard Operating Procedures, then that's when I pulled up
23   the section about diplomatic courier identification and
24   letters.  And the sentence -- the first sentence -- or within
25   the first paragraph it says that you need a diplomatic
```

1    passport.

2    Q    And what happened after you read that?

3    A    So I called my manager, Bill Cane, again.  I read him the

4    whole SOP, and he agreed with me at that time to deny the

5    defendant entry into the checkpoint because he did not have a

6    passport.

7    Q    And after your conversation with Mr. Cane, did you

8    speak -- relay that information to the defendant?

9    A    Yes.  I turned around and I told the defendant that unless

10   he had a passport with him, he would not be allowed to go

11   through with that pouch.

12   Q    And how did he receive that information?

13   A    He seemed upset, visibly upset and frustrated.  He was

14   telling us -- or telling me -- and, well, my supervisor was

15   standing next to me -- that I didn't know what I was doing, I

16   didn't know the law.  He was saying that he flew multiple times

17   with this ID and never been stopped.

18        He asked me if this is a new law with TSA in Chicago.  And

19   we're like, "No, everybody has the same SOP.  It's written the

20   same way.  It's distributed nationally."  He was explaining to

21   me that he had a copy of the Vienna Convention or something

22   with him, and he could show me where I was wrong.  And I was

23   like, "Sir, I have to follow this SOP.  This is what I follow.

24   I don't follow anything else.  If you want, I can call my

25   manager.  You can talk to him," at which point he said "yes."

1    So I contacted TSM Guy Sheridan to come down and explain

2    basically the same thing to the defendant.

3    Q     And can you mention his demeanor again?  What word would

4    you use to describe his demeanor?

5    A     Frustrated.

6              MR. HARBAUGH:  Objection, Your Honor.  The question

7    asked -- repeat again.

8              THE COURT:  I'm sorry, what's the grounds for the

9    objection?

10             MR. HARBAUGH:  Asked and answered.

11             THE COURT:  Overruled.

12   BY MS. RO:

13   Q     What was his demeanor when you told him?

14   A     He was frustrated and upset.

15   Q     Did he -- based on his frustration or when he was upset,

16   did he claim to have any other type of status or job to you?

17   A     He said he was a lawyer.

18   Q     And do people normally mention they are a lawyer when they

19   speak to you?

20             MR. HARBAUGH:  Objection; calls for speculation.

21             THE COURT:  It's sustained on relevance.

22   BY MS. RO:

23   Q     And what happened after Guy Sheridan approached?

24   A     Guy looked at the IDs, looked at the letter, and he

25   basically reiterated what I told the defendant, that he needed

1   a passport; this ID wasn't good enough.  I believe he also gave

2   him the option that if he was given permission to allow the

3   item to be screened, at that point he would be fine to go, it

4   just wouldn't be able to go as unscreened.

5   Q    Turning your attention -- if you could turn your attention

6   to the manila folders in front of you.  It's not in the binder,

7   but right in front.

8   A    Uh-huh.

9   Q    For Government's -- what's been previously marked as

10  Exhibits 12 through 16.

11       (Exhibits 12 through 16 for identification.)

12            MR. HARBAUGH:  No objection, Your Honor.

13            THE COURT:  Are you offering 12 through 16?

14            MS. RO:  Yes, Your Honor.  The United States moves

15  12 through 16 into evidence.

16            THE COURT:  All received, 12 through 16.  Thank you.

17       (Exhibits 12 through 16 received into evidence.)

18  BY MS. RO:

19  Q    If you could turn your attention to the screen.

20  A    Uh-huh.

21  Q    Playing Government's Exhibit 12.

22       (Video recording played in open court.)

23  BY MS. RO:

24  Q    First, what is Government's 12 through 16?

25  A    That is a video shot of the Checkpoint 5 at O'Hare

```
 1   International Airport.
 2   Q    And who is shown in the circle that just walked through?
 3   A    The defendant.
 4        MS. RO:  Now, turning to Government's Exhibit 13.
 5        (Video recording played in open court.)
 6   BY MS. RO:
 7   Q    I'm pausing it -- or not pausing it.  What's depicted
 8   here.
 9   A    So in the lower right-hand corner, you can see me standing
10   there on the phone.  I believe I was speaking with Bill -- the
11   manager Bill Cane at that time.  The female in the white shirt,
12   she's actually handing an on-the-job training binder back to my
13   partner, the female STSO, and I believe another officer handed
14   back a laptop or tablet to the defendant.
15   Q    And can you -- you can touch the screen?
16   A    Uh-huh.
17   Q    Use it as a marker.  Where are you?
18   A    I'm standing right here.
19        MS. RO:  Playing Government's Exhibit 14.
20        (Video recording played in open court.)
21   BY MS. RO:
22   Q    And pausing at this point, where is the defendant?  And
23   where are you?
24   A    Defendant is right where my finger is, and then I'm
25   standing right here.
```

1       (Video recording played in open court.)

2   BY MS. RO:

3   Q    Pausing it again.  And what's going on in that image?

4   A    Basically explaining to him, to the defendant, that after

5   reading the SOP and speaking to my managers, they have decided

6   to deny him entry unless he had the passport.  And this is

7   where he got frustrated, and it was explained that he was a

8   lawyer and that I didn't know what I was doing.

9           MS. RO:  Playing Government's Exhibit 15.

10      (Video recording played in open court.)

11  BY MS. RO:

12  Q    And who just walked in in that image?

13  A    So right where my finger is right now, that is TSM --

14  Transportation Security Manager Guy Sheridan.

15          MS. RO:  And playing Government's Exhibit 16.

16      (Video recording played in open court.)

17  BY MS. RO:

18  Q    Can you describe to the jury what was shown in

19  Government's Exhibit 16.

20  A    So after my manager, Guy Sheridan, reiterated and

21  basically gave him his options, the defendant agreed to try to

22  contact his ambassador or his point of contact at the

23  organization to try to see if he had access to a diplomatic

24  passport.  And the manager said, you know, "You can wait

25  outside and try to arrange whatever you need to, and then if

