1      UNITED STATES DISTRICT COURT.

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE S. JAMES OTERO, U.S. DISTRICT JUDGE

4

5  UNITED STATES OF AMERICA,            )
                                        )
6                    Plaintiff,         )
                                        )              Case No.
7       vs.                             )       CR 17-00697 SJO
                                        )
8  DANIEL FLINT,                        )        (Pages 1 - 44)
                                        )
9                    Defendant.         )
   _____     )

10

11

12
                        PARTIAL TRANSCRIPT
13
            REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
14                        TRIAL DAY 2
                  WEDNESDAY, OCTOBER 17, 2018
15                 LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22    _____

23        CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
              FEDERAL OFFICIAL COURT REPORTER
24            350 WEST 1ST STREET, SUITE 4311
           LOS ANGELES, CALIFORNIA 90012-4565
25                   (213) 894-3539

1              **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4       NICOLA T. HANNA
        United States Attorney
5       BY:  CHRISTINE M. RO
        BY:  IAN YANNIELLO
6       BY:  MARK AVEIS
             Assistant United States Attorneys
7       United States Courthouse
        312 North Spring Street
8       Los Angeles, California 90012

9   **FOR THE DEFENDANT:**

10      HILARY LEE POTASHNER
        Federal Public Defender
11      BY:  CRAIG A. HARBAUGH
        BY:  GEORGINA WAKEFIELD
12           Deputy Federal Public Defenders
        Central District of California
13      321 East Second Street
        Los Angeles, California 90012

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1

**I N D E X**

2

--------------------------------------------------------

3

**CHRONOLOGICAL INDEX OF WITNESSES**

4

5    **EXAMINATIONS**                                              **PAGE**

6     **GOVERNMENT WITNESS**

7    MICHAEL DURETTO
            DIRECT EXAMINATION BY MS. RO                          5
8            CROSS-EXAMINATION BY MS. WAKEFIELD                  22
            REDIRECT EXAMINATION BY MS. RO                      33
9

10    **DEFENSE WITNESS**

11    MICHAEL SIMON
            DIRECT EXAMINATION BY MS. WAKEFIELD                 37
12            CROSS-EXAMINATION BY MR. YANNNIELLO                41

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1

## INDEX OF EXHIBITS

| NUMBER | FOR IDENTIFICATION | IN EVIDENCE |
|--------|--------------------|-------------|
| 45     | 10                 | 10          |
| 148    | 32                 |             |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **LOS ANGELES, CALIFORNIA; WEDNESDAY, OCTOBER 17, 2018**

2                              **--oOo--**

3                (Other matters reported, not transcribed herein.)

4                THE COURT:  Next?

5                MS. RO:  The United States calls Michael Duretto to

6     the stand.

7                THE COURTROOM DEPUTY:  Good morning, sir.  Would you

8     please come forward.

9           Would you please stop right there and raise your right

10    hand to be sworn.

11          **MICHAEL DURETTO, GOVERNMENT WITNESS, WAS SWORN**

12                THE WITNESS:  I do.

13                THE COURTROOM DEPUTY:  Thank you, sir.  Please be

14    seated.

15          Sir, for the record, would you please state your name, and

16    spell your last name.

17                THE WITNESS:  Michael John Duretto, D-u-r-e-t-t-o.

18                THE COURT:  Your witness.

19                MS. RO:  Thank you, Your Honor.

20                          **DIRECT EXAMINATION**

21    BY MS. RO:

22    Q    What is your current occupation?

23    A    Currently I'm an assistant federal security director for

24    security operations at Los Angeles International Airport.

25    Q    And what are some of your duties for that position?

1   A     Primarily I oversee and maintain the integrity of the

2   security screening operation for both checkpoint and baggage.

3   Q     And how long have you held that position?

4   A     I've had this position -- it will be two years in January.

5   Q     And have you held any prior positions within the

6   Transportation Security Administration?

7   A     Yes, I have.

8   Q     And if you could briefly explain that to the jury, list

9   them and their duties.

10  A     Sure.  I started with the agency in 2005 as a uniformed

11  transportation security officer, so I was a frontline screening

12  officer.  I held that position for just slightly over a year.

13  Then I promoted to a lead transportation officer.  I held that

14  position for approximately a year.

15        From there I promoted to a supervisory transportation

16  security officer, which is the first level of management within

17  our agency.  I was the supervisor for one year.  From that

18  position I promoted to what we call a transportation security

19  manager, which there are two levels.  I promoted to the first

20  level of what we call a duty manager.  And my areas of

21  responsibility were basically overseeing a terminal, either a

22  shift -- an a.m. shift or p.m. shift, so overseeing the

23  security operation for a particular shift.

