1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3         HONORABLE S. JAMES OTERO, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,          )
                                       )
6                    Plaintiff,        )
                                       )              Case No.
7        vs.                           )      CR 17-00697 SJO
                                       )
8   DANIEL FLINT,                      )            VOLUME 1
                                       )        (Pages 1 - 208)
9                    Defendant.        )
    _____ )

10

11

12

13        REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
                         TRIAL DAY 1
14               TUESDAY, OCTOBER 16, 2018
                         9:07 A.M.
15               LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22   _____

23        CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
              FEDERAL OFFICIAL COURT REPORTER
24            350 WEST 1ST STREET, SUITE 4311
            LOS ANGELES, CALIFORNIA 90012-4565
25                   (213) 894-3539

1                        **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4        NICOLA T. HANNA
         United States Attorney
5        BY:  CHRISTINE RO
         BY:  IAN YANNIELLO
6        BY:  MARK AVEIS
              Assistant United States Attorneys
7        United States Courthouse
         312 North Spring Street
8        Los Angeles, California 90012

9    **FOR THE DEFENDANT:**

10       HILARY LEE POTASHNER
         Federal Public Defender
11       BY:  CRAIG A. HARBAUGH
         BY:  GEORGINA WAKEFIELD
12            Deputy Federal Public Defenders
         Central District of California
13       321 East Second Street
         Los Angeles, California 90012

14

15

16

17

18

19

20

21

22

23

24

25

                      **UNITED STATES DISTRICT COURT**

1

**I N D E X**

2

3      --------------------------------------------------------

**CHRONOLOGICAL INDEX OF WITNESSES**

4

5   **EXAMINATIONS**                                              **PAGE**

6    **GOVERNMENT WITNESSES**

7   CHRISTOPHER KOTULA
          DIRECT EXAMINATION BY MS. RO                     134
8          CROSS-EXAMINATION BY MR. HARBAUGH              148
          REDIRECT EXAMINATION BY MS. RO                  168
9
     GUY SHERIDAN
10          DIRECT EXAMINATION BY MS. RO                    170
          CROSS-EXAMINATION BY MS. WAKEFIELD             177
11
     CLAY YOKSAS
12          DIRECT EXAMINATION BY MS. RO                    187
          CROSS-EXAMINATION BY MR. HARBAUGH              196
13          REDIRECT EXAMINATION BY MS. RO                  205

14

15

16

17

18

19

20

21

22

23

24

25

1

**INDEX OF EXHIBITS**

| NUMBER | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 1 | | 141 |
| 2 | | 192 |
| 11 | 142 | 142 |
| 12 to 16 | 145 | 146 |
| 20 | | 189 |
| 21 to 23 | | 194 |
| 218 | | 158 |
| 265 | 197 | |

**UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, OCTOBER 16, 2018

 2                            9:07 A.M.

 3                            --oOo--

 4              THE COURTROOM DEPUTY:  Calling Item No. 1:

 5    Case number CR 17-00697 SJO; United States of America versus

 6    Daniel Flint.

 7         Counsel, please state your appearances.

 8              MS. RO:  Good morning, Your Honor.  Christine Ro,

 9    Ian Yanniello, and Mark Aveis for the United States.  And

10    sitting with us at counsel table is FBI Special Agent Michael

11    Simon.

12              MR. HARBAUGH:  Good morning, Your Honor.  Craig

13    Harbaugh and Georgina Wakefield from the federal public

14    defender's office for Daniel Flint.

15              THE COURT:  Please have a seat.  Good morning.

16              MR. YANNIELLO:  Good morning.

17              MR. AVEIS:  Good morning.

18              MS. WAKEFIELD:  Good morning.

19              THE COURT:  So one thing that judges generally do

20    not like are surprises, and in this particular case there's

21    been a few motions that have been filed in an untimely manner

22    and certain issues raised that could have been raised

23    previously.  This case has been pending for quite a long time,

24    and certain of the issues that have been presented to the Court

25    are last-minute matters presented.  So we need to discuss
```

```
 1   certain of them.
 2       I have a joint statement of the case.  The joint statement
 3   of the case appears to be agreed to by both sides.  That will
 4   be read to the jury.  I have the Government's proposed voir
 5   dire and the defendant's proposed voir dire.  The Government
 6   has filed in camera the statements of anticipated witnesses.
 7       Has that been provided to the defendant or defense
 8   counsel, have the statements?
 9           MS. RO:  The discovery production it has,
10   Your Honor, but the actual documents, as organized, that the
11   Court has, they did not receive that copy.
12           THE COURT:  And why not?  Do you intend to use these
13   during the course of the trial?
14           MS. RO:  Yes, Your Honor.
15           THE COURT:  Then they should be disclosed
16   immediately.
17           MS. RO:  Yes.
18           THE COURT:  I have a pleading that is -- that's been
19   filed under seal.  It's defendant's trial memorandum.  I
20   appreciate trial memorandums, but trial memorandums should be
21   disclosed to the other side on the day of trial.  I have not
22   read this trial memorandum because the Court does not intend to
23   read a trial memorandum that's filed in camera, not disclosed
24   to the other side on the day of trial.  If it was filed
25   previously, you could do that -- you could -- defense could
```

file a trial memorandum in camera if it's a few days before

trial, but I'm not going to read it on the day of trial.  So if

you did not share it with Government's counsel, the Court would

decline to read it.

I have the Government's witness list.  I have the joint

proposed jury instructions.  I have the Government's proposed

verdict form, Government's disputed jury instructions, defense

proposed instructions, and objections to Government's proposed

instructions.  And then I have a document entitled

"Government's Disputed Jury Instructions and Objections to

Defendant's Proposed Instructions."  We will put that aside.

I have also a pleading entitled the Government's -- and

this was filed yesterday, "Government's Opposition to

Defendant's Admission of Foreign Documents, Declaration of

Christine M. Ro."  I have not had time to review the

Government's opposition.  I understand that the Government has

certain objections to certain exhibits that the defendant would

be offering at trial.  The primary objection I understand is

based on authenticity.

I would just -- I'm going to give leeway to the defendants

to offer any admissible records at trial.  You can make

reference to these records during opening statement, but you're

cautioned, the records have to be -- you have to lay a

foundation for the admission of these records.  So if there's

any doubt in your mind as to whether they're going to be

1    received and whether they are admissible or not, you should be

2    very careful about mentioning them in opening statement.

3        The Court will rule on the admission of these documents at

4    the time they're offered, if they're offered at all.  And I'm

5    not going to give an advance advisory ruling as to what

6    documents will be admitted or not.  It's up to the defendant to

7    make sure that the foundation is laid.  The foundation is laid

8    if it's relevant, if authenticity has been established.  They

9    will be received unless there's another objection that should

10   be sustained.

11       I have the Government's -- I have the defendant's motion

12   in limine to preclude or limit expert testimony.  The expert

13   testimony has to do with an expert that the Government intends

14   to call, Danishgar, Fahima Danishgar is the person.  The

15   defendants -- or defense counsel has objected because the

16   proposed expert testimony of Danishgar was not timely produced.

17       So I would conclude that the testimony of Danishgar does

18   qualify as expert testimony, and the Government was required to

19   comply with the requirements of the Federal Rules of Criminal

20   Procedure regarding disclosure, so the Court is going to limit

21   the opinions offered by that witness to opinions that were

22   referenced in the letter of October 2nd, 2018.

23            MS. WAKEFIELD:  And, Your Honor, the Government

24   filed an opposition yesterday narrowing the proposed testimony

25   just to data searches that the expert did, and we're fine with

1    that.

2            THE COURT:  I have not read the opposition.  So

3    you're fine with -- what is the Government going to offer here

4    in reference to this witness?

5            MS. RO:  That there was a database that the state

6    department uses, and it's maintained within the state

7    department.  And within the database includes names and

8    organizations who are recognized by the state department as a

9    diplomat, including the October 2nd, 2018 letter; an October

10   9th, 2018 letter, basically that Daniel Flint and the

11   International Human Rights Commission, the International Human

12   Rights Commission Relief Trust Fund and the letter that defense

13   has about Robert Shumake, that those names are either in the

14   database or they're not in the database.

15           THE COURT:  So there's no dispute?

16           MS. RO:  No, Your Honor.

17           MS. WAKEFIELD:  The only potential issue, I wasn't

18   sure about this letter.  There was a letter dated October 9th

19   from a witness who's not testifying.  And so we would object to

20   introducing the letter of a non-testifying witness.

21           MS. RO:  And that's fine, Your Honor.  The substance

22   of the letter is what our state department witness will be

23   testifying to based on her own percipient witness testimony.

24           THE COURT:  Okay.  So that appears to be resolved.

25           MR. YANNIELLO:  And, Your Honor, if I may just say

```
 1    one thing about the foreign documents you referenced, the
 2    gravamen of the issue isn't necessarily the authenticity of the
 3    documents.  It's their inherent trustworthiness.  The
 4    defendants have offered the records as foreign business records
 5    from this entity.  And as the Government lays out, there are
 6    indicia of significant and serious issues about the reliability
 7    of these documents, and the jury may be prejudiced if an
 8    opening statement or even a reference to some of them.
 9             THE COURT:  I think I made it clear, the
10    Government's opposition was filed yesterday.  The Government
11    had plenty of time to file an opposition before yesterday so
12    the Court could carefully consider it.  I'm going to give the
13    defendants leeway to offer any reliable admissible document
14    that is important to their -- to the defense of their client,
15    with the proviso if they mention it in opening statement and
16    it's not received thereafter, that may affect the jury's view
17    of the credibility of the defense counsel and the defendant.
18    So it's up to you as to how you want to proceed.
19        And then I have an order that was issued yesterday
20    granting in part and denying in part the Government's motion to
21    admit clips of the defendant's recorded audio interview and
22    exclude hearsay.  Has that been reviewed?  And are there any
23    questions?
24             MS. RO:  They have been reviewed, Your Honor, and
25    there is no questions.  The Government is in the process of
```

```
 1    getting those exact clips prepared, and we have informed

 2    defense counsel those are the only clips that we will be

 3    playing.

 4              THE COURT:  Okay.

 5              MR. HARBAUGH:  Yes, Your Honor, the Government has

 6    clarified that they will be providing the additional clips, so

 7    the defense will not need to present those clips independently.

 8              THE COURT:  And then I have -- there was an order

 9    issued yesterday.  Let's see.  It's an order entitled "Order

10    Granting the Government's Motion to Admit Evidence of

11    Defendant's Other Acts," and I understand there is an issue or

12    dispute here.

13              MR. HARBAUGH:  Yes, Your Honor.  We simply just want

14    to clarify for the record, we believe it's -- or to proffer --

15    to make our record, we believe that the decision relies on a

16    material factual error, specifically that Mr. Flint asserted

17    diplomatic immunity on July 25th, the date of the offense,

18    when, in fact, the recording establishes that he does not claim

19    diplomatic immunity, which is different than carrying a

20    diplomatic pouch.

21         And so, Your Honor, we believe that that factual error

22    undermines the entire basis for the 404(b) motion.

23    Alternatively, Your Honor, if the Court persists in its ruling,

24    we are proposing, given the inflammatory nature of the

25    documents, particularly this certified record, with regard to
```

1    it -- in it it suggests he got jail time, which, in fact, he

2    didn't, but it creates the impression he got jail for this

3    essentially traffic offense.

4        And, Your Honor, we want the testimony limited to -- or

5    we're willing to stipulate that he made, at least twice, claims

6    of diplomatic immunity; no reference to any assertion that he

7    claimed via a civil rights attorney for the United States, no

8    statements regarding the impression that he was bullying or any

9    of that because it's not pertinent to the 404(b) assertion.

10   And so, Your Honor, we are proposing that, because we believe

11   under 403(b) it's too prejudicial to allow the testimony in its

12   entirety as the Government seeks.

13       THE COURT:  Well, there shouldn't be any reference

14   to any suggestion that he served any type of jail time or was

15   incarcerated.

16       MR. YANNIELLO:  We have already informed the defense

17   that we would redact that portion of the exhibit.  But to

18   respond to defense counsel's argument, I think that there is no

19   material factual issue.  The Court's ruling is very thorough

20   and actually factually correct.  The assertion of diplomatic

21   immunity over a pouch -- I'm sorry.  The assertion that your

22   pouch is immune from screening is a form of diplomatic

23   immunity.

24       I also think that the gravamen of the Court's ruling is

25   that defendant asserted some form of diplomatic status or

```
1    immunity to evade law enforcement consequences.  So the

2    reference to the specific word that defendant objects to,

3    "immunity," the Government's position is it's factually

4    correct, and it certainly is a material factor.

5              THE COURT:  Yes.  And this order is not going to be

6    shared with the jury.  So anyway, the issue has been raised,

7    and the record has been made.

8         Are we ready to start?

9              MS. RO:  Your Honor, I just want to bring one issue

10   to the Court -- not an issue, but the Government will provide

11   the Court with an amended witness list.  We forgot to include

12   the name of Deputy John Schneider, and we will be calling him,

13   and that's the deputy referenced in the 404(b) order that the

14   Court just referenced today.

15        Also, the defense requested that the Government call two

16   federal agents, and we're doing -- one is our case agent, Mike

17   Simon.  The defense has no objection that our case agent sits

18   at counsel table, but I did want to raise it to the Court's

19   attention.

20        The second witness that they provided is a federal TSA

21   officer.  He works for the air marshal, Wes Williams.  We are

22   doing our best to contact him, but we would want a proffer,

23   revisit it because his testimony is exactly what

24   Special Agent Rebecca Marriott would be testifying to.  I just

25   wanted to raise those issues with the Court with witnesses.
```

```
 1              THE COURT:  Okay.
 2              MR. YANNIELLO:  And just to clarify, Deputy John
 3  Schneider is in the statements of witnesses provided to the
 4  Court.  However, the Government omitted his reference to -- on
 5  the witness list, and we will amend that by noon.
 6              THE COURT:  Okay.  So what is the trial estimate?
 7              MS. RO:  Three days, Your Honor.
 8              THE COURT:  And defense agrees, approximately?
 9              MS. WAKEFIELD:  That's about right, Your Honor.
10              THE COURT:  Okay.  This seems to be a bit of a
11  strange case, from my perspective.  The issue of whether the
12  defendant has diplomatic immunity or not and was authorized to
13  carry a diplomatic pouch or not appears to be more of a legal
14  issue than a factual issue.  I'm assuming, based on what I'm
15  reading into everything that has been filed here, that it may
16  be that the defendant had a good faith belief that he had
17  immunity.
18       And is good faith a defense?
19              MS. WAKEFIELD:  It is, Your Honor.
20              MR. YANNIELLO:  Yeah, defendant's mental state is at
21  issue.  The Government would agree with the Court, it is a
22  legal issue whether or not defendant had diplomatic immunity at
23  the time or he asserted it.
24              THE COURT:  Okay.  Let's get the jury.
25       (Pause in proceedings.)
```

1           THE COURT:  So one issue we need to raise is the

2     issue of sidebars.  In the jury selection process, we will call

3     18 prospective jurors.  The Court will conduct all voir dire.

4     At the conclusion of the voir dire, I will call counsel to

5     sidebar, ask counsel if there's any additional questions that

6     were not asked that you would like me to ask the panel as a

7     whole and then whether there's any follow-up questions of any

8     particular jurors.

9        The defendant is generally not present at sidebar, so we

10    will need his waiver so that the matters can be addressed at

11    sidebar.

12           MS. WAKEFIELD:  He's willing to waive that,

13    Your Honor.

14           THE COURT:  Okay.  Mr. Flint, have you been able to

15    discuss that issue with your lawyers?

16           THE DEFENDANT:  Yes, I have, Judge.  That's fine.

17           THE COURT:  And you understand your right to be

18    present at all proceedings during the course of trial?  We are

19    going to have sidebar proceedings where the lawyers and the

20    Court will be discussing additional questions to ask.  Counsel

21    will have free rein.  If they need to consult with you on any

22    issue, they will be able to approach you at counsel table and

23    have any discussions.

24           THE DEFENDANT:  Yes, Your Honor.

25           THE COURT:  So you agree?

```
 1              THE DEFENDANT:  Yes.
 2              THE COURT:  Okay.
 3         (Discussion off the record.)
 4              THE COURT:  We have five to ten minutes while the
 5    jury arrives.
 6              THE COURTROOM DEPUTY:  The court's in recess.
 7         (Recess taken from 9:27 a.m. to 9:47 a.m.)
 8              THE COURTROOM DEPUTY:  Please remain seated and come
 9    order.
10         (Pause in proceedings.)
11              THE COURT:  Let's bring the jury in.
12              THE COURTROOM DEPUTY:  Counsel, would you all rise
13    for the jury, please.
14         Everyone rise for the jury.
15         (In the presence of the jury.)
16              THE COURTROOM DEPUTY:  Please come to order.  This
17    United States District Court, Central District of California,
18    is now in session, the Honorable S. James Otero presiding.
19         Calling Item No. 1:  Case number CR 17-00697 SJO; United
20    States of America versus Daniel Flint.
21         Counsel, please state your appearances.
22              MS. RO:  Good morning, Your Honor.
23         Good morning, members of the jury.  My name is Christine
24    Ro.  I represent the United States.  Sitting with me at counsel
25    table is Assistant United States Attorneys Ian Yanniello, Mark
```

1   Aveis, and FBI special agent Michael Simon.

2               MR. HARBAUGH:  Good morning, all.  My name is Craig

3   Harbaugh.  I am a federal deputy public defender.  Also with me

4   at counsel table is Georgina Wakefield, also a federal public

5   defender, and Daniel Flint.

6               THE COURT:  Thank you.  Please have a seat.

7        Let me take the opportunity to welcome the jury.  My name

8   is Judge S. James Otero.  You have been brought here today to

9   participate in a criminal proceeding.  There are probably two

10  questions on your mind before we start the process:  One is

11  what is the case about?  And then the second is how long will

12  the case last?

13       It's going to take about three to four days to try this

14  case, so the goal is to conclude the case by Friday.  That does

15  not include the deliberation time.  That's the time that it's

16  going to take the jury to reach a verdict in this case, if you

17  can reach a verdict in this case.  So it's three to four days

18  to try the case, including today.

19       In terms of what the case is about, I have a very short

20  statement of the case.  It's been provided by the parties.  The

21  facts of the case are going to be explained in far more detail

22  as the case moves forward.

23       The Government has charged the defendant, Mr. Daniel

24  Flint -- Mr. Daniel Flint is the gentleman closest to my right

25  here.

1          Mr. Flint, would you stand up, please.

2          Mr. Flint is the defendant in the case.  Next to Mr. Flint

3     is Ms. Wakefield, and then furthest from me and closer to you

4     is Mr. Harbaugh.  So Ms. Wakefield and Mr. Harbaugh are

5     Mr. Flint's lawyers.  Mr. Flint, again, is the defendant in the

6     case.

7          The Government has charged the defendant, Daniel Flint,

8     with one count of entering an airport in violation of security

9     requirements.  That charge is contained in an indictment.  An

10    indictment is simply a description of the charges against the

11    defendant.  It is not evidence against a defendant.

12         The Government contends that the defendant knowingly and

13    willfully entered Los Angeles International Airport in

14    violation of security prescribed by law.  The Government

15    further contends that the defendant intentionally evaded

16    airport security screening procedures at the Los Angeles

17    International Airport by entering a secured and sterile area of

18    the airport while carrying a pouch containing approximately

19    $148,145.

20         The Government contends that the defendant falsely claimed

21    that the pouch was a diplomatic courier pouch that was exempt

22    from -- that was exempt from Transportation Security

23    Administration screening and presented documents to the TSA

24    that purported to support defendant's false claim of diplomatic

25    status.

1        The defendant has entered a plea of not guilty to the

2   charges and is presumed innocent unless and until, if ever,

3   proven guilty beyond a reasonable doubt.  So those are the

4   charges.

5        The persons to my left are the Government lawyers who are

6   representing the Government in this case, in this trial.

7   Again, we have Ms. Ro closest to you.  Mr. Yanniello is the

8   next person over.  Mr. Aveis is the next person.  And then

9   closest to me is a special agent from the FBI, and that's

10  Special Agent Simon.

11       So we start the trial -- the first part of the trial is

12  the jury selection process.  The goal here is to select a jury,

13  based on what you've heard so far, is going to do your best to

14  be fair and objective to the Government and to the defendant.

15  So we start the process by calling 18 prospective jurors, first

16  6 in the top row, second 6 -- I'm sorry, first 9 in the top

17  row, second 9 in the bottom row.

18       Just because your name is called and you have taken a seat

19  doesn't mean that you will be a juror in the case.  There's

20  questions that the Court needs to ask before a jury is finally

21  selected.

22       And with that, let me have the clerk swear the panel,

23  please.

24            THE COURTROOM DEPUTY:  Would all of the ladies and

25  gentlemen of the jury please rise and raise your right hand to

1    be sworn.

2                    **THE PROSPECTIVE JURY WAS SWORN**

3            (Members of the prospective jury responded "I do.")

4                THE COURTROOM DEPUTY:  Thank you.  Please be seated.

5                THE COURT:  I have an instruction that I would like

6    to read before we start with the voir dire process.  From now

7    on until you're excused by the Court or otherwise, if the case

8    concludes, you're not to have any discussions among yourself or

9    with any other persons about the nature of the case or anyone

10   to do with the case.

11       Because your verdict must be based only on the evidence

12   received in the case and on the instructions, I remind you that

13   you must not be exposed to any other information about the case

14   or to the issues it involves.  Do not communicate with anyone

15   in any way, and do not let anyone else communicate with you in

16   any way about the merits of the case or anything to do with it.

17   This includes discussing the case in person, in writing, by

18   phone or electronic means via e-mail, text messaging or

19   Internet chat room, blog, website or other feature.  This

20   applies to communicating with your family members, your

21   employer, the media and press and people involved in the trial.

22       If you are asked or approached in any way about your jury

23   service or anything to do about this case, you must respond

24   that you have been ordered not to discuss the matter and to

25   report the contact to the Court.  Do not read, watch or listen

```
1    to any news media accounts or commentary about the case or
2    anything to do with it.  Do not do any research, such as
3    consulting dictionaries, searching the Internet or using other
4    reference materials, and do not make any investigation or in
5    any other way try to learn about the case.
6         The law requires these restrictions to ensure that the
7    parties have a fair trial based on the same evidence that each
8    party has had an opportunity to address.  A juror who violates
9    these restrictions jeopardizes the fairness of the proceedings
10   and a mistrial could result, which would require the entire
11   process to start again.
12        If any juror is exposed to any outside information, please
13   notify the Court immediately.  So this is an instruction that's
14   read in every case.  For those of you who have access to
15   Internet, at any recess or intermission please do not do any
16   investigation or search about anything to do with the case.
17   Again, a very important rule.
18        We start by having the clerk call 18 prospective jurors,
19   please.
20             THE COURTROOM DEPUTY:  Yes, Your Honor.
21        Ladies and gentlemen, as I call your name, please come
22   forward, and I will seat you in the appropriate seat.
23        Juror No. 1, Cynthia Ribot, R-i-b-o-t.  Would you please
24   take the first seat in the top row all the way down.
25        Juror No. 2, AJ Ferrara, F-e-r-r-a-r-a.
```

```
 1          Juror No. 3, Martin Zhao, Z-h-a-o.

 2          Juror No. 4, Louie Kawamoto, K-a-w-a-m-o-t-o.

 3          Juror No. 5, Jason Miranda, M-i-r-a-n-d-a.

 4          Juror No. 6, Jonathan Palencia, P-a-l-e-n-c-i-a.

 5          Juror No. 7, Sundee Zepeda, Z-e-p-e-d-a.

 6          Juror No. 8, Deanna Lara, L-a-r-a.

 7          Juror No. 9, Jacqueline Horn, H-o-r-n.

 8          Juror No. 10, Angela Moseslewis, M-o-s-e-s-l-e-w-i-s.

 9          Juror No. 11, Linda Du, D-u.

10          Juror No. 12, William Taron, T-a-r-o-n.

11          Juror No. 13, Michael Moore, M-o-o-r-e.

12          Juror No. 14, Claire Schmidt, S-c-h-m-i-d-t.

13          Juror No. 15, Judith Jansen, J-a-n-s-e-n.

14          Juror No. 16, Lee Kittay, K-i-t-t-a-y.

15          Juror No. 17, John Stevens, S-t-e-v-e-n-s.

16          Juror No. 18, Stephanie Smith, S-m-i-t-h.

17          Your Honor, that concludes the call.

18              THE COURT:  The clerk has called 18 prospective

19     jurors.  Before we start with Juror No. 1 answering the

20     questions on the monitor, I want to identify the witnesses who

21     may be called in this case.  It doesn't mean all of the

22     witnesses will be called.  The goal here is to determine if

23     anyone recognizes any of the names.  So if you recognize a

24     name, please simply raise your hand.  That includes persons in

25     the galley portion also.
```

```
 1          So we have Chicago O'Hare International Airport
 2   Supervisory Transportation Security Officer Christopher Kotula;
 3   Chicago O'Hare International Airport Transportation Security
 4   Manager Guy Sheridan; Midway International Airport Supervisory
 5   Transportation Security Officer Clay Yoksas; Midway
 6   International Airport Transportation Security Manager Ellen
 7   Sheahan; there's a Deputy John Schneider; Midway International
 8   Airport -- and Midway is the airport in Chicago.  Midway
 9   International Airport Supervisory Transportation Security
10   Officer Joe Stone; former Midway International Airport
11   Supervisory Transportation Security Officer Raja Wondrasek;
12   Los Angeles International Airport Assistant Federal Security
13   Director Michael Duretto or Duretto; U.S. Department of State,
14   Office of Foreign Missions, Foreign Affairs Officer Fahima
15   Danishgar; Federal Bureau of Investigation Special Agent
16   Rebecca Marriott; and then we have another potential U.S. air
17   marshal and FBI task force officer, Wesley Williams.
18          So the question is does anyone recognize those names?
19          No hands are raised in the courtroom.
20          So let's start with Juror No. 1, Cynthia -- is it Ribot?
21              PROSPECTIVE JUROR RIBOT:  Ribot.
22              THE COURT:  Ribot.  Cynthia Ribot, would you answer
23   the questions on the monitor, please.
24              PROSPECTIVE JUROR RIBOT:  Okay.  My name is Cynthia
25   Ribot.  I live in Los Angeles.  Single.  I work for a nonprofit
```

1    called Vision to Learn.  No spouse.  No children.  No prior

2    jury service.

3              THE COURT:  Okay.  The mission of the nonprofit is

4    what?

5              PROSPECTIVE JUROR RIBOT:  We provide free eye exams

6    and glasses for kids at schools.

7              THE COURT:  What is your job duties there?

8              PROSPECTIVE JUROR RIBOT:  Program assistant.  I try

9    to help day-to-day operations.

10             THE COURT:  So the goal here, the object of jury

11   selection process is to select a jury or have a jury -- we will

12   have a jury of 12 with a couple of alternates, but the goal

13   here is to make sure we have a jury here that's fair to the

14   Government and fair to the defendant.  The defendant in the

15   case is always presumed innocent unless, if ever, proved guilty

16   beyond a reasonable doubt to the jury's satisfaction.

17       A defendant has no duty to call witnesses, no duty to

18   offer evidence, no duty to testify.  The burden is always on

19   the Government to prove their case beyond a reasonable doubt to

20   your satisfaction.

21       So the questions to you, do you believe, based on what

22   you've heard so far, that you can be fair to the Government and

23   fair to the defendant?

24             PROSPECTIVE JUROR RIBOT:  Yes.

25             THE COURT:  Thank you.

1        Let's move to next juror.  Yes.

2            PROSPECTIVE JUROR FERRARA:  My name is AJ Ferrara.

3   My legal name is Anthony Joseph Ferrara.  I don't know where

4   you got "AJ," but I do go by that.  I live in Long Beach.  I'm

5   not married.  I work at the L.A. Zoo as a recreation assistant.

6   No children.  And I have no prior jury service.

7            THE COURT:  Okay.  And based on what you've heard so

8   far, do you feel that you could be fair to both sides?

9            PROSPECTIVE JUROR FERRARA:  Yes.

10           THE COURT:  Thank you.

11      Next.

12           PROSPECTIVE JUROR ZHAO:  My name is Martin Zhao.  I

13  live in Los Angeles.  I'm currently married.  I got three kid:

14  two girl, one boy.  And my wife's not working.  So my job right

15  now is grocery clerk.

16           THE COURT:  Okay.  And any adult children?  Younger?

17           PROSPECTIVE JUROR ZHAO:  All younger.

18           THE COURT:  Your wife is a stay-at-home mom?

19           PROSPECTIVE JUROR ZHAO:  Stay at home, yes.

20           THE COURT:  Has she ever worked in any other

21  capacity?

22           PROSPECTIVE JUROR ZHAO:  No.

23           THE COURT:  You've heard the charges.  I've read the

24  charges to you.  Based on what you've heard so far, do you feel

25  that you could be fair to the Government and to the defendant?

```
 1              PROSPECTIVE JUROR ZHAO:  Yes.

 2              THE COURT:  Would you pass the microphone, please.

 3              PROSPECTIVE JUROR KAWAMOTO:  My name is Louie

 4     Kawamoto.  I live in Los Angeles.  I'm married.  I am a network

 5     engineer.  My wife is a graphic designer.  And we have no kids.

 6     I have gone through the jury selection process previously a few

 7     years ago, and I was not selected for jury.

 8              THE COURT:  Was that in state or federal court?

 9              PROSPECTIVE JUROR KAWAMOTO:  That was state.

10              THE COURT:  Based on what you've heard so far, do

11     you feel that you could be fair to the Government and to the

12     defendant?

13              PROSPECTIVE JUROR KAWAMOTO:  Yes.

14              THE COURT:  One of your duties as a juror is to

15     assess the credibility of witnesses who are going to be called.

16     The Government is going to call several witnesses in this case.

17     I read the names of the witnesses who will be called or may be

18     called.  One of your duties is to assess the credibility of the

19     witnesses.

20         Just because someone comes to the witness chair here,

21     raises their right hand and swears that they will tell the

22     truth doesn't mean, in fact, they will tell the truth.  It's up

23     to the jury to make that determination as to whether they're

24     truthful in their testimony.

