

1              UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3          HONORABLE S. JAMES OTERO, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,          )
                                       )
6                   Plaintiff,         )
                                       )              Case No.
7        vs.                           )   CR 17-00697 SJO
                                       )
8   DANIEL FLINT,                      )         VOLUME 2
                                       )   (Pages 209 - 429)
9                   Defendant.         )
    _____)

10

11

12

13        REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
                        TRIAL DAY 2
14              WEDNESDAY, OCTOBER 17, 2018
                        8:51 A.M.
15              LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22   _____

23        CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
             FEDERAL OFFICIAL COURT REPORTER
24           350 WEST 1ST STREET, SUITE 4311
           LOS ANGELES, CALIFORNIA 90012-4565
25                  (213) 894-3539

              UNITED STATES DISTRICT COURT

1                  **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4        NICOLA T. HANNA
         United States Attorney
5        BY:   CHRISTINE RO
         BY:   IAN YANNIELLO
6        BY:   MARK AVEIS
              Assistant United States Attorneys
7        United States Courthouse
         312 North Spring Street
8        Los Angeles, California 90012

9   **FOR THE DEFENDANT:**

10       HILARY LEE POTASHNER
         Federal Public Defender
11       BY:   CRAIG A. HARBAUGH
         BY:   GEORGINA WAKEFIELD
12            Deputy Federal Public Defenders
         Central District of California
13       321 East Second Street
         Los Angeles, California 90012

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          **I N D E X**

2
         --------------------------------------------------------

3
             CHRONOLOGICAL INDEX OF WITNESSES

4

5     **EXAMINATIONS**                                          **PAGE**

6       **GOVERNMENT WITNESSES**

7     ELLEN SHEAHAN
             DIRECT EXAMINATION BY MS. RO                    217
8            CROSS-EXAMINATION BY MS. WAKEFIELD              231
             REDIRECT EXAMINATION BY MS. RO                 238
9
      RAJA WONDRASEK
10           DIRECT EXAMINATION BY MR. YANNIELLO             241
             CROSS-EXAMINATION BY MS. WAKEFIELD              253
11           REDIRECT EXAMINATION BY MR. YANNIELLO           260

12    FAHIMA DANISHGAR
             DIRECT EXAMINATION bY MR. YANNIELLO             264
13           CROSS-EXAMINATION BY MR. HARBAUGH               269
             REDIRECT EXAMINATION BY MS. RO                 282
14
      MICHAEL DURETTO
15           DIRECT EXAMINATION BY MS. RO                    291
             CROSS-EXAMINATION BY MS. WAKEFIELD              309
16           REDIRECT EXAMINATION BY MS. RO                 320

17    JOHN CURTIS SCHNEIDER, III
             DIRECT EXAMINATION BY MR. YANNIELLO             324
18           CROSS-EXAMINATION BY MS. WAKEFIELD              328
             REDIRECT EXAMINATION BY MR. YANNIELLO           332
19           RECROSS-EXAMINATION BY MS. WAKEFIELD            333

20    REBECCA MARRIOTT
             DIRECT EXAMINATION BY MR. YANNIELLO             335
21           CROSS-EXAMINATION BY MR. HARBAUGH               364
             REDIRECT EXAMINATION BY MR. YANNIELLO           378
22           RECROSS-EXAMINATION BY MR. HARBAUGH             379

23

24

25

**UNITED STATES DISTRICT COURT**

1          <u>CHRONOLOGICAL INDEX OF WITNESSES (Continued)</u>

2
           **EXAMINATIONS**                                      **PAGE**
3

4
            **DEFENSE WITNESSES**
5
           WESLEY WILLIAMS
6                DIRECT EXAMINATION BY MR. HARBAUGH            384

           MICHAEL SIMON
                 DIRECT EXAMINATION BY MS. WAKEFIELD          387
8                CROSS-EXAMINATION BY MR. YANNNIELLO           391

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

<u>INDEX OF EXHIBITS</u>

| NUMBER | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| 3 | 342 | 343 |
| 4, 5, 6, 8, 9 and 38 | | 343 |
| 8 | 362 | |
| 24 to 27 | 230 | 231 |
| 28 | 261 | 261 |
| 29 | 338 | 338 |
| 30 | 339 | 339 |
| 31 | 229 | 229 |
| 33 | 265 | 266 |
| 36 | 224 | 225 |
| 43 | | 335 |
| 45 | 295 | 296 |
| 46 | 225 | 226 |
| 48 to 55 and 38 | | 343 |
| 58 | | 344 |
| 59 | 351 | |
| 66 | | 287 |
| 114 | 276 | 278 |
| 148 | 319 | |
| 178 | 254 | |
| 207 | 273 | |

INDEX OF EXHIBITS

| NUMBER | FOR IDENTIFICATION | IN EVIDENCE |
|--------|--------------------|-------------|
| 263 | 365 | |
| 265 | 235 | |

UNITED STATES DISTRICT COURT

```
 1              LOS ANGELES, CALIFORNIA; WEDNESDAY, OCTOBER 17, 2018

 2                             8:51 A.M.

 3                             --oOo--

 4              THE COURTROOM DEPUTY:  Please come to order.  This

 5   court is again in session.  Please be seated.

 6              THE COURT:  We are back on the record on United

 7   States versus Flint.  We have counsel present, the defendant is

 8   present.

 9         And who is the Government's next witness?

10              MS. RO:  It's Ms. Ellen Sheahan, Your Honor.  And

11   the witness is in the courtroom.

12              THE COURT:  And then the Government has filed a

13   request for reconsideration of the Court's order regarding the

14   404(b) evidence motion in limine, and that's Document Number

15   105.  Does the defense intend to respond formally?

16              MS. WAKEFIELD:  Well, we were just reading it.  If

17   we could have an opportunity to respond formally, we can work

18   on that over lunch.

19              THE COURT:  And when do you think the opposition to

20   the response could be filed?

21              MS. WAKEFIELD:  I will do my best to get it done

22   over lunch and then file it this afternoon.

23              THE COURT:  Okay.  Thank you.

24              THE COURTROOM DEPUTY:  Ready, Your Honor?

25              THE COURT:  Yes.
```

1          THE COURTROOM DEPUTY:  All rise for the jury,

2     please.

3          (In the presence of the jury.)

4          THE COURT:  We have our jury reassembled with our

5     alternate.  Counsel are present with the defendant.  Please

6     have a seat.

7          The Government is able to call their next witness.  And

8     just to remind the jury, we are on a tight schedule, so try to

9     do your best to be here on time.  I recognize that this morning

10    there's a Dodger game that's in progress -- well, that starts

11    at 2:00, but the fans are already lining up at Elysian Stadium,

12    so I recognize the traffic was heavy this morning.

13         And with that, you may call your next witness.

14         MS. RO:  Thank you, Your Honor.  The United States

15    calls Ms. Ellen Sheahan to the stand.

16         THE COURTROOM DEPUTY:  Good morning, ma'am.  Would

17    you please come forward.

18         Good morning.  Would you please stop right there, and

19    raise your right hand to be sworn.

20         **ELLEN SHEAHAN, GOVERNMENT WITNESS, WAS SWORN**

21         THE WITNESS:  I do.

22         THE COURTROOM DEPUTY:  Thank you.  Please be seated.

23         Ma'am, for the record, would you please state your name,

24    and then spell your last name.

25         THE WITNESS:  Ellen Sheahan, S-h-e-a-h-a-n.

```
 1                  THE COURTROOM DEPUTY:  Thank you.

 2                  THE COURT:  Your witness.

 3                  MS. RO:  Thank you.

 4                        DIRECT EXAMINATION

 5     BY MS. RO:

 6     Q     Good morning, Ms. Sheahan.

 7     A     Good morning.

 8     Q     What is your occupation?

 9     A     I am a transportation security manager at Midway Airport

10     in Chicago.

11     Q     How long have you worked at Midway?

12     A     I have worked at Midway since March of 2017, so about a

13     year and a half so far.

14     Q     And how long have you worked for TSA?

15     A     I have worked for TSA since September of 2002, so over 16

16     years now.

17     Q     And where did you work prior to working at Midway?

18     A     I worked at O'Hare International Airport for 14-1/2 years.

19     Q     And you stated you are a transportation security manager,

20     correct?

21     A     Yes, I am.

22     Q     And what are your duties as a transportation security

23     manager?

24     A     As a manager I'm in charge of overseeing the screening

25     operations, mainly checkpoint and baggage operations, ensuring
```

1    that we are following Standard Operating Procedures, the

2    officers are trained, they maintain their certifications.  I'm

3    in charge of their payroll, their discipline and their

4    performance reviews as well as all of their DARP reports.

5    Q    Have you held prior positions, other than a transportation

6    security manager, with TSA?

7    A    Yes.  I was a supervisory transportation security officer

8    at O'Hare for approximately, I want to say, eight years.

9    Q    And what were your duties as a supervisor at O'Hare for

10   those eight years?

11   A    Pretty similar to the manager, I mean, more or less.  I

12   was in charge of the officers directly, so as a supervisor, I

13   could have approximately 80 direct reports.  As a manager, it

14   would be more along the lines of 200, 252, actually, at one

15   point at O'Hare.  Same thing as a supervisor, you're directly

16   responsible for your officers, directly responsible for

17   managing that particular checkpoint or baggage zone that you

18   are in charge of and making sure that the Standard Operating

19   Procedures are being carried out.

20   Q    And are airports characterized in certain categories?

21   A    Yes, they are.

22   Q    And what's the category of -- can you explain those

23   categories to the jury?

24   A    Well, there's five categories.  There's a Cat X airport,

25   and there's Cat 1, 2, 3 and 4 airports, and in that order,

```
1   largest being the Cat X, the smallest being the Cat 4
2               THE REPORTER:  I'm sorry.  Slow down.  Say that
3   again.
4               THE WITNESS:  The largest airport being a Category
5   X, and the smallest being a Category 4.
6   BY MS. RO:
7   Q    And do you know what O'Hare is categorized as?
8   A    O'Hare is a Cat X airport.
9   Q    And you said that's the largest?
10  A    The largest of that category, yes.
11  Q    And how is Midway characterized?
12  A    It is a Cat 1 airport.
13  Q    And based on your personal experience, if you know, how
14  many TSA officers are in O'Hare compared to Midway?
15  A    At O'Hare they have approximately close to 1600 employees,
16  and at Midway, we have approximately about 430 employees.
17  Q    And, again, based on your personal knowledge and personal
18  experience, do you know how many flights depart from O'Hare
19  versus Midway?
20  A    I can probably tell you more of how many passengers would
21  go through O'Hare versus Midway.  The departures are hundreds
22  of thousands at O'Hare, so I couldn't get you an accurate
23  answer on that.
24  Q    It's hundreds of thousands a day for one day?
25  A    A year.
```

```
 1   Q    A year.
 2        And Midway, in terms of passengers in comparison?
 3   A    Passengers at Midway are far less than at O'Hare.  I would
 4   like to give you an example.  I know that for today at Midway
 5   about 18,000 are going to go through, and I know that just from
 6   checking the staffing or the -- sorry, the departing passengers
 7   today.  At O'Hare, again, I haven't been there in a year, but
 8   pretty much on average would have about 75,000 to -- I think my
 9   high was 98,000 in one day.
10   Q    And based on your experience at O'Hare and Midway, have
11   you handled a diplomatic pouches before?
12   A    Could you repeat the question?
13   Q    Have you handled diplomatic pouches before?
14   A    Yes, I have.
15   Q    And how many?
16   A    At O'Hare?
17   Q    Yes.
18   A    At least 20, that I can think of.
19   Q    And what about at Midway?
20   A    None.
21   Q    Are you familiar with the term "specialized screening"?
22   A    I am.
23   Q    And what is specialized screening?
24   A    Specialized screening is a different procedure you would
25   apply to diplomatic pouches, is one example.  A specialized
```

 1   screening would apply to organs people are transferring,

 2   remains.  Sometimes we have scientific equipment, biohazards,

 3   things of that sort, they are screened in a different fashion.

 4   Q    And what types of specialized screening have you had

 5   experience with at O'Hare?

 6   A    All of the above.

 7   Q    And how about at Midway?

 8   A    None.

 9   Q    Why is that?

10   A    It's a smaller airport.  They don't have a lot of

11   international travel.  It's just not common there.  The number

12   of people that come through, it's not likely.

13   Q    Do you know what type of training Midway supervisors

14   receive versus O'Hare supervisors?

15   A    Every supervisor receives the same training.  They all go

16   through the same training process.

17   Q    Is there any difference between the experience or the

18   level of experience at O'Hare supervisors versus Midway

19   supervisors?

20   A    Yes.  O'Hare supervisors are more experienced.

21   Q    And why is that?

22   A    Well, they see more in a day than somebody would see at

23   Midway in a year.  They are -- it's with the volume, again,

24   that comes through with the number of people that they work

25   with and other people that are experienced, they definitely

```
 1  have more knowledge.
 2  Q     And were you working as a transportation security manager
 3  at Midway in July of 2017?
 4  A     Yes, I was.
 5  Q     And are you familiar with two events that occurred at
 6  Midway in July 2017 as it pertained to diplomatic pouches?
 7  A     Yes.
 8  Q     And how are you familiar with the two events?
 9  A     The one event I had to write the after-action report,
10  incident report regarding the event on July 20th.
11  Q     And why did you have to write that after-action report?
12  A     Because I was the manager on duty when we discovered the
13  error, so --
14  Q     And how did you discover the error?
15  A     So I came to work the next day.  I go through my e-mail
16  prior to staff briefings and gather up pertinent information
17  for the briefing.  I received a BOLO the night before at 10:00
18  from our coordination center, which was forwarded from the ORD
19  coordination center.  The BOLO was basically regarding a
20  diplomatic pouch be on the lookout for.  There was an
21  individual that was trying to circumvent security at O'Hare.
22      I brought that printout to the briefing, at the 12:00
23  briefing.  I began to brief the officers about, you know, being
24  conscious of this potential threat, and that's when one of the
25  officers raised his hand and said, "We had one yesterday."  And
```

1   when we investigated further, we discovered that they were the

2   same.

3   Q    When you say you discovered they were the same, what was

4   the same?

5   A    The individual that was in the BOLO.

6   Q    BOLO?

7   A    Be on the lookout for.

8   Q    BOLO?

9   A    Correct.

10           THE COURT:  Before you continue, is there a

11  definition as to diplomatic pouch?  How is it defined, if you

12  know?

13           THE WITNESS:  A diplomatic pouch, when it's

14  presented, has certain criteria you have to have in order to

15  receive that specialized screening.  You can have a diplomatic

16  bag or a diplomatic pouch.  Diplomatic bags are dropped with

17  baggage side of security.  Diplomatic pouches are typically

18  carried through the checkpoint with a courier, and there's --

19  you have to have a diplomatic passport.  You have to have a

20  letter from the Department of State.  If that letter is in

21  Polish or another language, you have to have a second letter in

22  English, and it has to have the seal, those types of criteria.

23           THE COURT:  The pouch actually has a seal?

24           THE WITNESS:  The pouch is not sealed.  It's marked

25  "Deemed diplomatic pouch."  The bags that go in the baggage

1    system actually do have the seal.  There should be a seal or a

2    tag of some type on the pouch, but it's more important the

3    diplomatic -- the letter and the passport.

4              THE COURT:  Are they --

5              THE WITNESS:  And those items don't get screened.

6    That's the specialized screening.

7              THE COURT:  Is there a limitation as to size of

8    pouch?

9              THE WITNESS:  No.

10             THE COURT:  Thank you.

11   BY MS. RO:

12   Q    And if I could turn your direction to the exhibit binder.

13   It's the black binder right in front.

14        Yes.

15        And if you can turn to what's been previously marked as

16   Government's Exhibit 36.

17        (Exhibit 36 for identification.)

18   BY MS. RO:

19   Q    Do you recognize the first page of Exhibit 36?

20   A    I do.

21   Q    What is it?

22   A    This is the original BOLO that came from O'Hare Airport to

23   Midway.

24   Q    And how do you recognize it?

25   A    Because that's the exact e-mail I received.

```
 1   Q    How about page 2 of Exhibit 36, do you recognize that?

 2   A    Yes.  This is the attachment that was with that e-mail.

 3             MS. RO:  United States moves to introduce

 4   Government's Exhibit 36 into evidence.

 5             THE COURT:  Any objection?

 6             MS. WAKEFIELD:  One moment, Your Honor.

 7        (Discussion off the record.)

 8             MS. WAKEFIELD:  No objection.

 9             THE COURT:  36 is received.

10        (Exhibit 36 received into evidence.)

11             MS. RO:  Your Honor, permission to publish to the

12   jury.

13             THE COURT:  Yes.

14   BY MS. RO:

15   Q    On the screen to your right, is this the e-mail that you

16   indicated the BOLO, be on the lookout?

17   A    Yes.

18   Q    Sorry.

19        And is this page 2 of the exhibit, the attachment?

20   A    Yes.

21   Q    And if I could turn your attention to the binder again to

22   Government's Exhibit 46.

23        (Exhibit 46 for identification.)

24             MS. RO:  46 that I'm showing defense counsel.

25   Q    Do you recognize that exhibit?
```

1    A    Repeat the question, please.

2    Q    Do you know what's on the exhibit?

3    A    Yes.

4    Q    And what is on the exhibit?

5    A    It's a passport and a diplomatic passport.

6    Q    Is it a United States --

7    A    Yes.

8    Q    Is it a true and accurate depiction of the official --

9         I apologize, Your Honor.  Strike that.

10        Is it a true and accurate depiction of a United States

11   diplomatic passport?  And is there another passport shown in

12   that image?

13   A    There's the -- I don't understand your question.  I'm

14   sorry.

15   Q    No, I will ask it in a better way.

16        What do you see in that exhibit?

17   A    I see a United States passport, and then I see a

18   diplomatic passport, also United States.  That would be what

19   they look like on the outside.

20            MS. RO:  The United States moves to introduce

21   Exhibit 46.

22            MS. WAKEFIELD:  No objection.

23            THE COURT:  Received.

24        (Exhibit 46 received into evidence.)

25   BY MS. RO:

1    Q    You mentioned a diplomatic pouch.  The courier needs to

2    carry a diplomatic passport.  On the screen here, which one is

3    a United States diplomatic passport?

4    A    The passport on the right.

5    Q    And how do you know that's the diplomatic passport?

6    A    Because that's what it says across the front of the

7    passport.  I have seen them before.

8    Q    And going back to the two events in July '17 at Midway

9    regarding the diplomatic pouch.  How were you aware of the

10   second event?

11   A    Well, after the first event happened, we were having a

12   meeting on Tuesday morning, at 11:00, with FSD staff, like we

13   do every Tuesday.

14   Q    And what does FSD stand for?

15   A    Federal security director.  FSD staff is anyone with FSD

16   in their title.  So it could be the AFSD, which is the

17   assistant federal security director.  The deputy assistant

18   federal security director was there, the actual federal

19   security director was there, so it's all of our top staff.  We

20   have a meeting with management, all the TSMs, video behavioral

21   detection office manager, and we were discussing the event that

22   happened on the 20th and --

23   Q    And what happened during that -- I apologize -- a briefing

24   or meeting that you said?

25   A    It's a meeting.

1    Q    And what happened during that meeting?

2    A    We went over what -- we call it a hot wash, what happened,

3    what we did wrong, what we did right, and basically we were

4    discussing what is required.  Some people need to know like

5    what exactly they need to do when they have this situation.

6    And one of the other managers mentioned that -- well, one

7    person said -- sorry -- that they've never seen one or they

8    never had this situation, and another manager then interjected

9    saying, "That's really funny, because I just had another one

10   this morning."  And that's when the FSD and I looked at each

11   other like, you know, "What did you just say?"  And so she

12   reiterated what she said, and that's how we, you know -- it

13   was -- being that it never happens there, that was awfully

14   coincidental for something to happen two times in a week, so

15   that's when action was taken.

16   Q    And what action was taken?

17   A    Mr. McCarthy, who is the federal security director, went

18   downstairs.  They pulled video.  They identified the individual

19   as being one and the same from the 20th, and they contacted --

20   Federal Security Director McCarthy informed me later that he

21   contacted LAX, and they were able to identify what flight he

22   was on and where he was going and what gate he was coming to.

23   Q    And after the first event, was some type of training tool

24   created to discuss on the meeting that you just discussed

25   happening for the second event?

1    A     Yes.  I believe the AFSD John Comston directed the

2    training department to put out some -- a job aid, more or less,

3    to the staff to -- you know, the step by step as a reminder of

4    if this happens, this is -- these are the things you must have

5    and must be the criteria that must be met in order for a

6    diplomatic pouch to not be screened.

7    Q     If I could turn your direction to Government's Exhibit 31.

8          (Exhibit 31 for identification.)

9    BY MS. RO:

10   Q     Do you recognize this?

11   A     I do.

12   Q     And how do you recognize it?

13   A     This is the training bulletin or what I just referred to

14   as a job aid that we received from the training department.

15   Q     After the first event?

16   A     After the first event.

17              MS. RO:  The United States moves to introduce

18   Exhibit 31 into evidence.

19              MS. WAKEFIELD:  No objection.

20              THE COURT:  Received.

21        (Exhibit 31 received into evidence.)

22   BY MS. RO:

23   Q     You stated Mr. McCarthy reviewed surveillance videos

24   regarding the July 25th, 2017 event.

25   A     I believe he did, yes.

```
 1              MS. RO:  Your Honor, may I have a moment with

 2   defense counsel regarding the exhibits?

 3              THE COURT:  Yes.

 4        (Discussion off the record.)

 5   BY MS. RO:

 6   Q    If I could turn your direction to the exhibits that are

 7   marked as Government's Exhibits 24 to 27.  And I apologize,

 8   they are in the manila folders right in front of you.

 9        (Exhibits 24 through 27 for identification.)

10              THE WITNESS:  Okay.

11   BY MS. RO:

12   Q    Do you recognize those exhibits?

13   A    I do.

14   Q    And how do you recognize them?

15   A    I recognize them because my initials are on them.  Those

16   are DVDs of video footage, CCT video footage from Midway

17   Airport.

18   Q    And from July 25th, 2017?

19   A    Yes.

20   Q    And how do you know that?

21   A    Because I watched them.

22   Q    And how do you know that this depicts the incident of July

23   25th, 2017, after you've watched them personally?

24   A    Well, I recognize the checkpoint very well, obviously, and

25   there's always the date on there, and that's -- the events
```

```
 1   match what happened.
 2            MS. RO:  United States moves to introduce Exhibits
 3   24 to 27 into evidence.
 4            THE COURT:  Any objection?
 5            MS. WAKEFIELD:  Our only objection is we haven't
 6   seen these clips, so we don't know which clips they refer to,
 7   but --
 8            THE COURT:  Well, you were provided a copy of
 9   Government's Exhibit list.
10            MS. WAKEFIELD:  Yes, but not the clips that they are
11   referring to, just the entire video.  So there's no objection.
12            THE COURT:  No objection.  It's received, both.
13        (Exhibits 24 through 27 received into evidence.)
14            MS. RO:  Your Honor, may I have one quick moment?
15            THE COURT:  Yes.
16        (Discussion off the record.)
17            MS. RO:  Nothing further.
18            THE COURT:  Cross?
19                         CROSS-EXAMINATION
20   BY MS. WAKEFIELD:
21   Q    Good morning.
22   A    Good morning.
23   Q    Now, at no point did you speak with Mr. Flint, correct?
24   A    No, I did not.
25   Q    You weren't present at the checkpoint on July 20th?
```

```
 1   A     No, I was not.

 2   Q     And you were not present at the checkpoint on July 25th?

 3   A     No, I was not.

 4   Q     And you didn't speak with Mr. Flint, correct?

 5   A     As I said, no.

 6   Q     And you didn't ask him any questions, right?

 7   A     That would be a no.

 8   Q     So your role was to oversee the investigation into what

 9   happened at Midway?

10   A     Correct, yes.

11   Q     And as part of your investigation, you identified all of

12   the TSA officers who interacted with Mr. Flint?

13   A     Yes.

14   Q     And all of the TSA officers who interacted with him on

15   July 20th, correct?

16   A     Just the July 20th.

17   Q     Just the July 20th.

18         And you spoke with all of those officers?

19   A     Yes.

20   Q     And you directed them to write reports about what

21   happened?

22   A     When an incident happens, they are required to give a

23   statement.

24   Q     And they gave a written statement?

25   A     They gave a written statement.
```

**UNITED STATES DISTRICT COURT**

1   Q    And you reviewed those written statements?

2   A    I did.

3   Q    And you signed off on the written statements as the

4   reviewing officer?

5   A    I signed off on the incident report as the reviewing

6   officer.

7   Q    And the incident report had a portion where the officer

8   handwrote what happened?

9   A    There's one page that, yes, they can write that, but often

10  when you have multiple people, we just Xerox like -- I think

11  it's page 4 and, you know, use that several times in there, but

12  yes, or they can provide a Word document, but either way --

13  Q    Okay.

14  A    -- they are all there in the report.

15  Q    And you also spoke with all of the officers?

16  A    I did.

17  Q    Directly, right?

18  A    Yes.

19  Q    And based on your investigation, you then wrote the

20  after-action report?

21  A    I did.

22  Q    And you distributed your after-action report to Midway

23  security?

24  A    I distribute after-action reports to FSD staff, the

25  coordination center, and TSMs.

```
 1  Q     Now, the first TSA officer who had contact with Mr. Flint
 2  on July 20th was Keyona Clanton?
 3  A     Yes.
 4  Q     And Ms. Clanton was working at the TSA precheck podium
 5  that day?
 6  A     Yes, a TAC.
 7  Q     So she would have been the officer who scanned Mr. Flint's
 8  boarding pass, right?
 9  A     I believe so, yes.
10  Q     Now, during your investigation you learned that Mr. Flint
11  asked Ms. Clanton for a supervisor, correct?
12  A     A supervisor was called.
13  Q     And that's because Mr. Flint asked for one, correct?
14          MS. RO:  Objection; lack of foundation, speculative.
15          THE COURT:  Do you have personal knowledge?
16          THE WITNESS:  No.
17          THE COURT:  Sustained.
18  BY MS. WAKEFIELD:
19  Q     Ms. Clanton in her written report didn't write anything
20  about Mr. Flint asking for a supervisor?
21  A     Can I see the written report?
22  Q     Would it refresh your memory to look at her written
23  statement?
24  A     It would.
25          MS. RO:  Objection; hearsay.
```

```
 1              THE COURT:  She's just asking for her memory to be
 2   refreshed.  It's overruled.
 3   BY MS. WAKEFIELD:
 4   Q    So there should be some binders up there, and it will be
 5   in the skinnier binder, I believe, which is Defense Exhibit
 6   265.
 7        (Exhibit 265 for identification.)
 8              THE WITNESS:  I'm assuming all these ones on the
 9   floor --
10   BY MS. WAKEFIELD:
11   Q    Yes, those are ours.  And I apologize, it might be the
12   bigger binder.
13   A    They all have the same number, I believe.  Am I looking in
14   the wrong place?
15              THE COURTROOM DEPUTY:  Your Honor, may I assist?
16              THE COURT:  Yes.
17              THE WITNESS:  Please.  Thank you.
18              THE COURTROOM DEPUTY:  What exhibit number are you
19   looking for?
20              MS. WAKEFIELD:  265.
21              THE COURTROOM DEPUTY:  265?
22              MS. WAKEFIELD:  Yes.
23              THE COURTROOM DEPUTY:  That doesn't appear to be in
24   the binder.
25              MS. WAKEFIELD:  It should be the larger of the
```

```
 1   binders.
 2   Q    And if you could read the third sentence, and let me know
 3   when you're done.
 4   A    "He said he wanted to speak with a supervisor."
 5   Q    Does that refresh your memory?
 6   A    Yes.
 7   Q    And -- thank you.
 8        And so Mr. Flint asked for a supervisor.  And in response,
 9   supervisor Enrique Rivera came to the precheck podium, right?
10            MS. RO:  Objection, Your Honor; lacks foundation,
11   and the witness read the report out loud and didn't state it
12   refreshed her memory prior to reading that statement.
13            THE COURT:  She did read it out loud, so what's --
14   repeat the question again.
15   BY MS. WAKEFIELD:
16   Q    Because Mr. Flint asked for a supervisor, Enrique Rivera,
17   who's a supervisor, came to the precheck podium?
18            THE COURT:  Do you have an objection?
19            MS. RO:  Objection; hearsay.
20            THE COURT:  Sustained.
21   BY MS. WAKEFIELD:
22   Q    Now, Mr. Rivera eventually came to the precheck podium,
23   right?
24   A    From what was reported?
25   Q    Yes.
```

```
 1   A      He was standing there already.
 2   Q      He was standing there.
 3          And he eventually called a more senior supervisor,
 4   Mr. Clay Yoksas, right?
 5   A      Correct.
 6   Q      And Mr. Yoksas, you determined, was the officer who
 7   reviewed Mr. Flint's documentation, correct?
 8   A      Correct.
 9   Q      And you determined that Mr. Yoksas was the officer that
10   concluded that Mr. Flint satisfied the diplomatic pouch
11   requirements, correct?
12   A      Repeat that, please.
13   Q      Sorry.  Mr. Yoksas was the officer who ultimately
14   concluded that Mr. Flint could proceed without the pouch being
15   screened?
16   A      He made that decision, yes.
17   Q      Yes.  That was his decision, right?
18   A      Correct.
19   Q      And he was a supervisor who was called to deal with the
20   situation?
21   A      Yes.
22              MS. WAKEFIELD:  May I have a moment, Your Honor?
23              THE COURT:  Yes.
24          (Discussion off the record.)
25   BY MS. WAKEFIELD:
```

1  Q    The Government asked you some questions about the relative

2  sizes of O'Hare versus Midway.  Do you recall that?

3  A    Yes.

4  Q    And you testified that more people come through with

5  specialized screening items at O'Hare, right?

6  A    Yes.

7  Q    And so it's more common at O'Hare for people to come

8  through with items requiring specialized screening?

9  A    Yes.

10  Q    And at Midway it's not as common?

11  A    No.

12  Q    It would stand out more if someone had an item requiring

13  specialized screening?

