

1                    UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3             HONORABLE S. JAMES OTERO, U.S. DISTRICT JUDGE

4

5    UNITED STATES OF AMERICA,           )
                                          )
6                        Plaintiff,       )
                                          )                 Case No.
7         vs.                             )        CR 17-00697 SJO
                                          )
8    DANIEL FLINT,                        )            VOLUME 3
                                          )        (Pages 430 - 496)
9                        Defendant.       )
     _____ )

10

11

12

13            REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
                              TRIAL DAY 3
14                   THURSDAY, OCTOBER 18, 2018
                              9:50 A.M.
15                    LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22    _____

23          CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
                 FEDERAL OFFICIAL COURT REPORTER
24              350 WEST 1ST STREET, SUITE 4311
             LOS ANGELES, CALIFORNIA 90012-4565
25                       (213) 894-3539

                    UNITED STATES DISTRICT COURT

1                      **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4        NICOLA T. HANNA
         United States Attorney
5        BY:  CHRISTINE RO
         BY:  IAN YANNIELLO
6        BY:  MARK AVEIS
               Assistant United States Attorneys
7        United States Courthouse
         312 North Spring Street
8        Los Angeles, California 90012

9    **FOR THE DEFENDANT:**

10       HILARY LEE POTASHNER
         Federal Public Defender
11       BY:  CRAIG A. HARBAUGH
         BY:  GEORGINA WAKEFIELD
12             Deputy Federal Public Defenders
         Central District of California
13       321 East Second Street
         Los Angeles, California 90012

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          LOS ANGELES, CALIFORNIA; THURSDAY, OCTOBER 18, 2018

2                            9:50 A.M.

3                             --oOo--

4          (Out of the presence of the jury.)

5          THE COURTROOM DEPUTY:  Please come to order.  This

6   United States District Court, Central District of California is

7   now in session, the Honorable S. James Otero presiding.

8          THE COURT:  We are back on United States versus

9   Flint.  The Court has received a final proposed set of jury

10  instructions consistent with the hearing held by the Court

11  yesterday where I ruled on particular objections.  I understand

12  that there are two remaining issues, Instruction Number 14.

13         And in reference to Instruction Number 14, I was informed

14  by the clerk that the defendants and Government have agreed to

15  modify Element Number 4 to strike the word "particular."  So it

16  will read:  Defendant also acted with the intent to evade the

17  security regulation.

18         And for clarity, all of the other objections made by

19  Ms. Wakefield concerning Instruction Number 14 remain in full

20  force and effect and preserved for any appeal.

21         And then there's an issue as to Instruction Number 13.

22         MS. WAKEFIELD:  Yes, Your Honor.  I believe where we

23  left things off yesterday, the Court was going to consider the

24  request by the defense to strike the first paragraph, lines 9

25  through 12, after the Court was able to review the grand jury

1    transcript.

2              THE COURT:  And I have the grand jury transcript

3    here.

4         The Government wish to be heard on that?

5              MR. YANNIELLO:  Yes, Your Honor.

6         The Government's position is the same as yesterday, that

7    the indictment clearly states what the rule is or what the

8    regulations that Mr. Flint violated is that he carried an

9    unscreened bag into LAX, and unscreened bag violates several of

10   the CFRs and that should be in the objection.

11             THE COURT:  The defense objection is overruled, and

12   the instruction will be given as offered.

13             MS. WAKEFIELD:  Would the Court consider giving --

14   what we are concerned with is not a unanimous verdict as to

15   which regulation was violated.  So I don't know if the Court

16   would consider adding to the end of that paragraph, "with all

17   of you agreeing as to which federal regulation the entry

18   violated."

19             MR. YANNIELLO:  We would object to that, Your Honor.

20   We don't think that's required.

21             THE COURT:  And why not?

22             MR. YANNIELLO:  Well, I think, arguably, the third

23   category covers both of the prior two -- I guess

24   "circumventing" might be a little broader.

25        One moment, Your Honor.

1          (Discussion off the record.)

2              THE COURT:  And so, Ms. Wakefield, you're proposing

3      the additional sentence to be placed at the end of line 12?

4              MS. WAKEFIELD:  Yes, Your Honor.

5          (Pause in proceedings.)

6              THE COURT:  Mr. Yanniello, do you have any

7      additional comment?

8              MR. YANNIELLO:  No, Your Honor.

9              THE COURT:  I'm going to include the language.  So

10     after line 12, it will read:  With all of you agreeing as to

11     which federal regulation was violated.

12             MS. WAKEFIELD:  Thank you, Your Honor.  I just want

13     to make sure we have preserved our objection to including all

14     three.

15             THE COURT:  Yes.

16             MS. WAKEFIELD:  Thank you.

17             MS. RO:  Your Honor, if I may, the Government did

18     want to raise one issue with respect to the Court's Instruction

19     Number 14.  The United States would request for Element 1 of

20     the offense, that "Terminal 3" be stricken.  "Terminal 3"

21     shouldn't be in the substantive elemental instructional.

22         Although the indictment contains it, the actual element of

23     the offense is entering a sterile area of an airport.  It's not

24     entering a specific sterile area of the airport, so it's not an

25     element of the offense that the defendant needs to enter

1  Terminal 3.  The element of the offense is that the defendant

2  has to enter a sterile area of an airport area, specifically to

3  LAX.

4           THE COURT:  To be clear, it has to be LAX?

5           MS. RO:  Yes, but not Terminal 3.

6           MS. WAKEFIELD:  Again, we would object to that.

7  This is in the indictment.  This gives -- the indictment gives

8  defendant notice of what he's charged with.  And the

9  Government's theory is changing based on the testimony of

10  Mr. Duretto, and that's -- it's not proper.  It's charged in

11  the indictment as he entered a secure and sterile area of

12  Terminal 3 at Los Angeles International Airport.

13           THE COURT:  It's going to remain as is, consistent

14  with the indictment.

15      And then I think we need to have a discussion about the

16  verdict form.

17           MS. RO:  Your Honor, Mr. Cruz provided both sides

18  the verdict form, and both sides agree with it.

19           THE COURT:  We have an agreed-upon verdict form.

20           MS. WAKEFIELD:  That's fine, Your Honor.

21           THE COURT:  I don't know if I have a copy.

22      Are there any other evidentiary issues to handle before we

23  call the jury in?

24           MS. RO:  Your Honor, I believe the Court was going

25  to consider the Government's request for reconsideration on the

1    Court's prior ruling.

2              THE COURT:  Yes, we have that.

3              MS. WAKEFIELD:  Thank you, Your Honor.

4         And I believe the only issue now that remains is the

5    bankruptcy exhibits proposed by the Government.  So I spent a

6    lot of time on the docket last night, so I wanted to point out

7    to the Court, I have Document Number 105, the Government's

8    request for reconsideration.  I'm looking at page 20, which is

9    the summary of schedules that the Court was looking at

10   yesterday.

11             THE COURT:  Yes.

12             MS. WAKEFIELD:  I wanted to point out to the Court,

13   at the top of that page, this case is not a bankruptcy filing

14   by Mr. Shumake.  It's a bankruptcy filing by ICG Real Estate

15   Advisors, LLC.  The previous stipulation is in a separate case.

16   The case number is different.  That is the case involving

17   Mr. Shumake.  And the stipulation is not a claim made by

18   Mr. Flint.

19        And then the ICG Real Estate Advisors case, this was a

20   Chapter 11 bankruptcy by a business, and the summary of

21   schedules was not a claim made by Mr. Flint.  It's actually

22   what the company filing for bankruptcy lists as people it owes

23   money to.  So this is not any sort of statement by Mr. Flint

24   that he's claiming that ICG Real Estate Advisors owes him

25   $25,000.  This is ICG Real Estate Advisors saying they owed

1   Mr. Flint $25,000.  And then this case was actually dismissed.

2                    MS. RO:  Your Honor, I do have the full, complete 25

3   pages that was filed in the U.S. Bankruptcy Court, if that may

4   assist the Court and defense counsel.

5                    THE COURT:  The problem with 25 pages is it's far

6   too complex for the jury to understand.  The Court is going to

7   deny the motion for reconsideration.

8        Okay.  Are we ready?  So we have the final issue as to

9   whether the defense has rested.

10                    MS. WAKEFIELD:  We will rest when the jury comes in.

11                    THE COURT:  Then we need to remove Instruction

12   Number 3B.

13                    MS. WAKEFIELD:  Correct.

14                    THE COURT:  So, Mr. Flint, you understand your right

15   to testify in this matter.  I assume that you've consulted with

16   your counsel, and you elect not to offer testimony in the case;

17   is that correct?

18                    THE DEFENDANT:  That's correct, Your Honor.

19                    THE COURT:  Any questions regarding your right?

20                    THE DEFENDANT:  No, Your Honor.

21                    THE COURT:  When the jury comes out, I'm going to

22   instruct the jury as to the law.  Is the Government able, when

23   the jury starts their deliberation, able to provide a copy for

24   each juror?  Can that be accomplished?

25                    MR. YANNIELLO:  Of the jury instructions?

```
 1                  THE COURT:  Yes.

 2                  MR. YANNIELLO:  Sure, Your Honor.

 3                  THE COURT:  Then how do you want to handle argument?

 4   Go right into the argument right away?

 5                  MR. HARBAUGH:  That's fine, Your Honor.

 6                  MR. YANNIELLO:  Can we actually have a short recess?

 7                  THE COURT:  So you want to set up, like five minutes

 8   to set up?

 9                  MR. YANNIELLO:  Probably closer to ten.  I apologize

10   for the inconvenience.

11                  THE COURT:  Okay.  Let's bring the jury out.

12                  MS. RO:  Your Honor, would the Court prefer, if I

13   may be excused to work on the instructions so the instructions

14   will be ready and available for the jury.

15                  THE COURT:  Feel free, yes.

16                  MS. RO:  Thank you.

17           (Pause in proceedings.)

18                  THE COURTROOM DEPUTY:  Are we ready, Your Honor?

19                  THE COURT:  Yes.

20                  THE COURTROOM DEPUTY:  Would you all rise for the

21   jury, please.

22           (In the presence of the jury.)

23                  THE COURT:  So we have the jury reassembled.  We

24   have the alternate also.  Counsel are present with the

25   defendant.  Please have a seat.
```

**UNITED STATES DISTRICT COURT**

1      Ms. Ro is not present this morning.  She is working on

2   other matters related to the case back at the office.

