HILARY POTASHNER (Bar No. 167060)
Federal Public Defender
GEORGINA E. WAKEFIELD (Bar No. 282094)
(Email: Georgina_Wakefield@fd.org)
CRAIG A. HARBAUGH (Bar No. 194309)
(Email: Craig_Harbaugh@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California  90012
Tel: 213-894-2854
Fax: 213-894-0081

Attorneys for Defendant
DANIEL FLINT

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| UNITED STATES OF AMERICA, | Case No. CR 17-697-SJO |
|---|---|
| Plaintiff, | |
| v. | **MOTION FOR JUDGMENT OF ACQUITTAL [FED. R. CRIM. P. 29]** |
| DANIEL FLINT | |
| Defendant. | |

Daniel Flint, through his counsel of record, Deputy Federal Public Defenders Georgina Wakefield and Craig Harbaugh, hereby file this motion for a judgment of acquittal.

Respectfully submitted,

HILARY POTASHNER
Federal Public Defender

DATED:  March 4, 2019

By  */s/ Georgina E. Wakefield*

GEORGINA E. WAKEFIELD
Deputy Federal Public Defender
Attorney for DANIEL FLINT

# TABLE OF CONTENTS

Table of Authorities ...........................................................................................................iv

INTRODUCTION ........................................................................................................... 1

SUMMARY OF TRIAL EVIDENCE ............................................................................ 1

ARGUMENT .................................................................................................................. 8

   The Court Should Set Aside the Jury's Guilty Verdict and Enter a Judgment of

      Acquittal ............................................................................................................. 8

     A. The Charging Statute Does Not Bear's the Government's Interpretation that a

         Defendant Can Repeatedly "Enter" New Sterile Areas, Effecitvely

         Committing the Crime Again and Again, After Having Evaded TSA

         Screening Only Once ................................................................................... 10

     B. The Government's Case Was Based on Flint Purportedly Evading TSA

         Screening in Chicago Before Entering a Sterile Area of LAX, So Its Failure to

         Present Any Evidence About What Happened During the Intervening Stop in

         Minneapolis-St. Paul Precludes a Conviction Here Because the Jury Could

         Not Simply *Assume* the Pouch Was Not Searched by TSA There ................ 11

     C. The Government Failed to Prove Beyond a Reasonable Doubt that Flint

         Knowingly and Willfully Entered a Sterile Area of LAX Terminal 3 ........... 15

        1. Because Agents Seized Flint Before he Existed the Plane, he Did Not

           Enter Terminal 3 Voluntarily ................................................................... 15

        2. Even If Flint Had Entered Terminal 3 on his Own Accord, the Evidence Is

           Still Insufficient to Establish that he Knew that Was a Sterile Area ......... 16

     D. The Government Did Not Prove Beyond a Reasonable Doubt that Flint

         Violated a Particular Regulation Covered by the Charging Statute ............... 17

        1. A Conviction Can Only Be Based on a Regulation Promulgated Under

           One of the Listed Statutes, Not On any Other Kind of Agency Rule like

State Department Protocols or the TSA's Standard Operating Procedures ........................................................................... 17

2.  Even *if* a Violation of Non-Regulation Rules Could Support a Conviction Under the Statute, Violation of *Secret* Rules (like SOPs) Cannot ............. 20

3.  Flint Did Not Violate the Cited Regulations at Midway Because he Submitted to TSA Screening by Presenting his Paperwork to TSA Officials Who Examined It and Concluded It Complied with the SOPs ... 21

4.  The Government Did Not Prove that Flint's Conduct Violated LAX's Security Program ........................................................................... 22

E.  The Government Did Not Prove Beyond a Reasonable Doubt that Flint Acted with the Requisite Intent .................................................................. 22

1.  Flint Did Not Knowingly and Willfully Violate the Law .......................... 22

2.  Even *if* Flint Knowingly and Willfully Violated the Law, he Did Not Also Act with Intent to Evade the Particular Regulations or SOPs at Issue ...... 24

3.  Even *if* Flint Had the Requisite Intent at Midway, the Evidence Does Not Permit a Reasonable Inference that he Still Had that Intent at the Moment he Entered Terminal 3 ...................................................................... 24

CONCLUSION ............................................................................................ 25

iii

1

## Table of Authorities

2

**<u>Cases</u>**

3   *Chiarella v. United States*,

4      445 U.S. 222 (1980)......................................................................14, 16

5   *Gasho v. United States*,

6      39 F.3d 1420 (9th Cir. 1994) ..................................................................25

7   *In re Winship*,

8      397 U.S. 358 (1970)..................................................................................9

9   *Jackson v. Virginia*,

10      443 U.S. 307 (1979)..................................................................................9

11   *Johnson v. United States*,

12      135 S.Ct. 2551 (2015)............................................................................20

13   *Juan H. v. Allen*,

14      408 F.3d 1262 (9th Cir. 2005) ..............................................................12

15   *McCormick v. United States*,

16      500 U.S. 257 (1991)...........................................................................14, 16

17   *Morissette v. United States*,

18      342 U.S. 246 (1952)................................................................................25

19   *O'Laughlin v. O'Brien*,

20      568 F.3d 287 (1st Cir. 2009)..................................................................24

21   *Paritem Singh Poonian v. United States*,

22      294 F.2d 74 (9th Cir. 1961) ..................................................................24

23   *Sebelius v. Cloer*,

24      569 U.S. 369 (2013)................................................................................10

25   *United States v. Bennett*,

26      621 F.3d 1131 (9th Cir. 2010) ..............................................................13

27

28

iv

*United States v. Caseer*,

   399 F.3d 828 (6th Cir. 2005) ................................................................... 24

*United States v. Cervantes*,

   703 F.3d 1135 (9th Cir. 2012) ................................................................ 15

*United States v. Elashyi*,

   554 F.3d 480 (5th Cir. 2008) ................................................................... 24

*United States v. Ganji*,

   880 F.3d 760 (5th Cir. 2018) ................................................................... 13

*United States v. Goldtooth*,

   754 F.3d 763 (9th Cir. 2014) ................................................................... 13

*United States v. Hawkins*,

   547 F.3d 66 (2d Cir. 2008) ...................................................................... 24

*United States v. James*,

   987 F.2d 648 (9th Cir. 1993) ................................................................... 11

*United States v. Johnson*,

   592 F.3d 749 (7th Cir. 2010) ................................................................... 24

*United States v. Lovern*,

   590 F.3d 1095 (10th Cir. 2009) ............................................................... 24

*United States v. Navarrette-Aguilar*,

   813 F.3d 785 (9th Cir. 2015) ................................................................... 12

*United States v. Nevils*,

   598 F.3d 1158 (9th Cir. 2010) ....................................................... 9, 12, 13

*United States v. Sanchez*,

   745 Fed.Appx. 690 (9th Cir. 2018) ......................................................... 11

*United States v. Santos*,

   553 U.S. 507 (2008) ................................................................................ 10

v

*United States v. Shill*,
   740 F.3d 1347 (9th Cir. 2014) ................................................................. 20

