NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
IAN V. YANNIELLO (Cal. Bar No. 265481)
CHRISTINE M. RO (Cal. Bar No. 285401)
Assistant United States Attorneys
General Crimes Section
     1200/1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-3667 / 4496
     Facsimile: (213) 894-0141
     E-mail:    Ian.Yanniello@usdoj.gov
                Christine.Ro@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                UNITED STATES DISTRICT COURT

             FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>                    v.<br><br>DANIEL FLINT,<br><br>          Defendant. | No. CR 17-697-SJO<br><br>OPPOSITION TO DEFENDANT DANIEL FLINT'S MOTION FOR JUDGMENT OF ACQUITTAL<br><br>Hearing Date: April 29, 2019<br>Time:        10:00 a.m.<br>Location:    Courtroom of the<br>             Hon. S. James Otero |

     Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California and Assistant United States Attorneys Christine M. Ro and
Ian V. Yanniello, hereby files its Opposition to defendant Daniel
Flint's motion for judgment of acquittal.

//

//

This Opposition is based upon the attached memorandum of points and authorities, the declaration of Ian V. Yanniello, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: March 25, 2019          Respectfully submitted,

                                      NICOLA T. HANNA
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division


                                /s/
_____
IAN V. YANNIELLO
CHRISTINE M. RO
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

**Contents**

MEMORANDUM OF POINTS AND AUTHORITIES...................................1

I.    INTRODUCTION.....................................................1

II.   SUMMARY OF EVIDENCE PRESENTED AT TRIAL..........................2

      A.   Defendant Has Never Been a Diplomat........................2

      B.   Relevant Airport Security Regulations: All Passengers
           and Baggage Must Be Screened Before Entering a
           "Sterile" Area.............................................3

      C.   TSA Officials Deny Defendant Entry at Chicago O'Hare
           Because Defendant Lacked a Diplomatic Passport............5

      D.   Defendant Books a New Flight and Successfully Evades
           Security Screening On July 20, 2017.......................8

      E.   Five Days Later (July 25, 2017), Defendant Returns to
           Midway and Again Evaded Security Screening for a
           "Diplomatic Pouch".........................................9

      F.   Within Hours, TSA Officials at Midway Learn that
           Defendant Evaded Security Screening and Contact the
           FBI at LAX................................................10

      G.   The FBI Intercepts Defendant When his Airplane Lands
           at LAX....................................................11

      H.   In September 2016, Defendant Falsely Claimed he had
           "Diplomatic Immunity".....................................13

      I.   Defendant's Pre-Verdict Rule 29 Motion...................14

III.  LEGAL STANDARD.................................................14

IV.   SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S GUILTY VERDICT........15

      A.   The Court Adopted Defendant's Proposed Elements..........16

      B.   Defendant Knowingly and Willfully Entered a Sterile
           Area of LAX's Terminal 3.................................17

      C.   Defendant's Venue Arguments Are the Same Arguments
           this Court Already Considered and Rejected...............19

           1.   The Court should reject defendant's claim that
                the statute of conviction does not permit
                violations in multiple jurisdictions...............19

2.    Defendant's "intervening airport" theory is
another red herring that should be rejected.........20

D.   Defendant Violated Airport Security Requirements by
Using Fraud to Bring an Unscreened "Diplomatic Pouch"
into Terminal 3 of LAX....................................21

E.   Substantial Evidence Establishes that Defendant
Intended to Evade Security Requirements...................24

V.   CONCLUSION....................................................25

# TABLE OF AUTHORITIES

**CASES**

Corbett v. Transportation Sec. Admin.,
    767 F.3d 1171 (11th Cir. 2014).................................22

Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.,
    653 F.3d 1 (D.C. Cir. 2011)...................................22

Jackson v. Virginia,
    443 U.S. 319 (1979)..........................................14

United States v. Alvarez-Valenzuela,
    231 F.3d 1198 (9th Cir. 2000)................................15

United States v. Lucas,
    963 F.2d 243 (9th Cir. 1992).................................15

United States v. Nevils,
    598 F.3d 1158 (9th Cir. 2010)................................15

United States v. Reed,
    575 F.3d 900 (9th Cir. 2009).................................15

United States v. Richter,
    782 F.3d 498 (9th Cir. 2015).................................15

United States v. Rocha,
    598 F.3d 1144 (9th Cir. 2010)................................15


**STATUTES**

49 U.S.C. § 44901..............................................22

49 U.S.C. § 44903(b)...........................................22

49 U.S.C. § 44903(c)...........................................22

49 U.S.C. § 46314.................................1, 19, 20, 21

**REGULATIONS**

49 C.F.R. § 1540.105(a)(1).....................................23

49 C.F.R. § 1540.105(a)(2).....................................23

49 C.F.R. § 1540.107(a)........................................23

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.   INTRODUCTION**

3        On October 19, 2018, following a three day trial, a jury found

4   defendant Daniel Flint guilty of intentionally evading airport

5   security requirements, in violation of 49 U.S.C. §§ 46314(a), (b)(2).

6   In July 2017, defendant used a manufactured "diplomatic identity

7   card" and other phony documents to convince Transportation Security

8   Administration ("TSA") officials in Chicago to let him carry an

9   unscreened "diplomatic pouch" onto flights to Los Angeles.  To

10  perpetrate the fraud and to avoid detection, defendant identified

11  himself as a licensed attorney, presented his attorney bar card to

12  TSA officers, and told TSA security personnel that he had been

13  through screening with his purported "diplomatic pouch" many times

14  before.  In truth, neither defendant nor the purported Pakistan-based

15  "international organization" to which defendant claimed affiliation

16  had <u>any</u> diplomatic privileges or status in the United States.