```
1    you have any issues, come see me and I can help you back
2    through security."  And then I walked him -- as you can see us
3    walking off screen, I was walking him outside of security.
4              MS. RO:  Your Honor, may I have one moment?
5              THE COURT:  Yes.
6         (Discussion off the record.)
7              MS. RO:  Nothing further, Your Honor.
8              THE COURT:  Cross?
9              MR. HARBAUGH:  Yes, Your Honor.
10             THE COURT:  Your witness, Mr. Harbaugh.
11             MR. HARBAUGH:  Thank you, Your Honor.
12                        CROSS-EXAMINATION
13   BY MR. HARBAUGH:
14   Q    Mr. Kotula, Mr. Flint entered through the precheck line at
15   O'Hare Airport on July 20th, correct?
16   A    Correct.
17   Q    Now, a person can't just enter through the precheck line
18   because they want to, right?
19   A    No.
20   Q    They need to have been previously approved by TSA for
21   precheck, correct?
22   A    Correct.
23   Q    Now, prior to going through the precheck lane, the TSA
24   screener has to verify that passenger's TSA traveler number,
25   correct?
```

1    A    Incorrect.  The traveler number is entered when booking

2    the ticket, and then when the ticket is printed, it will denote

3    TSA precheck somewhere on the boarding pass.

4    Q    Okay.  So they verify that the boarding pass has the TSA

5    precheck?

6    A    It usually has the logo on it or say "TSA precheck."

7    Q    So they don't have it on the boarding pass, they can't go

8    through the TSA precheck lane, right?

9    A    Correct.

10   Q    So on July 20th the TSA screener verified Mr. Flint's

11   precheck status before allowing him to proceed?

12   A    Yes.

13   Q    Now, to obtain precheck approval, passengers have to meet

14   several requirements first, correct?

15   A    I understand there's some sort of background check, but

16   that's to the extent of my knowledge.

17            MS. RO:  Objection, Your Honor, or move to strike

18   for speculation.

19            THE COURT:  Overruled.

20   BY MR. HARBAUGH:

21   Q    So, Mr. Kotula, you're not familiar with the steps a

22   person needs to take to get TSA approval for precheck?

23            THE COURT:  Mr. Harbaugh, would you go back to the

24   lectern?

25            MR. HARBAUGH:  Yes, Your Honor.

```
 1              THE WITNESS:  No.  I know that they are usually
 2    conducted by a third-party contractor, but I don't know the
 3    exact steps that you need to take in order to get the approval.
 4    BY MR. HARBAUGH:
 5    Q    You know they have to do an in-person appointment,
 6    correct --
 7    A    Yes.
 8    Q    -- at an enrollment center?
 9         At that enrollment center they have to submit to a
10    background check, right?
11    A    Yes, I know that.
12    Q    They also have to provide their fingerprints?
13    A    I wasn't aware of that.
14    Q    And you're aware that the fingerprints are kept by the
15    FBI, correct?
16    A    I was not aware of that.
17    Q    So you're not familiar -- to clarify, you are not familiar
18    with the TSA precheck process, correct?
19    A    I am familiar with the process when they get to our
20    checkpoint and they need to be screened.
21    Q    Now I want to talk about the TSA screening requirements
22    that you were applying that day at O'Hare Airport.
23    A    Okay.
24    Q    Now, TSA uses a lot of different screening requirements,
25    correct?
```

```
1    A      I believe so.
2    Q      Now, some of those screening requirements are available to
3    the public, right?
4    A      Yes.
5    Q      And some of those screening requirements are not available
6    to the public, correct?
7    A      Yes.
8    Q      Now, those requirements that are not available to the
9    public contain sensitive security information, correct?
10   A      Yes.
11   Q      Or SSI is the acronym TSA uses?
12   A      Correct.
13   Q      So to clarify, two types of screening requirements, right?
14   One type that is disclosed to the public, right?  And the other
15   type that's kept secret?
16   A      Yes.
17   Q      Now I want to start with the public ones that travelers
18   can be informed about.  Now, there are public requirements that
19   deal with the proper identification a person needs to enter TSA
20   screening, right?
21   A      Yes.
22   Q      There are other public requirements that deal with what
23   items a person can or cannot bring onto an airplane, correct?
24   A      Yes.
25   Q      There are also requirements that deal with what a person
```

1    needs to do when they submit themselves to TSA screening,

2    correct?

3    A    Yes.

4    Q    Now I want to focus on that last one, those public

5    screening requirements.  Now, there are requirements on how

6    people need to package and present liquids, right?

7    A    Yes.

8    Q    There are requirements on what people need to do with

9    their clothes when they go through security?

10            MS. RO:  Objection, Your Honor; relevance.

11            THE COURT:  I'm not sure I understand the relevance,

12   Mr. Harbaugh.  It will be sustained.

13   BY MR. HARBAUGH:

14   Q    Now, the public requirements, there's a number of ways

15   that TSA discloses to the public what those requirements are,

16   right?

17   A    Yes.

18   Q    One of the ways that TSA discloses those public

19   requirements is posting signs at the airport, right?

20   A    Yes.

21   Q    TSA also posts notice of those requirements on their

22   website, right?

23   A    Right.

24   Q    They even issue press releases when there is a change in

25   the public requirements?

A     Yes.

Q     And the publically available TSA screening requirements

have changed a lot over the years, haven't they?

A     Yes.

Q     In 2006, August 2006, no liquids were allowed on the

plane, right?

A     Yes.

Q     Then several months later liquids were allowed on the

plane, right?

A     Yes.

Q     And they implemented the 3-1-1, rule, right, for liquids,

less than 3 ounces, 1 bag --

A     Per person.

Q     -- 1 quart, correct?

A     Yeah.

Q     Now, there's been changing definitions of what a liquid

is, right?

A     Can you rephrase?

Q     For example, peanut butter is considered a liquid by TSA,

correct?

A     It's considered a paste.

          THE COURT:  Mr. Harbaugh, please, at the lectern.

          MR. HARBAUGH:  Yes, Your Honor.  I apologize.

Q     Now, in 2006 people had to start taking off their shoes,

right?

1    A     Yes.

2    Q     And you used to be allowed to keep your food inside of

3    your luggage when you went through TSA, correct?

4    A     That is a recent change.

5    Q     A recent change, and now if the food contains a powder

6    greater than 12 ounces or more that's unidentifiable, they must

7    remove it from their luggage, correct?

8    A     It's recommended; it's not required.

9    Q     Now, for a long time all electronics had to be removed

10   from the carry-on luggage and be placed into a bin for

11   screening, correct?

12   A     Large electronics.

13   Q     Then -- now, since July 2007, TSA changed the requirements

14   and all electronics larger than cell phone have to be taken out

15   and placed in a bag, correct?

16   A     That was a recent change, correct.

17   Q     Now, the screening can also -- TSA screening requirements

18   can also change depending on whether there's a K-9 unit at the

19   airport, correct?

20   A     Correct.

21   Q     And in those instances, a person doesn't have to remove

22   any of their clothes, their shoes or take their computer or

23   laptop out of their carry-on bag, right?

24   A     If it's a heavy jacket they do.  It's only light sports

25   jackets or windbreakers that they are allowed to keep on.  They