24        I was a duty manager for a little -- about a year and a

25  half, just under two years, and then I promoted to the second

```
 1   level of manager, which is lead manager.  And a lead manager,
 2   the area of responsibility increases.  You then have
 3   responsibility over an entire terminal for the entirety of the
 4   operating hours.
 5       I was in that position for about eight months, and then I
 6   was detailed to a senior advisor position with our federal
 7   security director.  And my responsibilities in that position
 8   was to basically advise the director on things and nature of
 9   policy, procedures, anything related to the screening
10   operation.  Served in that capacity for about eight months, and
11   then I promoted to a deputy assistant federal security
12   director, which, again, the area of responsibility expands.
13       At the time I had two terminals with direct reports,
14   approximately 500 direct reports coming to me.  Served as a
15   deputy assistant federal security director for five years, and
16   then promoted to my current position in January of 2017, as an
17   assistant federal security director.  And now I have -- I
18   oversee half the airport, so four terminals.  My direct reports
19   are approximately about 1150 to 1200 officers.
20   Q    So approximately how many years have you worked within the
21   Transportation Security Administration?
22   A    It will be 14 years this January.
23   Q    And has that exclusively been in the Los Angeles
24   International Airport?
25   A    Yes, it has.
```

```
 1   Q     Are there any specific security requirements when
 2   individuals want to check luggage or carry-on luggage, things
 3   of that nature?
 4   A     Yes.
 5   Q     And what are they?
 6   A     Anybody that's wishing to travel or enter the airport
 7   area, the nonpublic side of the airport, is required to
 8   undergo -- it would be a hundred percent screening on all
 9   persons and all property.
10   Q     Is that just at the Los Angeles International Airport?
11   A     No, that would be national and international as well.
12   Q     And you mentioned a nonpublic area.  What is a nonpublic
13   area?
14   A     Nonpublic area is something we would refer to as the
15   sterile area.  And basically the easiest definition to give to
16   that is anybody that passes into the sterile area is someone
17   who has successfully completed screening with TSA and they are
18   cleared for travel or boarding of an aircraft.
19   Q     You mentioned that bags get screened by the Transportation
20   Security Administration.  If bags -- what happens when bags
21   containing cash get screened by the Transportation Security
22   Administration?
23   A     Well, typically, if it's large amounts of cash, then one
24   of the things we look for -- x-ray operators look for is
25   organic material on their x-ray monitors, and that typically
```

1  shows up as something in a dense, orange color.  And explosives

2  are made from organic materials, so, obviously, one of the

3  things that we look for that's key is that organic material.

4  So what's that showing up on an x-ray screen, that would be a

5  red flag for us to pull that bag for secondary screening.

6  Q    And it would lead to secondary screening?

7  A    Yes.

8  Q    And what is secondary screening?

9  A    Secondary would be a property search of the contents of

10 that item.  Put another way, organic mass would be what we

11 designate as an alarm or an anomaly, and every anomaly and/or

12 alarm must be resolved prior to being cleared into the sterile

13 area.

14 Q    And does that secondary screening take time?

15 A    Yes.

16 Q    And you defined sterile area to the jury.  Does that

17 definition -- is that only for the Los Angeles International

18 Airport?

19 A    No.  That would be for --

20      MS. WAKEFIELD:  Your Honor, I would object to

21 questions beyond the scope of LAX.

22      THE COURT:  Overruled.

23      THE WITNESS:  No, that would pertain to all airports

24 nationwide.

25      MS. RO:  Your Honor, may I have a quick moment?

1          (Discussion off the record.)

2     BY MS. RO:

3     Q     Directing your attention to the Government's exhibit

4     binder, there's many binders but it's black, and it has blue

5     colors as dividers, and the cover should have a seal on it.

6     A     Trial exhibits?

7     Q     Yes.

8               THE COURT:  What number?

9               MS. RO:  45, Your Honor.

10    Q     If you could turn your direction to Government's Exhibit

11    45.

12         (Exhibit 45 for identification.)

13              THE COURT:  Any objection to 45?  If you look at the

14    list, the Government's exhibit list, it's easier.

15              MS. WAKEFIELD:  No objection.

16              THE COURT:  45 is received.  And you may publish so

17    we can move it along, please.

18         (Exhibit 45 received into evidence.)

19    BY MS. RO:

20    Q     Please describe this exhibit.  What is it?

21    A     So this is a bird's eye view of Terminal 3 at Los Angeles

22    International Airport.

23    Q     And please describe the sterile area of this image.

24    A     So there's --

25    Q     And feel free to use the screen.  You can mark --

1    A    Oh, I can?

2    Q    Yes.

3    A    Okay.  Excellent.

4         So there's a couple different colorations on this

5    particular map.  The purple area would constitute what we call

6    the security checkpoint screening area.  So the front part of

7    that would be nonsterile.  That's where passengers would get in

8    line to proceed through the security checkpoint.  And

9    ultimately, this more pinkish area, as well as the blue area,

10   would be what we call sterile.  So once a person passes through

11   the security checkpoint, they do enter the sterile area, and

12   the sterile area does include the airfield and the aircraft.

13   Q    So you mentioned how one can enter the sterile area.  If I

14   may, if I'm pointing an arrow this way -- or I guess the

15   appropriate is this way, is that one way to enter the sterile

16   area?  And, for the record, it's an arrow pointing into the

17   direction of the security checkpoint coming from the public

18   entry for Los Angeles International Airport.

19   A    Yes, that would be one way to enter the sterile area.

20   Q    And what is another way to enter the sterile area?

21   A    Another way would be deplaning an aircraft, you are

22   entering a sterile area.

23   Q    And what do you mean by "deplaning an aircraft"?

24   A    Every flight has an originating and destination location

25   both in the originating and destination.  On the originating

1   side you will go through the jet bridge to actually board the

2   aircraft.  That is all sterile, as is the aircraft.  And on the

3   destination side, when you arrive at your destination airport,

4   when you deplane, the aircraft, the jet bridge, and the area

5   you walk into is still sterile.

6   Q    So if passengers deplane, would they be coming through

7   this way?  And, for the record, it's an arrow pointing from the

8   blue area of the image from a destination flight would be

9   coming from.

10  A    Yes.  So specifically the blue area would be the airfield

11  itself where the planes taxi, and some of these smaller -- I

12  will mark them here, the appendages is the jet bridges.  An

13  aircraft would pull into the jet bridges, and people would go

14  into the sterile area from there.

15  Q    So, again, once people land at LAX and they deplane, do

16  they enter a sterile area?

17  A    Yes.

18  Q    When people deplane and enter the sterile area, do the

19  same security requirements apply, as you described before?