25         But credibility determination is often more complex.
```

Sometimes people believe certain events occurred, and there's
simply not enough foundation to support the belief, not enough
corroborating evidence to support it.  If a person has a stake
in the outcome, if they benefit or lose based on the outcome of
the case, you can consider that in assessing the credibility of
a witness.  If the witness is hostile in their demeanor and
manner, if they do not answer the questions of counsel, you can
consider that in assessing the credibility.

My point here is that an important duty of the jury, not
the judge, I don't make credibility determinations, but an
important duty of the jury is to assess the credibility of
witnesses who will be called to testify.

Are you the type of person, do you feel that you can do
that to the best of your ability?

PROSPECTIVE JUROR KAWAMOTO:  I believe so, yeah.

THE COURT:  Is there any one of the 18 prospective
jurors that you simply feel you are not the type of person who
can assess the credibility of witnesses, which is one of your
essential job functions as a juror, assess credibility?  Is
there anyone who feels they can't accomplish that to the best
of your ability?

Is there anyone who has a philosophical or religious
conviction or personal conviction that would make it difficult
for you to assess the credibility of witnesses who are going to
be called?

1          Okay.  No hands are raised.

2          Would you pass the microphone, please.

3               PROSPECTIVE JUROR MIRANDA:  My name is Jason

4     Miranda.  I live in Temple City.  I'm currently single.  And I

5     work at a fast food restaurant.  Obviously I'm not married, so

6     I have no spouse.  And no children as well.  And I have no

7     prior jury service.

8               THE COURT:  No prior jury service.  Welcome to jury

9     service.

10         Based on what you've heard so far, do you feel that you

11    could be fair to the parties here, both sides?

12              PROSPECTIVE JUROR MIRANDA:  Yes.

13              THE COURT:  Now, I mentioned already, and I want to

14    repeat it, and I will repeat it more than once, a defendant in

15    a criminal case -- this applies to Mr. Flint in this case.  It

16    applies to all defendants in any criminal proceeding through --

17    in any Court in the United States.  A defendant is always

18    presumed innocent unless and until the contrary is proved to

19    the jury's satisfaction, and the proof required is proof beyond

20    a reasonable doubt.

21         A defendant has no duty to call witnesses, no duty to

22    testify, no duty to produce evidence.  The Government always

23    has the burden.  At the conclusion of the case, defense counsel

24    may conclude that the Government has failed to meet their

25    burden.  Without calling any witnesses, they may stand up at

```
1    the lectern and ask you to return a verdict in favor of their
2    client because the Government has failed to meet their burden.
3         Can you follow those principles of law?
4              PROSPECTIVE JUROR MIRANDA:  Yes.
5              THE COURT:  Is there anyone who disagrees with any
6    of the principles of law that I have just referenced?  Anyone
7    who feels that a defendant has to testify or a defendant has to
8    call witnesses?
9         No hands are raised.
10        Would you pass the microphone, please.
11             PROSPECTIVE JUROR PALENCIA:  My name is Jonathan
12   Palencia.  I live in Los Angeles.  I'm single.  I work for
13   Target.  I don't have any children.  And I don't have any prior
14   jury service.
15             THE COURT:  And what is your occupation with Target?
16             PROSPECTIVE JUROR PALENCIA:  I'm general merch.
17             THE COURT:  Merchandise?
18             PROSPECTIVE JUROR PALENCIA:  Yeah.
19             THE COURT:  Another duty that the jury has is to
20   resolve conflicts in evidence.  So during the course of the
21   trial there may be conflicts that are presented to you.  A
22   person may be called as a witness in the case and provide a
23   version of what occurred very different from a version provided
24   by another person.  That's an example.  If that were to occur,
25   that would be a conflict in evidence.  And what we require of
```

1    the jury is we require the jury to work diligently and hard to

2    resolve those conflicts to reach a verdict in the case.  The

3    goal here is to reach a verdict in the case, if you can do so.

4        Sometimes persons hearing two versions of the same story

5    will throw up their hands and say they can't make a decision.

6    And what we -- again, what we require from the jury is diligent

7    effort to resolve those conflicts, there will be certain

8    conflicts that are presented to you, and to resolve it to the

9    best of your ability.

10       Do you feel you can accomplish that?

11           PROSPECTIVE JUROR PALENCIA:  Yes.

12           THE COURT:  Of the 18 prospective jurors, is there

13   anyone who feels that if there's a conflict in evidence, you

14   would find it -- you would not be able to resolve a conflict in

15   evidence?  Anyone who feels that way?

16       Okay.  We have one person with her hand up.  We have

17   Ms. -- is it Ms. Du?

18           PROSPECTIVE JUROR DU:  Yeah.

19           THE COURT:  We will come back to you, Ms. Du.

20       Pass the microphone, please.

21           PROSPECTIVE JUROR ZEPEDA:  My name is Sundee Zepeda.

22   I live in La Puente, California.  I'm married 30 years.  My

23   husband is a machine operator.  I do have two adult children:

24   one is going to school, majoring in business; and then I have

25   my other daughter who works for an accounts payable somewhere,

```
 1  ironworkers.
 2              THE COURT:  Any prior jury experience?
 3              PROSPECTIVE JUROR ZEPEDA:  Oh, yes, I had it a few
 4  years ago, but I wasn't chosen.
 5              THE COURT:  Was that in state or federal court?
 6              PROSPECTIVE JUROR ZEPEDA:  No, superior court.
 7              THE COURT:  Superior court.  That's state court.
 8         Was that a civil case, or was that a criminal case?
 9              PROSPECTIVE JUROR ZEPEDA:  It was a criminal.
10              THE COURT:  And you were not selected?
11              PROSPECTIVE JUROR ZEPEDA:  Correct.
12              THE COURT:  Can you be fair to the parties here?
13              PROSPECTIVE JUROR ZEPEDA:  Yes.
14              THE COURT:  Thank you.
15              PROSPECTIVE JUROR LARA:  My name is Deanna Lara.  I
16  live in Pomona, California.  I am married.  I'm a business
17  control specialist for Bank of America.  My husband is a
18  general manager of a printing company.  I have two children.
19  And I have no previous jury service.
20              THE COURT:  And, again, welcome to jury service.
21  Sometimes I get -- I'm asked if judges have to serve on juries,
22  and I get called on the state side, so I have jury service set
23  for the 19th of November, which will be close because it's just
24  right up the street here.
25         Can you be fair to the parties based on what you've heard
```

```
 1    so far?

 2              PROSPECTIVE JUROR LARA:  Yes.

 3              THE COURT:  We can't ask all the questions, so -- in

 4    this process of jury selection.  I'm asking questions.  The

 5    goal here is to determine whether a person can be fair to both

 6    sides, but I can't ask all the questions that the lawyers would

 7    like me to ask in an ideal world.

 8         So is there any aspect of your background, life

 9    experience, work experience that you believe that the lawyers

10    should know about in determining whether you should be a juror

11    in this case?  This applies to yourself and it applies to

12    anyone else here.

13         So if I don't ask a question and you think there's

14    something in your background that you feel that the parties

15    should know about, err on the side of caution by disclosing it.

16    Anything to disclose at this time?

17              PROSPECTIVE JUROR LARA:  No, I don't believe so.

18              THE COURT:  Okay.  If your memory is refreshed at

19    any time as the process moves forward, just raise your hand,

20    and we can come back to you.

21         Would you pass the microphone, please.

22              PROSPECTIVE JUROR HORN:  My it name is Jacqueline

23    Horn.  I live in Los Angeles.  I am a widow.  I am retired.  I

24    have no children.  And I have been on panels for the state,

25    both criminal and civil, but not chosen.
```

1          THE COURT:  Okay.  So, again, just to remind
2    everyone, this is a criminal proceeding.  In a criminal
3    proceeding -- one major difference between civil and criminal
4    is proof, the burden of proof.  In a criminal proceeding it's
5    proof beyond a reasonable doubt.  It's the highest standard we
6    impose in any proceeding in any court in the United States.
7    The Government must prove to your satisfaction the case beyond
8    a reasonable doubt.
9        Will you follow that instruction?
10         PROSPECTIVE JUROR LARA:  To the best of my ability,
11   yes.
12         THE COURT:  That's all we ask.  We are all human
13   beings, and we want to make sure that you strive to follow all
14   of the rules and duties of a juror to the best of your ability.
15       Your former occupation?
16         PROSPECTIVE JUROR LARA:  I worked for the archbishop
17   of Los Angeles.  And before him, Cardinal Mahoney.  And before
18   that, I was in advertising, producing television commercials.
19         THE COURT:  And what did you do for the archdiocese?
20         PROSPECTIVE JUROR LARA:  We produced special
21   projects, dinners, fundraising dinners, and citing people in
22   the community for their service to the church and others.
23         THE COURT:  And how long did you serve in that
24   capacity?
25         PROSPECTIVE JUROR LARA:  Five years.

1          THE COURT:  Do you have any religious conviction of

2   any type that would make it difficult for you to be a juror in

3   this case?

4          PROSPECTIVE JUROR LARA:  Just fairness.

5          THE COURT:  Well, fairness is part of the process,

6   but fairness means -- in a jury trial fairness is reduced to

7   this:  if the Government proves their case beyond a reasonable

8   doubt to your satisfaction, then you have a duty to return a

9   verdict in favor of the Government.

10          PROSPECTIVE JUROR LARA:  Agreed.

11          THE COURT:  If the Government fails to do that, if

12   based on your review of the evidence if they have not convinced

13   you beyond that high standard of beyond a reasonable doubt, you

14   have a duty to return a verdict in favor of the defendant.

15      And can you do that?

16          PROSPECTIVE JUROR LARA:  Yes, I understand that,

17   uh-huh.

18          THE COURT:  And then the occupation of your former

19   spouse?

20          PROSPECTIVE JUROR LARA:  He was a director and a

21   writer and art director for his own Hispanic advertising

22   agency.

23          THE COURT:  Okay.  Thank you very much.

24          PROSPECTIVE JUROR LARA:  You're welcome.

25          THE COURT:  And let's pass the microphone all the

```
 1    way down, and we will go to Juror No. 10.  And that's
 2    Ms. Moseslewis.
 3                PROSPECTIVE JUROR MOSESLEWIS:  Yes.
 4                THE COURT:  The microphone will be coming.
 5                PROSPECTIVE JUROR MOSESLEWIS:  My name is Angela
 6    Moseslewis.  I reside in Pasadena, California.  I'm separated
 7    at this time.  I'm a paraeducator for moderate to mild severely
 8    handicapped children.  I have two adult children:  one is
 9    licensed aesthetician and makeup artist; my son does medical
10    transportation.  And I have done jury service before, but I was
11    not selected.
12                THE COURT:  I'm not sure I'm familiar with the term
13    "paraeducator."
14                PROSPECTIVE JUROR MOSESLEWIS:  Well, I assist the
15    teacher in the classroom.
16                THE COURT:  And your focus is on severely
17    handicapped children?
18                PROSPECTIVE JUROR MOSESLEWIS:  Yes, sir.
19                THE COURT:  So how long have you been in that area?
20                PROSPECTIVE JUROR MOSESLEWIS:  37 years.
21                THE COURT:  So just as an aside, my wife was a
22    special ed teacher with severely emotionally challenged
23    children, and she did it for 36 years, so I understand the
24    challenges.
25            Based on what you've heard so far, do you feel that you
```

```
 1    could be fair to both sides?

 2              PROSPECTIVE JUROR MOSESLEWIS:  Yes.

 3              THE COURT:  Is there any -- is there any aspect of

 4    your background, life experience, work experience that you

 5    believe the lawyers should know about in determining whether

 6    you should be a juror in this case?

 7              PROSPECTIVE JUROR MOSESLEWIS:  No.

 8              THE COURT:  Thank you.

 9         Would you pass the microphone.

10              PROSPECTIVE JUROR DU:  My name is Linda.  I'm

11    from -- I live in -- I'm sorry.  I live in El Monte.  I'm

12    single.  I work for the City of Rosemead.  I don't have a

13    spouse.  I don't have children.  And I don't have prior jury

14    service.

15              THE COURT:  And what do you do for the City of

16    Rosemead?

17              PROSPECTIVE JUROR DU:  I'm a recreation leader.

18              THE COURT:  You had your hand raised, and the

19    question that I asked was whether you would find it difficult

20    to resolve conflicts in evidence, and you had your hand raised;

21    you thought you would.  Sometimes these are difficult issues,

22    but we require a jury to do their best as human beings to

23    resolve conflicts and to reach a verdict in the case.

24         And so the question is do you feel that you can accomplish

25    that?
```

1          PROSPECTIVE JUROR DU:  I don't know because I'm kind
2     of bad at making decisions, so I don't know.
3          THE COURT:  Well, the jury -- the jury service, it's
4     a collective process.  We have 12 people from the community,
5     all walks of life, backgrounds, ethnicities, races.  You are in
6     that jury room, and the duties of a jury is it requires you to
7     share your views, to discuss the evidence, to listen carefully
8     to the views of others.
9          If through logic and common sense and by pointing to
10    evidence they convince you that your vote or your view is
11    wrong, then you have a duty to change your view.  If they have
12    not accomplished that, then you have a duty to stand by your
13    convictions.
14         Do you feel you could accomplish that to the best of your
15    ability?
16         PROSPECTIVE JUROR DU:  I can try.
17         THE COURT:  Again, all we ask is that you do it to
18    the best of your ability.
19         And you have never participated in a jury proceeding
20    before?
21         PROSPECTIVE JUROR DU:  No.
22         THE COURT:  So one of the instructions that you're
23    going to be given in this case, and it's given in every case,
24    is the punishment or consequence for the act.  If the jury
25    returns a verdict in favor of the Government, and I'm not

1   suggesting that you should or would, but punishment is not to

2   be discussed by the jury.  It's not to enter into your

3   consideration at all.

4       Does that make it easier for you?

5           PROSPECTIVE JUROR DU:  I don't know because it's

6   kind of uncomfortable for me because like I just feel like --

7   like someone's trying to defend them, and then if I think

8   they're guilty, I kind of feel bad.  I don't know.  I kind of

9   feel uncomfortable doing this --

10          THE COURT:  Fair enough.

11          PROSPECTIVE JUROR DU:  -- to make a decision, like I

12  mean, I know I'm not the only person making the decision, but

13  like I know I could impact the decision, and it's kind of scary

14  to think that like what if I make the wrong decision?

15          THE COURT:  Okay.  Well, again, the standard here is

16  a high standard, proof beyond a reasonable doubt.  So the

17  standard requires you to be confident in your decision that you

18  make.

19      Do you feel you could be a juror?

20          PROSPECTIVE JUROR DU:  I don't feel confident.  I'm

21  sorry.

22          THE COURT:  Well, what you cannot do is -- in the

23  jury room is you can't elect not to make a decision.  So it's a

24  verdict in favor of the Government or a verdict in favor of the

25  defendant.  So you have to be able to voice an opinion and

```
 1   reach a decision, if you can do so.  And you're not confident
 2   you're able to?
 3                PROSPECTIVE JUROR DU:  I don't feel comfortable
 4   doing that.
 5                THE COURT:  If you change your mind, let us know.
 6   Think about it.
 7                PROSPECTIVE JUROR DU:  I'm sorry.  Yeah.
 8                THE COURT:  You don't have to apologize.
 9                PROSPECTIVE JUROR DU:  Okay.
10                THE COURT:  Let's go to Mr. Taron.
11                PROSPECTIVE JUROR TARON:  My name is William Taron.
12   I live in Sherman Oaks.  I am married.  I am retired, but I
13   hold a law license and practiced law for a long time.  About
14   half of my time was -- maybe more than half was spent in
15   federal court.  I also did some real estate development.  I
16   never did any criminal work; it was all civil.
17       My wife is a casting director.  She's also retired but
18   still works.  I have four adult children, two of which are
19   stepchildren:  my oldest stepson is a well-known actor.  My
20   biological son is a professor of architecture at the university
21   of Calgary.  My biological daughter is married with one and
22   about 99 percent of a second child going to be born any minute.
23   And my fourth -- my stepson is a real estate agent in
24   Albuquerque, New Mexico.
25       I have been in state court for a couple of times, several
```

```
 1    times for jury service.  I have never been empaneled.  I have
 2    never been called for jury service in federal court.  I also
 3    forgot to say my occupation.  I am also -- now that I'm retired
 4    three or four days a week, I drive a limousine, and much of
 5    that time is spent driving to and from the airport.  So when
 6    something happens at the airport which shuts down a terminal,
 7    it's really annoying.  So I don't think that affects my ability
 8    to make a judgment on guilt or innocence, but I'm experienced
 9    with what happens when things happen at the airport.
10              THE COURT:  So you were a lawyer for a number -- a
11    practicing lawyer for a number of years?
12              PROSPECTIVE JUROR TARON:  Yes.
13              THE COURT:  And your focus was civil litigation?
14              PROSPECTIVE JUROR TARON:  Civil litigation,
15    primarily did maritime work, offshore oil and gas, ship
16    collision, lots of things like that, lots of things that
17    brought me in federal court.  And I did a lot of diversity,
18    brought a lot of cases in diversity, limitation of liability
19    acts.  I felt comfortable in federal court, whereas a lot of
20    practicing attorneys are seldom in federal court so they are
21    not nearly as comfortable here.
22              THE COURT:  So you feel comfortable where you're
23    seated now?
24              PROSPECTIVE JUROR TARON:  Well, I have never picked
25    a federal -- yeah, I picked a couple of juries in federal
```

```
 1    court, several juries in state court.

 2              THE COURT:  So did you practice -- were any of your

 3    cases in this building here?  This is a relatively new

 4    building.

 5              PROSPECTIVE JUROR TARON:  No.  I was always in

 6    Spring Street.  I didn't have the privilege of -- it's nice in

 7    Spring Street, but not quite as beautiful as this.

 8              THE COURT:  Did you have any cases before me?

 9              PROSPECTIVE JUROR TARON:  No.

10              THE COURT:  Okay.  So based on what you've heard so

11    far, do you feel that you could be fair to the Government and

12    to the defendant?

13              PROSPECTIVE JUROR TARON:  Yes, I can.

14              THE COURT:  I think the evidence is going to show

15    that the defendant is a lawyer, licensed to practice law.

16    Would that at all affect --

17              PROSPECTIVE JUROR TARON:  I won't hold that against

18    him.

19              THE COURT:  -- your ability to be fair?

20         Okay.  Is there any other information that you believe the

21    lawyers should know about in determining whether you should be

22    a juror in the case?

23              PROSPECTIVE JUROR TARON:  I never did any criminal.

24    I think I mentioned that.

25              THE COURT:  Yes.
```

```
 1              PROSPECTIVE JUROR TARON:  No, I don't believe so.

 2              THE COURT:  Thank you.

 3              PROSPECTIVE JUROR MOORE:  Good morning, Your Honor.

 4   My name is Michael Moore.  And I live in Pismo Beach.  And I'm

 5   married.  I'm a massage therapist.  My wife is a physician.  I

 6   have four children:  one adult who is in college back in

 7   Boston.  And I have no prior.

 8              THE COURT:  No prior jury service?

 9              PROSPECTIVE JUROR MOORE:  No prior jury service.

10              THE COURT:  And Pismo is a little drive.

11              PROSPECTIVE JUROR MOORE:  It was.

12              THE COURT:  Based on what you've heard, can you be

13   fair to the parties?

14              PROSPECTIVE JUROR MOORE:  I can.

15              THE COURT:  One of the duties that you're going to

16   have is to follow the law as the Court instructs.  At the

17   conclusion of the case, I'm going to give you the law.  That's

18   the charge to the jury.  Those are jury instructions.  You must

19   follow the law whether you agree with the law or not.

20       When you're sworn in as the jury in the case, you have the

21   same duty as I have, and that's to follow the law.  So when I

22   became a judge, I took an oath to follow the law whether I

23   agreed with it or not.

24       We live in a very complex world; we have state laws,

25   federal laws, county ordinances, city ordinances.  I'm sure we
```

```
 1   can find -- all of us find laws that we agree with and many
 2   laws that we don't agree with.  The point is whether you agree
 3   with it or not, you must follow it.  Do you feel you can do
 4   that?
 5             PROSPECTIVE JUROR MOORE:  I can.
 6             THE COURT:  Is there any one of the 18 prospective
 7   jurors who has a philosophical conviction, religious conviction
 8   or personal conviction that would make it difficult for you to
 9   follow the law as the Court instructs?  If that's the case,
10   please raise your hand.
11      With that, Mr. Moore, would you pass the microphone.
12             PROSPECTIVE JUROR SCHMIDT:  My name is Claire
13   Schmidt.  I live in Los Angeles.  I am currently engaged.  My
14   occupation is an executive assistant.  My fiance's occupation,
15   he is a sergeant in the Marine Corps.  I do not have any
16   children.  And I have served jury service before.  I was on the
17   panel, but not selected.
18             THE COURT:  Okay.  Was it a civil case or criminal
19   case?
20             PROSPECTIVE JUROR SCHMIDT:  Criminal.
21             THE COURT:  And, again, this is a criminal
22   proceeding.  Was there anything that you saw, viewed or
23   discussed in that matter, even though you were not selected,
24   that would influence your decision making here?
25             PROSPECTIVE JUROR SCHMIDT:  No.
```

```
 1              THE COURT:  Can you be fair to both sides here?
 2              PROSPECTIVE JUROR SCHMIDT:  Yes.
 3              THE COURT:  So you have a fiance who is a sergeant
 4   in the marine -- did you say the Marine Corps?
 5              PROSPECTIVE JUROR SCHMIDT:  Uh-huh.
 6              THE COURT:  Do you know in what capacity he's
 7   serving?
 8              PROSPECTIVE JUROR SCHMIDT:  No.
 9              THE COURT:  Is he at all associated with the
10   military police?
11              PROSPECTIVE JUROR SCHMIDT:  No.
12              THE COURT:  Does he intend to make the military a
13   career --
14              PROSPECTIVE JUROR SCHMIDT:  No.
15              THE COURT:  -- if you know?
16         Does he intend to -- if you know, does he intend to pursue
17   any type of law enforcement work following his service with the
18   Marines?
19              PROSPECTIVE JUROR SCHMIDT:  No.
20              THE COURT:  And can you be fair to both sides?
21              PROSPECTIVE JUROR SCHMIDT:  Yes.
22              THE COURT:  Thank you.
23         Pass the microphone.  Yes.
24              PROSPECTIVE JUROR JANSEN:  My name is Judy Jansen.
25   I live in Whittier.  I'm single.  I'm a retired artist.  And I
```

```
 1    have no children.  And I have served several times with the
 2    state.
 3              THE COURT:  In civil cases or criminal cases?
 4              PROSPECTIVE JUROR JANSEN:  Actually, criminal.
 5              THE COURT:  Anything that you've ever discussed in
 6    those cases, viewed or heard that would in any way influence
 7    your decision making here?
 8              PROSPECTIVE JUROR JANSEN:  No, sir.
 9              THE COURT:  Without disclosing the verdict that was
10    reached, were you able to reach verdicts in those prior cases?
11              PROSPECTIVE JUROR JANSEN:  No, sir.
12              THE COURT:  How many times have you served?
13              PROSPECTIVE JUROR JANSEN:  Three.
14              THE COURT:  In those three cases, how many times did
15    the jury reach verdicts?
16              PROSPECTIVE JUROR JANSEN:  None of them.
17              THE COURT:  Okay.  Thank you.
18         Can you be fair to both sides?
19              PROSPECTIVE JUROR JANSEN:  Yes, sir.
20              THE COURT:  Okay.  Thank you.
21              PROSPECTIVE JUROR KITTAY:  My name is Lee Kittay.  I
22    live in Lawndale.  I'm divorced.  I work for a large accounting
23    firm.  I have two children who are in college.  And I was on a
24    case on a jury last year.
25              THE COURT:  Civil or criminal?
```

```
1          PROSPECTIVE JUROR KITTAY:  Criminal.

2          THE COURT:  And state or federal court?

3          PROSPECTIVE JUROR KITTAY:  State.

4          THE COURT:  Any aspect of that case that would

5    influence your decision making here?

6          PROSPECTIVE JUROR KITTAY:  No.

7          THE COURT:  Can you be fair to both sides?

8          PROSPECTIVE JUROR KITTAY:  Yes.

9          THE COURT:  What do you do?

10         PROSPECTIVE JUROR KITTAY:  Brand marketing and

11   communications.

12         THE COURT:  Of the questions I have asked so far,

13   are there any questions that stand out in your mind that you

14   would like to respond to?

15         PROSPECTIVE JUROR KITTAY:  No.

16         THE COURT:  Thank you.

17      Would you pass the microphone to Mr. Stevens.

18         PROSPECTIVE JUROR STEVENS:  My name is John Stevens.

19   I live in Arroyo Grande.  I'm married.  I am a baseball coach.

20   My wife is a teacher.  I have one child in college and one in

21   high school.  And I have served on one civil case.

22         THE COURT:  Did you reach a verdict in the case?

23         PROSPECTIVE JUROR STEVENS:  It was the state against

24   an employee, and it was ruled against the employee.

25         THE COURT:  So you reached a verdict in the case?
```

1          PROSPECTIVE JUROR STEVENS:  It was -- well, she was

2   suing the state.

3          THE COURT:  Yes.

4          PROSPECTIVE JUROR STEVENS:  And she lost, so yeah.

5          THE COURT:  How long ago was that?

6          PROSPECTIVE JUROR STEVENS:  2011, I believe.

7          THE COURT:  And then you said you're a baseball

8   coach?

9          PROSPECTIVE JUROR STEVENS:  Yeah.  During the season

10  I work for a minor league team in Cleveland, and then the rest

11  of the year I work at my house.  I have a batting cage facility

12  at my house, and players come to me.

13         THE COURT:  Did you ever play professionally

14  yourself?

15         PROSPECTIVE JUROR STEVENS:  Very short.

16         THE COURT:  Can you be fair to both sides?

17         PROSPECTIVE JUROR STEVENS:  Sure.

18         THE COURT:  Thank you.

19     Would you pass the microphone.

20         PROSPECTIVE JUROR SMITH:  Hi.  I'm Stephanie Smith.

21  I live in Camarillo, California.  I'm single.  I'm a physician

22  with Kaiser Permanente.  I don't have any children.  And I've

23  served multiple times, but never selected.

24         THE COURT:  Okay.  So how long have you been with

25  Kaiser?

1          PROSPECTIVE JUROR SMITH:  Just over three years.

2          THE COURT:  And area of specialty?

3          PROSPECTIVE JUROR SMITH:  Pediatrics.

4          THE COURT:  In your capacity as a doctor with

5   Kaiser, do you have any regular contact with law enforcement

6   officers at all?

7          PROSPECTIVE JUROR SMITH:  Not regular, no.

8          THE COURT:  Have you ever worked in an emergency

9   room?

10         PROSPECTIVE JUROR SMITH:  Yes.

11         THE COURT:  When you worked in the emergency room,

12  did you have regular contact with law enforcement?

13         PROSPECTIVE JUROR SMITH:  Intermittently, yes.

14         THE COURT:  Is there any aspect of that interaction

15  with law enforcement that would influence your decision making

16  here?

17         PROSPECTIVE JUROR SMITH:  No.  I do have a

18  brother-in-law that is a supervising DA in Ventura.

19         THE COURT:  Do you ever discuss with your

20  brother-in-law any of the cases that he's involved with?

21         PROSPECTIVE JUROR SMITH:  Yes.

22         THE COURT:  And is there anything that was ever

23  discussed that would influence your decision making here?

24         PROSPECTIVE JUROR SMITH:  Probably not.

25         THE COURT:  Okay.  I have certain questions that I'm

```
 1    going to ask the panel as a whole.  So this case involves an
 2    issue concerning diplomatic status, diplomatic immunities that
 3    may or may not apply.
 4         Does anyone have any background, experience or training in
 5    those areas?
 6         Has anyone ever been -- this applies to yourself, close
 7    family members or close friends, anyone who has ever worked for
 8    the state department in any capacity?
 9         Is there anyone who's ever worked with a law enforcement
10    agency in any capacity, whether it's federal, state or local?
11         Okay.  We have one person with their hand raised, and
12    that's Ms. Zepeda.
13         Would you answer -- would you tell us about that, please.
14              PROSPECTIVE JUROR ZEPEDA:  I have an uncle that
15    works for the Los Angeles Police Department here in
16    Los Angeles.  And just something to know about me is that --
17    not that I don't believe in courts; I just try to stay out of
18    trouble.  I had my father and my brother that were
19    incarcerated.  And I'm thinking about this, looking at
20    everything, and I don't think I could be fair about it.  I
21    would -- I know that I wouldn't be fair.
22              THE COURT:  So you had a father and a brother who
23    were incarcerated, and because of those experiences, you're
24    concerned about your ability to be fair?
25              PROSPECTIVE JUROR ZEPEDA:  Right, yes, yes.
```

**UNITED STATES DISTRICT COURT**