14  A    It should.

15          MS. WAKEFIELD:  Nothing further.

16          MS. RO:  Just one quick question, Your Honor.

17                      **REDIRECT EXAMINATION**

18  BY MS. RO:

19  Q    You stated that "it should," with some hesitation.  Can

20  you expand on that answer?

21  A    It's something that I -- I'm used to people not having to

22  question at O'Hare.  It's almost second nature.  So supervisors

23  can handle that, and they do regularly, meaning it's something

24  that I would think that would be easy.  But at Midway, they

25  have the same training, but it's one of those things if you

```
 1    don't see it very often, I think they may forget their
 2    training, so -- and that's kind of what I meant by that.
 3              MS. RO:  Nothing further, Your Honor.
 4              MS. WAKEFIELD:  Nothing.  Thank you.
 5              THE COURT:  Just for point of clarification,
 6    there's -- how many categories of passports are there?  There's
 7    your standard passport, the diplomatic passport, there's an
 8    official passport; is that correct?
 9              THE WITNESS:  Yes, there's the red one, the
10    maroon-colored one.
11              THE COURT:  And what's the difference between the
12    three passports?
13              THE WITNESS:  You're speaking for the United States
14    passport?
15              THE COURT:  Yes.
16              THE WITNESS:  The diplomatic passport is simply for
17    couriers.  I did deal with those with pilots as well because
18    there are a lot of international pilots.
19              THE COURT:  And then the official passport?
20              THE WITNESS:  Is the blue passport.
21              THE COURT:  And what does that do?
22              THE WITNESS:  It's your identification if you want
23    to travel internationally.
24              THE COURT:  How does it differ from a regular
25    passport?
```

1      THE WITNESS:  I don't have it in front of me.  I'm

2  not going to make guesses.  I just know there's a difference.

3  There's basic information, but I'm not from the --

4      THE COURT:  State department.

5      THE WITNESS:  Yeah, or the customs.

6      THE COURT:  Okay.  Thank you.

7  Thank you.  May the witness be excused?

8      MS. RO:  Yes, Your Honor.

9      THE COURT:  Thank you.

10  You're excused.  Thank you for your testimony.

11  Next?

12      MR. YANNIELLO:  Thank you, Your Honor.  The

13  Government calls Raja Wondrasek.

14      THE COURTROOM DEPUTY:  Good morning, ma'am.  Would

15  you please come forward.

16  Would you please stop right there and raise your right

17  hand to be sworn.

18      **RAJA WONDRASEK, GOVERNMENT WITNESS, WAS SWORN**

19      THE WITNESS:  Yes.

20      THE COURTROOM DEPUTY:  Thank you.  Would you please

21  be seated.

22  Ma'am, for the record, would you please state your name,

23  and spell your last name.

24      THE WITNESS:  Raja Wondrasek, W-o-n-d-r-a-s-e-k.

25      THE COURT:  There's a request for the Government to

```
 1   not use acronyms.
 2                      DIRECT EXAMINATION
 3   BY MR. YANNIELLO:
 4   Q    Good morning, Ms. Wondrasek.  How are you doing?
 5   A    Good morning.  Good.
 6   Q    What's your current occupation?
 7   A    I'm a flight attendant for Southwest Airlines.
 8   Q    And how long have you been a flight attendant with
 9   Southwest?
10   A    Eight months.
11   Q    And what was your occupation before?
12   A    I was a transportation security manager for TSA.
13   Q    And what airport did you work at?
14   A    Chicago Midway.
15   Q    And were you -- you said -- how long had you worked as a
16   TSA agent?
17   A    For a total of 15 years.
18   Q    And you said you were a manager in your last position?
19   A    Correct.
20   Q    And were you working as a TSA manager in July 2017?
21   A    Yes.
22   Q    Can you generally describe your job duties as of July
23   2017.
24   A    So my primary job is to protect the traveling public and
25   to oversee operations on the checkpoint.
```

```
 1    Q    And have you ever encountered somebody claiming they had a
 2    diplomatic pouch?
 3    A    Yes.
 4    Q    How many times?
 5    A    Once.
 6    Q    So once out of 15 years?
 7    A    Correct.
 8    Q    And did that happen on July 25th, 2017?
 9    A    Yes.
10    Q    And how were you alerted to somebody claiming they had a
11    diplomatic pouch?
12    A    My supervisor, Joe Stone, called me on my duty cell phone,
13    and he explained to me that he had a diplomatic pouch.  It was
14    his first time handling one, and he wanted my assistance to
15    make sure that he was doing the proper procedures for the
16    diplomatic pouch.
17    Q    And what was -- what were you doing at the time?
18    A    I was in the supervisors office checking my e-mails.
19    Q    And why were you checking your e-mails?
20    A    I had been on vacation for a week, so I was catching up on
21    my e-mails.
22    Q    And did you see any e-mails that morning that related to
23    diplomatic pouches?
24    A    I saw a training memo.
25    Q    And had you seen that before the call, or did you look for
```

1    it after the call?

2    A    I had remembered seeing it, so I did briefly look at it,

3    but I searched for this particular e-mail once I got the call

4    from Joe.

5    Q    I pulled up what's been previously admitted as

6    Government's Exhibit 31.  Do you recognize this?

7    A    Yes.

8    Q    What is it?

9    A    It's the training memo that was sent by the training

10   department.

11   Q    And this is the training memo that you reviewed that

12   morning?

13   A    Correct, this is the memo, yes.

14   Q    And you said when you received the call from Joe Stone,

15   you pulled up your e-mail with this memo in it and you reviewed

16   it; is that correct?

17   A    Correct.

18   Q    And you knew that somebody was waiting downstairs.  So can

19   you just approximate how long you reviewed the memo?

20   A    Maybe ten minutes, five to ten minutes because it was the

21   first time I had seen it and I wanted to make sure that I had

22   everything I needed.

23   Q    And there's references in this training bulletin to

24   SS SOP.  What does that refer to?

25   A    The procedures on screening a diplomatic pouch.

1    Q    And those would be referenced in the Standard Operating

2    Procedures, correct?

3    A    Correct.

4    Q    Okay.  And so what happened after you reviewed this memo?

5    A    So after I reviewed the memo, I closed my computer.  I

6    went to where Joe was.  He was in Pod 2 by Lane 4, which is a

7    precheck.  I went over to Joe, and I asked him, "What kind of

8    documentation did you have?  Where was the diplomatic pouch?"

9    So he had everything laid out on the table, which was a courier

10   letter, there was a driver's license, a passport card and a bar

11   card, yes.

12   Q    And when you refer to a bar card, what is that?

13   A    It's a -- it had the information on it of Mr. Flint, like

14   it had his name.  It was basically like a business card.

15   Q    Did it state that Mr. Flint was an attorney?

16   A    Yes.

17   Q    And so when you arrived, you saw these -- you saw the

18   courier letter, you said, and you saw these three forms of

19   identification.  And what did you do next?

20   A    So I looked at the courier letter.  I looked at the

21   diplomatic pouch.  I was basically comparing the numbers,

22   looking for the raised seal on the letter.  I looked at his

23   name, identification.  And I was talking to Joe to make sure

24   that we had everything that -- that everything was there that

25   was a requirement for a diplomatic pouch.

1   Q    You said you were talking to Joe.  Did you speak with the

2   defendant?

3   A    No.  Actually, I introduced myself, and then I proceeded

4   to talk to Joe.

5   Q    And what was the defendant doing when you were talking to

6   Joe?

7   A    In the beginning he was standing to the left side of us,

8   and then I asked him to come around in front of me.  So he was

9   basically standing by the TDC area.

10  Q    Okay.  I'm going to play a clip, what's been admitted as

11  Government's Exhibit 26.

12       (Video recording played in open court.)

13       THE COURT:  I don't have 26.  Let me check with the

14  clerk as being admitted.

15       THE COURTROOM DEPUTY:  Yes, 26 was admitted with 24

16  through 27.

17       THE COURT:  Okay.  Thank you.

18  BY MR. YANNIELLO:

19  Q    I'm sorry, Ms. Wondrasek, one additional question.  Do you

20  recognize the individual who you interacted with that day in

21  the courtroom?

22  A    Yes.

23  Q    Could you please identify that person by what they are

24  wearing or where they are sitting?

25  A    He has on a blue suit, a white shirt, and a blue tie.

UNITED STATES DISTRICT COURT

```
 1              MR. YANNIELLO:  Let the record reflect --
 2              THE COURT:  Identifying Mr. Flint.
 3              THE WITNESS:  He's sitting right there.
 4   BY MR. YANNIELLO:
 5   Q    Ms. Wondrasek, back to the video, do you recognize the TSA
 6   agent on the left of the screen?
 7   A    Yes, that's Joe Stone.
 8        (Video recording played in open court.)
 9   BY MR. YANNIELLO:
10   Q    Who just entered the frame?
11   A    I did.
12   Q    And so at this point where is the defendant?
13   A    He's standing to the left by the TDC podiums, right at the
14   end of the table.
15   Q    So at this point you're speaking to Joe about -- he's
16   basically bringing you up to speed about what's happened so
17   far?
18   A    Correct.
19        (Video recording played in open court.)
20   BY MR. YANNIELLO:
21   Q    So what are you doing here?
22   A    So I'm talking to Joe about the documentation that I had
23   in my hand.
24   Q    Do you know what you're looking at in that frame?
25   A    It looks like it's the diplomatic passport card, or it's
```

1    kind of hard to tell, but I believe that's what I'm looking at,

2    and then there's the courier letter on the table.

3         (Video recording played in open court.)

4    BY MR. YANNIELLO:

5    Q    And who just walked into the frame?

6    A    Mr. Flint.

7    Q    And what did he do immediately upon arriving?

8    A    It looks like he's pointing at the bottom of the letter.

9         (Video recording played in open court.)

10   BY MR. YANNIELLO:

11   Q    Can you generally describe what was going on in the last

12   20 seconds.

13   A    So I'm talking to Joe Stone, verifying that the numbers

14   coincide with the numbers that are on the letter, the letters

15   match up on the diplomatic pouch, and I was looking at his

16   identification.  So I'm just basically making sure that all --

17   he has all the documentation that was required.

18   Q    So is one of the things that TSA agents are trained in is

19   to match to make sure different numbers line up with different

20   forms of identification?

21   A    Correct.

22   Q    And to make sure that names are the same on different

23   identification documents?

24   A    Correct, yes.

25   Q    Is that why you were -- is there something, I guess,

```
 1   specific in the Standard Operating Procedures regarding
 2   diplomatic pouches that require you to confirm all those
 3   numbers, or is it something that you're just generally trained
 4   in?
 5   A    There is something in the SOP and also what we're trained
 6   on.  So anyone that has a diplomatic pouch, it has to be
 7   annotated on the documentation.  It has to say "Diplomatic
 8   pouch."  The number on the diplomatic pouch has to match the
 9   same number on the courier letter, as well as I believe there's
10   another number that goes on there as well.
11         (Video recording played in open court.)
12             THE WITNESS:  So that's what I'm doing, I'm
13   verifying that everything is there with Joe.
14         (Video recording played in open court.)
15   BY MR. YANNIELLO:
16   Q    So do you recall what the defendant brought you here?
17   A    I believe that's a larger copy of the diplomatic passport
18   card.
19   Q    So he had a larger copy of the actual card in his binder?
20   A    Yes.
21         (Video recording played in open court.)
22   BY MR. YANNIELLO:
23   Q    So you answered your phone here.  Do you recall whether
24   you placed the call or whether somebody called you?
25   A    No.  I was answering a phone call.
```

```
1    Q    And is that your work phone?

2    A    Yes.  It's my duty cell phone.

3    Q    Do you recall anything about that -- let me rephrase.

4         Was that phone call about this incident here?

5    A    No.

6    Q    Do you recall what the phone call was about?

7    A    No.

8              MS. WAKEFIELD:  Objection; relevance.

9              THE COURT:  She said she doesn't recall.  It stands.

10        (Video recording played in open court.)

11   BY MR. YANNIELLO:

12   Q    And you had mentioned you had been given three forms of

13   identification.  Can you place -- so you can actually place

14   your finger and draw a circle around where those three

15   identification documents are.

16        (Video recording played in open court.)

17             MR. YANNIELLO:  Sorry, Your Honor.  May the record

18   reflect that the witness circled the three identification

19   documents?

20             THE COURT:  Yes.

21        (Video recording played in open court.)

22   BY MR. YANNIELLO:

23   Q    So at this point what's going on?

24   A    So once I reviewed the documents one last time and Joe and

25   I agreed that everything was there, I proceeded to tell
```

```
 1   Mr. Flint that he would have to go through screening, all of
 2   his carry-ons, and we would hand him the diplomatic pouch on
 3   the other side.  That was the only thing that would not go
 4   through screening.
 5   Q    And so for the last 30 or 40 seconds or so, you had
 6   continued to make an assessment about Mr. Flint's credentials
 7   while you were handling another matter on the telephone?
 8   A    Correct.
 9        (Video recording played in open court.)
10   BY MR. YANNIELLO:
11   Q    So the defendant just left the frame.  Did you interact
12   with the defendant again after this point?
13   A    No.
14   Q    So this clip was your entire interaction with him on July
15   25th, 2017?
16   A    That's correct.
17   Q    Going back to Government's 31 for a moment.  Now,
18   Ms. Wondrasek, this training bulletin states that -- it says
19   that the TSA STSO must verify that the diplomatic courier
20   possesses a diplomatic passport.  Did you do that on that day?
21   A    He did not have a passport.  He had a passport card.
22   Q    Okay.  So I'm going to publish Government's Exhibit 2.
23        And is this the card that you saw that day?
24   A    Yes, it is.
25   Q    And you're referring to this as a passport card.  Can you
```

1    walk us through your reasoning or why you think it's a passport

2    card.

3    A    So at the time the reason I thought it was a passport card

4    is because I have a passport, and I also have a passport card,

5    which basically it serves the same purpose if you are not

6    traveling internationally.  So instead of having a passport

7    that has pages in it, you can have a passport card, which has

8    all of your information.  It has your number and all of your

9    personal information on it.  So that's why I associated the

10   passport card.

11   Q    And so let me just stop you for a moment.  You were

12   talking about your personal passport.

13   A    Correct, yes.

14   Q    And that's just a passport that any U.S. citizen can apply

15   for and receive?

16   A    Right, correct.

17   Q    And you have a passport card for that, for your regular

18   U.S. passport; is that right?

19   A    Correct, yes.

20   Q    And so when you saw this card that the defendant presented

21   you on July 25th, 2017, did you know whether or not there was,

22   in fact, something called a diplomatic passport card?

23   A    No, I did not.

24   Q    I'm just going to show you a few additional videos and

25   have you identify what's going on.  I'm bringing up

1    Government's Exhibit 27.

2         (Video recording played in open court.)

3    BY MR. YANNIELLO:

4    Q    Do you recognize this area?

5    A    Yes, that's the main checkpoint.

6    Q    And the interaction we just saw with you and the

7    defendant, is that on this screen or is it somewhere else?

8    A    That's in a separate area.

9    Q    Is it in this general terminal?  Or which direction would

10   it be if we were looking at this screen head-on?

11   A    So you're looking at the main checkpoint, and then there

12   are two overflow areas to the right side of the checkpoint.  So

13   where the incident happened, it was in this second pod.  We

14   have two -- actually three pods, but the incident took place in

15   Pod 2, which is precheck, which is to the very far right of the

16   checkpoint.

17        (Video recording played in open court.)

18   BY MR. YANNIELLO:

19   Q    It appears to be fairly busy at this time.  Do you recall

20   what time you interacted with Mr. Flint on July 25th, 2017?

21   A    It was in the morning, which typically on a Tuesday it's

22   busy.  That's like one of our busiest days, especially in the

23   morning on first shift.

24   Q    First shift.  And do you recall what time that was?

25   A    I believe it was like around 4:30 -- 4:30, 5:00 in the

1    morning.

2    Q    So this general traffic is how it -- how Midway is at 4:30

3    in the morning, 5:00?

4    A    Yes, it's busy.

5             MR. YANNIELLO:  One moment, Your Honor.

6        (Discussion off the record.)

7    BY MR. YANNIELLO:

8    Q    Ms. Wondrasek, so back to the passport and passport card

9    discussion we had -- or questions and answers.  So to you, at

10   July 25th, 2017, what was the physical difference between a

11   passport and a passport card?

12   A    A card -- well, a passport has pages, and a card does not.

13            MR. YANNIELLO:  Thank you.

14       Nothing further, Your Honor.

15            THE COURT:  Thank you.

16       Cross?

17                        **CROSS-EXAMINATION**

18   BY MS. WAKEFIELD:

19   Q    Good morning.

20   A    Good morning.

21   Q    On July 25th, 2017, when you went to speak with Mr. Flint,

22   you asked him questions, right?

23   A    No, I did not.

24   Q    You didn't ask him any questions; is that your testimony?

25   A    No, I did not.

```
 1   Q     You recall speaking with Agent Simon about this case?
 2   A     Yes.
 3   Q     And you recall speaking with him in May of this year,
 4   correct?
 5   A     I don't recall the exact time.
 6   Q     Okay.  But you recall speaking with him?
 7   A     Yes.
 8   Q     And you spoke with him about this case, right?
 9   A     Correct.
10   Q     And it was before today, so the events were more fresh in
11   your mind, right?
12   A     Yes.
13   Q     And you told Agent Simon that Mr. Flint only responded to
14   your questions; is that correct?
15   A     I don't remember saying that.
16   Q     Would it refresh your memory to look at Agent Simon's
17   notes of your interview with him?
18   A     Sure.
19   Q     I can direct you to the binder, or I can hand you a
20   physical copy.  It should be defense Exhibit 178.
21         (Exhibit 178 for identification.)
22   BY MS. WAKEFIELD:
23   Q     I don't think it's that binder.  It should be the skinny
24   binder.  I can also walk up, if the Court would permit me to.
25              THE COURT:  Mr. Cruz will handle it.
```

1          THE COURTROOM DEPUTY:  What number again?

2          MS. WAKEFIELD:  178.

3     Q    If you could read -- let's see.  It should be bullet point

4     6.

5     A    Okay.  So --

6     Q    Sorry.  Does that refresh your memory?

7     A    I don't see anything on here that states that I asked

8     Mr. Flint any questions.

9     Q    Does it -- well, did you say that Mr. Flint only responded

10    to your questions?

11    A    No.

12    Q    Okay.  So that doesn't refresh your memory?

13    A    No.

14    Q    Okay.  Now, you -- as you testified, you were the manager

15    at Midway of the passenger checkpoint and baggage at the time,

16    right?

17    A    Can you repeat that?

18    Q    On July 25th, 2017, you were the transportation security

19    manager, correct?

20    A    Correct.

21    Q    And part of your job is to implement the TSA Standard

22    Operating Procedures, right?

23    A    If needed, yes.

24    Q    And the Standard Operating Procedures are a guide for TSA

25    employees, right?

```
 1   A     Correct.

 2   Q     And you received training on the Standard Operating

 3   Procedures?

 4   A     Correct.

 5   Q     Now I want to talk about the difference between a manager

 6   and a supervisor.  The person who called you that day was TSA

 7   supervisor Joe Stone?

 8   A     Correct.

 9   Q     And your title was manager, as we discussed, right?

10   A     Yes.

11   Q     And a manager is senior to a supervisor in TSA?

12   A     Correct.

13   Q     Now, before you went to help Mr. Stone, you pulled up the

14   e-mail with instructions on handling diplomatic pouches,

15   correct?

16   A     Correct.

17   Q     And you reviewed that e-mail before you went to the

18   checkpoint?

19   A     Yes.

20   Q     And you reviewed that e-mail with the Government, and it

21   told you that a passenger needed a courier letter, right?

22   A     Correct.

23   Q     And a diplomatic passport as well?

24   A     Correct.

25   Q     And when you got to the checkpoint, Mr. Flint's documents
```

```
 1   were already laid out on the counter?

 2   A     Actually, the courier letter was on the table, and Joe

 3   Stone had the other documents in his hand.

 4   Q     But they were already out for Mr. Stone to review?

 5   A     Correct.

 6   Q     And you discussed with Mr. Stone the documents that he had

 7   already reviewed?

 8   A     Correct.

 9   Q     And you had your cell phone -- your work cell phone with

10   you when you were at the checkpoint, right?

11   A     Correct.

12   Q     And that cell phone had the memo in the e-mail that you

13   had received, right?

14   A     Yes.  My e-mails are on my duty phone, correct.

15   Q     And when you looked at the items that Mr. Flint had, you

16   compared them to the memo that you had just looked at, correct?

17   A     Correct.

18   Q     And you verified that Mr. Flint -- that the courier

19   letter, you know, was a courier letter, right?

20   A     Correct.

21   Q     It identified Mr. Flint as the courier, correct?

22   A     Correct.

23   Q     It identified that he had a diplomatic pouch, right?

24   A     Correct.

25   Q     It was on the letterhead of the international
```

```
 1   organization, right?
 2   A     It was on the courier letter, yes.
 3   Q     And you determined that the letter met all the
 4   requirements in the memo that you had just looked at?
 5   A     Yes.
 6   Q     And the other thing the memo said the passenger had to
 7   have was a diplomatic passport, right?
 8   A     Correct.
 9   Q     And you looked at the ID card that the Government just
10   showed you, correct?
11   A     Correct.
12   Q     And you concluded that that satisfied the requirement of a
13   diplomatic passport?
14   A     Correct.
15   Q     And you were confused because the memo didn't say
16   "passport book"; is that right?
17   A     No, I never said I was confused.
18   Q     Okay.  The memo didn't say "passport book," right?
19   A     Correct.
20   Q     And it didn't say "passport card," right?
21   A     Correct.
22   Q     It said only "passport," correct?
23   A     Correct.
24   Q     Now, Mr. Flint never said to you, "This is a diplomatic
25   passport," correct?
```

```
 1  A     No.
 2  Q     Your conclusion was based solely on looking at the ID,
 3  right?
 4  A     At the card, yes.
 5  Q     At the card.
 6        Now I want to talk about the rest of the screening
 7  process.  So TSA that day screened Mr. Flint's carry-on bag,
 8  right?
 9  A     Yes.  All his property went through screening, correct.
10  Q     His personal bag was -- did go through the x-ray?
11  A     Correct.
12  Q     And Mr. Flint himself, he was screened?
13  A     Correct.
14  Q     And he went through the metal detector that's at the
15  precheck line?
16  A     I don't -- I don't recall which --
17  Q     If it was the metal detector or --
18  A     Correct, I don't remember.
19  Q     But he was screened?
20  A     Yes.
21  Q     Okay.  Now, nothing about the courier letter or the ID
22  card raised any red flags for you?
23  A     No, because the courier letter had the raised seal.  All
24  the numbers, they matched.  I mean, Mr. --
25  Q     I'm sorry, go ahead.
```

1    A    Mr. Flint -- I mean, he looked like he was a seasoned

2    traveler.  He was very well put together.  There was no reason

3    for me to have any suspicion.

4    Q    And he was calm, right?

5    A    Yes, his demeanor was very calm.

6    Q    Now, you testified on direct that now you work for

7    Southwest Airlines.

8    A    Yes, that's correct.

9    Q    And you don't work for TSA anymore?

10   A    Correct.

11   Q    But that's not because of this incident?

12   A    No, it has nothing to do.

13   Q    You actually left with a good report?

14   A    Correct.

15   Q    And you never received any discipline for this, right?

16   A    Correct, nothing.

17              MS. WAKEFIELD:  May I have one moment, Your Honor?

18              THE COURT:  Yes.

19   (Discussion off the record.)

20              MS. WAKEFIELD:  Nothing further.  Thank you.

21              THE COURT:  Yes?  Redirect?

22              MR. YANNIELLO:  May we have a moment, Your Honor?

23              THE COURT:  Yes.

24   (Discussion off the record.)

25                          **REDIRECT EXAMINATION**

```
 1   BY MR. YANNIELLO:
 2   Q    Ms. Wondrasek, I'm going to ask you to look at what's been
 3   marked as Government's Exhibit 28.  It's in the binder next to
 4   you.
 5        (Exhibit 28 for identification.)
 6              THE WITNESS:  This one?
 7   BY MR. YANNIELLO:
 8   Q    Yeah.
 9        Do you recognize those pictures?
10   A    Yes.
11   Q    How do you recognize them?
12   A    Because they were shown to me prior to today.
13   Q    Okay.  Do they appear to be still-frame images from the
14   surveillance video that we just watched?
15   A    Yes.
16              MR. YANNIELLO:  Government would move to admit
17   Government's Exhibit 28.
18              THE COURT:  Any objection?
19              MS. WAKEFIELD:  No, Your Honor.
20              THE COURT:  28 is received.
21        (Exhibit 28 received into evidence.)
22   BY MR. YANNIELLO:
23   Q    So could you just stroll -- take a look at the different
24   images, and can you generally describe who you are conversing
25   with in those.
```

1  A     I'm talking to my supervisor, Joe Stone.

2  Q     And the defendant looks like he's reaching in and pointing

3  at certain areas.  Sorry.

4  A     That's correct.

5  Q     And so you were talking to Mr. Stone during your encounter

6  with the defendant?

7  A     Yes.  I was talking to Joe Stone while we were verifying

8  the documentation, so --

9  Q     So right there when defendant is pointing, are you

10 speaking to him?

11 A     No.

12 Q     So why was he pointing?

13 A     So basically he was volunteering, like when I would ask

14 Joe, "Where is this?" or like where a certain thing was or

15 "Where is the number for the diplomatic pouch?" he would like

16 volunteer like throughout the whole process and just point to

17 what I'm asking Joe.

18 Q     So you were speaking with your supervisor, Mr. Joe Stone,

19 and the defendant was listening to you and answering questions?

20 A     Correct, because he was standing right across the table,

21 so, I mean, he could hear everything.

22 Q     So defense counsel asked you if Mr. Flint represented that

23 his ID card was a diplomatic passport.

24 A     No, I don't remember him saying that.

25 Q     During your encounter with the defendant, did he ever tell

```
 1  you that he was denied entry to O'Hare five days before because

 2  he was told that his ID card was not a diplomatic passport?

 3  A    No, he did not.

 4  Q    And this is the -- I'm showing Government's Exhibit 2.

 5  This is the card that you saw, correct?

 6  A    Correct.

 7  Q    And it has the word "Diplomat" written across it?

 8  A    Correct.

 9  Q    And what's underneath the "Diplomat"?

10  A    It says "Passport," and it has the number.

11           MR. YANNIELLO:  Nothing further, Your Honor.

12           THE COURT:  Recross?

13           MS. WAKEFIELD:  No, Your Honor.

14           THE COURT:  Thank you, Ms. Wondrasek, for your

15  testimony.

16           THE WITNESS:  Thank you.

17           THE COURT:  May the witness be excused?

18           MR. YANNIELLO:  Yes, Your Honor.

19           THE COURT:  Yes?

20           MS. WAKEFIELD:  Yes.

21           THE COURT:  Thank you very much.

22      Next?

23           MS. RO:  United States calls Ms. Fahima Danishgar to

24  the stand.

25           THE COURTROOM DEPUTY:  Good morning, ma'am.  Would
```

```
 1    you please come forward.
 2              THE WITNESS:  Good morning.
 3              THE COURTROOM DEPUTY:  Would you please stop right
 4    there and raise your right hand to be sworn.
 5         FAHIMA DANISHGAR, GOVERNMENT WITNESS, WAS SWORN
 6              THE WITNESS:  I do.
 7              THE COURTROOM DEPUTY:  Thank you.  Would you please
 8    be seated.
 9         Ma'am, for the record, would you please state your name,
10    and spell your last name.
11              THE WITNESS:  Yes.  My name is Fahima Danishgar.  My
12    last name is spelled D-a-n-i-s-h-g-a-r.
13              THE COURTROOM DEPUTY:  Thank you.
14              THE COURT:  Your witness.
15                        DIRECT EXAMINATION
16    BY MR. YANNIELLO:
17    Q    Good morning, Ms. Danishgar.  How are you?
18    A    I'm well, thank you.
19    Q    And where do you work?
20    A    I work for the U.S. Department of State's Office of
21    Foreign Missions.
22    Q    And what is the Office of Foreign Missions?
23    A    The Office of Foreign Missions is interested with
24    accrediting, recognizing foreign diplomats that are based in
25    the United States.
```

```
 1   Q     And one step back, what is the United States state
 2   department?
 3   A     The state department is the lead U.S. agency for foreign
 4   affairs.
 5   Q     And you mentioned Office of Foreign Missions.  Is the word
 6   "missions" defined?
 7   A     A mission can be an embassy, consulate or international
 8   organization that represents a foreign government here in the
 9   U.S.
10   Q     And do you have a specific title?
11   A     I am a foreign affairs officer.
12   Q     And what are some of your duties as a foreign affairs
13   officer?
14   A     I accredit individuals that are -- that work for foreign
15   missions, as well as the World Bank.  I provide immunities and
16   privileges and services to these foreign missions that are
17   based here in L.A.
18   Q     And if I could turn your direction to Government's Exhibit
19   binder -- it's one of the black binders, and it says "United
20   States" -- it has a seal on it.
21   A     Yes.
22   Q     If I could turn your attention to what's been previously
23   identified as Government's Exhibit 33.
24         (Exhibit 33 for identification.)
25              THE WITNESS:  Yes.
```

**UNITED STATES DISTRICT COURT**

1    BY MS. RO:

2    Q     And what is this?

3    A     This is the Department of State's Office of Foreign

4    Missions, Official Guidance to the Diplomatic Community on --

5    it looks like Diplomatic Pouch and Diplomatic Mail Use.

6    Q     And is this publically available?

7    A     Yes, it's available on our website.

8              MS. RO:  Your Honor, I don't believe there's an

9    objection.

10             MR. HARBAUGH:  None, Your Honor.

11             MS. RO:  United States would move to admit

12   Exhibit 33.

13             THE COURT:  33 is received.  Thank you.

14        (Exhibit 33 received into evidence.)

15   BY MS. RO:

16   Q     Does the United States department maintain a database that

17   recognizes diplomats or missions with some type of diplomatic

18   status?

19   A     Yes, we do.  It's called a TOMIS database.

20   Q     What is the purpose of the TOMIS database?

21   A     The TOMIS database is the U.S. Government's repository of

22   information for all foreign missions and their members that are

23   accredited and recognized in the U.S.