3      So the parties have rested.  Each side has concluded with

4   their case, and now it's the Court's task to read the

5   instructions to the jury.  You don't have to take notes

6   regarding the instructions.  You're going to be given -- each

7   of you will be given a copy of these instructions in written

8   form so that it will guide you when you start your

9   deliberations.  And then today the jury will be provided lunch.

10   Mr. Cruz is working on that now.

11      After the Court reads instructions, we will take a short

12   recess, and that will allow counsel to set up for argument, and

13   then argument will be presented to you, and the matter will be

14   submitted to you today.  So I think we're a day ahead of

15   schedule.

16      Members of the jury, now that you have heard all of the

17   evidence, it's my duty to instruct you on the law that applies

18   to this case.  A copy of these instructions will be available

19   in the jury room for you to consult.  It is your duty to weigh

20   and to evaluate all the evidence received in the case, and in

21   that process to decide the facts.  It is also your duty to

22   apply the law as I give it to you to the facts as you find them

23   whether you agree with the law or not.

24      You must decide the case solely on the evidence and the

25   law.  Do not allow personal likes or dislikes, sympathy,

1  prejudice, fear or public opinion to influence you.  You should

2  also not be influenced by any person's race, color, religion,

3  national ancestry, gender, sexual orientation, profession,

4  occupation, celebrity, economic status or position in life or

5  in the community.  You will recall that you took an oath

6  promising to do so at the beginning of the case.

7      You must follow all of these instructions and not single

8  out some and ignore others.  They are all important.  Please do

9  not read into these instructions or anything that I may have

10  said or done any suggestion as to what verdict you should

11  return.  That is a matter entirely up to the jury.

12      The indictment is not evidence.  The defendant has pleaded

13  not guilty to the charge.  The defendant is presumed to be

14  innocent unless and until the Government proves the defendant

15  guilty beyond a reasonable doubt.  In addition, the defendant

16  does not have to testify or present any evidence to prove

17  innocence.  The Government has the burden of proving every

18  element of the charge beyond a reasonable doubt.

19      A defendant in a criminal case has a constitutional right

20  not to testify.  In arriving at your verdict, the law prohibits

21  you from considering in any manner that the defendant did not

22  testify.

23      Proof beyond a reasonable doubt is proof that leaves you

24  firmly convinced the defendant is guilty.  It is not required

25  that the Government prove guilt beyond all possible doubt.  A

1    reasonable doubt is doubt based upon reason and common sense
2    and is not based purely on speculation.  It may arise from a
3    careful consideration -- a careful and impartial consideration
4    of all of the evidence or from lack of the evidence.  If after
5    a careful and impartial consideration of all of the evidence
6    you are not convinced beyond a reasonable doubt that the
7    defendant is guilty, it is your duty to find the defendant not
8    guilty.  On the other hand, if after a careful and impartial
9    consideration of all of the evidence you are convinced beyond a
10   reasonable doubt that the defendant is guilty, it is your duty
11   to find the defendant guilty.
12        The evidence you are to consider in deciding what the
13   facts are consist of:  the sworn testimony of any witness, the
14   exhibits received in evidence, and any facts to which the
15   parties have agreed to.
16        In reaching your verdict you may consider only the
17   testimony and exhibits received in evidence.  The following
18   things are not evidence, and you may not consider them in
19   deciding what the facts are:  questions, statements,
20   objections, and arguments by the lawyers are not evidence.  The
21   lawyers are not witnesses.  Although you must consider a
22   lawyer's questions to understand the answers of a witness, the
23   lawyer's questions are not evidence.
24        Similarly, what the lawyers have said in opening
25   statements, what they will say in their closing arguments, and

at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.

Any testimony that I have excluded, stricken or instructed you to disregard is not evidence.  Anything you may have seen or heard when the Court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

Evidence may be either direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence; that is, it is proof of one or more facts from which you can find another fact.  You are to consider both direct and circumstantial evidence.  Either can be used to prove any fact.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

By way of example, if you wake up in the morning and see that the sidewalk is wet, you may find that the fact -- you may find that the fact -- you may find that that fact that it rained during the night.  However, other evidence, such as a turned-on garden hose may provide an explanation for the water on the sidewalk.  Therefore, before you decide that a fact has

been proved by circumstantial evidence, you must consider all of the evidence in the light of reason, experience, and common sense.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says or part of it or none of it.  In considering the testimony of any witness, you may take into account the following:  the opportunity and the ability of the witness to see or hear or know the things testified to; the witness's memory; the witness's manner while testifying; the witness's interest in the outcome of the case, if any; the witness's bias or prejudice, if any; whether other evidence contradicted the witness's testimony; the reasonableness of the witness's testimony in light of all of the evidence; and any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may

choose not to believe anything that witness said.  On the other
hand, if you think the witness testified untruthfully about
some things but told the truth about others, you may accept the
part you think is true and ignore the rest.

The weight of the evidence as to a fact does not
necessarily depend on the number of witnesses who testify.
What's important is how believable the witnesses were and how
much weight you think their testimony deserves.

The indictment charges the offense alleged was committed
on or about a certain date.  Although it is necessary for the
Government to prove beyond a reasonable doubt that the offense
was committed on a date reasonably near the date alleged in the
indictment, it is not necessary for the Government to prove
that the offense was committed precisely on the date charged.

You have heard testimony that the defendant made a
statement.  It is for you to decide whether the defendant made
the statement, and if so, how much weight to give to it.  In
making those decisions, you should consider all of the evidence
about the statement, including the circumstances under which
the defendant may have made it.

You have heard evidence that the defendant committed other
crimes, wrongs or acts not charged here.  You may consider this
evidence only for its bearing, if any, on the question of the
defendant's intent, knowledge, absence of mistake or absence of
accident and for no other purpose.  You may not consider this

1  evidence as evidence of guilt of the crime for which the

2  defendant is currently or now on trial.

3       You have heard testimony from Michael Duretto, the

4  assistant federal security director at the Transportation

5  Security Administration, and Fahima Danishgar, foreign affairs

6  officer at the U.S. Department of State to opinions and the

7  reasons for their opinions.  This opinion testimony is allowed

8  because of the education or experience of these witnesses.

9  Such opinion testimony should be judged like any other

10  testimony.  You may accept it or reject it and give it as much

11  weight as you think it deserves considering the witness's

12  education and experience, the reasons given for the opinion,

13  and all the other evidence in the case.

14       I will now instruct you on the relevant federal airport

15  security regulations and requirements referred to in the sole

16  count of the indictment.  The federal regulations and security

17  requirements prohibit any person from entering a sterile area

18  of an airport or boarding an aircraft without submitting to

19  screening and inspection of his or her person and accessible

20  property; circumventing or attempting to circumvent any

21  security system, measure or procedure implemented to protect

22  passengers and property on an aircraft; and/or entering a

23  sterile area without complying with the procedures being

24  applied to the area, with all of you agreeing as to which

25  federal regulation is violated.

1          The term "sterile area" means a portion of an airport

2     where passengers have access to boarding aircraft and to which

3     the access generally is controlled by the Transportation

4     Security Administration; an aircraft operator through the

5     screening of persons and property.  The Los Angeles

6     International Airport, the Chicago Airport and the Chicago

7     Midway International Airport are airports for purposes of these

8     regulations.

9          Diplomatic pouches are bags, pouches or other containers

10    that are used for transporting diplomatic correspondence,

11    documents, articles intended for official use from foreign

12    governments or public international organizations that are

13    registered with the United States Department of State.

14    Diplomatic pouches are exempted from the security screening

15    requirements when carried by diplomatic couriers who possess

16    diplomat status and the required documentation.

17         Specifically for a diplomatic pouch to be exempt from

18    security screening at TSA, the diplomatic courier must possess

19    and present to TSA a valid diplomatic passport that is issued

20    by a foreign government or public international organization

21    that is registered with the United States Department of State;

22    a courier letter from a foreign government or public

23    international organization registered with the United States

24    Department of State bearing the seal of the foreign government

25    or public international organization; and a diplomatic pouch

whose exterior is clearly identified as a diplomatic pouch and bears the official seal of the government or public international organization that is registered with the United States Department of State.

Individuals who are not diplomatic couriers and who do not possess valid diplomatic documentation must submit their items for screening and inspection before entering the sterile area of an airport.

The defendant, Mr. Flint, is charged in the sole count of the indictment with entering an airport in violation of security requirements.  In order for the defendant to be found guilty of that charge, the Government must prove each of the following elements beyond a reasonable doubt:  one, the defendant entered an airport area that serves an air carrier, namely, the sterile area of Terminal 3 at Los Angeles International Airport; two, defendant did so in violation of security requirements and regulations prescribed under sections 44901, 44903(c) of Title 49 of the United States Code; and the defendant acted knowingly and willfully and the defendant also acted with the intent to evade the security regulation.

The third element which the Government must prove beyond a reasonable doubt is that the defendant acted knowingly and willfully.  An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake or accident.  You may consider evidence of the defendant's words,

acts or omissions, along with all the other evidence, in
deciding whether the defendant acted knowingly.  An act is done
willfully if the defendant committed it voluntarily with
knowledge that it was prohibited by law and with the purpose of
violating the law and not by mistake, accident or good faith.

A defendant who acts on a good-faith misunderstanding as
to the requirements of the law does not act willfully even if
his understanding of the law is wrong or unreasonable.  Thus,
in order to prove that the defendant acted willfully, the
Government must prove beyond a reasonable doubt that the
defendant did not have a good-faith belief that he was
compliant with the law.