*United States v. Smith*,
   633 F.3d 889 (9th Cir. 2011) ................................................................... 15

*United States v. Vasarajs*,
   908 F.2d 443 (9th Cir. 1990) ................................................................... 21

*United States v. Washington*,
   490 F.3d 765 (9th Cir. 2007) ................................................................... 15

*United States v. Yarbrough*,
   852 F.2d 1522 (9th Cir. 1988) ................................................................... 9

*Yates v. United States*,
   135 S.Ct. 1074 (2015) ............................................................................ 10

**<u>Statutes</u>**

49 U.S.C. §44901 ........................................................................ 18, 19, 20

49 U.S.C. §44903 ................................................................. 18, 19, 20, 22

49 U.S.C. §46314 ........................................................................ *passim*

**<u>Rules</u>**

Fed. R. Crim. P. 29 ........................................................................ 1, 9, 15

**<u>Regulations</u>**

49 C.F.R. §1540.105 ................................................................................ 19

49 C.F.R. §1540.107 ................................................................................ 19

49 C.F.R. §1540.5 ................................................................................... 17

49 C.F.R. §1542.101 ................................................................................ 23

49 C.F.R. §1542.103 ................................................................................ 17

**<u>Other Authorities</u>**

*New Oxford American Dictionary* (3d ed. 2010) .......................................... 24

vi

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **INTRODUCTION**

A jury found Daniel Flint guilty of a single count of violating 49 U.S.C. §46314(a) & (b)(2).  But the trial evidence was constitutionally insufficient to prove that offense for several reasons.  Some of the deficiencies are rooted in the government's odd decision to prosecute the case here instead of Chicago, the place where Flint purportedly evaded TSA screening.  Others are due to the government's misunderstanding of the charging statute, which has not yet been interpreted by the Ninth Circuit.  And some result from the way the government investigated and presented its case.  But regardless of the reasons for the government's failure to meet its burden of proof, any *one* of the evidentiary deficiencies discussed below requires a judgment of acquittal under Fed. R. Crim. P. 29.

## **SUMMARY OF TRIAL EVIDENCE**

The indictment alleged that, on July 25, 2017, Daniel Flint knowingly and willfully, and with the intent to evade security procedures or restrictions, entered a sterile area of Terminal 3 of the Los Angeles International Airport (LAX) in violation of security requirements prescribed under certain statutes by "carrying items that had not been screened and inspected by the Transportation Security Administration ('TSA') and approved for entry by TSA into the secured area of the airport, namely, a pouch containing approximately $148,145 in United States currency separated into several plastic bags."  *See* Docket No. 15.  It further alleged that Flint "intentionally evaded security screening procedures for this pouch by falsely claiming that it was a diplomatic courier pouch that was exempt from TSA screening and by presenting documents purporting to support [that] false claim of diplomatic status."  *Id*.

At trial, the jury learned that the TSA has Standard Operating Procedures (SOPs)—a multi-volume "instruction manual" with the rules and regulations governing how TSA

1

officers do their job.  RT 142, 156, 310-12.[1]  Because the SOPs contain sensitive security information (SSI), they have not been, and cannot be, disclosed to the public.  RT 151-52, 155-58, 172, 179, 310.  Among those *secret* SOPs are the procedures for handling diplomatic pouches.  RT 157-58, 309-10, 312-13.  Such a pouch cannot be searched by TSA.  RT 136-37, 223-24.  When a person presents a diplomatic pouch at a TSA checkpoint, it cannot pass through without a search until a TSA supervisor confirms that the pouch has the required markings, that the courier has a diplomatic passport, and that he also has a letter containing the pouch's identification number, the courier's name and passport number, and other information.  RT 139, 223-24, 298-301, 310, 313-14; EX 31.

On July 20, 2017 (five days before the charged offense), Flint presented a diplomatic pouch, an identification card, and a courier letter at a TSA checkpoint at O'Hare International Airport in Chicago.  RT 139-42, 160-61, 165; EX 1-2, 11.  The identification card indicated that Flint was part of the International Human Rights Commission (IHRC) Diplomatic Corps; the word "diplomat" was stamped across the card in red.  EX 1-2.  This card did not qualify as a diplomatic passport for purposes of the secret SOPs.  RT 301-07.[2]  The letter Flint presented (on IHRC letterhead) was dated July 20, was addressed to Flint (an attorney), and explained that the IHRC appointed his law firm as a diplomatic courier agent to deliver a cash deposit to the organization's offices in California.  EX 11; *see also* RT 184.  That letter cited the Vienna Convention on Diplomatic Relations and instructed Flint to be courteous with TSA officers and other law enforcement without violating the confidentiality of his assignment.  EX 11; *see also* RT 188-67.  The letter was signed by "H.E.R.S. Shumake,

---

[1]      "RT" refers to the sequentially-numbered trial transcripts that have been filed at docket nos. 117 (day 1), 118 (day 2), 119 (day 3), and 120 (day 4).  "EX" refers to the trial exhibits.

[2]      Witnesses explained the different kinds of passports and described what a diplomatic passport would look like.  RT 225-27, 239-40, 281-83; EX 46.

2

Ambassador at Large, United Nations Representative, International Human Rights Commission, Americas, African Union, and United Nations Designee[.]"  EX 11 (commas inserted); *see also* RT 165-66, 179-80.

O'Hare's TSA officers thought Flint's identification didn't "look right," so they consulted the secret SOPs and saw that a diplomatic passport was required.  RT 140-43, 161-62.  A TSA officer then told Flint he couldn't pass through the checkpoint without having the pouch searched unless he had such a passport.  RT 143, 162, 169.  Flint asked to speak to a manager, who told him he could either present a diplomatic passport or allow TSA officers to search the pouch.  RT 144-45, 163, 171-72, 174-76.  Flint was upset and frustrated, telling the officers they must have misunderstood the law because he had previously flew multiple times with that identification without being stopped.  RT 144-45, 147, 164-65, 172-79.  The TSA officers did not give Flint a copy of, or even allow him to read, the secret SOPs on diplomatic pouches, even after he asked to see them.  RT 158, 165, 176, 179.  Flint said he would contact his organization to get either a diplomatic passport or permission to allow a search of the pouch.  RT 148, 167, 179-81.  He then placed a phone call but did not appear to reach anyone.  RT 166-68, 180-81.  Flint wasn't detained and was free to go at any time, but he remained in the area for over 20 minutes trying to resolve the situation before he left.  RT 163-64, 168, 181.  *See also* EX 12-16, 218 (security-camera video clips showing these interactions); RT 145-48, 158-60, 167, 171, 175-76 (testimony about those clips).