17  Rather, as the jury ultimately concluded, the purpose of defendant's

18  diplomat ruse was to evade TSA screening -- and law enforcement

19  scrutiny -- of the hundreds of thousands of dollars that defendant

20  was smuggling inside his purported "diplomatic pouch."

21       On March 4, 2019, defendant filed his motion for judgment of

22  acquittal, which is premised on arguments that were already

23  considered and rejected by this Court -- that the charging statute

24  was improperly interpreted by the government, venue was improper in

25  the Central District of California, and the evidence presented at

26  trial was insufficient to establish defendant's guilt.  Whether

27  raised as a challenge to the statute, indictment, or sufficiency of

28

the evidence, the result is the same: defendant's arguments are baseless and his motion should be denied.

## II. SUMMARY OF EVIDENCE PRESENTED AT TRIAL

At trial, the jury heard testimony from ten witnesses and the parties introduced 46 exhibits, including audio excerpts from defendant's recorded interview with the FBI, airport security surveillance videos, and TSA business records related to the airport security regulations and restrictions at issue in this case. (See Dkt. 132.) The evidence established the following:

### A. Defendant Has Never Been a Diplomat

Fahima Danishgar, Foreign Affairs Officer for the United States Department of State -- Office of Foreign Missions, testified that the State Department maintains a database with information about every diplomat, foreign mission, and international organization that is recognized and accredited by the United States. (RT 266-268.) The database, called "TOMIS", details the names, assignments, locations, and family members of individuals with diplomatic immunities and/or privileges in the United States. (Reporter's Transcript ("RT") 267-268.)[1] Ms. Danishgar confirmed that neither defendant nor the "International Human Rights Commission" have ever held diplomatic status in the United States.[2] (RT 267-268.) Mr. Danishgar also noted that information about whether a particular organization is

_____

[1] RT refers to the sequentially-numbered trial transcripts that have been filed at docket numbers 117 (day one), 118 (day two), 119 (day three), and 120 (day four). "Ex." refers to the trial exhibit number.

[2] Ms. Danishgar explained that diplomatic status for individuals stems from the status given to a foreign mission (country) or recognized international organization. (RT 288.) Thus, defendant could only have diplomatic privileges or immunities in the United States if he was representing a foreign country or organization that was listed in the TOMIS database.

2

accredited and recognized by the United States is publicly available on the Internet.  (RT 283.)

Additionally, the State Department issues "Official Guidance" to diplomats and foreign missions concerning the use of diplomatic pouches in the United States, which was admitted at trial (Exhibit 33).  (RT 266.)  Ms. Danishgar explained that this guidance, too, is publicly available on the Internet.  (Id.)  The State Department's official guidance on diplomatic pouches states, in relevant part: "[a]ll individuals designated by a foreign ministry/department, embassy, consular post, or international organization as being either a diplomatic or non-professional diplomatic courier, **must** use a valid diplomatic passport to accompany properly designated diplomatic pouches into, within, or from the United States."  (Ex. 33 at 7-8 (emphasis in original).)

Notably, FBI Special Agent ("SA") Rebecca Marriott testified that she was able to locate the State Department's formal guidance -- and thus the requirement that couriers possess a "a valid diplomatic passport" -- by conducting a Google search for "carrying cash in diplomatic pouch in the United States." (RT 359-360.)

**B.  Relevant Airport Security Regulations: All Passengers and Baggage Must Be Screened Before Entering a "Sterile" Area**

Michael Duretto, the Assistant Federal Security Director for security operations at Los Angeles International Airport ("LAX"), testified that TSA's Standard Operating Procedures ("SOP") are the "official policy that governs [TSA's] frontline officers."  (RT 311-315, 318.)  Mr. Duretto stated that federal regulations provide TSA's authority to screen passengers.  (RT 323.)

3

Mr. Duretto explained that passengers who wish "to travel or enter the ... nonpublic side of the airport" are "required to undergo ... a hundred percent screening on all persons and all property." (RT 293; 314.)  This requirement is common knowledge for anyone who has encountered security screening at an airport, but TSA nonetheless provides notice of the requirement to intended passengers:



(Ex. 20 at 5.)

At trial, Mr. Duretto explained that the boundary between the public and nonpublic (i.e., "sterile") areas of the airport are defined by the TSA security checkpoints.  (RT 293-294; see id. ["[A]nybody that passes into the sterile area is someone who has successfully completed screening with TSA and they are cleared for travel or boarding of an aircraft"].)  Mr. Duretto, however, made clear that passengers also enter the sterile area of the destination airport when the aircraft lands: "when you arrive at your destination airport, when you deplane, the aircraft, the jet bridge, and the area you walk into is still sterile."  (RT 297-298.)  "[T]he sterile area does include the airfield and the aircraft."  (RT 296.)  As Mr. Duretto made clear, the same security requirements (i.e., one hundred percent screening of individuals and their property) apply to

4

individuals who enter a sterile area of a destination airport.  (RT 298.)