```
 1   also get to keep on their shoes.
 2   Q     And keep their laptop in their luggage?
 3   A     Correct.
 4   Q     So those are some of TSA's publically available screening
 5   procedures?
 6   A     Yes.
 7   Q     Now I want to talk to you about the secret TSA screening
 8   procedures.  Now, there are no signs at O'Hare Airport
 9   describing those --
10              THE COURT:  Mr. Harbaugh, please.
11   BY MR. HARBAUGH:
12   Q     There are no signs at the airport describing TSA's secret
13   procedures, right?
14   A     Uh-huh.
15   Q     They aren't posted on TSA's website, right?
16   A     Not that I know of.
17   Q     They don't issue press releases about them, right?
18   A     Not that I know of.
19   Q     Now, many of those secret procedures are contained in the
20   Standard Operating Procedures manual, right?
21   A     Yes.
22   Q     It's a huge manual, right?
23   A     Multiple books.
24   Q     Multiple books.
25         Many sections, right?
```

```
 1   A      Uh-huh, yes.
 2   Q      Now, one of those secret screening procedures is called
     SPOT, which stands for the screening of passengers by
 3
     observation techniques, right?
 4
 5           MS. RO:  Objection, Your Honor.  A question was not
     asked.
 6
 7           THE COURT:  Overruled.
 8   BY MR. HARBAUGH:
 9   Q      One of the secret screening procedures is SPOT, which is
     screening of passengers by observation techniques, right?
10
11   A      That program was discontinued --
12   Q      Well --
13   A      -- to my knowledge.
14   Q      That was a secret program that you employed, correct --
15   A      Yes.
16   Q      -- TSA did?
17          And they would identify a number of factors that would
     require someone to submit to secondary screening, right?
18
19   A      Yes.
20   Q      So one of those secret factors was excessive yawning,
     right?
21
22   A      I'm not familiar with what the criteria was.
23   Q      Excuse me.  Exaggerated yawning, does that sound familiar?
24   A      No.  I'm not trained as a behavioral detection officer, so
     I would not know what those criterias were.
25
```

29

```
1    Q    But that was a secret procedure, correct?
2    A    That was its own SOP, yes, and it was not known to the
3    public.
4    Q    So another secret procedure that TSA uses is the one used
5    for diplomatic pouches, correct?
6    A    To my knowledge.
7    Q    Now, the diplomatic pouch procedure is secret and contains
8    sensitive security information, right?
9    A    It's -- well, it's within our SOP, which the whole SOP is
10   considered SSI.
11   Q    And the only time that secret or SSI material can be
12   disclosed is with the written permission of the TSA
13   administrator, correct?
14   A    Correct.
15   Q    Or written permission by the secretary of transportation?
16   A    To my understanding, yes.
17   Q    So on July 20th, last year, you didn't seek written
18   permission from anyone to disclose the SOP to Mr. Flint, right?
19   A    No.
20   Q    You didn't give Mr. Flint a copy of the SOP, right?
21   A    No.
22   Q    And you wouldn't let Mr. Flint read it, right?
23   A    Correct.
24   Q    Now I want to talk about when you first encountered
25   Mr. Flint that day.
```

1    A    Okay.

2    Q    We talked -- the Government presented you several clips.

3         Your Honor, I previously spoke with the Government.  We

4    would like to play -- jump to certain portions of the entire

5    20-minute video.  We are not going to play it, but we are

6    seeking to introduce, and this is Defense Exhibit 218.

7         MS. RO:  That's correct, Your Honor, there's no

8    objection.

9         THE COURT:  218 is received.

10        (Exhibit 218 received into evidence.)

11   BY MR. HARBAUGH:

12   Q    So I think there might be some overlap, but I think this

13   is the first -- when you first encountered Mr. Flint.  So we

14   are going to jump, and this is about a minute eight into the

15   video, so we're going to play that.

16        (Video recording played in open court.)

17   BY MR. HARBAUGH:

18   Q    So just in terms of orientation, this is when Mr. Flint

19   had presented himself at TSA precheck, and the lead TSO had

20   him -- directed him over to you, correct?

21   A    Correct.

22   Q    And this is the first time you encountered Mr. Flint?

23   A    Correct.

24   Q    Now I just want to confirm, so this entire encounter with

25   Mr. Flint was captured on video surveillance, correct?

```
 1   A     I believe so, yes.
 2   Q     Now, TSA has video cameras set up everywhere in the
 3   security area, right?
 4   A     They are run by the City of Chicago, and TSA has access to
 5   them.
 6   Q     So O'Hare Airport has multiple surveillance cameras
 7   throughout this screening area, correct?
 8   A     Yes.
 9   Q     Now I want to walk you through some of the other points in
10   the video.  So after Mr. Flint -- we will just proceed with it
11   a little bit.  So after he encounters you --
12         (Video recording played in open court.)
13            MR. HARBAUGH:  Then we can just pause it there.
14   Q     So if we can see right -- I will draw a circle.
15         So right here --
16         Actually, I'm not doing it.  Sorry.  I'm the worst.
17   Sorry.
18         Mr. Flint -- it's still not --
19   A     I think it's on the eraser.  I think you have to hit the
20   little pencil tool in the corner.
21   Q     Thank you so much.
22   A     No problem.
23   Q     There we go.
24         Mr. Flint is standing over here off to the side, correct?
25   A     I believe so, yes.
```