20  A    Yes.

21  Q    So does a person have to have been screened?

22  A    Yes.

23  Q    Do their carry-on items have to have been screened?

24  A    Yes.

25  Q    Are you familiar with the term "diplomatic pouch"?

1    A    I am.

2    Q    And how are you familiar?

3    A    I've had experience, both as a security officer clearing

4    diplomatic pouches and also management capacity and

5    senior-level management capacity of clearing those items,

6    proper screening procedures for those items.

7    Q    And is there a certain protocol you need to follow -- what

8    are the proper screening requirements?

9    A    Well, in order to be screened, the diplomatic pouch first

10   must meet specific criteria.

11   Q    And what is the specific criteria?

12   A    The specific criteria would be, number one, the item

13   that -- so diplomatic pouches are exempt if they meet the

14   proper criteria to constitute a diplomatic pouch, then that

15   item or items are exempt from screening.  In order to reach

16   that level, one of the first things that must be presented --

17   and typically, in my experience, how the process has played out

18   is a diplomatic courier most times is the individual that is

19   bringing a diplomatic pouch through an airport.

20        They just by nature of having done it previously, will

21   notify someone at the security checkpoint, usually a manager or

22   supervisor, to alert them that they have a diplomatic pouch.

23   At that point the supervisor or manager will engage in the

24   process, and on the pouch itself they are going to look for

25   specific distinctive markings:  number one, would be the pouch

must say "Diplomatic pouch" in English on the exterior of the pouch, and that pouch will have a specific and unique number associated with it.

The pouch is required to be sealed.  Typically it's sealed with a lead or plastic -- some sort of -- I guess I could use adhesive to describe it, and that typically will bear the seal of the Government that is sending the diplomatic materials through the screening process.

Additionally, the diplomatic pouch must have the address of the destination, the Government agency, embassy or ministry that that pouch is being delivered to.  From that point there's also a courier, the individual who's bringing that item through the airport.  The courier, basic requirements for that, there's two predominant ones:  number one, the courier must have in his or her possession a diplomatic passport, and the diplomatic passport will say on the front of the passport "Diplomatic Passport."  It is specific, and it is different than a standard U.S. passport that a nondiplomat will carry.

In addition to that, the courier will have what is known as a courier letter.  Within the courier letter there's going to be specific identifiers as well and distinguishing features that we would look at to determine authenticity.  Some of those would be the seal of the -- the official seal of the Government that's sending the diplomatic materials.  It's going to have the name of the courier, and the courier's diplomatic passport

1    number.  It will also have the diplomatic pouch number.  And

2    I'll further that by saying it's going to have all the criteria

3    of the diplomatic pouch.

4        So the pouch, in the traditional sense -- when I say

5    "pouch," it doesn't necessarily mean that it's a pouch.  It

6    could be a box.  It could be a bag.  It could be an envelope.

7    All those things would refer to a diplomatic pouch.  It will

8    specify the number of items, so a person may have two, three or

9    multiple items or they may have just one item.  It will specify

10    that in the courier letter.  It will have the number associated

11    with that item or those items.

12        It will have the approximate size and weight, so that the

13    individual that is assessing the authenticity of the materials

14    relied on to clear that gauge if this appears to be authentic.

15    It's going to also contain the address of the receiving party,

16    so, in other words, the Government, embassy, ministry, whoever

17    the receiving party is going to be will be in that.  And it

18    will also have the name, title, phone number, and address of

19    the initiator who is sending that diplomatic pouch.

20        So those are some of the distinguishing features we would

21    look for.  If all of those items are in concurrence, we would

22    exempt that item from screening.

23    Q    Can a diplomatic courier go through if the courier letter

24    matches with the pouch but did not meet the diplomatic passport

25    requirement?

1    A    I'm sorry, can you restate the question?

2    Q    Can a diplomatic courier go through security with a

3    diplomatic pouch if they only -- if they only have a courier

4    letter?

5    A    No.

6    Q    Is it an absolutely certainty that they need a diplomatic

7    passport?

8    A    Yes.

9    Q    Based on your training and experience, how many diplomatic

10   pouches have you processed, a ballpark?

11   A    Personally, firsthand experience, I would estimate 10 to

12   12.

13   Q    In front of your table there's Government's Exhibit 1.

14   It's an ID card with a yellow sticker --

15        I apologize.  If the case agent may give it to Mr. Cruz.

16   A    Thank you.

17   Q    Do you recognize this exhibit?

18   A    Yes, I do.

19   Q    How do you recognize it?

20   A    I observed this in the presence of yourself and the FBI.

21        MS. RO:  I'm publishing to the jury on the screen

22   Government's Exhibit 2 on the first page, which is a photocopy

23   of the physical item held by the witness.

24   Q    And were you asked to determine if this was a diplomatic

25   passport card?

```
 1   A      Yes.

 2   Q      And what is your opinion?

 3   A      No.

 4   Q      Why not?

 5   A      There's multiple things.  I can take you through them.  So

 6   authentic identifications issued by Government or state have

 7   distinguishing factors in them, a lot of which are security

 8   features, to ensure that they can't be duplicated by

 9   nonauthorized entities.  So first and foremost, just looking at

10   this on face value, one of the things that you will find with

11   any type of Government- or state-issued ID is uniformity.  You

12   can see on this particular --

13          Okay if I mark this screen?

14   Q      Yes, please.

15   A      You can see that the actual -- the actual ID itself, it's

16   nonuniform in terms of it's not centered from the laminate.  So

17   you can see it's off-center.  That would be one thing that I

18   would look at that would stand out.

19          And I guess I should say, obviously, the most obvious

20   thing to me is this is not a passport, so that would be first

21   and foremost that would be my concern.  But as I dig deeper,

22   the uniformity would be an issue.  I would also look at things

23   such as the font, the clarity of the font.

24          Can I use the back?

25   Q      Yes.
```

 1        I will now publish to the jury Government's Exhibit 2,

 2   page 2.