```
 1            THE COURT:  So you're concerned about your ability
 2   to be fair to the Government or to the defendant?
 3            PROSPECTIVE JUROR ZEPEDA:  The Government.
 4            THE COURT:  Was your -- so your father and brother
 5   were both charged?
 6            PROSPECTIVE JUROR ZEPEDA:  Yes, they were.
 7            THE COURT:  Were they separate matters or the same
 8   matter?
 9            PROSPECTIVE JUROR ZEPEDA:  Separate matters.
10            THE COURT:  And was that state or federal
11   proceedings?
12            PROSPECTIVE JUROR ZEPEDA:  It was state.
13            THE COURT:  And how long ago was that?
14            PROSPECTIVE JUROR ZEPEDA:  Well, my father is 70
15   now, but I guess he was incarcerated for eight years, my
16   brother for four.  And I think that it was not fair, the court
17   process.  And I do have cousins that were incarcerated, but
18   like I said, I try to stay, myself, out of trouble so I don't
19   have to be around the courts.
20            THE COURT:  So, again, just to make sure that we're
21   clear, as you sit here now, based on everything you've heard,
22   you feel that you cannot be fair to the Government?
23            PROSPECTIVE JUROR ZEPEDA:  No, I wouldn't.
24            THE COURT:  Thank you very much for your candor.
25   It's an important part of the process.
```

1      Anyone else who's ever worked, yourself or close family

2   members or close friends, who have been employed or worked in

3   any capacity with any law enforcement agency?

4      We go to Anthony Joseph Ferrara.

5            PROSPECTIVE JUROR FERRARA:  My uncle is the sheriff

6   of Solano County up in Northern California.  I see a lot of

7   police at my job, but not really interacting with them ever.

8            THE COURT:  Is this uncle somebody that you're

9   particularly close with?

10           PROSPECTIVE JUROR FERRARA:  In the past, yes, but I

11  haven't talked to him very often recently.  I saw him about

12  four months ago, but otherwise I'm not particularly close with

13  him.

14           THE COURT:  Anything that you've ever discussed that

15  would influence your decision making here?

16           PROSPECTIVE JUROR FERRARA:  No.

17           THE COURT:  And, again, do you believe that you

18  could be fair to both sides?

19           PROSPECTIVE JUROR FERRARA:  Yes.

20           THE COURT:  And we go to Ms. Moseslewis.  I think

21  she had her hand raised.

22           PROSPECTIVE JUROR MOSESLEWIS:  Yes, my brother is a

23  retired Cal State police officer.

24           THE COURT:  And is there anything that you've ever

25  discussed with him that would influence your decision making

1    here?

2              PROSPECTIVE JUROR MOSESLEWIS:  No.

3              THE COURT:  Thank you.

4        So I mentioned several of the agencies that are involved

5    here.  We have the Transportation -- the TSA.  We have an agent

6    with the FBI.  There may be an agent with the U.S. Marshal's

7    Office and FBI task force, and then there's a Deputy John

8    Schneider, who I believe is a state law enforcement officer.

9        Is there anyone who's ever had any -- I will leave it to

10   you to decide what a bad experience is, a bad experience or

11   negative experience with any law enforcement officer or law

12   enforcement agency, whether it's state, federal or local,

13   whether it's a traffic ticket that you thought you shouldn't

14   receive or something far more serious than that?  So let's

15   start with the back row first.

16       No hands.

17       Do we have a hand?

18             PROSPECTIVE JUROR FERRARA:  No.

19             THE COURT:  We have Ms. Lara who has her hand

20   raised.  She had a bad experience.

21             PROSPECTIVE JUROR LARA:  Yes I did.

22             THE COURT:  And how long ago was that?

23             PROSPECTIVE JUROR LARA:  It's probably 15 -- no, 16

24   years ago.

25             THE COURT:  And, again, just to repeat, these

```
 1   questions apply to yourself, close family members and close
 2   friends.  So are you able to discuss that here in open court?
 3            PROSPECTIVE JUROR LARA:  Yes.
 4            THE COURT:  Okay.  Go ahead.
 5            PROSPECTIVE JUROR LARA:  I was in a vehicle car
 6   accident with my children, and the individual that hit me was
 7   from a foreign country, and they didn't speak English.  And I
 8   felt that the officer was extremely rude to them, and I filed a
 9   complaint.
10            THE COURT:  Okay.  Do you feel that your complaint
11   was treated seriously?
12            PROSPECTIVE JUROR LARA:  No.
13            THE COURT:  And that matter has nothing to do with
14   this case here.  Do you feel that it will influence your
15   decision making here?
16            PROSPECTIVE JUROR LARA:  No.  I'm just being honest.
17            THE COURT:  Okay.  Thank you.
18         And when you say you filed a complaint, was it a written
19   complaint, or was it a telephone call?
20            PROSPECTIVE JUROR LARA:  Well, I first called, and
21   then they asked me to come in and file a complaint.  They did
22   come to my home, but it was never followed up on.
23            THE COURT:  And that was how many years ago?
24            PROSPECTIVE JUROR LARA:  About 16.
25            THE COURT:  Thank you.
```

UNITED STATES DISTRICT COURT

1      And then I think we had Ms. Moseslewis with her hand

2  raised.

3      Would you pass the microphone, please.

4          PROSPECTIVE JUROR MOSESLEWIS:  Yes, it was maybe 30

5  years ago.  Me and my husband were stopped by the police at

6  night.  We were told that my husband looked like someone that

7  they were looking for, and they made us get out of the car.

8  And they searched him, and they searched me, and they touched

9  my body parts, and I was very offended by this and somewhat

10  traumatized for years, yes.

11          THE COURT:  Well, that type of experience can be

12  extremely traumatizing.

13          PROSPECTIVE JUROR MOSESLEWIS:  Yes.

14          THE COURT:  What's important is that you're able, to

15  the best of your ability, to set that aside, decide this case

16  based on the evidence received and the law as the Court

17  instructs.  Do you feel that you can accomplish that?

18          PROSPECTIVE JUROR MOSESLEWIS:  Somewhat.  When I'm

19  thinking about that, it brought back memories.

20          THE COURT:  It brought back memories?

21          PROSPECTIVE JUROR MOSESLEWIS:  Yes.

22          THE COURT:  You continue thinking about that because

23  what's important here is the process is extremely important,

24  and what we're looking for is a jury that's going to listen

25  carefully to the evidence, critically analyze and look at the

Case 2:17-cr-00697-SJO   Document 117   Filed 10/29/18   Page 55 of 208   Page ID #:1538

55

1  evidence, hold the Government to the highest burden, which is

2  proof beyond a reasonable doubt, listen carefully to the law as

3  the Court instructs.  If at the conclusion of the case if you

4  believe the Government has proved their case beyond a

5  reasonable doubt, you have to return a verdict in favor of the

6  Government.  On the other hand, if you conclude that they

7  failed to do that, it's the same duty to return a verdict in

8  favor of the defendant.

9       So do you feel you can accomplish that?

10           PROSPECTIVE JUROR MOSESLEWIS:  I would try to the

11  best of my ability, yes.

12           THE COURT:  That's all we ask for.

13       So I think most of the agents here that are going to be

14  witnesses in the case are federal agents, not local or state

15  law enforcement officers.  Would that make a difference to you

16  in terms of your comfort level in terms of being fair?

17           PROSPECTIVE JUROR MOSESLEWIS:  No.

18           THE COURT:  No.

19       Anyone else?

20       Okay.  Let's go to Ms. Schmidt.

21           PROSPECTIVE JUROR SCHMIDT:  When I was 21, in

22  college, my roommate's boyfriend was hitting her and then came

23  into my room, grabbed me and shoved me to the ground.  And I

24  ran out and called the police, and the police arrested me

25  because they -- it was two stories against one, and she decided

```
 1    to side with him.  And I was in jail for 13 hours, you know,
 2    unrightfully.  And all the charges were dropped eventually.
 3              THE COURT:  That's another bad experience.  So do
 4    you feel that you could set that aside and be fair in this case
 5    here?
 6              PROSPECTIVE JUROR SCHMIDT:  Uh-huh.
 7              THE COURT:  That's "yes"?
 8              PROSPECTIVE JUROR SCHMIDT:  Yes.
 9              THE COURT:  During the course of the trial you may
10    hear references to the United Nations.  Is there anyone who has
11    ever worked or any particular background, training, expertise
12    involving the United Nations?
13         We have one person.
14         Yes, sir, Mr. Taron.
15              PROSPECTIVE JUROR TARON:  A nephew of mine was a
16    translator, a simultaneous translator at the United Nations.
17              THE COURT:  Have you ever visited the United
18    Nations?
19              PROSPECTIVE JUROR TARON:  Yes.  My wife and I, we
20    have an apartment in New York City, so I'm there frequently.
21    So I have gone and taken people and taken tours of the United
22    Nations.
23              THE COURT:  Do you have any friends who, other than
24    I think a relative, who are employees of the United Nations or
25    work for the United Nations?
```

```
 1              PROSPECTIVE JUROR TARON:  No, not now.  I don't
 2     think ever.
 3              THE COURT:  Is there anything about your familiarity
 4     with the United Nations that would influence your decision
 5     making here?
 6              PROSPECTIVE JUROR TARON:  None at all.
 7              THE COURT:  Is there anyone who's ever been employed
 8     with a diplomatic or foreign agency, any type of foreign agency
 9     in any type of capacity?
10         No hands are raised.
11         Let's discuss TSA, the Transportation Security
12     Administration.  I think most of us go through airports on a
13     number of occasions, and we're subject to searches, pat-down
14     searches and screening.  Is there anyone who's had a negative
15     experience, other than the inconvenience of being screened or
16     searched, any negative experiences that you believe the lawyers
17     should know about in determining whether you should be a juror
18     in this case?  And it involves yourself, family or close
19     friends.
20         Okay.  No hands are raised.
21         Is there anyone who's never traveled through an airport or
22     been screened by TSA personnel, who has never gone through that
23     process?
24         Okay.  No hands are raised.
25         Of the 18 prospective jurors, are there -- is there anyone
```

1    here who regularly travels and uses airports to travel on a

2    regular basis?

3          Okay.  Mr. Taron, yes, you travel to New York?

4                PROSPECTIVE JUROR TARON:  I travel to New York.  I

5    go to Albuquerque frequently.  I go to Calgary.  So that's

6    international.  I probably travel six to eight times a year,

7    maybe more.

8                THE COURT:  Based on the amount of travel, do you

9    feel that you have additional background or experience with the

10   TSA?

11               PROSPECTIVE JUROR TARON:  Well, I have a TSA pre,

12   so I go through real quick.  So, no, I don't have any negative

13   experiences.

14               THE COURT:  Is there anyone here who's ever held a

15   diplomatic passport, yourself, family members or close friends,

16   diplomatic passport or an official U.S. official passport?

17         Okay.  We have one person with his hand raised.

18         Yes.  Is it Mr. Moore?

19               PROSPECTIVE JUROR MOORE:  Mr. Moore.  I was in the

20   military and traveled internationally.

21               THE COURT:  So you had an official -- U.S. official

22   passport?

23               PROSPECTIVE JUROR MOORE:  I did.

24               THE COURT:  Is there anyone who believes that the

25   Government or the TSA should not be involved in screening

59

```
 1   passengers?  Anyone who has that belief?
 2        Okay.  No hands are raised.
 3              MR. YANNIELLO:  Your Honor?
 4              THE COURT:  Yes.
 5              MR. YANNIELLO:  I just want to bring it to your
 6   attention.
 7              THE COURT:  Yes.
 8              MR. YANNIELLO:  I believe Juror No. 4 raised his
 9   hand regarding frequent travel.
10              THE COURT:  Yes, I'm sorry, I missed Mr. Kawamoto.
11              PROSPECTIVE JUROR KAWAMOTO:  Yeah, for work I do
12   travel pretty frequently between Tokyo and Montreal.  My
13   experience with TSA, I think initially when I started travel
14   was an inconvenience, but nothing serious, but the delays
15   involved with waiting in line and all that prompted me to get
16   nexus and global entry passes, so just like the gentleman
17   below, preregistered with TSA and all that stuff.
18              THE COURT:  So you don't have to take off your shoes
19   in line and all that?
20              PROSPECTIVE JUROR KAWAMOTO:  No, I do not.
21              THE COURT:  Which is the way it used to be.
22              PROSPECTIVE JUROR KAWAMOTO:  Yeah.
23              THE COURT:  Is there anyone -- this applies to
24   yourself, close family members or close friends, anyone that's
25   ever been arrested, charged or convicted of any type of
```

```
 1   criminal offense, if you have not otherwise disclosed it?
 2   Ms. Zepeda referenced two family members.  Is there anyone
 3   who's ever been arrested, charged or convicted of any type of
 4   criminal offense, whether it's a misdemeanor driving-under-the-
 5   influence type of offense or something more serious.
 6        We have one hand raised, Mr. Stevens.
 7        Yes, would you pass the microphone.
 8        Is this something that you feel comfortable discussing
 9   here in open court?
10        PROSPECTIVE JUROR STEVENS:  It's 30 years ago.  I
11   just got a DUI.
12        THE COURT:  Do you feel that you were treated fairly
13   by the law enforcement officers involved?
14        PROSPECTIVE JUROR STEVENS:  Yeah.
15        THE COURT:  And do you feel that you were treated
16   fairly by the judicial process or system?
17        PROSPECTIVE JUROR STEVENS:  Yeah.
18        THE COURT:  Anyone else who has family members,
19   yourself or close friends who have been arrested, charged or
20   convicted?
21        We go to Mr. Ferrara.
22        PROSPECTIVE JUROR FERRARA:  My father has a DUI from
23   a couple decades ago.  My aunt, who I'm close with, was charged
24   with using a fake ID.  And one of my cousins was in some sort
25   of big intense federal thing that I don't really know all the
```

1    details of, but I know that he was in federal prison for a

2    pretty long time.

3              THE COURT:  So your aunt who was charged with using

4    a fake ID, how long ago was that?

5              PROSPECTIVE JUROR FERRARA:  That would have been

6    probably 2002.

7              THE COURT:  And when you say "charged," was she

8    arrested?

9              PROSPECTIVE JUROR FERRARA:  She was arrested.

10             THE COURT:  And were you present when she was

11   arrested?

12             PROSPECTIVE JUROR FERRARA:  No.

13             THE COURT:  Did she discuss the case with you?

14             PROSPECTIVE JUROR FERRARA:  No.

15             THE COURT:  From what you've heard about the case

16   through other family members, secondhand or thirdhand, do you

17   have any opinions one way or the other whether she was treated

18   fairly by the law enforcement officers involved?

19             PROSPECTIVE JUROR FERRARA:  Not really.  I think she

20   probably was treated fairly.

21             THE COURT:  And then you said you had a cousin who

22   had a significant criminal proceeding.

23             PROSPECTIVE JUROR FERRARA:  Yes.  Again, I don't

24   know all the details.  I know all the family stories.  He was

25   in prison pretty much from before I was born until I was in

```
 1   high school.  I know he got out when I was a senior, I think,
 2   but, yeah, I don't know the details.  It was an organized crime
 3   thing.
 4              THE COURT:  Did you ever talk to him about it?
 5              PROSPECTIVE JUROR FERRARA:  No.
 6              THE COURT:  No.  And would that influence your
 7   decision making here?
 8              PROSPECTIVE JUROR FERRARA:  No.
 9              THE COURT:  Anyone else?
10       Okay.  We have several others.  We go to Ms. -- we will
11   take it in order, so Moseslewis first.
12              PROSPECTIVE JUROR MOSESLEWIS:  I got a lot of
13   experience.  Yes, I raised my cousin's 16-month-old daughter
14   when she was in prison for driving under the influence of drugs
15   and several people were killed.  And that was very -- that
16   was -- the child now is 29.  So she was recently released from
17   prison last year, and that's one of my experiences.
18              THE COURT:  I'm assuming you were not present when
19   the incident occurred.
20              PROSPECTIVE JUROR MOSESLEWIS:  No, but I was there
21   with her.  I went to the crime scene.  And she was injured
22   also.  They took her to the hospital, so I was with her during
23   that time.
24              THE COURT:  Do you feel she was treated fairly by
25   law enforcement officers?
```

1          PROSPECTIVE JUROR MOSESLEWIS:  Well, during her

2    court process, going to court, she was told to plead guilty

3    without any -- how would -- she didn't get good counsel from

4    the defense attorney, so I felt very -- and she was given 38

5    years, but she ended up doing 16, I believe, yeah.  So it was

6    kind of, I felt, very unfair that she didn't get really good

7    counsel from her defense attorney.

8          THE COURT:  Do you feel that that incident, matter,

9    what you know of it, will influence your decision making here?

10          PROSPECTIVE JUROR MOSESLEWIS:  Well, I still believe

11    in the justice system, I still do.

12          THE COURT:  Okay.  You indicated previously that you

13    were concerned about your ability to be fair to the Government.

14          PROSPECTIVE JUROR MOSESLEWIS:  Let's say I will try

15    to the best of my ability, you know.

16          THE COURT:  Thank you.

17          PROSPECTIVE JUROR MOSESLEWIS:  Okay.

18          THE COURT:  And then do we have anyone else?

19          PROSPECTIVE JUROR DU:  So my aunt, she used to live

20    in a house, like it's a townhouse, so they share driveways with

21    the neighbors, and the neighbor was parking on the driveway.

22    So she was trying to get to her house with her car, so she

23    asked them if, you know, they could move, and instead, they

24    went to her through like the driver's side of the window, and

25    they spit in her face.

```
 1        So she got out of her car, and three people beat her down.

 2   And her kids, which is my cousins, they called the police, but

 3   when the police came, they arrested my aunt, which I didn't

 4   think that was fair, and it didn't make any sense because if

 5   three people were beating her down and she had to be arrested.

 6   And she spent the night at the hospital, so I didn't think that

 7   was fair.

 8            THE COURT:  Were you present at the time?

 9            PROSPECTIVE JUROR DU:  I wasn't.

10            THE COURT:  Thank you.

11        Anyone else?

12        Okay.  We have Mr. Taron.

13            PROSPECTIVE JUROR TARON:  My oldest stepson, during

14   a period of about 20 years, from about 1990 to -- so was

15   arrested multiple times for DUI, attacking police officers,

16   beating his girlfriend, a variety of different things, and was

17   arrested many times.

18            THE COURT:  And based on what you know of that, do

19   you feel that they were treated fairly by law enforcement

20   officers?

21            PROSPECTIVE JUROR TARON:  I think they bent over

22   backwards to give him better treatment than he should have

23   received.  Celebrity does have its privileges.

24            THE COURT:  So as I mentioned, Mr. Flint is a

25   lawyer.  Will that fact alone impact anyone's ability to be
```

```
 1   fair to the Government or fair to the defendant?

 2        Okay.  No hands are raised.

 3        Is there anyone who has -- yourself, if you have not

 4   otherwise disclosed it, yourself, close family members or very

 5   close friends that are attorneys?

 6        Okay.  Anyone in the back row first?

 7        And we go to Ms. Jansen is it?  Down on the bottom row.

 8   Somebody had their hand raised.

 9             PROSPECTIVE JUROR SCHMIDT:  My dad's an attorney.

10   My sister is an attorney.  My uncle is an attorney.  I work in

11   a law office.

12             THE COURT:  The area of law that your dad practices

13   in?

14             PROSPECTIVE JUROR SCHMIDT:  Workers' compensation.

15             THE COURT:  And you said you have an uncle?

16             PROSPECTIVE JUROR SCHMIDT:  Yes, he does litigation.

17             THE COURT:  Do you know what type?

18             PROSPECTIVE JUROR SCHMIDT:  I think personal injury.

19             THE COURT:  And you work in a law office?

20             PROSPECTIVE JUROR SCHMIDT:  I do.

21             THE COURT:  And the area -- the focus of the

22   practice is what?

23             PROSPECTIVE JUROR SCHMIDT:  They do entertainment,

24   real estate, litigation.

25             THE COURT:  Any type of criminal work?
```

```
 1                  PROSPECTIVE JUROR SCHMIDT:  No.
 2                  THE COURT:  One of your duties as a juror, if you're
 3    selected to sit in this case, is you can't discuss the case
 4    with anyone.  You're not able to contact any of the members of
 5    the firm, any family members to seek or solicit any type of
 6    information or advice.  Do you promise to follow that rule?
 7                  PROSPECTIVE JUROR SCHMIDT:  Yes.
 8                  THE COURT:  Thank you.
 9        Yes.
10                  PROSPECTIVE JUROR TARON:  My brother is a lawyer.
11                  THE COURT:  In what area?
12                  PROSPECTIVE JUROR TARON:  In Sacramento.  He
13    represents developers, does real estate financing, all civil,
14    never been in a courtroom.
15                  THE COURT:  Okay.  Thank you.
16        If you have not otherwise disclosed, is there anyone who
17    has had a significant negative experience with any type of
18    Government agency, significant negative experience with a
19    Government agency that you have not otherwise disclosed?
20        Okay.  That concludes -- a couple final questions.  Does
21    anyone have any medical condition that would make it difficult
22    for you to be a juror in the case if you have not otherwise
23    disclosed?
24        And is there any -- does anyone have any other information
25    to volunteer that you believe the lawyers should know about in
```

1    determining whether you should be a juror in this case that you

2    have not otherwise disclosed?

3         Okay.  We have Ms. Zepeda has her hand up.  Yes.

4              THE REPORTER:  Wait a minute.

5              THE COURT:  Microphone, please.

6              PROSPECTIVE JUROR ZEPEDA:  I do have a cousin that's

7    gang-affiliated.  He is on death row, and he's 34 now.  He was

8    18 at the time.

9              THE COURT:  Okay.  Thank you very much for that.

10        Let me see.  Anyone else?

11        I will see counsel at the sidebar.

12        (Discussion held at sidebar.)

13             THE COURT:  Okay.  We will start with the Government

14   first.  Any additional questions that you would like me to ask

15   the panel as a whole?

16             MR. YANNIELLO:  Not as a whole, Your Honor.

17             THE COURT:  Any follow-up questions?

18             MR. YANNIELLO:  Juror No. 3 wasn't asked about prior

19   jury service, so just a follow-up on that.

20        (In open court.)

21             THE COURT:  Mr. Zhao, do you have prior jury

22   service?

23             PROSPECTIVE JUROR ZHAO:  Yes, I do.

24             THE COURT:  Civil or criminal?

25             PROSPECTIVE JUROR ZHAO:  Criminal.

```
 1              THE COURT:  Without disclosing the verdict in the
 2   case, did you reach a verdict?
 3              PROSPECTIVE JUROR ZHAO:  Yes.
 4              THE COURT:  Any aspect of that that would influence
 5   your decision making here?
 6              PROSPECTIVE JUROR ZHAO:  No.
 7              THE COURT:  Thank you.
 8          (Discussion held at sidebar.)
 9              MS. RO:  Your Honor, I believe Juror No. 14 --
10              THE COURT:  Let's deal with one lawyer at a time.
11              MR. YANNIELLO:  Juror No. 14 had several attorneys
12   that she knew.
13              THE COURT:  What?
14              MR. YANNIELLO:  Juror No. 14 said she had a sister
15   that was an attorney, and she didn't disclose in what area the
16   attorney practiced.
17              (In open court.)
18              THE COURT:  Ms. Schmidt, you indicated that you have
19   family members who are lawyers.  Did you indicate you have a
20   sister who's a lawyer also?
21              PROSPECTIVE JUROR SCHMIDT:  Uh-huh.
22              THE COURT:  And what area of practice?
23              PROSPECTIVE JUROR SCHMIDT:  Workers' comp.
24              THE COURT:  Okay.  Thank you.
25          (Discussion held at sidebar.)
```

```
 1            THE COURT:  Anything else?  Defense?
 2            MR. AVEIS:  Your Honor, I worked at the Ventura DA's
 3   office.  I had a lot of dealings with the DA's office.
 4   Juror No. 18, Dr. Smith, mentioned that her brother-in-law is a
 5   supervising deputy DA in Ventura.
 6            THE COURT:  Yes.
 7            MR. AVEIS:  So perhaps inquiry makes sense
 8   whether --
 9            THE COURT:  I can ask if she recognizes you.
10            MR. AVEIS:  Yes, or my name.
11       (In open court.)
12            THE COURT:  Let me ask, does any of the 18
13   prospective jurors or anyone in the courtroom, any of the other
14   jurors in the courtroom recognize any of the lawyers or the
15   defendant?  Anyone familiar with the lawyers or the defendant?
16       No hands are raised.
17       (Discussion held at sidebar.)
18            MS. WAKEFIELD:  Your Honor, I would like the Court
19   to ask anyone if they have ever had a negative experience with
20   a lawyer, whether it's one that represented them or their
21   family members.
22            THE COURT:  Okay.  Fair enough.
23       (In open court.)
24            THE COURT:  Of the 18 prospective jurors, if you
25   have not otherwise disclosed, is there anyone who has ever had
```

```
 1   a negative -- and you decide what a negative experience is,
 2   negative experience with an attorney or a lawyer?
 3        No hands.
 4        (Discussion held at sidebar.)
 5             MS. WAKEFIELD:  Specifically as to Juror No. 13, he
 6   said he had a military passport.  We're not sure what type of
 7   passport that is.
 8             THE COURT:  It's an official passport.
 9             MS. WAKEFIELD:  Official passport?
10             THE COURT:  Yes.
11             MS. WAKEFIELD:  Then if the Court wouldn't mind
12   inquiring how long he was in the military and how often he
13   traveled.
14             THE COURT:  Okay.
15        (In open court.)
16             THE COURT:  Mr. Moore, how long were you in the
17   military?
18             PROSPECTIVE JUROR MOORE:  Four years.
19             THE COURT:  And how often did you travel?
20             PROSPECTIVE JUROR MOORE:  I lived in Panama for
21   three years.
22             THE COURT:  Back and forth between Panama and --
23             PROSPECTIVE JUROR MOORE:  U.S. and South American
24   countries.
25             THE COURT:  And your travel was for military
```

```
 1   purposes?
 2            PROSPECTIVE JUROR MOORE:  Yes.
 3        (Discussion held at sidebar.)
 4            MS. WAKEFIELD:  Nothing further.
 5            THE COURT:  Okay.  So we go to the exercise of
 6   challenges for cause, and we will start with the Government
 7   first.
 8            MR. AVEIS:  Can we confer, please, for just a
 9   minute?
10            THE COURT:  Yes.
11        (Discussion off the record.)
12            MR. YANNIELLO:  Thank you.
13            THE COURT:  Yes?
14            MR. YANNIELLO:  So we believe that at least
15   Juror No. 7, 10 and 11 have each indicated that -- they have
16   not stated affirmatively that they could be fair in this
17   proceeding.  They have actually all indicated that -- 1 and
18   number 10 said she would try her best.
19            THE COURT:  Yes, that's all we ask.
20            MR. YANNIELLO:  And there's been a recent court case
21   where the juror expressed equivocation about whether or not
22   they could be fair, and the Ninth Circuit reversed it.  So I
23   think under that current case, we're uncomfortable that.
24            THE COURT:  That's why we have peremptories,
25   unless -- let me hear from the defense.  So we will start with
```

```
 1    7, Zepeda, Sundee Zepeda, who's indicated unequivocally that

 2    she can't be fair to the Government in the case.  Does the

 3    defense wish to be heard?  The Court would conclude, based on

 4    her responses, that she cannot be a juror in the case because

 5    she cannot be fair.

 6              MS. WAKEFIELD:  Nothing to add.

 7              THE COURT:  Then she would be excused.

 8         Juror No. 10, Ms. Moseslewis, has indicated that she has

 9    some concerns about her ability to be fair, but when all is

10    said and done, she will do her best to listen carefully to the

11    law and to the evidence and decide the case based on that.  So

12    do you wish to be heard on that?

13              MS. WAKEFIELD:  We agree with the Court.

14              THE COURT:  So the motion as to Number 10 would be

15    denied.

16         11, Ms. Du, has stated unequivocally that she cannot -- is

17    not able to resolve conflicts in evidence, has difficulty

18    making decisions, so she would not be competent to sit as a

19    juror.  The Court would excuse her for cause.

20         Does the defense wish to be heard?

21              MS. WAKEFIELD:  No, Your Honor.

22              THE COURT:  All right.  Excused for cause.

23         So 7 and 11 are excused.

24         (In open court.)

25              THE COURT:  Ms. Zepeda, you're excused.  Thank you
```

1    very much for your candor.

2          And, Ms. Du, thank you also very much for your candor.

3          (Discussion held at sidebar.)

4              THE COURT:  We go to defense, motions for cause?

5              MS. WAKEFIELD:  Nothing, Your Honor.

6              THE COURT:  Pass for cause?

7              MS. WAKEFIELD:  Pass.

8              THE COURT:  Okay.  We probably should fill -- we

9    probably should fill that one seat.

10             THE COURTROOM DEPUTY:  There's two -- I'm sorry,

11   Your Honor.  There would be two seats, I believe, number 7 and

12   then number 11.

13             THE COURT:  7 and 11, yes.

14             THE COURTROOM DEPUTY:  So Juror No. 13, Michael

15   Moore, will replace the number 7 seat.

16             THE COURT:  Okay.

17             THE COURTROOM DEPUTY:  And then Juror No. 14, Claire

18   Schmidt, will replace juror seat number 11.

19         (In open court.)

20             THE COURT:  Mr. Moore, would you take the number 7

21   seat, please, on top.

22         And, Ms. Schmidt, would you take the number 11 seat,

23   please.

24         (Discussion held at sidebar.)

25             THE COURT:  So the presumptive jury is as to the

```
 1   first 12, so you exercise peremptory challenges as to the first
 2   12 only, and then they will be filled first in order.
 3        So the first peremptory is with the Government.
 4            MR. AVEIS:  May we confer?
 5            THE COURT:  Yes.
 6        We should probably take a recess.
 7            THE COURTROOM DEPUTY:  Yes.
 8        We need the Government to come back.
 9        The first is with the Government.  It shouldn't be a hard
10   one.
11            MR. YANNIELLO:  Number 10, Your Honor.
12        (In open court.)
13            THE COURT:  Ms. Moseslewis is excused.  Thank you
14   very much.
15        And, Ms. Jansen, would you take that seat, please.
16        (Discussion held at sidebar.)
17            THE COURT:  Next two with the defense.
18            MS. WAKEFIELD:  Your Honor, we would ask the Court
19   to thank and excuse Mr. Moore, who used to be number 13 and now
20   he is number 7.
21            THE COURT:  Okay.  Mr. Moore is excused, and you get
22   one more.
23            MS. WAKEFIELD:  Your Honor, we would ask the Court
24   to thank and excuse Mr. Taron, number 12.
25            THE COURT:  Mr. Taron, number 12.
```

```
 1        (In open court.)

 2            THE COURT:  Mr. Moore is excused.  Thank you very

 3   much, Mr. Moore.

 4        Mr. Moore is excused, and Mr. Taron is excused.

 5        Thank you.  And may I have Juror No. 16 -- in seat number

 6   16, Ms. Kittay, take that top seat, please.

 7        And, Mr. Stevens, would you move over all the way over,

 8   please.

 9        (Discussion held at sidebar.)

10            THE COURT:  Next is with the Government.

11            MR. YANNIELLO:  The Government would ask to thank

12   and excuse Juror No. 10, Jansen.

13            THE COURT:  Okay.  The last three juries were hung.

14   You don't want to take that chance again.

15            MR. YANNIELLO:  No.

16        (In open court.)

17            THE COURT:  Ms. Jansen is excused.  Thank you very

18   much.  Ms. Jansen, you're excused.

19        And, Dr. Smith, would you take that seat, please.

20        (Discussion held at sidebar.)

21            THE COURT:  Next two are with the defense.

22            MS. WAKEFIELD:  One moment, Your Honor.

23        (Discussion off the record.)