24   Q     And what does -- can you spell TOMIS?

25   A     Yes, it's T-O-M-I-S.

```
1    Q     Do you know what it stands for?

2    A     I don't, I'm sorry.

3    Q     And I apologize, one more time, what information does a

4    TOMIS database contain again?

5    A     The TOMIS database contains information specifically about

6    the name, assignment, the mission that the individual is

7    assigned to, physical location, family member information and

8    such.

9    Q     And how is this database maintained?

10   A     The database is maintained electronically with our office.

11   We are the responsible agency for maintaining it.

12   Q     And how often is it updated?

13   A     It's constantly updated on a daily basis.

14   Q     And what type of information does it contain to the

15   specific mission inside your database?

16   A     It includes information about the accreditation,

17   immunities, privileges and services that that mission or

18   mission member is granted by the state department.

19   Q     And in this database, were you asked to enter or search

20   the name Daniel Flint?

21   A     Yes, I was.

22   Q     And what, if anything, did you find in the TOMIS database?

23   A     I didn't find anything.

24   Q     Did you enter "International Human Rights Commission" into

25   this database?
```

```
1   A     I did.

2   Q     And what, if anything, did you find?

3   A     I didn't find anything.

4   Q     And would the database contain information on an

5   international organization?

6   A     Yes, absolutely.

7   Q     And were you asked to enter the search term "International

8   Human Rights Commission Relief Trust Fund" into this database?

9   A     Yes.

10  Q     And what, if anything, did you find?

11  A     No record.

12  Q     Were you asked to enter the name Robert Shumake --

13  spelling S-h-u-m-a-k-e -- into the database?

14  A     Yes I was.

15  Q     And what, if anything, did you find?

16  A     Mr. Shumake was accredited with the Office of Foreign

17  Missions, our office, for a certain period of time as an

18  honorary consul.

19  Q     Do you recall who he was -- or first, what is honorary

20  consul?

21  A     So an honorary consul is not an official diplomat but

22  usually a U.S. citizen or green card holder who has been asked

23  on a voluntary basis to perform foreign duties on behalf of a

24  foreign government.

25  Q     And who was he an honorary consul for?
```

```
 1   A     I believe it was Tanzania and Botswana.

 2   Q     And was he still accredited as an honorary consul for

 3   Botswana and Tanzania in July 2017?

 4   A     No, he was terminated in our database in 2015.

 5   Q     And does the database contain information about an active

 6   status or termination status?

 7   A     Yes, it does.

 8   Q     And also with a termination date?

 9   A     Yes.

10   Q     And, again, was there any organization called the

11   International Human Rights Commission or International Human

12   Rights Commission Relief Trust Fund inside this database?

13   A     No.

14            MR. HARBAUGH:  Objection; asked and answered.

15            THE COURT:  Overruled.

16            MS. RO:  Nothing further, Your Honor.

17            THE COURT:  Your witness.

18            MR. HARBAUGH:  Thank you, Your Honor.

19                        CROSS-EXAMINATION

20   BY MR. HARBAUGH:

21   Q     Ms. Danishgar, the TOMIS database is not available to the

22   public?

23   A     That's correct.

24   Q     So a person in the public can't simply go online and check

25   the database themselves?
```

UNITED STATES DISTRICT COURT

1  A     It's not a published format, no.

2  Q     So -- and you were asked -- so you were asked by

3  Special Agent Simon to identify -- to go into the database,

4  correct?

5  A     Yes.

6  Q     So you were asked to check for the IHRC?

7  A     Yes.

8  Q     For Daniel Flint?

9  A     Correct.

10 Q     And then you were asked to check the database for

11 Mr. Shumake?

12 A     Correct.

13 Q     Now, in the database Mr. Shumake was recognized as an

14 honorary consul?

15 A     Correct.

16 Q     Honorary consuls, unlike career consuls, are permitted to

17 carry on other business, right?

18 A     I didn't understand the question.

19 Q     Well, here, let me back up.  So honorary consuls are

20 either American citizens?

21 A     Or green card holders, correct.

22 Q     They perform consular services on a part-time basis,

23 right?

24 A     Yes, they can.

25 Q     And I want to distinguish, there's a career consul, right?

```
 1   A     Yes, a professional diplomat.
 2   Q     Yes.  The professional diplomat, they perform the
 3   diplomatic duties full time, correct?
 4   A     They are an official representative of their Government,
 5   correct.
 6   Q     And so they perform the duties full time, right?
 7   A     Yes, they can.
 8   Q     Now, an honorary consul can carry on other business,
 9   correct?
10   A     Yes.
11   Q     Now, honorary consul -- sorry.  Honorary consuls have
12   official-act immunity, correct?
13   A     Yes.  It's very limited.
14   Q     Honorary --
15               THE COURT:  You have to move back towards the
16   lectern, please.  You are moving away from the microphone.
17   BY MR. HARBAUGH:
18   Q     Honorary consuls have official-act immunity, correct?
19   A     It's limited official-acts immunity, correct.
20   Q     Now, honorary consuls are recognized by the state
21   department?
22   A     Yes, we do.
23   Q     Honorary consuls are established under Article 68 of the
24   Vienna Convention on consular relations?
25   A     Yes.
```

1    Q    To establish someone as an honorary consular officer, the

2    embassy must submit a diplomatic note?

3    A    Correct.

4    Q    Now, the request does not mean that that person is

5    automatically approved by the state department, correct?

6    A    That is correct.

7    Q    The state department retained the discretion to determine

8    whether an individual is acceptable to the U.S. as an honorary

9    consular officer?

10   A    Correct.

11   Q    Now, the state department expects foreign governments to

12   seek to nominate individuals of good standing and reputation in

13   the community, correct?

14   A    We hope that is the case, yes.

15   Q    And that's actually your guidance to -- on the state

16   department website on how handling -- how honorary consul are

17   handled, right?

18   A    Correct.

19   Q    Now, once an honorary consul is approved by the state

20   department, they are given a diplomatic identification card?

21   A    They are given a consular -- it's an honorary consular ID

22   card.  It's very different from a diplomatic ID card.

23   Q    So I want -- let's talk about the various types of

24   identification cards that are issued by the state department so

25   we can understand.

```
 1          Now, as an employee of the state department, you were
 2   aware of the state department's guide called Diplomatic and
 3   Consular Immunity?
 4   A     Yes.
 5   Q     You've reviewed this guide?
 6   A     I've worked with it, yes.
 7   Q     In fact, you've reviewed this guide in connection with
 8   your work on this case, right?
 9   A     I'm not sure I understand.
10   Q     Please take a look at Defense Exhibit 207.
11         (Exhibit 207 for identification.)
12   BY MR. HARBAUGH:
13   Q     Please, it is in a larger binder.
14              THE COURTROOM DEPUTY:  Let me assist you, please.
15              THE WITNESS:  Thank you.
16         Yes, this is the guidance.
17   BY MR. HARBAUGH:
18   Q     Just one moment, please.
19              THE COURT:  I don't have a defense exhibit list.
20   Did you provide?
21              THE COURTROOM DEPUTY:  They did not provide a list.
22              THE COURT:  It's in the binder.  Which binder?
23              MR. HARBAUGH:  It's the larger --
24              THE COURT:  I have the big one.
25              MR. HARBAUGH:  It's not the white one, Your Honor.
```

**UNITED STATES DISTRICT COURT**

1    I believe it's the black one, defense.

2    Q    So the first question is do you recognize that document?

3    A    I do.

4    Q    And that is the diplomatic and consular immunity?

5    A    Guidance for law enforcement and judicial authorities,

6    correct.

7    Q    Yes.  Now, please turn your attention to page 32 of

8    Defense Exhibit 207.

9    A    Yes, I see it.

10   Q    Now, at the bottom of the page is an image of the ID card

11   for an honorary consul, correct?

12   A    Yes.

13   Q    Now, let's talk about some of the features of the honorary

14   consul identification card.  It's -- an honorary consul

15   identification card is a photo ID, correct?

16   A    Yes.

17   Q    It has a red border on it, correct?

18   A    Uh-huh, correct.

19   Q    The red border is used to signify consular status,

20   correct?

21   A    Yes.  All of the cards have the red border, yes.

22             MS. RO:  Your Honor, I apologize.  Can I confer with

23   counsel regarding this exhibit?

24             THE COURT:  Sure.

25        (Discussion off the record.)

1          THE COURT:  Is there any objection to its receipt?

2          MR. HARBAUGH:  Your Honor, we're not moving to

3     introduce --

4          MS. RO:  No objection.

5          MR. HARBAUGH:  We are not moving to introduce the

6     document.

7          THE COURT:  It's --

8          MR. HARBAUGH:  Your Honor --

9          MS. RO:  Your Honor, the United States are objecting

10    for the lack of receiving of the evidence if it's being

11    mentioned page by page on the record.

12         THE COURT:  How many pages are you going to refer

13    to?

14         MR. HARBAUGH:  Your Honor, we're just simply asking

15    her her information regarding the characteristics of the

16    honorary consul ID card.  We will move on.

17    Q    So the state department issues a diplomatic ID card for

18    consuls for six years from the date of issuance, correct?

19    A    I believe it's five.  It's five years.

20         MR. HARBAUGH:  One moment, Your Honor.

21         (Pause in proceedings.)

22    BY MR. HARBAUGH:

23    Q    Now, in reviewing the TOMIS database, you learned that

24    Robert Shumake was registered as an honorary consul by the

25    state department, correct?

```
 1   A     Yes.
 2   Q     That Mr. Shumake was recognized as honorary consul for
 3   Botswana?
 4   A     Correct.
 5   Q     And honorary consul for Tanzania?
 6   A     Correct.
 7   Q     And the state department issued Mr. Shumake a consular
 8   identification card in 2012, correct?
 9   A     Yes.
10   Q     And Shumake's state department diplomatic ID remained
11   valid until 2018, correct?
12   A     Yes.
13   Q     Please take a look at Defense Exhibit 114 marked for
14   identification, and it is in the white binder.
15         (Exhibit 114 for identification.)
16            THE WITNESS:  I'm sorry, what was the number?
17   BY MR. HARBAUGH:
18   Q     114, all the way to your right -- left, I'm sorry.
19   A     114, yes.
20   Q     Now, you have previously seen this photograph, correct?
21   A     Yes.
22   Q     It's a photograph of a consular identification card,
23   correct?
24   A     I'm sorry, you said 114, correct?  Am I looking at the
25   correct --
```

```
 1   Q     One moment.
 2         Yes, it should be a photograph of a consular
 3   identification card.
 4   A     No, I don't see a consular identification card here.
 5         Sorry, I was looking at the wrong place.
 6   Q     Sorry for the confusion.  It's a very bulky binder.
 7         So you were previously shown this photograph, correct?
 8   A     Yes.
 9   Q     And you recognize this as a consular identification card?
10   A     Yes.  It appears to be a consular -- or photograph or a
11   copy of a consular ID card.
12   Q     And it has the identical features as a consular
13   identification card that you recognize issued by the state
14   department?
15              MS. RO:  Objection, Your Honor; lack of foundation.
16   The witness has stated this is a photograph of what appears --
17              THE COURT:  Don't argue.  Just state the grounds.
18              MS. RO:  Yes, Your Honor.  Objection; foundation.
19              THE COURT:  Ask the question again, please.
20   BY MR. HARBAUGH:
21   Q     This photograph has the identifying features of a consular
22   identification card, correct?
23              THE COURT:  Objection overruled.
24              THE WITNESS:  I can't say a hundred percent just
25   looking at the photograph.  It appears to look like a consular
```

1    ID card.

2    BY MR. HARBAUGH:

3    Q    It has the red border, correct?

4    A    Yeah, but -- I'm sorry, I can't see the security markings

5    on it; therefore, I can't state a hundred percent that this is

6    truly generally a consular ID card.

7    Q    The -- well, going back, you know that Mr. Shumake was

8    issued a consular identification card based upon your review of

9    the TOMIS database?

10   A    Yes, he was.

11   Q    And this photograph appears to be a true and correct copy

12   of the photograph of Mr. Shumake's identification card issued

13   by the state department?

14            THE COURT:  Are you offering 114?

15            MR. HARBAUGH:  Yes, Your Honor.

16            THE COURT:  Any objection?

17            MS. RO:  No objection.

18            THE COURT:  114 is received, and publish for the

19   jury, please.

20        (Exhibit 114 received into evidence.)

21   BY MR. HARBAUGH:

22   Q    Now I would like to point out some of the features on the

23   card.  So there is a PID.  What is that?

24   A    A PID is a personal identification number that we use and

25   assign to consular and honorary consul members.

1    Q    All right.  And what is here, what I just circled on the

2    image, please?

3    A    It appears to be an expiration date.

4    Q    And what does that date state?

5    A    That date states January 31st of 2018.

6    Q    Now, you have -- you indicated that Mr. Shumake's consular

7    status --

8              THE COURT:  You need to stand by the lectern,

9    please.

10   BY MR. HARBAUGH:

11   Q    You indicated that Mr. Shumake's consular status expired

12   in 2015, correct?

13   A    Correct.  He was terminated in the TOMIS database in 2015,

14   and by law, this identification should have been returned to

15   our office within 30 days.

16   Q    And you have no evidence to indicate that this

17   identification was returned to you following his termination?

18   A    In the TOMIS database, when identifications are returned,

19   it's marked as such.

20   Q    And the TOMIS database did not indicate that Mr. Shumake

21   returned his identification card to the state department?

22   A    Correct.

23             THE COURT:  And with that, we are going to take the

24   morning recess.  Please return at a quarter to, a 15-minute

25   recess.  During your absence do not discuss the case amongst

```
 1   yourself or with any other person, please.

 2              THE COURTROOM DEPUTY:  All rise for the jury,

 3   please.

 4        (Recess taken from 10:29 a.m. to 10:47 a.m.)

 5        (Outside the presence of the jury.)

 6              THE COURTROOM DEPUTY:  Please come to order.  This

 7   court is again in session.

 8        (Pause in proceedings.)

 9              THE COURT:  Please have a seat.  We are waiting

10   for -- do we have all lawyers back?  Yes, we do.  Okay.

11              MR. HARBAUGH:  Your Honor, the defense does want --

12   the Government intends to admit additional pages from the guide

13   that was discussed but not admitted by the defense.

14              THE COURT:  Uh-huh.

15              MR. HARBAUGH:  It's beyond the scope, and it exceeds

16   the basis for her expert notice disclosure in response to our

17   motion.

18              THE COURT:  Well, if it's offered, you can make your

19   objection; the Court will rule.

20              MS. RO:  And, Your Honor, just to clarify, the

21   Government didn't call her as an expert.

22              THE COURT:  Again, if an exhibit is offered, I'll

23   entertain an objection, and then I will rule.

24              MS. RO:  Yes, Your Honor.  Thank you.

25              THE COURTROOM DEPUTY:  Your Honor, are we ready?
```

```
 1                    THE COURT:  Yes.

 2                    THE COURTROOM DEPUTY:  All rise for the jury,

 3      please.

 4          (In the presence of the jury.)

 5                    THE COURT:  We have the jury reassembled with the

 6      alternate, and we have all counsel present with the defendant.

 7      Please have a seat.  And we continue with our witness.

 8                    THE COURTROOM DEPUTY:  She's outside.

 9                    THE COURT:  And that's Ms. Danishgar, and I believe

10      she's on her way in.

11          You may continue with the examination.

12                    MR. HARBAUGH:  Defense has no more questions,

13      Your Honor.

14                    THE COURT:  Okay.  Before the Government starts, if

15      you could just educate me in terms of the types of passports

16      that the U.S. Government issues.  There's a passport that every

17      citizen can apply for.  That's the blue one?

18                    THE WITNESS:  Correct.

19                    THE COURT:  Then there's an official passport, and

20      that's the maroon one?

21                    THE WITNESS:  Correct.

22                    THE COURT:  And then there's a diplomatic passport?

23                    THE WITNESS:  Yes, it's a black one.

24                    THE COURT:  Are there any other types of passports?

25                    THE WITNESS:  That the U.S. issues, no, not that I'm
```

1    aware of.

2              THE COURT:  So what's the difference between an

3    official passport and a regular passport?

4              THE WITNESS:  An official passport is used when the

5    individual is traveling in the capacity or on behalf of the

6    government for official business, and if it's a diplomatic

7    passport, then the individual is an official representative of

8    the U.S. government traveling on behalf of the U.S. government

9    to conduct business overseas.

10             THE COURT:  Is there a document that's referred to

11   as a passport card?

12             THE WITNESS:  Yes.  There is a passport card which

13   is used to cross borders between the U.S., Canada, and Mexico.

14             THE COURT:  Only?  Is it -- is a passport card the

15   same as a passport?

16             THE WITNESS:  It is not.

17             THE COURT:  And what's the difference between the

18   two?

19             THE WITNESS:  So the border crossing or -- sorry.

20   The passport cards are only used to cross land borders.

21             THE COURT:  So land borders being Mexico and Canada?

22             THE WITNESS:  Yes, Your Honor.

23             THE COURT:  Thank you.

24                        **REDIRECT EXAMINATION**

25   BY MS. RO:

1    Q    A quick follow-up to the Court's question, Ms. Danishgar.
2    Is there a diplomatic passport card?
3    A    Not that I'm aware of.  No, there is not.
4    Q    Defense counsel asked you about the TOMIS database, that's
5    T-O-M-I-S, and asked if it was publically available.  And your
6    response was a bit hesitant and did not --
7              THE COURT:  Just ask the question.  Don't describe
8    her response, please.
9    BY MS. RO:
10    Q    And you answered it's not a published format.  Can you
11    explain that.
12    A    Sure.  So the TOMIS database is an internal database that
13    the U.S. Government maintains, specifically our office, but we
14    do publically announce all of the accreditations through a
15    publication called the Blue Book, which includes all of the
16    accredited personnel to missions and organizations in the U.S.
17    That's the public format.
18    Q    And is that also available publically on the Internet
19    online?
20    A    Yes.  I believe it's available through the state
21    department's general website.
22    Q    And do you need a special permission to access that?
23    A    No, it's available to the public.
24    Q    And you were also asked about accreditation processes in
25    cross-examination.  Can you further unpack that statement?

```
 1    What is the accreditation process?

 2    A     So the accreditation process is a method, a way of

 3    recognizing the diplomats or officials of that country that are

 4    assigned here in the U.S.  They are recognized by the U.S.

 5    government to have certain privileges and immunities, and

 6    that's the accreditation process.

 7    Q     And what is required on the mission's part to get

 8    accredited by the United States department?

 9    A     So a mission or a representative office of that country

10    will submit a notification on behalf of that individual who is

11    to work in the U.S. for that government to our office.  That

12    will include their visa information.  It will include their

13    diplomatic passport information.  It will include their

14    assignment location and what their job title is.  And then our

15    office will accept it and accredit them accordingly.

16    Q     I want to discuss some of the testimony in

17    cross-examination regarding Defendant's Exhibit 207.

18    A     I don't think I have that.  207?

19               THE COURTROOM DEPUTY:  Let me assist you again.

20    Okay?

21               THE WITNESS:  Thank you.

22               THE COURTROOM DEPUTY:  Here we are.

23               THE WITNESS:  Thank you.

24               THE COURTROOM DEPUTY:  You're welcome.

25    BY MS. RO:
```

```
 1   Q     You were asked by defense counsel if this is published by
 2   the United States Department of State Office of Foreign
 3   Missions, correct?
 4   A     Yes.
 5   Q     And is this publically available?
 6   A     Yes.  It's given to law enforcement, yes.
 7   Q     And you were asked --
 8              THE COURT:  Well, is it publically available?
 9              THE WITNESS:  It's on our website, yes.
10   BY MS. RO:
11   Q     So anyone can access it on the website?
12   A     Yes, anyone can access it.
13   Q     And you testified to -- what is Defense Exhibit 207?  Can
14   you explain that again?
15   A     Yeah, sure.  So this is a publication that the Department
16   of State's Office of Foreign Missions, my office, puts out, and
17   it's guidance on diplomatic and consular immunity for law
18   enforcement or anyone who's interested in judicial authorities.
19   It explains the immunities or privileges that individuals are
20   entitled to.
21   Q     And you were asked to describe certain cards,
22   identification cards, given by the state department, correct?
23   A     Yes.
24   Q     And does this document contain the various types of
25   identification cards issued by the state department to
```

1    missions?

2    A    I believe so.  Just let me have a look.  One second.

3          Yes, it does.  It includes all of our documents that we

4    issue, including consular cards.

5    Q    And defense counsel specifically asked you about the

6    identification cards.

7    A    Yes.

8          MS. RO:  Your Honor, at this time, the United States

9    would like to admit what's been now marked as Government's

10   Exhibit 66, which only includes three pages of Defense Exhibit

11   207, specifically the pages, Your Honor, if I may -- can I

12   identify them by the Bates numbering on the bottom for the

13   Court and the record?

14         THE COURT:  Yes, yes, please.

15         MS. RO:  The first page is USAO_001686.  It's just

16   the front page.  The second page is further back, USAO_001723.

17   It's Appendix A for the identifying documents.  And the last

18   page, just the third page is USAO_001725.

19         THE COURT:  Let me review those pages.

20         MR. HARBAUGH:  Your Honor, I will make it easy.  No

21   objection.

22         THE COURT:  1686, 1723 and 1725 of Exhibit 207

23   received.

24         MS. RO:  And, Your Honor, it would be Government's

25   Exhibit 66.

```
 1                 THE COURT:  Well --
 2                 MS. RO:  But yes.
 3                 THE COURT:  It doesn't matter.  It will be
 4     Government's Exhibit 66.
 5          (Exhibit 66 received into evidence.)
 6     BY MS. RO:
 7     Q    Publishing to the jury and in front of your screen,
 8     Ms. Danishgar, what is this page?
 9     A    That's the cover page for the guide or publication that
10     was just mentioned.
11     Q    I'm showing you the second page of Government's
12     Exhibit 66.  What is this page?
13     A    This is pertaining to the diplomatic and embassy
14     identification cards our office issues.  It has examples of.
15     Q    Going through the first -- zooming in on the two cards
16     listed, can you describe each card to the jury.
17     A    Sure.  So the first one with the blue on the top is a
18     diplomatic identification card.  These are issued to members of
19     the foreign community or foreign missions community who work at
20     embassies.
21     Q    And how does one receive this specific card from the
22     Department of State?
23     A    They would have to be accredited as an official diplomat
24     of that sending state or nation.
25     Q    And how would the state department know they are an
```

1    official diplomat from the sending nation?

2    A    We would receive a diplomatic note from the sending

3    Government or from the embassy, as well as a notification of

4    appointment, through our EGO system, which connects to our

5    TOMIS database to pertain to the assignment off the individual,

6    the location of, their diplomatic passport information, and

7    their diplomatic visa that they were granted.

8    Q    Do they have to show a separate diplomatic passport to the

9    state department?

10   A    Yes, they do in order to get that diplomatic visa.

11   Q    And you mentioned an embassy.  Does that also apply to

12   international organizations as well?

13   A    Yes, it does.

14   Q    And does the diplomatic status stem from the organization,

15   or can individuals hold it on their own?

16   A    Diplomatic status stems from the organization or the

17   country that they are assigned from.

18   Q    And zooming into the green card now, is that the same or

19   different type of identification card?

20   A    So this is -- there are two categories.  This one is given

21   to administrative and technical employees and their family

22   members at embassies, so it's different.  They are not an

23   official diplomat, but they are a technical -- technical or

24   administrative staff at the embassy.

25   Q    And are either of these cards, quote/unquote, a diplomatic

1   passport card?

2   A    Not at all.

3   Q    And are there certain security features on the types of

4   cards that are issued from the Department of State?

5   A    Yes.  We have security features.  It's hard to tell from

6   the copy here, but if you look over the photos of the

7   individuals, there's the flag, and there's a reflector that's

8   kind of shown here.  It's hard to see.  There's a security

9   marking there as well.

10            MS. RO:  Your Honor, if I may have the case agent

11   hand Mr. Cruz Government's Exhibit 1 that's already been

12   admitted into evidence.

13            THE COURT:  Yes.

14   BY MS. RO:

15   Q    Have you seen that item before?

16   A    Yes, I have.

17   Q    Can you review that physical item?

18   A    I have.

19            MS. RO:  Also publishing to the jury a photocopy of

20   the physical item being held by this witness.  This is -- the

21   photocopy published is Government's Exhibit 2.

22   Q    Does this have the security requirements issued by the

23   state department?

24   A    No, it doesn't.

25   Q    Is this a diplomatic passport card?

```
 1  A     No, it's not.
 2              MS. RO:  Nothing further, Your Honor.
 3              THE COURT:  Recross?
 4              MR. HARBAUGH:  Nothing, Your Honor.
 5              THE COURT:  Thank you, Ms. Danishgar, for your
 6  testimony.
 7       May the witness be excused?
 8       Are you -- is your duty station here in Los Angeles?
 9              THE WITNESS:  Yes.
10              THE COURT:  Okay.  Thank you.
11              THE WITNESS:  Thank you.
12              THE COURT:  Next?
13              MS. RO:  The United States calls Michael Duretto to
14  the stand.
15              THE COURTROOM DEPUTY:  Good morning, sir.  Would you
16  please come forward.
17       Would you please stop right there and raise your right
18  hand to be sworn.
19          MICHAEL DURETTO, GOVERNMENT WITNESS, WAS SWORN
20              THE WITNESS:  I do.
21              THE COURTROOM DEPUTY:  Thank you, sir.  Please be
22  seated.
23       Sir, for the record, would you please state your name, and
24  spell your last name.
25              THE WITNESS:  Michael John Duretto, D-u-r-e-t-t-o.
```

```
 1              THE COURT:  Your witness.
 2              MS. RO:  Thank you, Your Honor.
 3                      DIRECT EXAMINATION
 4   BY MS. RO:
 5   Q    What is your current occupation?
 6   A    Currently I'm an assistant federal security director for
 7   security operations at Los Angeles International Airport.
 8   Q    And what are some of your duties for that position?
 9   A    Primarily I oversee and maintain the integrity of the
10   security screening operation for both checkpoint and baggage.
11   Q    And how long have you held that position?
12   A    I've had this position -- it will be two years in January.
13   Q    And have you held any prior positions within the
14   Transportation Security Administration?
15   A    Yes, I have.
16   Q    And if you could briefly explain that to the jury, list
17   them and their duties.
18   A    Sure.  I started with the agency in 2005 as a uniformed
19   transportation security officer, so I was a frontline screening
20   officer.  I held that position for just slightly over a year.
21   Then I promoted to a lead transportation officer.  I held that
22   position for approximately a year.
23        From there I promoted to a supervisory transportation
24   security officer, which is the first level of management within
25   our agency.  I was the supervisor for one year.  From that
```

1    position I promoted to what we call a transportation security

2    manager, which there are two levels.  I promoted to the first

3    level of what we call a duty manager.  And my areas of

4    responsibility were basically overseeing a terminal, either a

5    shift -- an a.m. shift or p.m. shift, so overseeing the

6    security operation for a particular shift.

7         I was a duty manager for a little -- about a year and a

8    half, just under two years, and then I promoted to the second

9    level of manager, which is lead manager.  And a lead manager,

10   the area of responsibility increases.  You then have

11   responsibility over an entire terminal for the entirety of the

12   operating hours.

13        I was in that position for about eight months, and then I

14   was detailed to a senior advisor position with our federal

15   security director.  And my responsibilities in that position

16   was to basically advise the director on things and nature of

17   policy, procedures, anything related to the screening

18   operation.  Served in that capacity for about eight months, and

19   then I promoted to a deputy assistant federal security

20   director, which, again, the area of responsibility expands.

21        At the time I had two terminals with direct reports,

22   approximately 500 direct reports coming to me.  Served as a

23   deputy assistant federal security director for five years, and

24   then promoted to my current position in January of 2017, as an

25   assistant federal security director.  And now I have -- I

```
 1   oversee half the airport, so four terminals.  My direct reports
 2   are approximately about 1150 to 1200 officers.
 3   Q    So approximately how many years have you worked within the
 4   Transportation Security Administration?
 5   A    It will be 14 years this January.
 6   Q    And has that exclusively been in the Los Angeles
 7   International Airport?
 8   A    Yes, it has.
 9   Q    Are there any specific security requirements when
10   individuals want to check luggage or carry-on luggage, things
11   of that nature?
12   A    Yes.
13   Q    And what are they?
14   A    Anybody that's wishing to travel or enter the airport
15   area, the nonpublic side of the airport, is required to
16   undergo -- it would be a hundred percent screening on all
17   persons and all property.
18   Q    Is that just at the Los Angeles International Airport?
19   A    No, that would be national and international as well.
20   Q    And you mentioned a nonpublic area.  What is a nonpublic
21   area?
22   A    Nonpublic area is something we would refer to as the
23   sterile area.  And basically the easiest definition to give to
24   that is anybody that passes into the sterile area is someone
25   who has successfully completed screening with TSA and they are
```

```
 1   cleared for travel or boarding of an aircraft.
 2   Q    You mentioned that bags get screened by the Transportation
 3   Security Administration.  If bags -- what happens when bags
 4   containing cash get screened by the Transportation Security
 5   Administration?
 6   A    Well, typically, if it's large amounts of cash, then one
 7   of the things we look for -- x-ray operators look for is
 8   organic material on their x-ray monitors, and that typically
 9   shows up as something in a dense, orange color.  And explosives
10   are made from organic materials, so, obviously, one of the
11   things that we look for that's key is that organic material.
12   So what's that showing up on an x-ray screen, that would be a
13   red flag for us to pull that bag for secondary screening.
14   Q    And it would lead to secondary screening?
15   A    Yes.
16   Q    And what is secondary screening?
17   A    Secondary would be a property search of the contents of
18   that item.  Put another way, organic mass would be what we
19   designate as an alarm or an anomaly, and every anomaly and/or
20   alarm must be resolved prior to being cleared into the sterile
21   area.
22   Q    And does that secondary screening take time?
23   A    Yes.
24   Q    And you defined sterile area to the jury.  Does that
25   definition -- is that only for the Los Angeles International
```

```
 1  Airport?
 2  A     No.  That would be for --
 3             MS. WAKEFIELD:  Your Honor, I would object to
 4  questions beyond the scope of LAX.
 5             THE COURT:  Overruled.
 6             THE WITNESS:  No, that would pertain to all airports
 7  nationwide.
 8             MS. RO:  Your Honor, may I have a quick moment?
 9        (Discussion off the record.)
10  BY MS. RO:
11  Q     Directing your attention to the Government's exhibit
12  binder, there's many binders but it's black, and it has blue
13  colors as dividers, and the cover should have a seal on it.
14  A     Trial exhibits?
15  Q     Yes.
16             THE COURT:  What number?
17             MS. RO:  45, Your Honor.
18  Q     If you could turn your direction to Government's Exhibit
19  45.
20        (Exhibit 45 for identification.)
21             THE COURT:  Any objection to 45?  If you look at the
22  list, the Government's exhibit list, it's easier.
23             MS. WAKEFIELD:  No objection.
24             THE COURT:  45 is received.  And you may publish so
25  we can move it along, please.
```

```
 1           (Exhibit 45 received into evidence.)
 2    BY MS. RO:
 3    Q     Please describe this exhibit.  What is it?
 4    A     So this is a bird's eye view of Terminal 3 at Los Angeles
 5    International Airport.
 6    Q     And please describe the sterile area of this image.
 7    A     So there's --
 8    Q     And feel free to use the screen.  You can mark --
 9    A     Oh, I can?
10    Q     Yes.
11    A     Okay.  Excellent.
12          So there's a couple different colorations on this
13    particular map.  The purple area would constitute what we call
14    the security checkpoint screening area.  So the front part of
15    that would be nonsterile.  That's where passengers would get in
16    line to proceed through the security checkpoint.  And
17    ultimately, this more pinkish area, as well as the blue area,
18    would be what we call sterile.  So once a person passes through
19    the security checkpoint, they do enter the sterile area, and
20    the sterile area does include the airfield and the aircraft.
21    Q     So you mentioned how one can enter the sterile area.  If I
22    may, if I'm pointing an arrow this way -- or I guess the
23    appropriate is this way, is that one way to enter the sterile
24    area?  And, for the record, it's an arrow pointing into the
25    direction of the security checkpoint coming from the public
```

1    entry for Los Angeles International Airport.