After argument of counsel and later this afternoon or
later today when you begin your deliberations, elect one member
of the jury as your foreperson who will preside over the
deliberations and speak for you here in court.  You will then
discuss the case with your fellow jurors and reach an
agreement, if you can do so.  Your verdict of guilty or not
guilty must be unanimous.  Each of you must decide the case for
yourself, but you should do so only after having considered all
of the evidence, discussed it fully with your fellow jurors,
and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion
persuades you that you should, but do not come to a decision
simply because other jurors think it is right.  It is important

that you attempt to reach a unanimous verdict, but, of course, only if each of you can do so after having made your own conscientious decision.  Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Perform these duties fairly and impartially.  Do not allow personal likes or dislikes, sympathy, prejudice, fear or public opinion to influence you.  You should also not be influenced by any person's race, color, religion, national ancestry, gender, sexual orientation, profession, occupation, celebrity, economic circumstances or position in life or in the community.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement, if you can do so.  During your deliberations, you should not hesitate to re-examine your own views and change your opinion if you become persuaded that it is wrong.

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues that it involves, except for discussing the case with your fellow jurors during your deliberations.

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it.  This includes discussing the case in person, in writing, by phone or electronic means

via e-mail, text messaging or by any Internet chat room, blog, website or any other feature.  This applies to communicating with your family members, your employer, the media, press and the people involved in the trial.

If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the Court.  Do not read, watch or listen to any news or media accounts or commentary about the case or anything to do with it.  Do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure that the parties have a fair trial based on the same evidence that each party had an opportunity to address.  A juror who violates these restrictions jeopardizes the fairness of these proceedings, a mistrial could be a result.  That would require the entire trial process to start over.  If any juror is exposed to any outside information, please notify the Court immediately.

Some of you have taken notes during trial.  Whether or not you took notes, you should rely on your own memory of what was said.  Notes are only to assist your memory.  You should not be overly influenced by the notes of your fellow jurors.

1    Punishment provided by law for this crime is for the Court

2    to decide.  You may not consider punishment in deciding whether

3    the Government has proved its case against defendant beyond a

4    reasonable doubt.

5    A verdict form has been prepared for you.  After you have

6    reached a unanimous verdict or unanimous agreement on a

7    verdict, your foreperson should complete the verdict form

8    according to the deliberations, sign and date it, and advise

9    the clerk or bailiff that you have -- that you are ready to

10   return to the courtroom.

11   If it becomes necessary during your deliberations to

12   communicate with the Court, you may send a note through the

13   clerk or bailiff signed by one or more of you.  No member of

14   the jury should ever attempt to communicate with me except by a

15   signed writing.  And I will respond to the jury concerning the

16   case only in writing or here in open court.  If you send out a

17   question, I will first consult with the lawyers before

18   answering it, which may take some time.  You may continue your

19   deliberations while waiting for the answer to any question.

20   Remember, you are not to tell anyone, including me, how

21   the jury stands numerically or otherwise on any question

22   submitted by you, including the question of the guilt of the

23   defendant, until after you have reached a unanimous verdict or

24   have been discharged.

25   That concludes the reading of the jury instructions to the

```
 1   jury.
 2         Are we going to take a short recess?  Yes?
 3              MR. YANNIELLO:  Yes, Your Honor.
 4              THE COURT:  Are there any other issues to discuss
 5   regarding the Court's reading of the jury instructions?  None?
 6              MS. WAKEFIELD:  No.
 7              MR. YANNIELLO:  No, Your Honor.
 8              THE COURT:  So a short recess that's going to allow
 9   counsel to set up.  It's probably a good opportunity to take a
10   restroom break also.  And please return at -- we will make it
11   20 to the hour.
12              THE COURTROOM DEPUTY:  All rise for the jury,
13   please.
14              THE COURT:  We are in recess.
15         (Recess taken from 10:26 a.m. to 10:40 a.m.)
16              THE COURTROOM DEPUTY:  Would you all rise for the
17   jury, please.
18         (In the presence of the jury.)
19              THE COURT:  We have the jury reassembled.  We have
20   the alternates.  We have counsel and the defendant here.
21   Please have a seat.
22         It's now the opportunity for the parties to provide
23   argument to you.  The Government starts first, followed by the
24   defendant.  Mr. Harbaugh will be providing the argument for --
25   on behalf of Mr. Flint, and then Mr. Yanniello will have a
```

second opportunity to address you.  The Government gets two
opportunities, the defendant just one because the Government
has the burden of proof in the case.

　　　　With that, I will turn it over to counsel.

　　　　　　　　MR. YANNIELLO:  Thank you, Your Honor.

　　　　When you heard opening statement, you heard about two
Daniel Flints.  The defense told you that Daniel Flint was a
small-town lawyer, someone who was handed this identification
card, and he swore a diplomatic oath, someone that was duped by
Robert Shumake because he trusted Robert Shumake.

　　　　The Government told you that this case was about a Daniel
Flint who knew he wasn't a diplomat, a Daniel Flint that was
specifically told by TSA that he needed a diplomatic passport,
and that he couldn't board a flight with a diplomatic courier
bag, and a Daniel Flint who researched and knew the rules and
what was required to bring that diplomatic bag on the airplane.

　　　　But he researched the rules, not so that he could comply
with them; he researched the rules so he could violate them.
He researched the rules -- the evidence in this case supports
only one of those stories:  that the defendant knew his
credentials were phony, that he intended to use his skills as a
lawyer to talk his way through screening, and that he intended
to evade airport security so that he could smuggle cash through
screening over and over and over again.

　　　　Yesterday you heard about Robert Shumake, the man

1  Mr. Flint trusted and swore an oath to.  Well, Special

2  Agent Simon testified that Mr. Shumake has a criminal history

3  about that big, testified that when this offense happened on

4  July 25th, 2017, he was -- Mr. Shumake was facing fraud

5  charges.

6       Ladies and gentlemen, Daniel Flint wasn't born yesterday.

7  He knew -- he knew that taking a piece of paper to Kinko's and

8  having it laminated did not make him a diplomat.  He knew that

9  swearing an oath to some organization based out of a P.O. Box

10 in Pakistan did not give him diplomatic privileges to board an

11 aircraft with an unscreened bag.  He knew, and he didn't care.

12      And, again, he didn't care because the purpose of his

13 entire scheme was to -- the reason Daniel Flint pretended to be

14 a diplomat is because Daniel Flint wanted to transport bags

15 full of money to LAX, through LAX, without any law enforcement

16 individual seeing it, without TSA, without screeners at

17 Los Angeles Airport, without any law enforcement seeing it.

18      For this, defendant has been charged with a single count,

19 entering an airport in violation of security requirements.

20 There are four elements to this charge:  entering a sterile

21 area of Terminal 3 of LAX; violating security requirements;

22 knowingly and willful; and intent to evade.  And when I get to

23 those last two elements, I'm going to talk about them together

24 because they both relate to what defendant was thinking at the

25 time, and the evidence that showed that he did, in fact, intend

1    to evade the security procedures.

2        Let's talk about Element 1, entering a sterile area.  How

3    do you know that defendant entered a sterile area of

4    Terminal 3?  Well, you heard testimony and you saw this

5    exhibit, 45, that shows you a bird's eye view of Terminal 3.

6    And you heard quite a bit of testimony from several people, but

7    Michael Duretto, the assistant security director of LAX

8    Airport, he drew a big box around this area, he drew a circle

9    around the terminal, and then he drew a big box and he said all

10   of that's sterile.

11       He said when people get onto planes and when they get off

12   of planes, even the little boarding hallways that attach to the

13   plane, those are sterile as well.  He also testified that

14   airplanes themselves are sterile, and that any -- essentially

15   anytime you pass a TSA checkpoint, anytime you are in an area

16   where you're boarding, where there's people boarding planes,

17   that's sterile.

18       So when Mr. Flint went through airport security in Chicago

19   Midway on July 25th, when he tricked TSA into believing he was

20   a diplomat, he entered a sterile area of Chicago Airport.  When

21   he got on the plane, he was still in a sterile area.  When he

22   got all the way back to LAX and landed, sterile area.

23       And so how do you know that defendant entered a sterile

24   area of LAX?  Well, because his plane landed and he got off and

25   that bag was not screened.

1        So Element 2, violated security requirements.  Well,

2   ladies and gentlemen, we have all been to an airport, and we

3   know that -- we've seen this sign.  And you've heard evidence

4   about this.  When you enter an area past TSA checkpoints,

5   everyone must be screened:  all persons, all bags, all

6   property.  No attempting to circumvent security screening.

7        And you will see this in Instruction 13.  It's very clear

8   on this point.  And Mr. Duretto explained this, but there is

9   also a regulation that discusses it doesn't matter where you

10  enter the secure area, if you get off a plane, if you enter

11  through a window, if you enter that area, you must comply with

12  the overall mechanism for controlling access, and that

13  mechanism is TSA screening.

14       So you also heard that there's a limited exception to TSA

15  screening, and that's a diplomatic bag.  And, again,

16  Instruction 13 very clearly instructs that this applies, this

17  limited exception applies to a bona fide, real diplomat and a

18  real diplomatic courier bag.  And it makes clear that, also,

19  individuals who are not diplomatic couriers and who do not

20  possess valid diplomatic identification, they must submit their

21  items to screening.

22       So how do you know that Daniel Flint violated security

23  requirements on July 25th, 2017 when he got to LAX?  Well, his

24  bag had never been screened.  He had duped TSA security in

25  Midway, got that bag through, but they figured it out.  They

UNITED STATES DISTRICT COURT

1    called LAX.  And as you heard Special Agent Marriott, the FBI,

2    TSA, and other security personnel were waiting for Mr. Flint

3    because you can't bring that bag on an airplane without it

4    being screened.

5         So when Mr. Flint landed, we know he doesn't have a

6    diplomatic passport.  We know he showed phony credentials, so

7    he violated TSA -- he violated federal regulations by landing

8    with that unscreened bag.

9         So let's talk about -- I mentioned before, I want to talk

10   about Element 3 and Element 4 together because those relate to

11   defendant's mental state:  What was he thinking?  And what did

12   he intend?  Knowingly and willfully is Element 3, and intent to

13   evade, which is that he -- his purpose was, in fact, to violate

14   security requirements or circumvent them.  So I'm going to talk

15   about these together because the evidence shows unequivocally

16   that defendant did intend to evade security requirements, and

17   so he also knowingly and willfully violated them.