Later that day, Flint approached a TSA checkpoint at Chicago's Midway Airport.  RT 189-91, 196-98; EX 20.  He once again presented the diplomatic pouch, the identification card, and the letter, along with his driver's license.  RT 191-93; EX 2.  Flint asked to speak to a supervisor.  RT 198, 234-36.  That supervisor then called over a more senior supervisor.  RT 237.  The TSA officers, including the two supervisors, concluded that Flint had everything required by the TSA's diplomatic-pouch SOPs, so they allowed him to proceed through the checkpoint without searching the pouch.  RT

3

191-93, 195-96, 198-203, 237.  Flint was calm and appeared like he had been through this process many times.  RT 193-94, 202-06.  *See also* EX 21-23 (security-camera video clips showing these interactions); RT 194-95 (testimony about those clips).

That night, TSA officers at O'Hare sent out an email asking officers to be on the lookout for Flint, described as someone trying to circumvent security with a diplomatic pouch, and when TSA officers at Midway saw it, they recalled their experience with him.  RT 222-25; EX 36.  The TSA officers therefore wrote a report about the incident. RT 196, 231-33.  The TSA training department also sent out a bulletin reminding officers of the SOPs for diplomatic pouches.  RT 228-29; EX 31.

On the morning of July 25, Flint once again presented himself at Midway's TSA checkpoint.  RT 252-53.  A TSA supervisor called TSA manager Raja Wondrasek for advice about how to proceed with regard to his diplomatic pouch.  RT 241-42, 255-56. For five to ten minutes, Wondrasek reviewed the diplomatic-pouch training bulletin that had been sent out a few days before.  RT 242-44, 256; EX 31.  She then went to the checkpoint, where she reviewed Flint's pouch, courier letter, driver's license, diplomat identification card, and business card.  RT 244, 246-48, 250, 256-58.  Flint waited nearby as she did so.  RT 245-46.  Wondrasek, who thought Flint's diplomat identification card qualified as a passport card, concluded that his paperwork was in order, so she allowed him to go through the checkpoint without searching the pouch; but Flint himself went through the metal detector and his other baggage went through the x-ray machine.  RT 249-51, 253, 258-59, 262-63; EX 2.  Flint was very calm and seemed like a seasoned traveler.  RT 260.  Wondrasek was never disciplined for what happened.  RT 260.  *See also* EX 24-27 (security-camera video clips showing these interactions); EX 28 (still-frame photos from the videos); RT 229-31, 245-52, 261-62 (testimony about those clips and photos).

At a TSA staff meeting at Midway later that morning, the topic of diplomatic pouches came up, and Wondrasek told the others about her recent experience with

4

Flint. RT 227-28. The TSA director there contacted law enforcement at LAX to let them know what happened and the flight on which Flint would arrive. RT 228, 336, 364, 380, 384-85.

Flint did not travel directly from Midway to LAX. Rather, he arrived at LAX from the Minneapolis-St. Paul Airport (MSP). RT 315, 365. The government presented no evidence whatsoever about what happened at MSP.

When Flint's plane arrived at LAX, two FBI agents, an air marshal, TSA officers, and airport police officers were waiting at the gate. RT 336-37, 365-67. The air marshal and another officer went onto the plane and "required" Flint to accompany them off the plane. RT 367-69, 377-78, 385-86.

LAX's security director explained that each airport has its own security program, but such programs are considered sensitive security information (SSI), so their contents cannot be disclosed to the public. RT 314-16. Although the director only had a "general understanding" of LAX's airport security program and therefore conceded he wasn't an "expert" on that, he nevertheless claimed to be enough of an expert to know that the part of Terminal 3 after the TSA checkpoint and up to and including the boarding ramps was a "sterile area." RT 293-97, 318-23; EX 45.[3] Thus, anyone exiting a plane would enter *that* sterile area. RT 297. But because the plane itself is also a sterile area, a passenger remains in sterile areas continuously from the time he passes the TSA checkpoint in the originating airport until the time he leaves the sterile area of the destination airport. RT 297. The director testified that the TSA's SOPs require a person to undergo screening of his person and all property before he "enters" a sterile area. RT 293. Accordingly, a person exiting a plane must have already been screened at the originating airport. RT 298.

---

[3]     He also said the same was true for any American airport. RT 293-95.

5

After agents took Flint off the plane, the large group of officers escorted him to an interview room in the airport.  RT 369-70.  An FBI agent and others interviewed Flint at LAX for almost two hours, and he was cooperative throughout.  RT 370-71.  During the questioning, Flint referred to a binder he had with various documents, including: a letter dated July 24, 2017, from Shumake at the IHRC designating Flint as the diplomatic courier for the pouch containing a cash deposit; a May 2015 letter from the IHRC to the U.S. Secretary of State designating Shumake as the "newly appointed Head of the IHRC Mission to the United States of America"; a photocopy of Schmake's IHRC diplomat card; a photocopy of Flint's IHRC diplomat card; a June 2016 letter from the IHRC to the Republic of Kenya about diplomatic relations; and the 1975 Vienna Convention on the Representation of States in their Relations with International Organizations of a Universal Character.  RT 337-38, 342-43, 362-63; EX 3-6, 8-9, 38.  Flint also showed the FBI agent his state bar cards for North Carolina and Michigan.  RT 362; EX 7.

The jury heard several excerpts of the recording of Flint's interview.  RT 343-44; EX 47-55, 58.[4]  Flint explained that he was an attorney appointed by Shumake, an ambassador for the IHRC, to bring cash deposits to the organization's headquarters in California, and Flint's own research led him to believe he followed the proper procedures.  RT 345-48, 350; EX 47-55, 58.  Flint told the agent that Shumake could provide more information.  RT 372; EX 49.  At that point, Flint placed a call using his speakerphone, allowing the agent to talk to a man identifying himself as Shumake.  RT 372-74.

During the interview, Flint said he didn't recall having ever been turned away from a screening checkpoint for not wanting his bag to be screened.  RT 345, 378-79; EX 53.

---

[4]     The jurors were given transcripts of the interview audio clips, but they were admonished that the transcripts were not themselves evidence but merely an aid to assist them as they listened to the audio.  RT 343-44.

He also told the agent he had not previously known there was "an issue with ... the State Department[.]"  RT 349; EX 54.  Additionally, Flint said that he had been a diplomat for a couple months, that his appointment would expire that December, and that he laminated his diplomat card so it wouldn't get worn out.  RT 349-50; EX 55.