Mr. Duretto also provided extensive testimony about the sterile areas of LAX, including Terminal 3.  (RT 296; see Ex. 45 [Map showing sterile areas of Terminal 3].)  Consistent with Mr. Duretto's testimony above, he stated that a person enters the sterile area of LAX's Terminal 3 when (i) the individual passes through a TSA security checkpoint in the terminal, or (ii) the individual is on a plane that lands at LAX and enters the terminal area.  (RT 297-298.)

Mr. Duretto further testified that bonafide diplomatic pouches are exempt from TSA screening.  (RT 298-299.)  However, the diplomatic pouch and diplomatic courier must meet "specific criteria" established in TSA's SOP, including the requirement that the courier possess a valid diplomatic passport.  (RT 298-301.)

### C.   TSA Officials Deny Defendant Entry at Chicago O'Hare Because Defendant Lacked a Diplomatic Passport

On July 20, 2017, defendant attempted to pass through a TSA security checkpoint at Chicago O'Hare International Airport ("ORD") with a purported "diplomatic pouch."  (RT 139-148, 183.)  At approximately 2 p.m., defendant entered the TSA screening checkpoint and presented TSA officers with a diplomatic "courier letter" and a laminated identification card stating he was "Legal Counsel & Diplomatic Courier" for the "International Human Rights Commission."

//

//

//

1      Among other things, the laminated card stated "DIPLOMAT" in

2  large red script, which was stamped above "PASSPORT#" followed by a

3  nine digit number:

 

11  (Exs. 1 & 2 [Laminated Identification Card]; see RT 183.)  There was

12  a smudged signature on the back of the laminated card (written on the

13  outside of the laminate), and the document stated the "IHRC

14  HEADQUARTERS" was located at "P.O. Box 1997" in "Islamabad-Pakistan."

15  (Ex. 2 at 2; see 372.)  Defendant also presented a binder of

16  documents to TSA officials that purportedly supported his false claim

17  to diplomatic status.  (See Ex. 3 [Binder]; see also Exs. 4-6, 8-9 &

18  38 [Photocopies of documents contained in binder].)  According to the

19  "courier letter," defendant's "law firm [was] being entrusted with a

20  cash deposit" to "transport to [the IHRC's] main offices in San

21  Francisco, CA."  (Ex. 11 at 1 ["Confidential Attorney/Client

22  Privilege Diplomatic Transportation and Direction Letter," dated July

23  20, 2017].)

24      Christopher Kotula, a lead transportation security officer at

25  ORD, analyzed and rejected defendant's credentials.  Mr. Kotula

26  explained to defendant that TSA's SOP required diplomatic couriers to

27  possess an official diplomatic passport.  (RT 137.)  He explained

28  that defendant's laminated "diplomat identity card" was not a

diplomatic passport, and thus defendant did not have the necessary identification to exempt the "diplomatic pouch" from TSA screening. (RT 143-144.)

The TSA manager on duty at ORD, Guy Sheridan, reiterated to defendant that TSA security regulations required a valid diplomatic passport before exempting a diplomatic pouch from screening. (RT 172-176; see RT 176 ("[defendant] wanted me to basically accept his ID as a passport, and I was explaining to him that it wasn't a passport, and [that] our SOP [Standard Operating Procedure] clearly states he needed a diplomatic passport in order to exempt a bag from screening").) During the encounter, Sheridan told defendant he had two options: let TSA screen the bag, or leave the airport and return when defendant had a valid diplomatic passport. (RT 176-177.) Defendant chose to leave the airport. (Id.)

At 10 p.m. later that day, TSA officials at ORD circulated a "Be On the Look Out" ("BOLO") email warning security personnel about defendant's attempt to circumvent security screening:

> Please be on the lookout for the passenger on the attached image. Subject attempted to move a large amount of currency in a diplomatic pouch on 7/20/17 but does not possess diplomatic credentials. The pouch was denied access and the subject cancelled his flight, but may reattempt to travel in the near future.

(Ex. 36.) Attached to the BOLO email was a photograph of both defendant's Michigan driver's license and the laminated "diplomat identity card." (Ex. 36 at 2.) Although the BOLO email was sent to TSA security personnel at Chicago Midway Airport, defendant, as discussed in the next section, had already evaded security screening for his "diplomatic pouch" at Midway by using his fake diplomatic credentials.

### D.   Defendant Books a New Flight and Successfully Evades Security Screening On July 20, 2017

After leaving ORD on July 20, 2017, defendant canceled his flight and booked a new flight from Chicago Midway to LAX for that same afternoon. (RT 190-191.) Defendant still lacked a diplomatic passport, but nevertheless presented his laminated "diplomat identity card" to TSA officials, asserting that he was a "diplomat ... carrying a diplomatic pouch." (RT 192-193, 198.) Clay Yoksas, a supervisory transportation security officer, believed defendant had the proper documentation to exempt the pouch from screening because defendant had a letter that stated he was a diplomatic courier, defendant presented a driver's license, and defendant presented an identification card that, according to Mr. Yoksas, looked similar to identification cards of senators and representatives. (RT 196; 200.) Yoksas did not consult with TSA's SOP or other security personnel before accepting defendant's representation that he was a diplomat with a diplomatic pouch. (RT 195.) Yoksas had also never personally screened a diplomat or diplomatic pouch, though he believed he saw his manager screen one once before. (RT 189, 195.) At the time of the encounter, Yoksas observed that defendant was "very calm" and "seemed like . . . he was a diplomatic courier" who "had come through the checkpoint many times." (RT 193-194.) Defendant "knew exactly what was needed" to exempt the diplomatic pouch from TSA screening, so Yoksas "had no reason to believe that anything was suspicious or not right about it." (RT 193-194, 202.)