```
 1   Q    Now, I want to fast-forward to about --
 2        (Video recording played in open court.)
 3   BY MR. HARBAUGH:
 4   Q    So at about 8 minutes 49 seconds, Mr. Flint is then
 5   brought over to your area, correct?
 6   A    Yes.
 7   Q    Okay.  And then -- so he's talking to you for a while, and
 8   then you have him step back to the same area where he was
 9   waiting before.  And this is about -- we will play it.
10        (Video recording played in open court.)
11            MR. HARBAUGH:  So we will pause it there.
12   Q    So Mr. Flint presents to you his material, correct?
13   A    Uh-huh.
14   Q    And then he also, as part of that material, he provides
15   you with a letter, correct?
16   A    Yes.
17   Q    And he lets you make a copy of that letter, correct?
18   A    I didn't ask.
19   Q    But you made a copy of that letter?
20   A    I did make a copy of that letter.
21   Q    And he didn't snatch it out of your hand?
22   A    No.
23   Q    Now, you talked to a number of people after Mr. Flint came
24   over to your station, correct?
25   A    Regarding?
```

```
 1   Q    Well, regarding the procedure for diplomatic pouches,
 2   right?
 3   A    My managers, correct.
 4   Q    Well, first you talked to your fellow TSA officer, Ila
 5   Clemus, right?
 6   A    Yes.
 7   Q    You ask Ila Clemus to check the SOP to see what it says,
 8   right?
 9   A    If she could open up that portion of the SOP.
10   Q    You next talked to Bill Cane, right?
11   A    I called Guy Sheridan first and let him know because he
12   was the manager responsible at the terminal.  Then I told him I
13   would call Bill because Bill and I had more experience -- or
14   Bill in general had more experience dealing with department of
15   state and diplomats.
16   Q    So you called Guy Sheridan, correct?
17   A    Uh-huh.
18   Q    Then you called Bill Cane?
19   A    Correct.
20   Q    Now, at that point you informed Mr. Flint that he would
21   not be able to enter the sterile area with the pouch without a
22   diplomatic passport, correct?
23   A    Correct.
24   Q    And the SOP section on diplomatic passports directs you to
25   deny access if the person does not have the proper
```

```
 1   documentation for the pouch, right?

 2   A    Yes.

 3   Q    And it's -- the SOP further states improperly documented

 4   pouches must not be opened, right?  Not be allowed into the

 5   sterile area, and be returned to the courier, right?

 6   A    Yes.

 7   Q    That's what the SOP says.  The SOP doesn't direct you to

 8   detain the traveler, right?

 9   A    Correct.

10   Q    And you didn't detain Mr. Flint, right?

11   A    No, we did not.

12   Q    And Mr. Sheridan didn't detain Mr. Flint, right?

13             THE REPORTER:  I didn't hear the answer.

14             THE WITNESS:  No.

15   BY MR. HARBAUGH:

16   Q    Mr. Flint was free to leave after you denied him entry

17   without screening, right?

18   A    Correct.

19   Q    But Mr. Flint didn't leave, right?

20   A    Once I walked him out, I don't know where he went.

21   Q    Well, I'm -- we're not actually at that point.

22   A    Okay.

23   Q    He stayed there after you told him he would need a

24   diplomatic passport; he stayed there talking to you, right?

25   A    Yes.
```

```
 1   Q     You then called Guy Sheridan to come, correct?
 2   A     Yes.
 3   Q     Mr. Flint talked to Guy Sheridan, right?
 4   A     Yes.
 5   Q     Mr. Flint didn't leave after talking to -- right away
 6   after talking to Guy Sheridan, right?
 7   A     Correct.
 8   Q     Mr. Flint stayed there for over 20 minutes, right?
 9   A     Yes.
10   Q     Even though Mr. Flint was free to leave?
11   A     Free to exit out to the nonsterile area.
12   Q     Yes.
13         Now I want to talk to you about what was going on during
14   this 20-minute exchange.  Now, while Mr. Flint was staying
15   there for 20 minutes, he was disagreeing with you, right?
16   A     Correct.
17   Q     Mr. Flint insisted that you were wrong about the law,
18   right?
19   A     Correct.
20   Q     Now, during your exchange, you learned that Mr. Flint had
21   flown through other airports with the same documents with no
22   issues, right?
23   A     That's what he stated.
24   Q     And, in fact, Mr. Flint had flown out of O'Hare just a few
25   months earlier, on April 28th, 2017, using the same diplomatic
```

```
 1   ID?
 2              MS. RO:  Objection, Your Honor; calls for
 3   speculation and not covered in direct examination.
 4              THE COURT:  Overruled.
 5        If you have personal knowledge, you may answer.
 6              THE WITNESS:  I have no knowledge of that.
 7   BY MR. HARBAUGH:
 8   Q    Now, Mr. Flint questioned you whether this was a new TSA
 9   procedure, right?
10   A    Correct.
11   Q    He questioned whether it was a different procedure for
12   Chicago O'Hare, right?
13   A    For Chicago.
14   Q    And you told Mr. Flint this was in your SOP, right?
15   A    Correct.
16   Q    And Mr. Flint asked to see it, right?
17   A    Correct.
18   Q    And you refused to show him the SOP, right?
19   A    Yes.
20   Q    So we talked about Government Exhibit 11, and I want to
21   now please turn your attention to Government Exhibit 11.
22        Your Honor, this exhibit has already been introduced by
23   the Government, so permission to show the jury?
24              THE COURT:  Yes, please.
25   BY MR. HARBAUGH:
```

1    Q    All right.  Mr. Kotula, as you previously stated, this is

2    the letter that Mr. Flint -- that you made a copy of when you

3    saw Mr. Flint on July 20th, right?

4    A    Correct.

5    Q    Let's take a look at this letter.  So on the second page,

6    the letter says it's signed by H.E.R.S. Shumake, correct?

7    A    Yes.

8    Q    And Shumake says he is an ambassador with the

9    International Human Rights Commission, right?

10   A    Yes.

11   Q    It also says Shumake is a U.S. representative, right?

12   A    Yes.

13   Q    And on that first page it says your law firm is being

14   entrusted with a cash deposit, right?

15   A    Yes.

16   Q    So the letter disclosed what Mr. Flint was carrying,

17   right?

18   A    Yes.

19   Q    Now, are you familiar with items that are allowed for a

20   person to bring through the airport, right?

21   A    Yes.

22   Q    TSA does not prohibit anyone from bringing cash in, right?

23   A    No.

24   Q    In fact, people can carry as much cash as they want,

25   right?

1    A    Yes.

2    Q    And only for international flights must a person declare

3    on their customs form cash amounts in excess of $10,000, right?

4    A    Right.

5    Q    And Mr. Flint was not traveling on an international

6    flight, right?

7    A    Not that I know of.

8    Q    So I want to turn back to that letter.  At the bottom of

9    that first page it talks about -- it states what he must do,

10   and at the very last sentence it says, "Your assignment may not

11   be disclosed or disseminated to anyone without the expressed

12   written consent of this office."  Right?  That's what it says?

13   A    Yes.

14   Q    And on the second page it lists a phone number to contact,

15   right?

16   A    Yes.

17   Q    Now, at a certain point Mr. Flint makes a phone call in

18   front of you, right?

19   A    Yes.

20   Q    All right.  I want to pull that up.  All right.

21        Oh, I'm sorry, Your Honor.  Let's try this again.

22        (Video recording played in open court.)

23   BY MR. HARBAUGH:

24   Q    See, now we are looking at Defense Exhibit 218 again.

25   About 19:31 is the beginning.  We can just pause it.

1      He is holding the phone up to his ear, right?

2  A    Correct.

3  Q    And before he picked up the phone, he told you he was

4  going to attempt to speak to the ambassador, right?

5  A    The point of contact or the ambassador, yes.

6  Q    He told you he was going to call the ambassador to get

7  permission to screen the bag?

8  A    To screen the bag or to get a diplomatic passport.

9  Q    Now, Mr. Flint did not appear to reach anybody on the

10 line, correct?

11 A    Correct.

12 Q    He does not appear to be speaking into the phone, right?

13 A    Not that I witnessed.

14 Q    So when Mr. Flint doesn't get through to anyone, he

15 leaves, right?

16 A    He was escorted out, yes.

17 Q    He stops trying to convince you he is allowed to bring in

18 the bag, right?

19 A    Yes.

20 Q    He is not trying to sneak past security?

21 A    No.

22 Q    Flint walks out of the airport -- or walks out of the

23 screening area, right?

24 A    He was escorted out of the screening area by myself.

25 Q    Flint leaves peacefully, right?