 3   A    So on the back, if you will notice, first of all, the text

 4   that's written on the back, it starts in lower case.  So that

 5   would be something that is a grammatical or -- well, sentences

 6   don't start in lower case; they start in caps.  You've got a

 7   multitude of fonts on the back.  So this appears one size.

 8        You've got down here on the bottom right, which there are

 9   various sizes there.  You also have a barcode, an issue date,

10   and I'm not sure what the S number HQ-001203/16 refers to, but

11   you can see on the barcode there's blurring, so those are not

12   defined.  That would be a factor that would be a concern as

13   well.

14   Q    Mr. Duretto, if I may just pause you for a second.  So

15   I'll zoom this in for the jury.

16   A    Sure.

17        So you can see that those are nondefined lines, as is --

18   actually, as is all this text here.  It's just blurred.  It's

19   not defined.  The Government identifications there's -- the

20   clarity is pure.  So you're not going to run into blurring.

21        If we could zoom out.

22        The seal, you'll see there's variations in shading.  That

23   would be problematic as well.  It's not clear.  I can't really

24   differentiate.  I can vaguely see "International."  I'm not

25   really sure what this says here.  You could see blotches here

1    in terms of definition.  It's not as dark as other areas.

2         And if we could zoom out again.

3         On the laminate itself, typically what you'll find -- not

4    typically.  Always what you'll find on authentic Government- or

5    state-issued IDs is security features that will contain -- and

6    you can see this on a U.S. passport.  The laminate actually has

7    security features in it, contained in it.  The purpose of that

8    is obviously so that someone can't take an identification and

9    alter it or modify it, which would deem it unauthentic or

10   invalid.

11        This particular one on the laminate itself, there is no

12   security features contained.  And as a matter of fact, and you

13   can see, I believe -- I will try to highlight.  This area here,

14   this area here, and this area here, and on the front as well,

15   you can see bubbling in the laminate, which would be a big

16   concern.  You won't see that in Government- or state-issued

17   IDs.  You will not see bubbling.  And actually enlarged, this

18   would be these areas here.

19        In addition to that, if we could zoom out, the signature

20   is blurred.  It's smeared, especially in this area here.

21        And then if possible, could we go back to the front?

22   Q    Yes.

23   A    Okay.  On this specific side here, the "Diplomat" written

24   across the front of the ID, you won't see that, but that's

25   really obstructing the ID itself.  It's print over print.  The

1    "Issued by," I don't -- I'm not able to reference a name.  It

2    just said "World chairman."  I don't know what this signature

3    is or what it relates to.  That's just indistinguishable to me.

4    So that would not be valid.

5         If you could zoom out.

6         You will typically see seals on state-issued IDs.  Those

7    are typically holograms, which would be a security feature.  So

8    this particular one here, again, has lack of definition in the

9    font that it's printed in.  It just looks like -- there's no

10   differentiation on the photo side versus the non-photo side.

11   So that, to me, with my experience, would appear to be

12   something that is not authentic in terms of security features

13   because it's just stamped on the actual card itself.

14        If we could zoom back out, please.

15        When I talked of -- excuse me -- uniformity, you can see

16   on the edges, typically -- again, I say typically, but I should

17   specify that it's at all times.  You will see Government- or

18   state-issued IDs, the uniformity piece is key and, those are

19   die cut.  You can see this particular corner here is distinctly

20   different in terms of the roundedness of the other three

21   corners.  That would be a concern.

22        And then just in terms of security features that we would

23   look at, some of those include -- and it could be any or all on

24   any specific Government- or state-issued ID, there are things

25   that are called microprinting, which is kind of exactly what it

1  sounds like; it's printing that is very microscopic, and you

2  can only see it through an enhanced lens we use in the airport

3  environment.  We use basically what would be a small magnifying

4  glass that you put up to your eye.  You hold up the ID, and you

5  can see microprinting that you can't see with the naked eye.

6       Microprinting would be, one, background patterns, or

7  colorations is another one because it's very hard to alter an

8  ID when there's background colorations or patterns.  This

9  specific ID has none.  Watermarks would be another

10  distinguishing feature.  There's no watermarks on this specific

11  ID.

12       Additionally, there's raised printing, and I can refer to

13  like the California driver's license.  If you run your fingers

14  across parts of the ID, you will feel that some of the printing

15  is raised.  And then there's also ultraviolet features that can

16  only be seen when put under an ultraviolet light.

17       So all those things put into one ball of wax, those would

18  be the things that we would look for.  And the vast majority of

19  those I do not see on this, which would deem this invalid.

20  And, again, just to emphasis, this is not a diplomatic

21  passport.