24            THE COURT:  Next?

25            MS. WAKEFIELD:  Thank you, Your Honor.
```

1          We would also like to thank and excuse Ms. Kittay, who is

2     now in seat 7.

3          (In open court.)

4          THE COURT:  Ms. Kittay is excused.  That's in seat

5     number 7.

6          (Discussion held at sidebar.)

7          THE COURT:  And we will take a short restroom break.

8          (In open court.)

9          THE COURT:  We are going to take a very short

10    restroom break, so please do not leave the floor.  We are going

11    to resume again in 10 minutes, and that will be 11:30.  For

12    those of you who leave the courtroom, do not discuss the case

13    amongst yourself or with any other person.  Please make sure

14    you stay on the floor and you return precisely at 11:30.  Thank

15    you.

16          THE COURTROOM DEPUTY:  All rise for the jury,

17    please.

18          (Recess taken from 11:19 a.m. to 11:30 a.m.)

19          THE COURT:  Let me have the clerk call seven

20    additional prospective jurors.

21          THE COURTROOM DEPUTY:  As I call your name, please

22    come forward.

23          Juror No. 19, Juan Platero, P-l-a-t-e-r-o.  Would you

24    please come forward.  Sir, would you take this empty seat in

25    the top row.

1          Juror No. 20, Inge Hobo-Scheinfarb, H-o-b-o, hyphen,

2     S-c-h-e-i-n-f-a-r-b.

3          Juror No. 21, Searlait Sequeida-Tapia, S-e-q-u-e-i-d-a,

4     hyphen, T-a-p-i-a.

5          Juror No. 22, Samuel Lanfur, L-a-n-f-u-r.

6          Juror No. 23, Freeda Latimore, L-a-t-i-m-o-r-e.

7          Juror No. 24, Yen Sung, S-u-n-g.

8          And Juror No. 25, Linda Hamer, H-a-m-e-r.

9          That concludes the call.

10              THE COURT:  Okay.  Let's start with the juror in

11     seat number 7, Mr. Platero.  Would you answer the questions.

12              PROSPECTIVE JUROR PLATERO:  Yes.  My name is Juan

13     Platero.  I live in Wilmington, California.  I am single.  I am

14     a chemist.  I have three children:  I have a 19-year-old.  He's

15     an adult, I guess.  He works for a chocolate company.  And I

16     have no prior jury service.

17              THE COURT:  Other than work as a chemist, any other

18     occupations?

19              PROSPECTIVE JUROR PLATERO:  No.

20              THE COURT:  I asked a number of questions this

21     morning.  Are there any questions that stand out in your mind

22     that you would like to respond to?

23              PROSPECTIVE JUROR PLATERO:  No.

24              THE COURT:  Any prior arrests, charges or

25     convictions involving yourself, family members or close

```
 1   friends?
 2              PROSPECTIVE JUROR PLATERO:  One close friend serving
 3   some time right now.
 4              THE COURT:  Were you present when this person was
 5   arrested?
 6              PROSPECTIVE JUROR PLATERO:  No.
 7              THE COURT:  Is it a male?
 8              PROSPECTIVE JUROR PLATERO:  Yes.
 9              THE COURT:  Did he discuss the case with you?
10              PROSPECTIVE JUROR PLATERO:  Yes.
11              THE COURT:  And from what you can -- from what you
12   heard from him and from others, do you have any opinions or
13   impressions one way or the other whether he was treated fairly
14   by law enforcement?
15              PROSPECTIVE JUROR PLATERO:  I believe he was treated
16   fairly.
17              THE COURT:  And by the judicial system or process?
18              PROSPECTIVE JUROR PLATERO:  Yes.
19              THE COURT:  Any, yourself, family members or close
20   friends, who have ever been employed with a law enforcement
21   agency?
22              PROSPECTIVE JUROR PLATERO:  My uncle works for the
23   IRS.  I don't know if that's a --
24              THE COURT:  Yeah, well, do you know if in a law
25   enforcement capacity?
```

```
 1              PROSPECTIVE JUROR PLATERO:  No, I don't think so.
 2              THE COURT:  Can you be fair to the Government and to
 3    the defendant?
 4              PROSPECTIVE JUROR PLATERO:  Yes.
 5              THE COURT:  Okay.  Thank you.
 6         Let's move to Ms. -- is it Hobo-Scheinfarb?
 7              PROSPECTIVE JUROR HOBO-SCHEINFARB:  Yes.  Good
 8    morning.  My name is Inge Hobo-Scheinfarb.  I live in Los
 9    Angeles.  I'm married.  I am a real estate broker/property
10    manager, and I run a nonprofit.  My husband is an L.A. County
11    Sheriff's deputy.  He is in the U.S. Navy, 20 years for both.
12    We have three kids.  And I have not served on jury service
13    before.
14              THE COURT:  What is your nonprofit?
15              PROSPECTIVE JUROR HOBO-SCHEINFARB:  We run -- we
16    take in VA patients in Wadsworth and take them out there
17    sailing.  They are actually out there now.  I'm missing it.
18              THE COURT:  Do you feel that you could be fair to
19    the Government and to the defendant?
20              PROSPECTIVE JUROR HOBO-SCHEINFARB:  Yes.
21              THE COURT:  Do you know if your husband has worked
22    any task force details working with federal agencies?
23              PROSPECTIVE JUROR HOBO-SCHEINFARB:  Absolutely.  He
24    is in the harbor.  He is a boat operator, rescue boat operator
25    in the marina, and he does several joint task forces in the
```

```
 1    waters.
 2              THE COURT:  Does he work with the Coast Guard at
 3    all?
 4              PROSPECTIVE JUROR HOBO-SCHEINFARB:  Their station is
 5    right next door.
 6              THE COURT:  Does he have any regular contact with
 7    TSA?
 8              PROSPECTIVE JUROR HOBO-SCHEINFARB:  No, not that I'm
 9    aware of.
10              THE COURT:  Can you be fair to both sides?
11              PROSPECTIVE JUROR HOBO-SCHEINFARB:  Yes.
12              THE COURT:  Thank you.
13         Next?
14              PROSPECTIVE JUROR HOBO-SCHEINFARB:  Sorry.
15              THE COURT:  I'm sorry.
16              PROSPECTIVE JUROR HOBO-SCHEINFARB:  My younger
17    sister was a state department employee in Amsterdam.  She was
18    the assistant to the U.S. consulate in the Netherlands for 10
19    or 15 years for various of the consuls there, so --
20              THE COURT:  Is she still with the state department?
21              PROSPECTIVE JUROR HOBO-SCHEINFARB:  She is no longer
22    with the state department.  She moved back to the United
23    States.
24              THE COURT:  Did you ever visit her when she was with
25    the consulate?
```

1          PROSPECTIVE JUROR HOBO-SCHEINFARB:  I went there.  I

2    was on a trip with my husband and kids, and we went inside.

3    And I took a picture behind a podium, and that was it.

4          THE COURT:  Is there anything about that

5    relationship that would influence your decision making here?

6          PROSPECTIVE JUROR HOBO-SCHEINFARB:  No.

7          THE COURT:  Thank you.

8       Next.

9          PROSPECTIVE JUROR SEQUEIDA-TAPIA:  Hi.  My name is

10   Searlait Sequeida-Tapia.  I currently live in La Puente,

11   California.  I'm single.  My current occupation is an AVID

12   tutor.  I don't have a spouse.  No children.  And I have never

13   done jury duty, but I was called; I wasn't selected.

14         THE COURT:  What do you do as a tutor?

15         PROSPECTIVE JUROR SEQUEIDA-TAPIA:  I usually work

16   with the middle schoolers, 7th or 8th grade.  I help them with

17   tutorials.  I walk around the classroom, make sure they are on

18   task.  I don't have the same responsibility as a teacher, but I

19   do discipline them if they are off task.  I also have authority

20   to send them to the office.

21         THE COURT:  Can you be fair to both sides?

22         PROSPECTIVE JUROR SEQUEIDA-TAPIA:  I believe so.

23         THE COURT:  Is there any question that I've asked

24   this morning that you would like to respond to?

25         PROSPECTIVE JUROR SEQUEIDA-TAPIA:  Not that I can

```
 1    think of any.
 2               THE COURT:  Thank you.
 3        Would you pass the microphone.
 4               PROSPECTIVE JUROR LANFUR:  Good morning.  My name is
 5    Samuel Lanfur.  I live in Los Angeles.  I'm single.  I'm an
 6    associate manager at a restaurant.  No children.  And I have
 7    not done jury service before.
 8               THE COURT:  Welcome to jury service.  Can you be
 9    fair to both sides?
10               PROSPECTIVE JUROR LANFUR:  I can try.
11               THE COURT:  Do you have any concern about your
12    ability to be fair?
13               PROSPECTIVE JUROR LANFUR:  Well, to be honest, the
14    government and lawyers, I don't really trust the government and
15    don't really trust lawyers, and this is a case full of
16    government lawyers and against a lawyer.  So it's kind of
17    like --
18               THE COURT:  So do you have prior -- is there any
19    prior negative experience involving a government agency?
20               PROSPECTIVE JUROR LANFUR:  Well, not government
21    agency, but a lawyer, yes.
22               THE COURT:  You said you don't trust government
23    lawyers.  So did you have a prior --
24               PROSPECTIVE JUROR LANFUR:  I'm saying I don't trust
25    the government or lawyers, but here we have government lawyers
```

```
 1    and other lawyers.
 2              THE COURT:  So my question is a little bit more
 3    specific.  You don't trust the government, I get that.
 4              PROSPECTIVE JUROR LANFUR:  Yeah.
 5              THE COURT:  But did you have a prior negative
 6    experience with a government agency or arm of the government
 7    that has resulted in you not trusting the government?
 8              PROSPECTIVE JUROR LANFUR:  No, not a government
 9    agency.
10              THE COURT:  What causes your distrust?
11              PROSPECTIVE JUROR LANFUR:  Oh, well, I was convicted
12    of a DUI a few years ago, and I had a lawyer who -- or a public
13    defender who was basically useless, so I had to ask for
14    outside -- I mean outside counseling and just kind of learning
15    how the judicial system works.  It's very manipulative, and --
16    I don't know, just --
17              THE COURT:  So that occurred several years ago?
18              PROSPECTIVE JUROR LANFUR:  Yeah, about two years
19    ago.
20              THE COURT:  About two years ago.  Were you treated
21    fairly by law enforcement?
22              PROSPECTIVE JUROR LANFUR:  I guess, yeah.
23              THE COURT:  But you were not treated fairly by the
24    judicial process or system?
25              PROSPECTIVE JUROR LANFUR:  Yeah, it was a little of
```

```
 1   a hassle -- or a big hassle.
 2              THE COURT:  Are you currently on probation?
 3              PROSPECTIVE JUROR LANFUR:  Yes.
 4              THE COURT:  So going back to your concerns about
 5   your ability to be fair, to the best -- and so the process is
 6   important.  We need -- this is an important case.  This is
 7   important to the Government; it's important to the defendant.
 8         Do you feel that you can set aside the issues involving
 9   yourself concerning the prior DUI, listen carefully to the
10   evidence, carefully to the Court's instruction?  If you believe
11   that the jury should return a verdict in favor of the
12   Government, can you do that?
13              PROSPECTIVE JUROR LANFUR:  I can try.
14              THE COURT:  Okay.  Thank you.
15         Next.
16              PROSPECTIVE JUROR LATIMORE:  My name is Freeda
17   Latimore.  And I live in Gardena, California.  My occupation,
18   I'm a retired nurse for the County of Los Angeles, 30 years.
19   My spouse -- well, I'm also a widow.  I have three adult
20   children:  one is a teacher, one's a nurse, and my son is an
21   entertainer/photographer/this and that.  And I have had prior
22   jury service.
23              THE COURT:  Criminal or civil?
24              PROSPECTIVE JUROR LATIMORE:  One was criminal, and a
25   few others was civil, but I didn't get on the case.
```

1          THE COURT:  Did you serve as a juror on any of those

2     matters?

3          PROSPECTIVE JUROR LATIMORE:  Yes.

4          THE COURT:  And that was a criminal matter?

5          PROSPECTIVE JUROR LATIMORE:  Yes.

6          THE COURT:  Without disclosing the verdict, did you

7     reach a verdict in the case?

8          PROSPECTIVE JUROR LATIMORE:  No.

9          THE COURT:  Are there any questions that I've asked

10    so far that stand out in your mind that you would like to

11    respond to?

12         PROSPECTIVE JUROR LATIMORE:  No, there's not.

13         THE COURT:  Any additional information you believe

14    the lawyers should know about in determining whether you should

15    be a juror in this case?

16         PROSPECTIVE JUROR LATIMORE:  No.

17         THE COURT:  Okay.  Thank you.

18       Next.

19         PROSPECTIVE JUROR SUNG:  My name is Yen Sung.  I

20    live in Torrance.  I'm married.  My job is for a shipping

21    company, just consulting shipping.  My husband is a technician.

22    I have two children, college.

23         THE COURT:  Any prior jury service?

24         PROSPECTIVE JUROR SUNG:  No.

25         THE COURT:  Of the questions I've asked, any

```
 1    questions that stand out in your mind that you would like to
 2    respond to?
 3              PROSPECTIVE JUROR SUNG:  You know, my -- I cannot
 4    understand -- understand 50 percent the English, so I don't
 5    know how to answer you.
 6              THE COURT:  Okay.  So you're concerned about your
 7    ability to understand English?
 8              PROSPECTIVE JUROR SUNG:  Yeah.  And I hope I can
 9    doing, but I worry that I do something wrong.
10              THE COURT:  Have you been able to understand
11    everything I've said so far?  Yes?
12              PROSPECTIVE JUROR SUNG:  Yes.
13              THE COURT:  This morning when you were sitting in
14    the galley, were you able to understand everything that I said?
15              PROSPECTIVE JUROR SUNG:  I can -- I can understand
16    50 percent.
17              THE COURT:  Okay.  Fair enough.  Thank you.
18              PROSPECTIVE JUROR SUNG:  Sorry.
19              PROSPECTIVE JUROR HAMER:  My name is Linda Hamer.  I
20    live in Redondo Beach.  I'm divorced.  I'm a retired teacher.
21    I have one child who is freelance film, music.  And I have been
22    called for civil service three times and served on one jury.
23              THE COURT:  Did that jury reach a verdict?
24              PROSPECTIVE JUROR HAMER:  Only because it was a
25    sham.
```

```
 1              THE COURT:  I don't know, was a verdict --
 2              PROSPECTIVE JUROR HAMER:  The jurors wheeled and
 3    dealed so that they could leave and be done.
 4              THE COURT:  So a verdict was reached?
 5              PROSPECTIVE JUROR HAMER:  Yes.
 6              THE COURT:  I'm assuming you agreed with the
 7    verdict.
 8              PROSPECTIVE JUROR HAMER:  No.
 9              THE COURT:  And was that a criminal case or civil
10    case?
11              PROSPECTIVE JUROR HAMER:  Civil.
12              THE COURT:  Okay.  Thank you.
13        So my questions are to the new seven that have taken a
14    seat.  If you have not otherwise disclosed, is there anyone
15    who's ever been arrested, charged or convicted of any type of
16    offense if you have not otherwise disclosed?
17        We go back to our juror in seat number 13.  Would you pass
18    the microphone over here in the first row.
19              PROSPECTIVE JUROR HOBO-SCHEINFARB:  I was only
20    arrested July 1990 for suspicion of DUI, and it was thrown out
21    because my blood alcohol level was .02, and nothing came of it,
22    no ticket, no nothing.  They just impounded my car, and I
23    picked it up the next day.
24              THE COURT:  So do you feel that you were treated
25    fairly by the --
```

 1          PROSPECTIVE JUROR HOBO-SCHEINFARB:  Absolutely.

 2          THE COURT:  You were treated fairly?

 3          PROSPECTIVE JUROR HOBO-SCHEINFARB:  Yes.

 4          THE COURT:  Would that experience influence your

 5   decision making here?

 6          PROSPECTIVE JUROR HOBO-SCHEINFARB:  It would not.

 7          THE COURT:  Anyone else, any prior arrests, charges,

 8   convictions, involving yourself, family members or close

 9   friends?

10       Is there anyone who has ever been employed with in any

11   capacity with any law enforcement agency?

12       Is there anyone who's ever had any bad experience with any

13   law enforcement agency or law enforcement officer?

14       We have Ms. Sequeida-Tapia with her hand raised.

15       Yes?

16          PROSPECTIVE JUROR SEQUEIDA-TAPIA:  This was more

17   with my sister, but I was little, and I got to experience where

18   her boyfriend at the time got pulled over in front of our house

19   for -- he wasn't pulled over for any reason.  He was just

20   racially profiled in front of our house, and he was almost

21   arrested in front of our house.

22          THE COURT:  How long ago was that?

23          PROSPECTIVE JUROR SEQUEIDA-TAPIA:  I was in

24   elementary school, but I remember like seeing it because my

25   sister was like really freaking out about it.

```
 1              THE COURT:  Can you set that aside and be fair in
 2   this case?
 3              PROSPECTIVE JUROR SEQUEIDA-TAPIA:  I can try.
 4              THE COURT:  To the best of your ability?
 5              PROSPECTIVE JUROR SEQUEIDA-TAPIA:  Uh-huh.
 6              THE COURT:  Again, what occurred back then I
 7   understand can be very traumatic.  Life experiences influence
 8   our decision making process.  We have to recognize that.  What
 9   we ask from a jury is for you to recognize that, set it aside
10   because it has nothing to do with this case, listen carefully
11   to the evidence.  If the evidence convinces you the
12   defendant -- if the Government proves to your satisfaction
13   beyond a reasonable doubt that the defendant is guilty, return
14   a verdict in favor of the Government.  If they fail to do that,
15   same duty to return a verdict in favor of the defendant.
16        Can you accomplish that to the best of your ability?
17              PROSPECTIVE JUROR SEQUEIDA-TAPIA:  I think I can.
18              THE COURT:  Okay.  Thank you.
19        Does anyone have any medical condition that would make it
20   difficult for you to be a juror in the case?
21        Is there any -- of the new seven, is there any additional
22   information that you would like to volunteer that you believe
23   the lawyers should know about in determining whether you should
24   be a juror in this case that you have not otherwise disclosed?
25        We have Ms. Smith -- I'm sorry, Ms. Hamer.
```

Case 2:17-cr-00697-SJO   Document 117   Filed 10/29/18   Page 90 of 208   Page ID #:1573

90

1           Microphone, please.

2               PROSPECTIVE JUROR HAMER:  I, like the gentleman two

3     seats -- three seats, I have no faith in the system.  I don't

4     have any faith in the government.  I think that, too, is a big

5     sham.  And, I'm sorry, and I am disappointed to say I know it's

6     the best system we have, but it just doesn't work, and it goes

7     from the very top, way down.  So that's my prejudice, my

8     feeling.

9               THE COURT:  Okay.  Thank you for your candor.  Thank

10    you very much.

11          Any other information?  None?

12              THE COURTROOM DEPUTY:  There's one more hand,

13    Your Honor.

14              THE COURT:  One more hand.

15              PROSPECTIVE JUROR SEQUEIDA-TAPIA:  I wasn't sure

16    this would count because this happened outside of the United

17    States, but I have a close relative who got arrested, and it

18    was a very severe case to the point that it was broadcasted all

19    of the news channels.  And just going through that was very

20    traumatizing knowing what she went through.  And it got so bad

21    to the point that my cousin, who was with -- one of my cousin's

22    daughter decided to become a lawyer for that reason because of

23    what happened to her mother.

24              THE COURT:  And this occurred outside the United

25    States?

 1              PROSPECTIVE JUROR SEQUEIDA-TAPIA:  It occurred

 2     outside the United States, but we got to -- we have a special

 3     channel we got to see the newscast.  So we got to like watch it

 4     and follow the news with it, and it was a very horrible

 5     experience.

 6              THE COURT:  Did your cousin become a lawyer?

 7              PROSPECTIVE JUROR SEQUEIDA-TAPIA:  She's studying to

 8     be a lawyer right now.  I believe she is in her third year

 9     because originally she wasn't -- that wasn't what she wanted to

10     do, but because of what happened with her mother, she decided

11     to go through it.

12              THE COURT:  Is she studying law in the United

13     States.

14              PROSPECTIVE JUROR SEQUEIDA-TAPIA:  Not in the United

15     States.  That's why I wasn't sure to bring it up, but since

16     it's like lawyer and a judicial system --

17              THE COURT:  Do you feel that's going to influence

18     your decision making here?

19              PROSPECTIVE JUROR SEQUEIDA-TAPIA:  It's -- it's like

20     just being here it's stressful because it was pretty recent,

21     like a couple years back, so it's making me very anxious to be

22     here.

23              THE COURT:  Thank you.

24          Counsel.

25          (Discussion held at sidebar.)

```
 1              THE COURT:  Okay.  Let's start with the Government.
 2              MR. YANNIELLO:  If Your Honor wouldn't mind just
 3    following up, the Freeda Latimore reference to widow but didn't
 4    describe what the widow did for a living.  I believe she is
 5    number --
 6              THE COURT:  Her husband, former?
 7              MR. YANNIELLO:  Yes.
 8         (In open court.)
 9              THE COURT:  Ms. Latimore, the occupation of your
10    former husband?
11              PROSPECTIVE JUROR LATIMORE:  He was a body shop
12    owner and tow truck driver.
13              THE COURT:  Thank you.
14         (Discussion held at sidebar.)
15              THE COURT:  Defense?
16              MS. WAKEFIELD:  Your Honor, Mr. Platero, who is in
17    seat number 7, he said he was a chemist, and we're wondering
18    where he is a chemist.
19         (In open court.)
20              THE COURT:  Mr. Platero, where do you work?  What --
21              PROSPECTIVE JUROR PLATERO:  I work at Bureau
22    Veritas.  It's a laboratory testing company, Bureau Veritas in
23    Torrance.
24              THE COURT:  Thank you.
25         (Discussion held at sidebar.)
```

93

```
 1              THE COURT:  Any motions for cause, Government, of
 2   the new seven?
 3              MR. YANNIELLO:  We would do a for-cause challenge
 4   for Samuel Lanfur and Linda Hamer.
 5              THE COURT:  Okay.  Let's start with Mr. Lanfur.  Do
 6   you wish to be heard?
 7              MS. WAKEFIELD:  No, Your Honor.
 8         (In open court.)
 9              THE COURT:  Mr. Lanfur, going back to your ability
10   to be fair again, just to emphasize, the process is extremely
11   important.  It is an extremely important case.  Can you set
12   aside prior experiences, listen carefully to the evidence,
13   evaluate the evidence, apply the law?  If the Government proves
14   their case, a verdict in favor of the Government.  If they fail
15   to do that, verdict in favor of the defendant.  Can you
16   accomplish that?
17              PROSPECTIVE JUROR LANFUR:  Again, I can try.
18              THE COURT:  Are you concerned about your ability to
19   be fair?
20              PROSPECTIVE JUROR LANFUR:  Yeah.
21              THE COURT:  Thank you.
22         (Discussion held at sidebar.)
23              THE COURT:  Okay.  The Court would excuse Mr. Lanfur
24   for cause.
25              MR. YANNIELLO:  Your Honor, the Government lastly
```

1    has a concern that Mr. Yen -- or Ms. Sung only understands

2    50 percent.

3              THE COURT:  The Court would determine she is not

4    qualified to be a juror because she is not able to understand

5    everything that's been said in the courtroom, so she would be

6    excused.  Ms. Sung is confused.

7         Then you had Ms. Hamer?

8              MR. YANNIELLO:  Yes.

9              THE COURT:  Do you wish to be heard on Ms. Hamer?

10             MS. WAKEFIELD:  Yes, Your Honor.  If the Court

11   wouldn't mind inquiring, she said she doesn't have faith in the

12   system, but it's the best system we have, but if the Court

13   could ask if she could be fair.

14        (In open court.)

15             THE COURT:  Ms. Hamer, you've indicated I think

16   pretty unequivocally that you have significant concerns about

17   faith in the system and fairness in the system.

18             PROSPECTIVE JUROR HAMER:  I do.

19             THE COURT:  And do you feel you could be a juror in

20   this case?

21             PROSPECTIVE JUROR HAMER:  Highly doubtful.

22        (Discussion held at sidebar.)

23             THE COURT:  Okay.  She would be excused for cause

24   based on her responses.  She has indicated unequivocally she

25   has no faith in the system, and it goes all the way from the

```
 1   top down.
 2       Defense, motions for cause?
 3           MS. WAKEFIELD:  No, Your Honor.
 4           THE COURT:  Okay.  The next peremptory is with the
 5   defense.
 6           MS. WAKEFIELD:  Thank you, Your Honor.  We would ask
 7   the Court to thank and excuse Ms. Hobo-Scheinfarb.  I'm not
 8   even going to try.  She is in seat number 13.
 9           THE COURT:  No, no, you exercise peremptories only
10   against the first 12.
11           MS. WAKEFIELD:  My apologies.
12       So we would ask the Court to thank and excuse Ms. Schmidt,
13   who is seated in number 11.
14           THE COURT:  Ms. Schmidt is excused.
15       I'm not going to ask Ms. Hobo-Scheinfarb to move because I
16   think she will be excused soon, but the next peremptory is with
17   the Government.
18           MR. YANNIELLO:  The Government would like to thank
19   and excuse Mr. Ferrara, sitting in seat 2.
20           THE COURT:  AJ Ferrara?
21           MR. YANNIELLO:  That's right.
22           THE COURT:  Okay.  So Ms. Schmidt is excused, right?
23           MR. YANNIELLO:  Yes.
24       (In open court.)
25           THE COURT:  Ms. Schmidt is excused, and Mr. Ferrara
```

 1    is excused.

 2         (Discussion held at sidebar.)

 3              THE COURT:  Next up is defense.

 4              MS. WAKEFIELD:  Thank you, Your Honor.  We would ask

 5    the Court to thank and excuse Ms. Hobo-Scheinfarb.

 6         (In open court.)

 7              THE COURT:  Ms. Hobo-Scheinfarb is excused.

 8         (Discussion held at sidebar.)

 9              THE COURT:  So let's have the rest seated.  So we

10    have Sequeida-Tapia, Latimore.

11              THE COURTROOM DEPUTY:  And that's it.

12              THE COURT:  And that's it.  So Sequeida-Tapia would

13    be in seat number 2.

14              THE COURTROOM DEPUTY:  Okay.

15         (In open court.)

16              THE COURT:  Ms. Sequeida-Tapia, would you take seat

17    number 2, please.

18         And, Ms. Latimore, would you take the seat number 11.

19         Mr. Lanfur is excused, Ms. Sung is excused, and Ms. Hamer

20    are excused.

21         (Discussion held at sidebar.)

22              THE COURT:  Next peremptory is with the defense.

23              THE COURTROOM DEPUTY:  Yes, number 6.

24              THE COURT:  6.

25              MS. WAKEFIELD:  One moment, Your Honor.

```
 1          (Pause in proceedings.)

 2              MS. WAKEFIELD:  We will pass, Your Honor.

 3              THE COURT:  Pass.

 4          Peremptory with the Government?

 5              MR. YANNIELLO:  Yes, Your Honor, the Government

 6     would like to thank and excuse Ms. Sequeida-Tapia.

 7          (In open court.)

 8              THE COURT:  Sequeida-Tapia is excused.

 9          (Discussion held at sidebar.)

10              THE COURT:  Call seven.

11              THE COURTROOM DEPUTY:  Yes, Your Honor.

12          (In open court.)

13              THE COURTROOM DEPUTY:  As I call your name, please

14     come forward, and I will seat you in the appropriate seat.

15          Juror No. 26, Luis Perez, P-e-r-e-z.  Would you please

16     come forward.

17              PROSPECTIVE JUROR:  May we interrupt you?  This lady

18     was bleeding, and she touched the mic with her hands.

19              THE COURTROOM DEPUTY:  Thank you for bringing it to

20     our attention.  I will take care of it.

21          Would you please take the seat number 2 on the top.

22          (Discussion off the record.)