2    A    Yes, that would be one way to enter the sterile area.

3    Q    And what is another way to enter the sterile area?

4    A    Another way would be deplaning an aircraft, you are

5    entering a sterile area.

6    Q    And what do you mean by "deplaning an aircraft"?

7    A    Every flight has an originating and destination location

8    both in the originating and destination.  On the originating

9    side you will go through the jet bridge to actually board the

10   aircraft.  That is all sterile, as is the aircraft.  And on the

11   destination side, when you arrive at your destination airport,

12   when you deplane, the aircraft, the jet bridge, and the area

13   you walk into is still sterile.

14   Q    So if passengers deplane, would they be coming through

15   this way?  And, for the record, it's an arrow pointing from the

16   blue area of the image from a destination flight would be

17   coming from.

18   A    Yes.  So specifically the blue area would be the airfield

19   itself where the planes taxi, and some of these smaller -- I

20   will mark them here, the appendages is the jet bridges.  An

21   aircraft would pull into the jet bridges, and people would go

22   into the sterile area from there.

23   Q    So, again, once people land at LAX and they deplane, do

24   they enter a sterile area?

25   A    Yes.

1   Q     When people deplane and enter the sterile area, do the

2   same security requirements apply, as you described before?

3   A     Yes.

4   Q     So does a person have to have been screened?

5   A     Yes.

6   Q     Do their carry-on items have to have been screened?

7   A     Yes.

8   Q     Are you familiar with the term "diplomatic pouch"?

9   A     I am.

10  Q     And how are you familiar?

11  A     I've had experience, both as a security officer clearing

12  diplomatic pouches and also management capacity and

13  senior-level management capacity of clearing those items,

14  proper screening procedures for those items.

15  Q     And is there a certain protocol you need to follow -- what

16  are the proper screening requirements?

17  A     Well, in order to be screened, the diplomatic pouch first

18  must meet specific criteria.

19  Q     And what is the specific criteria?

20  A     The specific criteria would be, number one, the item

21  that -- so diplomatic pouches are exempt if they meet the

22  proper criteria to constitute a diplomatic pouch, then that

23  item or items are exempt from screening.  In order to reach

24  that level, one of the first things that must be presented --

25  and typically, in my experience, how the process has played out

1    is a diplomatic courier most times is the individual that is

2    bringing a diplomatic pouch through an airport.

3         They just by nature of having done it previously, will

4    notify someone at the security checkpoint, usually a manager or

5    supervisor, to alert them that they have a diplomatic pouch.

6    At that point the supervisor or manager will engage in the

7    process, and on the pouch itself they are going to look for

8    specific distinctive markings:  number one, would be the pouch

9    must say "Diplomatic pouch" in English on the exterior of the

10   pouch, and that pouch will have a specific and unique number

11   associated with it.

12        The pouch is required to be sealed.  Typically it's sealed

13   with a lead or plastic -- some sort of -- I guess I could use

14   adhesive to describe it, and that typically will bear the seal

15   of the Government that is sending the diplomatic materials

16   through the screening process.

17        Additionally, the diplomatic pouch must have the address

18   of the destination, the Government agency, embassy or ministry

19   that that pouch is being delivered to.  From that point there's

20   also a courier, the individual who's bringing that item through

21   the airport.  The courier, basic requirements for that, there's

22   two predominant ones:  number one, the courier must have in his

23   or her possession a diplomatic passport, and the diplomatic

24   passport will say on the front of the passport "Diplomatic

25   Passport."  It is specific, and it is different than a standard

1    U.S. passport that a nondiplomat will carry.

2        In addition to that, the courier will have what is known

3    as a courier letter.  Within the courier letter there's going

4    to be specific identifiers as well and distinguishing features

5    that we would look at to determine authenticity.  Some of those

6    would be the seal of the -- the official seal of the government

7    that's sending the diplomatic materials.  It's going to have

8    the name of the courier, and the courier's diplomatic passport

9    number.  It will also have the diplomatic pouch number.  And

10   I'll further that by saying it's going to have all the criteria

11   of the diplomatic pouch.

12       So the pouch, in the traditional sense -- when I say

13   "pouch," it doesn't necessarily mean that it's a pouch.  It

14   could be a box.  It could be a bag.  It could be an envelope.

15   All those things would refer to a diplomatic pouch.  It will

16   specify the number of items, so a person may have two, three or

17   multiple items or they may have just one item.  It will specify

18   that in the courier letter.  It will have the number associated

19   with that item or those items.

20       It will have the approximate size and weight, so that the

21   individual that is assessing the authenticity of the materials

22   relied on to clear that gauge if this appears to be authentic.

23   It's going to also contain the address of the receiving party,

24   so, in other words, the government, embassy, ministry, whoever

25   the receiving party is going to be will be in that.  And it

```
1   will also have the name, title, phone number, and address of

2   the initiator who is sending that diplomatic pouch.

3       So those are some of the distinguishing features we would

4   look for.  If all of those items are in concurrence, we would

5   exempt that item from screening.

6   Q    Can a diplomatic courier go through if the courier letter

7   matches with the pouch but did not meet the diplomatic passport

8   requirement?

9   A    I'm sorry, can you restate the question?

10  Q    Can a diplomatic courier go through security with a

11  diplomatic pouch if they only -- if they only have a courier

12  letter?

13  A    No.

14  Q    Is it an absolutely certainty that they need a diplomatic

15  passport?

16  A    Yes.

17  Q    Based on your training and experience, how many diplomatic

18  pouches have you processed, a ballpark?

19  A    Personally, firsthand experience, I would estimate 10 to

20  12.

21  Q    In front of your table there's Government's Exhibit 1.

22  It's an ID card with a yellow sticker --

23       I apologize.  If the case agent may give it to Mr. Cruz.

24  A    Thank you.

25  Q    Do you recognize this exhibit?
```

1   A      Yes, I do.

2   Q      How do you recognize it?

3   A      I observed this in the presence of yourself and the FBI.

4          MS. RO:   I'm publishing to the jury on the screen

5   Government's Exhibit 2 on the first page, which is a photocopy

6   of the physical item held by the witness.

7   Q      And were you asked to determine if this was a diplomatic

8   passport card?

9   A      Yes.

10  Q      And what is your opinion?

11  A      No.

12  Q      Why not?

13  A      There's multiple things.  I can take you through them.  So

14  authentic identifications issued by government or state have

15  distinguishing factors in them, a lot of which are security

16  features, to ensure that they can't be duplicated by

17  nonauthorized entities.  So first and foremost, just looking at

18  this on face value, one of the things that you will find with

19  any type of government- or state-issued ID is uniformity.  You

20  can see on this particular --

21         Okay if I mark this screen?

22  Q      Yes, please.

23  A      You can see that the actual -- the actual ID itself, it's

24  nonuniform in terms of it's not centered from the laminate.  So

25  you can see it's off-center.  That would be one thing that I

1    would look at that would stand out.

2        And I guess I should say, obviously, the most obvious

3    thing to me is this is not a passport, so that would be first

4    and foremost that would be my concern.  But as I dig deeper,

5    the uniformity would be an issue.  I would also look at things

6    such as the font, the clarity of the font.

7        Can I use the back?

8    Q    Yes.

9        I will now publish to the jury Government's Exhibit 2,

10   page 2.

11   A    So on the back, if you will notice, first of all, the text

12   that's written on the back, it starts in lower case.  So that

13   would be something that is a grammatical or -- well, sentences

14   don't start in lower case; they start in caps.  You've got a

15   multitude of fonts on the back.  So this appears one size.

16       You've got down here on the bottom right, which there are

17   various sizes there.  You also have a barcode, an issue date,

18   and I'm not sure what the S number HQ-001203/16 refers to, but

19   you can see on the barcode there's blurring, so those are not

20   defined.  That would be a factor that would be a concern as

21   well.

22   Q    Mr. Duretto, if I may just pause you for a second.  So

23   I'll zoom this in for the jury.

24   A    Sure.

25       So you can see that those are nondefined lines, as is --

1    actually, as is all this text here.  It's just blurred.  It's

2    not defined.  The Government identifications there's -- the

3    clarity is pure.  So you're not going to run into blurring.

4         If we could zoom out.

5         The seal, you'll see there's variations in shading.  That

6    would be problematic as well.  It's not clear.  I can't really

7    differentiate.  I can vaguely see "International."  I'm not

8    really sure what this says here.  You could see blotches here

9    in terms of definition.  It's not as dark as other areas.

10        And if we could zoom out again.

11        On the laminate itself, typically what you'll find -- not

12   typically.  Always what you'll find on authentic government- or

13   state-issued IDs is security features that will contain -- and

14   you can see this on a U.S. passport.  The laminate actually has

15   security features in it, contained in it.  The purpose of that

16   is obviously so that someone can't take an identification and

17   alter it or modify it, which would deem it unauthentic or

18   invalid.

19        This particular one on the laminate itself, there is no

20   security features contained.  And as a matter of fact, and you

21   can see, I believe -- I will try to highlight.  This area here,

22   this area here, and this area here, and on the front as well,

23   you can see bubbling in the laminate, which would be a big

24   concern.  You won't see that in government- or state-issued

25   IDs.  You will not see bubbling.  And actually enlarged, this

 1    would be these areas here.

 2        In addition to that, if we could zoom out, the signature

 3    is blurred.  It's smeared, especially in this area here.

 4        And then if possible, could we go back to the front?

 5    Q    Yes.

 6    A    Okay.  On this specific side here, the "Diplomat" written

 7    across the front of the ID, you won't see that, but that's

 8    really obstructing the ID itself.  It's print over print.  The

 9    "Issued by," I don't -- I'm not able to reference a name.  It

10    just said "World chairman."  I don't know what this signature

11    is or what it relates to.  That's just indistinguishable to me.

12    So that would not be valid.

13        If you could zoom out.

14        You will typically see seals on state-issued IDs.  Those

15    are typically holograms, which would be a security feature.  So

16    this particular one here, again, has lack of definition in the

17    font that it's printed in.  It just looks like -- there's no

18    differentiation on the photo side versus the non-photo side.

19    So that, to me, with my experience, would appear to be

20    something that is not authentic in terms of security features

21    because it's just stamped on the actual card itself.

22        If we could zoom back out, please.

23        When I talked of -- excuse me -- uniformity, you can see

24    on the edges, typically -- again, I say typically, but I should

25    specify that it's at all times.  You will see government- or

1    state-issued IDs, the uniformity piece is key and, those are

2    die cut.  You can see this particular corner here is distinctly

3    different in terms of the roundedness of the other three

4    corners.  That would be a concern.

5        And then just in terms of security features that we would

6    look at, some of those include -- and it could be any or all on

7    any specific government- or state-issued ID, there are things

8    that are called microprinting, which is kind of exactly what it

9    sounds like; it's printing that is very microscopic, and you

10   can only see it through an enhanced lens we use in the airport

11   environment.  We use basically what would be a small magnifying

12   glass that you put up to your eye.  You hold up the ID, and you

13   can see microprinting that you can't see with the naked eye.

14       Microprinting would be, one, background patterns, or

15   colorations is another one because it's very hard to alter an

16   ID when there's background colorations or patterns.  This

17   specific ID has none.  Watermarks would be another

18   distinguishing feature.  There's no watermarks on this specific

19   ID.

20       Additionally, there's raised printing, and I can refer to

21   like the California driver's license.  If you run your fingers

22   across parts of the ID, you will feel that some of the printing

23   is raised.  And then there's also ultraviolet features that can

24   only be seen when put under an ultraviolet light.

25       So all those things put into one ball of wax, those would

1    be the things that we would look for.  And the vast majority of

2    those I do not see on this, which would deem this invalid.

3    And, again, just to emphasis, this is not a diplomatic

4    passport.

5              THE COURT:  With that, we are going to take the

6    morning recess.  Please return back to the Court at 12:00 -- we

7    will make it 12:45.  During your absence do not discuss the

8    case amongst yourself or with any other person, please.

9              THE COURTROOM DEPUTY:  All rise for the jury,

10   please.

11        (Recess taken from 11:30 a.m. to 12:49 p.m.)

12        (Out of the presence of the jury.)

13             THE COURTROOM DEPUTY:  Please come to order.  This

14   court is now in session.  You can be seated everyone.

15             THE COURT:  Okay.  We are back on the record on

16   United States versus Flint.  We have counsel present, and the

17   defendant is present, and the jury is not.

18        There are apparently a couple matters to address before we

19   bring in the jury, but I want to do that quickly because I

20   would like to avoid delaying the trial.

21             MR. HARBAUGH:  Yes, Your Honor.  Quickly, I would

22   like to address with regard to the witness Agent Marriott, the

23   Government provided at 7:38 last night new documents that had

24   not been disclosed before trial.  So they violate Rule 16.  We

25   open based on the state of the evidence.

1       Secondly, Your Honor, the documents that the Government is

2  attempting to offer are hearsay, and --

3            THE COURT:  I'm not sure what you're referring to,

4  so --

5            MR. HARBAUGH:  So, Your Honor, it's Government

6  Exhibits 59 through 64, which we received last night.

7            THE COURT:  Let's see.  Let me find my exhibit.  59

8  through 64?

9            MR. HARBAUGH:  I'm sorry, through 65.

10           THE COURT:  59 through 65 were listed in the

11  Government's exhibit list, and that was provided at the

12  beginning of trial.

13           MR. YANNIELLO:  So, Your Honor, they were provided

14  on the exhibit list.  Some of these documents were actually

15  produced in discovery.  For example, the --

16           THE COURT:  What I'm trying to figure out is when

17  they were provided to defense counsel.  They are on the exhibit

18  list.  You indicated, Mr. Harbaugh, that they were provided

19  last night, but they're listed on the exhibit list.  The

20  exhibit list was provided to the Court I believe on Tuesday.

21           MR. HARBAUGH:  Yes, Your Honor, they were provided

22  last night.  They were generated on 10/15/2018, and they were

23  provided to us on 10/16, which is last night, at 7:40.

24           THE COURT:  So --

25           MR. HARBAUGH:  They were not provided to the

UNITED STATES DISTRICT COURT

1　defense, the underlying documents.  But, Your Honor, beyond

2　that, fundamentally, these are searches, Internet searches,

3　conducted by Agent Marriott on the 15th --

4　　　　　THE COURT:  I think we are ahead of ourselves.  So

5　let's go back to this witness here, this witness.  If the

6　Government intends to offer it at the time -- is it

7　Mr. Marriott or Ms. Marriott?

8　　　　　MR. YANNIELLO:  Ms., Special Agent Marriott.

9　　　　　THE COURT:  At the time Special Agent Rebecca

10　Marriott is called, then the Court will entertain objections.

11　　　　　THE COURTROOM DEPUTY:  Ready?

12　　　　　THE COURT:  Yes.

13　　　　(In the presence of the jury.)

14　　　　　THE COURT:  We have the jury reassembled with the

15　alternate, all counsel are present and the defendant.  Please

16　have a seat.

17　　　　We continue with the examination of Mr. Duretto.

18　　　　　MS. RO:  Your Honor, nothing further from the

19　Government.

20　　　　　THE COURT:  Cross?

21　　　　　　　　　　　**CROSS-EXAMINATION**

22　BY MS. WAKEFIELD:

23　Q　　Good afternoon.

24　A　　Good afternoon.

25　Q　　The Government asked you questions about the requirements

1    for diplomatic pouches.  Do you recall that?

2    A     Yes.

3    Q     And your testimony regarding the requirements for

4    diplomatic pouches, that's based on your knowledge and review

5    of the Standard Operating Procedures, correct?

6    A     Correct.

7    Q     And the Standard Operating Procedures are classified as

8    sensitive security information?

9    A     Correct.

10   Q     And no part of the Standard Operating Procedures may be

11   disclosed to the public, correct?

12   A     Correct.

13   Q     In fact, every page of the Standard Operating Procedures

14   is marked with a warning that the document contains sensitive

15   security information?

16   A     Correct.

17   Q     And that unauthorized release of these procedures may

18   result in penalties?

19   A     Correct.

20   Q     The Standard Operating Procedures are not available

21   online?

22   A     Correct.

23   Q     They're not published in legal books?

24   A     Correct.

25   Q     Now, the Standard Operating Procedures, they're the

```
 1  official guidance for TSA's security officers?
 2  A    I would not use the word "guidance."  I would say it's the
 3  official policy that governs our frontline officers.
 4  Q    It governs the officers of the TSA?
 5  A    Correct.
 6  Q    And those are the officers who screen bags, right?
 7  A    Yes.
 8  Q    And people?
 9  A    Yes.
10  Q    Now, security officers are trained on the Standard
11  Operating Procedures?
12  A    Correct.
13  Q    And they're, of course, allowed to look at them?
14  A    Yes, they are.
15  Q    And they receive -- officers receive in-the-classroom
16  training?
17  A    Yes, they do.
18  Q    They receive on-the-job training?
19  A    Yes.
20  Q    And they also must complete certification tests, right?
21  A    Yes, annually.
22  Q    Annually.
23       And supervisors also provide frequent briefing on the
24  Standard Operating Procedures to the frontline security
25  officers?
```

1    A    They do at times.

2    Q    Well, they're supposed to, right?

3    A    If needed, yes.  Not always.

4    Q    Well, the training that's provided to the security

5    officers, it's to help them follow what's in the Standard

6    Operating Procedures?

7    A    Correct.

8    Q    And you, you personally, have received extensive training

9    on the Standard Operating Procedures, right?

10   A    Yes.

11   Q    And that's part of the elevated position that you hold?

12   A    Correct.

13   Q    And you have extensive on-the-job experience implementing

14   the procedures in the Standard Operating Procedures?

15   A    Correct.

16   Q    It's fair to say that you know more about the Standard

17   Operating Procedures than a frontline screening officer?

18   A    Yes.  And if I may add to that, the -- the bag search,

19   pat-downs of individuals, as you advance further into

20   management and higher levels in management, your purview

21   becomes more focused on what we call management screening

22   Standard Operating Procedures, as opposed to what a uniformed

23   officer does in terms of the step-by-step procedures.

24   Q    Now, the Standard Operating Procedures, they have a

25   chapter on specialized screening of property?

```
 1   A     Yes, correct.
 2   Q     And that chapter includes a section on diplomatic pouches?
 3   A     Yes.
 4   Q     And it addresses diplomatic courier documentation?
 5   A     Correct.
 6   Q     Now, when a diplomatic pouch is presented, the Standard
 7   Operating Procedures tell the security officer to check for
 8   certain forms of documentation?
 9   A     Well, it's something that must be handled by a supervisor.
10   That's the lowest level that can do it.  So the transportation
11   security officers and lead officers are not authorized to
12   conduct that screening.
13   Q     So a supervisor has to do the screening and make the
14   decision?
15   A     Supervisor or above, yes.
16   Q     Now, we've talked -- or you've talked about with the
17   Government that the standard operation procedures tell the
18   screening officer, whether that's the frontline or the manager
19   or the supervisor, to check for a diplomatic passport?
20   A     Correct.
21   Q     And the other thing they're supposed to check for is a
22   courier letter?
23   A     Correct.
24   Q     Now, the Standard Operating Procedures, they don't tell
25   officers to rely on passenger statements, right?
```

1    A    Correct.

2    Q    They're supposed to look for documents?

3    A    Factual documents, yes.

4    Q    Factual documents?

5    A    Verifiable documents.

6    Q    Now I want to talk to you about airport security programs.

7    A    Okay.

8    Q    Each airport has its own security program?

9    A    Correct.

10   Q    LAX has a security program?

11   A    Correct.

12   Q    And that program defines the sterile areas of LAX?

13   A    Correct.

14   Q    And what procedures are in place at LAX?

15   A    I'm not sure I understand the question, what procedures.

16   Q    What security procedures are in place at LAX?

17   A    Anybody that -- anybody that enters the sterile area must

18   receive 100 percent screening of the person and property.

19   Q    Well, I want to ask you about LAX's security program.

20   LAX's security program, as you said, is specific to LAX,

21   correct?

22   A    Yes.

23   Q    Now, Chicago Midway has its own airport security program?

24   A    Yes.

25   Q    O'Hare Chicago has its own security program?

```
 1   A     Yes.
 2   Q     St. Paul-Minneapolis airport has its own security program?
 3   A     Yes.
 4   Q     Now, you're aware that on July 25th, 2017, Mr. Flint's
 5   first flight was from Chicago Midway?
 6   A     As I understand it, yes.
 7   Q     And so when he was at Midway Airport, Midway's security
 8   program applied to him there, correct?
 9   A     Yes.
10   Q     And then when he was at Minneapolis-St. Paul, that airport
11   security program applied to him when he was there?
12   A     Yes.
13   Q     And then when he flew from Minneapolis-St. Paul to LAX and
14   his flight landed at LAX, LAX's security program applied to him
15   at LAX?
16   A     Yes.
17   Q     Now, you testified that you are the assistant federal
18   security director for screening at LAX.
19   A     Correct.
20   Q     And you don't work at Midway, correct?
21   A     Correct.
22   Q     And you have never worked at Midway?
23   A     No.
24   Q     And you don't work at Minneapolis-St. Paul?
25   A     No, I do not.
```

1    Q      And you have never worked there?

2    A      No.

3    Q      Now, LAX's security program is considered sensitive

4    security information?

5    A      Correct.

6    Q      It's contents are not allowed to be disclosed to the

7    public?

8    A      Correct.

9    Q      Public can't see what's inside LAX's security program?

10   A      Correct.

11   Q      Can't see the procedures outlined in that security

12   program?

13   A      Correct.

14   Q      Now, LAX's security program differentiates between when

15   the screening checkpoints are operational and when the

16   screening checkpoints are nonoperational?

17   A      I don't know if that's contained in the airport security

18   plan.  Are you referring specifically to hours of operation?

19   Q      No.  I'm referring to the section that deals with access

20   by passengers.

21            MS. RO:  Objection, Your Honor; vague.

22            THE COURT:  Do you understand the question?

23            THE WITNESS:  I do not.

24            THE COURT:  Rephrase.

25            MS. WAKEFIELD:  Thank you, Your Honor.

1    Q    LAX's security program, it's written down, right, in a

2    document?

3    A    Yes, correct.

4    Q    And the section of the document that deals with passenger

5    access --

6    A    Okay.

7    Q    -- deals with -- has a section that talks about when

8    security checkpoints -- when screening checkpoints are

9    nonoperational, right?

10   A    Yes.  So when -- for clarification, I'm assuming you're

11   referring to when the screening operations are closed,

12   nonoperational?

13   Q    Well, you tell me.  The security program says when

14   passenger screening checkpoints are nonoperational -- if it

15   would refresh your recollection, I can direct you to the

16   section.

17   A    So point of clarification, the airport security plan is

18   really -- it's a regulatory department that has jurisdiction or

19   governance over the airport security plan.  I'm specifically

20   from the airport screening operation, so I can look at it and

21   give you some sort of intelligent answer, but it's not -- the

22   airport security plan is nothing I operate off of.  We operate

23   off of the Standard Operating Procedures for screening.

24   Q    So you don't operate off of the airport security program

25   at LAX?

```
 1   A     There would be components of -- for example, there's

 2   access doors throughout the airport where you can use your

 3   secure media card to access.  Those would be things that just

 4   by nature of -- nature of going from one place to another

 5   throughout the course of the day would be something that

 6   would -- I would encounter in regards to the airport security

 7   plan.  But, again, basically the entirety of what the security

 8   operation operates off of is our Standard Operating Procedures

 9   for the screening operation.

10   Q     Okay.  So is it fair to say, then, you are not as familiar

11   with LAX's airport security plan?

12   A     I have general knowledge of it, but I'm not a subject

13   matter expert.  That would be our inspectors or regulators that

14   would be the subject matter experts.

15   Q     So you don't consider yourself an expert in LAX's airport

16   security plan?

17   A     I have a general understanding of it.

18   Q     So that's a "no"?

19   A     That's a "no."

20   Q     So your testimony today is based on your expertise with

21   respect to TSA's Standard Operating Procedures?

22   A     So yes.  However, one thing that I would say that, yes, I

23   am a subject matter expert in is defined areas in the airport

24   that are sterile versus nonsterile, which would be included in

25   the airport security plan.
```

```
 1   Q    Okay.  So just so I'm clear, so the airport security plan
 2   defines what areas are sterile and not sterile at LAX?
 3   A    It's an agreement between the airport authority and TSA.
 4   Q    Okay.  And you consider yourself an expert in that portion
 5   of the airport security program; is that --
 6   A    Yes, correct.
 7   Q    So, then, you're familiar with the section of the airport
 8   security program that deals with when passengers can enter the
 9   sterile area when the passenger screening checkpoint is
10   nonoperational?
11   A    I would have to view it to know what you're referring to.
12   Q    Okay.  It should be Defense Exhibit 148.  I apologize,
13   there are a lot of binders up there.
14        (Exhibit 148 for identification.)
15             THE WITNESS:  148?
16   BY MS. WAKEFIELD:
17   Q    148.
18   A    Okay.
19   Q    And if you look at page 2.
20   A    Okay.
21   Q    You see where it says "Access controls to be used when the
22   passenger screening checkpoint is nonoperational"?
23   A    Yes, I see that.
24   Q    And you're not familiar with this section of the airport
25   security program?
```

```
 1   A    I've read it at some point.  It's been quite a while.  I
 2   would have to review it.
 3   Q    Okay.  Well, this section deals with when screening
 4   checkpoints are nonoperational, correct?
 5   A    I would have to read it first.
 6            MS. WAKEFIELD:  May I have one moment, Your Honor?
 7            THE COURT:  Yes.
 8        (Discussion off the record.)
 9   BY MS. WAKEFIELD:
10   Q    Thank you.  If you're not familiar with it, then I'm not
11   going to ask you any questions on it.
12   A    Okay.
13            MS. WAKEFIELD:  May I have one more moment,
14   Your Honor?
15        (Discussion off the record.)
16            MS. WAKEFIELD:  Nothing further, Your Honor.
17            THE COURT:  Thank you.
18        Redirect?
19            MS. RO:  Yes, Your Honor.
20                   REDIRECT EXAMINATION
21   BY MS. RO:
22   Q    Mr. Duretto, defense counsel just asked you to look at the
23   airport security program, and they referenced it in a defense
24   exhibit, and I apologize, I forget the exhibit number.  You
25   mentioned that you're an expert of the sterile area within it?
```

```
1   A     Yes.
2   Q     If I could turn your direction to the defense exhibit,
3   second page.
4   A     Okay.
5   Q     Paragraph --
6              THE COURT:  What number are you referring to?
7   Exhibit 148?
8              MS. WAKEFIELD:  It's 148, Your Honor.
9              MS. RO:  Thank you.  Sorry.
10  Q     Defense Exhibit 148, the second page, and only the
11  specific section under 6.1.
12  A     Okay.
13             THE COURT:  And this is Bates-stamped 1039?
14             MS. RO:  Yes, Your Honor.
15  Q     Are you familiar with that specific paragraph?
16  A     May I read it first?
17  Q     Yes.
18             THE COURT:  To yourself, first.
19  BY MS. RO:
20  Q     To yourself.
21  A     Yes.
22        Okay.  Yes, I'm familiar with that.
23  Q     And what is the definition of a sterile area during the
24  inplaning and deplaning of passengers specific to boarding
25  bridges or stairs?
```

```
 1   A     I'm unclear of what you mean by "inplaning."

 2   Q     Sure.  What is the definition of a sterile area based on

 3   that specific paragraph, if you know from your own knowledge?

 4   A     So a sterile area, based off of this paragraph, would be

 5   areas beyond the security checkpoint where passengers and

 6   property have been screened, and that would be inclusive of --

 7   I mentioned previously to the defense, there's access doors

 8   that only security media can authorize you through those doors.

 9   Those would be encompassed in the sterile area, as would the

10   holding areas for boarding of aircraft, the jet bridges, which

11   you walk onto the aircraft, the aircraft itself.  And then,

12   again, as stated earlier, the airfield itself is also a sterile

13   area.

14             MS. RO:  I'm publishing to the jury what's been

15   previously admitted as Government's Exhibit 45, which is an

16   image of Terminal 3.

17   Q     You mentioned the boarding bridges and boarding stairs.

18   Is that indicated in this image?

19   A     Yes.

20   Q     And can you please circle the area.

21   A     And, actually, these lines here, so everything that's

22   blue, this is all airfield.  This would be outdoors, of course.

23   This is not inside the building, but this entire area would be

24   sterile.

25             MS. RO:  May the record reflect that the witness has
```

```
 1    drawn a red square around the blue area of this exhibit, as

 2    well as drawing a circle around the pink -- the pink image as

 3    well.

 4             THE COURT:  Not quite a circle, but --

 5             MS. RO:  An outline.

 6             THE COURT:  He outlined it.

 7    BY MS. RO:

 8    Q    So are these the sterile areas of Los Angeles

 9    International Airport?

10    A    Yes, ma'am.

11    Q    And are security requirements and TSA policies derived

12    from United States statutes, regulations, United States law?

13             MS. WAKEFIELD:  Objection; calls for a legal

14    conclusion and compound.

15             THE COURT:  Overruled.

16             THE WITNESS:  There are Code of Federal Regulations

17    that govern that, and, again, that would be our compliance,

18    also referred to as regulatory department that has oversight on

19    those areas.

20             MS. RO:  Your Honor, may I have one quick moment?

21        Nothing further, Your Honor.

22             THE COURT:  Recross?

23             MS. WAKEFIELD:  Nothing.  Thank you.

24             THE COURT:  Thank you, sir, for your testimony.

25             THE WITNESS:  Thank you, Your Honor.
```

1          THE COURT:  May the witness be excused?

2          MS. RO:  Yes, Your Honor.

3          THE COURT:  Mr. Duretto is excused.  Thank you.

4          THE WITNESS:  Thank you.

5          MR. YANNIELLO:  Your Honor, the United States calls

6    Deputy John Schneider.

7        May I have a moment with defense counsel?

8          THE COURT:  Yes.

9        (Discussion off the record.)