18        How do we know?  Well, we first know because defendant was

19   actually told the rules.  He went to Chicago O'Hare just five

20   days before, and TSA personnel, two of them, you heard them

21   testify, said this plastic, self-laminated identification

22   card -- you know it's self-laminated.  You heard testimony that

23   defendant went and had it laminated, but they didn't know.

24   They just saw his document, and it was not a diplomatic

25   passport.  "You need a diplomatic passport.  You can't come

```
 1   through."
 2        So what did defendant do that day?  And, again, let me
 3   back up for a second.  They also gave him an option.  They
 4   said, "We will screen that bag and you can go on your merry way
 5   and you can get on your plane and go to LAX, or you can decide
 6   not to screen that bag and you can't board the plane."
 7        So what did defendant do?  He said "no."  He immediately
 8   booked another flight from another airport, went across town to
 9   Chicago Midway.  And, unfortunately, he did get through
10   security there.  So he was told the rules.  He also researched
11   the rules.  And how do we know he researched the rules?
12   Because he said it multiple times in his interview.  He said,
13   "I looked at all the rules."  He said, "Based on all my
14   research."  He researched the rules.
15        And let's also think about what Special Agent Marriott
16   testified to yesterday.  We have the formal state department
17   guidance on diplomatic pouches, which very clearly states any
18   diplomatic courier needs a diplomatic passport.  It took
19   Special Agent Marriott two clicks with a Google search.  The
20   first click, state department.  On that state department
21   website, a link to that formal guidance.
22        We also know that defendant knew the rules because of the
23   video we saw on July 25th.  He walked up.  You know, you
24   heard -- you heard Raja Wondrasek, first time ever dealing with
25   a diplomatic passport -- or sorry, diplomatic courier bag or
```

alleged diplomatic courier bag in 15 years as a TSA officer.
She was a manager.  She went out there; she was doing her best.
She saw the first courier letter she had ever seen.

And so what does defendant do when he gets up and makes
contact with Ms. Wondrasek?  "I know the rules.  That's a
seal."  What does he do when she's looking at his
identification document?  He brings out the binder, which you
should take a very close look at when you're back in the jury
room deliberating.  And what does he open to?  He opens up to a
large laminated version of his diplomatic identification card.

And what does he point to?  The word "Passport."  Now, it
says "ID card number," but it says "Passport."  And you
understand just by looking at this and looking at the card how
somebody could be reasonably confused by this, that
something -- the requirement is a diplomatic passport, and this
card that they're being presented with that -- they've never
seen a diplomatic passport.  The card they are being presented
with says "Diplomat" in red across it with "Passport" right
below it.  Not a diplomatic passport, ladies and gentlemen.

You also heard in one of the clips that was played for you
that Mr. Flint told Special Agent Marriott -- he offered it up.
He said, "Oh, I have a copy of Mr. Shumake's diplomatic
passport in that binder."  You heard Special Agent Marriott
testify that the only form of identification related to
diplomatic status was Mr. Shumake's IHRC card, or a copy of it,

1    again, with a passport number listed right below "Diplomat."

2         Ladies and gentlemen, you also know that he intended to

3    evade security procedures because he knew these documents were

4    bogus.  He knew -- he knew that a laminated card that he took

5    and had it laminated referencing a P.O. Box in Pakistan did not

6    give him diplomatic status.  His courier letter references a

7    main office in San Francisco and then has some 5250 Lankershim

8    Boulevard, North Hollywood.

9         The letter you heard testimony about from Special

10   Agent Marriott, Exhibit 5, it specifically says -- it doesn't

11   say that there is any formal relationship between the United

12   States and this organization.  It's just some letter from the

13   organization requesting status about the possibility of

14   starting a friendly relationship.

15        You also know that defendant, during his interview with

16   agents, referenced this agreement, the Vienna Convention --

17   it's a long name.  It's a 1997 -- or 1975 agreement,

18   apparently, but you also know on the very cover of that

19   agreement, it says, "Not yet in force."  We are talking about

20   an attorney here, somebody who went to college, law school,

21   took two bar exams, presumably.  He's barred in two states.  It

22   says "Not yet in force" on the very cover of the agreement.

23        And remember, defendant's intent was not just to get the

24   bag on the plane.  His intent was to get the bag through

25   airport security and to Los Angeles so he could hand it off to

whoever he needed to hand it off to.

This is not a case about an innocent mistake.  This is a case about an attorney who knew what he was doing, someone who researched the law and tested airport security to find weaknesses, and someone who dedicated hours, days, weeks crafting this scheme, putting these documents together.  And the scheme, again, as I just said, it wasn't just to get to L.A.; it was to get through L.A., through security at Los Angeles International Airport.

And in summary, this case, as defense counsel put it earlier, is a case about trust, except that the evidence shows that the defense had it backwards.  Robert Shumake trusted the defendant, not the other way around.  Shumake trusted defendant to use his smarts as a lawyer; his ability to use his silver tongue; his skills of argument; his ability to stay calm, cool and collected; to con his way through airport security.  And defendant succeeded over and over and over again.

He violated the trust placed in TSA to protect the traveling public.  He jeopardized the trust of fellow passengers who had no idea what was in that bag, all to smuggle a lot of cash.  He chose to ignore obvious and easily researched Internet sites that directed him to the state department rules about diplomatic passports.

That is the only reasonable explanation given, that he stated he knew all of the rules.  Thus, based on the reasonable

```
 1   and the only reasonable interpretation of the evidence,
 2   defendant knew beyond a reasonable doubt what he was doing, the
 3   evidence needed of each element as required, and you should
 4   find him guilty as charged.  Thank you.
 5           THE COURT:  Thank you.
 6           MR. HARBAUGH:  This case is about faith.  Mr. Flint
 7   placed his faith in Robert Shumake, he placed his faith in the
 8   IHRC, and he placed his faith in the TSA.  Mr. Flint was too
 9   trusting.  Mr. Flint should have done his homework, should have
10   asked more questions, and he shouldn't have accepted the
11   representations of others.  But one thing is certain, Mr. Flint
12   did not intend to break the law.  Mr. Flint didn't commit a
13   crime.  He acted in good faith, and he's not guilty of the
14   charge.
15      Now, ladies and gentlemen, the judge read to you a lot of
16   jury instructions.  I want you to focus on one in particular,
17   Jury Instruction 15.  It talks -- it gives you the definition
18   of what knowing and willfully is, and it specifically states
19   that a defendant who acts on a good-faith misunderstanding of
20   the requirements of the law does not act willfully even if his
21   understanding of the law is wrong, even if his understanding of
22   the law is unreasonable.
23      And the judge talked to you about that Mr. Flint has no
24   obligation to prove any element, but, in particular, Mr. Flint
25   doesn't have to prove to you that he acted in good faith.  The
```

1    Government has to disprove that Mr. Flint did not act in good

2    faith and beyond a reasonable doubt.

3         Now, ladies and gentlemen, reasonable doubt is the highest

4    burden of proof under the law.  It requires that before we

5    subject someone to a federal felony conviction, that the

6    Government has met all of their burden, and the Government

7    hasn't done it here.

8         Mr. Flint relied in good faith on what TSA did, and he

9    relied in good faith on what Mr. Shumake told him.  So let's

10   first talk about his good faith reliance on TSA.  Now, we heard

11   a lot about TSA's screening rules, we did.  And, ladies and

12   gentlemen, I waited for it.  I was wondering if we were going

13   to actually see this super secret Standard Operating Procedure

14   that they talked about the entire trial.  Remember, I asked

15   Mr. Kotula about that, could he show that to the public?  And

16   he said, "No, we have to get written permission from the

17   secretary of transportation."

18        Now, it's up to the Government to decide how to present

19   their case, but the Government wants you to convict Mr. Flint

20   of violating an internal secret guideline, and they won't even

21   show it to you.

22        Now how do we know that Mr. Flint acted in good faith?  So

23   even before we talk about the events of July 20th, that's at

24   O'Hare Airport, Mr. Flint told anyone who would listen -- or

25   told the individuals at O'Hare, and then later Agent Marriott,

1    that he had flown with the identical documents repeatedly and

2    TSA had never had a problem.

3        Ladies and gentlemen, it's real easy for the Government to

4    prove that or disprove that.  They have surveillance videos at

5    every airport.  They can get flight records.  They can disprove

6    that easily, but they chose not to challenge that.  So, ladies

7    and gentlemen, we have Mr. Flint repeatedly flying through the

8    airport with the same documents.

9        So the identical documents, the same secret protocol that

10   was used in all the prior instances that he flew, and he's

11   denied on that occasion.  They tell him that he now has to have

12   a diplomatic passport.  He asked to read that secret rule.

13   They deny him that.  He insists, "Is this a new rule?  Is this

14   something different for O'Hare?"  They tell him "no," it's the

15   same protocol, same procedure that they have been applying to

16   him all the other times that he flew.

17       He disagreed with them, and Mr. Flint elevated it to a

18   supervisor.  He wanted a supervisor, Guy Sheridan, to explain

19   what he believed was a change in the rule.  So let's talk about

20   the next time he encounters -- the very same day, using the

21   identical documents with the same secret protocol, and he's

22   granted access.

23       Now, we heard from Supervisor Yoksas.  He told you he

24   followed the Standard Operating Procedure.  He found Mr. Flint

25   met all the requirements, and he sent him on his way.  Now, the

1    Government talked about it with Ms. Wondrasek, but I'm

2    confident they will talk about it again, that "Well, because

3    these individuals had never had a" -- "had dealt with this

4    situation, basically we should give TSA a pass."  The burden is

5    on Mr. Flint to ensure they follow their own internal super

6    secret guidelines.  Ladies and gentlemen, that's not how the

7    law works.

8         So the next time that Mr. Flint encounters TSA with the

9    identical documents, this is at Midway, five days later, the

10   same secret protocol, and this time we have something special.

11   And I think this did come into evidence.  So after Mr. Flint

12   went through Midway on July 20th, they reviewed a training

13   bulletin.  We heard from Ms. Sheahan.  They issued a bulletin

14   to narrow it down, to make it very clear.  It states

15   "diplomatic passport."