Throughout the interview, the agent told Flint her understanding of what the law required with regard to diplomatic pouches, but Flint disputed her assertions.  RT 374-75; EX 50-52.  At trial, the agent continued to question statements Flint made.  For example, she testified that Flint wrongly said that his binder included Shumake's diplomatic passport, not just his diplomat identification.  RT 345, 363; EX 47.  The agent also noted Flint's reference to a May 2015 IHRC letter appointing Shumake as an ambassador, but she concluded that it didn't provide any diplomatic immunity or status.  RT 347-48; EX 5, 49.  Additionally, she faulted Flint for mistakenly referring to the Geneva Convention when his binder contained a copy of the Vienna Convention.  RT 346-47; EX 6, 47.  Finally, to undermine Flint's claim that he had researched the proper procedures for diplomatic pouches, the agent testified that when she conducted a Google search for "carrying cash in a diplomatic pouch in the United States" one of the first results linked to a document on the State Department's website stating: "Individuals, whether or not they are either a diplomat or nonprofessional diplomatic courier, must use a valid diplomatic passport."  RT 350, 359-60; EX 33; *see also* RT 265-66.

The agent told Flint that the pouch would have to be screened and asked for his consent to search.  RT 375.  Flint responded that he needed to consult with Shumake before he could give consent, and then he placed another phone call to someone who sounded like the same man he called earlier.  RT 375-76.  Eventually, agents searched the pouch and found cash inside.  RT 337-41; EX 29-30.  TSA rules do not prohibit or limit passengers carrying cash on domestic flights, however.  RT 166.

7

A State Department official testified about its database of diplomats or missions with some type of diplomatic status; that database is not available to the public, although some of the information contained therein is publically available.  RT 266-67, 269-70, 283.  According to the official, neither Flint nor the IHRC appeared in the database.  RT 267-68.  But Shumake did because he was accredited as an honorary consul for Tanzania and Botswana from 2012 until sometime in 2015.  RT 268-70, 275-76; EX 114.  Honorary consuls are established by the Vienna Convention, recognized by the State Department, and have some diplomatic immunity.  RT 271-72.  And despite the database's information about Shumake's honorary-consul status ending in 2015, his official State Department consular identification card did not expire until 2018.  RT 269, 272-79; EX 114.  Furthermore, the United Nations' Economic and Social Council (ECOSOC)—the organization listed on Shumake's IHRC identification card—confirmed that the IHRC had some official status with the ECOSOC and that Shumake was listed as one of the contact persons for that organization.  RT 389-91; EX 8.  Although the case agent also discovered that Shumake had a long criminal history, including a fraud case pending in July 2017, there was no evidence that Flint knew about that.  RT 391-92.

Finally, to suggest that Flint had the requisite intent, the government presented evidence that in September 2016 (ten months before the charged crime) a police officer in Michigan pulled him over on a traffic stop due to an expired registration tag and he purportedly claimed to have diplomatic immunity.  RT 324-35; EX 43.

## ARGUMENT

### The Court Should Set Aside the Jury's Guilty Verdict and Enter a Judgment of Acquittal

The Due Process Clause required the government to prove beyond reasonable doubt "every fact necessary to constitute the crime" charged.  *In re Winship*, 397 U.S. 358, 364 (1970).  This constitutional burden of proof "plays a vital role in the American

scheme of criminal procedure" because it's "a prime instrument for reducing the risk of convictions resting on factual error" and it "provides concrete substance for the presumption of innocence[.]" *Id.* at 363.  A conviction "cannot constitutionally stand" if no rational trier of fact could find that the government met its burden.  *Jackson v. Virginia*, 443 U.S. 307, 317-18 (1979).  More than a "mere modicum" of evidence is required to support a verdict.  *Id.* at 320.  The relevant question is whether, after viewing the evidence in the light most favorable to the government, any rational factfinder could have found the essential elements of the crime beyond a reasonable doubt.  *Id.* at 319; *see also United States v. Yarbrough*, 852 F.2d 1522, 1542 (9th Cir. 1988) (*Jackson* standard is test for determining whether to grant a motion for judgment of acquittal under Rule 29).  This "standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw *reasonable* inferences from basic facts to ultimate facts."  *Jackson*, 443 U.S. at 319 (emphasis added).  Thus, "evidence is insufficient to support a verdict where mere speculation, rather than *reasonable* inference, supports the government's case[.]" *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010) (en banc) (emphasis added).

The government charged Daniel Flint with violating 49 U.S.C. §46314(a) & (b)(2). Subsection (a) provides that a "person may not knowingly and willfully enter, in violation of security requirements prescribed under section 44901, 44903(b) or (c), or 44906 of this title, an aircraft or an airport area that serves an air carrier or foreign air carrier."  This offense is a misdemeanor, punishable by imprisonment for not more than a year.  49 U.S.C. §46314(b)(1).  To qualify as the far more significant felony charged in this case under subsection (b)(2), punishable by imprisonment for up to ten years, the defendant must have acted "with intent to evade security procedures or restrictions[.]"[5]

---

[5]     Although this subsection also applies where the defendant entered with intent to commit a felony in the aircraft or airport area, that provision is not at issue here.

As the Court interprets this statute for purposes of this motion, it should keep two things in mind.  First, the starting point is the statute's plain language.  *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (interpretation of statute begins with its text and, unless otherwise defined, terms are generally given their ordinary meaning).  Second, the rule of lenity requires resolving any ambiguity in the statute in Flint's favor.  *Yates v. United States*, 135 S.Ct. 1074, 1088 (2015); s*ee also United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality opinion) (rule requires adopting most "defendant-friendly" of any plausible interpretations).

As explained below, when the charging statute is properly construed, the trial evidence (even when viewed in the light most favorable to the government) is constitutionally insufficient to support the jury's verdict for several reasons, any *one* of which requires a judgment of acquittal.

**A. The Charging Statute Does Not Bear's the Government's Interpretation that a Defendant Can Repeatedly "Enter" New Sterile Areas, Effecitvely Committing the Crime Again and Again, After Having Evaded TSA Screening Only Once**

The government's theory was that Flint evaded TSA screening at Midway Airport.  It could have charged him in Chicago with violating §46314 by entering the sterile area just beyond that TSA checkpoint.  Instead, it charged him here with entering a sterile area of LAX after having previously evaded the screening in Chicago.  Assuming for the moment there was no significant break in the chain between what happened in Chicago and what happened in Los Angeles,[6] the government's theory depends on interpreting §46314(a) to allow multiple violations each time a defendant enters a new sterile area after having passed a single TSA checkpoint.  As applied to the facts of this case, for example, the government apparently believes that Flint violated the statute

---

[6]     As discussed in the next section, the government failed to prove there wasn't.

when he entered the sterile area of Midway, violated it again when he entered the sterile area of the airplane he boarded there, violated it again when he exited that plane and entered the sterile area of the Minneapolis-St. Paul Airport, violated it again when he entered the sterile area of another plane there, and then finally violated it again when he landed at LAX.  But nothing in the plain language of §46314(a), or elsewhere for that matter, reflects Congress's intent to criminalize anything other than the initial *entry* into a sterile area after the purported security violation.  Flint therefore didn't violate that statute when he arrived in Los Angeles, regardless of what happened in Chicago.