The following day, Yoksas received a call from his manager stating the diplomatic identification used the prior day was

1   "fraudulent" and that the individual (defendant) "was not truly a

2   diplomatic courier."  (RT 196.)

3       **E.  Five Days Later (July 25, 2017), Defendant Returns to
            Midway and Again Evaded Security Screening for a
4           "Diplomatic Pouch"**

5       At approximately 5 a.m. on July 25, 2017, defendant entered a

6   TSA screening checkpoint at Midway and again identified himself as a

7   lawyer and a diplomat, and presented TSA officials with his laminated

8   "diplomat identity card."  (RT 252-253, 242.)  TSA supervisor Joe

9   Stone, who had never screened a diplomat or diplomatic pouch before,

10  requested help from his manager, Raja Wondrasek.

11      Ms. Wondrasek arrived at the checkpoint and reviewed the

12  documents that defendant provided to Stone, including the purported

13  "courier letter" (Exhibit 4) and three forms of identification: a

14  driver's license, an attorney bar card, and the laminated "diplomat

15  identity card" which Ms. Wondrasek -- who also had never screened a

16  diplomat before -- mistook for a "diplomatic passport card" based on

17  her own experience with a personal passport card.[3]  (RT 244, 246; <u>see</u>

18  Ex. 28 at 10 [Still Images from Surveillance Video; Ex. 7 [Photograph

19  of Defendant's Attorney Bar Cards].)  Ms. Wondrasek recalled

20  reviewing a TSA training memorandum sent to her email before

21  screening the defendant on July 25, 2017.  (RT 242-243.)  That memo

22  stated, among other things, that TSA officers must "verify the

23  Diplomatic Courier possesses ... a Diplomatic Passport." (RT 242-243;

24  <u>see</u> Exhibit 31 [TSA Training Memorandum].)  The training memo cited

25

26  _____

27      [3] The government's State Department witness, Ms. Danishgar,
    testified that she had never heard of a "diplomatic passport card."
    (RT 283.)  She did, however, explain that a regular "passport card"
28  is used by U.S. citizens to cross land borders between the United
    States and Mexico or Canada.  (RT 282.)

to and tracked the requirements of TSA's SOP on screening diplomatic pouches. (RT 243-244.)

As Yoksas did five days earlier, Ms. Wondrasek permitted defendant to enter the airport with the unscreened "diplomatic pouch." (RT 250-251.)  Among other things, Ms. Wondrasek recalled that defendant "was very well put together" and "looked like ... a seasoned traveler." (RT 260.)  She recalled that when she was discussing the "diplomatic pouch" with the TSA supervisor Joe Stone, defendant was listening to their conversation and volunteered information "throughout the whole process and just point[ed] to what [Wondrasek was] asking" about to Joe Stone. (RT 262; see Ex. 28 at 1-10.)  At one point, defendant presented Ms. Wondrasek with the binder of documents and showed her a full page version of the laminated "diplomat identity card." (RT 248; see Ex. 28 at 5-8.) Wondrasek also recalled that the identification card listed a passport number under the word "DIPLOMAT." (RT 263; see Ex. 2.) Surveillance video confirmed that defendant pointed to the general area where the "passport number" was listed. (See 28 at 5-8.)

> **F.    Within Hours, TSA Officials at Midway Learn that Defendant Evaded Security Screening and Contact the FBI at LAX**

TSA officials at Midway hold weekly meetings on Tuesdays at 11 a.m. (RT 227.)  During the Tuesday meeting on July 25, 2017, TSA security employees discussed the event that occurred on July 20, 2017. (RT 227-228.)  At that time, a TSA manager (Raja Wondresek) said that she had encountered another diplomatic pouch earlier that morning. (RT 228.)  The federal security director, Michael McCarthy, subsequently reviewed surveillance video of the incident and identified that it was the same individual who posed as a diplomat on

10

1   July 20, 2017.  (RT 228-229.)  TSA officials determine that the
2   individual -- defendant Daniel Flint -- was at the time on a flight
3   bound for LAX.  (RT 228.)  Mr. McCarthy reported the incident to law
4   enforcement officials at LAX.  (RT 228.)

5       **G.   The FBI Intercepts Defendant When his Airplane Lands at LAX**
6       SA Marriott testified that, on July 25, 2017, her office
7   received a report that an individual -- later identified as defendant
8   -- was on a flight to LAX with a "bag that had not been screened, and
9   so the contents of the bag were unknown, and [the FBI was] requested
10  to meet the aircraft" when it landed.  (RT 336.)  SA Marriott
11  testified that defendant was aboard Delta flight 1358, which arrived
12  at LAX at approximately 11 a.m. PST (RT 365).

13      SA Marriott and other law enforcement officers arrived at the
14  boarding gate 15-20 minutes before defendant's flight landed.  (RT
15  336.)  SA Marriott first observed defendant "as he was disembarking
16  off the aircraft" in Terminal 3.  (RT 337.)  Federal Air Marshal
17  Wesley Williams and another law enforcement officer boarded the plane
18  to escort defendant off the flight.  (RT 368, 386.)  In response to
19  defense counsel's question about whether Air Marshal Williams
20  "required [defendant] to get off the plane," Air Marshal Williams
21  responded, "yes."  (RT 386)  When defendant exited the plane, "he was
22  walking on his own accord" and "[n]o one was forcing him, and he was
23  not fighting anyone."  (RT 378.)