```
 1   A    Yes.
 2   Q    And let's look at that because you say he was escorted
 3   out.  Can we --
 4        (Video recording played in open court.)
 5   BY MR. HARBAUGH:
 6   Q    And right there he is actually shaking Sheridan's hand,
 7   right?
 8   A    Correct.
 9             MR. HARBAUGH:  All right.  Nothing further.
10             THE COURT:  Any redirect?
11             MS. RO:  Yes, Your Honor.
12                      REDIRECT EXAMINATION
13   BY MS. RO:
14   Q    Do you know what happens when cash inside a bag goes
15   through an x-ray machine?
16   A    It shows up as dense materials, which most likely would --
17   it depends on the amount of cash.  That's how the x-rays kind
18   of work is on densities, how thick something is.  So if it's a
19   large amount of cash, most likely we would end up opening up
20   that bag and checking it.
21   Q    And did you categorically tell the defendant that he
22   needed a diplomatic passport?
23   A    Yes.
24             MS. RO:  Nothing further, Your Honor.
25             THE COURT:  Recross?
```

```
 1          MR. HARBAUGH:  Nothing, Your Honor.

 2          THE COURT:  Thank you, sir, for your testimony.

 3          THE WITNESS:  Thank you very much.

 4      (Other matters reported, not transcribed herein.)

 5          THE COURT:  Okay.  We have the jury reassembling

 6   with our alternate.

 7       And, Mr. Yoksas, would you come forward, please.

 8          THE COURTROOM DEPUTY:  This way, sir.

 9       Would you stop right there and raise your right hand to be

10   sworn.

11          CLAY YOKSAS, GOVERNMENT WITNESS, WAS SWORN

12          THE WITNESS:  I do.

13          THE COURTROOM DEPUTY:  Thank you, sir.  Would you

14   please be seated.

15       Good afternoon, sir.  Sir, for the record, would you

16   please state your name, and spell your last name.

17          THE WITNESS:  Clay Yoksas, last name is Y-o-k-s-a-s.

18          THE COURT:  Your witness.

19          MS. RO:  Thank you, Your Honor.

20                      DIRECT EXAMINATION

21   BY MS. RO:

22   Q    What is your occupation, Mr. Yoksas?

23   A    Supervisory transportation security officer.

24   Q    And where do you work?

25   A    At Midway Airport.
```

UNITED STATES DISTRICT COURT

1    Q     And how long have you been a supervisor?

2    A     13 years.

3    Q     How long have you been with Transportation Security

4    Administration, TSA?

5    A     16 years.

6    Q     And have you held other positions within TSA?

7    A     I started off as a transportation security officer.  I did

8    that for a year, then I was promoted to lead transportation

9    security officer, and then two years later I became supervisor.

10   Q     And where do you work?

11   A     At the checkpoint at Midway Airport.

12   Q     And do you receive any specialized training to be a

13   supervisor?

14   A     Yes, constantly.

15   Q     And what does that training consist of?

16   A     As a supervisor we need to be able to resolve alarms, deal

17   with many different issues that might happen at checkpoints.

18   We have a lot of pieces of equipment that we need training on.

19   A lot of it is helping us to deal with people, difficult

20   situations.  So there's always some kind of training.

21   Q     What are your duties specifically as a supervisor?

22   A     There are times when I'm actually running the checkpoint,

23   running the operations of the checkpoint where we will staff

24   the lanes.  And as part-time officers might come and go

25   throughout the day, I might have to make sure the lanes are

```
 1   staffed properly so we are able to get the right amount of
 2   lanes open with the officers we have.
 3        There are other days where I'm actually working on the
 4   floor and resolving alarms, dealing with passenger complaints,
 5   any issues that might come up.  When equipment goes down, I
 6   will have to call it in.  So there's always something going on.
 7   Q    And are you familiar with the term "diplomatic pouch"?
 8   A    Yes.
 9   Q    And how are you familiar with that term?
10   A    Well, we have had training on diplomatic pouches and the
11   way that they need to be screened.
12   Q    And have you screened a diplomatic pouch before July 2017?
13   A    I personally had not, although I was present when a
14   manager had screened one.
15   Q    And do you recall what was presented at that prior
16   occasion?
17   A    I recall that a letter was presented by the diplomat, the
18   actual pouch, and then some various IDs.
19   Q    And do you recall what the various IDs looked like?
20   A    No, I don't recall exactly what was presented at that
21   time.
22   Q    If I could turn your attention to the black binder in
23   front of you.  It's Exhibit 20 that's been identified.
24        Your Honor, I don't believe there's an objection, if the
25   Government could move Exhibit 20 into evidence.
```

1          MR. HARBAUGH:  No objection, Your Honor.

2          THE COURT:  20 is received.  You may publish,

3  please.

4      (Exhibit 20 received into evidence.)

5  BY MS. RO:

6  Q     What is this a photo of?

7  A     That is the entrance to the checkpoint.  So before the

8  checkpoint, this is where the passengers would wait in line to

9  get to the checkpoint.

10 Q     And what is this a photo of?

11 A     It's a sign that's posted at the entry of the checkpoint.

12 Q     And what is this a photograph of?

13 A     That's also another sign that's posted at the entry to the

14 checkpoint.  This one is actually angled toward the precheck

15 area.

16     (Video recording played in open court.)

17 BY MS. RO:

18 Q     And what is this a photograph of?

19 A     That's a monitor that we have above the checkpoint, and it

20 has various messages for the passengers, things they need to

21 take out of their bag, things like guns, knives, other items

22 that are prohibited from coming through the checkpoint, and it

23 just flashes various information that passengers would need to

24 know.

25     (Video recording played in open court.)