22            THE COURT:  With that, we are going to take the

23  morning recess.  Please return back to the Court at 12:00 -- we

24  will make it 12:45.  During your absence do not discuss the

25  case amongst yourself or with any other person, please.

```
 1              THE COURTROOM DEPUTY:  All rise for the jury,
 2    please.
 3         (Recess taken from 11:30 a.m. to 12:49 p.m.)
 4         (Other matters reported, not transcribed herein.)
 5              THE COURTROOM DEPUTY:  Ready?
 6              THE COURT:  Yes.
 7         (In the presence of the jury.)
 8              THE COURT:  We have the jury reassembled with the
 9    alternate, all counsel are present and the defendant.  Please
10    have a seat.
11         We continue with the examination of Mr. Duretto.
12              MS. RO:  Your Honor, nothing further from the
13    Government.
14              THE COURT:  Cross?
15                         CROSS-EXAMINATION
16    BY MS. WAKEFIELD:
17    Q    Good afternoon.
18    A    Good afternoon.
19    Q    The Government asked you questions about the requirements
20    for diplomatic pouches.  Do you recall that?
21    A    Yes.
22    Q    And your testimony regarding the requirements for
23    diplomatic pouches, that's based on your knowledge and review
24    of the standard operating procedures, correct?
25    A    Correct.
```

```
 1   Q    And the standard operating procedures are classified as
 2   sensitive security information?
 3   A    Correct.
 4   Q    And no part of the Standard Operating Procedures may be
 5   disclosed to the public, correct?
 6   A    Correct.
 7   Q    In fact, every page of the Standard Operating Procedures
 8   is marked with a warning that the document contains sensitive
 9   security information?
10   A    Correct.
11   Q    And that unauthorized release of these procedures may
12   result in penalties?
13   A    Correct.
14   Q    The Standard Operating Procedures are not available
15   online?
16   A    Correct.
17   Q    They're not published in legal books?
18   A    Correct.
19   Q    Now, the Standard Operating Procedures, they're the
20   official guidance for TSA's security officers?
21   A    I would not use the word "guidance."  I would say it's the
22   official policy that governs our frontline officers.
23   Q    It governs the officers of the TSA?
24   A    Correct.
25   Q    And those are the officers who screen bags, right?
```

```
 1    A     Yes.
 2    Q     And people?
 3    A     Yes.
 4    Q     Now, security officers are trained on the Standard
 5    Operating Procedures?
 6    A     Correct.
 7    Q     And they're, of course, allowed to look at them?
 8    A     Yes, they are.
 9    Q     And they receive -- officers receive in-the-classroom
10    training?
11    A     Yes, they do.
12    Q     They receive on-the-job training?
13    A     Yes.
14    Q     And they also must complete certification tests, right?
15    A     Yes, annually.
16    Q     Annually.
17          And supervisors also provide frequent briefing on the
18    Standard Operating Procedures to the frontline security
19    officers?
20    A     They do at times.
21    Q     Well, they're supposed to, right?
22    A     If needed, yes.  Not always.
23    Q     Well, the training that's provided to the security
24    officers, it's to help them follow what's in the Standard
25    Operating Procedures?
```

1    A    Correct.

2    Q    And you, you personally, have received extensive training

3    on the Standard Operating Procedures, right?

4    A    Yes.

5    Q    And that's part of the elevated position that you hold?

6    A    Correct.

7    Q    And you have extensive on-the-job experience implementing

8    the procedures in the Standard Operating Procedures?

9    A    Correct.

10   Q    It's fair to say that you know more about the Standard

11   Operating Procedures than a frontline screening officer?

12   A    Yes.  And if I may add to that, the -- the bag search,

13   pat-downs of individuals, as you advance further into

14   management and higher levels in management, your purview

15   becomes more focused on what we call management screening

16   Standard Operating Procedures, as opposed to what a uniformed

17   officer does in terms of the step-by-step procedures.

18   Q    Now, the Standard Operating Procedures, they have a

19   chapter on specialized screening of property?

20   A    Yes, correct.

21   Q    And that chapter includes a section on diplomatic pouches?

22   A    Yes.

23   Q    And it addresses diplomatic courier documentation?

24   A    Correct.

25   Q    Now, when a diplomatic pouch is presented, the Standard

```
 1   Operating Procedures tell the security officer to check for
 2   certain forms of documentation?
 3   A    Well, it's something that must be handled by a supervisor.
 4   That's the lowest level that can do it.  So the transportation
 5   security officers and lead officers are not authorized to
 6   conduct that screening.
 7   Q    So a supervisor has to do the screening and make the
 8   decision?
 9   A    Supervisor or above, yes.
10   Q    Now, we've talked -- or you've talked about with the
11   Government that the standard operation procedures tell the
12   screening officer, whether that's the frontline or the manager
13   or the supervisor, to check for a diplomatic passport?
14   A    Correct.
15   Q    And the other thing they're supposed to check for is a
16   courier letter?
17   A    Correct.
18   Q    Now, the Standard Operating Procedures, they don't tell
19   officers to rely on passenger statements, right?
20   A    Correct.
21   Q    They're supposed to look for documents?
22   A    Factual documents, yes.
23   Q    Factual documents?
24   A    Verifiable documents.
25   Q    Now I want to talk to you about airport security programs.
```

1    A    Okay.

2    Q    Each airport has its own security program?

3    A    Correct.

4    Q    LAX has a security program?

5    A    Correct.

6    Q    And that program defines the sterile areas of LAX?

7    A    Correct.

8    Q    And what procedures are in place at LAX?

9    A    I'm not sure I understand the question, what procedures.

10   Q    What security procedures are in place at LAX?

11   A    Anybody that -- anybody that enters the sterile area must

12   receive 100 percent screening of the person and property.

13   Q    Well, I want to ask you about LAX's security program.

14   LAX's security program, as you said, is specific to LAX,

15   correct?

16   A    Yes.

17   Q    Now, Chicago Midway has its own airport security program?

18   A    Yes.

19   Q    O'Hare Chicago has its own security program?

20   A    Yes.

21   Q    St. Paul-Minneapolis airport has its own security program?

22   A    Yes.

23   Q    Now, you're aware that on July 25th, 2017, Mr. Flint's

24   first flight was from Chicago Midway?

25   A    As I understand it, yes.

1   Q    And so when he was at Midway Airport, Midway's security

2   program applied to him there, correct?

3   A    Yes.

4   Q    And then when he was at Minneapolis-St. Paul, that airport

5   security program applied to him when he was there?

6   A    Yes.

7   Q    And then when he flew from Minneapolis-St. Paul to LAX and

8   his flight landed at LAX, LAX's security program applied to him

9   at LAX?

10  A    Yes.

11  Q    Now, you testified that you are the assistant federal

12  security director for screening at LAX.