23              THE COURTROOM DEPUTY:  Juror No. 27, Frank-Joshua

24     Hernandez, H-e-r-n-a-n-d-e-z, would you please come forward.

25     Would you please take the first empty seat on the bottom row.
```

```
 1          Juror No. 28, Frances Romo, R-o-m-o.  Would you please
 2   take the next seat over.
 3          Juror No. 29, Juan Escobar, E-s-c-o-b-a-r.
 4          Juror No. 30, Stephen Williams, W-i-l-l-i-a-m-s.
 5          Juror No. 31, Esther Valdovinos, V-a-l-d-o-v-i-n-o-s.
 6          And Juror No. 32, William Power, P-o-w-e-r.
 7          Will you give me one moment, Your Honor.
 8          (Pause in the proceedings.)
 9              THE COURTROOM DEPUTY:  Your Honor, I believe we are
10   ready whenever you are.
11              THE COURT:  Let's start with the juror in seat
12   number 2, Mr. Perez.
13              PROSPECTIVE JUROR PEREZ:  Yeah, my name is -- is
14   this working?  My name is Luis Perez.  I live in Moorpark,
15   California.  I'm married.  I'm an automobile sales and leasing
16   consultant.  My wife is a homemaker.  We have four kids:  one
17   of our kids is an adult, and he just got his license for a real
18   estate agent.  And I have been called for jury service, but I
19   haven't been selected, in Ventura, California, so I think
20   superior court.
21              THE COURT:  Occupation of your spouse?
22              PROSPECTIVE JUROR PEREZ:  Homemaker.
23              THE COURT:  Thank you.
24          Would you pass the microphone to -- pass the microphone
25   to -- is it Mr. Hernandez.
```

```
 1            PROSPECTIVE JUROR HERNANDEZ:  Yes, sir.  My name is
 2   F. Joshua Hernandez.  I live in Hollywood, California.  I'm
 3   married.  My spouse's occupation is for -- director for Alpha
 4   Phi sorority.  I work at UCLA.  I'm a Ph.D. counselor there,
 5   and I'm also completing my Ph.D. in economics.  I have no kids.
 6   And also, I did do jury service before, about 20 years ago,
 7   district, and it was a murder conviction.
 8            THE COURT:  When you say "district," you are talking
 9   about district court?
10            PROSPECTIVE JUROR HERNANDEZ:  Yes, yes.
11            THE COURT:  Federal court?
12            PROSPECTIVE JUROR HERNANDEZ:  Municipal.
13            THE COURT:  State court.
14            PROSPECTIVE JUROR HERNANDEZ:  State court, yeah,
15   Riverside County.
16            THE COURT:  And then you're pursuing your Ph.D. in
17   economics?
18            PROSPECTIVE JUROR HERNANDEZ:  Yes, sir.
19            THE COURT:  And what is your career goal?
20            PROSPECTIVE JUROR HERNANDEZ:  Professor, eventually.
21            THE COURT:  Thank you.
22        Would you pass the microphone.
23            PROSPECTIVE JUROR ROMO:  Hello.  My name is Frances
24   Romo.  I live in Whittier, California.  I'm married 38 years.
25   I'm an administrative assistant to the vice president and dean
```

1    of students at Whittier College.  My husband is a general

2    manager for several body shops.  I have two adult children:  my

3    daughter is an auditory specialist; my son manages an

4    independent theater company.  And I have been called, but I

5    have never been on a panel.

6                THE COURT:  Okay.  Thank you.

7         Next?

8                PROSPECTIVE JUROR ESCOBAR:  Hello.  My name is Juan

9    Escobar.  I live in Montebello.  I work for the L.A. Zoo for

10   admissions.  I'm single.  I have no children.  And I was called

11   last year for jury duty, but was not selected for a civil case.

12               THE COURT:  Thank you.

13        Mr. Williams.

14               PROSPECTIVE JUROR WILLIAMS:  My name is Stephen

15   Williams.  I live in Burbank, California.  I'm married.  I'm a

16   medical bodywork therapist.  My spouse is a television

17   executive.  I have two children:  one in college, one recently

18   graduated who was an advertising copywriter.  And I have been

19   selected for jury I believe three times, two municipal and one

20   state, all three had a verdict.

21               THE COURT:  All criminal?

22               PROSPECTIVE JUROR WILLIAMS:  All criminal.

23               THE COURT:  Thank you.

24               PROSPECTIVE JUROR VALDOVINOS:  My name is Esther

25   Valdovinos.  I live in Downey, California.  I'm engaged.  I'm a

1    registered nurse.  And my fiance is a marriage and family

2    therapist.  I have two children.  And I've been summoned for

3    jury duty, but never been selected.

4              THE COURT:  Thank you.

5              PROSPECTIVE JUROR POWER:  Hi.  My name is William

6    Power.  I live in Long Beach.  I'm married.  I'm a greeter at

7    LAX Airport.  My wife, she works in the bridal industry.  No

8    kids.  And I served on a civil trial three years ago.

9              THE COURT:  Did you reach a verdict in the case?

10             PROSPECTIVE JUROR POWER:  Yes.

11             THE COURT:  As a greeter at LAX, what does that

12   entail?

13             PROSPECTIVE JUROR POWER:  I bring, basically, VIPs

14   through security.

15             THE COURT:  Do you have a relationship with TSA,

16   formal relationship?

17             PROSPECTIVE JUROR POWER:  I go through -- about five

18   to ten times a day I go through security, so, yeah, I know

19   them.

20             THE COURT:  You know TSA persons?

21             PROSPECTIVE JUROR POWER:  Very well, yeah.

22             THE COURT:  When you say you take -- is it VIPs

23   through security?

24             PROSPECTIVE JUROR POWER:  Yeah, celebrities, VIPs,

25   you name it.

1              THE COURT:  Are you familiar with the security

2    systems in process there?

3              PROSPECTIVE JUROR POWER:  Yes.

4              THE COURT:  Do you have friends who are with TSA?

5              PROSPECTIVE JUROR POWER:  Yes.

6              THE COURT:  Do you have any familiarity with

7    diplomatic immunity status?

8              PROSPECTIVE JUROR POWER:  I've had some diplomats,

9    but the issue with their immunity never came up.

10             THE COURT:  Diplomats from which countries?

11             PROSPECTIVE JUROR POWER:  I don't know.  All over

12   Europe.  I don't remember the exact countries, but all over the

13   world.

14             THE COURT:  Are you contacted by embassies?

15             PROSPECTIVE JUROR POWER:  Usually not directly, you

16   know, not directly.

17             THE COURT:  Have you ever seen a diplomatic pouch?

18             PROSPECTIVE JUROR POWER:  I don't -- if I have, I

19   wasn't aware it was a diplomatic pouch.

20             THE COURT:  How about diplomatic passport?

21             PROSPECTIVE JUROR POWER:  Yeah, I have seen

22   diplomatic passports.

23             THE COURT:  And how long have you been working in

24   this capacity?

25             PROSPECTIVE JUROR POWER:  Five years.

And also I need to add, my older sister works in Chicago at O'Hare Airport for the city.

THE COURT:  And what does she do there?

PROSPECTIVE JUROR POWER:  She's in charge -- actually, she got fired a month ago, but she was in charge of security measures there at O'Hare and Midway a few years back also.

THE COURT:  Was she in law enforcement?

PROSPECTIVE JUROR POWER:  No.  She's a city employee, but she dealt -- I don't remember the titles, but she was in badging at one point, and then she dealt with the airport police in charge of some of them.

THE COURT:  Have you ever had any negative experience with any of the security personnel at LAX?

PROSPECTIVE JUROR POWER:  No.

THE COURT:  Is there any aspect of your experience as a greeter at LAX that would influence your decision making here?

PROSPECTIVE JUROR POWER:  Yes.

THE COURT:  Go ahead.  Would you explain.

PROSPECTIVE JUROR POWER:  I've had people ask me if they could avoid security.  I've had people ask if they could take something through for me, but they were going to come through later.  I've had -- it's made me a little biased against -- or I'm way more understanding for TSA because I know

```
 1    they put up with a lot and a lot of people try and bring stuff
 2    through.
 3              THE COURT:  Okay.  Well, I guess the question is to
 4    the best of your ability can you set all that aside, listen
 5    carefully to the evidence in this case -- those prior
 6    experiences have nothing to do with this case -- and apply the
 7    law to the best of your ability?  And if the Government fails
 8    to prove their case beyond a reasonable doubt, could you return
 9    a verdict in favor of the defendant?
10              PROSPECTIVE JUROR POWER:  I don't know.  I have a
11    lot of biases about people trying to get special privileges
12    when I think they are pushing the limits.
13              THE COURT:  Okay.  Fair enough.
14         So my questions are to the new group.  Any prior
15    convictions, arrests or charges involving yourself, close
16    members -- close family members or close friends?
17         Okay.  Yes, sir.
18              PROSPECTIVE JUROR HERNANDEZ:  20, 25 years ago --
19              THE COURT:  We need a microphone, sorry.
20              PROSPECTIVE JUROR HERNANDEZ:  Sorry.  25 to 30 years
21    ago, DUI.
22              THE COURT:  Do you feel you were treated fairly by
23    law enforcement?
24              PROSPECTIVE JUROR HERNANDEZ:  Oh, absolutely.
25              THE COURT:  Do you feel that experience would
```

```
 1   influence you here?

 2            PROSPECTIVE JUROR HERNANDEZ:  None.

 3            THE COURT:  Anyone else, any prior arrests or

 4   convictions?

 5        Yes, Mr. Perez.

 6            PROSPECTIVE JUROR PEREZ:  Yeah, I had a DUI 18 years

 7   ago.

 8            THE COURT:  And were you treated fairly?

 9            PROSPECTIVE JUROR PEREZ:  No, I wasn't.

10            THE COURT:  You were not.  Do you feel that

11   experience would influence your decision making here?

12            PROSPECTIVE JUROR PEREZ:  Yeah, I don't think I

13   would be a good juror in this case.

14            THE COURT:  Even though this case has nothing to do

15   with your matter?

16            PROSPECTIVE JUROR PEREZ:  It's in the back of my

17   mind.

18            THE COURT:  I'm sorry, I can't hear you.

19            PROSPECTIVE JUROR PEREZ:  Yeah, I was mistreated, so

20   it's still in the back of my mind all these years.

21            THE COURT:  So do you feel that you would not be

22   fair to the Government, is that -- I don't want to put words in

23   your mouth.

24            PROSPECTIVE JUROR PEREZ:  Well, to the Government,

25   but also lawyers.  I was manipulated also by the lawyer who I
```

```
 1   paid to, you know, to defend me, and I felt that he manipulated
 2   me.  So I just don't have a good feeling about being here.
 3              THE COURT:  So the defendant in this case is a
 4   lawyer.  And are you concerned about your ability to be fair to
 5   the defendant?
 6              PROSPECTIVE JUROR PEREZ:  I am.
 7              THE COURT:  And you're concerned about your ability
 8   to be fair to the Government?
 9              PROSPECTIVE JUROR PEREZ:  Both, yeah.
10              THE COURT:  Okay.  Anyone else?
11       Is there anyone who's ever been employed, yourself, or
12   family members or close friends, employed with any law
13   enforcement agency in any capacity?
14       Okay.  We have a couple of hands.
15       Ms. Romo, yes.
16       Would you pass the microphone.
17              PROSPECTIVE JUROR ROMO:  My cousin's husband worked
18   for the L.A. Sheriff and retired.
19              THE COURT:  Is this somebody you were close with?
20              PROSPECTIVE JUROR ROMO:  Yeah.  He's a good family
21   member, close family member.
22              THE COURT:  Anything discussed that would influence
23   you here?
24              PROSPECTIVE JUROR ROMO:  Not at all.
25              THE COURT:  Anyone else?
```

1    We have Mr. Williams.

2         PROSPECTIVE JUROR WILLIAMS:  Yes, I also teach

3    self-defense in the city of Burbank, and over the years we have

4    had a lot of law enforcement, law enforcement agency people, a

5    lot of federal law enforcement agency people, and just in

6    general, I've had quite a bit of contact.

7         THE COURT:  Any friends that -- any law enforcement

8    agents that you socialize with on a regular basis?

9         PROSPECTIVE JUROR WILLIAMS:  Yes.

10        THE COURT:  Anything that you've ever discussed that

11   would influence your decision making here?

12        PROSPECTIVE JUROR WILLIAMS:  I don't think so.

13        THE COURT:  Any persons associated with U.S.

14   Marshals or FBI?

15        PROSPECTIVE JUROR WILLIAMS:  U.S. Marshals.

16        THE COURT:  And have you ever applied to be a --

17        PROSPECTIVE JUROR WILLIAMS:  No.

18        THE COURT:  -- law enforcement officer?

19        PROSPECTIVE JUROR WILLIAMS:  No.

20        THE COURT:  Of the new seven, is there any

21   information that you believe the lawyers should know about in

22   determining whether you should be a juror in this case?

23        No hands.

24        Is there anyone that has any medical issues or conditions

25   that you believe would impact your ability to be a juror in the

```
 1   case?

 2        Okay.  No hands.

 3        Let me have counsel at sidebar again.

 4        (Discussion held at sidebar.)

 5             THE COURT:  Okay.  Motion for cause?

 6             MR. YANNIELLO:  The Government would move to strike

 7   Mr. Perez for cause, Luis Perez.

 8             THE COURT:  Do you wish to be heard?

 9             MS. WAKEFIELD:  No, Your Honor.

10             THE COURT:  The motion would be granted.  He's

11   indicated unequivocally that he could not be fair to both

12   sides.  So, yeah, he would be excused.

13        Any other?  Pass?

14             MR. YANNIELLO:  Pass.

15             MS. WAKEFIELD:  We move to strike Mr. Power, who is

16   the greeter at LAX.  He said he is familiar with the security

17   systems in place at LAX, which is there's going to be expert

18   testimony about that in this case.  He said he goes through

19   security five to ten times a day.  He's familiar with the TSA

20   employees.  He actually feels sympathy for them because so many

21   people try to sneak things through and get privileges.

22             THE COURT:  Yes, I think he's clearly indicated he

23   would be biased against the defendant.  So the Court would

24   excuse him for cause, Mr. Power.

25        Pass as to the rest?
```

```
 1              MS. WAKEFIELD:  Yes, Your Honor.

 2              THE COURT:  Okay.

 3          (In open court.)

 4              THE COURT:  Mr. Perez and Mr. Power are excused.

 5  Thank you very much.

 6          Mr. Hernandez -- is it Dr. Hernandez?

 7              PROSPECTIVE JUROR HERNANDEZ:  Not yet.  Close to.

 8  December.

 9              THE COURT:  Would you take that seat number 2,

10  please.

11              PROSPECTIVE JUROR HERNANDEZ:  Sure.

12          (Discussion held at sidebar.)

13              THE COURT:  So defense seven and eight.

14              MS. WAKEFIELD:  Your Honor, we would ask the Court

15  to thank and excuse Mr. Zhao, who is seated in number 3.

16              THE COURT:  And Ms. Romo would take that seat.

17          (In open court.)

18              THE COURT:  Mr. Zhao, you are excused.

19          Ms. Romo, would you take that seat, please.

20          (Discussion held at sidebar.)

21              MS. WAKEFIELD:  I will pass, Your Honor.

22              THE COURT:  Pass.

23          Government five.

24              MR. YANNIELLO:  Your Honor, the Government would

25  like to thank and excuse Jacqueline Horn.
```

```
1              THE COURT:  I didn't hear you.
2              MR. YANNIELLO:  Jacqueline Horn.
3              THE COURTROOM DEPUTY:  Number 9?
4              MR. YANNIELLO:  Number 9.
5         (In open court.)
6              THE COURT:  Juror No. 9, Ms. Horn, is excused.
7              PROSPECTIVE JUROR HORN:  I couldn't hear you.
8              THE COURT:  Juror No. 9, Ms. Horn, is excused.
9         And, Mr. Escobar, would you take that seat, please.
10        (Discussion held at sidebar.)
11             THE COURT:  Nine, defense nine.
12             MS. WAKEFIELD:  We will pass, Your Honor -- oh, I
13   thought we were eight -- no, nine.
14             THE COURTROOM DEPUTY:  It's nine and ten.
15             THE COURT:  You pass, pass.
16             MS. WAKEFIELD:  Pass, pass.
17             THE COURT:  Government six.
18             MR. YANNIELLO:  We are going to pass, too,
19   Your Honor.
20             THE COURT:  Okay.  We have a jury, then, two passes.
21        (In open court.)
22             THE COURT:  We have a jury that's been selected.
23   It's the first nine [sic].  Once you are sworn in as the jury
24   in the case, you will be the jury throughout the proceedings.
25   Again, the case should conclude on Friday, no later than
```

```
 1    Friday.
 2         And with that, let me have the clerk swear in the jurors.
 3              THE COURTROOM DEPUTY:  Yes, Your Honor.
 4         Ladies and gentlemen of the jury, would you all rise and
 5    raise your right hand to be sworn in.
 6                        THE JURY WAS SWORN
 7              (Members of the jury responded "I do.")
 8              THE COURTROOM DEPUTY:  Thank you.  Please be seated.
 9         (Discussion held at sidebar.)
10              THE COURT:  We need to select the alternates.  We
11    have two that remain.  If we have agreement, we can have these
12    two as alternates; if not, we can go through the exercise of
13    peremptories, and each side will get one peremptory.
14              MR. YANNIELLO:  The Government's fine with the two
15    seated there.
16              THE COURT:  Pass.
17              MS. WAKEFIELD:  We are going to strike -- or we are
18    going to ask the Court to thank and excuse Mr. Williams.
19              THE COURT:  Okay.  So we have Mr. -- Ms. Valdovinos
20    as the alternate.  Mr. Williams is excused.
21         (In open court.)
22              THE COURT:  Mr. Williams is excused, and we have one
23    alternate, Ms. Valdovinos.
24         Would you stand, and we will swear her in.
25              ALTERNATE JUROR VALDOVINOS:  Am I excused?
```

1          THE COURT:  No.  You're the alternate in the case.

2          ALTERNATE JUROR VALDOVINOS:  Sorry.  I didn't hear.

3          THE COURTROOM DEPUTY:  Ma'am, will you please stand

4    and raise your right hand to be sworn.

5                    **THE ALTERNATE JUROR WAS SWORN**

6          ALTERNATE JUROR VALDOVINOS:  I do.

7          THE COURTROOM DEPUTY:  Thank you.

8          THE COURT:  We have selected the jury and the

9    alternate.  We are going to take the afternoon recess.  We will

10   start at 1:30.  There's a cafeteria downstairs.  We are going

11   to start precisely at 1:30, so make sure you are here a little

12   bit before so we can start.

13       During your absence do not discuss the case amongst

14   yourself or with any other person.  Do not do any type of

15   research on the case.  Please, those of you who have access to

16   the Internet, no research on the case of any kind.  I'm going

17   to provide additional instructions to you this afternoon.  Any

18   questions before you are excused?  You will return back to this

19   courtroom, and we will start with opening statements and

20   evidence this afternoon.  Any questions?

21       Okay.  The clerk will take charge.  Everyone else in the

22   jury, please return to the jury room for further assignment.

23   Thank you very much.

24          THE COURTROOM DEPUTY:  Would you all rise for the

25   jury, please.

```
1            (Recess taken from 12:21 p.m. to 1:36 p.m.)

2                 THE COURTROOM DEPUTY:  Would you all rise for the

3    jury, please.

4            (In the presence of the jury.)

5                 THE COURT:  Please have a seat.

6         Let me just take another opportunity to welcome the jury

7    and our alternate.  Again, my name is Judge S. James Otero, and

8    you are the jury and the alternate in the case.  I just want to

9    emphasize the importance of your role.  You are the most

10   important part of the trial.  You have the duty of making all

11   of the credibility determinations and resolving all conflicts

12   in evidence, evaluating the evidence offered in the case, and

13   then following the instructions given by the Court.  I have

14   some instructions that I will provide to you.  You'll get

15   another body of instructions that will control your

16   deliberation.

17        Ladies and gentlemen, you are now the jury in this case,

18   and I want to take a few minutes to tell you something about

19   your duty as jurors and to give you some preliminary

20   instructions.  At the end of the trial I will give you a more

21   detailed set of instructions.  Those instructions will control

22   your deliberation.

23        The defendant, Mr. Flint -- again, Mr. Flint is over here

24   to my right.  This is a criminal case.  The criminal case is

25   brought by the United States Government.  The Government has
```

charged Mr. Flint in an indictment.  An indictment is simply a description of the charges made by the Government against the defendant and is not evidence of anything.

The defendant, Mr. Flint, has entered a plea of not guilty to the charges, and the defendant is presumed innocent unless and until proved guilty beyond a reasonable doubt.  A defendant has a right to remain silent, never has to prove innocence, present evidence or call any witnesses.

As I mentioned, one of your roles is to consider the evidence in the case.  The evidence you are to consider in the case will consist of the sworn testimony of the witnesses called here to testify; the exhibits received into evidence; any facts to which the lawyers and parties stipulate.  If there's a stipulation, then I will bring that to your attention when that occurs.

The following is not evidence and you must not consider it as evidence in deciding the case:  statements and arguments of the attorneys is not evidence in the case, questions and objections by the lawyers not evidence in the case, and then testimony I instruct you to disregard, anything that you may see or hear when the Court is not in session, even if what you see or hear is done or said by one of the parties or one of the witnesses.

There may be an occasion where evidence is received for a limited purpose.  If that's the case, I will instruct you as to

```
 1   that item of evidence and how you must consider it.
 2       There are two types of evidence:  evidence can be direct
 3   or circumstantial.  Direct evidence is direct proof of a fact,
 4   such as the testimony by a witness about what that witness
 5   personally saw or heard or did.  And then circumstantial
 6   evidence is indirect evidence; that is, it is proof of one or
 7   more facts from which you can find another fact.  You are to
 8   consider both direct and circumstantial evidence.  The law
 9   permits you to give equal weight to both, but it is for you to
10   decide how much weight to give any of the evidence.
11       During the course of the trial I will rule on the evidence
12   in the case.  There are rules of evidence which control what
13   can be received into evidence.  When a lawyer asks a question
14   or offers an exhibit into evidence and a lawyer for the other
15   side thinks it is not permitted by the rules of evidence, the
16   lawyer may object.  If I overrule the objection, the question
17   may be answered or the exhibit received.  If I sustain the
18   objection, the question cannot be answered and the exhibit not
19   received.
20       Whenever I sustain an objection to a question, you must
21   ignore the question and must not guess as to what the answer
22   would have been.  Sometimes I may order that evidence be
23   stricken from the record.  If that occurs, that means in
24   deciding the case, you must not consider evidence that I told
25   you to disregard.
```

1        In deciding the case you will have to, again, decide which

2    testimony to believe and which testimony not to believe.  You

3    may believe everything that a witness says or part of it or

4    none of it.  In considering the testimony of any witness you

5    may take into consideration the following:  The opportunity and

6    ability of the witness to see or hear or know the things

7    testified to; the witness's memory; the witness's manner while

8    testifying; the witness's interest in the outcome of the case;

9    and any bias or prejudice exhibited by that witness; whether

10   other evidence contradicted the witness's testimony; the

11   reasonableness of the witness's testimony in light of all of

12   the evidence; and then any other factors that bear on

13   believability.

14       At the end of the trial you will have to make your

15   decision based on what you recall of the evidence.  You will

16   not have a written transcript of the trial proceedings, so I

17   urge you to pay close attention.

18       During the course of the trial the clerk will be handing

19   out notebooks and pens.  You may take notes to help you

20   remember what witnesses have said.  If you do take notes,

21   please keep them to yourself until you and your fellow jurors

22   go into the jury room to decide the case.  Do not let

23   note-taking distract you so that you do not hear or see the

24   witnesses while they testify.  When you leave each day, your

25   notes are to be left in the jury room.

1        Whether or not you take notes, you should rely on your own

2   memory of what was said.  Notes are only to assist your memory.

3   You are not to be overly influenced by the notes.

4        Let me just take a moment to explain to you that neither

5   the parties nor the attorneys are permitted to talk to the

6   jurors outside the formal proceedings in court, even to offer a

7   friendly greeting.  So if you happen to see any of the lawyers

8   in the corridor or hallway during any of the breaks or

9   recesses, please do not take offense if they ignore you.

10  Please help them by not acknowledging them.  These rules are

11  very strict.  Again, the rules are to protect the integrity of

12  the process.  And so if you see the lawyers, they will not have

13  any contact with you, nor should you have contact with them.

14       There are going to be witnesses called during the course

15  of the trial.  If you see someone in the hallway and they're

16  not wearing a jury badge, they could be a witness in the case.

17  So avoid contact with any person in the hallway.  If you're

18  seen having a conversation with any person associated with the

19  trial, I'm required to stop the proceedings and hold a hearing

20  to determine whether anything that was said or discussed would

21  influence your decision making.  So rather than cause further

22  delay, just please be vigilant to following that directive.

23       During the course of the trial you may hear testimony from

24  a certain person or persons testifying as expert witnesses.

25  Expert witnesses are simply witnesses who, by education and/or

experience, have become experts in certain areas or knowledge. They may express an opinion as to a relevant matter in which they profess to be an expert and explain the reasons for their opinion.

The testimony of an expert is subject to the same considerations concerning credibility, reliability and interests as the testimony of any other witness.  You should consider the testimony of an expert and give it such weight as you believe it deserves, consider the expert's appearance and manner while testifying, the reasonableness of the opinion, and the qualifications of the expert.

Let me just say a few words about the conduct of the jurors.  First, again, you are not to discuss the case with anyone, including your fellow jurors, members of your family, people involved in the trial or anyone else, nor are you allowed to permit others to discuss the case with you.  If anyone approaches you or tries to talk to you about the case, please inform the Court immediately.

Second, do not read any news stories or articles or listen to any radio or television reports about the case or anyone who has anything to do with it.  Very important, as I mentioned at the beginning of the proceedings, do not do any research, such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own.

1        If you need to communicate with me during the course of

2    the trial, you can do that by sending out a note to the clerk

3    of the court.  The clerk will provide the note to me.  I will

4    generally share the note with counsel before responding, so

5    that may take a little bit of time.

6        I'm going to reread the joint statement of the case to

7    refresh your memory as to the allegations brought by the

8    Government.  The Government has charged Mr. Flint with one

9    count of entering an airport area in violation of airport

10   security requirements.  That charge is contained in an

11   indictment, which is simply a description of the charge against

12   the defendant.

13       In the indictment the Government alleges or contends that

14   the defendant knowingly and willfully entered the Los Angeles

15   International Airport in violation of security prescribed by

16   law.  The Government further contends that the defendant

17   intentionally evaded airport security screening procedures at

18   Los Angeles International Airport by entering a secured,

19   sterile area of the airport while carrying a pouch containing

20   approximately $148,145.

21       The Government contends that the defendant falsely claimed

22   that the pouch was a diplomatic courier pouch that was exempt

23   from Transportation Security Administration screening, and

24   presented documents to the TSA that purported to support

25   defendant's false claim of diplomatic status.

1    Again, the defendant has pleaded not guilty to the charges

2   and is presumed innocent unless and until proven guilty beyond

3   a reasonable doubt.

4    So, again, you are the most important part of the trial.

5   I want to make sure everyone is comfortable.  Feel free to have

6   water with you or coffee in the afternoon.  There's soft drinks

7   also in the jury room.  Feel free to have soft drinks with you

8   in the jury box.  Please no food or gum.  If you have a medical

9   reason and you need to eat for any reason, please bring that to

10  the attention of the clerk and we can accommodate that.

11    In terms of the trial schedule going forward, today we're

12  going to go until approximately 4:00 -- 4:00, 4:15.  I have two

13  other matters to handle after that.  Tomorrow we are going to

14  start at 8:30.  Arrive a little earlier than that because we

15  are going to start at 8:30.  We will go from 8:30 to 11:30, and

16  we will break a little early for lunch to beat the traffic, and

17  we will resume again approximately at 12:30, 12:45, depending

18  on how we are proceeding with the trial.  And then we will

19  conclude about 4:00, 4:15 each day.

20    So that's the schedule we are going to keep.  We are going

21  to keep that schedule through the conclusion of the case.  I

22  hope the case will be concluded and submitted to the jury by

23  Friday.

24    Any questions before we start?  Everyone have notebooks

25  and tablets?

1       We start with the outline of the trial.  The first part --

2   or the next part of the trial, I should say, is opening

3   statement.  An opening statement is kind of an outline of what

4   counsel believes the evidence will be in the case and the

5   evidence received during the course of the trial.  Again the

6   opening statements at this point in the trial is not evidence

7   in the case.

8       And I will turn it over to the Government to make opening

9   statements.

10      Is it Ms. Ro?

11          MS. RO:  Yes, Your Honor.  Thank you.

12      Defendant Daniel Flint, with an ID card that he, himself,

13  laminated.

14      I apologize, Your Honor, may I have one moment?

15      I apologize.  As I stated, the defendant, Daniel Flint,

16  used an ID card that he, himself, laminated, that he, himself

17  laminated, pretended to be a diplomat and tricked TSA.  As a

18  result, he entered LAX with this bag --

19          THE COURT:  Ms. Ro, would you return back to the

20  lectern, please.

21          MS. RO:  Yes, Your Honor.

22      -- with this bag that contained almost $150,000 in cash.

23  And with the ID that he laminated himself, you will hear how he

24  pretended to be a diplomat on at least three separate occasions

25  to TSA.  The evidence will show he's not a diplomat.  He was

not a diplomat, but with the ID on three -- at least three separate occasions, he pretended to be one for one sole purpose:  to enter LAX with a bag undetected.

The defendant is charged with entering an airport area in violation of security requirements.  When people enter a specific area in the airport or enter an airplane, their person and item they need to have been screened.  But there's a specific exception to that rule, and that specific exception is carved out for a diplomatic pouch.

A diplomatic pouch is like a carry-on bag, but it can only be used for limited specific purpose:  for a diplomat, used for a diplomat for an official diplomatic purpose.  TSA will not and cannot screen the bag, but you need a diplomatic passport, not an ID self-laminated with the words "diplomat."  You need a diplomatic passport.  And the defendant knew that.  He knew that because he was told specifically by TSA at Chicago O'Hare International Airport that that self-laminated ID is not enough.  It's not a diplomatic passport.

Daniel Flint, he's a lawyer, educated.  Told TSA, "You don't know what the law is," and TSA held their ground.  At O'Hare they gave him two options:  one, "You can go through our checkpoint, but we need to screen that bag"; or two, "Go back, talk to whoever you need to talk to and come back with a valid diplomatic passport."  Defendant left, cancelled his flight from O'Hare International Airport to LAX but booked another

1     flight that same day with that same ID that he knew was not a

2     diplomatic passport.  He flew out of Midway and booked a flight

3     to LAX.

4          Midway is a smaller airport, and you'll hear that they

5     don't really deal with a lot of diplomatic pouches.  Defendant

6     showed them that ID, the same ID he knew from that same day was

7     not enough, and TSA let him through.  Five days later, on July

8     25th, 2017, the date for which he is charged today, he went

9     back to Midway International Airport, the place where TSA

10    believed showed him, showed them the ID.  They let him through.

11    But this time, while he was en route to LAX, TSA realized they

12    had been tricked.  They contacted authorities, informed LAX

13    authorities, and federal agents stop him after the defendant

14    enters LAX with this unscreened bag.

15         They ask him -- you'll hear his statement.  You will hear

16    the interview that took place.  They asked him, "Were you ever

17    stopped before by TSA about this pouch?"  And the defendant

18    says, "No."  It's five days before he was stopped.  He was

19    turned away at Chicago O'Hare International Airport.  He was

20    told that ID was not enough, and he told federal agents "no."

21         After you hear all of the evidence throughout the trial,

22    ladies and gentlemen, you will only come to one conclusion:

23    And that is that the defendant is guilty.

24              THE COURT:  Thank you.

25         Ms. Wakefield.

1          MS. WAKEFIELD:  This is a case about trust.  Daniel

2    Flint trusted his boss, Ambassador Robert Shumake, and he

3    trusted the International Human Rights Commission.  And this

4    case is also about mistakes, mistakes made by Mr. Flint and

5    mistakes made by TSA.  Mr. Flint is an imperfect man who made

6    mistakes, but imperfection is not intent, and mistakes are not

7    a crime.

8         Now, Mr. Flint is from small-town Michigan, and he stayed

9    there first for college and then law school.  And after law

10   school he didn't get a fancy job with a law firm.  He didn't

11   clerk for a judge.  Instead, he got a job with a part-time solo

12   practitioner.  And at that small office was a big-time client,

13   Robert Shumake.  And it was through that job that brand-new

14   attorney Mr. Flint met Mr. Shumake in 2010.

15        Mr. Flint believed that Mr. Shumake was an internationally

16   connected man with substantial experience, knowledge, and

17   sophistication regarding diplomatic laws.  In 2012 Mr. Shumake

18   was appointed as honorary consul of the Republic of Botswana

19   and the Republic of Tanzania, and the U.S. Department of State

20   recognized him in that position.

21        And then in 2016 Mr. Shumake was appointed as the U.S.

22   ambassador for the International Human Rights Commission relief

23   fund trust, the IHRC.  And that's a human rights organization

24   with special consultative status in the United Nations.  To

25   Mr. Flint, Ambassador Shumake was highly accomplished.  He was

1    knowledgeable about diplomatic laws and customs.  After all,

2    that was his job, and he was trustworthy.

3         Now, after Mr. Shumake began with the IHRC in his

4    ambassador position, he offered Mr. Flint a position as legal

5    counsel and diplomatic courier.  Now, the title of legal

6    counsel for an international human rights organization was

7    alluring.  It was an opportunity for Mr. Flint to be part of

8    something bigger, part of something glamorous, an opportunity

9    he couldn't refuse.

10        And a job as legal counsel with IHRC is not what you might

11   think.  He wasn't tasked with writing the bylaws of the

12   organization or looking at contracts or anything like that.

13   His job was to fly across the country with a diplomatic pouch

14   at the direction of Ambassador Shumake.  And it wasn't a

15   full-time position, but something he did to make ends meet

16   while he worked on his own -- setting up his own practice.

17        In October of 2016, Mr. Shumake gave Mr. Flint a sealed

18   and signed notification officially appointing him as legal

19   counsel and diplomatic courier for the IHRC.  He gave him a

20   corresponding IHRC diplomatic corps identification card, and he

21   gave him a diplomatic pouch that had the organization's emblem

22   sewn into it.  And Mr. Shumake administered an oath to

23   Mr. Flint and swore him into the position.

24        Then Mr. Flint began his work, which was to transport

25   diplomatic pouches on behalf of the organization to offices

1    across the U.S. when directed to do so by Ambassador Shumake.

2    Now, Mr. Flint's understanding was that the diplomatic pouch

3    was exempt from TSA screening and that all he needed was the

4    letter that Ambassador Shumake gave him and his IHRC diplomatic

5    corps ID card because that's what Mr. Shumake told him, and

6    that's what the IHRC gave him to do his job.

7        And Mr. Flint trusted Mr. Shumake.  He relied on his

8    expertise in diplomatic law, his experience.  And Mr. Shumake

9    was, of course, prestigious, and he was polished, and he had

10   given Mr. Flint this incredible opportunity.  And Mr. Flint

11   didn't think to question Mr. Shumake; that is, until July 25th,

12   2017, when Mr. Flint was surrounded by the FBI agents, pulled

13   off of an airplane, interrogated for two hours, and accused of

14   a federal crime.

15       Now, the Government has charged Mr. Flint with entering

16   LAX in violation of LAX's security procedures with the intent

17   to evade them.  And the date of the charge is July 25th, 2017.

18   He's not charged with entering Midway Airport in Chicago or

19   O'Hare Airport in Chicago.  He is not charged with breaking any

20   state department laws or anything related to this money, so at

21   its core, this case isn't about those things even though these

22   are part of the story, but they're only part of the story.

23       And so let's talk about July 25th, 2017.  And I want to go

24   over the flight path that Mr. Flint took that day.  Mr. Flint

25   boarded a plane at Chicago Midway International Airport, MDW,

1   and he flew from MDW to Minneapolis-St. Paul International

2   Airport, or MSP, and from MSP he finally landed at his

3   destination, LAX.

4       When he went to the airport at Midway, he submitted to TSA

5   screening.  He got his boarding pass.  He waited in line at

6   security.  And when he got to the front of the line, he gave

7   his boarding pass and his ID to the TSA officer.  He didn't

8   sneak on the plane.  He didn't try to hide.  He showed the IHRC

9   diplomatic pouch.  He showed the diplomatic letter with the

10  raised seal of the organization, signed by ambassador-at-large,

11  Mr. Shumake.  And this letter says exactly what's inside the

12  pouch, cash deposit, and he showed his IHRC diplomatic courier

13  ID card given to him by the organization.

14      He showed all of these first to a line screening officer,

15  then to a supervisor and even a TSA manager.  Now, TSA

16  Manager Raja Wondrasek, who you will hear from, concluded

17  Mr. Flint satisfied all of TSA's own operating procedures.  And

18  she decided that he met the rules, and so she let the pouch

19  into the airport at Midway without being screened.

20      And Mr. Flint's personal baggage was screened.  His

21  carry-on bag was screened.  He went through the metal detector.

22  He did everything else -- everything that everyone else in

23  precheck with him that day did.  He had his bag go through the

24  metal detector, he went through the metal detector, and there

25  were no issues, and TSA allowed him to proceed.  He boarded his

1    plane.  He flew to Minneapolis, and he boarded another plane

2    and flew to LAX.

3        Now, TSA is the gatekeeper, and they have exclusive

4    control and say-so over screening at the airport.  We rely on

5    TSA not only to screen us, but also to tell us when something

6    is or isn't allowed.  You're going to hear that TSA has an

7    internal guide for its employees.  It's called the Standard

8    Operating Procedures, or the SOP.  That guide tells TSA

9    employees that diplomatic couriers are supposed to have

10   diplomatic passports.

11       Now, by law, members of the public are not allowed to look

12   at the SOP.  They are not allowed to read it.  It's something

13   only TSA can see.  It's an internal document, and Mr. Flint was

14   not allowed to read it.  He wasn't allowed to read it to figure

15   out what he needed and what wasn't allowed.

16       And you're going to hear that the SOP is confusing.  And

17   you're going to hear that TSA Manager Wondrasek actually had in

18   her hand, on July 25th, 2017, an e-mail with the exact

19   instructions that TSA had given its employees on what was

20   required for a diplomatic pouch.

21       And as she read that e-mail in one hand, she looked at

22   Mr. Flint's documents laid out on the counter before her, and

23   she compared them, and she even concluded that Mr. Flint

24   satisfied the requirements, even though Mr. Flint did not have

25   a diplomatic passport.  He didn't claim he had a diplomatic

1    passport, and he didn't present any diplomatic passport that

2    day.  So not even someone trained on and responsible for

3    implementing these secret rules and reading it that day in

4    front of her face could make much sense out of it.

5         And it was only later that day, while Mr. Flint was

6    already on his flight on the way to LAX, that TSA in Midway

7    realized it had made a mistake, and they called the FBI at LAX.

8         Now, agents at LAX, they intercepted Mr. Flint.  They

9    seized the diplomatic pouch, and they escorted him inside LAX

10   to a screening checkpoint.  Mr. Flint then spoke with the FBI

11   for almost two hours about why he believed he had followed the

12   rules.  Agents even spoke with Ambassador Shumake after

13   Mr. Flint called him on his phone to clear up this whole mess.

14        Mr. Flint himself, he said, "You could search the pouch."

15   At Midway he presented himself to security.  He explained who

16   he was, who he worked for, and he showed them all the items

17   that IHRC had given him.  He didn't claim he had a diplomatic

18   passport or show any diplomatic passport.  And at LAX he spoke

19   to agents for two hours and called who he thought was the

20   ambassador, who had given his permission, and he agreed to let

21   the pouch be searched.  Those are not the actions of a criminal

22   trying to sneak or hide or evade security.

23        Now, you heard that the Government is going to focus on

24   things that didn't happen on July 25th.  They are going to

25   focus on an incident from July 20th, an interaction between

1    Mr. Flint and TSA at Chicago O'Hare.  And during the course of

2    this trial, the Government will also focus on a second incident

3    from September 2016, an interaction between Mr. Flint and a

4    traffic officer in Horton Township, Michigan.

5        So I want to talk about the traffic incident first.  That

6    was in September of 2016.  In that incident Mr. Flint told a

7    law enforcement officer that he had diplomatic immunity, and

8    that was incorrect.  And he realized later he shouldn't have

9    said that, but he wasn't sure at the time.  It was at the very

10   beginning of his involvement with the IHRC.  He hadn't even

11   received his ID card yet.  He knew Ambassador Shumake was the

12   ambassador for the organization, but he didn't yet know what

13   that meant for his own status.

14       And he only learned later that diplomatic couriers do not

15   have diplomatic immunity, and he admitted that because he

16   wasn't sure that day in September 2016.  He shouldn't have told

17   the officer that he had diplomatic immunity because he wasn't

18   sure, and he definitely shouldn't have said that to try to get

19   out of a traffic ticket.  That was wrong.  But on July 25th,

20   2017, Mr. Flint expressly told the FBI agents at LAX that he

21   did not have diplomatic immunity.  He corrected that mistake.

22       And Mr. Flint, he didn't need diplomatic immunity because

23   he wasn't doing anything wrong.  So even though he was mistaken

24   back in 2016, it doesn't show his intent almost a year later

25   because by then, he knew that diplomatic couriers, which he

believed he was, didn't have diplomatic immunity, so he didn't claim to have it.  He said the opposite.

So the other incident that the Government is going to focus on is what happened at Chicago O'Hare on July 20th.  On July 20th Mr. Flint went to Chicago O'Hare for a flight on behalf of the IHRC.  And at TSA he explained he was a diplomatic courier and showed them all of the documents that IHRC had given him.

The TSA officer there told him he needed a diplomatic passport or the pouch had to be screened.  And there is a conversation between the two, "Where is this rule?  Can I see a copy of it?"  The officer wouldn't let him.  The officer said it was secret.  It was in the SOP.  He wasn't allowed to show Mr. Flint.

And TSA officers watched as Mr. Flint got out his phone to try to call his boss, Ambassador Shumake, because after all, Mr. Flint was just the courier; he wasn't the ambassador.  And as ambassador, Mr. Shumake was the one that gave him the pouch, the letter, the courier title, and told him to fly.

But Mr. Shumake didn't answer his phone.  And after about 20 minutes of staying at the security checkpoint, drawing attention to himself, Mr. Flint ultimately gave up and left the airport.  Again, he didn't try to sneak this pouch through in any way, and he never said he had a diplomatic passport. Instead, he went to Midway Airport in Chicago to try to get on

another flight to do his job, which was to make sure that the
pouch got delivered on time.

At Midway, the first thing he did when he got to security
was he asked to speak to a supervisor.  He didn't try to sneak
in through a low-level TSA screener who may not know the rules.
He asked for a supervisor, to go straight to the top to clear
up this confusion because he thought O'Hare was wrong.  And he
gave that supervisor at Midway all of the same information, all
of the same documents he had just shown at O'Hare.

And with that same exact information and the same exact
documents on the same day, applying the same secret rule, TSA
at Midway concluded that the pouch didn't have to be screened
and that Mr. Flint could proceed.  He was allowed to pass, and
he flew to his destination without any issues.

The evidence will show that it was reasonable for
Mr. Flint to believe that TSA was just wrong; they were wrong
about the requirements they wouldn't even show him because
Midway let him through using the same documents and information
and the same rule.

As you heard, TSA at Midway not only let him through once,
but twice, with the same exact documents.  This evidence isn't
proof that Mr. Flint intended to evade security, and it
certainly isn't proof beyond a reasonable doubt.  Mr. Flint
didn't have a diplomatic passport.  He didn't claim he had a
diplomatic passport and he didn't present any diplomatic