10          THE COURTROOM DEPUTY:  Good afternoon, sir.  Would

11   you please come forward.

12        Would you please come right here.  Would you stop right

13   there and raise your right hand to be sworn.

14      **JOHN CURTIS SCHNEIDER, III, GOVERNMENT WITNESS, WAS SWORN**

15          THE WITNESS:  Yes, I do.

16          THE COURTROOM DEPUTY:  Thank you, sir.  Would you

17   please be seated.

18        Sir, for the record, would you please state your name, and

19   spell your last name.

20          THE WITNESS:  Yes, my name is John Curtis

21   Schneider, III, and my last name is spelled S-c-h-n-e-i-d-e-r.

22          THE COURT:  Your witness.

23                      **DIRECT EXAMINATION**

24   BY MR. YANNIELLO:

25   Q    Good afternoon, Deputy Schneider.

1    A    Good afternoon.

2    Q    What is your current occupation?

3    A    I'm a deputy sheriff for the Ogemaw County Sheriff's

4    Office in West Branch, Michigan.

5    Q    And whereabouts in Michigan is Ogemaw County?

6    A    Ogemaw is located approximately four and a half hours

7    north of Detroit.

8    Q    And how long have you been a law enforcement officer?

9    A    I have been a police officer for 10-1/2 years.

10   Q    And how long have you been with the sheriff's office?

11   A    I have been with Ogemaw about 10.

12   Q    What are your general job duties?

13   A    Generally I do roll patrol, traffic enforcement.

14   Q    Were you working patrol on September 10th, 2016?

15   A    Yes, I was.

16   Q    And did you conduct a traffic stop on someone in this

17   room?

18   A    Yes, I did.

19   Q    Can you please identify that person.

20   A    It's the gentleman in the dark blue suit with a grayish

21   tie.

22            MR. YANNIELLO:  Your Honor, we would ask that the

23   transcript reflect that the witness has identified the

24   defendant.

25            THE COURT:  Yes, he's identified Mr. Flint.

```
 1   BY MR. YANNIELLO:
 2   Q    You said you conducted a traffic stop on the defendant
 3   that day; is that correct?
 4   A    Yes, I did.
 5   Q    Can you describe that for us.
 6   A    I was sitting stationary on I-75, which is a highway that
 7   runs through our county, and I observed Mr. Flint's vehicle
 8   traveling northbound past my location where I was set up.
 9   Q    And did you observe a traffic violation?
10   A    Yes, I did.  I observed that Mr. Flint's vehicle had an
11   expired registration tag affixed to the license plate.
12   Q    I assume you pulled the defendant over at that point.
13   A    Yes.  I got behind Mr. Flint and conducted a traffic stop.
14   Q    What happened when you made contact with Mr. Flint?
15   A    I asked Mr. Flint for his driver's license, his
16   registration, and proof of insurance.
17   Q    And how did he respond?
18   A    Mr. Flint provided me with his driver's license and
19   advised me that his registration, proof of insurance he did not
20   have with him, that it was at his house.
21   Q    Did he make any other representations to you at that
22   point?
23   A    Yes.  Immediately after that he advised me that he was a
24   civil rights attorney for the United States government, and
25   that he was also a defense attorney in the state of Michigan
```

1   and in North Carolina.

2   Q    So he volunteered all that information to you when you

3   requested his identification and proof of insurance?

4   A    Yes.

5   Q    Did you continue to conduct your investigation after that?

6   A    Yes, I did.

7   Q    And what was the result of your investigation?

8   A    Through the results of my investigation, it was determined

9   that Mr. Flint's registration was not valid and that he did not

10  have insurance on his vehicle.

11  Q    Did you tell the defendant that he was going to be placed

12  under arrest?

13  A    Yes, I did.

14  Q    And how did the defendant respond?

15  A    Mr. Flint advised me again that he was a civil rights

16  attorney for the United States Government and that he has

17  diplomatic immunity and cannot be charged with traffic or

18  criminal offenses.

19  Q    So he told you that he had diplomatic immunity when you

20  said you were going to arrest him?

21  A    Yes.

22  Q    And what happened next?

23  A    I placed a handcuff on Mr. Flint, and he tensed up, and he

24  again told me that he had diplomatic immunity and he could not

25  be arrested.

```
 1   Q     So he told you he stated he had diplomatic immunity twice
 2   to you?
 3   A     Yes.
 4   Q     And when he did this, how -- just to provide some context
 5   for the jury, where were you and the defendant at the time?
 6   A     We were on the rear passenger side of his car, and I was
 7   probably approximately three to four feet away from him when I
 8   was talking to him.
 9   Q     Okay.  At the time did he show you a diplomatic passport?
10   A     No, he did not.
11   Q     Did he show you any form of identification that said he
12   was a diplomat?
13   A     No.
14   Q     Did he describe what type of diplomatic status he thought
15   he had?
16   A     No, he did not.
17   Q     Did he tell you he worked for a man named Robert Shumake?
18   A     No, he did not.
19         MR. YANNIELLO:  Nothing further, Your Honor.
20         THE COURT:  Any cross?
21                    CROSS-EXAMINATION
22   BY MS. WAKEFIELD:
23   Q     Good afternoon.
24   A     Good afternoon.
25   Q     You're a sheriff's deputy in Ogemaw County, Michigan?
```

1    A     Yes, ma'am.

2    Q     And Ogemaw County, the population is pretty small, right?

3    A     Yes, ma'am.

4    Q     And you pulled over Mr. Flint in Horton Township,

5    Michigan?

6    A     Yes, ma'am.

7    Q     That also is pretty small, right?

8    A     It's a township, ma'am.  It's not a town.

9    Q     More than a thousand people that live there?

10   A     I'm not sure.  There is more than a thousand in

11   West Branch.

12   Q     When Mr. Flint said he had diplomatic immunity, you didn't

13   ask him to explain why he thought he did, right?

14   A     Right.

15   Q     You didn't ask him why he misunderstood why he thought he

16   did, right?

17   A     Right.

18   Q     You didn't ask him to explain what he had been told about

19   having diplomatic immunity?

20   A     Correct.

21   Q     You didn't ask him any questions about what his status was

22   specifically?

23   A     Correct.

24   Q     In your view, Mr. Flint was not immune from the vehicle

25   violations, right?

1    A    Correct.

2    Q    And your investigation that day was not about whether he

3    was mistaken about having diplomatic immunity?

4    A    Correct.

5    Q    Now, the traffic stop that you're talking about, it

6    occurred in September of 2016?

7    A    Yes.

8    Q    Now I would like you to take a look at Government Exhibit

9    2, which should be in one of the binders, or I can display it,

10   if that's easier.

11        And, Your Honor, this is Government's Exhibit 2.

12             THE COURT:  Yes, it's already been received, yes.

13   BY MS. WAKEFIELD:

14   Q    He didn't show you this ID card, right?

15   A    No, he did not.

16   Q    And you see on the back of that ID card is an issue date

17   of October 20th, 2016?

18   A    Yes.

19   Q    And that would be after the traffic stop, right?

20   A    Yes.

21   Q    Now, Mr. Flint didn't show you a diplomatic pouch, right?

22   A    No, he did not.

23   Q    Or a courier letter, anything like that, right?

24   A    No.

25   Q    And Mr. Flint that day, he was detained for the license

```
 1   plate issue, right?
 2   A     That, and the insurance, yes, ma'am.
 3   Q     And the insurance.
 4         And those are both traffic infractions?
 5   A     They are misdemeanor charges.
 6   Q     They are infractions, right?
 7   A     They're misdemeanor charges.
 8               MR. YANNIELLO:  Objection; legal conclusion,
 9   Your Honor.
10               THE COURT:  Overruled.
11   BY MS. WAKEFIELD:
12   Q     And you know that Mr. Flint accepted responsibility,
13   right?
14   A     I believe so, yes.
15   Q     He paid the fine that was required, right?
16   A     From what I've been told, yes.
17   Q     You weren't required to testify at a trial, right?
18   A     No.
19   Q     And so he admitted that he didn't have the right license
20   plate on the car, correct?
21   A     That day he did not.
22   Q     Now, you were contacted by federal prosecutors for the
23   first time on October 5th, 2018, correct?
24   A     I believe that's the day, yes.
25   Q     They didn't contact you in 2017?
```

```
 1   A     No, they did not.

 2   Q     And they flew you from Ogemaw County, Michigan to L.A.?

 3   A     From Traverse City, Michigan to L.A.

 4   Q     And that's to testify, right?

 5   A     Yes, ma'am.

 6   Q     And the only thing Mr. Flint was charged with is the

 7   license plate?

 8   A     And the no insurance.

 9   Q     And the no insurance.

10         And you are aware that Mr. Flint did accept responsibility

11   for that, correct?

12   A     From what I've been told.

13              MS. WAKEFIELD:  No further questions.

14              THE COURT:  Keep it short, please.

15              MR. YANNIELLO:  Yes, Your Honor.

16                     REDIRECT EXAMINATION

17   BY MR. YANNIELLO:

18   Q     When Mr. Flint asked you or when he asserted diplomatic

19   immunity to you, he didn't ask to call Robert Shumake, correct?

20   A     No, he did not.

21   Q     And this document here, you have no idea if this is real

22   or fake, correct?

23   A     Correct.

24              MR. YANNIELLO:  Nothing further.

25              MS. WAKEFIELD:  Just one follow-up question,
```

1   Your Honor.

2          THE COURT:  Go ahead.

3                    **RECROSS-EXAMINATION**

4   BY MS. WAKEFIELD:

5   Q    On the expired insurance, you realize it had only been

6   expired for two days, correct?

7   A    On his phone.

8   Q    He pulled up the Geico policy, correct?

9   A    I called Geico.

10  Q    You called Geico, and you realized it had only been

11  expired for two days?

12  A    No, they didn't say it was expired.  They said he was not

13  insured.

14  Q    For two days, correct?

15  A    Correct.

16          THE COURT:  Thank you.

17      May the deputy be excused?

18          MR. YANNIELLO:  Yes, Your Honor.

19          THE COURT:  Thank you very much for your testimony.

20      Next?

21          MR. YANNIELLO:  The Government calls Rebecca --

22  Special Agent Marriott.

23          THE COURT:  And why don't you confer with counsel

24  regarding the exhibits that were previously discussed.

25          THE COURTROOM DEPUTY:  Good afternoon.  Would you

```
 1   please come forward.

 2       Would you please stop right there and raise your right

 3   hand to be sworn.

 4       REBECCA MARRIOTT, GOVERNMENT WITNESS, WAS SWORN

 5           THE WITNESS:  I do.

 6           THE COURTROOM DEPUTY:  Thank you.  Would you please

 7   be seated.

 8       Hi.

 9           THE WITNESS:  Hi.

10           THE COURTROOM DEPUTY:  For the record, would you

11   please state your name, and then spell your last name.

12           THE WITNESS:  Rebecca Marriott, M-a-r-r-i-o-t-t.

13           THE COURTROOM DEPUTY:  Thank you.

14           THE COURT:  You need some water?

15           THE WITNESS:  I'm good, thank you.

16           THE COURTROOM DEPUTY:  There's some water right

17   there for you if you need it.

18           THE WITNESS:  Thank you.

19           THE COURT:  Your witness, Mr. Yanniello.

20           MR. YANNIELLO:  Thank you, Your Honor.

21       And just one cleanup item from the prior witness.  The

22   Government would move, pursuant to the Court's order, the

23   certified conviction record, that's Government's 43, into

24   evidence.

25           THE COURT:  Any objection?
```

1        MS. WAKEFIELD:  No, Your Honor.

2        THE COURT:  Received.

3     (Exhibit 43 received into evidence.)

4                  **DIRECT EXAMINATION**

5  BY MR. YANNIELLO:

6  Q    Good morning, Special Agent Marriott.

7  A    Good morning.

8  Q    For how long have you been an FBI agent?

9  A    I have been an agent for 8-1/2 years.

10 Q    And that's your current role?

11 A    Yes, it is.

12 Q    And what did you do before you were an FBI agent?

13 A    I was an elementary teacher.

14 Q    And were you -- where were you assigned in July 2017?

15 A    I was assigned to Los Angeles International Airport.

16 Q    And can you generally describe your job duties as an FBI

17 agent assigned to LAX.

18 A    I investigated crimes onboard aircraft, as well as federal

19 violations within the airport.

20 Q    Did your job responsibilities at that time include

21 interviewing individuals who disembark from -- at LAX?

22 A    Yes.

23 Q    In July 2017 did you participate in an interview of an

24 individual that you see in this courtroom?

25 A    Yes, I did.

1    Q    Can you identify that individual?

2    A    He is on my right, in the blue suit.

3              THE COURT:  Identifying Mr. Flint.

4    BY MR. YANNIELLO:

5    Q    Can you please explain the circumstances leading up to

6    your participation in that interview with Mr. Flint on July

7    25th, 2017?

8    A    My office at LAX had received a phone call that an

9    individual was flying into the airport, and that he had boarded

10   that aircraft and that his bag had not been screened, and so

11   the contents of the bag were unknown, and we were requested to

12   meet the aircraft.

13   Q    So you said "requested to meet the aircraft."  So you

14   received notice prior to the plane landing?

15   A    Yes.

16   Q    And can you estimate how long before the plane landed that

17   you received that notice?

18   A    It wasn't very long.  I want to say maybe 15 or 20 minutes

19   prior to the aircraft landing we were notified.

20   Q    What did you do after you were notified?

21   A    We immediately went to the gate to meet the aircraft.

22   Q    And were you -- where were you when the plane landed?

23   A    We were waiting for the plane to land at the gate where

24   they extend the jet bridge out to meet the aircraft.

25   Q    And so is the gate -- where did you first see the

1    defendant?

2    A     As he was disembarking off of the aircraft.

3    Q     And you met him there?

4    A     Yes.

5    Q     I'm going to show you what has been marked and admitted as

6    Government Exhibit 45.

7          Do you recognize this?

8    A     Yes.

9    Q     What does it depict?

10   A     This is a map of Terminal 3 at Los Angeles International

11   Airport.

12   Q     And can you just generally describe where you met the

13   defendant on July 25th, 2017.

14   A     Is this touch screen?

15         So these are -- back here are all of the gates where

16   aircraft can land, and the jet bridge is attached to the

17   aircraft and passengers disembark.  All of this is in the --

18   what's considered the sterile or secure side of the airport.

19   Q     And so you don't necessarily recall which gate, but that's

20   where you met him, in one of those or around one of those

21   gates?

22   A     Yes.

23   Q     Thank you.

24         When the defendant arrived, were there any items seized

25   from him on July 25th, 2017?

1    A    Yes.

2    Q    What was seized?

3    A    He had a binder full of documentations that he presented.

4    He also had identification cards that he had presented, a bag

5    that contained cash as well.

6              MR. YANNIELLO:  And, Your Honor, may I request that

7    Special Agent Simon approach the witness with what's been

8    marked as Government's Exhibit 29?

9              THE COURT:  Yes.

10         (Exhibit 29 for identification.)

11   BY MR. YANNIELLO:

12   Q    Do you recognize this item?

13   A    Yes.

14   Q    What is it?

15   A    This is the bag that Mr. Flint carried with him that day.

16   Q    Now I'm going to direct your attention to the binder next

17   to you.  Could you please open Government's Exhibit 30.

18             THE COURT:  Do you have -- are you moving 29 into

19   evidence at this time?

20             MR. YANNIELLO:  The Government would move to admit

21   Government's 29.

22             MR. HARBAUGH:  No objection, Your Honor.

23             THE COURT:  29 is received.

24         (Exhibit 29 received into evidence.)

25             THE COURT:  May I see 29, please?

1        Go ahead.

2    BY MR. YANNIELLO:

3    Q    Special Agent Marriott, would you look at Exhibit 30 in

4    the binder next to you, Government's Exhibit 30, yes, and take

5    a look at those photographs.

6        (Exhibit 30 for identification.)

7    BY MR. YANNIELLO:

8    Q    Do you generally recognize what these photographs depict?

9    A    Yes, I do.

10   Q    What do they depict?

11   A    These are photographs of Mr. Flint's bag that he had that

12   day, as well as the contents of the bag.

13           MR. YANNIELLO:  Government moves to admit Exhibit

14   30, Your Honor.

15           THE COURT:  Objection?

16           MR. HARBAUGH:  No objection, Your Honor.

17           THE COURT:  Received.

18       (Exhibit 30 received into evidence.)

19   BY MR. YANNIELLO:

20   Q    Special Agent Marriott, I'm publishing the first page.

21   Can you describe what you see there?

22   A    This is the one side of Mr. Flint's bag.

23   Q    And it appears that there's some embroidery on it?

24   A    Yes.

25   Q    Now I'm going to publish page 2.  What does that depict?

1  A    This is showing the other side of his bag, as well as some

2  of his personal belongings that he had with him that day.

3  Q    And so this is the other side of the pouch?

4  A    Correct.

5  Q    Now, you previously mentioned that you interviewed the

6  defendant on that day, but before we discuss that, I'm going to

7  focus on the search of the pouch.  Did -- was the pouch

8  searched on July 25th, 2017?

9  A    Yes, it was.

10 Q    And did the pouch have a lock on the zipper?

11 A    Yes, it did.

12 Q    Now I'm going to publish page 4.  On the top right-hand

13 corner, does that depict the locking system that you

14 referenced?

15 A    Yes, it does.

16 Q    And what does this picture depict?

17 A    This is the bag showing the contents of what's inside.

18 Q    And what were those contents?

19 A    Plastic bags with money inside.

20 Q    Okay.  I'm going to publish page 4.  Does that accurately

21 depict how the money was wrapped inside of the bag?

22 A    Yes, it does.

23 Q    And were there multiple bags wrapped in a similar manner?

24 A    Yes.

25 Q    So just two more photos, I believe.  This is number

1   page 7.

2        And, finally, page 12.

3        Special Agent Marriott, does this accurately reflect the

4   amount of money that Defendant Flint had in the pouch that day?

5   A    Yes.

6   Q    And all of those bags that are in the top portion of the

7   picture, those were the bags that were wrapping around the

8   money?

9   A    Yes.

10            MR. YANNIELLO:  Your Honor, I apologize for having

11   to request it, but is there any way that the Government can get

12   a short continuance?  The clips -- we're having a malfunction

13   and probably just need five to ten minutes.

14            THE COURT:  You're talking about a recess?

15            MR. YANNIELLO:  Brief recess.

16            THE COURT:  Yes, we can take a brief recess.

17        Please return back to the court at a quarter to and we

18   will continue with the trial.  During your absence do not

19   discuss the case amongst yourself or with any other person.

20            THE COURTROOM DEPUTY:  All rise for the jury,

21   please.

22            THE COURT:  We are in recess.

23        (Recess taken from 1:37 p.m. to 1:53 p.m.)

24            THE COURTROOM DEPUTY:  All rise for the jury,

25   please.

```
1            (In the presence of the jury.)

2                THE COURT:  Okay.  We have the jury reassembled with

3    our alternate, counsel are present with the defendant, and we

4    continue with the direct examination of Special Agent Rebecca

5    Marriott.

6            And has the matter been fixed?

7                MR. YANNIELLO:  Yes, Your Honor.

8    Q    Special Agent Marriott, you referenced that a binder was

9    seized from the defendant on July 25th, 2017.

10           Your Honor, may I ask Special Agent Simon to bring the

11   witness what's been marked as Exhibit 3?

12               THE COURT:  Yes.

13           (Exhibit 3 for identification.)

14   BY MR. YANNIELLO:

15   Q    Do you recognize this?

16   A    Yes.

17   Q    What is it?

18   A    This is the binder that was presented to me during the

19   interview.

20               MR. YANNIELLO:  And, Your Honor, to save court time,

21   I would move in copies of those -- the contents of that binder,

22   which are Exhibits 4 through 6, 8, 9 and 38.

23               THE COURT:  4, 5, 6, 8, 9 and 38, any objection?

24               MR. HARBAUGH:  No objection.

25               THE COURT:  All received.
```

```
 1            (Exhibits 4, 5, 6, 8, 9 and 38 received into evidence.)
 2                 MR. YANNIELLO:  And move Exhibit 3 in too.
 3                 THE COURT:  All received.
 4            (Exhibit 3 received into evidence.)
 5   BY MR. YANNIELLO:
 6   Q    Special Agent Marriott, prior to court today, have you
 7   reviewed excerpts of the recorded interview involving the
 8   defendant on July 25th, 2017?
 9   A    Yes.
10   Q    And have those been marked -- or have those been
11   identified as Government's Exhibits 47 through 55 and 58?
12   A    Yes.
13                 MR. HARBAUGH:  No objection, Your Honor.
14                 THE COURT:  48 through 55 and 38 are received.
15            (Exhibits 48 through 55 and 38 received into evidence.)
16                 MR. YANNIELLO:  Your Honor, may I have the Court's
17   permission to distribute to members of the jury a set of
18   transcripts, each of which has been provided to the defense?
19                 THE COURT:  Yes.
20                 MR. YANNIELLO:  And may I also ask that the Court
21   admonish the jury about how to consider the transcripts and the
22   recordings?
23                 THE COURT:  Yes.  One second.
24        You're going to hear an audio recording.  This apparently
25   is an interview of Mr. Flint.  You have transcripts of the
```

**UNITED STATES DISTRICT COURT**

 1    recording.  The evidence is the recording itself and not the

 2    transcripts.  If there's a difference in your reading of the

 3    transcripts with what is stated on the recording, it is the

 4    recording that is the evidence in the case.  The transcripts

 5    are only provided to assist you in understanding the words.

 6         So, Counsel, you move for -- moved into evidence

 7    Exhibits 48 -- I'm sorry, 47 through 55, and so certain of the

 8    exhibits that you offered were transcripts, and those should

 9    not be received into evidence, the transcripts are not

10    received.

11              MR. YANNIELLO:  That's correct, Your Honor.

12              THE COURT:  They are only to assist the jury at this

13    time.

14              MR. YANNIELLO:  Right.

15              THE COURT:  Let's -- do you wish to play the audio?

16              MR. YANNIELLO:  Yes.

17         And just to clarify, there are a couple empty binders -- a

18    couple empty exhibit clips, but there is 58 that the Government

19    has moved in as well.

20              THE COURT:  So 58 is offered?

21              MR. YANNIELLO:  Yes, Your Honor.

22              THE COURT:  Any objection to 58?

23              MR. HARBAUGH:  No, Your Honor.

24              THE COURT:  That's received also.

25         (Exhibit 58 received into evidence.)

```
 1   BY MR. YANNIELLO:

 2   Q    So, Special Agent Marriott, during the interview with

 3   defendant on July 25th, 2017, did you ask him if he had ever

 4   been stopped before or turned away from a security screening

 5   checkpoint?

 6   A    Yes.

 7           MR. YANNIELLO:  One moment, Your Honor.

 8        (Discussion off the record.)

 9           THE COURT:  Ready?

10           MR. YANNIELLO:  Yes.

11   Q    I will restate the question.  During the interview on July

12   25th, 2017, did you ask the defendant whether he had ever

13   previously been turned away from a security checkpoint before?

14   A    Yes.

15   Q    I will now play Government's Exhibit 53.

16        (Audio recording played in open court.)

17           MR. YANNIELLO:  At this time I will play Exhibit 47.

18        (Audio recording played in open court.)

19   BY MR. YANNIELLO:

20   Q    Special Agent Marriott, in that portion of the clip, did

21   defendant present you with a copy of Robert Shumake's passport

22   in the binder?

23   A    Yes.

24   Q    Was that true?

25   A    No.
```

1    Q    The defendant also referenced the Geneva Convention.  Did

2    you see a copy of the Geneva Convention in the binder?

3    A    No.

4    Q    Do you know what the Geneva Convention is?

5    A    I only know it has to do with war crimes.

6    Q    Was there a copy of any agreement in the binder?

7    A    There was a copy of the Vienna Convention.

8    Q    I am showing you what's been admitted as Government's

9    Exhibit 6.

10        Is this a copy of the Vienna Convention that you found

11   in -- or that was located in defendant's binder?

12   A    Yes.

13   Q    And on July 25th, 2017, did you review the documents

14   closely, or did you review this document closely?

15   A    No.

16   Q    Looking at this document now, does anything stand out to

17   you?

18   A    Yes.

19   Q    What stands out to you?

20   A    The document states:  "Not yet in force."

21   Q    And you're referring to this portion here?

22   A    Yes.

23   Q    And just to be clear, on July 25th, 2017, the defendant

24   referenced this agreement as a basis for his diplomatic

25   immunity, correct?

1    A      Yes.

2    Q      At this time I will play Government's Exhibit 48.

3           (Audio recording played in open court.)

4               MR. YANNIELLO:   I'm going to play the next exhibit

5    as well, and that's Exhibit 49.

6           (Audio recording played in open court.)

7    BY MR. YANNIELLO:

8    Q      So, Special Agent Marriott, in that clip the defendant

9    discussed an appointment notice for Robert Shumake, did you

10   review that document?

11   A      Yes.

12   Q      I'm going to show you what has been admitted as

13   Government's Exhibit 5.

14          Now, is this that document that the defendant was

15   referencing?

16   A      Yes.

17   Q      And why did defendant point this document out to you on

18   July 25th, 2017?

19   A      He was showing it as a reference to Mr. Shumake being a

20   ambassador and that this was his appointment letter.

21   Q      And have you reviewed the letter?

22   A      Yes.

23   Q      Does it provide any diplomatic immunities or status to

24   Mr. Shumake?

25   A      No.

1    Q      What gave you that impression?

2    A      There is certain wording, such as paragraph 3, "The

3    defendant of foreign and international affairs of the

4    International Human Rights Commission hope that the government

5    of the United States will extend all possible assistance

6    according to the international protocols," "hope" leads me to

7    believe that nothing has occurred.  Also, if you reference

8    paragraph 5, "The Department of Foreign and International

9    Affairs of the International Human Rights Commission is

10   wondering about the possibility of starting friendly, then a

11   formal diplomatic relationship with the people and state of the

12   United States."

13   Q      So the document actually states on its face that there's

14   no formal relationship between the United States and this

15   Pakistan-based organization?

16   A      Yes.

17   Q      At this time I'm going to play Government's --

18          One moment, Your Honor.

19          At this time I'm going to play Government's Exhibit 50.

20          (Audio recording played in open court.)

21              MR. YANNIELLO:  I'm now going to play Government's

22   Exhibit 51.

23          (Audio recording played in open court.)

24              MR. YANNIELLO:  I will now play Government's Exhibit

25   52.

```
 1              (Audio recording played in open court.)

 2              MR. YANNIELLO:  I'm going to play Government's

 3   Exhibit 54.

 4              (Audio recording played in open court.)

 5   BY MR. YANNIELLO:

 6   Q    And so in that clip, just to highlight something that the

 7   defendant said, he represented to you -- is it true he

 8   represented to you that he didn't know that there was an issue

 9   with the state department prior to this incident?

10   A    Correct, he did not know.

11              MR. YANNIELLO:  One moment, Your Honor.

12        (Discussion off the record.)

13              MR. YANNIELLO:  I'm going to play Government's

14   Exhibit 58.

15        (Audio recording played in open court.)

16              MR. YANNIELLO:  And then, finally, I'm going to play

17   Government's Exhibit 55.

18        (Audio recording played in open court.)

19   BY MR. YANNIELLO:

20   Q    I'm going to publish what's been marked as Government's

21   Exhibit 2.

22        And so in that final portion of that clip, was this the

23   address you were referring to?

24   A    Yes, it was.

25   Q    And did the defendant tell you during that clip how this
```

```
1    card came to be laminated?

2    A     Yes.

3    Q     How was it laminated?

4    A     He laminated it.

5    Q     He also referenced in that clip that he looked up things

6    online and he researched, essentially, whether or not he could

7    travel with this diplomatic passport, correct?

8    A     That's correct.

9    Q     After this interview, have you conducted some Internet

10   research?

11   A     Yes.

12   Q     Did you --

13         Let me back up, Your Honor.

14         Are you familiar with Google?

15   A     Yes.

16   Q     And did you do a Google search related to being a

17   diplomatic courier who is carrying cash?

18   A     Yes.

19   Q     And what search did you type?

20   A     What did I type in the search engine?

21   Q     Yes.

22              MR. HARBAUGH:  Objection; relevance, Your Honor.

23              THE COURT:  Overruled.

24              THE WITNESS:  "Carrying cash in a diplomatic pouch."

25   BY MR. YANNIELLO:
```

1   Q    And did you make a screen shot of your search result?

2   A    Yes.

3   Q    I'm going to ask you what's been marked -- I'm going to

4   ask you to look at what's been marked as Government's

5   Exhibit 59.

6        (Exhibit 59 for identification.)