16        Ms. Wondrasek printed it off.  She had it with her.  She

17   compared the requirements for the TSA guideline and looked at

18   Mr. Flint's documents and found they met the requirement.

19   Ladies and gentlemen, that's good faith.  That's acting in good

20   faith.

21        So I want to talk about Mr. Flint's good-faith reliance on

22   Robert Shumake.  So we heard about Mr. Shumake in this case.

23   We didn't get really any information about him, didn't testify,

24   didn't hear about anything that he had said, but we do know how

25   Mr. Shumake -- and the Government talked about, Mr. Shumake

1    duped the state department, Mr. Shumake duped the United

2    Nations, and Mr. Shumake duped Mr. Flint.

3        First, with regard to the state department, we know that

4    Mr. Shumake had obtained honorary consul status from two

5    countries, Botswana and Tanzania.  He had to go through the

6    accreditation process.  He had to be vetted by the state

7    department.  They could have denied him an ID in their

8    discretion, and they chose to grant him.  He had honorary

9    consul status.

10       Now, we heard that that status terminated in 2015, but

11   that's not available to the public, ladies and gentlemen.  We

12   heard from Ms. Danishgar that that's in the TOMIS system that

13   I'm not even going to try to give you the acronym, but their

14   internal system that only she can access, that they did

15   terminate.

16       Now, she talked about the public can gain access when

17   someone gets accreditation, but I listened, and she didn't talk

18   about when somebody can find out if they had their status

19   terminated.  Now, she talked about when an individual no longer

20   has their status they're required to return that ID.  Well, we

21   have no -- and she actually said Mr. Shumake didn't do that,

22   but what we do know is that Mr. Shumake had an ID that was

23   valid until January 31st of 2018.  So seven -- excuse me, six

24   months after Mr. Flint got on the plane on July 25th,

25   Mr. Shumake had a valid state department diplomatic ID.

1          And, ladies and gentlemen, the Government talks about, and

2     we will get into this, that a person should know that only

3     diplomatic passports, and not diplomatic IDs -- ladies and

4     gentlemen, this is a diplomatic ID accepted by the state

5     department, it's not a diplomatic passport, entitles a person

6     to privileges and immunities.

7          So the other entity that Mr. Shumake duped was the

8     United Nations.  Now, again, it's the Government's decision on

9     how they want to present their case, but we wanted to present

10    the full story of Mr. Shumake's background, so we called the

11    case agent, Special Agent Simon.  And he took the stand, and he

12    explained to you the very involved process that he went

13    through.

14         We actually had missed a step.  He had to contact the FBI

15    in New York, then the FBI in New York had to contact the state

16    department, and then the state department had to contact the UN

17    to get a determination as to Mr. Shumake's status, and the

18    International Human Rights Commission.

19         So we heard the results of that, right?  We heard

20    confirmation that in 2016, Mr. Shumake and the IHRC Relief

21    Fund -- or Release -- excuse me, Trust Fund Relief had

22    consultative status with the UN and with a particular division

23    of the UN, the ECOSOC.  That's his -- where he had specific

24    consultative status with the UN.

25         Ladies and gentlemen, this is Government's Exhibit 8, and

1   this was in the binder that Mr. Flint had at the airport.

2   Mr. Flint had a copy of Mr. Shumake's UN ID.  Ladies and

3   gentlemen, if that was good enough for the UN, certainly

4   Mr. Flint relied in good faith on Mr. Shumake's representations

5   that he is an ambassador.  Mr. Shumake duped the state

6   department.  He duped the UN, and he duped Mr. Flint.

7       So I listened to the Government, and they talked about the

8   two Mr. Flints, that the one they are telling us about today,

9   that he spent hours, days and weeks crafting this scheme, that

10  Mr. Flint's a con man.  So let's talk about that.  Let's look

11  at the -- does the evidence bear that out?  Ladies and

12  gentlemen, I submit to you it does not.

13      So what does a con man do?  Well, first, they're going to

14  look as genuine as possible.  They're going to make sure that

15  everything looks on the up and up.  Right?  They are going to

16  do their best not to get flagged.  So we heard from Agent -- or

17  excuse me, Mr. Duretto, the security manager, and he talked

18  about -- I mean, it was incredibly detailed, all of the flaws

19  he identified in this diplomatic ID.  It took him quite a

20  while.  He noticed bubbles.  He noticed different fonts.

21      Ladies and gentlemen, if someone is a professional con

22  man, they're not going to make these amateur mistakes.  They're

23  not going to think they're going to float past TSA screening

24  and not one level, but multiple levels.  And, ladies and

25  gentlemen, if Mr. Flint was trying to dupe -- well, actually, I

1    put up a picture because the Government made a huge issue about

2    the passport number here.

3        Now, it doesn't say it is a diplomatic passport, and the

4    Government didn't provide any information that Mr. Flint didn't

5    have his own personal passport, which we were told by

6    Ms. Danishgar this is an ordinary personal passport; this is a

7    diplomatic passport.  Mr. Flint didn't think he was going to

8    confuse TSA that -- as the Government points out, his

9    self-laminated identification card was going to be confused

10   with a diplomatic passport.  Ladies and gentlemen, that just

11   doesn't make sense.

12       And the Government talked about other problems, and you're

13   going to look at the packet.  So if Mr. Flint is going to

14   create a packet to convince TSA that everything is on the up

15   and up, they talked about the letter that was written from

16   IHRC, and it talked about a wish, a hope to develop diplomatic

17   status with the United States.  Ladies and gentlemen, why would

18   you make -- write up a half lie?  Why not go all the way?  If

19   you're going to fabricate the letter, you're going to say the

20   United States has diplomatic status with the IHRC.  Why write a

21   half lie?  According to the Government, Mr. Flint is a con man.

22   Amateur mistake, ladies and gentlemen.

23       So the other thing Mr. Flint did to dupe TSA was to put a

24   copy of the Vienna Convention that hadn't gone into effect.

25   Remember, the Government did a much better job.  They screen

1    shot that first part, the first page of the Vienna Convention

2    and they showed it had not taken force.  Is that a professional

3    con man?  No.  It's somebody relying on good faith, of

4    documents from another organization.  He's relying on IHRC, and

5    he's relying on Mr. Shumake.

6        If you are going to pull off a scam on TSA, why are you

7    going to create documents that create red flags?  It doesn't

8    make sense.  Either Mr. Flint was the dumbest criminal in the

9    world, or he was duped by Mr. Shumake.

10        Now, the other thing a con man does is avoid drawing

11    attention to yourself.  You don't want any scrutiny.  You want

12    to get in and get out as fast as you can.  So let's talk about

13    at O'Hare.  After Mr. Flint was told by Mr. Kotula that he

14    couldn't fly with a diplomatic passport, that what he presented

15    was inadequate and he either needed to have it screened or

16    leave, Mr. Flint was given the option of talking with a

17    supervisor, and Mr. Flint asked to.

18        He did -- a con man who's caught is going to run, is going

19    to get out of there as fast as he can.  Not Mr. Flint.  He

20    wanted to speak with the supervisor.  He stayed there for over

21    20 minutes, arguing, disagreeing with them regarding the

22    protocol.  Ladies and gentlemen, that's not a con man; that's

23    an innocent man.

24        So the other thing a con man doesn't do -- or a con man

25    does -- or excuse me.  If a con man's caught, he's going to

```
 1   find another route.  He's not going to go back to TSA somewhere
 2   else.  He's going to rent a car and drive to L.A.  He's not
 3   going to expose himself to potentially getting caught again,
 4   but not Mr. Flint, because Mr. Flint believes in good faith
 5   that what he's doing is legal.
 6        So he goes to Midway that same day.  Now, this time
 7   Mr. Flint goes straight to the top.  He walks up to the person
 8   standing at the podium that checks the ID, and he asked for a
 9   supervisor, doesn't wait for one.  "I want a supervisor.  I
10   have a diplomatic pouch, and I'm a diplomatic courier."  Ladies
11   and gentlemen, that is inconsistent with a con man.  It's
12   consistent with an innocent man.
13        So finally, the third thing that a con man does -- oh, and
14   I'm sorry, the other thing that a con man doesn't do is -- so
15   as the Government stated, for a diplomatic courier, diplomatic
16   pouch, they have no authority to screen it.  They can't look at
17   it at all.  So he has a letter telling TSA that he has a cash
18   deposit weighing approximately 18 pounds.
19        Ladies and gentlemen, if there was ever a red flag, that
20   would be one.  A con man isn't going to put that in his letter.
21   He's not going to alert TSA that "I've got 18 pounds of cash."
22   He's going to say -- the letter is just going to say "I have a
23   diplomatic pouch."  That's it.
24        So the final thing that a con man does -- and, I'm sorry,
25   that's Exhibit 4 you can see at the bottom.  I'm doing a
```

1    terrible job of identifying.

2         And, ladies and gentlemen, I didn't want -- and I don't

3    want you to have to watch this entire video.  This is Defense

4    Exhibit 218, but remember, the Government played little

5    snippets of the video for you.

6         (Video recording played in open court.)

7              MR. HARBAUGH:  And I just wanted to highlight that

8    Mr. Flint stayed there for over 20 minutes.  Now, he's --

9    according to the Government, he's a con man that just got

10   caught.  Is he running out of the area?  Is he nervous?  He's

11   relaxed.  He presses his point strongly.  He disagrees with

12   TSA, and then he shakes the TSA's employee's hand at the end.

13        (Video recording played in open court.)

14             MR. HARBAUGH:  I think it's at the 19-minute mark.

15        So the final thing that a con man does is they don't help

16   the police.  Now, what we know Mr. Flint did, he agreed to be

17   interrogated, interrogated by two law enforcement

18   professionals, FBI Agent Marriott and Air Marshal Williams, not

19   for a couple of minutes, not a few questions; for two hours.