**B. The Government's Case Was Based on Flint Purportedly Evading TSA Screening in Chicago Before Entering a Sterile Area of LAX, So Its Failure to Present Any Evidence About What Happened During the Intervening Stop in Minneapolis-St. Paul Precludes a Conviction Here Because the Jury Could Not Simply *Assume* the Pouch Was Not Searched by TSA There**

Sometimes the government loses simply because it forgets to connect the dots.  *See*, *e.g.*, *United States v. James*, 987 F.2d 648, 649-51 (9th Cir. 1993) (reversing for insufficient evidence in bank-robbery case where government had stipulation pertaining to FDIC-insurance element but forgot to present it to jury); *United States v. Sanchez*, 745 Fed.Appx. 690, 691-92 (9th Cir. 2018) (applying *James* to reverse felon-in-possession conviction where government had stipulation on prior-felony-conviction element, and even discussed that stipulation generally at bench trial, but never formally put it into evidence).  That's what should happen here.  Because the government chose for some reason to prosecute Flint in Los Angeles instead of Chicago, it relied on a strained theory that he committed the crime here by entering LAX Terminal 3 after previously having evaded security at Midway airport.  It then completely ignored that Flint did not fly directly from Chicago to Los Angeles; Flint himself had to bring out through cross-examination that his flight into LAX originated at the Minneapolis-St. Paul Airport (MSP).  RT 315, 365.  But there is no evidence whatsoever about what

11

1    happened at MSP, including whether Flint left the sterile area of that airport and

2    therefore went through TSA screening again there.  Indeed, the trial evidence does not

3    even permit a reasonable inference that there were no other legs to Flint's journey

4    between Chicago and Minneapolis-St. Paul.  Thus, having based its case on a chain of

5    events beginning in Chicago and ending in Los Angeles, the government dropped the

6    ball by not presenting any evidence regarding critical links in that chain.

7        When confronted with this blunder, the government claimed that "it would be purely

8    speculative to infer that defendant was screened in Minneapolis[,]" that the jurors could

9    use their "own common sense and life experience" to "find that he was not screened

10   given that one typically does not have to undergo screening when he or she has a

11   layover and needs to switch planes to arrive at the final destination[,]" and that Flint

12   "suggested in his interview that the bag had not been screened" so "a rational jury

13   could easily infer that the bag had not been screened when he entered LAX."  *See*

14   Docket No. 107 (hereinafter "Government Opposition to Pre-Verdict Rule 29 Motion")

15   at 11 n.3; *see also* RT 494-95.  Let's take these one at a time.

16       1.  To say it's "purely speculative" to infer that Flint did <u>not</u> pass through a TSA

17   checkpoint again at MSP turns the applicable standard on its head.  *The government* has

18   the burden to prove each element beyond a reasonable doubt and it fails to do so

19   "where mere speculation, rather than reasonable inference, supports" its case.  *Nevils*,

20   598 F.3d at 1167.  A "reasonable inference is one that is supported by a chain of logic

21   rather than mere speculation dressed up in the guise of evidence."  *United States v.*

22   *Navarrette-Aguilar*, 813 F.3d 785, 793 (9th Cir. 2015) (quoting *Juan H. v. Allen*, 408

23   F.3d 1262, 1277 (9th Cir. 2005) (internal quotation marks omitted).  Because no chain

24   of logic permits an inference that Flint could not have gone through screening at MSP,

25   it's the government—not Flint—that resorts to impermissible speculation and

26   guesswork.  *See United States v. Goldtooth*, 754 F.3d 763, 768 (9th Cir. 2014) (citing

27   *Nevils*); *United States v. Bennett*, 621 F.3d 1131, 1139 (9th Cir. 2010) (court couldn't

28                                                    12

permissibly infer that Bank of America had custody or control of Equicredit's funds simply because Equicredit was wholly owned by BOA); s*ee also United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018) ("'a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference'").

2.  For the same reason, the government wrongly believes that the jurors' "common sense and life experience" could lead to them to conclude that flyers do not "typically" leave the sterile area of an airport when they have layovers.  First of all, that's not the kind of thing jurors can legitimately assume.  But even if that assumption is true of a "typical" traveler, that's a far cry from proving beyond a reasonable doubt that a particular traveler, like Flint, acted accordingly on this particular trip.  Jurors could only reach that destination with improper speculation.

3.    Finally, nothing about Flint's LAX interview permits the reasonable inference that he didn't go through screening again at MSP.  In denying Flint's Rule 29 motion at trial, the Court acknowledged that "[i]t's not clear how long he was in Minneapolis[,]" but it concluded "there are two possible inferences that could be drawn: one is that he stayed in the sterile area or on the plane in Minneapolis; the other is that he could have left the sterile area and then returned and was screened in Minneapolis and then flew from Minneapolis to Los Angeles."  RT 495.  But because there was supposedly "no suggestion in [the LAX] interview that the defendant was claiming that his pouch had been screened by anyone," the Court inferred "that he was not screened in Minneapolis."  RT 495.  Neither the Court nor the government pointed to anything in particular Flint said during the admitted excerpts of the interview that would allow such an inference, let alone a reasonable one.  On the contrary, the argument appears to be that the mere absence of any contrary comment by Flint during the interview permits a reasonable inference that his pouch was not searched by TSA anywhere.  That, however, improperly puts the burden on Flint himself to speak up to

13

1    during the interview to say what happened at MSP, when it was *the government's*
2    *burden* to prove that.  Moreover, because the jurors learned that the LAX interview
3    lasted for almost two hours and only several minutes of clips were introduced into
4    evidence, they could not reasonably infer anything from the absence of any particular
5    statement by Flint because they were not informed about most of his statements.

6          But even if the Court could reach the point where it, and more importantly the
7    jurors, could reasonably infer that Flint evaded TSA screening at MSP even if he went
8    through a checkpoint again there, that cannot save the government's case because a
9    court cannot uphold a conviction on a legal or factual theory that wasn't presented to
10   the jury.  *McCormick v. United States*, 500 U.S. 257, 270 n.8 (1991); *Chiarella v.*
11   *United States*, 445 U.S. 222, 236 (1980).  Again, the government presented evidence
12   about what happened at the TSA checkpoint at Midway on July 25—and nothing about
13   what happened at MSP—because its theory has always been that there was a *direct*
14   *uninterrupted link* between Flint entering the sterile area of Midway and him arriving at
15   LAX; there has never even been a suggestion that he again evaded screening at MSP
16   (which would break the Chicago-to-Los Angeles link).[7]  Indeed, the government didn't
17   mention Minneapolis-St. Paul at all in its closing arguments, even after Flint noted the
18   evidentiary deficiency in making his Rule 29 motion.  RT 403, 453-62, 479-83.