24      The FBI subsequently conducted a recorded interview of the
25  defendant.  From this interview, the government introduced ten audio
26  clips at trial.  (See Exs. 47-55, 58.)  During the interview,
27  defendant continued to assert that he was a bonafide diplomat.  He
28  presented SA Marriott with the binder of documents he previously

showed TSA officers, which he claimed supported his claim to diplomatic status.  (See Ex. 3 [Binder]; see also Exs. 4-6, 8-9 & 38 [Photocopies of documents contained in binder].)  Among other things, defendant represented that he had a copy of a diplomatic passport belonging to the "Ambassador" of the organization to which he claimed affiliation:

> So I work for the Ambassador of the International Human
> Rights Commission Robert Shumake. I have all of his
> information here, diplomatic passport, diplomatic ID as
> well and what we are doing is bringing through--he has our
> headquarters in California so we're bringing through cash
> deposits, it's all right here.

(Ex. 47 [Audio Exhibit].)  SA Marriott reviewed the contents of the binder, and confirmed there was nothing related to a "diplomatic passport" inside.  (RT 345.)  The binder contained only a photocopy of a laminated card similar to defendant's laminated IHRC card.  (See Ex. 8.)  SA Marriott reviewed the other documents and testified about what stood out to her.  For example, she reviewed the copy of the "Vienna Convention" defendant cited as support for his purported diplomatic status; she observed the cover of the document read "not yet in force."  (RT 346; see Ex. 6 at 1.)  Defendant also represented to SA Marriott that the binder included an "appointment notice" showing Robert Shumake was a bonafide "ambassador."  (RT 347.)  Upon review, however, SA Marriott confirmed "the document actually states on its face that there's no formal relationship between the United States and [the IHRC]."  (RT 348; see Ex. 5.)

During the interview, defendant also admitted that he helped manufacture the "diplomatic identity card."  (RT 350; see Ex. 58 ["I laminated it because I didn't want it to get wore out"].)  He also asserted that that he had no idea there was an "issue with ... the

12

State Department," even though he had been rejected from ORD just five days before. (See Ex. 54.) Defendant was also dishonest with the FBI, stating multiple times that he had never "been turned away from a screening checkpoint" when attempting to travel with a "diplomatic pouch." (See Ex. 53

Ultimately, the FBI searched defendant's pouch and found over $148,000 in U.S. Currency stuffed inside plastic shopping bags. See Exhibit 30 at 1-15.).

### H. In September 2016, Defendant Falsely Claimed he had "Diplomatic Immunity"

For the limited purpose of establishing defendant's knowledge, the government called Deputy John Schneider of the Ogemaw County Sheriff's Office in West Branch, Michigan. (RT 325.) Deputy Schneider testified that stopped defendant's vehicle on September 10, 2016 because the vehicle had an expired registration tag affixed to the license plate. (Id.) When the deputy requested defendant's registration and proof of insurance, defendant immediately identified himself as a civil rights attorney for the United States government, and a defense attorney licensed in Michigan and North Carolina. (RT 325-326.) After conducting his investigation, deputy confirmed defendant's registration was invalid and he did not have insurance on the vehicle. (RT 327.) As such, the deputy told defendant he was going to be arrested. (Id.) In response, defendant stated again that he was a civil rights attorney and represented that he had "diplomatic immunity" and therefore "cannot be charged with traffic or criminal offenses." (RT 327.) Ultimately, defendant was arrested and subsequently convicted because, contrary to defendant's claim, he

did not have diplomatic status or immunity.  (RT 327-328; <u>see</u> Ex. 43 [Certified Conviction Records].)

### I.   Defendant's Pre-Verdict Rule 29 Motion

On October 17, 2018, following the close of government's case-in-chief, defendant moved for a judgement of acquittal under Federal Rule of Criminal Procedure 29, asserting four theories: (1) improper venue; (2) the government failed to establish that defendant "voluntarily" entered Terminal 3 at LAX; (3) the government failed to prove that defendant violated the security programs that applied to LAX; and (4) the government presented insufficient evidence to convict the defendant because, according to defendant, the government failed to present evidence about whether defendant and his purported "diplomatic pouch" were screened at the Minneapolis-St. Paul Airport ("MSP") during a layover on July 25, 2017.  (RT 403.)  On October 18, 2018, the government filed a written opposition (Dkt. No. 107), and the Court subsequently denied defendant's motion (RT 495).  On October 19, 2018, the jury found defendant guilty of the charged offense.

On March 4, 2019, defendant filed the instant motion for judgment of acquittal, which primarily asserts the same arguments previously addressed and rejected by this Court.  (<u>See</u> Dkt. 140.)