```
 1  BY MS. RO:
 2  Q     And is that just another signage on the same screen?
 3  A     Yes.
 4  Q     Were you working at Midway on July 20th, 2017?
 5  A     Yes, I was.
 6  Q     And were you working at approximately 5 to 8:00 p.m.?
 7  A     Yes.
 8  Q     Did you make contact with an individual named Daniel
 9  Flint?
10  A     Yes, I did.
11  Q     Please take a look around a courtroom and identify an item
12  of clothing that person is wearing and where that person is
13  sitting.
14  A     I believe it's this gentleman over here in the gray suit
15  and gray tie.
16            MS. RO:  Your Honor, may the record reflect that
17  this witness has identified the defendant?
18            THE COURT:  Yes.
19       Just want to make sure which direction you're pointing.
20            THE WITNESS:  Right over here.
21            THE COURT:  Yes, he's identified Mr. Flint.
22  BY MS. RO:
23  Q     And why did you make contact with the defendant on July
24  20th, 2017?
25  A     He had come to the precheck area, presented his, I
```

1    guess -- encountered an officer.  He had presented his

2    information about the diplomatic pouch.  The officer called for

3    a supervisor.  Another supervisor responded and saw that I was

4    nearby so called me over to assist.

5    Q    And what happened next?

6    A    We walked to the area where he was presenting his boarding

7    pass and ID, and spoke to Mr. Flint, and he presented all

8    the -- he said that he had a diplomatic pouch.  He presented

9    all of the paperwork and his identification in order for us to

10   conduct the usual screening that we would for a diplomatic

11   pouch.

12   Q    And showing you Government's Exhibit 2, which has already

13   been admitted.

14        THE COURT:  I don't have 2 as being received.

15        MS. RO:  I apologize, Your Honor.  If I may show the

16   defendant --

17   Q    If you could turn to Government's Exhibit 2, it's in the

18   black binder in front of you.

19        THE COURT:  Any objection to 2?

20        MR. HARBAUGH:  No, Your Honor.

21        THE COURT:  2 now is received, and you may publish.

22        (Exhibit 2 received into evidence.)

23        MS. RO:  Thank you, Your Honor.

24   Q    What is this photograph?

25   A    That is -- it looks like the ID that he presented when he

1  came through the checkpoint.

2  Q    And what happened after he presented this ID to you?

3  A    So this was one of the ID cards that he had presented

4  saying that he was a diplomat who was carrying a diplomatic

5  pouch, that he was a courier carrying a diplomatic pouch.

6  Q    Do you recall any other IDs that he presented to you?

7  A    I believe there was one other that I'm not exactly sure

8  what kind of identification it was, and then I also asked if he

9  had a Government-issued photo ID, and he presented a driver's

10  license.

11  Q    I'm showing you the second page of Government's Exhibit 2.

12       Is this the back of the ID?

13  A    Yes, it looks like it.

14  Q    And did you closely pay attention to the address listed on

15  the back of the ID?

16  A    I don't recall if I closely looked at the address.

17  Q    And as you stated, he showed you the additional IDs.  What

18  happened next?

19  A    After he showed us all of the IDs, he showed us the

20  courier letter, which had the information that said that he was

21  a diplomatic courier carrying a diplomatic pouch.  It had the

22  information from the agency that he was carrying the pouch for.

23  It had an embossed notarized stamp on the bottom, and he showed

24  me that the letter actually had a number that matched a number

25  that was on the pouch.

1    Q      And what happened next?

2    A      It appeared that he had everything that he needed to

3    proceed through the checkpoints, and he was allowed to proceed

4    through the checkpoint, and we handled the screening of the

5    pouch per TSA policy.

6    Q      And what was his demeanor like, do you recall?

7    A      Very calm.  It seemed like he had -- like he was a

8    diplomatic courier; he had come through the checkpoint many

9    times.  He presented everything just as, you know -- it was not

10   really a big deal, like it was something he had done a bunch of

11   times and he knew exactly what was needed, he showed it to be,

12   and I had no reason to believe that anything was suspicious or

13   not right about it.

14   Q      If you could turn -- if I could turn your direction to the

15   manila folders in Government's Exhibit 21 through 23.  They are

16   surveillance clips from July 20th, 2017.

17          I don't believe there's an objection.

18                MR. HARBAUGH:  No objection, Your Honor.

19                THE COURT:  Exhibits 21 through 23 are received.

20          (Exhibits 21 through 23 received into evidence.)

21   BY MS. RO:

22   Q      Showing you Government's Exhibit 21.

23          (Video recording played in open court.)

24                MS. RO:  I'm pausing it.

25   Q      What does this video depict?

UNITED STATES DISTRICT COURT

```
1    A     That is Mr. Flint coming through the TSA TC area.  That's

2    basically where he would have his boarding pass and ID checked

3    by a TSA officer.

4    Q     And did he pass the signs that you testified about on

5    Exhibit 20, the photographs?

6    A     Yes.

7    Q     And where is Mr. Flint?  Can you circle or just point to

8    him on the screen?

9    A     He is on the far left at the front of the line wearing the

10   white shirt and dark-colored jacket.

11             MS. RO:  Playing Government's Exhibit 22.

12        (Video recording played in open court.)