13  A    Correct.

14  Q    And you don't work at Midway, correct?

15  A    Correct.

16  Q    And you have never worked at Midway?

17  A    No.

18  Q    And you don't work at Minneapolis-St. Paul?

19  A    No, I do not.

20  Q    And you have never worked there?

21  A    No.

22  Q    Now, LAX's security program is considered sensitive

23  security information?

24  A    Correct.

25  Q    It's contents are not allowed to be disclosed to the

```
 1   public?
 2   A    Correct.
 3   Q    Public can't see what's inside LAX's security program?
 4   A    Correct.
 5   Q    Can't see the procedures outlined in that security
 6   program?
 7   A    Correct.
 8   Q    Now, LAX's security program differentiates between when
 9   the screening checkpoints are operational and when the
10   screening checkpoints are nonoperational?
11   A    I don't know if that's contained in the airport security
12   plan.  Are you referring specifically to hours of operation?
13   Q    No.  I'm referring to the section that deals with access
14   by passengers.
15               MS. RO:  Objection, Your Honor; vague.
16               THE COURT:  Do you understand the question?
17               THE WITNESS:  I do not.
18               THE COURT:  Rephrase.
19               MS. WAKEFIELD:  Thank you, Your Honor.
20   Q    LAX's security program, it's written down, right, in a
21   document?
22   A    Yes, correct.
23   Q    And the section of the document that deals with passenger
24   access --
25   A    Okay.
```

```
1   Q    -- deals with -- has a section that talks about when
2   security checkpoints -- when screening checkpoints are
3   nonoperational, right?
4   A    Yes.  So when -- for clarification, I'm assuming you're
5   referring to when the screening operations are closed,
6   nonoperational?
7   Q    Well, you tell me.  The security program says when
8   passenger screening checkpoints are nonoperational -- if it
9   would refresh your recollection, I can direct you to the
10  section.
11  A    So point of clarification, the airport security plan is
12  really -- it's a regulatory department that has jurisdiction or
13  governance over the airport security plan.  I'm specifically
14  from the airport screening operation, so I can look at it and
15  give you some sort of intelligent answer, but it's not -- the
16  airport security plan is nothing I operate off of.  We operate
17  off of the Standard Operating Procedures for screening.
18  Q    So you don't operate off of the airport security program
19  at LAX?
20  A    There would be components of -- for example, there's
21  access doors throughout the airport where you can use your
22  secure media card to access.  Those would be things that just
23  by nature of -- nature of going from one place to another
24  throughout the course of the day would be something that
25  would -- I would encounter in regards to the airport security
```

```
 1   plan.  But, again, basically the entirety of what the security
 2   operation operates off of is our Standard Operating Procedures
 3   for the screening operation.
 4   Q    Okay.  So is it fair to say, then, you are not as familiar
 5   with LAX's airport security plan?
 6   A    I have general knowledge of it, but I'm not a subject
 7   matter expert.  That would be our inspectors or regulators that
 8   would be the subject matter experts.
 9   Q    So you don't consider yourself an expert in LAX's airport
10   security plan?
11   A    I have a general understanding of it.
12   Q    So that's a "no"?
13   A    That's a "no."
14   Q    So your testimony today is based on your expertise with
15   respect to TSA's Standard Operating Procedures?
16   A    So yes.  However, one thing that I would say that, yes, I
17   am a subject matter expert in is defined areas in the airport
18   that are sterile versus nonsterile, which would be included in
19   the airport security plan.
20   Q    Okay.  So just so I'm clear, so the airport security plan
21   defines what areas are sterile and not sterile at LAX?
22   A    It's an agreement between the airport authority and TSA.
23   Q    Okay.  And you consider yourself an expert in that portion
24   of the airport security program; is that --
25   A    Yes, correct.
```

**UNITED STATES DISTRICT COURT**

```
 1  Q    So, then, you're familiar with the section of the airport
 2  security program that deals with when passengers can enter the
 3  sterile area when the passenger screening checkpoint is
 4  nonoperational?
 5  A    I would have to view it to know what you're referring to.
 6  Q    Okay.  It should be Defense Exhibit 148.  I apologize,
 7  there are a lot of binders up there.
 8       (Exhibit 148 for identification.)
 9            THE WITNESS:  148?
10  BY MS. WAKEFIELD:
11  Q    148.
12  A    Okay.
13  Q    And if you look at page 2.
14  A    Okay.
15  Q    You see where it says "Access controls to be used when the
16  passenger screening checkpoint is nonoperational"?
17  A    Yes, I see that.
18  Q    And you're not familiar with this section of the airport
19  security program?
20  A    I've read it at some point.  It's been quite a while.  I
21  would have to review it.
22  Q    Okay.  Well, this section deals with when screening
23  checkpoints are nonoperational, correct?
24  A    I would have to read it first.
25            MS. WAKEFIELD:  May I have one moment, Your Honor?
```

```
 1                    THE COURT:  Yes.
 2           (Discussion off the record.)
 3   BY MS. WAKEFIELD:
 4   Q    Thank you.  If you're not familiar with it, then I'm not
 5   going to ask you any questions on it.
 6   A    Okay.
 7              MS. WAKEFIELD:  May I have one more moment,
 8   Your Honor?
 9           (Discussion off the record.)
10              MS. WAKEFIELD:  Nothing further, Your Honor.
11              THE COURT:  Thank you.
12           Redirect?
13              MS. RO:  Yes, Your Honor.
14                      REDIRECT EXAMINATION
15   BY MS. RO:
16   Q    Mr. Duretto, defense counsel just asked you to look at the
17   airport security program, and they referenced it in a defense
18   exhibit, and I apologize, I forget the exhibit number.  You
19   mentioned that you're an expert of the sterile area within it?
20   A    Yes.
21   Q    If I could turn your direction to the defense exhibit,
22   second page.
23   A    Okay.
24   Q    Paragraph --
25              THE COURT:  What number are you referring to?
```

```
 1   Exhibit 148?
 2               MS. WAKEFIELD:  It's 148, Your Honor.
 3               MS. RO:  Thank you.  Sorry.
 4   Q    Defense Exhibit 148, the second page, and only the
 5   specific section under 6.1.
 6   A    Okay.
 7               THE COURT:  And this is Bates-stamped 1039?
 8               MS. RO:  Yes, Your Honor.
 9   Q    Are you familiar with that specific paragraph?
10   A    May I read it first?
11   Q    Yes.
12               THE COURT:  To yourself, first.
13   BY MS. RO:
14   Q    To yourself.
15   A    Yes.
16        Okay.  Yes, I'm familiar with that.
17   Q    And what is the definition of a sterile area during the
18   inplaning and deplaning of passengers specific to boarding
19   bridges or stairs?
20   A    I'm unclear of what you mean by "inplaning."
21   Q    Sure.  What is the definition of a sterile area based on
22   that specific paragraph, if you know from your own knowledge?
23   A    So a sterile area, based off of this paragraph, would be
24   areas beyond the security checkpoint where passengers and
25   property have been screened, and that would be inclusive of --
```