```
 1   passport.
 2        If he knew that's what he needed, why use what the
 3   Government is saying is a fake ID?  Why not use a fake
 4   passport?  Why show TSA a letter that says what's inside the
 5   pouch, cash?  Why not drive?  It's because Mr. Flint didn't
 6   know, and the evidence in this case will show only that
 7   Mr. Flint made mistakes.  He trusted people he shouldn't have
 8   trusted.  He made some choices maybe he shouldn't have made,
 9   but being naive or too trusting or even a dupe doesn't make him
10   guilty of a crime.
11        At the end of this case, we are going to ask you to find
12   Mr. Flint not guilty because he's not guilty.  Thank you.
13             THE COURT:  Thank you.
14        That concludes opening statements.  Now we move to the
15   evidence portion of the case.
16        Ms. Ro you may call your first witness.
17             MS. RO:  Thank you, Your Honor.  The United States
18   calls Christopher Kotula to the stand.
19             THE COURTROOM DEPUTY:  Sir, would you please come
20   forward.
21             THE WITNESS:  Yeah.
22             THE COURTROOM DEPUTY:  Thank you.
23        Good afternoon.
24             THE WITNESS:  Good afternoon.
25             THE COURTROOM DEPUTY:  Sir, would you please stop
```

```
 1    right there, and raise your right hand to be sworn.
 2             CHRISTOPHER KOTULA, Government WITNESS, WAS SWORN
 3             THE WITNESS:  Yes.
 4             THE COURTROOM DEPUTY:  Thank you, sir.  Would you
 5    please walk around and have a seat.
 6         Sir, for the record, would you please state your name, and
 7    then spell your last name.
 8             THE WITNESS:  Christopher Kotula, K-o-t-u-l-a.
 9             THE COURTROOM DEPUTY:  Thank you.
10             THE COURT:  Your witness.
11             MS. RO:  Thank you, Your Honor.
12                        DIRECT EXAMINATION
13    BY MS. RO:
14    Q    Good afternoon, Mr. Kotula.
15    A    Good afternoon.
16    Q    What is your occupation?
17    A    I'm a supervisory transportation security officer.
18    Q    And where do you work?
19    A    O'Hare International Airport.
20    Q    And did you say you worked for the Transportation Security
21    Administration?
22    A    Yes, Transportation Security Administration.
23    Q    And is that TSA for short?
24    A    Yes.
25    Q    And how long have you worked at TSA?
```

A      For approximately 13-1/2 years.

Q      And how long have you been a supervisor?

A      About three and a half.

Q      And what does a supervisor do?

A      Supervisor -- so in the airport there are multiple
checkpoints, so supervisor would oversee the operations at a
single-layer checkpoint.

Q      Have you held any other positions within TSA?

A      Yeah.  I started off as the transportation security
officer, which are the individuals who search property on x-ray
or do pat-downs, pat people down.  Then I was promoted to a
lead transportation security officer, and now I'm a supervisor.

Q      And what does a lead do?

A      Lead basically -- so if a supervisor oversees the whole
checkpoint, a lead officer would oversee two lanes.  So when
you go through and put your items through on the x-ray machine,
that's considered one lane.  So a TSO would oversee operations
on two lanes, ensuring officers are rotating every 30 minutes
so they are not fatigued, ensuring they are breaking for lunch
on time.

Q      What does LTSO stand for?

A      Lead transportation security officer.

Q      Have you worked at other airports?

A      I've worked maybe for one day at Midway just assisting
when they were short-staffed, but no other airports.

1    Q    And have you worked at various checkpoints at O'Hare?

2    A    I have worked pretty much every single checkpoint.

3    Q    And how many checkpoints are at O'Hare?

4    A    10, I believe.

5    Q    And what does each checkpoint look like?

6    A    They range in size.  So there are four terminals at

7    O'Hare, 1, 2, 3 and 5.  They range from anywhere from nine

8    lanes to two lanes depending on the terminal.  They are spread

9    out pretty randomly.

10   Q    And have you received any specialized trainings as it

11   pertains to your duties as -- from a TSO, or transportation

12   security officer, all the way to being a lead and to a

13   supervisor?

14   A    So when you first start out, you do a two-week training

15   course, and there's about 80 hours of on-the-job training as an

16   officer, where you're mentored on the job to pat people down,

17   check property, run the x-ray.  As a lead there's about a

18   two-week course ensuring that officers are rotating on time,

19   breaks, lunches, how to -- they are called rotations, on how

20   you make sure all the people rotate at the right time.  And

21   there's also a two-week course for supervisors on discipline,

22   attendance issues, and checkpoint management.

23   Q    Included in that training -- or based on your experience,

24   have you -- or are you familiar with the term "diplomatic

25   pouch"?

UNITED STATES DISTRICT COURT

A      Yes.

Q      And how are you familiar with that term?

A      I've had previous experiences with diplomatic pouches.

Q      And what are diplomatic pouches?

A      Usually a diplomatic pouch is a bag or satchel that has diplomatic mail from a consulate, either from the United States or from a foreign country, either going back to that foreign country or coming into the United States that cannot be screened.

Q      And you said "that cannot be screened."  Can you unpack that statement?

A      So, basically, if they are traveling with a diplomatic courier, because of the sensitive nature of those contents, we, as TSA, are instructed not to look inside, not to run through x-ray those bags.

Q      And does that require any additional requirements?

A      Yes.  It requires documentation in the form of a letter identifying the number of the bag -- the bag should be tagged -- the specific number, the diplomatic courier's passport number, the diplomatic courier's name, and I believe there's some other information I'm not too familiar with.

Q      And did you say they require an identification document?

A      A diplomatic passport.

Q      And based on your experience, have you dealt with -- firsthand dealt with diplomatic pouches?

1  A     Yes, on two occasions.

2  Q     And can you explain the two occasions?

3  A     On the first occasion, this is maybe two years ago, we had

4  a diplomatic courier flying from Iran, connecting through

5  Chicago and then ending up in, I believe, Michigan or

6  Minnesota.  He had the diplomatic passport, and he had the bag.

7  The only issue we had with that gentleman was his letter was in

8  Iranian so we couldn't translate that information.

9      So I contacted my manager.  He got in contact with the

10 state department.  They said we needed an English version of

11 the letter so we could verify the information.  I believe he

12 got in touch with his consulate.  And he was waiting in the

13 airport for like six hours trying to get a translated letter to

14 us.  And when he finally got it, I got him on his way.

15 Q     And you said you observed a diplomatic passport for this

16 individual?

17 A     Yes, yes.  He had the passport in the bag; he just didn't

18 have the English version of the courier letter that you need.

19 Q     And what was your second occasion with a diplomatic pouch?

20 A     The second one, same thing, the bag -- everything about

21 the bag was correct.  He had the diplomatic passport.  I

22 believe the letter was missing either the bag number, or he was

23 missing the passport number of the individual.  I'm not a

24 hundred percent sure.

25 Q     And what role did you have when you had this experience

```
 1   with diplomatic pouches as a TSO, the security officer?

 2   A    I was a supervisor.

 3   Q    You were the supervisor?

 4   A    Uh-huh.

 5   Q    And who makes that call, do you know, of letting someone

 6   through with a diplomatic pouch?

 7   A    It's ultimately the supervisor's call.  We do have the

 8   option to get the managers involved because they either were

 9   previously supervisors so they have more experience.  So when

10   I'm not sure, I usually get my managers involved.

11   Q    Were you working as a TSA supervisor on July 20th, 2017?

12   A    Yes.

13   Q    And were you working at the Chicago O'Hare International

14   Airport?

15   A    Yes.

16   Q    And on that date, do you recall where you were working?

17   A    Terminal 2, Checkpoint 5.

18   Q    And on that date did you make contact with an individual

19   named Daniel Flint?

20   A    Yes.

21   Q    Please take a look around the courtroom today.  Please

22   identify an item of -- do you see him in court today?

23   A    Yes.  It's the gentleman over there with the gray tie and

24   gray jacket.

25            MS. RO:  Your Honor, may the witness [sic] reflect
```

1    that the witness has identified the defendant?

2             THE COURT:  The record will reflect that the witness

3    has identified Mr. Flint.

4    BY MS. RO:

5    Q    What happened when you made contact with the defendant,

6    Mr. Flint?

7    A    So my lead officer, who was running, I believe, Lane 5

8    when the gentleman came through, came up to me and said, "We

9    have a diplomatic pouch."  So he handed me the letter and the

10   ID.  He was holding on to the pouch.  And I started reviewing

11   the ID and the letter.  And I read through the letter first,

12   looked at the ID.

13        Something didn't feel right about it just being an ID or

14   the ID itself.  So then I called one of my managers, Guy

15   Sheridan, let him know that I have an ID that doesn't look

16   right and that I was going to call my other manager, Bill Cane,

17   who had more experience with the state department and

18   diplomatic IDs, and kind of went over, read the whole letter to

19   him, described what the ID looked like.  And he told me

20   basically to double-check the SOP and make sure that if IDs

21   were okay.  So I had my partner, STSO, open up our Standard

22   Operating Procedures.

23   Q    And sorry to interrupt you.

24   A    Uh-huh.

25   Q    Before we get into that, you stated you viewed the ID

1    yourself?

2    A     Yes.

3          MS. RO:  Your Honor, may Agent Simon approach the

4    clerk or the witness with a physical ID which was previously

5    identified as Government's Exhibit 1?

6          THE COURT:  Yes.

7       Is there any objection to the receipt of 1?

8          MR. HARBAUGH:  No, Your Honor.

9          THE COURT:  Then it's received, and you can publish.

10      (Exhibit 1 received into evidence.)

11         MS. RO:  Thank you, Your Honor.

12   Q    Is that the identification card you viewed on July 20th,

13   2017?

14   A     Yes.

15   Q    Is it the actual card?

16   A     It looks exactly like the card I saw that date.

17   Q    And on the screen, is that a photograph of a card that's

18   in your hands?

19   A     Yes.

20         MS. RO:  And the United States moves to introduce

21   Government 1 into evidence.

22         THE COURT:  It's already received.

23         MS. RO:  Thank you, Your Honor.

24   Q    And you stated you saw a letter.

25   A     Yes.

**UNITED STATES DISTRICT COURT**

```
1    Q    Showing you what's been previously marked -- if you could
2    turn to your binder -- as Government's Exhibit 11.
3         (Exhibit 11 for identification.)
4    BY MS. RO:
5    Q    And it's in the black binder that's standing upright.
6              THE COURT:  Any objection to 11?
7              MR. HARBAUGH:  No, Your Honor.
8              THE COURT:  11 is received.  You may publish.
9         (Exhibit 11 received into evidence.)
10   BY MS. RO:
11   Q    And what is this letter?
12   A    This is the letter that my LTSO handed me that I made a
13   scanned copy of at that time at the checkpoint.
14   Q    And so you mentioned the SOP, standard operating
15   procedure?
16   A    Yes.
17   Q    What is that?
18   A    Basically they are rules and regulations to help us make
19   sure we are doing our job correctly, almost like an instruction
20   manual, per se.  So basically tells us how to do A, B, C, D and
21   make sure we are doing it in that order.
22   Q    When you saw the ID that's in front of you --
23   A    Uh-huh.
24   Q    -- what did you think?
25   A    I thought it was, perhaps, like an internal ID, like an ID
```

that we wear at work around our -- you know, like this one.

This one was an O'Hare ID, so I thought it was maybe something

internal for their building or something.  That's why I was

like the ID is not enough, that I know he needed a passport.

That's why I was bouncing that thought, and that's why I called

my manager so see if this ID was just enough or good enough.

Q     So what happened after you thought this ID was not good

enough?

A     So then I contacted my managers, they told me to look in

the Standard Operating Procedures, then that's when I pulled up

the section about diplomatic courier identification and

letters.  And the sentence -- the first sentence -- or within

the first paragraph it says that you need a diplomatic

passport.

Q     And what happened after you read that?

A     So I called my manager, Bill Cane, again.  I read him the

whole SOP, and he agreed with me at that time to deny the

defendant entry into the checkpoint because he did not have a

passport.

Q     And after your conversation with Mr. Cane, did you

speak -- relay that information to the defendant?

A     Yes.  I turned around and I told the defendant that unless

he had a passport with him, he would not be allowed to go

through with that pouch.

Q     And how did he receive that information?

```
1   A    He seemed upset, visibly upset and frustrated.  He was
2   telling us -- or telling me -- and, well, my supervisor was
3   standing next to me -- that I didn't know what I was doing, I
4   didn't know the law.  He was saying that he flew multiple times
5   with this ID and never been stopped.
6        He asked me if this is a new law with TSA in Chicago.  And
7   we're like, "No, everybody has the same SOP.  It's written the
8   same way.  It's distributed nationally."  He was explaining to
9   me that he had a copy of the Vienna Convention or something
10  with him, and he could show me where I was wrong.  And I was
11  like, "Sir, I have to follow this SOP.  This is what I follow.
12  I don't follow anything else.  If you want, I can call my
13  manager.  You can talk to him," at which point he said "yes."
14  So I contacted TSM Guy Sheridan to come down and explain
15  basically the same thing to the defendant.
16  Q    And can you mention his demeanor again?  What word would
17  you use to describe his demeanor?
18  A    Frustrated.
19            MR. HARBAUGH:  Objection, Your Honor.  The question
20  asked -- repeat again.
21            THE COURT:  I'm sorry, what's the grounds for the
22  objection?
23            MR. HARBAUGH:  Asked and answered.
24            THE COURT:  Overruled.
25  BY MS. RO:
```

Q     What was his demeanor when you told him?

A     He was frustrated and upset.

Q     Did he -- based on his frustration or when he was upset,
did he claim to have any other type of status or job to you?

A     He said he was a lawyer.

Q     And do people normally mention they are a lawyer when they
speak to you?

            MR. HARBAUGH:  Objection; calls for speculation.

            THE COURT:  It's sustained on relevance.

BY MS. RO:

Q     And what happened after Guy Sheridan approached?

A     Guy looked at the IDs, looked at the letter, and he
basically reiterated what I told the defendant, that he needed
a passport; this ID wasn't good enough.  I believe he also gave
him the option that if he was given permission to allow the
item to be screened, at that point he would be fine to go, it
just wouldn't be able to go as unscreened.

Q     Turning your attention -- if you could turn your attention
to the manila folders in front of you.  It's not in the binder,
but right in front.

A     Uh-huh.

Q     For Government's -- what's been previously marked as
Exhibits 12 through 16.

            (Exhibits 12 through 16 for identification.)

            MR. HARBAUGH:  No objection, Your Honor.

```
 1              THE COURT:  Are you offering 12 through 16?
 2              MS. RO:  Yes, Your Honor.  The United States moves
 3    12 through 16 into evidence.
 4              THE COURT:  All received, 12 through 16.  Thank you.
 5         (Exhibits 12 through 16 received into evidence.)
 6    BY MS. RO:
 7    Q    If you could turn your attention to the screen.
 8    A    Uh-huh.
 9    Q    Playing Government's Exhibit 12.
10         (Video recording played in open court.)
11    BY MS. RO:
12    Q    First, what is Government's 12 through 16?
13    A    That is a video shot of the Checkpoint 5 at O'Hare
14    International Airport.
15    Q    And who is shown in the circle that just walked through?
16    A    The defendant.
17              MS. RO:  Now, turning to Government's Exhibit 13.
18         (Video recording played in open court.)
19    BY MS. RO:
20    Q    I'm pausing it -- or not pausing it.  What's depicted
21    here.
22    A    So in the lower right-hand corner, you can see me standing
23    there on the phone.  I believe I was speaking with Bill -- the
24    manager Bill Cane at that time.  The female in the white shirt,
25    she's actually handing an on-the-job training binder back to my
```

```
 1  partner, the female STSO, and I believe another officer handed
 2  back a laptop or tablet to the defendant.
 3  Q    And can you -- you can touch the screen?
 4  A    Uh-huh.
 5  Q    Use it as a marker.  Where are you?
 6  A    I'm standing right here.
 7         MS. RO:  Playing Government's Exhibit 14.
 8      (Video recording played in open court.)
 9  BY MS. RO:
10  Q    And pausing at this point, where is the defendant?  And
11  where are you?
12  A    Defendant is right where my finger is, and then I'm
13  standing right here.
14      (Video recording played in open court.)
15  BY MS. RO:
16  Q    Pausing it again.  And what's going on in that image?
17  A    Basically explaining to him, to the defendant, that after
18  reading the SOP and speaking to my managers, they have decided
19  to deny him entry unless he had the passport.  And this is
20  where he got frustrated, and it was explained that he was a
21  lawyer and that I didn't know what I was doing.
22         MS. RO:  Playing Government's Exhibit 15.
23      (Video recording played in open court.)
24  BY MS. RO:
25  Q    And who just walked in in that image?
```

```
 1   A     So right where my finger is right now, that is TSM --
 2   Transportation Security Manager Guy Sheridan.
 3              MS. RO:  And playing Government's Exhibit 16.
 4         (Video recording played in open court.)
 5   BY MS. RO:
 6   Q     Can you describe to the jury what was shown in
 7   Government's Exhibit 16.
 8   A     So after my manager, Guy Sheridan, reiterated and
 9   basically gave him his options, the defendant agreed to try to
10   contact his ambassador or his point of contact at the
11   organization to try to see if he had access to a diplomatic
12   passport.  And the manager said, you know, "You can wait
13   outside and try to arrange whatever you need to, and then if
14   you have any issues, come see me and I can help you back
15   through security."  And then I walked him -- as you can see us
16   walking off screen, I was walking him outside of security.
17              MS. RO:  Your Honor, may I have one moment?
18              THE COURT:  Yes.
19         (Discussion off the record.)
20              MS. RO:  Nothing further, Your Honor.
21              THE COURT:  Cross?
22              MR. HARBAUGH:  Yes, Your Honor.
23              THE COURT:  Your witness, Mr. Harbaugh.
24              MR. HARBAUGH:  Thank you, Your Honor.
25                       CROSS-EXAMINATION
```

```
 1   BY MR. HARBAUGH:
 2   Q     Mr. Kotula, Mr. Flint entered through the precheck line at
 3   O'Hare Airport on July 20th, correct?
 4   A     Correct.
 5   Q     Now, a person can't just enter through the precheck line
 6   because they want to, right?
 7   A     No.
 8   Q     They need to have been previously approved by TSA for
 9   precheck, correct?
10   A     Correct.
11   Q     Now, prior to going through the precheck lane, the TSA
12   screener has to verify that passenger's TSA traveler number,
13   correct?
14   A     Incorrect.  The traveler number is entered when booking
15   the ticket, and then when the ticket is printed, it will denote
16   TSA precheck somewhere on the boarding pass.
17   Q     Okay.  So they verify that the boarding pass has the TSA
18   precheck?
19   A     It usually has the logo on it or say "TSA precheck."
20   Q     So they don't have it on the boarding pass, they can't go
21   through the TSA precheck lane, right?
22   A     Correct.
23   Q     So on July 20th the TSA screener verified Mr. Flint's
24   precheck status before allowing him to proceed?
25   A     Yes.
```

UNITED STATES DISTRICT COURT

1    Q    Now, to obtain precheck approval, passengers have to meet

2    several requirements first, correct?

3    A    I understand there's some sort of background check, but

4    that's to the extent of my knowledge.

5               MS. RO:  Objection, Your Honor, or move to strike

6    for speculation.

7               THE COURT:  Overruled.

8    BY MR. HARBAUGH:

9    Q    So, Mr. Kotula, you're not familiar with the steps a

10   person needs to take to get TSA approval for precheck?

11              THE COURT:  Mr. Harbaugh, would you go back to the

12   lectern?

13              MR. HARBAUGH:  Yes, Your Honor.

14              THE WITNESS:  No.  I know that they are usually

15   conducted by a third-party contractor, but I don't know the

16   exact steps that you need to take in order to get the approval.

17   BY MR. HARBAUGH:

18   Q    You know they have to do an in-person appointment,

19   correct --

20   A    Yes.

21   Q    -- at an enrollment center?

22        At that enrollment center they have to submit to a

23   background check, right?

24   A    Yes, I know that.

25   Q    They also have to provide their fingerprints?

1    A    I wasn't aware of that.

2    Q    And you're aware that the fingerprints are kept by the

3    FBI, correct?

4    A    I was not aware of that.

5    Q    So you're not familiar -- to clarify, you are not familiar

6    with the TSA precheck process, correct?

7    A    I am familiar with the process when they get to our

8    checkpoint and they need to be screened.

9    Q    Now I want to talk about the TSA screening requirements

10   that you were applying that day at O'Hare Airport.

11   A    Okay.

12   Q    Now, TSA uses a lot of different screening requirements,

13   correct?

14   A    I believe so.

15   Q    Now, some of those screening requirements are available to

16   the public, right?

17   A    Yes.

18   Q    And some of those screening requirements are not available

19   to the public, correct?

20   A    Yes.

21   Q    Now, those requirements that are not available to the

22   public contain sensitive security information, correct?

23   A    Yes.

24   Q    Or SSI is the acronym TSA uses?

25   A    Correct.