7   BY MR. YANNIELLO:

8   Q    Do you recognize it?

9   A    Mine doesn't have 59.

10            MR. YANNIELLO:  Your Honor, may Special Agent Simon

11  approach the witness with an exhibit binder that contains the

12  proper exhibits?

13            THE COURT:  Yes.

14            MR. HARBAUGH:  Your Honor, I would like to request a

15  sidebar at this time to discuss all of these exhibits.

16            THE COURT:  All of these -- what exhibits do you

17  intend to refer to?

18            MR. YANNIELLO:  69 -- sorry, 59, 60 and 61.

19            THE COURT:  Let me review.

20            MR. YANNIELLO:  And 63 and 64, Your Honor.

21            THE COURT:  So 59 through 64?

22            MR. YANNIELLO:  Yes.

23            THE COURT:  Yes, let's have a sidebar.

24        (Discussion held at sidebar.)

25            THE COURT:  When did the special agent conduct the

**UNITED STATES DISTRICT COURT**

1    Google search?

2              MR. YANNIELLO:  She conducted the Google search, I

3    believe -- whatever the date at the bottom would be.

4              MR. HARBAUGH:  10/15, Monday.

5              MR. YANNIELLO:  10/15.

6              MR. HARBAUGH:  A year and a half after --

7              MR. YANNIELLO:  The search results promulgate --

8    what comes back are articles that relate to before

9    Defendant Flint's activity, including documents that show that

10   contrary to what defense counsel has represented in opening

11   statement, that Mr. Shumake is not a trustworthy individual.

12             THE COURT:  So the Google search was conducted

13   Monday?

14             MR. HARBAUGH:  Yes, Your Honor.

15             MR. YANNIELLO:  Monday.

16             THE COURT:  And then when were the documents turned

17   over?

18             MR. YANNIELLO:  Well, the exhibit list was turned

19   over on the day of trial.

20             THE COURT:  Which is 10/16.

21             MR. YANNIELLO:  10/16.

22        And it says "Google search results" and with the direct

23   quotes for what the search results were.

24             MR. HARBAUGH:  And then they were provided at 7:38

25   by e-mail last night.

```
 1              THE COURT:  All right.  We have Exhibit Number --
 2   that's Exhibit Number 59.
 3              MR. YANNIELLO:  So for this, Your Honor, to provide
 4   a little bit of background, it's the search result that
 5   Agent Marriott just testified to, which is that she ran a
 6   search for money couriering in the United States or something
 7   of that sort, and those were the search results that came back,
 8   with the state department being the obvious first hit of that.
 9              THE COURT:  What is 60?
10              MR. YANNIELLO:  So 60 is the -- if you click on the
11   first link to the state department, it provides a -- it
12   provides a little commentary about diplomatic pouches, and then
13   it actually links to the formal policy manual that our state
14   department witness has testified is the formal guidance on
15   diplomatic pouches, which is already in evidence, Your Honor.
16              THE COURT:  So what is the date on the first hit on
17   the Google list?  So the first is entitled "Diplomatic Pouches
18   Department of State," and then there's also a reference to
19   Wikipedia, and then there's several other references that have
20   dates.  But the first two, what dates are there?
21          (Discussion off the record.)
22              MR. HARBAUGH:  Your Honor, just with all of these,
23   at the very bottom it provides a footer that indicates the date
24   is 10/15/2018 for every document, except for -- actually, no,
25   for all.
```

1          MR. YANNIELLO:  Which, of course, only refers to the

2    date that the search was run, not when the documents were

3    originally provided.  I can get an answer for you, Your Honor.

4    I'm not sure when that document was there.  What I could --

5          THE COURT:  Let's go to 61.

6          MR. YANNIELLO:  So 61 is actually already in

7    evidence.  That's the formal state department guidance.  Now,

8    this is just a cover page of it to show that the third click --

9    or the second click that Special Agent Marriott clicked

10   pursuant to her Google search led her right back to the

11   diplomatic --

12         THE COURT:  And then 62?

13         MR. YANNIELLO:  So 62 is a Google search for just

14   Robert Shumake.  And defense counsel opened by representing

15   that Mr. Flint was duped and that this case is a case about

16   trust and Mr. Flint trusting Robert Shumake.  And this search

17   shows that if you had Googled Robert Shumake, you would have

18   found articles that predated defendant's offense conduct that

19   link Mr. Shumake to fraud.

20         THE COURT:  Okay.  I assume you did this yourself

21   way back at some point in time?  The U.S. Attorney's Office

22   would have done a Google search of Mr. Shumake?

23         MR. YANNIELLO:  Well, this is true, Your Honor.

24     And the next exhibit we have actually produced to

25   defendant a long time ago.  Not the exhibit with Rebecca

1   Marriott's signature on it, but that exhibit has been produced

2   to defendant a long time ago.

3            MR. HARBAUGH:  That's actually not true because they

4   are all marked 10/15/2018, Your Honor.

5            MR. YANNIELLO:  So the substance of this article has

6   been provided.  The exact article, different printout.

7            MR. HARBAUGH:  But it renders it all irrelevant

8   because it occurred after the date, the offense conduct, the

9   entirety, beyond that, Your Honor.

10           THE COURT:  I'm just trying to figure out when the

11  U.S. Attorney's Office, the lawyers within the U.S. Attorney's

12  Office did the Google search of Mr. Shumake.  I would assume

13  that occurred very early on in this -- after the indictment or

14  during the indictment.

15           MR. YANNIELLO:  Well --

16           THE COURT:  Years ago.

17           MR. YANNIELLO:  It could be.  I know that there's

18  some Internet research was done and produced to defendant.  I

19  don't know if the search pages -- the initial search pages were

20  produced, but I know --

21           THE COURT:  Why didn't you turn this over initially?

22           MR. YANNIELLO:  Meaning?

23           THE COURT:  The Google search information,

24  Exhibits 59 through 64.

25           MR. YANNIELLO:  Your Honor, we didn't -- to be

1     honest, I didn't expect that we would be trying to introduce

2     this.  The defense have taken a position that Mr. Shumake was

3     inherently trustworthy, and I think that's why we are seeking

4     to admit these documents.

5            THE COURT:  The defense here is -- obviously, the

6     only viable defense here is good-faith belief, and I would

7     think that because of that viable defense, you would have been

8     prepared to produce these -- this information if the defense

9     went forward at the time of trial, and it would appear that you

10    should have given counsel this information before.

11       60, what else do you have here?

12           MR. YANNIELLO:  So the -- this -- I wouldn't be

13    seeking to admit that document.  I think that the --

14           THE COURT:  So 60 -- let's look.  64 is out?

15           MR. YANNIELLO:  Yeah, 64 is out.

16           THE COURT:  And 65 you are not offering.  There's a

17    lot of pages here.

18           MR. YANNIELLO:  Yeah, 65 we wouldn't be offering.

19           THE COURT:  65 is not going to be offered.  64 is

20    not going to be offered.

21           MR. HARBAUGH:  63 is an article of him showing up to

22    court.  It's completely prejudicial, and there's no evidence

23    that he saw this article ever beyond the fact that it was

24    produced or generated on 10/15/2018.

25           THE COURT:  So in reference to 63, how are you able

```
 1    to establish that the document was accessible prior to
 2    10/15/2018?
 3              MR. YANNIELLO:  So there's actually a date on the
 4    article, Your Honor, I believe on the first page, right there,
 5    that states that article was published, and if you -- this
 6    case --
 7              THE COURT:  The article is published March -- I
 8    don't know when it was published, but there's a date here March
 9    29th, 2017.
10              MR. YANNIELLO:  That's correct.  And this was about
11    an ongoing fraud case against Mr. Shumake that didn't resolve
12    until, I believe, the end of the year, but it was -- it had
13    predated this article, and it was produced again.
14              MR. HARBAUGH:  Well, we have the date of the
15    article, Your Honor, but we don't have a date as to when this
16    was posted online, but we have the date it was generated,
17    10/15/2018.
18              MR. YANNIELLO:  And just to clarify, Your Honor,
19    defense counsel keeps discussing when it was generated.  That's
20    when the document was printed.
21              MR. HARBAUGH:  Unless Ms. Marriott is an expert in
22    describing Internet -- Google Internet research, you don't have
23    a witness to testify as to the basis of when that was posted.
24              MR. YANNIELLO:  Your Honor, our position would be
25    it's nontestimonial, the date on here.  The Google search page
```

```
 1    shows the date of the article.
 2              THE COURT:  I'm looking at -- for example, I'm
 3    looking at Exhibit Number 62, and there's a reference that
 4    "Judge calls to the stand Robert Shumake, a criminal," and
 5    "Robert Shumake got busted," and "Robert Shumake, best-selling
 6    author and businessman."
 7              MR. YANNIELLO:  So, Your Honor, some of those dates
 8    are after the dates; some of them are before.  We would be
 9    willing to redact anything that is --
10              THE COURT:  So why are you offering this again?
11              MR. YANNIELLO:  Because the defense, in their
12    opening statement, "This is a case about trust."
13              THE COURT:  Yes.
14              MR. YANNIELLO:  That Mr. Flint trusted Robert
15    Shumake, and the Government should be able to introduce
16    evidence to rebut that, Your Honor.
17              MR. HARBAUGH:  It's evidence in the defense case to
18    rebut, not rebut a theory of defense at trial.
19              MR. YANNIELLO:  And we actually received -- we
20    ordered an expedited transcript of the opening.  We can
21    identify the portions.
22              THE COURT:  I recall the opening.  It seems to me
23    that the document should have been provided at an earlier date.
24    And so there's a lot of 403 information contained in here, and
25    it's going to take too long to redact, so the Court is going to
```

1    sustain the objection on 403 in its entirety.

2           MR. YANNIELLO:  Even though -- Your Honor, if we

3    didn't introduce the process and we had the agent testify about

4    her investigation and what it led to --

5           THE COURT:  You can ask questions, and I will rule.

6        (In open court.)

7           THE COURT:  Your witness, please.

8    BY MR. YANNIELLO:

9    Q    Agent Marriott, I'm actually going to ask you to look at a

10   different exhibit, an exhibit -- what's been admitted into

11   evidence as Government's Exhibit 33.

12       Do you recognize this document?

13   A    Yes.

14   Q    How do you recognize this document?

15          MR. HARBAUGH:  Objection, Your Honor; beyond the

16   Court's ruling.

17          THE COURT:  Overruled.

18          THE WITNESS:  This document was a link off of a

19   state department website referencing diplomatic pouches.

20   BY MR. YANNIELLO:

21   Q    And how did you find that state department website link to

22   diplomatic pouches?

23   A    When I Googled "Carrying cash in a diplomatic pouch in the

24   United States," one of the first results is a state department

25   website, which led me then to the link that provides this

1    explanation of diplomatic pouches.

2    Q    Okay.  And just to unpack that, you typed something into

3    Google, and it led to a state department website?

4    A    Correct.

5    Q    From that second -- from that first website, I guess --

6    A    Yes.

7    Q    -- you clicked a link, and it led you to this document?

8    A    Yes.

9    Q    Have you reviewed this document?

10   A    Yes.

11   Q    And I'm going to ask you to turn to page 7 of that

12   document.

13        And what does that say?

14   A    Well, the document specifies at the very bottom:

15   "Individuals, whether or not they are either a diplomat or

16   nonprofessional diplomatic courier, must use a valid diplomatic

17   passport."

18              MR. YANNIELLO:  One moment, Your Honor.

19        (Discussion off the record.)

20   BY MR. YANNIELLO:

21   Q    In your Google -- did you also conduct a separate Google

22   search?

23   A    Yes.

24   Q    What was the search term you used for that?

25              MR. HARBAUGH:  Objection, Your Honor.

```
 1              THE COURT:  Grounds?

 2              MR. HARBAUGH:  Relevance.

 3              THE COURT:  Grounds?

 4              MR. HARBAUGH:  Relevance and hearsay.

 5              THE COURT:  The objection is overruled.

 6              THE WITNESS:  Can you repeat the question?

 7  BY MR. YANNIELLO:

 8  Q    Did you conduct -- what was the substance of your Google

 9  search, the second one?

10              MR. HARBAUGH:  Objection; vague as to time,

11  Your Honor.

12              THE COURT:  You can clarify as to time.

13  BY MR. YANNIELLO:

14  Q    Before testifying today, did you conduct a Google search

15  and search for Robert Shumake?

16  A    Yeah.

17              MR. HARBAUGH:  Objection; vague as to time.

18              THE COURT:  When did you do that?

19              THE WITNESS:  I did the Google search -- what is

20  today?  Monday, the 15th, October 15th, 2018.

21  BY MR. YANNIELLO:

22  Q    And did that search return any information that predated

23  July 25th, 2017?

24              MR. HARBAUGH:  Objection; calls for hearsay.

25              THE COURT:  It's going to be sustained, lack of
```

1    foundation and 403.

2    BY MR. YANNIELLO:

3    Q    I'm going to ask you to turn to what's already been

4    admitted as Government's Exhibit 7.

5         Do you recognize this picture?

6    A    Yes.

7    Q    What does it depict?

8    A    Those are the identification cards that Mr. Flint

9    presented during the interview.

10   Q    And just to be clear, he had these cards on his person on

11   July 25th, 2017?

12   A    Yes.

13   Q    And he showed them to you?

14   A    Yes.

15   Q    Will you turn to what's been marked as Government's

16   Exhibit 8.

17        (Exhibit 8 for identification.)

18   BY MR. YANNIELLO:

19   Q    Do you recognize it?

20   A    Yes.

21   Q    What is it?

22   A    This is the cards that Mr. Flint presented to me for

23   Mr. Robert Shumake.

24             MR. YANNIELLO:  May 7 and 8 be admitted, Your Honor?

25             MR. HARBAUGH:  No objection.

UNITED STATES DISTRICT COURT

1      THE COURT:  7 and 8 have already been received.

2      MR. YANNIELLO:  I'm publishing Government's

3  Exhibit 8.

4  Q    And so one more time, what does this depict?

5  A    This is -- it was a photocopy of identifications that

6  Mr. Flint had to provide, identifying Mr. Robert Shumake.

7  Q    And where was this document located?

8  A    Inside his binder.

9  Q    And do you recall any representations that he made about

10  identification documents that belonged to Mr. Shumake that were

11  in the binder?

12  A    He had referenced that he had Mr. Shumake's diplomatic

13  passport.

14  Q    And your understanding, that none of these documents are

15  diplomatic passports, correct?

16  A    Correct.

17  Q    In fact, the top document, do you generally recognize that

18  document as -- what is that document?

19  A    I have no idea what it is.  I do not recognize it.

20  Q    Does it appear to be a similar identification document to

21  what Mr. Flint was carrying with him?

22  A    Yes.

23      MR. YANNIELLO:  Nothing further, Your Honor.

24      THE COURT:  Thank you.

25      Cross?

```
 1              MR. HARBAUGH:  Thank you, Your Honor.
 2                        CROSS-EXAMINATION
 3   BY MR. HARBAUGH:
 4   Q    Agent Marriott, the FBI was contacted on July 25th by the
 5   TSA?
 6   A    Is that a question?
 7   Q    Yes.
 8   A    Oh, yes, we were contacted by TSA.
 9   Q    And you were told by TSA that a passenger was on a flight
10   to LAX with an unscreened bag?
11   A    I may have received the phone call from my supervisor.  My
12   supervisor called the office.  So my supervisor, yes, was
13   informed of that, and he relayed the message to me.
14   Q    So TSA called your supervisor?
15   A    Uh-huh.
16   Q    And your supervisor told you, correct?
17   A    Correct.
18   Q    That a flight was arriving to LAX, right?
19   A    Yes.
20   Q    With a passenger with an unscreened bag, right?
21   A    Correct.
22   Q    Now, that flight was Delta flight 1358, right?
23   A    I don't remember the flight number.
24   Q    Let's pull up your report that you prepared with agent
25   Wes Williams.  Why don't you turn to defense Exhibit 263.  It's
```

1    in the larger binder.

2         There you go.

3         (Exhibit 263 for identification.)

4              THE WITNESS:  What number was it?

5    BY MR. HARBAUGH:

6    Q    263.

7              THE COURT:  What's the question?

8              MR. HARBAUGH:  I'm refreshing her memory as to what

9    flight Mr. Flint was on.

10             THE COURT:  Will the Government stipulate as to the

11   flight number?

12             MR. YANNIELLO:  Yes, Your Honor.

13             THE COURT:  There's no issue.

14   BY MR. HARBAUGH:

15   Q    So Mr. Flint was arriving on Delta flight 1358 --

16   actually, Agent Marriott, we can hold off for now.

17   A    Okay.

18   Q    The flight was coming from Minneapolis-St. Paul airport,

19   right?

20   A    Yes.

21   Q    Please close the binder, if you could.

22   A    Okay.

23   Q    Thank you.

24        And the flight arrived around 11:00 a.m. that morning,

25   right?

```
 1    A      Approximately.
 2    Q      Now, when -- you arrived at Terminal 3 before the flight
 3    landed, right?
 4    A      Correct.
 5    Q      You weren't the only person that was there to meet the
 6    flight, right?
 7    A      That is correct.
 8    Q      Now, there were other agents with you at the time,
 9    correct?
10    A      There was one other agent FBI agent, if that's what you're
11    referring to, yes.
12    Q      Excuse me.  There were other law enforcement personnel
13    that were with you at the time you met the flight?
14    A      Yes.
15    Q      Now, there was FBI Agent Wes Williams, correct?
16    A      No.  He's -- he is a federal air marshal.  He is not an
17    FBI agent.
18    Q      Excuse me, Federal Air Marshal Wes Williams was with you?
19    A      Correct.
20    Q      Another FBI agent, correct?
21    A      Yes.
22    Q      There were TSA agents, correct?
23    A      Yes.
24    Q      How many were there?
25    A      I don't recall how many.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q      More than two?
 2   A      I don't recall, so I would -- I don't know the number.
 3   Q      And there were also officers from the Los Angeles Police
 4   Department LAX, correct?
 5   A      Yes.
 6   Q      So there were about six to seven --
 7            THE COURT:  Mr. Harbaugh, would you please --
 8   BY MR. HARBAUGH:
 9   Q      There were about six to seven law enforcement officials
10   that came to the flight that day?
11   A      Approximate.
12   Q      Now, as you indicated, Wes Williams is an air marshal,
13   correct?
14   A      Correct.
15   Q      And when you met that flight, Agent Williams got Mr. Flint
16   off the plane, right?
17   A      I believe, as well as there were others that went onboard.
18   Q      That went onboard the plane?
19   A      Uh-huh.
20            THE COURT:  I need to see counsel at sidebar.
21        (Discussion held at sidebar.)
22            THE COURT:  Mr. Harbaugh, stay behind the
23   microphone.  When you move away from it, I'm not hearing you.
24            MR. HARBAUGH:  I'm sorry.
25            THE COURT:  So just remind you to stay behind it.
```

```
 1                    MR. HARBAUGH:  I will.  I will tie a rope.

 2                    THE COURT:  Thank you.

 3                    MR. HARBAUGH:  Sorry.

 4          (In open court.)

 5    BY MR. HARBAUGH:

 6    Q    So Air Marshal Williams and other law enforcement

 7    officials walked down the jetway, correct?

 8    A    Correct.

 9    Q    Went onto the plane, correct?

10    A    Correct.

11    Q    Went to where Mr. Flint was seated, correct?

12                    MR. YANNIELLO:  Your Honor, objection; relevance.

13                    THE COURT:  It will be overruled at this time, but

14    get to the point, please.

15    BY MR. HARBAUGH:

16    Q    And Mr. Flint was taken off the plane, correct?

17    A    Mr. Flint walked off the plane.

18    Q    With an escort by Agent Williams and the other law

19    enforcement person?

20    A    Yes.

21    Q    Mr. Flint could not refuse to stay in his seat, correct?

22                    MR. YANNIELLO:  Objection; relevance.

23                    THE COURT:  Sustained.

24    BY MR. HARBAUGH:

25    Q    He wasn't given the option to remain in his seat, correct?
```

```
 1              MR. YANNIELLO:  Objection; relevance.

 2              THE COURT:  Sustained.

 3   BY MR. HARBAUGH:

 4   Q    So when Air Marshal Williams and the other law enforcement

 5   agent pulled Mr. Flint off the flight, he was escorted into an

 6   interview room?

 7              MR. YANNIELLO:  Objection; misstates testimony.

 8              THE COURT:  Sustained.

 9   BY MR. HARBAUGH:

10   Q    So the six to seven law enforcement personnel escorted

11   Mr. Flint to an interview room, correct?

12   A    Correct.

13   Q    And this was a TSA screening room, correct?

14   A    Yes.

15   Q    That you were using -- going to use to interview

16   Mr. Flint, right?

17   A    Yes.

18   Q    Now, we talked about some of the LAPD officers.  They were

19   uniformed officers, correct?

20   A    It was Los Angeles International Airport police, not LAPD.

21   Q    Excuse me.  So they were airport police, correct?

22              MR. YANNIELLO:  Objection; relevance.

23              THE COURT:  Overruled.

24   BY MR. HARBAUGH:

25   Q    They had guns, right?
```

```
 1    A    Yes.

 2    Q    One of them was wearing all black tactical gear, correct?

 3    A    That, I do not recall.

 4    Q    One actually had a rifle slung over his back, correct?

 5    A    I do not recall that.

 6    Q    So after this group of six to seven law enforcement

 7  escorted -- or brought Mr. Flint to an interview room, you

 8  interviewed Mr. Flint, correct?

 9    A    Correct.

10    Q    Also Air Marshal Williams, correct?

11    A    Correct.

12    Q    And I believe a few others came in at certain times as

13  well?

14    A    Agent Michael Simon.

15             MR. HARBAUGH:  And let the record reflect that the

16  witness identified the case agent at the Government's table.

17             THE COURT:  I didn't see it.  Did you?

18             THE WITNESS:  Yes.

19             THE COURT:  Thank you.

20  BY MR. HARBAUGH:

21    Q    Now, we heard some clips today of that interview, correct?

22    A    Correct.

23    Q    Now, you interviewed Mr. Flint for almost two hours,

24  right?

25    A    I believe so.  I believe it was almost two hours.
```

1   Q    About an hour, 50 minutes 37 seconds, does that sound
2   about right?
3   A    That would be about approximate two hours.
4   Q    Now, Mr. Flint was cooperative during the interview?
5   A    Yes.
6   Q    And, actually, you told him that, right?
7   A    Yes, I did.
8   Q    Now I want to go over some of the questions you asked
9   Mr. Flint about during that two-hour interview.  You asked him
10  about his understanding of his authority to serve as a
11  diplomatic courier, right?
12  A    Yes, I did.
13  Q    And he identified the Geneva Convention, right?
14  A    Correct.
15  Q    Which has nothing to do with diplomatic couriers, right?
16  A    That's my understanding of the Geneva Convention.
17  Q    Now, during that interview, you learned that the
18  diplomatic pouch he was holding belonged to Robert Shumake,
19  right?
20  A    Correct.
21           MR. YANNIELLO:  Objection; lack of foundation.
22           THE COURT:  Overruled.
23           THE WITNESS:  Correct.
24  BY MR. HARBAUGH:
25  Q    And you asked -- you asked Mr. Flint where Mr. Shumake was

1    appointed, right?

2    A    Yes.

3    Q    And you asked because the records show the organization is

4    based in Pakistan, right?

5    A    Well, there was several different addresses listed, so

6    that was my wondering of where exactly this headquarters was.

7    Q    And Mr. Flint directed you to talk to Mr. Shumake about

8    it, correct?

9    A    Correct.

10   Q    Now, that's when Mr. Flint calls Mr. Shumake the first

11   time during that interview, right?

12   A    Correct.

13   Q    And during that time the line gets -- he actually picks up

14   his phone, right?  He dials a number?

15   A    Mr. Flint?

16   Q    Yes.

17   A    Yes.

18   Q    And he indicates to you that the line is disconnected,

19   right?

20   A    Yes.

21   Q    Then Mr. Flint calls Mr. Shumake again, right?

22   A    Yes.

23   Q    Mr. Flint puts Mr. Shumake on speaker phone, correct?

24           MR. YANNIELLO:  Objection, Your Honor; motion in

25   limine.

```
 1              THE COURT:  Sustained.
 2  BY MR. HARBAUGH:
 3  Q    Once Mr. Shumake is on speaker phone, you talked directly
 4  to Mr. Shumake, correct?
 5              MR. YANNIELLO:  Your Honor, can we go to sidebar?
 6              THE COURT:  Request denied.
 7              THE WITNESS:  I'm sorry, can you repeat?
 8              MR. YANNIELLO:  Objection; motion in limine.
 9              THE COURT:  You understand the prior rulings of the
10  Court?
11              MR. HARBAUGH:  Your Honor, we are not eliciting
12  testimony.  We are not eliciting hearsay.  We are eliciting
13  that a phone call was placed and made.
14              THE COURT:  Go ahead.
15  BY MR. HARBAUGH:
16  Q    Once Mr. Shumake is on the speaker phone, you talked
17  directly to Mr. Shumake, correct?
18  A    Who he identified as Mr. Shumake.  Whether or not it was
19  actually Mr. Shumake, I have no way of knowing.
20  Q    You identify yourself?
21  A    Yes, I do.
22  Q    You indicate you are an agent with the FBI, right?
23  A    Yes.
24  Q    You asked where he works, right?
25              MR. YANNIELLO:  Objection, Your Honor; motion in
```

UNITED STATES DISTRICT COURT

```
 1   limine.
 2                THE COURT:  Sustained.
 3   BY MR. HARBAUGH:
 4   Q    You have difficulty hearing this person on the other end,
 5   correct?
 6   A    Yes.
 7   Q    And you, after the conversation concludes, you ask for the
 8   phone number of this person you're talking to, right?
 9   A    Yes.
10   Q    And that person gives you that phone number, right?
11                MR. YANNIELLO:  Objection; same objection,
12   Your Honor.
13                THE COURT:  Sustained.
14                MR. HARBAUGH:  One moment.
15        (Discussion off the record.)
16   BY MR. HARBAUGH:
17   Q    Now, throughout the interview you tell Mr. Flint your
18   understanding of what the law requires, right?
19   A    Yes.
20   Q    At one point you tell him that diplomatic status comes
21   from the Department of State, right?
22   A    Correct.
23   Q    You told him he had to be vetted by the state department,
24   right?
25   A    Correct.
```

```
 1   Q     And Mr. Flint wasn't aware of that, right?
 2                MR. YANNIELLO:  Objection; lack of foundation.
 3                THE COURT:  Sustained.
 4   BY MR. HARBAUGH:
 5   Q     Now, you tell Mr. Flint he cannot be a diplomat in his own
 6   country, right?
 7   A     Correct.
 8   Q     You told him he needed a diplomatic passport, right?
 9   A     Yes.
10   Q     And Mr. Flint disputes your assertions, right?
11   A     Yes.
12   Q     Mr. Flint believes that his status comes from the IHRC?
13                MR. YANNIELLO:  Objection; lacks foundation.
14                THE COURT:  Sustained, and argumentative.
15   BY MR. HARBAUGH:
16   Q     Now, later you told Mr. Flint because his bag had not been
17   screened, it would have to be screened at LAX, right?
18   A     Yes.
19   Q     Now -- and you sought Mr. Flint's consent to search?
20   A     Yes.
21   Q     Now, Mr. Flint indicated before he could give that
22   consent, he had to consult Mr. Shumake, right?
23   A     Yes.
24   Q     And, again, Mr. Flint called an individual indicating that
25   it was Mr. Shumake, right?
```

```
 1   A      Correct.
 2   Q      Mr. Flint sought authorization from that person to open
 3   the pouch, right?
 4              MR. YANNIELLO:  Objection; motion in limine.
 5              THE COURT:  Sustained.
 6   BY MR. HARBAUGH:
 7   Q      You eventually talked to another individual -- excuse me,
 8   an individual on the phone after you request authorization?
 9              MR. YANNIELLO:  Same objection, Your Honor.
10              THE COURT:  Overruled.
11              THE WITNESS:  Can you repeat the question?
12   BY MR. HARBAUGH:
13   Q      Sure.  So we're saying now after you requested Mr. Flint
14   to provide authorization or consent to search the bag --
15   A      Uh-huh.
16   Q      -- you talked to another individual on the phone?
17   A      Yes.
18   Q      And that based upon your hearing of that voice previously,
19   it's the same individual you spoke to earlier, correct?
20   A      Again, I have no idea if that's the same person on the
21   other line or not.
22   Q      But the voice wasn't different?
23   A      The voice did not sound different, but that doesn't mean
24   it's not a different person.
25              MR. HARBAUGH:  One moment.
```

1       (Discussion off the record.)

2    BY MR. HARBAUGH:

3    Q    I just want to follow up on one point we discussed at the

4    beginning, when you saw Mr. Flint.  Mr. Flint was not alone,

5    correct?  Excuse me.  So you were at the gate, correct?

6    A    Yes.

7    Q    You did not personally go on the plane, right?

8    A    Not that I recall, no.  I did not go on the plane.

9    Q    Agent Williams -- or excuse me, Air Marshal Williams did,

10   right?

11   A    You would need to speak with Agent Williams to verify.

12   I'm not for sure all of the individuals who went on the

13   aircraft.  I know I did not go on the aircraft.

14   Q    So there were several individuals that went on the

15   aircraft, correct?

16   A    As far as I recall, yes.

17   Q    And when they came back off the aircraft, they had

18   Mr. Flint, right?

19   A    Mr. Flint was walking off the aircraft, yes.

20   Q    With them?

21   A    With them.

22   Q    Not by himself?

23   A    No, not by himself.

24        MR. HARBAUGH:  Nothing further, Your Honor.

25        THE COURT:  Redirect?

UNITED STATES DISTRICT COURT

**REDIRECT EXAMINATION**

1

2  BY MR. YANNIELLO:

3  Q    So defense counsel asked you quite a few questions about

4  how Mr. Flint exited the airplane.  And did he -- was anybody

5  forcing him to walk off the airplane?

6              MR. HARBAUGH:  Objection; calls for speculation.

7              THE COURT:  You can testify as to what you observed.

8              THE WITNESS:  When I observed Mr. Flint walking off

9  the aircraft, he was walking on his own accord.  No one was

10  forcing him, and he was not fighting anyone.