20        Now, again, the Government can present their case any way

21   they want.  We heard a few clips, probably amounted to about

22   ten minutes of a two-hour interview.  Now, we don't know what

23   Mr. Flint said during the rest of the interview.  We know he

24   tried to place phone calls, that other individuals were on the

25   end.  So even though we don't know what Mr. Flint said during

1    the rest of the interview, I guarantee you this:  If Mr. Flint

2    ever admitted to knowingly violate the rules, if he ever

3    admitted to evading security on purpose, you would have heard

4    it.  The Government would have played it for you, but he

5    didn't.

6         You heard from Agent Marriott that throughout the

7    interview Mr. Flint argued, contested, he didn't believe the

8    diplomatic passport was required.  Mr. Flint also told them to

9    talk to Mr. Shumake.  That's in one of the clips that you have.

10   "You'll have to talk to Mr. Shumake."  The Government never

11   talked to him, never interviewed him, never placed a phone

12   call.  They were too focused on prosecuting Mr. Flint than

13   finding out the truth.

14        Now, I guess if a con man does decide to talk to the

15   police, he's going to sound confident.  After all, the term

16   "con man" is a short inversion of "confidence man."  But listen

17   to those clips.  Mr. Flint doesn't sound confident at all.  And

18   I forgot to mention, we heard from Agent Marriott, Mr. Flint is

19   very cooperative throughout this two-hour interrogation.

20        At one point he says he feels like an idiot.  Is that a

21   con man, ladies and gentlemen?  It's an innocent man.  And a

22   con man isn't going to tell the truth about something that

23   looks bad.  They're not.  Flint admitted to laminating his ID

24   card so it couldn't get torn.  He didn't say this to help

25   himself; he said it because it's the truth.

1    The Government hasn't proven to you by any measure, and

2  certainly not beyond a reasonable doubt, that Mr. Flint wasn't

3  acting in good faith.  The only thing that the Government has

4  shown is that at one point Mr. Flint was mistaken, at one point

5  he was wrong, and at one point he was careless, but that's not

6  evidence he was acting in bad faith.

7    So let's look at each of those because I know the

8  Government will highlight that when they get up on rebuttal.

9  So let's talk about them now, the Government's assumption of

10  bad faith.  So the first one is when Mr. Flint is interrogated

11  and he says he does not recall being stopped previously.  Now,

12  the Government wants you to believe that Mr. Flint was hiding

13  something, that he was trying to keep from the FBI and the TSA

14  that he had gotten turned away at O'Hare.  He's trying to hide

15  that.

16    So if Mr. Flint was trying to hide something, why would he

17  talk to the FBI in the first place?  The easiest way to hide

18  something is just to not say anything at all.  But Mr. Flint

19  did agree to talk to law enforcement for two hours and was

20  cooperative.  So even though Mr. Flint tried to be helpful,

21  there's no question that that is a stressful environment.

22    Now, when we first heard on direct with Agent Marriott, it

23  sounded like a very casual encounter.  She greeted Mr. Flint

24  when he got off the plane, and then the two walked to an

25  interview room and had a discussion.  Now, it wasn't until she

1    admitted on cross and then we called Air Marshal Williams to

2    lay out the actual scene.

3        They reach out to the airplane before it lands.  Mr. Flint

4    has just competed -- completed the second leg of a

5    cross-country flight.  He just flew in from Minneapolis.  The

6    plane is pulling up to the gate.  No one is allowed to leave.

7    An air marshal and a police officer get on the plane, walk

8    directly to Mr. Flint and take him off the plane.

9        Air Marshal Williams told you he got him off the flight.

10   Mr. Flint didn't have a choice.  He was required.  Then he was

11   escorted with six to seven officers, armed, all just for him,

12   brought to an interrogation room and sat there for two hours.

13       Now, I just want to touch -- because I have limited time

14   and I don't want to delay you, but I want to touch on one issue

15   that the Government has to prove, and that's that Mr. Flint

16   voluntarily entered Terminal 3 of LAX, that on his own

17   volition, he got off the plane and went into Terminal 3.

18       The Government didn't present that evidence, but we did,

19   and it's clear that Mr. Flint had no choice.  They can't prove

20   he willfully entered Terminal 3.  And on that basis alone, you

21   must find him not guilty.  But I want to go back to this

22   environment, this stressful environment leading up to this

23   two-hour interrogation.

24       Mr. Flint wasn't lying about the O'Hare stop.  Mr. Flint

25   blanked in a highly stressful situation.  And it doesn't make

```
 1    sense that he would try to lie.  And we heard from Mr. Kotula
 2    that there are video cameras, surveillance cameras throughout.
 3    And you can rely on your own experience traveling through an
 4    airport that there are surveillance cameras everywhere.
 5    Mr. Flint didn't think he was going to be able to hide or cover
 6    up the fact that he got turned away from O'Hare.  Mr. Flint
 7    blanked.
 8         One thing, we know he was nervous, and I want you to
 9    listen to those recordings.  But ladies and gentlemen, and
10    this, again, goes to Mr. Flint, the Government's theory that
11    Mr. Flint's a con man, that he can't even identify the
12    international agreement that's supposed to govern his conduct.
13    He says the Geneva Convention.  Now, we heard from
14    Agent Marriott, he's not an expert in international law, but
15    even she knew that the Geneva Convention applies to the laws of
16    war and not to consular relations.  So the Government relies on
17    a mistake.  It's not evidence of bad faith.
18         So the other thing that the Government wants you to
19    believe that Mr. Flint acted in bad faith is when he asserted
20    diplomatic immunity back in 2016, and this is with the Deputy
21    Sheriff Schneider.  And we know that this occurred in September
22    2016.  This is a month before Mr. Flint had his diplomatic ID
23    issued from the state department.  He didn't know his status,
24    and he thought he was covered.
25         But when Mr. Flint discovered that he didn't have immunity
```

1    from the arrest or the traffic stop, he took responsibility.

2    He owned up to his conduct, he accepted the misdemeanor charge,

3    the traffic infraction, and paid a fine.  And, ladies and

4    gentlemen, I want you to listen to those recordings because

5    Mr. Flint repeatedly tells Ms. Marriott that he doesn't have

6    diplomatic immunity.  He learned from his mistake.  He was

7    wrong, but he didn't act in bad faith.

8         So the final thing the Government's focused on is

9    Mr. Flint's inadequate research.  Ladies and gentlemen, no

10   question, Mr. Flint was careless, didn't look into it enough

11   and should have.  Before he got on that plane, he should have

12   looked into it.  But, ladies and gentlemen, the instruction

13   says even if Mr. Flint was wrong, even if he was

14   unreasonable -- and you can probably conclude he was

15   unreasonable for not looking into it -- he is still not guilty

16   because he relied on Mr. Shumake.  He relied on Mr. Shumake's

17   status with the state department and with the UN.

18        This is my last opportunity to talk to you, so I want to

19   emphasize the key instruction that governs everything you do

20   here, and that's proof beyond a reasonable doubt.  The burden

21   rests with the Government to prove beyond a reasonable doubt.

22   Ladies and gentlemen, I have been doing this for a while, and I

23   struggle with understanding what reasonable doubt is.

24   Reasonable doubt is a deep-seated concern, a gnawing feeling, a

25   nagging question.

1    Ladies and gentlemen, we're at the end of this case, and

2  there are a lot of nagging questions.  Where's Mr. Shumake?

3  What do the IHRC know?  And the most nagging question that I

4  have is why?  Why?  Why would Mr. Flint fly with a diplomatic

5  pouch through the airport knowingly and willfully violating the

6  law?

7    So the Government's theory is that Mr. Flint wanted to

8  avoid screening of cash.  Now, we heard from Mr. Kotula there's

9  nothing illegal about cash, nothing at all.  A person can walk

10  onto a plane with as much cash as they want.  We know about

11  international flights; you must declare over 10,000, but for a

12  domestic flight, which is what Mr. Flint was on, he had no

13  obligation.  It was completely legal.  Cash that he fully

14  disclosed in the letter that he brought with him.

15    So why would Mr. Flint violate a law he didn't need to?

16  Why would he jeopardize his status as a lawyer in not one

17  state, but two so he could do something that he was legally

18  allowed to do?  Why would Mr. Flint risk a felony conviction to

19  do something that was legal?  Ladies and gentlemen, the

20  Government hasn't answered that question.  They haven't even

21  attempted to answer that question.  Instead, they want you to

22  assume that Mr. Flint acted in bad faith.

23    But proof beyond a reasonable doubt is not based on

24  assumptions.  It's based on evidence, and the evidence shows

25  that Mr. Flint was duped.  And the other great part of our

1    criminal justice system is our reliance on a jury, 12

2    individuals from the public, from all walks of life with vast

3    life experience.  We don't rely on 12 lawyers.  And no offense,

4    Your Honor, but we don't rely on judges.  That before the

5    Government can sanction an individual with a federal felony

6    conviction, we make sure that the public decides that they have

7    proven their case beyond a reasonable doubt.

8        Mr. Flint now places his faith in you, the jury, and we

9    ask that after you review all of the evidence, that you reach

10   the only just verdict in this case, which is not guilty.  Thank

11   you.

12           THE COURT:  Thank you.

13       Mr. Yanniello.

14           MR. YANNIELLO:  Ladies and gentlemen, there are good

15   con men and there are lousy con men.  Bernie Madoff is on the

16   one end of the spectrum, and then there's guys who call on the

17   phone and try to market you with some kind of telemarketing

18   scheme.  What do they have in common?  Criminal intent.  They

19   want to defraud, and the same intent that the defendant and his

20   client of seven years, his buddy, Mr. Shumake, had on July

21   25th.

22       Now, many of the arguments that defense counsel raised are

23   smoke and mirrors.  I think, first, it's important, the

24   instructions and reasonable doubt is a great starting place.  A

25   reasonable doubt is based on reason and common sense.  It's not

1   based on speculation.  And when you go back there and you

2   deliberate -- we are on the 10th floor here -- don't leave your

3   common sense in the room.  Take it back.