19         To summarize, the government's failure to explain what happened at MSP left a
20   hole in its case.  That hole cannot be filled with speculation or a completely new theory
21   of guilt.  Simply put, it's not the Court's "'role to engineer a path for the Government
22   to meet [its] burden'" to prove its case beyond a reasonable doubt.  *Cf. United States v.*
23   *Cervantes*, 703 F.3d 1135, 1142 n.1 (9th Cir. 2012) (commenting on government's
24   evidentiary burden at suppression hearing).

25

26   [7]      Thus, to allow a conviction based on purported TSA evasion at MSP would also
27   be a constructive amendment of, and fatal variance from, the indictment because the
     grand jury was not presented with that theory either.
28
                                           14

**C. The Government Failed to Prove Beyond a Reasonable Doubt that Flint Knowingly and Willfully Entered a Sterile Area of LAX Terminal 3**

**1. Because Agents Seized Flint Before he Existed the Plane, he Did Not Enter Terminal 3 Voluntarily**

The government had to prove that Flint "knowingly and willfully enter[ed]" LAX Terminal 3. 49 U.S.C. §46314(a). As the Court instructed the jury, an act is committed willfully only if done voluntarily. RT 448. Here, however, an air marshal and another officer went onto the plane and "required" Flint to accompany them off it. RT 367-69, 377-78, 385-86. Because the officers jumped the gun and took custody of Flint before he got off the plane rather than afterwards, they controlled his movements, thereby precluding him from *voluntarily* entering Terminal 3. Contrary to what the government baldly claimed, rational jurors could not hear that officers "required" Flint to accompany them off the plane and still reasonably conclude that he "voluntarily" walked with the officers into Terminal 3 simply because there was no evidence that he "was handcuffed, threatened, dragged, or otherwise [physically] forced off the plane." *See* Government Opposition to Pre-Verdict Rule 29 Motion at 7-8. *Cf. United States v. Smith*, 633 F.3d 889, 892-93 (9th Cir. 2011) (even in absence of physical force, person has been seized for Fourth Amendment purposes if he submits to officer's assertion of authority); *United States v. Washington*, 490 F.3d 765, 771 (9th Cir. 2007) (Fourth Amendment seizure occurs when "officer, through ... a show of authority, in some way restricts the liberty of a person").

It also makes no difference that, as the government claimed, Flint "would have knowingly entered Terminal 3 whether or not he had encountered agents." *See* Government Opposition to Pre-Verdict Rule 29 Motion at 8. The issue is whether Flint *voluntarily* entered Terminal 3; he didn't. Once again, the problem results from the government's own decisions. First, as noted above, it prosecuted Flint in Los Angeles instead of Chicago based on a strained theory requiring it to show that he voluntarily

15

entered Terminal 3.  But its agents prevented *that crime* by seizing him *before* he did so.  Section 46314 does not criminalize attempted entering, the indictment did not charge Flint with attempt, and the jury was not instructed on an attempt theory.  His conviction therefore can't be upheld on a theory that he *would have* completed the crime but for the officers' intervention.

When this issue was raised at trial, the Court suggested that it was "probably resolved" by the testimony of LAX's security director that "the entire tarmac area is a sterile or secured area[.]"  RT 404; *see also* Government Opposition to Pre-Verdict Rule 29 Motion at 7 (government making similar argument).  The security director did testify that "once a person passes through the security checkpoint, they do enter the sterile area, and the sterile area does include the airfield and the aircraft."  RT 296.  But Flint was charged specifically with entering LAX Terminal 3, and the security director was clear that a passenger would not enter *that* sterile area (the building itself) until he exited the plane.  RT 296-97; EX 45.  Again, the Court cannot uphold a conviction on a legal or factual theory that wasn't presented to the jury, like that Flint violated the statute as soon as he landed on the tarmac.  *McCormick*, 500 U.S. at 270 n.8; *Chiarella*, 445 U.S. at 236.  Although that should be the end of the matter, such a theory would also be problematic for another reason to the extent it requires the improper conclusion that Flint "knowing and willfully enter[ed]" the tarmac area of LAX simply by being an inert passenger on a plane (already a sterile area) piloted by someone else.  But that's really beside the point because the Court cannot rely on a new theory anyway.

### 2.  Even If Flint Had Entered Terminal 3 on his Own Accord, the Evidence Is Still Insufficient to Establish that he Knew that Was a Sterile Area

Even if Flint voluntarily entered Terminal 3, the government still had to prove that he "knowingly and willfully entered" a "sterile area" when he did so.  A regulation defines "sterile area" as "a portion of an airport defined *in the airport security program* that provides passengers access to boarding aircraft and to which the access generally is

16

controlled by TSA, or by an aircraft operator under part 1544 of this chapter or a foreign air carrier under part 1546 of this chapter, through the screening of persons and property."  49 C.F.R. §1540.5 (emphasis added); *see also* 49 C.F.R. §1542.103(a)(6) (airport operator must include in its security program a "description of the sterile areas, including ... [a] diagram with dimensions detailing boundaries and pertinent features[.]").  But LAX's security program is considered sensitive security information (SSI), so it cannot be disclosed to the public.  RT 314-16.  Congress nevertheless intended for travelers to have sufficient notice before they suffered the penalties of violating §46314 because the statute itself requires "signs ... providing notice of the penalties ... displayed near all screening locations, all locations where passengers exit the sterile area, and such other locations at the airport as the Secretary of Homeland Security determines appropriate."  49 U.S.C. §46314(c)(1).  Although the failure to post such signs does not preclude a conviction under the statute, *see* §46314(c)(2), there must be *some evidence* permitting a *reasonable* inference that a defendant knew he was entering a sterile area covered by the statute.  But the government did not present any evidence that signs or anything else informed Flint that he was entering a sterile area when he exited the plane into Terminal 3.

**D. The Government Did Not Prove Beyond a Reasonable Doubt that Flint Violated a Particular Regulation Covered by the Charging Statute**

**1. A Conviction Can Only Be Based on a Regulation Promulgated Under One of the Listed Statutes, Not On any Other Kind of Agency Rule like State Department Protocols or the TSA's Standard Operating Procedures**

To properly convict Flint, the government had to prove that his entry into Terminal 3 was "in violation of security requirements prescribed under section 44901, 44903(b) or (c), or 44906 of" Title 49.  49 U.S.C. §46314(a).  The reference to §44906, which pertains to foreign air carriers, is irrelevant here because the indictment cited only

17

§44901 and §44903(c).  *See* Docket No. 15.  Section §44901(a) (2017) instructed the Under Secretary of Transportation for Security to develop screening procedures for passengers and property "that will be carried aboard a passenger aircraft" such that "the screening shall take place before boarding[.]"  And §44903(c) (2017) instructed the Under Secretary to prescribe regulations requiring each airport to establish a security program to protect passengers and property.  Thus, these statutes require the promulgation of certain regulations; they do not themselves set forth any security procedures.