### III. LEGAL STANDARD

When evaluating a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, the Court must follow the two-step process set forth in <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979); <u>United States v. Nevils</u>, 598 F.3d 1158, 1161, 1164 (9th Cir. 2010) (<u>en banc</u>) (unanimous).  First, the Court "construe[s] the evidence in the light most favorable to the prosecution."  <u>Nevils</u>,

598 F.3d at 1161 (internal quotations omitted). In performing this first step, "[t]he government is entitled to all reasonable inferences that can be drawn from the evidence." United States v. Lucas, 963 F.2d 243, 247 (9th Cir. 1992). After doing so, the Court must then evaluate whether the evidence "is adequate to allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." United States v. Richter, 782 F.3d 498, 501 (9th Cir. 2015) (emphasis added; citations omitted). Indeed, as the Ninth Circuit has explained, "[t]he hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high," United States v. Rocha, 598 F.3d 1144, 1153 (9th Cir. 2010), and "any conflicts in the evidence [must] be resolved in favor of the jury's verdict," United States v. Alvarez-Valenzuela, 231 F.3d 1198, 1201-02 (9th Cir. 2000). In short, the jury's verdict must stand if, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Reed, 575 F.3d 900, 923 (9th Cir. 2009) (quotations omitted).

**IV. SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S GUILTY VERDICT**

On July 25, 2017, defendant presented fake diplomatic credentials to TSA officers in Chicago to smuggle a purported "diplomatic pouch" filled with U.S. Currency onto a flight to Los Angeles. The jury heard overwhelming evidence establishing that defendant knew he was not a real diplomat or diplomatic courier. Indeed, just five days earlier, TSA officials at ORD had repeatedly instructed defendant that diplomatic couriers must possess a valid diplomatic passport. When defendant left ORD, rather than inquire about a diplomatic passport, he canceled his flight from ORD and

15

immediately booked a flight out of Midway, where he again used his self-laminated "diplomatic identity card" at a TSA security checkpoint.  At the time, defendant was a lawyer.  He was licensed to practice law in two different states, and he represented to the FBI that he knew the law governing diplomatic pouches because he had "researched" it.  (See Ex. 47.)  But even a cursory review of the documents defendant presented to substantiate his claim of "diplomatic status" -- or a Google search -- categorically disproved defendant's assertion.  The "Vienna Convention" he relied on stated it was "not yet in force" on the front page.  The "international organization" to which defendant claimed affiliation was headquartered at a "P.O. Box" in Pakistan.  Indeed, the evidence at trial showed that defendant knew full well that he did not actually have diplomatic status because he tried the same ruse in connection with a traffic stop in Michigan in September 2016 – and failed. Viewing this evidence in the light most favorable to the prosecution, a rational trier of fact could -- and did -- find the "essential elements of the crime beyond a reasonable doubt."  Reed, 575 F.3d at 923.

### A.   The Court Adopted Defendant's Proposed Elements

As a threshold matter, the Court adopted the elements of the offense that defendant proposed.  Before trial, the parties submitted competing jury instructions governing the elements of the offense. See Dkt 94 at 3 [Defendant's Proposed Elements]; Dkt. 96 at 4 [Government's Proposed Elements].)  The Court heard argument and adopted -- in all material respects -- the elements that defendant

16

proposed.[4]  (RT 409-412; see Dkt. 131 at 16 [Court's Instruction No. 14].)  Thus, the jury was instructed that to find defendant guilty, the government was required to prove the following elements beyond a reasonable doubt: (1) defendant entered an airport area that serves an air carrier, namely a sterile area of Terminal 3 at LAX; (2) defendant did so in violation of security requirements and regulations prescribed under Section 44901 and 44903(c) of Title 49 of the United States Code; (3) defendant acted knowingly and willfully; and (4) defendant also acted with the intent to evade the security regulation.  See Dkt. 131 at 16; 49 U.S.C. §§ 46314(a), (b)(2).  As explained below, the government presented substantial evidence establishing defendant's guilt.

**B.   Defendant Knowingly and Willfully Entered a Sterile Area of LAX's Terminal 3**

A reasonable fact finder could conclude that defendant knowingly and willfully entered a sterile area of Terminal 3 at LAX.  Defendant voluntarily boarded a flight to LAX, that flight landed at LAX and parked outside of a gate at Terminal 3, and the passengers -- including defendant -- exited the plane through a boarding ramp at the terminal.  The undisputed evidence at trial established that where the plane parked, the boarding ramp, and the interior of the terminal are "sterile" areas of Terminal 3 at LAX.  (See, e.g., RT 337 (SA Marriott testifying that she first observed defendant "as he was disembarking off of the aircraft" in a sterile area); Exhibit 45

---

[4] The Court included the second element as proposed by the government after observing "[t]he defendant's proposed second element is almost the same" as the government's proposal with "minor differences" that appeared to be "distinctions without a difference." (RT 410-411.)  Defense counsel stated, "That's fine."  (Id. at 411.)

1  (Map showing sterile and secure areas of LAX Terminal 3); RT 293-294

2  [TSA's Assistant Federal Security Director, Michael Duretto,

3  testifying that passengers enter sterile area by, *inter alia*,

4  arriving at destination airport].)[5]

5      Defendant does not credibly dispute that he entered a sterile

6  area of Terminal 3.  Rather, defendant reasserts the same argument

7  this Court considered and rejected when it denied defendant's pre-

8  trial motion for judgment of acquittal: that because Air Marshal

9  William's testified that defendant was "required" to exit the

10  airplane, no rational jury could conclude that defendant

11  "voluntarily" entered the interior of Terminal 3.  (Mot. at 15; see

12  RT 386.)  Defendant's argument misconstrues the standard of review.

13  Contrary to defendant's position, the jury could -- and did --

14  consider all of the evidence presented and was not, as defendant

15  suggests, bound by defendant's unduly narrow interpretation of the

16  word "required."  SA Marriott testified that "[w]hen she observed Mr.