13   BY MS. RO:

14   Q     And what does that clip or video depict?

15   A     It was Mr. Flint pushing his bag into the x-ray, and it

16   looks like the courier letter that he also put through the

17   x-ray as well.

18             MS. RO:  I'm showing Government's -- playing

19   Government's Exhibit 23.

20        (Video recording played in open court.)

21   BY MS. RO:

22   Q     And what does that video depict?

23   A     That was when I handed Mr. Flint the diplomatic pouch

24   after he had come through screening.

25   Q     Have you seen a diplomatic passport before?
```

1   A    I don't -- I may have seen it when I originally observed

2   the manager with a diplomatic courier before, but in this case

3   I guess he did not present a diplomatic passport.

4   Q    And did you consult anyone on July 20th, 2017 or consult

5   any type of specific procedure or policy with TSA?

6   A    I did not.

7   Q    Why did you believe that the defendant had a proper

8   diplomatic pouch?

9   A    I knew that he had to have something from the agency that

10  said he was a diplomatic courier.  He had the other

11  identification.  He had the driver's license.  It all matched.

12  Everything had the security features.  He had the letter which

13  said that he was a diplomatic courier.  Everything just seemed

14  like it was proper and what was needed for him to be able to

15  bring this diplomatic pouch through the checkpoint.

16  Q    And what happened next, the next day or two?

17  A    So after this happened, I was actually on my -- the next

18  day was my day off, and I received a call from my manager about

19  this event, and she told me that it was, I guess, a fraudulent

20  ID or something, that this was not truly a diplomatic courier,

21  and she had me write a statement about what had occurred.

22            MS. RO:  Nothing further, Your Honor.

23            THE COURT:  Cross?

24            MR. HARBAUGH:  Thank you, Your Honor.

25                        **CROSS-EXAMINATION**

1    BY MR. HARBAUGH:

2    Q    Sorry, Mr. Yoksas.

3         So this is -- I want to talk about July 20th, 2017, Midway

4    Airport.  So you were working as an STSO that day, right?

5    A    Correct.

6    Q    And as you just said, Mr. Flint came through the precheck

7    line at Midway, right?

8    A    That's correct.

9    Q    And TSO Keyona Clanton was working the precheck podium

10   that day, right?

11   A    I don't recall exactly which officer, and I could not see

12   the one in the video, but I believe she would have been the one

13   to call for the supervisor.

14   Q    I'm going to see if one of the reports will refresh your

15   memory as to who was at the podium.  Can you turn your

16   attention -- or would a report of another TSO officer refresh

17   your memory as to who was there that day?

18   A    Okay.

19   Q    Please turn your attention to -- it's not that binder.

20   I'm sorry.  It is probably the largest of the three binders

21   that you have up there.

22   A    I only have one.

23   Q    On the floor, I'm sorry.  So it's the larger of the two on

24   the floor.  And this is Defense Exhibit 265, marked for

25   identification.

```
 1          (Exhibit 265 for identification.)
 2   BY MR. HARBAUGH:
 3   Q    So, yeah, if you flip -- and I'm sorry, it's pretty
 4   burdensome.
 5   A    You said 265?
 6   Q    265.  There should be a tab.
 7   A    Okay.  That is Keyona Clanton's statement.
 8   Q    One moment, Your Honor.
 9        Mr. Yoksas, having seen that, does that refresh your
10   memory as to who was working the podium -- the precheck podium
11   that day?
12   A    Yes, it does.
13   Q    And who was working the podium?
14   A    TSO Keyona Clanton.
15   Q    So working at the podium, that is where Ms. Clanton would
16   have checked Mr. Flint's ticket, right?
17   A    Correct.
18   Q    To make sure it had the precheck emblem on it?
19   A    Right.
20   Q    And then also to check his identification, right?
21   A    Right.
22   Q    Now, you learned that Mr. Flint requested to speak with a
23   TSA supervisor when he came to that podium, right?
24   A    I don't know if he requested it or if it was requested by
25   the officer.
```

```
1   Q     Would looking at that report possibly refresh your memory
2   as to who made the request for the supervisor?
3   A     Looking at the report, it sounds like he presented himself
4   as a diplomat.  She said he wanted to speak with a supervisor.
5   There was another supervisor, Enrique Rivera, who was right
6   there, and he saw that I was nearby, so he called me over to
7   assist.
8   Q     Okay.  So at that time you happened to be walking toward
9   the precheck area, correct?
10  A     Correct.
11  Q     And, actually, Supervisor Rivera told you, "Good.  I'm
12  glad you're here," right?
13  A     Right.
14  Q     And he told you that a passenger identified himself as a
15  diplomatic courier, right?
16  A     Uh-huh, right.
17  Q     And that Mr. Rivera wanted you to double-check everything?
18  A     Correct.
19  Q     You agreed to help Supervisor Rivera?
20  A     Correct.
21  Q     So you walked up to the passenger?
22  A     Yes.
23  Q     And that was Mr. Flint?
24  A     Correct.
25  Q     You asked him to explain the situation?
```

```
 1   A     Correct.

 2   Q     He presented a photo identification?

 3   A     Yes.

 4   Q     And that was an identification -- that was presented as a

 5   diplomatic identification card, right?

 6   A     Right.

 7   Q     Now, you reviewed that identification card?

 8   A     Yes.

 9   Q     You considered that diplomatic ID card to be valid?

10   A     I did.

11   Q     It looked similar to IDs for U.S. senators?

12   A     I had written that in my statement, I thought it looked

13   similar to ones I had seen before for senators and

14   representatives, yes.

15   Q     And you wrote that in your statement because it was true,

16   right?

17   A     Correct.

18   Q     You also asked him for his driver's license?

19   A     Yes.

20   Q     And you wanted the driver's license to further confirm his

21   identity?