1    I mentioned previously to the defense, there's access doors

2    that only security media can authorize you through those doors.

3    Those would be encompassed in the sterile area, as would the

4    holding areas for boarding of aircraft, the jet bridges, which

5    you walk onto the aircraft, the aircraft itself.  And then,

6    again, as stated earlier, the airfield itself is also a sterile

7    area.

8              MS. RO:  I'm publishing to the jury what's been

9    previously admitted as Government's Exhibit 45, which is an

10   image of Terminal 3.

11   Q    You mentioned the boarding bridges and boarding stairs.

12   Is that indicated in this image?

13   A    Yes.

14   Q    And can you please circle the area.

15   A    And, actually, these lines here, so everything that's

16   blue, this is all airfield.  This would be outdoors, of course.

17   This is not inside the building, but this entire area would be

18   sterile.

19             MS. RO:  May the record reflect that the witness has

20   drawn a red square around the blue area of this exhibit, as

21   well as drawing a circle around the pink -- the pink image as

22   well.

23             THE COURT:  Not quite a circle, but --

24             MS. RO:  An outline.

25             THE COURT:  He outlined it.

1    BY MS. RO:

2    Q    So are these the sterile areas of Los Angeles

3    International Airport?

4    A    Yes, ma'am.

5    Q    And are security requirements and TSA policies derived

6    from United States statutes, regulations, United States law?

7            MS. WAKEFIELD:  Objection; calls for a legal

8    conclusion and compound.

9            THE COURT:  Overruled.

10           THE WITNESS:  There are Code of Federal Regulations

11   that govern that, and, again, that would be our compliance,

12   also referred to as regulatory department that has oversight on

13   those areas.

14           MS. RO:  Your Honor, may I have one quick moment?

15       Nothing further, Your Honor.

16           THE COURT:  Recross?

17           MS. WAKEFIELD:  Nothing.  Thank you.

18           THE COURT:  Thank you, sir, for your testimony.

19           THE WITNESS:  Thank you, Your Honor.

20           THE COURT:  May the witness be excused?

21           MS. RO:  Yes, Your Honor.

22           THE COURT:  Mr. Duretto is excused.  Thank you.

23       (Other matters reported, not transcribed herein.)

24           MS. WAKEFIELD:  Your Honor, the defense would call

25   Michael Simon to the stand.

1          **MICHAEL SIMON, DEFENSE WITNESS, WAS SWORN**

2          THE WITNESS:  Yes.

3          THE COURTROOM DEPUTY:  Thank you.  Would you please

4    be seated.

5       Sir, for the record, would you please state your name, and

6    spell your last name.

7          THE WITNESS:  Sure.  My name is Michael Simon, last

8    name spelled S-i-m-o-n.

9                          **DIRECT EXAMINATION**

10   BY MS. WAKEFIELD:

11   Q    Good afternoon.

12   A    Good afternoon.

13   Q    Now, you are the case agent on this case, right?

14   A    That is correct.

15   Q    And I'm going to be brief.  As the case agent, you sent a

16   letter to the United Nations, correct?

17   A    I did not send a letter to the United Nations.

18   Q    Did you sign a letter to the United Nations?

19   A    No, I did not.

20   Q    Did you send a letter to the state department?

21   A    No, I did not -- well, let me correct that.  I sent a

22   letter to -- a request to the FBI in New York, who then

23   requested, through their formal channels, they wrote a letter

24   to the U.S. mission to the United Nations.  So my letter was

25   forwarded to the U.S. mission to the United Nations.

1    Q     And the U.S. mission to the United Nations sent a request

2    to the United Nations?

3    A     That is correct.

4    Q     And forwarded your letter, correct?

5    A     I do not believe they forwarded my letter.  I think they

6    wrote their own letter to the United Nations.

7    Q     And point of all of this was asking the United Nations to

8    provide confirmation of the status of the international human

9    rights fund -- or sorry, International Human Rights Commission

10   Relief Fund Trust?

11             MR. YANNIELLO:  Objection; hearsay and misstates --

12             THE COURT:  Overruled.

13             THE WITNESS:  Can you ask it one more time, please?

14   BY MS. WAKEFIELD:

15   Q     You wanted to find out from the United Nations whether the

16   International Human Rights Commission Relief Fund Trust had any

17   status with the United Nations?