```
 1   Q    So to clarify, two types of screening requirements, right?
 2   One type that is disclosed to the public, right?  And the other
 3   type that's kept secret?
 4   A    Yes.
 5   Q    Now I want to start with the public ones that travelers
 6   can be informed about.  Now, there are public requirements that
 7   deal with the proper identification a person needs to enter TSA
 8   screening, right?
 9   A    Yes.
10   Q    There are other public requirements that deal with what
11   items a person can or cannot bring onto an airplane, correct?
12   A    Yes.
13   Q    There are also requirements that deal with what a person
14   needs to do when they submit themselves to TSA screening,
15   correct?
16   A    Yes.
17   Q    Now I want to focus on that last one, those public
18   screening requirements.  Now, there are requirements on how
19   people need to package and present liquids, right?
20   A    Yes.
21   Q    There are requirements on what people need to do with
22   their clothes when they go through security?
23           MS. RO:  Objection, Your Honor; relevance.
24           THE COURT:  I'm not sure I understand the relevance,
25   Mr. Harbaugh.  It will be sustained.
```

```
 1   BY MR. HARBAUGH:
 2   Q    Now, the public requirements, there's a number of ways
 3   that TSA discloses to the public what those requirements are,
 4   right?
 5   A    Yes.
 6   Q    One of the ways that TSA discloses those public
 7   requirements is posting signs at the airport, right?
 8   A    Yes.
 9   Q    TSA also posts notice of those requirements on their
10   website, right?
11   A    Right.
12   Q    They even issue press releases when there is a change in
13   the public requirements?
14   A    Yes.
15   Q    And the publically available TSA screening requirements
16   have changed a lot over the years, haven't they?
17   A    Yes.
18   Q    In 2006, August 2006, no liquids were allowed on the
19   plane, right?
20   A    Yes.
21   Q    Then several months later liquids were allowed on the
22   plane, right?
23   A    Yes.
24   Q    And they implemented the 3-1-1, rule, right, for liquids,
25   less than 3 ounces, 1 bag --
```

```
1    A      Per person.

2    Q      -- 1 quart, correct?

3    A      Yeah.

4    Q      Now, there's been changing definitions of what a liquid

5    is, right?

6    A      Can you rephrase?

7    Q      For example, peanut butter is considered a liquid by TSA,

8    correct?

9    A      It's considered a paste.

10          THE COURT:  Mr. Harbaugh, please, at the lectern.

11          MR. HARBAUGH:  Yes, Your Honor.  I apologize.

12   Q      Now, in 2006 people had to start taking off their shoes,

13   right?

14   A      Yes.

15   Q      And you used to be allowed to keep your food inside of

16   your luggage when you went through TSA, correct?

17   A      That is a recent change.

18   Q      A recent change, and now if the food contains a powder

19   greater than 12 ounces or more that's unidentifiable, they must

20   remove it from their luggage, correct?

21   A      It's recommended; it's not required.

22   Q      Now, for a long time all electronics had to be removed

23   from the carry-on luggage and be placed into a bin for

24   screening, correct?

25   A      Large electronics.
```

```
1    Q     Then -- now, since July 2007, TSA changed the requirements
2    and all electronics larger than cell phone have to be taken out
3    and placed in a bag, correct?
4    A     That was a recent change, correct.
5    Q     Now, the screening can also -- TSA screening requirements
6    can also change depending on whether there's a K-9 unit at the
7    airport, correct?
8    A     Correct.
9    Q     And in those instances, a person doesn't have to remove
10   any of their clothes, their shoes or take their computer or
11   laptop out of their carry-on bag, right?
12   A     If it's a heavy jacket they do.  It's only light sports
13   jackets or windbreakers that they are allowed to keep on.  They
14   also get to keep on their shoes.
15   Q     And keep their laptop in their luggage?
16   A     Correct.
17   Q     So those are some of TSA's publically available screening
18   procedures?
19   A     Yes.
20   Q     Now I want to talk to you about the secret TSA screening
21   procedures.  Now, there are no signs at O'Hare Airport
22   describing those --
23             THE COURT:  Mr. Harbaugh, please.
24   BY MR. HARBAUGH:
25   Q     There are no signs at the airport describing TSA's secret
```

1    procedures, right?

2    A     Uh-huh.

3    Q     They aren't posted on TSA's website, right?

4    A     Not that I know of.

5    Q     They don't issue press releases about them, right?

6    A     Not that I know of.

7    Q     Now, many of those secret procedures are contained in the

8    Standard Operating Procedures manual, right?

9    A     Yes.

10   Q     It's a huge manual, right?

11   A     Multiple books.

12   Q     Multiple books.

13         Many sections, right?

14   A     Uh-huh, yes.

15   Q     Now, one of those secret screening procedures is called

16   SPOT, which stands for the screening of passengers by

17   observation techniques, right?

18              MS. RO:   Objection, Your Honor.  A question was not

19   asked.

20              THE COURT:   Overruled.

21   BY MR. HARBAUGH:

22   Q     One of the secret screening procedures is SPOT, which is

23   screening of passengers by observation techniques, right?

24   A     That program was discontinued --

25   Q     Well --

1    A    -- to my knowledge.

2    Q    That was a secret program that you employed, correct --

3    A    Yes.

4    Q    -- TSA did?

5        And they would identify a number of factors that would

6    require someone to submit to secondary screening, right?

7    A    Yes.

8    Q    So one of those secret factors was excessive yawning,

9    right?

10   A    I'm not familiar with what the criteria was.

11   Q    Excuse me.  Exaggerated yawning, does that sound familiar?

12   A    No.  I'm not trained as a behavioral detection officer, so

13   I would not know what those criterias were.

14   Q    But that was a secret procedure, correct?

15   A    That was its own SOP, yes, and it was not known to the

16   public.

17   Q    So another secret procedure that TSA uses is the one used

18   for diplomatic pouches, correct?

19   A    To my knowledge.

20   Q    Now, the diplomatic pouch procedure is secret and contains

21   sensitive security information, right?

22   A    It's -- well, it's within our SOP, which the whole SOP is

23   considered SSI.

24   Q    And the only time that secret or SSI material can be

25   disclosed is with the written permission of the TSA

1    administrator, correct?

2    A    Correct.

3    Q    Or written permission by the secretary of transportation?

4    A    To my understanding, yes.

5    Q    So on July 20th, last year, you didn't seek written

6    permission from anyone to disclose the SOP to Mr. Flint, right?

7    A    No.

8    Q    You didn't give Mr. Flint a copy of the SOP, right?

9    A    No.

10   Q    And you wouldn't let Mr. Flint read it, right?

11   A    Correct.

12   Q    Now I want to talk about when you first encountered

13   Mr. Flint that day.

14   A    Okay.

15   Q    We talked -- the Government presented you several clips.

16        Your Honor, I previously spoke with the Government.  We

17   would like to play -- jump to certain portions of the entire

18   20-minute video.  We are not going to play it, but we are

19   seeking to introduce, and this is Defense Exhibit 218.

20            MS. RO:  That's correct, Your Honor, there's no

21   objection.

22            THE COURT:  218 is received.

23        (Exhibit 218 received into evidence.)

24   BY MR. HARBAUGH:

25   Q    So I think there might be some overlap, but I think this

1    is the first -- when you first encountered Mr. Flint.  So we

2    are going to jump, and this is about a minute eight into the

3    video, so we're going to play that.

4         (Video recording played in open court.)

5    BY MR. HARBAUGH:

6    Q    So just in terms of orientation, this is when Mr. Flint

7    had presented himself at TSA precheck, and the lead TSO had

8    him -- directed him over to you, correct?

9    A    Correct.

10   Q    And this is the first time you encountered Mr. Flint?

11   A    Correct.

12   Q    Now I just want to confirm, so this entire encounter with

13   Mr. Flint was captured on video surveillance, correct?

14   A    I believe so, yes.

15   Q    Now, TSA has video cameras set up everywhere in the

16   security area, right?

17   A    They are run by the City of Chicago, and TSA has access to

18   them.

19   Q    So O'Hare Airport has multiple surveillance cameras

20   throughout this screening area, correct?

21   A    Yes.

22   Q    Now I want to walk you through some of the other points in

23   the video.  So after Mr. Flint -- we will just proceed with it

24   a little bit.  So after he encounters you --

25        (Video recording played in open court.)

UNITED STATES DISTRICT COURT

1          MR. HARBAUGH:  Then we can just pause it there.

2   Q    So if we can see right -- I will draw a circle.

3          So right here --

4          Actually, I'm not doing it.  Sorry.  I'm the worst.

5   Sorry.

6          Mr. Flint -- it's still not --

7   A    I think it's on the eraser.  I think you have to hit the

8   little pencil tool in the corner.

9   Q    Thank you so much.

10  A    No problem.

11  Q    There we go.

12         Mr. Flint is standing over here off to the side, correct?

13  A    I believe so, yes.

14  Q    Now, I want to fast-forward to about --

15         (Video recording played in open court.)

16  BY MR. HARBAUGH:

17  Q    So at about 8 minutes 49 seconds, Mr. Flint is then

18  brought over to your area, correct?

19  A    Yes.

20  Q    Okay.  And then -- so he's talking to you for a while, and

21  then you have him step back to the same area where he was

22  waiting before.  And this is about -- we will play it.

23         (Video recording played in open court.)

24         MR. HARBAUGH:  So we will pause it there.

25  Q    So Mr. Flint presents to you his material, correct?

```
 1   A      Uh-huh.
 2   Q      And then he also, as part of that material, he provides
     you with a letter, correct?
 3
 4   A      Yes.
 5   Q      And he lets you make a copy of that letter, correct?
 6   A      I didn't ask.
 7   Q      But you made a copy of that letter?
 8   A      I did make a copy of that letter.
 9   Q      And he didn't snatch it out of your hand?
10   A      No.
11   Q      Now, you talked to a number of people after Mr. Flint came
12   over to your station, correct?
13   A      Regarding?
14   Q      Well, regarding the procedure for diplomatic pouches,
15   right?
16   A      My managers, correct.
17   Q      Well, first you talked to your fellow TSA officer, Ila
18   Clemus, right?
19   A      Yes.
20   Q      You ask Ila Clemus to check the SOP to see what it says,
21   right?
22   A      If she could open up that portion of the SOP.
23   Q      You next talked to Bill Cane, right?
24   A      I called Guy Sheridan first and let him know because he
25   was the manager responsible at the terminal.  Then I told him I
```

```
 1    would call Bill because Bill and I had more experience -- or

 2    Bill in general had more experience dealing with department of

 3    state and diplomats.

 4    Q    So you called Guy Sheridan, correct?

 5    A    Uh-huh.

 6    Q    Then you called Bill Cane?

 7    A    Correct.

 8    Q    Now, at that point you informed Mr. Flint that he would

 9    not be able to enter the sterile area with the pouch without a

10    diplomatic passport, correct?

11    A    Correct.

12    Q    And the SOP section on diplomatic passports directs you to

13    deny access if the person does not have the proper

14    documentation for the pouch, right?

15    A    Yes.

16    Q    And it's -- the SOP further states improperly documented

17    pouches must not be opened, right?  Not be allowed into the

18    sterile area, and be returned to the courier, right?

19    A    Yes.

20    Q    That's what the SOP says.  The SOP doesn't direct you to

21    detain the traveler, right?

22    A    Correct.

23    Q    And you didn't detain Mr. Flint, right?

24    A    No, we did not.

25    Q    And Mr. Sheridan didn't detain Mr. Flint, right?
```

```
 1              THE REPORTER:  I didn't hear the answer.
 2              THE WITNESS:  No.
 3   BY MR. HARBAUGH:
 4   Q    Mr. Flint was free to leave after you denied him entry
 5   without screening, right?
 6   A    Correct.
 7   Q    But Mr. Flint didn't leave, right?
 8   A    Once I walked him out, I don't know where he went.
 9   Q    Well, I'm -- we're not actually at that point.
10   A    Okay.
11   Q    He stayed there after you told him he would need a
12   diplomatic passport; he stayed there talking to you, right?
13   A    Yes.
14   Q    You then called Guy Sheridan to come, correct?
15   A    Yes.
16   Q    Mr. Flint talked to Guy Sheridan, right?
17   A    Yes.
18   Q    Mr. Flint didn't leave after talking to -- right away
19   after talking to Guy Sheridan, right?
20   A    Correct.
21   Q    Mr. Flint stayed there for over 20 minutes, right?
22   A    Yes.
23   Q    Even though Mr. Flint was free to leave?
24   A    Free to exit out to the nonsterile area.
25   Q    Yes.
```

```
 1        Now I want to talk to you about what was going on during
 2   this 20-minute exchange.  Now, while Mr. Flint was staying
 3   there for 20 minutes, he was disagreeing with you, right?
 4   A    Correct.
 5   Q    Mr. Flint insisted that you were wrong about the law,
 6   right?
 7   A    Correct.
 8   Q    Now, during your exchange, you learned that Mr. Flint had
 9   flown through other airports with the same documents with no
10   issues, right?
11   A    That's what he stated.
12   Q    And, in fact, Mr. Flint had flown out of O'Hare just a few
13   months earlier, on April 28th, 2017, using the same diplomatic
14   ID?
15        MS. RO:  Objection, Your Honor; calls for
16   speculation and not covered in direct examination.
17        THE COURT:  Overruled.
18        If you have personal knowledge, you may answer.
19        THE WITNESS:  I have no knowledge of that.
20   BY MR. HARBAUGH:
21   Q    Now, Mr. Flint questioned you whether this was a new TSA
22   procedure, right?
23   A    Correct.
24   Q    He questioned whether it was a different procedure for
25   Chicago O'Hare, right?
```

1    A    For Chicago.

2    Q    And you told Mr. Flint this was in your SOP, right?

3    A    Correct.

4    Q    And Mr. Flint asked to see it, right?

5    A    Correct.

6    Q    And you refused to show him the SOP, right?

7    A    Yes.

8    Q    So we talked about Government Exhibit 11, and I want to

9    now please turn your attention to Government Exhibit 11.

10        Your Honor, this exhibit has already been introduced by

11   the Government, so permission to show the jury?

12              THE COURT:  Yes, please.

13   BY MR. HARBAUGH:

14   Q    All right.  Mr. Kotula, as you previously stated, this is

15   the letter that Mr. Flint -- that you made a copy of when you

16   saw Mr. Flint on July 20th, right?

17   A    Correct.

18   Q    Let's take a look at this letter.  So on the second page,

19   the letter says it's signed by H.E.R.S. Shumake, correct?

20   A    Yes.

21   Q    And Shumake says he is an ambassador with the

22   International Human Rights Commission, right?

23   A    Yes.

24   Q    It also says Shumake is a U.S. representative, right?

25   A    Yes.

```
1   Q     And on that first page it says your law firm is being
2   entrusted with a cash deposit, right?
3   A     Yes.
4   Q     So the letter disclosed what Mr. Flint was carrying,
5   right?
6   A     Yes.
7   Q     Now, are you familiar with items that are allowed for a
8   person to bring through the airport, right?
9   A     Yes.
10  Q     TSA does not prohibit anyone from bringing cash in, right?
11  A     No.
12  Q     In fact, people can carry as much cash as they want,
13  right?
14  A     Yes.
15  Q     And only for international flights must a person declare
16  on their customs form cash amounts in excess of $10,000, right?
17  A     Right.
18  Q     And Mr. Flint was not traveling on an international
19  flight, right?
20  A     Not that I know of.
21  Q     So I want to turn back to that letter.  At the bottom of
22  that first page it talks about -- it states what he must do,
23  and at the very last sentence it says, "Your assignment may not
24  be disclosed or disseminated to anyone without the expressed
25  written consent of this office."  Right?  That's what it says?
```

```
 1   A     Yes.
 2   Q     And on the second page it lists a phone number to contact,
 3   right?
 4   A     Yes.
 5   Q     Now, at a certain point Mr. Flint makes a phone call in
 6   front of you, right?
 7   A     Yes.
 8   Q     All right.  I want to pull that up.  All right.
 9         Oh, I'm sorry, Your Honor.  Let's try this again.
10         (Video recording played in open court.)
11   BY MR. HARBAUGH:
12   Q     See, now we are looking at Defense Exhibit 218 again.
13   About 19:31 is the beginning.  We can just pause it.
14         He is holding the phone up to his ear, right?
15   A     Correct.
16   Q     And before he picked up the phone, he told you he was
17   going to attempt to speak to the ambassador, right?
18   A     The point of contact or the ambassador, yes.
19   Q     He told you he was going to call the ambassador to get
20   permission to screen the bag?
21   A     To screen the bag or to get a diplomatic passport.
22   Q     Now, Mr. Flint did not appear to reach anybody on the
23   line, correct?
24   A     Correct.
25   Q     He does not appear to be speaking into the phone, right?
```

UNITED STATES DISTRICT COURT

```
 1   A     Not that I witnessed.

 2   Q     So when Mr. Flint doesn't get through to anyone, he

 3   leaves, right?

 4   A     He was escorted out, yes.

 5   Q     He stops trying to convince you he is allowed to bring in

 6   the bag, right?

 7   A     Yes.

 8   Q     He is not trying to sneak past security?

 9   A     No.

10   Q     Flint walks out of the airport -- or walks out of the

11   screening area, right?

12   A     He was escorted out of the screening area by myself.

13   Q     Flint leaves peacefully, right?

14   A     Yes.

15   Q     And let's look at that because you say he was escorted

16   out.  Can we --

17         (Video recording played in open court.)

18   BY MR. HARBAUGH:

19   Q     And right there he is actually shaking Sheridan's hand,

20   right?

21   A     Correct.

22            MR. HARBAUGH:  All right.  Nothing further.

23            THE COURT:  Any redirect?

24            MS. RO:  Yes, Your Honor.

25                        REDIRECT EXAMINATION
```

```
 1    BY MS. RO:
 2    Q     Do you know what happens when cash inside a bag goes
 3    through an x-ray machine?
 4    A     It shows up as dense materials, which most likely would --
 5    it depends on the amount of cash.  That's how the x-rays kind
 6    of work is on densities, how thick something is.  So if it's a
 7    large amount of cash, most likely we would end up opening up
 8    that bag and checking it.
 9    Q     And did you categorically tell the defendant that he
10    needed a diplomatic passport?
11    A     Yes.
12              MS. RO:  Nothing further, Your Honor.
13              THE COURT:  Recross?
14              MR. HARBAUGH:  Nothing, Your Honor.
15              THE COURT:  Thank you, sir, for your testimony.
16              THE WITNESS:  Thank you very much.
17              THE COURT:  Next?
18              MR. YANNIELLO:  Government calls Guy Sheridan.
19              THE COURTROOM DEPUTY:  Good afternoon, sir.  Would
20    you please come forward.
21         Would you please stop right, and raise your right hand to
22    be sworn.
23              GUY SHERIDAN, GOVERNMENT WITNESS, WAS SWORN
24              THE WITNESS:  Yes, I do.
25              THE COURTROOM DEPUTY:  Thank you, sir.  Would you
```

UNITED STATES DISTRICT COURT

1    please be seated.

2         Sir, for the record, would you please state your name, and

3    spell your last name.

4              THE WITNESS:  My name is Guy Dwight Sheridan, last

5    name is spelled, S-h-e-r-i-d-a-n.

6              THE COURT:  Your witness.

7                          **DIRECT EXAMINATION**

8    BY MS. RO:

9    Q    Good afternoon, Mr. Sheridan.

10   A    Good afternoon.

11   Q    What was your occupation in July 2017?

12   A    Transportation security manager with the Transportation

13   Security Administration.

14   Q    So that's a TSA manager.  At what airport did you work?

15   A    Chicago O'Hare.

16   Q    And how long have you been a TSA employee?

17   A    I have been an employee there for TSA since September

18   2002.

19   Q    So about 16 years at this point?

20   A    16 years, yes, sir.

21   Q    And you said you were a manager in 2017.  Are you --

22   what's your current position?

23   A    I'm still a manager, and I manage other managers.  I was

24   promoted.

25   Q    In your current duties, what are those?

```
 1   A    Current duties are to manage other managers with the daily
 2   operation; any incidents that occur outside the norm, such as
 3   courier letters, guns in the x-ray, any other out-of-the-
 4   ordinary incidents that, you know, don't fall under the normal
 5   screening process.
 6   Q    Were you on duty on July 20th, 2017?
 7   A    Yes, I was.
 8   Q    And did anything unusual happen on that day?
 9   A    Yes, it did.  I received a call from one of my
10   supervisors, Chris Kotula, at Terminal 2, which I was a duty
11   manager there for, and he reported that he had an individual
12   there that was claiming to be a diplomat, wanted diplomatic
13   status, but he didn't have correct ID.
14   Q    I'm going to pull up Government's Exhibit 16 -- 15.
15        (Video recording played in open court.)
16   BY MR. YANNIELLO:
17   Q    Now, Mr. Sheridan, can you identify the individuals on the
18   screen right there?
19   A    Yeah.  That's Chris Kotula that's leaning over the desk,
20   the supervisor.  It's myself walking up on the left, and in the
21   center is Mr. Daniel Flint.
22   Q    So that's you in the black shirt?
23   A    Yes, sir.
24   Q    And do you see the individual who you interacted with that
25   day in the courtroom right now?
```

```
1    A     Yes, I do.

2    Q     Could you please identify him.

3    A     Right here, sir.

4    Q     Could you identify him by his clothing?

5    A     Yeah.  He has a gray suit, gray tie, white shirt.

6               THE COURT:  Identifying Mr. Flint.

7    BY MR. YANNIELLO:

8    Q     So when you arrived -- and in the video right now, is this

9    the point -- is this your first contact with the defendant?

10   A     Yes, it is.

11   Q     And what happened when you arrived?

12   A     I arrived -- Chris Kotula was leaned over the desk.  I

13   think he was looking at the actual letter.  So I walk around

14   Mr. Flint, and I talked to Mr. Kotula, and he said that

15   Mr. Flint didn't have a diplomatic passport at that time.

16   Q     Okay.  So you said Mr. Kotula was bending over looking at

17   the letter.  Do you know where the SOP is in this frame?

18   A     The SOP is behind Mr. Kotula in that frame, right behind

19   him.  We try to keep it out of public view.

20   Q     Okay.  I'm going to play this a little forward.

21         (Video recording played in open court.)

22   BY MR. YANNIELLO:

23   Q     So what's going on here?

24   A     After speaking with Mr. Kotula, Mr. Flint kind of leans in

25   and says, "Well, I don't need a diplomatic passport because I
```

UNITED STATES DISTRICT COURT

1  have this ID."  The ID was sitting on the table also.

2  Q    Did you take a look at the ID that day?

3  A    I sure did.

4            MR. YANNIELLO:  Your Honor, can I request that

5  Agent Simon walk up and present Exhibit 1 to the witness?

6            THE COURT:  I believe it's still there, Counsel.

7            THE WITNESS:  Yeah, I have it right there.

8  BY MR. YANNIELLO:

9  Q    Is that the card you saw that day?

10 A    Absolutely.

11 Q    Did the defendant present that to you, or did Mr. Kotula

12 present that to you?

13 A    Mr. Kotula already had it on the table.

14 Q    And did you speak with the defendant about this card?

15 A    Yes, I did.

16 Q    And can you generally describe that conversation.

17 A    When I walked up, Mr. Flint seemed to be a little upset

18 because we weren't going to allow the bag to be brought into

19 the secure area unless it was screened.  And what I was

20 explaining to him is that there were certain criteria that

21 needed to happen.

22      So as Mr. Kotula, Chris, was explaining this to me, Mr.

23 Flint was kind of leaning in and pointing, "I don't need a

24 diplomatic passport because I have this ID.  I want to know

25 what's going on because -- did Chicago O'Hare change the rules?

1    Because I've done this in the past.  I want to know why,"

2    basically, he couldn't get through or why he was having a

3    problem.  He stated he had done this in the past and he never

4    had a problem.

5    Q    When he asked you whether or not the rules had changed,

6    what was your response?

7    A    I told him, "Absolutely not, the rules haven't changed."

8    Q    And when you say "rules," what particular rule?

9    A    It was the rule that a diplomatic passport was required in

10   order to not to have a diplomatic pouch screened.

11   Q    So in order for the exception -- essentially in order for

12   the diplomatic pouch to be exempt from TSA security screening,

13   the courier or the person purporting to carry the diplomatic

14   pouch needed to have a diplomatic passport; is that correct?

15   A    Yes, sir, absolutely.

16   Q    When you looked at this card when you were conversing with

17   Mr. Flint about the diplomatic passport, did you notice

18   anything?

19   A    Well, yeah, I noticed that the ID stated it had a

20   diplomatic immunity passport on it.

21   Q    Did you ask Mr. Flint any questions about that?

22   A    I just asked him -- I said, "So you don't have a

23   diplomatic passport, Mr. Flint?"

24        And he goes, "No."

25        I says, "Well, it says you have a passport number on your

```
 1   ID.  So you never got a passport?"

 2        And he goes, "No, that's all they gave me.  This is all

 3   I've ever gotten.  I don't have a diplomatic passport."

 4   Q    And did Mr. Flint that day identify himself to you as a

 5   diplomat?

 6   A    He didn't come out personally and say, "I'm a diplomat."

 7   He did say he was a lawyer, but he basically handed us a

 8   letterhead, he handed us the passport, and he also had a bag

 9   that was marked as a diplomatic --

10             THE COURT:  Listen to the question, please.  So the

11   question:  "And did Mr. Flint that day identify himself to you

12   as a diplomat?"

13             THE WITNESS:  Not verbally.

14   BY MR. YANNIELLO:

15   Q    And you mentioned that he did identify himself as an

16   attorney?

17   A    Yes.

18   Q    What was Mr. Flint's demeanor when you interacted with

19   him?

20   A    He seemed a little upset that we had stopped him.

21   Q    I'm going to play a portion of the video.

22        (Video recording played in open court.)

23   BY MR. YANNIELLO:

24   Q    So there was an exchange, and it looked like the defendant

25   was pointing at several things.  Do you recall what you were
```

1    conversing at that point?

2    A    Well, we were conversing at that point is Mr. Flint, he

3    wanted me to basically accept his ID as a passport, and I was

4    explaining to him that it wasn't a passport, and then our SOP

5    clearly states he needed a diplomatic passport in order to

6    exempt a bag from screening.

7    Q    So you discussed the SOP?

8    A    Yes.

9    Q    And did you consult the SOP --

10   A    Yes, I did.

11   Q    -- when you were at that stand?

12   A    Yes, I did.

13   Q    What happened after you consulted the SOP?

14   A    He asked to look at it.  I told him absolutely he could

15   not look at it, "But rest assured, I had just read it, and it

16   does state you need a diplomatic passport."

17   Q    And so you turned around, read the SOP, and then informed

18   defendant about what the contents were?

19   A    Yes, sir.

20   Q    And did you give the defendant an option that day?

21   A    Yes, I did, on multiple occasions.  I told him that either

22   we could screen the bag and it wouldn't be an issue, we could

23   let him through after we screened the bag, or he would have to

24   present the diplomatic passport in order to have the bag go

25   through exempt.

1        MR. YANNIELLO:  One moment, Your Honor.

2     (Discussion off the record.)

3        MR. YANNIELLO:  Nothing further, Your Honor.

4        THE COURT:  Thank you, Mr. Yanniello.

5     Ms. Wakefield?

6                    **CROSS-EXAMINATION**

7  BY MS. WAKEFIELD:

8  Q    You testified on direct examination that Mr. Flint told

9  you he had been allowed through TSA without a diplomatic

10 passport, correct?

11 A    He did state that, yes.

12 Q    And that TSA had let him through with only his diplomat ID

13 card, right?

14 A    That's what he stated.

15 Q    And he said he had never heard of needing a diplomatic

16 passport, right?

17 A    That's what he said.

18 Q    And you're aware that Mr. Flint flew out of Chicago O'Hare

19 in April of 2017, correct?

20        MR. YANNIELLO:  Objection; no foundation, lacks

21 foundation.

22        THE WITNESS:  I have no idea.

23        THE COURT:  He doesn't know.

24 BY MS. WAKEFIELD:

25 Q    So you didn't investigate whether Mr. Flint had flown out

1    of O'Hare before?

2    A     Absolutely not.

3    Q     And you didn't speak with any of your employees to

4    determine if anyone had ever come across Mr. Flint before?

5    A     No, I did not.

6    Q     Mr. Flint didn't show you a diplomatic passport, correct?

7    A     He did not, no.

8    Q     He didn't claim he had a diplomatic passport?

9    A     He stated he had not gotten a diplomatic passport.  He

10   only had the ID.

11   Q     And even after you told him he needed a diplomatic

12   passport, he still said he had only ever been issued the

13   diplomatic ID card, right?

14   A     That's what he stated, yes.

15   Q     And you testified on direct examination that at one point

16   you asked him about the passport number listed on the ID card,

17   right?

18   A     Yes.

19   Q     And even still, he said he had never gotten a diplomatic

20   passport, correct?

21   A     It's what he stated, yes.

22   Q     Mr. Flint asked you if this was a new rule, correct?

23   A     Yes, he did.

24   Q     And he also said TSA can't make up its own laws, right?

25   A     Yes, ma'am.

**UNITED STATES DISTRICT COURT**

```
 1   Q    And you told him it was in the Standard Operating
 2   Procedures?
 3   A    Yes, I did, ma'am.
 4   Q    And he asked if he could see it in writing, right?
 5   A    Yes.
 6   Q    And you told him absolutely he could not?
 7   A    "Absolutely not," I did state that, yes.
 8   Q    And the reason you couldn't show him the SOP is because
 9   that document cannot be shown to the public?
10   A    We are not allowed to show to the public any part of our
11   SOP, no.
12   Q    Now, in response, Mr. Flint said he was going to try to
13   call the ambassador, right?
14   A    Yes.
15   Q    Now I would like to direct your attention to Government
16   Exhibit 11, and this is the letter that was previously
17   admitted.
18        You recognize this letter?
19   A    Yes.
20   Q    This is the letter that Mr. Flint had with him on July
21   20th at Chicago O'Hare, right?
22   A    Yes.
23   Q    Now -- and this is a copy of the letter, right?  It's not
24   the original?
25   A    That is a copy, appears to be a copy of the letter he
```

1    presented, yes.

2    Q    Now, on the second page of the letter, it identifies

3    Mr. Shumake as the ambassador-at-large, correct?

4    A    Yes, ma'am.

5    Q    And it has a phone number on there?

6    A    Yes, ma'am.

7    Q    Now, you watched as Mr. Flint pulled out his cell phone?

8    A    Yeah, I seen him pull out his cell phone.

9    Q    And he appeared to call someone?

10   A    I'm not -- no, it's not clear that he did.

11   Q    He didn't pull out his phone and put it up to his ear?

12   A    I may not have seen that except in the video, but at the

13   time, no, I did not.

14   Q    So you have seen it in the video --

15   A    Yes.

16   Q    -- that he pulled out his phone, and it appeared that he

17   called someone, right?

18   A    Yes, ma'am.

19   Q    And it didn't appear that anyone answered that phone call?

20   A    No, it did not appear that way, no, ma'am.

21   Q    And you told Mr. Flint that he would need to be escorted

22   out while he tried to contact the ambassador?

23   A    At that moment, yes, exactly.

24   Q    And your understanding was that Mr. Flint was trying to

25   call the ambassador to allow the bag to be screened?

A     Yes, ma'am.

Q     And if Mr. Shumake, the ambassador, would allow the bag to be screened, that Mr. Flint would return to allow the bag to be screened, right?

A     I'm not sure he returned, but that option was given to him.

Q     And the option was that he could come back if the ambassador had given him permission, right?

A     Yes.  He needed the permission.  We needed permission from Mr. Flint for the bag, just to clear that up.

Q     And he said he needed permission from the ambassador?

A     Right, yes, ma'am, but that option to screen the bag was there the whole time.

Q     The whole time he said he needed permission from the ambassador, right?

A     At the end, yes, ma'am.

Q     Now, this interaction lasted about 15 to 20 minutes, right?

A     Approximately 20 minutes, ma'am.

Q     And Mr. Flint wasn't put in an interview room, right?

A     No.

Q     He wasn't subject to any advance screening?

A     No, ma'am.

Q     He was permitted to leave, right?

A     Yes, ma'am.