11  BY MR. YANNIELLO:

12  Q    And because -- was this -- Mr. Flint's flight had just

13  landed, correct?

14  A    Correct.

15  Q    And so people who were on that flight were getting off

16  that flight?

17  A    If I remember correctly, I believe he was one of the

18  first -- seated near the very front of the aircraft, so he was

19  one of the first passengers coming off of the aircraft.

20  Q    Okay.  And defense counsel also asked you a couple of

21  questions or quite a few questions about the interview.  I just

22  want to ask you about something that you testified to in your

23  direct.

24  A    Uh-huh.

25  Q    Did you ask Mr. Flint directly whether or not he had been

```
 1   stopped with the identification document that he brought and

 2   the diplomatic bag that he claimed was a diplomatic courier

 3   bag?

 4                MR. HARBAUGH:  Objection; beyond the scope of cross,

 5   Your Honor.

 6                THE COURT:  Overruled.

 7                THE WITNESS:  Can you repeat the question?

 8   BY MR. YANNIELLO:

 9   Q    Did you ask Mr. Flint directly whether or not he had ever

10   been stopped with his laminated -- self-laminated

11   identification card?

12   A    Yes, I asked him directly.

13   Q    And what did he say?

14   A    No.

15                MR. YANNIELLO:  Nothing further, Your Honor.

16                THE COURT:  Recross?

17                         RECROSS-EXAMINATION

18   BY MR. HARBAUGH:

19   Q    Agent Marriott, you have been working as an FBI agent for

20   approximately eight years?

21   A    Yes.

22   Q    And you have spent those eight years at LAX?

23   A    Not all of them at LAX, no.

24   Q    How long have you been at LAX?

25   A    I had been at LAX at that time over -- or right at three
```

1    years.

2    Q    And in those three years, you were responsible for

3    handling -- investigating incidents within the airport, right?

4    A    Right.

5    Q    And incidents on aircraft, right?

6    A    Correct.

7    Q    Now, you received a call regarding an unscreened package

8    on the plane, correct?

9              MR. YANNIELLO:  Objection; exceeds the scope of --

10             THE COURT:  Overruled.

11             THE WITNESS:  Yes, correct.

12   BY MR. HARBAUGH:

13   Q    And protocol is that when an individual needs to be

14   contacted, a suspect, on an aircraft, law enforcement notifies

15   that plane first, right?

16   A    There's protocol, but it depends.  All situations are

17   different, so I would hate to say this is exactly what happens

18   each and every time.

19   Q    Oftentimes the airport -- the airplane is contacted itself

20   regarding a potential suspect on a plane, correct?

21   A    Yes.

22   Q    And they direct that no other passengers get off the

23   flight until that person could be taken off the flight, right?

24   A    Correct.

25   Q    And that's what was done in this case, right?

1          MR. YANNIELLO:  Objection; calls for speculation.

2          THE COURT:  Do you know?  Do you have personal

3   knowledge?

4          THE WITNESS:  No, I don't.

5          THE COURT:  Sustained.

6          MR. HARBAUGH:  Nothing further, Your Honor.

7          THE COURT:  Thank you.

8      May the special agent be excused?  Yes?

9          MR. YANNIELLO:  Yes, Your Honor.

10          THE COURT:  Thank you very much, Special

11   Agent Marriott.

12      Additional witnesses?

13          MR. YANNIELLO:  Subject to the Government's pending

14   motion, Your Honor, we would rest our case.

15          THE COURT:  Defense?

16          MS. WAKEFIELD:  I'm sorry, Your Honor?

17          THE COURT:  Do you have any witnesses?

18          MS. WAKEFIELD:  We would like to make a motion

19   first.

20          THE COURT:  You will have an opportunity to -- the

21   Court will reserve -- do you have any witnesses to call?

22          MS. WAKEFIELD:  May I have one moment?

23          THE COURT:  Yes.

24      (Discussion off the record.)

25          MR. HARBAUGH:  Yes, Your Honor.  The defense calls

```
 1   Air Marshal Wes Williams.
 2              MS. RO:  Your Honor, may we have a sidebar?  This is
 3   to raise an issue that was raised on Tuesday.
 4              THE COURT:  Is the air marshal in the corridor
 5   outside?
 6              MS. RO:  Yes, Your Honor.
 7              THE COURT:  Yes, let's hear what you have to say.
 8         (Discussion held at sidebar.)
 9              THE COURT:  So we have Government's request for
10   reconsideration of the Court's order regarding 404(b) evidence,
11   and the defense was supposed to file a pleading.  I know you
12   probably did not have enough opportunity or time.
13              MS. WAKEFIELD:  I did not.  I wrote down some
14   thoughts, though.
15              THE COURT:  We need to address that issue.  And then
16   we also have the air marshal that the defense intends to call.
17              MS. WAKEFIELD:  Uh-huh.
18              THE COURT:  So what's the issue with the air
19   marshal?
20              MS. RO:  Your Honor, the defense asked us to bring
21   the air marshal the first day of trial.  He wasn't on the
22   witness list.  We said we would make him available during a
23   proffer because he was present during the interview.  The
24   testimony elicited came directly from Agent Marriott.  And they
25   cannot call him just to impeach the witness or to elicit other
```

```
 1    self-serving hearsay that the Court already ruled on.

 2              THE COURT:  I don't understand your objection.

 3              MS. RO:  The Government wants a proffer of why they

 4    are calling the Government's witness.

 5              THE COURT:  He was there.

 6              MS. RO:  And just specifically that they won't go

 7    into impeaching the witness.

 8              THE COURT:  We don't know what they are going to do.

 9              MS. RO:  The Government would ask for a proffer of

10    proof.

11              THE COURT:  The request is denied.  He was there.

12         (In open court.)

13              THE COURT:  You may call your next witness.

14              THE COURTROOM DEPUTY:  Good afternoon, sir.  Would

15    you please come forward.

16         Sir, would you please stop right there, and raise your

17    right hand to be sworn.

18         **WESLEY WILLIAMS, DEFENSE WITNESS, WAS SWORN**

19              THE WITNESS:  I do.

20              THE COURTROOM DEPUTY:  Thank you, sir.  Would you

21    please be seated.

22         Sir, for the record, would you please state your name, and

23    spell your last name.

24              THE WITNESS:  Hi.  My name is Wesley Williams, last

25    name is W-i-l-l-i-a-m-s.
```

```
 1              THE COURT:  Your witness.

 2              MR. HARBAUGH:  Thank you, Your Honor.

 3                       DIRECT EXAMINATION

 4   BY MR. HARBAUGH:

 5   Q    Good afternoon, Mr. Williams.

 6   A    Hello.

 7   Q    What is your current duty position?

 8   A    I am a federal air marshal.  I'm currently stationed in

 9   Herndon, Virginia.  I work in TSA's Freedom Center.

10   Q    Now, were you previously working at -- as an air marshal

11   at Los Angeles International Airport?

12   A    So -- yes.  I worked as an air marshal at LAX from 2014 to

13   2017.  I was the federal air marshal representative on the LAX

14   FBI's joint terrorism task force.

15   Q    And on July 25th of last year, you responded to a call

16   regarding a passenger with an unscreened bag at LAX, correct?

17   A    Yes.

18   Q    And that passenger was Mr. Daniel Flint, correct?

19   A    Yes.

20   Q    Now, you received notice before the flight landed,

21   correct?

22              MS. RO:  Objection, Your Honor; leading.

23              MR. HARBAUGH:  Your Honor, Rule 611(c)(2), witness

24   identified with an adverse party, he's the witness that was

25   involved in interrogating and prosecuting Mr. Flint.
```

```
 1              THE COURT:  It's overruled.
 2   BY MR. HARBAUGH:
 3   Q    So let me back up.  So the FBI -- or the task force was
 4   contacted by the TSA, correct?
 5   A    No.  To my knowledge, FBI Chicago contacted us.
 6   Q    FBI Chicago contacted you?
 7   A    Yes.
 8   Q    Then you were told there was a passenger on a flight to
 9   LAX with an unscreened bag, right?
10   A    Yes.
11   Q    And when you met the flight, you got the passenger off the
12   plane, correct?
13   A    Yes.
14   Q    You had one other officer with you, correct?
15   A    I believe so.  Normally when we get people off the plane,
16   folks on the task force, local airport police would be
17   alongside us.  I couldn't tell you who that person was, though.
18              MR. HARBAUGH:  One moment, Your Honor.
19        (Discussion off the record.)
20   BY MR. HARBAUGH:
21   Q    At the time you got Mr. Flint off the plane, no other
22   passengers were free to leave until law enforcement got him
23   off?
24   A    Yes.
25   Q    And Mr. Flint had no choice but to get off the plane,
```

```
 1   correct?
 2            MS. RO:  Objection.  That's leading.
 3            THE COURT:  It's 403.  The Court's going to sustain
 4   under 403.
 5            MR. HARBAUGH:  Your Honor, we would request a quick
 6   sidebar.
 7            THE COURT:  Request denied.  Please continue.
 8   BY MR. HARBAUGH:
 9   Q    You required Mr. Flint to get off the plane, correct?
10   A    Yes.
11            MR. HARBAUGH:  Nothing further, Your Honor.
12            THE COURT:  Government?
13            MS. RO:  No, Your Honor.
14            THE COURT:  May the witness be excused?
15            MR. HARBAUGH:  Yes, Your Honor.
16            MS. RO:  Yes, Your Honor.
17            THE COURT:  Thank you very much for your testimony.
18            THE WITNESS:  No problem.
19            THE COURT:  Next?
20            MS. WAKEFIELD:  May we have just one moment,
21   Your Honor?
22            THE COURT:  Yes.
23         (Discussion off the record.)
24            MS. WAKEFIELD:  Your Honor, the defense would call
25   Michael Simon to the stand.
```

1            **MICHAEL SIMON, DEFENSE WITNESS, WAS SWORN**

2            THE WITNESS:  Yes.

3            THE COURTROOM DEPUTY:  Thank you.  Would you please

4 be seated.

5       Sir, for the record, would you please state your name, and

6 spell your last name.

7            THE WITNESS:  Sure.  My name is Michael Simon, last

8 name spelled S-i-m-o-n.

9                    **DIRECT EXAMINATION**

10 BY MS. WAKEFIELD:

11 Q     Good afternoon.

12 A     Good afternoon.

13 Q     Now, you are the case agent on this case, right?

14 A     That is correct.

15 Q     And I'm going to be brief.  As the case agent, you sent a

16 letter to the United Nations, correct?

17 A     I did not send a letter to the United Nations.

18 Q     Did you sign a letter to the United Nations?

19 A     No, I did not.

20 Q     Did you send a letter to the state department?

21 A     No, I did not -- well, let me correct that.  I sent a

22 letter to -- a request to the FBI in New York, who then

23 requested, through their formal channels, they wrote a letter

24 to the U.S. mission to the United Nations.  So my letter was

25 forwarded to the U.S. mission to the United Nations.

```
1   Q     And the U.S. mission to the United Nations sent a request
2   to the United Nations?
3   A     That is correct.
4   Q     And forwarded your letter, correct?
5   A     I do not believe they forwarded my letter.  I think they
6   wrote their own letter to the United Nations.
7   Q     And point of all of this was asking the United Nations to
8   provide confirmation of the status of the international human
9   rights fund -- or sorry, International Human Rights Commission
10  Relief Fund Trust?
11            MR. YANNIELLO:  Objection; hearsay and misstates --
12            THE COURT:  Overruled.
13            THE WITNESS:  Can you ask it one more time, please?
14  BY MS. WAKEFIELD:
15  Q     You wanted to find out from the United Nations whether the
16  International Human Rights Commission Relief Fund Trust had any
17  status with the United Nations?
18  A     If I can recall correctly, my letter requested to
19  determine the diplomatic status of the International Human
20  Rights Commission.
21  Q     And they replied that an organization --
22            MR. YANNIELLO:  Objection; hearsay.
23            THE COURT:  Sustained.
24            MS. WAKEFIELD:  Your Honor, we would move this -- we
25  would move an exhibit into evidence, so I don't know if --
```

**UNITED STATES DISTRICT COURT**

1          THE COURT:  What exhibit number?

2          MS. WAKEFIELD:  Defense Exhibit 202.

3          THE COURT:  Is it in the book?

4          MS. WAKEFIELD:  It is, Your Honor.

5          MR. YANNIELLO:  Objection; hearsay.

6          THE COURT:  Let me find the exhibit, please.

7     The objection would be sustained subject to further

8   argument.

9          MS. WAKEFIELD:  Would the Court want us to --

10          THE COURT:  No.  Continue with your questioning.

11          MS. WAKEFIELD:  Okay.

12  Q    Agent Simon, you reviewed the documents in Mr. Flint's

13  binder that was seized on July 25th, 2017, correct?

14  A    Are you asking me if I reviewed them that day?

15  Q    You reviewed the documents, right?

16  A    Yes, I reviewed the documents.

17          MS. WAKEFIELD:  And, Your Honor, I would like to

18  publish Government's Exhibit 8.

19          THE COURT:  Feel free if it's already been received.

20  8's already in evidence.

21  BY MS. WAKEFIELD:

22  Q    Now, that is an ID card from the United Nations for

23  Mr. Shumake, correct?

24  A    That looks -- that, to me, appears --

25          MR. YANNIELLO:  Objection; lacks foundation.

**UNITED STATES DISTRICT COURT**

1           MS. WAKEFIELD:  This is the Government's exhibit,

2   Your Honor.

3           THE COURT:  Are you able to identify this as the ID

4   card from the United Nations?  Do you know one way or the

5   other?

6           THE WITNESS:  Your Honor, no, I do not.

7   BY MS. WAKEFIELD:

8   Q    You don't know what an ID card from the United Nations is?

9           THE COURT:  It's sustained on foundation.

10  BY MS. WAKEFIELD:

11  Q    So your testimony is you don't know what an ID from the

12  United Nations looks like?

13  A    I'm trying to say that this is a photocopy of -- this is a

14  photocopy of some kind of card.

15  Q    Are you familiar with the term ECOSOC, which stands for

16  Economic and Social Council?

17  A    I believe that's what was in the letter from the United

18  Nations.

19  Q    And ECOSOC refers to a committee or a council within the

20  United Nations, correct?

21  A    I know that it's called the Economic and Social Council.

22  Q    And you see the acronym ECOSOC on Government's Exhibit 8

23  there, correct?

24  A    Yes, I do.

25  Q    Did you investigate whether Mr. Shumake had any

1    recognition from the United Nations?

2    A    According to the letter, the International Human Rights

3    Commission had observer status with the ECOSOC.

4    Q    And Mr. Shumake was listed as a contact for the IHRC on

5    that council?

6    A    If I could look at the exact letter to refresh my memory.

7    Q    Would it refresh your memory to look at Defense Exhibit

8    202?

9    A    Yes.

10   Q    It should be in one of those binders, and page 2,

11   paragraph 2.  And let me know if that refreshes your memory.

12   A    Okay.

13   Q    Does that refresh your recollection?

14   A    Yes.

15   Q    And Mr. Shumake was listed as one of the individuals as a

16   contact person for the United Nations, correct?

17   A    Yes.

18         MS. WAKEFIELD:  One moment, Your Honor.

19        (Discussion off the record.)

20         MS. WAKEFIELD:  Nothing further.

21                         **CROSS-EXAMINATION**

22   BY MR. YANNNIELLO:

23   Q    Good afternoon, Agent Simon.

24   A    Good afternoon.

25   Q    Defense counsel asked you about some investigation that

```
 1   you conducted about Robert Shumake.

 2   A     Correct.

 3   Q     Did you conduct any other investigations related to

 4   Mr. Shumake?

 5              MS. WAKEFIELD:  Objection.  It exceeds the scope.

 6              THE COURT:  Overruled.

 7              THE WITNESS:  I did.

 8   BY MR. YANNIELLO:

 9   Q     Did you look into Mr. Shumake's criminal history?

10   A     Yes, I did.

11   Q     And what did that investigation reveal?

12   A     It revealed --

13              MS. WAKEFIELD:  I'm going to object on 403.

14              THE COURT:  Overruled.

15              THE WITNESS:  It revealed a long criminal history as

16   I would -- and I say that in there are multiple pages in the

17   criminal history report.

18   BY MR. YANNIELLO:

19   Q     Was Mr. Shumake -- at the time that defendant was stopped

20   in July 25th, 2017, was there a pending fraud case against

21   Mr. Shumake?

22   A     That is correct.

23              MR. YANNIELLO:  Nothing further, Your Honor.

24              THE COURT:  Redirect?

25              MS. WAKEFIELD:  No, Your Honor.
```

```
 1              THE COURT:  May the witness be excused?

 2              MS. WAKEFIELD:  Yes.

 3              THE COURT:  Thank you.

 4         Thank you.  Any additional witnesses?

 5              MS. WAKEFIELD:  One moment.

 6              THE COURT:  Let's take the afternoon recess.

 7    There's some legal issues for the Court to discuss with

 8    counsel, so the jury would be excused.  I'm assuming that the

 9    case will be submitted to the jury tomorrow.  So let me have

10    the jury arrive tomorrow, we will make it at 9:30.

11         So, again, traffic could be a little bit heavier at that

12    time, so make sure you give yourself plenty of time to arrive

13    here at 9:30.  Tomorrow I expect that I will provide jury

14    instructions to you, hopefully counsel will be able to argue

15    the case to you, and the case will be submitted to you tomorrow

16    is the goal.  Thank you.

17              THE COURTROOM DEPUTY:  All rise for the jury,

18    please.

19         (Outside the presence of the jury.)

20              THE COURT:  Okay.  The jury has been excused.

21         There are several issues to discuss:  one is the

22    defendant's request to offer into evidence Exhibit Number 202.

23    There was a Government objection to that exhibit.  The

24    objection was hearsay.  And I understand the hearsay objection,

25    but I do not understand why the Government would not want to
```

1  offer or have this received.

2      On page 2 the letter unequivocally states that they,

3  referring to, I would imagine, Mr. Shumake and those associated

4  with him, do not enjoy the immunities and facilities of

5  diplomatic envoys.

6          MR. YANNIELLO:  Your Honor, we will withdraw the

7  objection.

8          MS. WAKEFIELD:  We will withdraw it from evidence.

9          THE COURT:  The objection -- it's hearsay, so it's

10  been withdrawn.

11      And then we have the issue that just occurred regarding

12  Mr. Shumake's prior criminal history, I just want to make it

13  clear that the Court allowed counsel for the Government to

14  inquire regarding that because, in the Court's view, the

15  defense has opened the door in reference to questions asked of

16  the special agent regarding his investigation of whether

17  Mr. Shumake had any recognition from the United Nations.  So

18  the door was opened, and the additional questions from the

19  Government was allowed.

20      We have the motion, Government's request for

21  reconsideration of the Court's order re 404(b) evidence.  The

22  Court has reviewed and read the request.  So let me -- so I

23  have some questions.  The question -- I'm assuming that the --

24  well, there were certain exhibits attached to the motion

25  itself, to the request for reconsideration.  This is Document

1    Number 105.  I didn't see that the exhibits were lettered or

2    numbered.

3        On page 5 of the document, Document 105, do you have that

4    page?  Let's make sure that both sides have a clear

5    understanding of what I'm referring to.  So do you have

6    Exhibit 105, both sides?

7              MS. RO:  Yes, Your Honor.

8              THE COURT:  Yes.

9              MS. WAKEFIELD:  Yes.

10             THE COURT:  So on page 5 -- page 5, on line 18

11   references Exhibit A attached hereto, and I didn't see -- and

12   the exhibits being lettered, I'm assuming because the first

13   document, Exhibit A, appears to reference the first document.

14   Exhibit A, I'm assuming, is the website for Mr. Flint.

15             MS. RO:  Yes, Your Honor.

16             THE COURT:  And it consists of two pages.

17             MS. RO:  Yes.

18             THE COURT:  So the Government, on page 5, on lines

19   17 -- let's see, commencing on line -- let me find this.

20   Commencing on line 16 references the attached Google search

21   resulted in defendant's law office Web page shows the solo

22   practice that defendant started out with was that of Douglas

23   Hampton.  I don't see on Exhibit A any reference to Douglas

24   Hampton.

25             MS. RO:  Your Honor, we are withdrawing the Douglas

1   Hampton mention.

2              THE COURT:  Okay.  So then we have Exhibit B, and

3   Exhibit B is a bankruptcy document, United States Bankruptcy

4   Court, Eastern District of Michigan, Southern Division.

5   It's -- in this case it's identified as Document 105, page 14

6   of 23, and page ID number 1327.  This appears to be a

7   bankruptcy document that was filed on or about the 1st --

8   January 21st, 2015, involving a bankruptcy of Mr. Shumake.

9        And in the body of the document on page -- I'm looking at

10  page 3 of 6, it references Mr. Flint's law firm and Mr. Douglas

11  Hampton's law firm.  And then in the attachment thereto, there

12  appears to be a summary of schedules associated with the

13  bankruptcy proceeding.  And it appears that Mr. Flint seems to

14  have made a claim in the bankruptcy court as a creditor for

15  attorney fees involving -- it looks like, I'm assuming, monies

16  owed by Mr. Shumake to Mr. Flint for attorney's fees in the sum

17  of $25,000.

18       So what's the import of this document?

19             MS. RO:  The import is that, Your Honor, this

20  occurred -- predates September 2016, for when the defendant may

21  have initially been -- or believed to have thought --

22  Your Honor, if I may rephrase that.  That was poorly

23  articulated.

24       The import is that this offense -- or the defendant

25  seeking money from Robert Shumake, it predates September 2016.

1    It predates October 2016.  So the theory that he was duped, the

2    testimony that -- or the offer of proof -- there's no

3    evidence -- this contradicts -- again, I cannot articulate this

4    thoroughly, but it predates September 2016, and it predates

5    October 2016.  The issue of whether the defendant was duped by

6    Robert Shumake, this clearly impeaches that.  This is

7    inconsistent with that offer that the defense has provided to

8    the jury.

9              THE COURT:  And so do you have a certified copy of

10   the bankruptcy proceeding?

11             MS. RO:  We do not have a certified copy,

12   Your Honor, but this is self-authenticated, that we pulled it

13   off PACER with the docket number at the bottom.

14             THE COURT:  So it would be offered under what

15   exception to the hearsay rule?

16             MS. RO:  Your Honor, I would argue it's a public

17   record.  It's publically available on PACER, and it's a court

18   record used in -- itself self-authenticating for that purpose.

19   The bottom of the header includes the case number, the file

20   date, and the entered date.  Or the Court may also take

21   judicial notice of a court document.

22             THE COURT:  Okay.  So do you wish to be heard on the

23   issue of relevance, Ms. Wakefield?

24             MS. WAKEFIELD:  Are there specific documents that

25   the Court would like me to address?

 1              THE COURT:  Yes.  Well, I'm looking at the document

 2     that's entitled "United States Bankruptcy Court, Eastern

 3     District of Michigan, Southern Division."  It consists of pages

 4     1 -- well, it's hard to -- let's see.  5, 6 -- it doesn't look

 5     like it's complete.  The document consists of pages 1 through

 6     6, and then there's a summary of schedules, and the summary of

 7     schedules references pages 1 through 25, but the pages that

 8     have been attached here are pages 1, 9, 10 and 11.

 9          I'm assuming that the remainder of the pages included in

10     1 through 25 have nothing to do with the defendant in this

11     case.  And the Government is offering this document to reflect

12     that Mr. Flint was claiming to be a creditor of Mr. Shumake in

13     a bankruptcy proceeding and claiming that Mr. Shumake owed him

14     $25,000 in what appears to be attorney's fees.

15          And it looks like the document was filed in the bankruptcy

16     proceeding.  And the date of the document is -- and I'm looking

17     at the schedule itself.  It looks like it was entered on

18     4/20/2012, well before the incident involving Mr. Flint in this

19     case here.  And the Government is claiming that this is -- that

20     this schedule and the claim made by Mr. Flint in the bankruptcy

21     proceeding is inconsistent with his claim that he was somehow

22     duped by Mr. Shumake.

23              MS. WAKEFIELD:  Thank you, Your Honor.  A few

24     points.  The first time we saw this document was this morning

25     when the Government filed it, so there's that problem.  And I

1  don't understand the inference that because Mr. Flint -- and,

2  also, I should say because we received it this morning, we

3  haven't looked at the entire case on PACER to see what

4  happened, whether this claim was withdrawn or what the ultimate

5  outcome is.  So we haven't done that investigation yet, but I

6  don't think it shows -- I don't think it's probative that

7  Mr. Flint may have made a claim back in 2002, five years

8  before -- or back in 2012, five years before the charged

9  offense conduct.  And I don't think that if -- if to the extent

10 that Mr. Shumake owed Mr. Flint money back in 2012, I don't

11 know that that proves anything.

12         THE COURT:  The Government wish -- does the

13 Government have any response?

14         MS. RO:  Yes, Your Honor.

15     These documents were new to the Government as well, and we

16 can concede this was provided to the defense as soon as we

17 found them, which was early -- early this morning.  And we did

18 search for these documents based off of the testimony

19 elicited -- or the first day of trial, Your Honor.

20     And I would also like to note one of the Court's ruling,

21 the litigation with the motion in limine to admit certain

22 portions of defendant's interview and the motion to exclude

23 self-serving hearsay, one of the reasons why defense wanted to

24 add a further explanation of how he came to know Mr. Shumake

25 was that he met through a law school professor and had only

1    worked for a year.

2         And the defense's argument was that defendant only

3    tangentially had any relationship with Mr. Shumake.  And

4    consistent with that statement, consistent with the opening,

5    consistent with what's been represented through trial, the

6    United States believes that the 2012 document where the

7    defendant is now claiming -- or claimed that this individual

8    Shumake owes him money, so the theory that he was defrauded or

9    had only a tangential type of relationship or limited,

10   relationship with Mr. Shumake, it's clearly inconsistent.

11             THE COURT:  It appears to the Court that the

12   document would support the Government's argument here, but I

13   think, at the very least, counsel for the defendant should be

14   given additional opportunity to conduct a more thorough

15   research regarding the bankruptcy proceedings to see if there's

16   any additional information that the Court should consider

17   before it makes a final ruling.  So you'll have until this

18   evening to do that.

19        And then we have a motion that needs to be heard.

20             MS. WAKEFIELD:  Yes.  Thank you, Your Honor.  One

21   moment.

22        Thank you, Your Honor.  I want to clarify sort of where we

23   left off with Agent Williams -- or Marshal Williams and

24   Agent Marriott.  I guess I should say, for the record, that I

25   would like to make a motion for judgment of acquittal on all

1    elements and all bases, including venue.

2        The reason why we were asking those questions of

3    Ms. Marriott and Mr. Williams about Mr. Flint being taken off

4    the plane is because the first element the Government must

5    prove is that Mr. Flint knowingly and willfully entered

6    Terminal 3 at LAX.  And we heard testimony that entry was not

7    done voluntarily since it was done under the order of the

8    federal government when the agent -- when the marshal went on

9    the plane, didn't let any of the other passengers leave and

10   removed Mr. Flint from the plane, thereby causing him to enter

11   Terminal 3 at LAX.  So that's the first argument.

12       The second element the Government has to prove is that

13   entry was made in violation of security requirements prescribed

14   under 49 U.S.C. 44901 and 44903, and I think the Government's

15   proof has come up short.  That the testimony of Mr. Duretto was

16   supposed to prove that element, but Mr. Duretto admitted that

17   he was not an expert in LAX's security program.  He could only

18   testify as to what areas were sterile areas, but not as to the

19   security program that applied at LAX.

20       And there is a provision of the United States Code and the

21   Federal Rules of -- I'm sorry, the Code of Federal Regulations,

22   so the first one is 49 U.S.C. 44903, which is charged in the

23   indictment, and 49 CFR 1542.101.  And I can provide a written

24   background on this law, but by law each airport must generate

25   an airport security program containing the procedures applied

1    to control access at the airport.

2         And Mr. Duretto said he was not an expert in those

3    procedures.  He was an expert in the TSA Standard Operating

4    Procedures and an expert in what areas were sterile areas.  And

5    when I tried to ask him about screening checkpoints and things

6    at LAX, he said he didn't know, and he didn't know those

7    provisions under the airport security program at LAX.  And he

8    told me that every airport has its own airport security

9    program.

10        So the Government would need to prove that LAX's airport

11   security program established procedures and rules for

12   controlling access to the sterile area, and the Government has

13   not -- has not made that proof.  It's actually offered no

14   evidence because Mr. Duretto admitted he was not an expert and

15   could not provide that testimony.

16        Finally, I want to argue that I think the law is clear

17   that a conviction can only be based on any regulation

18   promulgated under one of the listed statutes.  It cannot be

19   based on a secret rule, and I think that's what the Standard

20   Operating Procedures are.  We've heard testimony they are just

21   guidance and they are an internal guide for the TSA employees.

22   They don't create requirements for passengers because they're

23   not published; they are not online.  So I don't see how a

24   conviction can be based on a violation of a secret rule,

25   especially when the intent requirements are knowingly and

1    willfully and with the intent to evade security.

2         One moment.

3         Your Honor, in one of our jury instructions we asked for

4    an instruction on the joint union of intent and act, and I

5    think that's really important in this case given that the

6    testimony is that at the time Mr. Flint entered Terminal 3 at

7    LAX, he was under escort and instruction and order to do so,

8    and so I think there's a disjoint there.

9         And also, the only evidence we've heard is that the

10   security screening that was -- that might even be close to

11   having been evaded happened at Midway, and so I don't think --

12   I don't think that that can show that the intent existed at the

13   time he entered LAX.  And also, we have testimony that he had a

14   flight to Minneapolis-St. Paul in the middle, and we have heard

15   absolutely no evidence from the Government about what happened

16   at that airport.  So that's an intervening act in the middle of

17   all of this.  It's not a direct flight from Midway to LAX.  So

18   I don't think the Government's carried its burden on that

19   either.

20        I think that's all I have.

21             THE COURT:  Thank you.

22        So I think certain of the arguments that have been raised

23   are highly technical and may be meritorious, so the Court is

24   going to require counsel for the Government to respond in

25   writing.  We will continue with the trial.  So once the Court

1    has the opportunity to review the Government's opposition to

2    the motion for judgment of acquittal, then I can rule at the

3    appropriate time.  Tomorrow we should be prepared to -- counsel

4    should be prepared to argue their case if the Court has not yet

5    ruled on the motion, and jury instructions should be finalized

6    also.  So I'm going to go into chambers and start looking at

7    the jury instructions, and counsel should do the same, and then

8    we can come out and have a hearing on the jury instructions.