4       Now, defense counsel asked questions about the IHRC.  Take

5   a look at the documents.  We discussed some of them.  He said

6   because it references a cash deposit, defendant had nothing to

7   hide.  Well, ask yourself, you saw that this organization

8   appeared to be based out of a P.O. Box in Pakistan.  What

9   organization -- what credible, legitimate organization needs to

10  transport cash all the time?  On July 25th, on July 20th you

11  saw at least two examples of that, bags of cash.  Organizations

12  have bank accounts.  They deposit their cash.

13      Now, defense counsel also talked about this concept of a

14  secret, that there were secret rules.  We discussed this.

15  There's nothing secret about the requirement that a diplomatic

16  courier have a diplomatic passport.  Google could have brought

17  the defendant's attention to it, and it probably did because he

18  showed such great control and such great understanding of the

19  rules when he was interacting with TSA officers.

20      And the one thing I do agree with defense counsel, you

21  should listen to those audio files.  You should listen to those

22  excerpts, and you be the judge about whether or not when

23  defendant was asked specifically by Agent Marriott, "Have you

24  ever been stopped before?" he says it multiple times, "No.  For

25  what?"  Cagey efforts.  "No."  He was stopped five days before.

UNITED STATES DISTRICT COURT

1    He was turned away.  Counsel showed you a video, he was there

2    20 minutes and trying to negotiate, get inside the checkpoint.

3        I also want to bring your attention to Exhibit 31, which

4    is the training bulletin that Ms. Wondrasek referenced in her

5    testimony, that after defendant had successfully evaded

6    security screening on July 20th.  Now, one of the things here

7    is the requirement that there be a diplomatic passport, but

8    another thing to consider is this was actually a sophisticated

9    con.  This scheme was pretty smart.  The TSA can't screen a

10   diplomatic pouch, a bona fide diplomatic pouch.

11       And so defendant's negotiating up there, but he knows

12   there's no real repercussions, "They will send me away.  I will

13   say I will call the ambassador when I leave."  And what did he

14   do?  Didn't try to get a diplomatic passport.  He went straight

15   across town to Midway, tried the con again.

16       As for the why, ladies and gentlemen, we know why.  He

17   wanted to smuggle thousands and thousands and thousands of

18   dollars through airport security without it being screened.

19   You heard from Mike Duretto, that large sums of cash when they

20   go through an x-ray machine, they look like -- it comes out as

21   organic material that could be confused with explosives.  It's

22   going to get sent to secondary screening.  TSA is going to open

23   up that bag; they are going to examine it closely.  Risk.

24   Risk, that's why.  Smuggle thousands and thousands and

25   thousands of dollars, unscreened, untouched by any law

1    enforcement, unnoticed.

2         I also want to talk to you about another red herring, that

3    defendant somehow didn't enter Terminal 3 of LAX.  Ladies and

4    gentlemen, we have all been on flights.  You don't get the

5    option to sit on the flight and stay there.  You have to leave.

6    Everybody exits and they leave.  Agent Marriott told you that

7    defendant walked out of the terminal.  In fact, when he stepped

8    foot on that terminal, when he stepped foot on the boarding

9    ramp, he was within LAX.

10        He was actually -- if you look at Michael Duretto, if you

11   remember Michael Duretto's testimony, the entire blue space was

12   the secure area of that terminal.  So the second he stepped out

13   of the airplane and into the boarding ramp, he was in

14   Terminal 3.

15        And as far as agents coming there and making sure that

16   defendant was escorted to the interview room, of course they

17   don't know what's in that bag.  It could be anything.  Safety

18   of the passengers, safety of everybody, that was necessary.

19        Now, Counsel talked to you about good faith, good faith in

20   Mr. Shumake.  Well, we know about Mr. Shumake; criminal history

21   this big, a fraudster.  Good faith means good.  It doesn't mean

22   relying on fake documents, pretending to be a diplomat.

23        When you go back in the jury room and deliberate on all of

24   the evidence, think about it, use your common sense.  Defendant

25   lied in July 2016, "I have diplomatic immunity.  I am a civil

1    rights attorney for the U.S. government."  The officer says,

2    "No," arrests him.  Defendant pleads guilty.  He knows he is

3    not a diplomat.  So what does he do?  Comes to the airport with

4    an identification card now claiming to be a diplomat.  The

5    scheme got more sophisticated.

6        Ladies and gentlemen, there's only one result that's

7    consistent with the evidence that you've heard, and that's

8    guilty.  Thank you.

9            THE COURT:  Thank you.

10       That concludes our argument of counsel.

11       So I'm informed by Mr. Cruz that lunch has arrived.  Do

12   not start your deliberations.  I'm going to give you some

13   additional instructions when you return after lunch.  Again,

14   during your absence do not discuss the case amongst yourself or

15   with any other person.  And I believe everything would be

16   available in the jury room.  So you're excused to the jury

17   room.  Please return -- we will make it at 1:00, 1:00.

18       (Out of the presence of the jury.)

19           THE COURT:  Please have a seat.

20       Has the Government filed their opposition to the motion?

21           MS. RO:  Not yet, Your Honor.  I believe the Court

22   graciously gave us until 1:30.  So we are going to run back.

23           MS. WAKEFIELD:  May we make a motion, Your Honor?

24           THE COURT:  Yes.

25           MS. WAKEFIELD:  We would move the Court to give our

proposed instruction of entry.  The Government argued in its

opening closing that Mr. Flint entered the sterile area of

Midway, the aircraft was sterile, so he stayed in the sterile

area and he violated by landing at LAX with an unscreened bag.

And we think that misconstrues the statute and also constitutes

a constructive amendment to the indictment.  So we would ask

for the Court to provide our instruction with respect to entry,

or in the alternative, move to dismiss based on improper venue.

That's the first item.

And then the second item is the Government implied in

opening and closing that -- it put the address of IHRC from the

letterhead on it's PowerPoint.  It said 5250 Lankershim

Boulevard in North Hollywood.  The Government implied that this

was a bogus office.  The agent actually confirmed that there

was an IHRC office at 5250 Lankershim Boulevard.

THE COURT:  And your request -- in reference to your

request for the another instruction, the Court would just refer

you and the Government to Instruction Number 14, which directs

the jury as to what the elements of the offense are, what the

Government's proved beyond a reasonable doubt, and the

Government must prove that the defendant entered an airport

area that serves an air carrier, namely, a sterile area of

Terminal 3 at Los Angeles International Airport.  So I think

that instruction, along with other elements that are required

to be proved, will guide the jury.  The request for an

1    additional instruction would be denied.

2              MS. WAKEFIELD:  Thank you.

3              THE COURT:  Thank you.  And we are in recess until

4    1:00.

5              THE COURTROOM DEPUTY:  The Court's in recess.

6         (Recess taken from 11:55 a.m. to 1:07 p.m.)

7         (Out of the presence of the jury.)

8              THE COURTROOM DEPUTY:  Please remain seated and come

9    to order.  This court is again in session.

10             THE COURT:  Okay.  We are ready for the jury.  They

11   are lined up.  And we have all counsel present, with the

12   exception of Ms. Ro is not here.

13        Do we have jury instructions that are prepared?

14             THE COURTROOM DEPUTY:  Yes, Your Honor.  They are on

15   the table.

16             THE COURT:  Have you had an opportunity to review

17   the jury instructions?

18             MS. WAKEFIELD:  Yes, Your Honor.

19             THE COURT:  Just for the record, the verdict form

20   has been approved by both sides?

21             MS. WAKEFIELD:  Yes, Your Honor.

22             THE COURT:  And you have reviewed the exhibits to

23   make sure the exhibits given to the jury are the exhibits that

24   were received into evidence?

25             MS. WAKEFIELD:  Yes.

1       One question on the verdict form.  Sorry.  It says "as

2  charged in the indictment."  Is the indictment going back to

3  the jury?

4            THE COURT:  The indictment would generally not go

5  back to the jury unless you would request it.

6            MS. WAKEFIELD:  We would not request it.  So I don't

7  know if it makes sense to change the verdict form to say

8  something else.

9            THE COURT:  No.  It makes sense to just keep it "as

10  charged in Count One of the indictment."

11            MS. WAKEFIELD:  Okay.  Thank you.

12            THE COURT:  Let's get the jury in.

13            THE COURTROOM DEPUTY:  All rise for the jury,

14  please.

15       (In the presence of the jury.)

16            THE COURT:  We have the jury reassembled with the

17  alternate.  Please have a seat.  We have counsel present.  The

18  defendant is also present.

19       So the jury is about to commence deliberation.  You start

20  that process by selecting your foreperson.  I would suggest

21  that you take a little bit of time to make sure that the person

22  who is the foreperson is the right person for the job.  It's a

23  person that makes sure everybody's voice will be heard, make

24  sure that the jury attempts to accomplish its goal, which is to

25  come to a verdict, if you can do so, somebody that is going to

1    keep order in the jury room.

2         You're going to have a verdict form.  It's a simple

3    question as to what the jury is going to be asked to answer

4    here, and you're going to have the jury instructions to guide

5    you.  Each juror will have a copy of those instructions to

6    guide you in your deliberations.

7         And then all of the exhibits that have been received into

8    evidence will be provided to you in that jury room.  If you

9    wish to have any of the audio or video played back, we can do

10   it here in open court, and you would do that by sending out a

11   request to the bailiff or the clerk, and then everybody would

12   be reassembled here in the courtroom.

13        With that being said, are there any questions before you

14   start your deliberations?

15             JUROR:  Do you want to take these?

16             THE COURT:  Good question.  Please leave the

17   transcripts here because, again, the transcripts are not the

18   evidence.  It's the audio which you heard that's the evidence.

19   And you would take your notebooks back there.

20        And then you determine when you would like your afternoon

21   break.  We will stay here until at least 4:30.  If you would

22   like to remain longer, we can remain longer.

23        And with that, please start your deliberations.

24             THE COURTROOM DEPUTY:  Your Honor, I have to swear

25   in the bailiff.

1        THE COURT:  I'm sorry, we have to swear in the

2   bailiff.

3        **DAVID WILLIAMS, THE BAILIFF, WAS SWORN**

4        THE BAILIFF:  I do.

5        THE COURTROOM DEPUTY:  For the record, please state

6   your name, and spell your last name.