Over Flint's objection, the Court instructed the jurors that "federal regulations and security requirements prohibit any person from entering a sterile area of an airport or boarding an aircraft without submitting to screening and inspection of his or her person and accessible property; circumventing or attempting to circumvent any security system, measure, or procedure implemented to protect passengers and property on an aircraft; and/or entering a sterile area without complying with the procedures being applied to the area[.]"  RT 445.  In requesting this instruction, the government pointed to 49 C.F.R. §1540.107(a) and §1540.105.  *See* Docket No. 96 at 9-11.  The government has not even established that those regulations were "prescribed under" §44901 and §44903(c), and that alone is fatal to its case.  But even assuming that these regulations are covered by §46314, that doesn't get the government where it needs to go.  The cited part of the first regulation provides: "No individual may enter a sterile area or board an aircraft without submitting to the screening and inspection of his or her person and accessible property *in accordance with the procedures being applied to control access to that area or aircraft under this subchapter*."  49 C.F.R. §1540.107(a) (emphasis added).  And the cited parts of the second regulation provide: "No person may ... Tamper or interfere with, compromise, modify, attempt to circumvent, or cause a person to tamper or interfere with, compromise, modify, or attempt to circumvent *any security system, measure, or procedure implemented under this subchapter*" or "Enter,

18

or be present within, a secured area, AOA, SIDA or sterile area without complying with *the systems, measures, or procedures being applied* to control access to, or presence or movement in, such areas." 49 C.F.R. §1540.105(a)(1) & (2) (emphasis added). Thus, none of these provisions actually identify the procedures or security systems in place to control access to sterile areas; rather, they refer generally to the many regulations contained within that entire subchapter of the Code of Federal Regulations. In other words, these regulations only prohibit doing things in violation of other regulations.

Instead of pointing to other such *regulations* purportedly violated by Flint's conduct, the government cited the Vienna Convention of Diplomatic Relations and a U.S. State Department publication on diplomatic pouches. *See* Docket No. 96 at 11. Because the plain language of §46314(a) requires a violation of a regulation promulgated under one of the listed statutes, that will not do. But even if the Court could look beyond officially-published regulations—again, it can't—these diplomatic documents do not even arguably set forth procedures developed by the Under Secretary of Transportation for Security to govern airport security.

At trial, the government relied on the TSA's Standard Operating Procedures (SOPs)—a multi-volume "instruction manual" with the rules and regulations governing how TSA officers do their job, including procedures for handling diplomatic pouches. RT 142, 157-58, 309-13. Even then, however, the government didn't introduce a copy of the relevant SOPs, only testimony from airport employees about them. RT 136-37, 139, 223-24, 298-301, 310, 313-14.[8] It also didn't present evidence directly linking the SOPs to security requirements "prescribed under" §44901 and §44903(c) by the Under Secretary of Transportation for Security. Those omissions are reason enough to find the evidence insufficient. But even putting all that aside, the SOPs would still not be a *regulation* within the scope of §46314.

---

[8]     Exhibit 31 is a TSA training bulletin on diplomatic pouches, not the actual SOPs on that topic.

19

1  Permitting a §46314 conviction based on anything other than a published regulation
2  would not only contradict the plain-language of the statute; it would render the statute
3  "so vague that it fails to give ordinary people fair notice of the conduct it punishes" and
4  "so standardless that it invites arbitrary enforcement" such that it violates the Fifth
5  Amendment. *Johnson v. United States*, 135 S.Ct. 2551, 2556-57 (2015).  After all, if
6  the scope of §46314 is so ill defined that the government can seek a conviction based
7  on violations of diplomatic protocols or unpublished SOPs, as it did here, then it's far
8  from clear exactly what kind of rule it couldn't rely upon.  The Court must therefore
9  apply the doctrine of constitutional avoidance and construe the statute, "if fairly
10  possible, so as to avoid not only the conclusion that it is unconstitutional but also grave
11  doubts upon that score." *United States v. Shill*, 740 F.3d 1347, 1355 (9th Cir. 2014)
12  (internal quotation marks omitted).

**2.  Even <u>if</u> a Violation of Non-Regulation Rules Could Support a Conviction Under the Statute, Violation of *Secret* Rules (like SOPs) Cannot**

15  Even assuming that a §46314 conviction may be based on something other than a
16  regulation promulgated by notice in the Federal Register and publication in the Code of
17  Federal Regulations, a defendant cannot be convicted based on a purported violation of
18  a *secret* rule like the one at issue here.  Because the SOPs contain sensitive security
19  information (SSI), they have not been, and cannot be, disclosed to the public.  RT 151-
20  52, 155-58, 172, 179, 310.  Among those *secret* SOPs are the procedures for handling
21  diplomatic pouches.  RT 157-58, 309-13.  In fact, TSA officers did not give Flint a
22  copy of, or even allow him to read, the secret SOPs on diplomatic pouches, even after
23  he asked to see them.  RT 158, 165, 176, 179.  And as noted above, the government
24  didn't even introduce the secret SOPs at trial.
25  Upholding Flint's conviction based on his purported violation of the secret SOPs,
26  would run afoul of the "legality principle," which "mandates that conduct is not
27  criminal unless forbidden by law which gives advance warning that such conduct is

criminal." *United States v. Vasarajs*, 908 F.2d 443, 448 (9th Cir. 1990) (internal quotation marks omitted).  "Thus, the maxim that ignorance of the law is no excuse for committing a crime presupposes a penal statute that adequately puts citizens on notice of what is illegal.  Despite the fact that most citizens do not keep abreast of every statutory development, *that statutes are published and available to the public in the first place means that citizens can fairly be charged with constructive notice of the laws that bind them.*"  *Id*. (internal citation and quotation marks omitted) (emphasis added). Given this significant constitutional principle, Congress could not have intended §46314 convictions based on secret rules like the SOPs at issue here.

### 3. Flint Did Not Violate the Cited Regulations at Midway Because he Submitted to TSA Screening by Presenting his Paperwork to TSA Officials Who Examined It and Concluded It Complied with the SOPs

Flint's conviction also can't stand because the government failed to prove he violated any of the cited regulations by entering a sterile area without "submitting" to TSA screening, by "circumventing" such screening, or by not "complying" with such screening.  RT 445.  The trial evidence established that Flint appeared at the TSA checkpoint at Midway and presented his diplomatic pouch and related paperwork; a TSA supervisor and a TSA manager then spent considerable time reviewing those documents and researching the applicable procedures (while Flint waited patiently nearby) before concluding that his paperwork was in order and therefore allowed him to go through the checkpoint without searching the pouch, while Flint himself went through the metal detector and his other baggage went through the x-ray machine.  RT 241-63.  Thus, Flint did submit to the screening process and did comply with the TSA officials' instructions; he did not try to circumvent the process.  He therefore did not violate the plain language of the cited regulations, regardless of whether the TSA agents may have messed up in how they conducted the screening.