17  Flint walking off the aircraft, he was walking on his own accord.  No

18  one was forcing him, and he was not fighting anyone."  (RT 378.)  The

19  evidence also showed that at the time, defendant was cooperating with

20  law enforcement and continued to assert his pouch was exempt from

21  security screening.  Indeed, defendant participated in a two-hour

22

23  ───────────────

24      [5] Notably, Mr. Duretto also testified that aircrafts and
    airfields are sterile areas, including the airfield depicted in the
    government's Exhibit 45, which he explained was a bird's eye view of

25  Terminal 3 at LAX. (RT 296.)  Mr. Duretto made clear that the
    airfield depicted in Exhibit 45 was a sterile area of Terminal 3: "So

26  there's a couple different colorations on this particular map.  The
    purple area would constitute what we call the security checkpoint

27  screening area.  So the front part of that would be nonsterile.
    That's where passengers should get in line to proceed through the

28  security checkpoint.  And ultimately, this more pinkish area, as well
    as the blue area, would be what we call sterile."  (RT 296.)

voluntary interview, where he tried to convince FBI agents that he was a bonafide diplomat and, that even if there was a problem with his diplomatic credentials, he had merely made an innocent mistake. (See RT 370-371.)  The jury was free to consider all of this evidence when evaluating whether defendant knowingly and willfully entered Terminal 3.  The jurors were also free to use their common sense to consider and reject defendant's implausible argument to the contrary. Indeed, there can be little dispute that all passengers are expected to de-plane once a plane lands at a destination airport, and thus all passengers are in one sense or another "required" to exit a plane once it lands.  Accordingly, viewing the evidence in the light most favorable to the government, the jury could -- and did -- reasonably conclude that on July 25, 2017, defendant voluntarily boarded a plane in Midway, Chicago with the purpose to land in LAX, and on that same date, defendant was on a plane that landed at the airfield of Terminal 3 of LAX -- a sterile area -- and deplaned and walked into the building area of the airport of Terminal 3 of LAX – also a sterile area.  Defendant knowingly, voluntarily, and willfully, entered a sterile area of Terminal 3 of LAX.

**C.   Defendant's Venue Arguments Are the Same Arguments this Court Already Considered and Rejected**

      1.   <u>The Court should reject defendant's claim that the statute of conviction does not permit violations in multiple jurisdictions</u>

As noted above, defendant requested the elements to which the jury was instructed.  Defendant's motion, however, attempts to second guess those elements by arguing, *inter alia*, that the charging statute (49 U.S.C. § 46314) does not permit "violations each time a defendant enters a new sterile area after passing a single TSA

checkpoint."  (Mot. at 10.)  Defendant's argument is frivolous and should be rejected.

Here, defendant used his status as an attorney and phony diplomatic credentials to trick TSA officials in Chicago into permitting him to carry an unscreened "diplomatic pouch" past security.  Defendant is right that the government could have prosecuted him in Chicago for entering a sterile area of Midway in violation of Section 46314.  Through fraud, however, defendant avoided detection at Chicago and he boarded a flight to LAX, where he was ultimately apprehended by law enforcement.  By doing so, defendant was still in violation of Section 46314 because he entered Terminal 3 of LAX with the same unscreened bag.  Defendant fails to cite any authority -- not one case -- to support his contention that flying to a new jurisdiction somehow prevents the government from charging him under 49 U.S.C. § 46314.

> 2.  Defendant's "intervening airport" theory is another red herring that should be rejected

Defendant argues that his conviction must be overturned because his flight to LAX had a layover at Minneapolis-St. Paul Airport ("MSP"), and the government purportedly failed to present any "evidence whatsoever about what happened" while defendant was there. (Mot. at 11-12.)  This argument, again, misconstrues the deferential standard of review and should therefore be rejected.

The evidence established that defendant boarded a morning flight from Midway to LAX on July 25, 2017.  TSA personnel at Midway realized the error during their 11 a.m. managers meeting and subsequently learned that defendant was the same individual who evaded security screening of the "diplomatic pouch" five days

earlier.  TSA officials also learned defendant's flight information, including that he was, at the time, on a flight to LAX.  FBI agents at LAX contacted the defendant when his flight landed at approximately 11 a.m. (Pacific Standard Time).  Then, for several hours, the defendant continued to assert he was a bonafide diplomat, including statements to the FBI that he had no reason to know there was an issue with the State Department, and that he had never been stopped at a TSA checkpoint before (even though he had been stopped just five days before at ORD).

Viewing this evidence in the light most favorable to the government, the jury reasonably concluded that defendant's layover in MSP was irrelevant to the charged offense.  Defendant either remained on the plane at MSP, or he switched planes, but remained in the sterile area of the airport; either way, from the time defendant boarded his flight at Midway to the time he landed at LAX Terminal 3, he remained in a sterile area.  Indeed, given that defendant was denied entry to ORD just five days, the jury could have reasonably inferred that defendant stayed inside the sterile area at MSP because leaving the area would have required that defendant to pass through another TSA checkpoint with his fraudulent diplomatic credentials, and thus risk being denied entry and exposing his fraudulent conduct.