22   A     That's correct.

23   Q     And Mr. Flint provided that driver's license?

24   A     Yes.

25   Q     You determined the driver's license was valid?
```

```
 1   A     Yes.
 2   Q     In addition to the driver's license, you also made sure
 3   Mr. Flint had additional items?
 4   A     Right.
 5   Q     You made sure that Mr. Flint had a notarized letter
 6   stating he was a courier, right?
 7   A     Yes.
 8   Q     And Mr. Flint presented a valid notarized letter?
 9   A     I believed it was valid, yes.
10   Q     You also wanted to ensure that the notarized letter
11   matched the four-digit number that was on the diplomatic pouch?
12   A     Correct.
13   Q     And you did do that, right?
14   A     Yes.
15   Q     And those numbers matched?
16   A     Yes, they did.
17   Q     Based on your assessment, Mr. Flint satisfied all of the
18   requirements of TSA procedures?
19   A     Based on my assessment at that time, I thought that he had
20   satisfied those.
21   Q     At that time you had worked for TSA for 15 years?
22   A     Correct.
23   Q     And you had been a supervisor for 12 of those years?
24   A     Yes.
25   Q     And as a supervisor, you received training?
```

1    A      Yes.

2    Q      You also received annual training on TSA screening

3    procedures?

4    A      Correct.

5    Q      This was not your first time screening a diplomatic pouch?

6    A      Well, it was my first time alone.  The other time I had

7    just observed a manager.

8    Q      So you were present when another manager had screened a

9    pouch previously?

10   A      Right.

11   Q      And based upon your training and prior experience,

12   Mr. Flint satisfied the TSA security requirements for a

13   diplomatic pouch?

14   A      I believed so at that time, yes.

15   Q      I want to talk to you about Mr. Flint's demeanor that day.

16   The Government asked you about it.  Mr. Flint wasn't nervous?

17   A      I didn't -- I did not pick up on any nervousness from him,

18   no.

19   Q      And that's what you wrote in your report:  Mr. Flint

20   wasn't nervous?

21   A      Right.

22   Q      Mr. Flint wasn't restless?

23   A      Correct.

24   Q      Mr. Flint wasn't in a hurry?

25   A      Correct.

1    Q     Mr. Flint seemed calm?

2    A     Yes.

3    Q     Mr. Flint seemed cool?

4    A     Yes.

5    Q     Mr. Flint clearly understood the requirements of a

6    diplomatic courier?

7    A     I believed so, and that's why there was nothing for me to

8    question what he was presenting to me.

9    Q     So after you found that Mr. Flint met all of the TSA

10   requirements, you walked the carrier -- you walked the pouch to

11   the back of the screening lane, right?

12   A     That's correct.

13   Q     And while you were carrying that pouch, Mr. Flint did not

14   seem overly concerned?

15   A     No, he did not.

16   Q     Mr. Flint wasn't keeping a watchful eye on you as you were

17   bringing that pouch?

18   A     No.

19   Q     And Mr. Flint didn't watch you as you waited for him at

20   the back of the lane, right?

21   A     It didn't appear that way.

22   Q     Now, you didn't open the pouch?

23   A     No.

24   Q     The pouch seemed to contain paper?

25   A     I don't know -- I don't know what was in --

```
 1              MS. RO:   Objection.
 2   BY MR. HARBAUGH:
 3   Q    Well, you had described it.  It didn't seem like a metal
 4   object, right?
 5   A    It seemed heavy, but it didn't seem like there was
 6   anything metal in there.
 7   Q    And you actually wrote in your report that it seemed like
 8   paper, right?
 9   A    Yes.
10   Q    Now, after you cleared Mr. Flint through security,
11   Mr. Flint didn't leave right away, right?
12   A    I don't understand.
13   Q    Well, Mr. Flint actually stayed there in the TSA screening
14   area, right?
15   A    Well, he was collecting his belongings from the x-ray
16   belt, and as soon as he had collected them -- you're right,
17   actually.  He collected the belongings.  I gave him the pouch.
18   And he actually brought his carry-on bag to the back of the
19   lane, put the pouch into the carry-on bag, and I believe left
20   at that time.
21   Q    Actually, Mr. Flint asked if he could use the TSA private
22   screening room, right?
23   A    Yeah.  Actually, I recall that now, yes.
24   Q    And because Mr. Flint said he wanted to put the pouch
25   inside his carry-on luggage, right?
```

```
 1   A      Right.
 2   Q      So you asked Mr. -- or sorry.
 3          So you allowed Mr. Flint to use the TSA private screening
 4   room, right?
 5   A      Yes.
 6   Q      And that room is located at the end of the security?
 7   A      That's right in the precheck area.  It's just right at the
 8   back of the lane.
 9   Q      And you watched Mr. Flint while he was inside the TSA
10   screening room?
11   A      I wasn't really watching him the whole time, but I noticed
12   that he had placed the pouch inside of the bag.
13   Q      Mr. Flint stepped inside the room?
14   A      Correct.
15   Q      Mr. Flint left the door open?
16   A      Yes.
17   Q      Then Mr. Flint walked out of the screening -- the TSA
18   screening room?
19   A      Yes.
20   Q      And then Mr. Flint walked toward the gate area?
21   A      Correct.
22   Q      Mr. Flint wasn't in a hurry?
23   A      It didn't appear that way.
24          MR. HARBAUGH:  One moment, Your Honor.
25          (Discussion off the record.)
```

```
 1              MR. HARBAUGH:  I apologize, Your Honor.  One moment.
 2        (Discussion off the record.)
 3              MR. HARBAUGH:  No further questions, Your Honor.
 4              THE COURT:  Redirect?
 5              MS. RO:  Yes, Your Honor.
 6                        REDIRECT EXAMINATION
 7   BY MS. RO:
 8   Q    You alone have never dealt with diplomats or diplomatic
 9   pouches at Midway, correct?
10   A    That's correct.
11   Q    And if Defendant Flint had been nervous, you would have
12   taken notice, correct?
13   A    Yes.  That would have raised my suspicion.
14   Q    And Defendant Flint seemed like a pro, didn't he?
15   A    What's that?
16   Q    He seemed like a pro, like he knew what he was doing?
17              MR. HARBAUGH:  Objection, Your Honor.
18   Mischaracterizes his testimony.
19              THE COURT:  It's vague and ambiguous.  It's
20   sustained.
21   BY MS. RO:
22   Q    And did Defendant Flint appear he knew exactly what he was
23   doing?
24   A    Yes.
25              MS. RO:  Nothing further.
```

1               THE COURT:  Recross?

2               MR. HARBAUGH:  None, Your Honor.

3               THE COURT:  Thank you very much for your testimony.

4          (Partial proceedings concluded at 4:07 p.m.)

5                         --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5

6            I, CAROL JEAN ZURBORG, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the Central District of California, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date:  October 18, 2018

17

18

19                         /s/ CAROL JEAN ZURBORG

20                _____
                  CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
21                    Federal Official Court Reporter

22

23

24

25

**UNITED STATES DISTRICT COURT**