18   A     If I can recall correctly, my letter requested to

19   determine the diplomatic status of the International Human

20   Rights Commission.

21   Q     And they replied that an organization --

22             MR. YANNIELLO:  Objection; hearsay.

23             THE COURT:  Sustained.

24             MS. WAKEFIELD:  Your Honor, we would move this -- we

25   would move an exhibit into evidence, so I don't know if --

1          THE COURT:  What exhibit number?

2          MS. WAKEFIELD:  Defense Exhibit 202.

3          THE COURT:  Is it in the book?

4          MS. WAKEFIELD:  It is, Your Honor.

5          MR. YANNIELLO:  Objection; hearsay.

6          THE COURT:  Let me find the exhibit, please.

7     The objection would be sustained subject to further

8 argument.

9          MS. WAKEFIELD:  Would the Court want us to --

10          THE COURT:  No.  Continue with your questioning.

11          MS. WAKEFIELD:  Okay.

12 Q    Agent Simon, you reviewed the documents in Mr. Flint's

13 binder that was seized on July 25th, 2017, correct?

14 A    Are you asking me if I reviewed them that day?

15 Q    You reviewed the documents, right?

16 A    Yes, I reviewed the documents.

17          MS. WAKEFIELD:  And, Your Honor, I would like to

18 publish Government's Exhibit 8.

19          THE COURT:  Feel free if it's already been received.

20 8's already in evidence.

21 BY MS. WAKEFIELD:

22 Q    Now, that is an ID card from the United Nations for

23 Mr. Shumake, correct?

24 A    That looks -- that, to me, appears --

25          MR. YANNIELLO:  Objection; lacks foundation.

1    MS. WAKEFIELD:  This is the Government's exhibit,

2    Your Honor.

3         THE COURT:  Are you able to identify this as the ID

4    card from the United Nations?  Do you know one way or the

5    other?

6         THE WITNESS:  Your Honor, no, I do not.

7    BY MS. WAKEFIELD:

8    Q    You don't know what an ID card from the United Nations is?

9         THE COURT:  It's sustained on foundation.

10   BY MS. WAKEFIELD:

11   Q    So your testimony is you don't know what an ID from the

12   United Nations looks like?

13   A    I'm trying to say that this is a photocopy of -- this is a

14   photocopy of some kind of card.

15   Q    Are you familiar with the term ECOSOC, which stands for

16   Economic and Social Council?

17   A    I believe that's what was in the letter from the United

18   Nations.

19   Q    And ECOSOC refers to a committee or a council within the

20   United Nations, correct?

21   A    I know that it's called the Economic and Social Council.

22   Q    And you see the acronym ECOSOC on Government's Exhibit 8

23   there, correct?

24   A    Yes, I do.

25   Q    Did you investigate whether Mr. Shumake had any

1    recognition from the United Nations?

2    A    According to the letter, the International Human Rights

3    Commission had observer status with the ECOSOC.

4    Q    And Mr. Shumake was listed as a contact for the IHRC on

5    that council?

6    A    If I could look at the exact letter to refresh my memory.

7    Q    Would it refresh your memory to look at Defense Exhibit

8    202?

9    A    Yes.

10   Q    It should be in one of those binders, and page 2,

11   paragraph 2.  And let me know if that refreshes your memory.

12   A    Okay.

13   Q    Does that refresh your recollection?

14   A    Yes.

15   Q    And Mr. Shumake was listed as one of the individuals as a

16   contact person for the United Nations, correct?

17   A    Yes.

18         MS. WAKEFIELD:  One moment, Your Honor.

19        (Discussion off the record.)

20         MS. WAKEFIELD:  Nothing further.

21                       **CROSS-EXAMINATION**

22   BY MR. YANNNIELLO:

23   Q    Good afternoon, Agent Simon.

24   A    Good afternoon.

25   Q    Defense counsel asked you about some investigation that

```
 1   you conducted about Robert Shumake.

 2   A      Correct.

 3   Q      Did you conduct any other investigations related to

 4   Mr. Shumake?

 5             MS. WAKEFIELD:  Objection.  It exceeds the scope.

 6             THE COURT:  Overruled.

 7             THE WITNESS:  I did.

 8   BY MR. YANNIELLO:

 9   Q      Did you look into Mr. Shumake's criminal history?

10   A      Yes, I did.

11   Q      And what did that investigation reveal?

12   A      It revealed --

13             MS. WAKEFIELD:  I'm going to object on 403.

14             THE COURT:  Overruled.

15             THE WITNESS:  It revealed a long criminal history as

16   I would -- and I say that in there are multiple pages in the

17   criminal history report.

18   BY MR. YANNIELLO:

19   Q      Was Mr. Shumake -- at the time that defendant was stopped

20   in July 25th, 2017, was there a pending fraud case against

21   Mr. Shumake?

22   A      That is correct.

23             MR. YANNIELLO:  Nothing further, Your Honor.

24             THE COURT:  Redirect?

25             MS. WAKEFIELD:  No, Your Honor.
```

1          THE COURT:  May the witness be excused?

2          MS. WAKEFIELD:  Yes.

3          THE COURT:  Thank you.

4       (Partial proceedings concluded at 3:22 p.m.)

5                      --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3     COUNTY OF LOS ANGELES    )
                               )
4     STATE OF CALIFORNIA      )

5

6          I, CAROL JEAN ZURBORG, Federal Official Realtime

7     Court Reporter, in and for the United States District Court for

8     the Central District of California, do hereby certify that

9     pursuant to Section 753, Title 28, United States Code that the

10    foregoing is a true and correct transcript of the

11    stenographically reported proceedings held in the

12    above-entitled matter and that the transcript page format is in

13    conformance with the regulations of the judicial conference of

14    the United States.

15

16    Date:  October 18, 2018

17

18

19                        /s/ CAROL JEAN ZURBORG

20          _____
                 CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
21                    Federal Official Court Reporter

22

23

24

25