```
 1   Q     Now, you recall that Mr. Flint's flight that day was
 2   scheduled to leave at about 5:30, correct?
 3   A     I'm not sure what time.
 4   Q     Would it refresh your memory to go look at your report?
 5   A     I'm not sure what time the flight left, ma'am.  I know a
 6   flight -- he had a flight for that day, yes.
 7   Q     And you recall --
 8   A     I can't recall --
 9   Q     And you recall it was scheduled to leave Chicago O'Hare
10   Airport at 5:30, correct?
11   A     If you say so, ma'am.
12   Q     Well --
13   A     I don't recall.
14   Q     Would it refresh --
15              THE REPORTER:  One at a time.
16              THE WITNESS:  I didn't write the report, ma'am.  I
17   didn't write the report.
18   BY MS. WAKEFIELD:
19   Q     Would it refresh your memory to look at the report that
20   was written?
21   A     Sure.
22   Q     So there should be some binders on the floor next to you,
23   and it should be the skinnier of the three binders.  And if you
24   can turn to Tab 173.
25              Do you have that in front of you?
```

UNITED STATES DISTRICT COURT

```
 1   A     Yes.

 2   Q     Now, if you go to the fifth page, which is marked at the

 3   bottom as 64, do you have that in front of you?  If you look to

 4   the right there, that should have the flight information.

 5   A     ORD to LAX 1730, flight VX0241.

 6   Q     And 1730 would be 5:30 p.m., right?

 7   A     Yes, ma'am.

 8   Q     And your interaction with Mr. Flint that day was sometime

 9   before 2:20 in the afternoon, right?

10   A     It was approximately 2:00 to 2:20, yes, ma'am.

11   Q     So that would be over three hours before the flight was

12   scheduled to leave, right?

13   A     Yes, ma'am.

14   Q     Meaning that Mr. Flint had arrived to the airport more

15   than three hours before his scheduled flight?

16   A     Yes, ma'am.

17   Q     And if he had been allowed to enter without the pouch

18   being screened, TSA had more than three hours to correct that

19   mistake, right?

20   A     Could you repeat the question?

21   Q     TSA had three hours to deal with this situation, right,

22   before Mr. Flint got on a plane?

23              MR. YANNIELLO:  Objection, Your Honor; vague.

24              THE COURT:  Do you understand the question?

25              THE WITNESS:  No, I have no idea.
```

**UNITED STATES DISTRICT COURT**

1    BY MS. WAKEFIELD:

2    Q    If Mr. Flint had been allowed to enter the airport without

3    the pouch being screened, you had three hours to correct that

4    mistake, right?

5    A    I don't understand when you say "mistake."

6    Q    If he had been allowed to be let in.

7    A    If he had been allowed to be let in, yeah, we would have

8    had time to correct that, but he wasn't allowed in.

9    Q    Right.  But there would have been three hours before he

10   boarded a plane, right?

11   A    Sure.

12   Q    Again, I want to direct your attention to Government

13   Exhibit 11.

14        Now, if you look in the first sentence, it says that "Your

15   law firm is being entrusted with a cash deposit," correct?

16   A    Yes.

17   Q    And you read that -- you read this letter on July 20th,

18   right?

19   A    Not in depth, no.  My supervisor read it, and I trust my

20   supervisor to tell me if the letter was legitimate or not.

21   Q    And your supervisor read the letter, and the only thing he

22   told you was that Mr. Flint did not have a diplomatic passport,

23   correct?

24   A    Absolutely, and that's one of our requirements in the SOP

25   to have, yes.

```
1   Q    And that was the only issue that Mr. Kotula identified for

2   you, right?

3   A    Yes, ma'am.

4             MS. WAKEFIELD:  One moment, Your Honor.

5        (Discussion off the record.)

6             MS. WAKEFIELD:  Nothing further.

7             THE COURT:  Thank you.

8        Any redirect?

9             MR. YANNIELLO:  No, Your Honor.  Nothing further.

10            THE COURT:  May the witness be excused?  Yes?

11            MS. WAKEFIELD:  Yes.

12            MR. HARBAUGH:  Yes, Your Honor.

13            THE COURT:  Mr. Sheridan, thank you for your

14  testimony.

15            THE WITNESS:  Thank you.

16            THE COURT:  Next?

17            MS. RO:  The United States calls Mr. Clay Yoksas to

18  the stand.

19            JUROR:  Excuse me.

20            THE COURTROOM DEPUTY:  Yes.

21       (Discussion off the record.)

22            THE COURTROOM DEPUTY:  Your Honor, we need a break.

23            THE COURT:  We will take a ten-minute recess.

24  Please return back to the Court at 20 to the hour.  During your

25  absence do not discuss the case amongst yourself or with any
```

```
1    other person.
2              THE COURTROOM DEPUTY:  All rise for the jury,
3    please.
4         (Outside the presence of the jury.)
5              THE COURT:  The jury has been excused.
6         Is there -- I have a question regarding the testimony of
7    Mr. Yoksas.  Is it different than the testimony offered by
8    Mr. Sheridan and Mr. Kotula?
9              MS. RO:  Yes, Your Honor.
10             THE COURT:  And if so, how?
11             MS. RO:  Mr. Yoksas was at Midway, Your Honor, not
12   at O'Hare.
13             THE COURT:  Okay.  Thank you.
14             MS. RO:  Thank you.
15             THE COURT:  We are in recess.
16             THE COURTROOM DEPUTY:  The court's in recess.
17        (Recess taken from 3:27 p.m. to 3:39 p.m.)
18             THE COURTROOM DEPUTY:  Please come to order.  All
19   rise for the jury, please.
20        (In the presence of the jury.)
21             THE COURT:  Okay.  We have the jury reassembling
22   with our alternate.
23        And, Mr. Yoksas, would you come forward, please.
24             THE COURTROOM DEPUTY:  This way, sir.
25        Would you stop right there and raise your right hand to be
```

1   sworn.

2                **CLAY YOKSAS, Government WITNESS, WAS SWORN**

3            THE WITNESS:  I do.

4            THE COURTROOM DEPUTY:  Thank you, sir.  Would you

5   please be seated.

6        Good afternoon, sir.  Sir, for the record, would you

7   please state your name, and spell your last name.

8            THE WITNESS:  Clay Yoksas, last name is Y-o-k-s-a-s.

9            THE COURT:  Your witness.

10           MS. RO:  Thank you, Your Honor.

11                      **DIRECT EXAMINATION**

12  BY MS. RO:

13  Q    What is your occupation, Mr. Yoksas?

14  A    Supervisory transportation security officer.

15  Q    And where do you work?

16  A    At Midway Airport.

17  Q    And how long have you been a supervisor?

18  A    13 years.

19  Q    How long have you been with Transportation Security

20  Administration, TSA?

21  A    16 years.

22  Q    And have you held other positions within TSA?

23  A    I started off as a transportation security officer.  I did

24  that for a year, then I was promoted to lead transportation

25  security officer, and then two years later I became supervisor.

```
1    Q      And where do you work?

2    A      At the checkpoint at Midway Airport.

3    Q      And do you receive any specialized training to be a

4    supervisor?

5    A      Yes, constantly.

6    Q      And what does that training consist of?

7    A      As a supervisor we need to be able to resolve alarms, deal

8    with many different issues that might happen at checkpoints.

9    We have a lot of pieces of equipment that we need training on.

10   A lot of it is helping us to deal with people, difficult

11   situations.  So there's always some kind of training.

12   Q      What are your duties specifically as a supervisor?

13   A      There are times when I'm actually running the checkpoint,

14   running the operations of the checkpoint where we will staff

15   the lanes.  And as part-time officers might come and go

16   throughout the day, I might have to make sure the lanes are

17   staffed properly so we are able to get the right amount of

18   lanes open with the officers we have.

19        There are other days where I'm actually working on the

20   floor and resolving alarms, dealing with passenger complaints,

21   any issues that might come up.  When equipment goes down, I

22   will have to call it in.  So there's always something going on.

23   Q      And are you familiar with the term "diplomatic pouch"?

24   A      Yes.

25   Q      And how are you familiar with that term?
```

1    A    Well, we have had training on diplomatic pouches and the

2    way that they need to be screened.

3    Q    And have you screened a diplomatic pouch before July 2017?

4    A    I personally had not, although I was present when a

5    manager had screened one.

6    Q    And do you recall what was presented at that prior

7    occasion?

8    A    I recall that a letter was presented by the diplomat, the

9    actual pouch, and then some various IDs.

10   Q    And do you recall what the various IDs looked like?

11   A    No, I don't recall exactly what was presented at that

12   time.

13   Q    If I could turn your attention to the black binder in

14   front of you.  It's Exhibit 20 that's been identified.

15        Your Honor, I don't believe there's an objection, if the

16   Government could move Exhibit 20 into evidence.

17             MR. HARBAUGH:  No objection, Your Honor.

18             THE COURT:  20 is received.  You may publish,

19   please.

20        (Exhibit 20 received into evidence.)

21   BY MS. RO:

22   Q    What is this a photo of?

23   A    That is the entrance to the checkpoint.  So before the

24   checkpoint, this is where the passengers would wait in line to

25   get to the checkpoint.

```
 1   Q     And what is this a photo of?

 2   A     It's a sign that's posted at the entry of the checkpoint.

 3   Q     And what is this a photograph of?

 4   A     That's also another sign that's posted at the entry to the

 5   checkpoint.  This one is actually angled toward the precheck

 6   area.

 7         (Video recording played in open court.)

 8   BY MS. RO:

 9   Q     And what is this a photograph of?

10   A     That's a monitor that we have above the checkpoint, and it

11   has various messages for the passengers, things they need to

12   take out of their bag, things like guns, knives, other items

13   that are prohibited from coming through the checkpoint, and it

14   just flashes various information that passengers would need to

15   know.

16         (Video recording played in open court.)

17   BY MS. RO:

18   Q     And is that just another signage on the same screen?

19   A     Yes.

20   Q     Were you working at Midway on July 20th, 2017?

21   A     Yes, I was.

22   Q     And were you working at approximately 5 to 8:00 p.m.?

23   A     Yes.

24   Q     Did you make contact with an individual named Daniel

25   Flint?
```

A     Yes, I did.

Q     Please take a look around a courtroom and identify an item of clothing that person is wearing and where that person is sitting.

A     I believe it's this gentleman over here in the gray suit and gray tie.

          MS. RO:  Your Honor, may the record reflect that this witness has identified the defendant?

          THE COURT:  Yes.

     Just want to make sure which direction you're pointing.

          THE WITNESS:  Right over here.

          THE COURT:  Yes, he's identified Mr. Flint.

BY MS. RO:

Q     And why did you make contact with the defendant on July 20th, 2017?

A     He had come to the precheck area, presented his, I guess -- encountered an officer.  He had presented his information about the diplomatic pouch.  The officer called for a supervisor.  Another supervisor responded and saw that I was nearby so called me over to assist.

Q     And what happened next?

A     We walked to the area where he was presenting his boarding pass and ID, and spoke to Mr. Flint, and he presented all the -- he said that he had a diplomatic pouch.  He presented all of the paperwork and his identification in order for us to

1   conduct the usual screening that we would for a diplomatic

2   pouch.

3   Q    And showing you Government's Exhibit 2, which has already

4   been admitted.

5          THE COURT:  I don't have 2 as being received.

6          MS. RO:  I apologize, Your Honor.  If I may show the

7   defendant --

8   Q    If you could turn to Government's Exhibit 2, it's in the

9   black binder in front of you.

10         THE COURT:  Any objection to 2?

11         MR. HARBAUGH:  No, Your Honor.

12         THE COURT:  2 now is received, and you may publish.

13      (Exhibit 2 received into evidence.)

14         MS. RO:  Thank you, Your Honor.

15  Q    What is this photograph?

16  A    That is -- it looks like the ID that he presented when he

17  came through the checkpoint.

18  Q    And what happened after he presented this ID to you?

19  A    So this was one of the ID cards that he had presented

20  saying that he was a diplomat who was carrying a diplomatic

21  pouch, that he was a courier carrying a diplomatic pouch.

22  Q    Do you recall any other IDs that he presented to you?

23  A    I believe there was one other that I'm not exactly sure

24  what kind of identification it was, and then I also asked if he

25  had a Government-issued photo ID, and he presented a driver's

1    license.
2    Q    I'm showing you the second page of Government's Exhibit 2.
3         Is this the back of the ID?
4    A    Yes, it looks like it.
5    Q    And did you closely pay attention to the address listed on
6    the back of the ID?
7    A    I don't recall if I closely looked at the address.
8    Q    And as you stated, he showed you the additional IDs.  What
9    happened next?
10   A    After he showed us all of the IDs, he showed us the
11   courier letter, which had the information that said that he was
12   a diplomatic courier carrying a diplomatic pouch.  It had the
13   information from the agency that he was carrying the pouch for.
14   It had an embossed notarized stamp on the bottom, and he showed
15   me that the letter actually had a number that matched a number
16   that was on the pouch.
17   Q    And what happened next?
18   A    It appeared that he had everything that he needed to
19   proceed through the checkpoints, and he was allowed to proceed
20   through the checkpoint, and we handled the screening of the
21   pouch per TSA policy.
22   Q    And what was his demeanor like, do you recall?
23   A    Very calm.  It seemed like he had -- like he was a
24   diplomatic courier; he had come through the checkpoint many
25   times.  He presented everything just as, you know -- it was not

really a big deal, like it was something he had done a bunch of

times and he knew exactly what was needed, he showed it to be,

and I had no reason to believe that anything was suspicious or

not right about it.

Q    If you could turn -- if I could turn your direction to the

manila folders in Government's Exhibit 21 through 23.  They are

surveillance clips from July 20th, 2017.

     I don't believe there's an objection.

          MR. HARBAUGH:  No objection, Your Honor.

          THE COURT:  Exhibits 21 through 23 are received.

     (Exhibits 21 through 23 received into evidence.)

BY MS. RO:

Q    Showing you Government's Exhibit 21.

     (Video recording played in open court.)

          MS. RO:  I'm pausing it.

Q    What does this video depict?

A    That is Mr. Flint coming through the TSA TC area.  That's

basically where he would have his boarding pass and ID checked

by a TSA officer.

Q    And did he pass the signs that you testified about on

Exhibit 20, the photographs?

A    Yes.

Q    And where is Mr. Flint?  Can you circle or just point to

him on the screen?

A    He is on the far left at the front of the line wearing the

1  white shirt and dark-colored jacket.

2          MS. RO:  Playing Government's Exhibit 22.

3      (Video recording played in open court.)

4  BY MS. RO:

5  Q    And what does that clip or video depict?

6  A    It was Mr. Flint pushing his bag into the x-ray, and it

7  looks like the courier letter that he also put through the

8  x-ray as well.

9          MS. RO:  I'm showing Government's -- playing

10  Government's Exhibit 23.

11      (Video recording played in open court.)

12  BY MS. RO:

13  Q    And what does that video depict?

14  A    That was when I handed Mr. Flint the diplomatic pouch

15  after he had come through screening.

16  Q    Have you seen a diplomatic passport before?

17  A    I don't -- I may have seen it when I originally observed

18  the manager with a diplomatic courier before, but in this case

19  I guess he did not present a diplomatic passport.

20  Q    And did you consult anyone on July 20th, 2017 or consult

21  any type of specific procedure or policy with TSA?

22  A    I did not.

23  Q    Why did you believe that the defendant had a proper

24  diplomatic pouch?

25  A    I knew that he had to have something from the agency that

```
 1    said he was a diplomatic courier.  He had the other
 2    identification.  He had the driver's license.  It all matched.
 3    Everything had the security features.  He had the letter which
 4    said that he was a diplomatic courier.  Everything just seemed
 5    like it was proper and what was needed for him to be able to
 6    bring this diplomatic pouch through the checkpoint.
 7    Q     And what happened next, the next day or two?
 8    A     So after this happened, I was actually on my -- the next
 9    day was my day off, and I received a call from my manager about
10    this event, and she told me that it was, I guess, a fraudulent
11    ID or something, that this was not truly a diplomatic courier,
12    and she had me write a statement about what had occurred.
13              MS. RO:  Nothing further, Your Honor.
14              THE COURT:  Cross?
15              MR. HARBAUGH:  Thank you, Your Honor.
16                         CROSS-EXAMINATION
17    BY MR. HARBAUGH:
18    Q     Sorry, Mr. Yoksas.
19          So this is -- I want to talk about July 20th, 2017, Midway
20    Airport.  So you were working as an STSO that day, right?
21    A     Correct.
22    Q     And as you just said, Mr. Flint came through the precheck
23    line at Midway, right?
24    A     That's correct.
25    Q     And TSO Keyona Clanton was working the precheck podium
```

1    that day, right?

2    A    I don't recall exactly which officer, and I could not see

3    the one in the video, but I believe she would have been the one

4    to call for the supervisor.

5    Q    I'm going to see if one of the reports will refresh your

6    memory as to who was at the podium.  Can you turn your

7    attention -- or would a report of another TSO officer refresh

8    your memory as to who was there that day?

9    A    Okay.

10   Q    Please turn your attention to -- it's not that binder.

11   I'm sorry.  It is probably the largest of the three binders

12   that you have up there.

13   A    I only have one.

14   Q    On the floor, I'm sorry.  So it's the larger of the two on

15   the floor.  And this is Defense Exhibit 265, marked for

16   identification.

17        (Exhibit 265 for identification.)

18   BY MR. HARBAUGH:

19   Q    So, yeah, if you flip -- and I'm sorry, it's pretty

20   burdensome.

21   A    You said 265?

22   Q    265.  There should be a tab.

23   A    Okay.  That is Keyona Clanton's statement.

24   Q    One moment, Your Honor.

25        Mr. Yoksas, having seen that, does that refresh your

1  memory as to who was working the podium -- the precheck podium

2  that day?

3  A    Yes, it does.

4  Q    And who was working the podium?

5  A    TSO Keyona Clanton.

6  Q    So working at the podium, that is where Ms. Clanton would

7  have checked Mr. Flint's ticket, right?

8  A    Correct.

9  Q    To make sure it had the precheck emblem on it?

10  A    Right.

11  Q    And then also to check his identification, right?

12  A    Right.

13  Q    Now, you learned that Mr. Flint requested to speak with a

14  TSA supervisor when he came to that podium, right?

15  A    I don't know if he requested it or if it was requested by

16  the officer.

17  Q    Would looking at that report possibly refresh your memory

18  as to who made the request for the supervisor?

19  A    Looking at the report, it sounds like he presented himself

20  as a diplomat.  She said he wanted to speak with a supervisor.

21  There was another supervisor, Enrique Rivera, who was right

22  there, and he saw that I was nearby, so he called me over to

23  assist.

24  Q    Okay.  So at that time you happened to be walking toward

25  the precheck area, correct?

```
 1   A     Correct.
 2   Q     And, actually, Supervisor Rivera told you, "Good.  I'm
 3   glad you're here," right?
 4   A     Right.
 5   Q     And he told you that a passenger identified himself as a
 6   diplomatic courier, right?
 7   A     Uh-huh, right.
 8   Q     And that Mr. Rivera wanted you to double-check everything?
 9   A     Correct.
10   Q     You agreed to help Supervisor Rivera?
11   A     Correct.
12   Q     So you walked up to the passenger?
13   A     Yes.
14   Q     And that was Mr. Flint?
15   A     Correct.
16   Q     You asked him to explain the situation?
17   A     Correct.
18   Q     He presented a photo identification?
19   A     Yes.
20   Q     And that was an identification -- that was presented as a
21   diplomatic identification card, right?
22   A     Right.
23   Q     Now, you reviewed that identification card?
24   A     Yes.
25   Q     You considered that diplomatic ID card to be valid?
```

1    A    I did.

2    Q    It looked similar to IDs for U.S. senators?

3    A    I had written that in my statement, I thought it looked

4    similar to ones I had seen before for senators and

5    representatives, yes.

6    Q    And you wrote that in your statement because it was true,

7    right?

8    A    Correct.

9    Q    You also asked him for his driver's license?

10   A    Yes.

11   Q    And you wanted the driver's license to further confirm his

12   identity?

13   A    That's correct.

14   Q    And Mr. Flint provided that driver's license?

15   A    Yes.

16   Q    You determined the driver's license was valid?

17   A    Yes.

18   Q    In addition to the driver's license, you also made sure

19   Mr. Flint had additional items?

20   A    Right.

21   Q    You made sure that Mr. Flint had a notarized letter

22   stating he was a courier, right?

23   A    Yes.

24   Q    And Mr. Flint presented a valid notarized letter?

25   A    I believed it was valid, yes.

```
 1    Q     You also wanted to ensure that the notarized letter
 2    matched the four-digit number that was on the diplomatic pouch?
 3    A     Correct.
 4    Q     And you did do that, right?
 5    A     Yes.
 6    Q     And those numbers matched?
 7    A     Yes, they did.
 8    Q     Based on your assessment, Mr. Flint satisfied all of the
 9    requirements of TSA procedures?
10    A     Based on my assessment at that time, I thought that he had
11    satisfied those.
12    Q     At that time you had worked for TSA for 15 years?
13    A     Correct.
14    Q     And you had been a supervisor for 12 of those years?
15    A     Yes.
16    Q     And as a supervisor, you received training?
17    A     Yes.
18    Q     You also received annual training on TSA screening
19    procedures?
20    A     Correct.
21    Q     This was not your first time screening a diplomatic pouch?
22    A     Well, it was my first time alone.  The other time I had
23    just observed a manager.
24    Q     So you were present when another manager had screened a
25    pouch previously?
```

```
1    A     Right.
2    Q     And based upon your training and prior experience,
3    Mr. Flint satisfied the TSA security requirements for a
4    diplomatic pouch?
5    A     I believed so at that time, yes.
6    Q     I want to talk to you about Mr. Flint's demeanor that day.
7    The Government asked you about it.  Mr. Flint wasn't nervous?
8    A     I didn't -- I did not pick up on any nervousness from him,
9    no.
10   Q     And that's what you wrote in your report:  Mr. Flint
11   wasn't nervous?
12   A     Right.
13   Q     Mr. Flint wasn't restless?
14   A     Correct.
15   Q     Mr. Flint wasn't in a hurry?
16   A     Correct.
17   Q     Mr. Flint seemed calm?
18   A     Yes.
19   Q     Mr. Flint seemed cool?
20   A     Yes.
21   Q     Mr. Flint clearly understood the requirements of a
22   diplomatic courier?
23   A     I believed so, and that's why there was nothing for me to
24   question what he was presenting to me.
25   Q     So after you found that Mr. Flint met all of the TSA
```

```
 1    requirements, you walked the carrier -- you walked the pouch to
 2    the back of the screening lane, right?
 3    A     That's correct.
 4    Q     And while you were carrying that pouch, Mr. Flint did not
 5    seem overly concerned?
 6    A     No, he did not.
 7    Q     Mr. Flint wasn't keeping a watchful eye on you as you were
 8    bringing that pouch?
 9    A     No.
10    Q     And Mr. Flint didn't watch you as you waited for him at
11    the back of the lane, right?
12    A     It didn't appear that way.
13    Q     Now, you didn't open the pouch?
14    A     No.
15    Q     The pouch seemed to contain paper?
16    A     I don't know -- I don't know what was in --
17              MS. RO:  Objection.
18    BY MR. HARBAUGH:
19    Q     Well, you had described it.  It didn't seem like a metal
20    object, right?
21    A     It seemed heavy, but it didn't seem like there was
22    anything metal in there.
23    Q     And you actually wrote in your report that it seemed like
24    paper, right?
25    A     Yes.
```

1  Q    Now, after you cleared Mr. Flint through security,
2  Mr. Flint didn't leave right away, right?
3  A    I don't understand.
4  Q    Well, Mr. Flint actually stayed there in the TSA screening
5  area, right?
6  A    Well, he was collecting his belongings from the x-ray
7  belt, and as soon as he had collected them -- you're right,
8  actually.  He collected the belongings.  I gave him the pouch.
9  And he actually brought his carry-on bag to the back of the
10  lane, put the pouch into the carry-on bag, and I believe left
11  at that time.
12  Q    Actually, Mr. Flint asked if he could use the TSA private
13  screening room, right?
14  A    Yeah.  Actually, I recall that now, yes.
15  Q    And because Mr. Flint said he wanted to put the pouch
16  inside his carry-on luggage, right?
17  A    Right.
18  Q    So you asked Mr. -- or sorry.
19      So you allowed Mr. Flint to use the TSA private screening
20  room, right?
21  A    Yes.
22  Q    And that room is located at the end of the security?
23  A    That's right in the precheck area.  It's just right at the
24  back of the lane.
25  Q    And you watched Mr. Flint while he was inside the TSA

1    screening room?

2    A     I wasn't really watching him the whole time, but I noticed

3    that he had placed the pouch inside of the bag.

4    Q     Mr. Flint stepped inside the room?

5    A     Correct.

6    Q     Mr. Flint left the door open?

7    A     Yes.

8    Q     Then Mr. Flint walked out of the screening -- the TSA

9    screening room?

10   A     Yes.

11   Q     And then Mr. Flint walked toward the gate area?

12   A     Correct.

13   Q     Mr. Flint wasn't in a hurry?

14   A     It didn't appear that way.

15          MR. HARBAUGH:  One moment, Your Honor.

16      (Discussion off the record.)

17          MR. HARBAUGH:  I apologize, Your Honor.  One moment.

18      (Discussion off the record.)

19          MR. HARBAUGH:  No further questions, Your Honor.

20          THE COURT:  Redirect?

21          MS. RO:  Yes, Your Honor.

22                      **REDIRECT EXAMINATION**

23   BY MS. RO:

24   Q     You alone have never dealt with diplomats or diplomatic

25   pouches at Midway, correct?

```
 1   A    That's correct.

 2   Q    And if Defendant Flint had been nervous, you would have

 3   taken notice, correct?

 4   A    Yes.  That would have raised my suspicion.

 5   Q    And Defendant Flint seemed like a pro, didn't he?

 6   A    What's that?

 7   Q    He seemed like a pro, like he knew what he was doing?

 8              MR. HARBAUGH:  Objection, Your Honor.

 9   Mischaracterizes his testimony.

10              THE COURT:  It's vague and ambiguous.  It's

11   sustained.

12   BY MS. RO:

13   Q    And did Defendant Flint appear he knew exactly what he was

14   doing?

15   A    Yes.

16              MS. RO:  Nothing further.

17              THE COURT:  Recross?

18              MR. HARBAUGH:  None, Your Honor.

19              THE COURT:  Thank you very much for your testimony.

20         That ends it for today.  Tomorrow at 8:30.  The clerk will

21   ask you to arrive about 8:15 tomorrow, so please come early so

22   we can start at 8:30.  During your absence do not discuss the

23   case amongst yourself or with any other person.  We will see

24   you tomorrow.

25              THE COURTROOM DEPUTY:  All rise for the jury,
```

**UNITED STATES DISTRICT COURT**

1   please.

2        (Outside the presence of the jury.)

3             THE COURT:  Thank you, Mr. Yoksas.

4        May the witness be excused?

5             MS. RO:  Yes, Your Honor.

6             MR. HARBAUGH:  Yes, Your Honor.

7             THE COURT:  Thank you.  Okay.  We are in recess on

8   this case.

9               (Proceedings concluded at 4:08 p.m.)

10                      ---oOo---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )


         I, CAROL JEAN ZURBORG, Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.


Date:  October 29, 2018



                         /s/ CAROL JEAN ZURBORG
                         _____
                         CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
                              Federal Official Court Reporter