9         In reference to one of the arguments made by Ms. Wakefield

10   concerning whether Mr. Flint was removed either through some

11   type of force or coercion from the airplane itself and then

12   entered a security area in the airport itself, I think the

13   testimony that I recall from the witness, and I forget the

14   gentleman's name, the head of security at LAX, he indicated

15   that the entire tarmac area is a sterile or secured area, and

16   so I think that issue is probably resolved based on the

17   testimony of -- I want to say Mr. Duretto, yes.

18              MS. WAKEFIELD:  And, Your Honor, if I can just

19   briefly respond.  The indictment charges Mr. Flint with

20   entering Terminal 3 at LAX, and there is a provision of the

21   statute that says "entering an aircraft."  That is not charged.

22   So the aircraft provision of the statute is not charged here.

23   It's that he entered a sterile area of LAX, and as alleged in

24   the indictment, Terminal 3 at LAX.

25              THE COURT:  So the Government needs to prepare a

```
 1    response to each of the arguments.
 2              MR. YANNIELLO:  And just for clarification,
 3    Your Honor, there's also testimony that once there's a
 4    deplaning process, then the arm attaches to the plane, that
 5    becomes a sterile area in the terminal.  But as far as what
 6    Your Honor wants the Government to respond, is the defense
 7    going to file a motion and then we are going to respond to the
 8    motion?
 9              THE COURT:  They made their motion.  And what I can
10    do is order the reporter to provide you a transcript of the
11    argument that was placed on the record today, and hopefully you
12    can have it this evening, and then the Court expects an
13    opposition in response tomorrow.  Okay.
14              MR. YANNIELLO:  Thank you, Your Honor.
15              THE COURT:  It's not going to be a finalized copy.
16    It's whatever the reporter was able to achieve here, which
17    looks pretty good to me here.
18              MS. WAKEFIELD:  I have a written background of law
19    that I can file, if that's helpful.
20              THE COURT:  Yes, that would be helpful.
21         And then so let's look at jury instructions.  So we are in
22    recess.
23              THE COURTROOM DEPUTY:  The Court's in recess.
24         (Recess taken from 3:48 p.m. to 4:34 p.m.)
25         (Outside the presence of the jury.)
```

1          THE COURT:  We are back on the record on

2    United States versus Flint, and we will commence the discussion

3    regarding jury instructions.

4          So I have several documents that have been filed here in

5    reference to the charge to be given to the jury.  I have the

6    joint proposed jury instructions.  And so the instructions that

7    the parties have agreed to, and I'm looking at Document Number

8    95 entitled "Joint Proposed Jury Instructions," the

9    instructions that the parties have agreed to and which the

10   Court will give include -- and if you start on page 20 of

11   Document Number 95:  Instruction 3.1 will be given, Ninth

12   Circuit Model Instruction; 3.2, presumption of innocence, will

13   be given.  That will be given.  Defendant's decision not to

14   testify, I'm not sure that has been decided yet, but if he does

15   not testify, 3.3 will be given.

16         And 3.4 should be removed if the defendant does not

17   testify, and vice versa if he does.  3.6, what is evidence,

18   will be given.  3.7 will be given.  This is model instruction

19   3.7.  Next in order would be direct and circumstantial

20   evidence, based on 3.8.  Credibility of witnesses, based on

21   model instruction 3.9.

22         The next would be 3 .18, on or about explained, Ninth

23   Circuit Model Instruction 3.18.  And then we have testimony --

24   or I'm sorry, statement by defendant, based on 4.1, that will

25   be given.  Other crimes, wrongs or acts, 4.3, should be given

1   in light of the prior infraction issue.  And then we have

2   opinion evidence expert witness, based on 4.14, that should be

3   given.

4       Then we have duty to deliberate based on 7.1.

5   Consideration of the evidence; conduct of the jury, based on

6   instruction 7.2; notes, based on 7.3; punishment, 7.4; and then

7   the verdict form instruction based on 7.5.  And then the

8   instruction 7.6, communications with the Court.

9       So those are instructions that have been agreed to.

10          MS. WAKEFIELD:  Yes, Your Honor.  And on

11  Instruction -- it's Joint Proposed Instruction Number 28 or

12  Ninth Circuit Model Criminal Instruction 4.14, which deals with

13  expert testimony.

14          THE COURT:  Uh-huh.

15          MS. WAKEFIELD:  Only one expert is identified.  I

16  think there was testimony -- I think Ms. Danishgar's testimony

17  also was expert testimony, so we would request to add her into

18  this instruction.

19          THE COURT:  That should be accomplished.

20          MR. YANNIELLO:  Yes, Your Honor.

21          THE COURT:  I don't think it makes that much of a

22  difference, but that should be accomplished.  That would be

23  modified.  The Government would be ordered to accomplish the

24  modification.

25      Okay.  We go to the more important issues, the disputed

1    instructions.  And I have -- so I'm looking at Document -- so I

2    have the indictment here to refresh my memory regarding the

3    particular allegations contained therein, and it's Document

4    Number 15.  And then I'm looking at the Government's disputed

5    jury instructions and objections to defendant's proposed

6    instructions, and that's Document Number 96.  And then I'm

7    looking at defendant's proposed instructions, Document Number

8    94.  And then we have the objections to the Government's

9    proposed instructions, Document Number 98.

10        So I'm going to start with Document Number 96, the

11   Government's disputed jury instructions and objections to

12   defendant's proposed instructions.  The first issue has to do

13   with the reasonable doubt instruction.  The Government has

14   proposed model instruction 3.5.  The defendants have proposed a

15   competing reasonable doubt instruction based on O'Malley and

16   Grenig, modified as based on O'Malley and Grenig.

17        The Court is going to provide the instruction -- model

18   instruction 3.5, sustain the Government's objection to the

19   defendant's reasonable doubt instruction.  I will give the

20   model instruction 3.5.

21        The next issue concerns Disputed Instruction Number 2.

22   Instruction Number 2 is the instruction that references the

23   elements of the offense.  There are a couple of differences or

24   distinctions between the competing instruction.  In the

25   Government's proposed instruction in reference to the first

1    element, it references that the Government must prove each of

2    the following elements beyond a reasonable doubt:  first, on or

3    about July 25th, 2017, the defendant entered an airport area in

4    Los Angeles International Airport.

5         The defendant 's proposed instruction in reference to the

6    first element identifies the particular area that the defendant

7    allegedly entered unlawfully, and that would be the sterile

8    area of Terminal 3 of Los Angeles International Airport.  So

9    the indictment references that the defendant entered a secured

10   and sterile area at Los Angeles International Airport.

11        So unless I hear convincingly from the Government, I'm

12   going to provide the defendant's proposed instruction at least

13   as to Element 1.  Is there a reason that the Court should not

14   do that?

15             MR. YANNIELLO:  Your Honor, I would just ask that it

16   be admitted and say "a secure or sterile area."  I know there

17   was some testimony from Mr. Duretto about secure areas as well

18   as sterile areas.

19             THE COURT:  I'm sorry, you're --

20             MR. YANNIELLO:  Just the addition of "secure or"

21   before the reference to sterile area.

22             THE COURT:  In your proposed instruction you didn't

23   reference either.  You didn't reference the word or the term

24   "secured or sterile."  So you're asking that the first element

25   should read that defendant entered a sterile or secured --

1          MR. YANNIELLO:  That's right, Your Honor.

2          THE COURT:  Of Terminal 3 at Los Angeles

3     International Airport.

4          MS. WAKEFIELD:  And I think we would object to the

5     "or" in that proposal, "secure or sterile."  I think the jury

6     would have to be unanimous as to whether it's secured or

7     whether it's sterile.  And we proposed "sterile" because the

8     regulation that's referenced in 44901 and 44903 refer to a

9     sterile area, and I believe Mr. Duretto testified that it was a

10    sterile area, that was the original.

11         THE COURT:  I'm not sure there's any distinction

12    drawn between "sterile" and "secured."  As I understand

13    Mr. Duretto's testimony and others, the terms are synonymous.

14         MR. YANNIELLO:  We will withdraw, Your Honor.

15    "Secure" is fine -- sorry, "sterile."

16         THE COURT:  "Sterile."  So the first element will

17    read that:  The defendant -- that the Government's proved

18    beyond a reasonable doubt that on or about July 25th, the

19    defendant entered a sterile airport area in Los Angeles

20    International Airport -- sterile area of Terminal 3 at Los

21    Angeles International Airport.  Okay?

22       The next element -- the Government's proposed next element

23    is that defendant did so in violation of the security

24    requirements and regulations prescribed in 44901 and 44903 of

25    Title 9 United States Code.  The defendant's proposed second

1    element is almost the same.  There's some minor differences.  I

2    don't -- I think there are distinctions without a difference,

3    so I would -- unless I hear further from counsel for the

4    defendant, I'm going to provide the Element Number 2 as offered

5    by the Government.

6              MS. WAKEFIELD:  That's fine.  I think that we worded

7    it the way we did because of sort of later issues with respect

8    to the regulation that's charged.

9              THE COURT:  Okay.  So Element Number 2 as offered by

10   the Government will be provided.

11        The third element offered by the Government that the

12   Government must prove beyond a reasonable doubt is that the

13   defendant acted knowingly and willfully, that is, the defendant

14   acted both with knowledge that he was entering an airport area

15   in violation of security requirements and that his conduct was

16   unlawful.

17        In the defendant's Proposed Instruction Number 2 you have

18   divided up the elements, so there is a third element that was

19   defendant acted knowingly and willfully, and then fourth, that

20   the defendant acted with intent to evade the particular

21   security regulation.

22        So let me hear from Ms. Wakefield on this.

23              MS. WAKEFIELD:  Thank you, Your Honor.  This is --

24   the intent to evade the security regulation is the critical

25   element because it's what makes this offense a felony as

1  opposed to a misdemeanor under the statute.  So if it was just

2  knowingly and willfully, it would be a misdemeanor violation.

3  The statute provides that it's only a felony and it raises the

4  stat max to 10 years if the defendant also acted with the

5  intent to evade the security regulations.  So we think it's an

6  important element that the jury needs to be instructed on.

7            THE COURT:  Government?

8            MR. YANNIELLO:  Yes, Your Honor.  We think, as we've

9  noted in our objection, we think this is analogous to a drug

10  quantity finding where the jury makes the finding on the

11  verdict form and it's merely a penalty enhancement.  And so

12  including the fourth element as a -- well, defendant's proposed

13  fourth element seems inappropriate in this circumstance.

14            THE COURT:  I think the Court has to tread

15  cautiously here, so the Court is going to provide or include

16  Element Number 3, the third and fourth element as offered by

17  the defendant.

18      And then we have the next disputed instruction is the

19  defendant's proposed instruction regarding entry defined.  The

20  Government has objected to the defendant's special instruction

21  on the grounds that the instruction regarding entry is

22  unnecessary and misleading in that there is no requirement that

23  the jury unanimously agree as to the precise point of entry.

24  So long as the jury unanimously finds that the defendant

25  knowingly and willfully entered a sterile area of LAX and did

1    so in violation of the security requirements.

2         Ms. Wakefield, do you wish to be heard further?

3              MS. WAKEFIELD:  Yes, Your Honor.  We're concerned

4    that the jury is going to be tempted to convict Mr. Flint based

5    on what happened at Midway Airport, and so we -- that's why

6    we're requesting this instruction, so that it's clear that the

7    entry is the precise moment at LAX, at the sterile area of

8    Terminal 3 when he crosses that threshold into the terminal, as

9    opposed to entering Midway Airport, in violation of the

10   screening procedures there.

11             THE COURT:  So I think the jury would be guided by

12   Instruction Number 2, which the Court will be giving, which in

13   reference to Instruction Number 2 -- I'm referring to Disputed

14   Instruction Number 2 which references that the Government must

15   prove that on or about July 25th the defendant entered the

16   sterile area of Terminal 3 at LAX.  That clearly avoids or

17   eliminates any concern on the part of the defendant or counsel

18   for the defendant that the jury may be confused here.

19        So I think that they would not be confused, and the

20   instruction is not necessary, so the Court will sustain the

21   Government's objection.

22        We have the Government's Proposed Instruction Number 4

23   regarding the federal security requirements and regulations.

24   And Instruction Number 4 is based on 49 U.S.C. 46314(b)(2),

25   entering an aircraft or airport security area in violation of

security requirements, and then the other cited sections that
are too numerous to mention here.

The defendant has -- or defense counsel has provided a
counter or opposing Instruction Number 4, and the Government
has objected.  The basis of the objection includes that the
defendant's proposed instruction focuses solely on
identification requirements, rather than the screening
requirements, that are the core of the case, and it's a
misleading characterization of the security requirements
prescribed in the statute.

I tend to agree, unless I hear further from Ms. Wakefield.

MS. WAKEFIELD:  Yeah, what we're proposing is to
strike everything that begins with -- that's -- everything
after that section.  So we were just trying to put the entire
regulation in the instruction, but we're proposing striking
everything after "under Title 49 of the Code of Federal
Regulations," et cetera, and then the next sentence and
everything that follows.  So the instruction would be "In order
to find," all the way down to the CFR citation.

THE COURT:  So I'm looking at your instruction,
Proposed Instruction Number 4.  You would propose modifying it
to eliminate the words -- or beginning on line 15?

MS. WAKEFIELD:  Line 11.

THE COURT:  Line 11?

MS. WAKEFIELD:  Yes.

1          THE COURT:  Let's see.

2          MS. WAKEFIELD:  Let me put it on here.

3      So everything from here, down.

4          THE COURT:  But I think the jury would need to be

5  guided by having additional information provided as to what the

6  regulations prohibit or require, and if I stop after

7  referencing Chapter XII, subchapter C, the jury may be

8  confused.

9          MS. WAKEFIELD:  So we're confused as well.  So, I

10  mean, this is the heart of the issue here is this was the

11  regulation that's charged in the indictment.  So this was where

12  we are, and I think Title 49 of the CFR, that is the part that

13  references the airport security program or includes the

14  reference to the airport security program.  So that was part of

15  the Rule 29 motion, but I don't think that the procedures under

16  Title 49 relate to the Department of State's diplomatic notes.

17  So I don't think the Government is offering an answer either.

18          THE COURT:  Okay.  Yes.

19          MR. YANNIELLO:  I can offer an answer, Your Honor.

20          THE COURT:  Yes.

21          MR. YANNIELLO:  The statute states that a person may

22  not knowingly and willfully enter in violation of security

23  requirements prescribed under, and then there lists the

24  enabling statutes.

25          THE COURT:  Yes.

 1              MR. YANNIELLO:   The Government's proposed

 2    regulations that are listed in the proposed jury instruction

 3    are CFRs that are promulgated pursuant to that regulation.   As

 4    Your Honor notes, the TSA standard operating procedure is

 5    actually also promulgated under those statutes, so it would be

 6    a regulation that falls within what's described in these

 7    enabling statutes.

 8              THE COURT:   The Court is going to sustain the

 9    Government's objection to defendant's proposed instruction as

10    offered and modified.   The Court will be giving the

11    Government's Proposed Instruction Number 4.

12              MS. WAKEFIELD:   There were a few other objections,

13    Your Honor, to Government's Proposed Number 4, if I may.

14              THE COURT:   Yes, please.

15              MS. WAKEFIELD:   Well, I mean, the first is the

16    circumventing or attempting to circumvent any security system,

17    measure or procedure implemented to protect passengers or

18    property on an aircraft, that's not charged in the indictment.

19        And I actually brought the grand jury transcript with me

20    to show the Court that is never referenced in the grand jury

21    testimony, but, one, what is referenced is submitting to

22    screening and inspection of his or her person and accessible

23    property.  That's 1540.107(a).

24        So the other two that follow, they're not charged in the

25    indictment.  They weren't referenced in the complaint.  They

```
 1   weren't presented to the grand jury.  And so we think that
 2   adding these will constitute a constructive amendment or fatal
 3   variance to the indictment.  And, also, they're phrased in the
 4   alternative, so the jury could find and not be unanimous as to
 5   which violation -- as to which regulation Mr. Flint's entry
 6   violated.
 7        So I think there are a few issues with instructing the
 8   jury in the alternative as to these uncharged regulations.  So
 9   if the Court is inclined to give the Government's instruction,
10   we would ask that it end at -- on line 10, after the first
11   option there, which is the one that's charged in the indictment
12   and was presented to the grand jury.
13             THE COURT:  Well, that seems to make some sense, but
14   let me hear from Mr. Yanniello.
15             MR. YANNIELLO:  So, Your Honor, what the defense
16   counsel is trying to do here is they're focused on the term
17   "submitting," and they may argue, "Well, he actually was never
18   asked to submitted to anything except in Midway," and that,
19   actually, I think would create the venue issue that counsel is
20   concerned about.  There's the second CFR that the Government
21   cites -- I'm sorry.  The third, which is -- let me make sure I
22   have it right.
23        It states:  No person may enter or be present within a
24   sterile area without complying with procedures being applied to
25   control access to such area, and that is 49 CFR 1540.105(a)(2).
```

1    And what that covers is the situation here that's charged in

2    the indictment, where the specific language in the indictment

3    is that the defendant entered a secure and sterile area of

4    Terminal 3 carrying an item that had not been screened or

5    inspected by TSA security administration.  So there's no

6    reference to simply he didn't submit the bag for screening, but

7    he also circumvented the security requirements.  And then when

8    he entered LAX, he didn't comply with the requirements required

9    for screening at the airport, so he was still in violation of

10   security requirements.

11           THE COURT:  Why do you need -- in reference to the

12   Government's proposed instruction, I'm looking at line -- on

13   line 12, the last reference to entering a sterile area without

14   complying with the procedures being applied to that area when

15   you have numbered paragraph number 2, which references

16   circumventing or attempting to circumvent any security measure

17   or procedure implemented to protect passengers and property on

18   an aircraft?

19           MR. YANNIELLO:  I acknowledge, Your Honor, there is

20   some overlap there.  I think that the -- the second regulation,

21   even though we proposed entering, it covers entering or being

22   present.  I think it's a broader, more --

23           THE COURT:  So if I only give one -- paragraph

24   numbered 1, the sentence number 1, and not the others, your

25   concern is what?

1           MR. YANNIELLO:  My concern is that it may open the

2    door for the defense making an argument that somebody could

3    simply fly into another airport and have violated all kinds of

4    security procedures, and even --

5           THE COURT:  I don't understand the argument, so --

6           MR. YANNIELLO:  Well -- so the argument is without

7    complying -- without submitting to screening and inspection of

8    his or her person, that it may -- it would mislead the jury

9    because it opens the door for an argument that "Well, he wasn't

10   asked to submit for screening because he landed.  He wasn't

11   necessarily going through a checkpoint," and I think that would

12   be incredibly misleading to the jury to not also be alerted to

13   that you violate security procedures simply by not complying

14   with the requirements for any entry into that area.

15          MS. WAKEFIELD:  And, Your Honor, if I may, we did

16   file a motion for both particulars a long time ago.  This was

17   entering the sterile area without submitting was the regulation

18   that was identified by the Government.  Also, in the Court's

19   order, Document Number 57, the Court construed the statute and

20   the operative regulation 49 CFR 1540.107.

21       The Government for the first time presented this

22   regulation to us when it sent us its jury instructions and then

23   filed them that same day.  So this regulation, the 1540.105,

24   has never been a part of this case.  It wasn't presented to the

25   grand jury, and the first time it was ever raised as a

1   potential violation was on October 12th.

2       And so we've already gone through this, and the Court's

3   already made its decision, and I also have the grand jury

4   transcript where the agent is asked "Under federal law, are

5   persons required to submit to screening and inspection of their

6   persons and personal belongings at the airport?"  And that's

7   essentially asking about this regulation, entering a sterile

8   area without submitting to the screening and inspection of

9   their person and accessible property.

10          THE COURT:  Any response?

11          MR. YANNIELLO:  Yes, Your Honor.

12      I think that the -- again, looking at the transcript -- or

13  looking at the grand jury transcript -- and I actually don't

14  think that the Government made the representation that counsel

15  made.  I don't have our bill of particulars on file, but

16  without submitting to security procedures, I think, again, it

17  covers -- having the second regulation referenced, and that's

18  the Element 3 here, entering a sterile area without complying

19  with the procedures being applied to that area, it covers

20  the -- it makes clear that if you carry an unscreened bag into

21  a sterile area, no matter how you get it in there, you're

22  violating security requirements, and I think that's a clear --

23          THE COURT:  I think the Court is going to have to

24  make a decision here, but I think Government's Proposed

25  Instruction Number 4 would be consistent with the Instruction

1    Number 2, which the Court will be giving.  So the Court will

2    overrule the objection of the defense.

3            MS. WAKEFIELD:  I have a few more objections.  I'm

4    really sorry, Your Honor.

5            THE COURT:  Feel free.

6            MS. WAKEFIELD:  We also objected to including

7    instructing the jury that Chicago O'Hare Airport and Chicago

8    Midway International Airport are airports for the purposes of

9    these regulations.  Those are not the charged airports, so I

10   don't think the jury should be instructed.  I think it's

11   misleading about what is actually the charge here and where it

12   occurred.

13           THE COURT:  Well, Instruction Number 2 I think

14   guides the jury, so your additional objection would be

15   overruled.

16           MS. WAKEFIELD:  And then we would object to -- in

17   addition to objecting to everything, but we would also object

18   to instructing the jury about the testimony provided by

19   Mr. Duretto.  I think his testimony should stand for itself,

20   and I don't think the jury should be instructed as to that

21   testimony.

22       And then finally, the diplomatic pouches section and

23   beyond, that's all based on the diplomatic note on the state

24   department's website.  A diplomatic note is not law.  It's

25   correspondence between the U.S. government and foreign

```
 1    governments, and so I don't think it's proper to instruct the
 2    jury about the contents of a correspondence between two
 3    countries.
 4              THE COURT:  The Court will strike on line 20,
 5    beginning with the words "You have heard testimony," that will
 6    be eliminated through line 23, ending with "an airport."
 7         And then in reference to the objections to the definition
 8    of diplomatic pouches and the other language that's contained
 9    therein, do you have any comment?
10              MR. YANNIELLO:  Yes, Your Honor.  So the -- if the
11    SOP isn't cited here, the SOP is consistent with the
12    requirements that are required by the state department, they're
13    actually created to comply with the state department
14    requirements.  So the Government stands by the proposed
15    language.
16              THE COURT:  Yes.  And the remainder of the defense
17    objection would be overruled.  The Court would provide the
18    instruction as offered by the Government, with the exception of
19    the sentence "You have heard," beginning with "You have heard"
20    and then ending with "an airport," lines 20 through 23.
21         Then we go to -- let's see.  Then we have Defendant's
22    Proposed Instruction Number 5, third element, knowingly and
23    willfully defined.  The Government's objection here is that the
24    instruction is, I guess, too long and confusing, and the
25    offense -- the elements of the offense sufficiently cover the
```

1   definition of knowingly and willfully.

2        And then in the instructions that the Court will be

3   giving, the jury would be instructed that the defendant must

4   have acted deliberately with knowledge both that he was

5   entering an airport area in violation of security requirements

6   and that his conduct was unlawful.

7        So why do you need this additional instruction?

8             MS. WAKEFIELD:  The Ninth Circuit defines knowingly

9   in an instruction, so we think it should be given since that's

10  one of the intent elements of the offense.  And then willfully,

11  in terms of our instruction, it's not that different from the

12  Government's with respect to the first sentence.  So an act is

13  done willfully if committed voluntarily with knowledge that it

14  was prohibited by law and with the purpose of violating the law

15  and not by mistake, accident or good faith.

16       And then the good faith -- good-faith defense, which is

17  recognized in the Ninth Circuit, added in that definition

18  because it's the Government's burden to prove beyond a

19  reasonable doubt that he did not have a good-faith belief.

20            THE COURT:  And certainly one of the focal points of

21  the defense here is defendant's good faith.

22       Do you have anything else to add?

23            MR. YANNIELLO:  Yes, just quickly, Your Honor.

24       Given that the Court has ruled that the fourth element

25  will be included, this attempt to evade security procedures, I

1    think that the jury is just going to be left with flipping

2    through different instructions.  And I'm reading this, and when

3    we were responding to it, it took me four or five times reading

4    it.  I think just telling the jury they must act deliberately

5    and with knowledge that they are violating the law and their

6    conduct is unlawful is sufficient.

7              THE COURT:  I think the instruction is a bit

8    redundant, but I don't see it as prejudicing the Government.

9    So the instruction -- Defense Instruction Number 5, which is

10   important to the defendant's claim of good faith, I think

11   should be given.  So I will give that instruction.

12        Then we have Instruction Number -- Defendant's Proposed

13   Instruction Number 6, defendant acts with intent to evade

14   particular security regulation if he knows about the specific

15   regulation and purposely violates it, and the Government has

16   objected.  And the objection includes that there is no

17   requirement that he be aware of the specific regulation.  And

18   the Court is going to sustain the Government's objection to

19   number 6.

20        And then we have this joint union act and intent,

21   Instruction Number 7 offered by the defense.  The Government

22   has objected to it as being confusing and unnecessary.

23        And then, Ms. Wakefield, do you wish to be heard on this

24   last one?

25              MS. WAKEFIELD:  I think I articulated our concern in

1   this case, that we are concerned that the intent and that the

2   act don't match up in terms of the Government's theory and the

3   difference it will make to the jury.  We think that the

4   Government will argue that the intent occurred in Chicago and

5   the act occurred in L.A., so we think the jury should be

6   instructed on that the act and the intent need to occur at the

7   same time.

8            THE COURT:  The act and intent may have started in

9   Chicago, and if the Government's witnesses are believed by the

10  jury, continued all the way through LAX.

11       Do you wish to be heard?  What's your concern here?

12           MR. YANNIELLO:  The concern is just, I guess, the

13  cumulative effect of the different proposed jury instructions

14  by the defense, that there are multiple mens rea components,

15  and now there is something else they are going to muddy the

16  waters with.

17           THE COURT:  They're not -- they're trying to, I

18  think, provide a vigorous defense for their client, and so --

19           MR. YANNIELLO:  That's understandable, Your Honor.

20  I guess our position --

21           THE COURT:  The question is whether it's going to

22  confuse the jury.

23           MR. YANNIELLO:  And I think it will.

24           THE COURT:  So the Court will sustain the objection.

25      Okay.  So it will be up to the Government to put the

```
 1    instructions in order so that we have a final set of
 2    instructions that I can instruct the jury tomorrow.  Hopefully
 3    we can start that -- the Court would intend to instruct before
 4    argument of counsel.
 5         And then how much time do you anticipate argument will
 6    take?  How much time do you need, Ms. Wakefield?
 7              MS. WAKEFIELD:  Mr. Harbaugh suggested 45 minutes.
 8              THE COURT:  Who will be providing the argument?
 9    Mr. Harbaugh?
10              MR. HARBAUGH:  Yes, Your Honor.
11              THE COURT:  How much time do you need, Mr. Harbaugh?
12              MR. HARBAUGH:  45.
13              THE COURT:  45 minutes.
14         And the Government?
15              MR. YANNIELLO:  I will be arguing, Your Honor.  I
16    think less than that combined.
17              THE COURT:  Who is going to be providing rebuttal
18    argument?
19              MR. YANNIELLO:  I will.
20              THE COURT:  So you can reserve any portion of your
21    45 minutes for rebuttal.  So it's up to you.
22         And then when can the Government provide an opposition or
23    response to the motion for judgment of acquittal?
24              MR. YANNIELLO:  So, Your Honor, we were going to
25    raise that with you.  We can get it done -- I mean, it's --
```

```
 1    they've raised pretty substantial arguments.  There's four, I
 2    believe, arguments they are making.  When would the Court like
 3    us to file something?
 4              THE COURT:  Well, look, I recognize the time crunch,
 5    but certainly sometime tomorrow, early tomorrow.  So what do
 6    you suggest?
 7              MR. YANNIELLO:  How about the close of business
 8    tomorrow?
 9              THE COURT:  I think why don't we set it for 1:30
10    tomorrow.
11              MR. YANNIELLO:  Okay.  Your Honor.
12              THE COURT:  I would like to be able to rule on these
13    issues in the afternoon.
14              MS. WAKEFIELD:  Does the Court want a copy of the
15    grand jury transcripts, or does the Court have that?
16              THE COURT:  I think that would be helpful, a copy of
17    the grand jury transcripts.
18         One concern that I have is what happened between Midway
19    and LAX in terms of the stop and whether the defendant went
20    through another screening process there, so --
21              MR. YANNIELLO:  Would you like me to respond?
22              THE COURT:  Yes, I would like your thoughts on that.
23              MR. YANNIELLO:  I think the inference drawn from the
24    evidence and that's presented is that the defendant stayed
25    within a sterile area and boarded another aircraft to get to
```

```
 1  L.A., so --
 2           THE COURT:  How do we know that?  What's the
 3  timeline?  Timeline would be important.  One inference is
 4  that -- I can extrapolate from personal experience that when
 5  you have a stop before your final destination, you generally
 6  stay in the sterile area, but if there's a long period of time,
 7  sometimes you leave the sterile area and you exit the airport
 8  and then you return.
 9           MR. YANNIELLO:  We do have the flight record, and we
10  are pulling it, Your Honor.
11           MR. HARBAUGH:  It wasn't introduced at trial, so you
12  can't add to the case now.
13           THE COURT:  So it's something you should be prepared
14  to address in your pleading, so okay.  We have other matters to
15  handle.
16           MS. WAKEFIELD:  Thank you, Your Honor.
17           MR. HARBAUGH:  Thank you, Your Honor.
18           MS. RO:  I believe there is a dispute with the
19  verdict form still.
20           THE COURT:  We will have to address that tomorrow.
21  I have two other matters to handle.
22           MS. RO:  Yes, Your Honor, yes.
23               (Proceedings concluded at 5:16 p.m.)
24                       ---oOo---
25
```

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )

        I, CAROL JEAN ZURBORG, Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.

Date:  October 29, 2018

                     /s/ CAROL JEAN ZURBORG
                _____
                CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
                    Federal Official Court Reporter