7        THE BAILIFF:  David Williams, W-i-l-l-i-a-m-s.

8        THE COURTROOM DEPUTY:  Thank you.

9        THE COURT:  And then only the 12 jurors will be

10  taken into the jury room.  The alternate will be kept separate,

11  the reason being the jury is composed of 12 persons only, and

12  to avoid any type of complication that could occur in the jury

13  room having the extra person there, the alternate is always

14  separated.

15       And may I have the jury proceed to the jury room, please.

16       THE COURTROOM DEPUTY:  All rise for the jury,

17  please.

18       (Out of the presence of the jury.)

19       THE COURT:  We are in recess.  Just make sure you

20  are in contact with Mr. Cruz and that you should be able to be

21  at a location where you can arrive within 15 minutes after

22  receiving a phone call, or sooner.

23       MS. WAKEFIELD:  Thank you, Your Honor.

24       THE COURT:  And do you have a pleading?

25       MS. RO:  I do, Your Honor.  May I approach?

```
 1          THE COURT:  Yes.

 2          THE COURTROOM DEPUTY:  The Court's in recess.

 3      (Recess taken from 1:12 p.m. to 2:44 p.m.)

 4      (Out of the presence of the jury.)

 5          THE COURTROOM DEPUTY:  Please come to order.  This

 6  court is again in session.

 7          THE COURT:  We have everyone reassembled.

 8      Please make sure that you stay within 15 minutes away so

 9  that when Mr. Cruz calls, you can be here within 15 minutes.

10  It took a little bit longer to round up everyone.

11      We have jury note number 1, time 2:12.  Question 1:  "We

12  would like to hear the FBI interview 'audio' between Flint and

13  Special Agent Marriott."  The next question is -- it looks like

14  "How many times before July 20th, 2017 did he..." I'm assuming

15  that's the defendant "...go through the TSA checkpoint with his

16  diplomatic card and diplomatic pouch?"  And it's signed the

17  foreperson, Mr. Hernandez.

18      So the question has been shared with both sides.  Do you

19  have any input?

20          MS. RO:  Your Honor, for the first question, we

21  agree that all the clips should be played in its entirety with

22  the instruction that they should consider -- the jury should

23  consider it in light of all the other evidence and not give it

24  undue influence.  To the second question, I believe the parties

25  are in agreement, the jury should rely on its memory of the
```

```
 1   evidence.
 2              THE COURT:  Okay.
 3              MS. WAKEFIELD:  And on number 2, the defense would
 4   ask that the Court reinstruct the jury on burden of proof and
 5   reasonable doubt instructions.
 6              MS. RO:  Your Honor, we don't believe that's
 7   necessary.
 8              THE COURT:  I'm not going to reinstruct the jury and
 9   only include one of the jury instructions.
10              THE COURTROOM DEPUTY:  Ready for the jury,
11   Your Honor?
12              THE COURT:  Yes.
13              THE COURTROOM DEPUTY:  Please rise for the jury.
14        (In the presence of the jury.)
15              THE COURT:  We have the jury reassembled with
16   counsel and our alternate.  The defendant is present.  Please
17   have a seat.
18        We have jury question number 1 -- or Jury Note, I should
19   say, with two questions.  First is "We would like to hear the
20   FBI interview with audio" -- "interview 'audio' between Flint
21   and Special Agent Rebecca Marriott."  That's going to be played
22   for you here in open court.
23        The second question is:  "How many times before July 20,
24   2017 did he..." referring to Mr. Flint "...he go through the
25   TSA checkpoint with his diplomatic card and diplomatic pouch?"
```

 1          When we get a note from the jury, we discuss with counsel

 2     how it should be responded to.  In reference to the first

 3     request, the audio will be played here in open court.  I would

 4     instruct the jury not to place any undue influence -- be unduly

 5     influenced of any item of evidence.  You have to consider the

 6     evidence in its entirety.  So when you hear it, please do not

 7     place any undue influence on that particular audio.

 8          Then in reference to the second, how many times before

 9     July 20th did Mr. Flint go through the TSA checkpoint with his

10     diplomatic card and diplomatic pouch?  It's up to the jury to

11     recall that from the testimony.

12          And with that, we will have the playback.

13              MR. YANNIELLO:  I will go in order of the exhibit

14     numbers.

15              THE COURT:  Yes.

16              MR. YANNIELLO:  Starting with 47.

17              THE COURT:  I think you have the transcripts up

18     there to assist you.  Again, it's the audio that's the

19     evidence, not the transcripts.

20          (Audio recording played in open court.)

21              MR. YANNIELLO:  Okay.  I'm going to play 48.

22          (Audio recording played in open court.)

23              MR. YANNIELLO:  Playing 49.

24          (Audio recording played in open court.)

25              MR. YANNIELLO:  Turning to Exhibit 50.

```
 1          (Audio recording played in open court.)
 2              MR. YANNIELLO:  Exhibit 51.
 3          (Audio recording played in open court.)
 4              MR. YANNIELLO:  Exhibit 52.
 5          (Audio recording played in open court.)
 6              MR. YANNIELLO:  Exhibit 53.
 7          (Audio recording played in open court.)
 8              MR. YANNIELLO:  Exhibit 54.
 9          (Audio recording played in open court.)
10              MR. YANNIELLO:  Exhibit 55.
11          (Audio recording played in open court.)
12              MR. YANNIELLO:  And Exhibit 58.
13          (Audio recording played in open court.)
14              THE COURT:  Okay.  It's been played for the jury.
15          And I would ask the jury to go back in the jury room to
16     continue deliberations.  Again, do not be unduly influenced by
17     one item of evidence.  Consider all of the evidence in its
18     entirety.
19              THE COURTROOM DEPUTY:  All rise for the jury,
20     please.
21          (Outside the presence of the jury.)
22              THE COURT:  The jury has been excused, I believe.
23     Is the door shut or closed?  Yes, it's closed.
24          Okay.  I have the pending motion for judgment of
25     acquittal.  The Court has reviewed, again, the oral motion made
```

1   by Ms. Wakefield, and I have reviewed the Government's

2   opposition.  In the opposition the Government did not cover one

3   of the issues raised by Ms. Wakefield, and that was the issue

4   concerning the stopover in Minneapolis.  I didn't see that in

5   the pleading.

6          MS. RO:  Your Honor, I believe there is mention to

7   that in the footnote.

8          THE COURT:  Oh, okay.

9          MS. RO:  And I apologize, I did not bring hard

10  copies of that motion at this time, and I can't reference the

11  Court to the page.

12         THE COURT:  Page -- it looks like page 11.

13         MS. WAKEFIELD:  Thank you, Your Honor.

14      One other thing, Your Honor, Mr. Harbaugh and I were

15  talking in preparation for arguing this, and we couldn't recall

16  any evidence regarding what happened after Mr. Flint entered --

17  or went past the security in Midway.  We don't remember if

18  there was -- I don't remember testimony about him actually

19  boarding a plane there.  The flight records were not introduced

20  into evidence.  I don't think there was witness testimony that

21  he actually boarded an airplane.

22      So I think the only testimony that came in was

23  Mr. Harbaugh's cross-examination of Special Agent Marriott,

24  that the plane in which Mr. Flint landed at LAX that day was

25  Delta flight 1358, and it came from Minneapolis-St. Paul

1    Airport.  So there's sort of a big gap in there how he got from

2    Midway to Minneapolis at all and then what happened at

3    Minneapolis.

4        So if there is evidence of a layover, there is only

5    evidence of a flight from Minneapolis to L.A.  There is no

6    testimony about screening in Minneapolis, no testimony about

7    security procedures in place at Minneapolis, nothing like that.

8    So I think there is a total absence on this point.

9            THE COURT:  Who's going to argue that point?

10           MR. YANNIELLO:  I'm going to argue that point,

11   Your Honor.

12       I think that there was ample evidence provided on that

13   point.  I believe Ellen Sheahan testified about both of the

14   flights that Mr. Flint took.  I think that with respect to

15   security protocols and procedures, I think Mike Duretto

16   testified that in any airport past a security checkpoint is a

17   sterile area.

18       And, again, I will stand by the Government's footnote, if

19   you are traveling through a -- you have a leg and a layover

20   somewhere, you are moving through a secure area to the next

21   flight.  And in the defendant's interview where he was

22   specifically asked, he sat there for two hours being

23   interviewed, the first thing he said, had he been screened, he

24   would have said, "I was screened at the airport I stopped

25   over."  So just based on the evidence that's presented, I

1    think --

2          THE COURT:  Yes, I think, based on -- look, until

3    the motion that's before the Court, the Court has to draw all

4    inferences in favor of the Government here, and it seems to me

5    that the reasonable inferences to draw is that the defendant

6    boarded a plane in Midway, landed in Minneapolis.  It's not

7    clear how long he was in Minneapolis.

8        And there are two possible inferences that could be drawn:

9    one is that he stayed in the sterile area or on the plane in

10   Minneapolis; the other is that he could have left the sterile

11   area and then returned and was screened in Minneapolis and then

12   flew from Minneapolis to Los Angeles.

13       But I think the Government's point here is a fair one.  In

14   the interview that was just played for the jury and for the

15   Court and for counsel, there is no suggestion in that interview

16   that the defendant was claiming that his pouch had been

17   screened by anyone, so the inference that the Court draws is

18   that he was not screened in Minneapolis.

19       And drawing all other inferences in favor of the

20   Government, the Court would deny the motion for judgment of

21   acquittal.  Thank you.  We will just have to wait for the jury.

22              (Proceedings concluded at 3:06 p.m.)

23                          --oOo--

24

25

1           **CERTIFICATE OF OFFICIAL REPORTER**

2

3   COUNTY OF LOS ANGELES   )
                                )

4   STATE OF CALIFORNIA     )

5

6          I, CAROL JEAN ZURBORG, Federal Official Realtime

7   Court Reporter, in and for the United States District Court for

8   the Central District of California, do hereby certify that

9   pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date:  October 29, 2018

17

18

19                        /s/ CAROL JEAN ZURBORG

20                 CAROL JEAN ZURBORG, CSR NO. 7921, CCRR, RMR
                     Federal Official Court Reporter

21

22

23

24

25