21

### 4. The Government Did Not Prove that Flint's Conduct Violated LAX's Security Program

By law, each airport must generate an airport security program containing the procedures applied to control access at the airport. *See* 49 U.S.C. §44903(c); 49 C.F.R. §1542.101 *et seq.* LAX's security director confirmed that each airport has its own security program and explained that such programs are considered sensitive security information (SSI), so their contents cannot be disclosed to the public. RT 314-16. Because the director only had a "general understanding" of LAX's airport security program, he conceded he wasn't an "expert" on that (except to the limited extent he claimed to know what parts of the airport were sterile areas). RT 293-97, 318-23. The government's failure to present any relevant provision of LAX's secret security program, or even competent testimony about it, is significant because the cited regulations and secret SOPs all pertain to what happened at the TSA screening checkpoint at Midway. But the key conduct—entry into a sterile area (in particular, Terminal 3)—occurred at LAX. The government didn't prove that conduct violated LAX's security program, however.

### E. The Government Did Not Prove Beyond a Reasonable Doubt that Flint Acted with the Requisite Intent

#### 1. Flint Did Not Knowingly and Willfully Violate the Law

The Court instructed the jurors that an act is "done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident[,]" and it's "done willfully if the defendant committed it voluntarily, with knowledge that it was prohibited by law, and with the purpose of violating the law, and not by mistake, accident or good faith." RT 447-48. The government didn't prove that Flint knowingly and willfully violated security requirements.

First of all, Flint could not act "with knowledge that it was prohibited by law, and with the purpose of violating the law," to the extent the government relied on the SOPs because they are kept *secret*. *See supra* Part D.2.

Even putting that aside, however, rational jurors still couldn't find beyond a reasonable doubt that Flint had the requisite intent. The government presented evidence about three times Flint went through TSA checkpoints in Chicago. *See generally supra* Summary of Trial Evidence. The first time, TSA officers looked at the SOPs and concluded that Flint's documentation was not sufficient to permit the pouch to bypass screening; reflecting his innocent state of mind, Flint asked to speak to a manager and told the officers they must have misunderstood the law because he had previously flew multiple times with that paperwork without being stopped. RT 134-85. Later that day, Flint presented the same paperwork to TSA supervisors, who closely reviewed it and concluded it satisfied the SOPs. RT 187-206. Five days later, a TSA manager (higher in rank than a supervisor) who had just received a training bulletin on diplomatic pouches looked closely at the same paperwork and also found that it satisfied the SOPs. RT 241-63. That manager was never disciplined for allowing Flint's pouch to go through screening without being searched. RT 260. Given that most of the TSA supervisors who reviewed Flint's paperwork concluded it satisfied secret SOPs he was never allowed to see, there's no reasonable basis to conclude that he himself thought any different. The paperwork was provided to him by Shumake (whom the State Department had previously accredited as an honorary consul and who still had an unexpired State Department consular identification card), a man who represented himself as an ambassador for the IHRC, an organization that had some official status with the United Nations with Shumake as a point of contact. RT 268-79, 345-50, 389-91; EX 47-55, 58, 114. Although the case agent also discovered that Shumake had a long criminal history, including a fraud case pending in July 2017, there was no evidence that Flint knew about that. RT 391-92. Thus, it was no more likely

23

that Flint was in cahoots with Shumake than it was that he had been duped by him. Where the evidence is, at best, in equipoise, such that the plausibility of the inference supporting guilt is about the same as (if not less than) the plausibility of the inference supporting innocence, any rational juror would necessarily have to entertain a reasonable doubt.  *See United States v. Johnson*, 592 F.3d 749, 755 (7th Cir. 2010); *United States v. Lovern*, 590 F.3d 1095, 1107 (10th Cir. 2009); *O'Laughlin v. O'Brien*, 568 F.3d 287, 301 (1st Cir. 2009); *United States v. Elashyi*, 554 F.3d 480, 492 (5th Cir. 2008); *United States v. Hawkins*, 547 F.3d 66, 71 (2d Cir. 2008); *United States v. Caseer*, 399 F.3d 828, 840 (6th Cir. 2005).

### 2. Even <u>if</u> Flint Knowingly and Willfully Violated the Law, he Did Not Also Act with Intent to Evade the Particular Regulations or SOPs at Issue

If the government proved Flint knowingly and willfully violated the law, that would only amount to a *misdemeanor* violation of §46314(a) & (b)(1).  Flint is only guilty of a *felony* violation of §46314(a) & (b)(2) if he also acted "with intent to evade security procedures or restrictions[.]"  Because this intent element raises the maximum punishment from one to ten years in prison, it must be *significantly* different from the knowing-and-willful intent necessary for a misdemeanor conviction.  That something more is reflected in the word "evade," which means to "defeat the intention of (a law or rule)[.]"  *New Oxford American Dictionary* at 598 (3d ed. 2010).  One cannot intentionally evade a rule unless one knows about it.  Therefore, this intent element required the government to prove Flint knew of a specific regulation at issue and purposefully violated it.  It did not meet that burden.

### 3. Even <u>if</u> Flint Had the Requisite Intent at Midway, the Evidence Does Not Permit a Reasonable Inference that he Still Had that Intent at the Moment he Entered Terminal 3

It's "hornbook law that in every crime there must be a joint union of act and intent." *Paritem Singh Poonian v. United States*, 294 F.2d 74, 76 (9th Cir. 1961); *see also*

1    *Morissette v. United States*, 342 U.S. 246, 251 (1952) ("Crime, as a compound concept,

2    generally constituted only from concurrence of an evil-meaning mind with an evil-

3    doing hand"); *Gasho v. United States*, 39 F.3d 1420, 1429 (9th Cir. 1994) ("It is

4    fundamental that a person is not criminally responsible unless criminal intent

5    accompanies the wrongful act."). Here, the government's theory was that Flint evaded

6    TSA screening in Chicago and then later entered LAX. Even assuming for the moment

7    that the evidence, when viewed in the light most favorable to the government, was

8    sufficient to prove Flint at the requisite intent at the moment he went through the TSA

9    checkpoint at Midway,[9] it doesn't permit the reasonable inference that he *still* had that

10   intent hours later when he arrived in Los Angeles. Indeed, it defies common sense to

11   believe anyone who did what the government claims Flint did would think he was

12   continuing to violate and evade security requirements at that point.

13                                          **<u>CONCLUSION</u>**

14       For the foregoing reasons, Daniel Flint respectfully requests that the Court enter a

15   judgment of acquittal.

16

17                                          Respectfully submitted,

18                                          HILARY POTASHNER
                                            Federal Public Defender
19

20   DATED: March 4, 2019                   By  */s/ Georgina E. Wakefield*
                                            _____
21                                          GEORGINA E. WAKEFIELD
                                            Deputy Federal Public Defender
22                                          Attorney for DANIEL FLINT

23

24

25

26

27   [9]      As discussed above, it wasn't.

28                                               25