### D. Defendant Violated Airport Security Requirements by Using Fraud to Bring an Unscreened "Diplomatic Pouch" into Terminal 3 of LAX

At trial, the government established that defendant violated airport security requirements by falsely claiming he was a diplomat with a "diplomatic pouch" that was exempt from screening.  By bringing the unscreened bag into Terminal 3 of LAX, defendant entered Terminal 3 of LAX "in violation of security requirements prescribed

under section 44901, 44903(b) or (c), or 44906 of" Title 49.  (See 49 U.S.C. § 46314; Dkt. __ [Final Jury Instructions].)

Contrary to defendant's arguments, the regulations that were incorporated into Court's Instruction 13, and the TSA's SOP, are regulations and security requirements "prescribed under" the aforementioned statutory authority.

As background, Sections 44901, 44903(b) or (c), and 44906 of Title 49 are enabling statutes that grant the following authority to the "Administrator of the Transportation Security Administration":

> 1) "provide for the screening of all passengers and property that will be carried in a cabin of an aircraft...," 49 U.S.C. § 44901(a);
>
> 2) "prescribe regulations to protect passengers and property on an aircraft operating in air transportation or interstate air transportation," 49 U.S.C. § 44903(b); and
>
> 3) "prescribe regulations ... that require each operator of an airport ... establish an air transportation security program that provides a law enforcement presence and capability ... that is adequate to ensure the safety of passengers," 49 U.S.C. § 44903(c).

Pursuant to such authority, the TSA promulgated regulations and its requirements (the SOP) to control access to and movement within sterile areas of airports, including LAX.  See Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec., 653 F.3d 1, 3 (D.C. Cir. 2011) ("Congress generally has left it to the agency to prescribe the details of the screening process, which the TSA has documented in a set of Standard Operating Procedures"); Corbett v. Transportation Sec. Admin., 767 F.3d 1171, 1174 (11th Cir. 2014) ("To fulfill [its] statutory mandates, the [TSA] issues standard operating procedures for security screening nationwide.").

Among the relevant regulations promulgated by the TSA are the regulations the Court incorporated into Court's Instruction 13.[6]  See Elec. Privacy Info. Ctr., 653 F.3d at 3 (noting TSA "promulgated a blanket regulation barring any person from entering the so-called 'sterile area' of an airport ... 'without complying with the systems, measures, or procedures being applied to control access to, or presence or movement in, such area[].'" (quoting 49 C.F.R. § 1540.105(a)(2)); see 49 C.F.R. § 1540.105(a)(1) ("Authority" includes "49 U.S.C. 44901-44907," among other statutes); Id. at § 1540.107(a) (same); see also Civil Aviation Security Rules, 67 FR 8340-01 (explaining regulatory scheme, including that the "rulemaking establishes the basic organization for TSA rules. The rules will appear in title 49, Code of Federal Regulations, Chapter XII, which includes parts 1500 through 1699").

There was nothing "secret" about the fact that defendant and his items were subject to screening.  While defendant engages in extensive discussion about TSA's "Secret" Standard Operating Procedures, there is nothing secret about 49 U.S.C. § 44901, which clearly states that every single person and item must be screened before entering an airplane.  Nor is there anything remotely "secret" about 49 C.F.R. § 1540.107(a) or 49 C.F.R. § 1540.105(a)(1-2).

---

[6] Court's Instruction 13 incorporated three regulations.  See 49 C.F.R. § 1540.107(a) ("No individual may enter a sterile area or board an aircraft without submitting to the screening and inspection of his or her person and accessible property in accordance with the procedures being applied to control access to that area or aircraft..."); 49 C.F.R. § 1540.105(a)(1) (provides that "no person may ... interfere with ... [or] attempt to circumvent ... any security system, measure, or procedure implemented under this subchapter."); 49 C.F.R. § 1540.105(a)(2) (prohibits any person from being "present within a secure area ... or sterile area without complying with the systems, measures, or procedures being applied to control access to, or presence or movement in, such areas.").

### E.   Substantial Evidence Establishes that Defendant Intended to Evade Security Requirements

As discussed above, the government presented substantial evidence to show that defendant pretended to be a diplomat for the purpose of evading TSA security requirements.  Although defendant claims that the government failed to prove that he "knew of a specific regulation . . . and violated it" (Mot. at 24), this argument is directly contrary to the record.  At trial, the government introduced evidence that defendant was very well aware that he and his "diplomatic pouch" were required to undergo screening in the absence of a diplomatic passport; defendant was stopped at ORD and advised regarding this specific requirement, but purposely declined to have his bag screened when confronted.  Instead, he purposefully -- and successfully -- tried to evade the screening requirement by flying out of another airport.

There is no question that defendant intended to "defeat" the law.  Not only did he try his scheme at a different airport, but he: manufactured a purported "diplomat identity card"; relied on a clearly defective document to support his purported "diplomatic status" (see, e.g., Ex. 6 [Vienna Convention stating "not yet in force"); and repeatedly lied to the FBI when he pretended he had never been stopped by TSA security officials before.

Moreover, defendant's argument that he did not have the requisite intent to evade upon entering Terminal 3 at LAX is illogical.  The whole point of defendant's ruse was to successfully transport his pouch full of cash to LAX and through LAX so he could get it to the final destination.  To contend that he suddenly lost

the intent to evade security procedures or restrictions when he arrived in Los Angeles defies common sense -- and the evidence presented at trial.  It was more than reasonable for a jury to conclude the same.

**V.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendant's motion in its entirety.