NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
IAN V. YANNIELLO (Cal Bar No. 265481)
CHRISTINE M. Ro (Cal Bar No. 285401)
Assistant United States Attorneys
General Crimes Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3667/4496
    Facsimile: (213) 894-2927/0141
    E-mail:   ian.yanniello@usdoj.gov
              christine.ro@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 17-697-SJO |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT DANIEL FLINT |
| v. | |
| DANIEL FLINT, | Hearing Date: July 1, 2019<br>Hearing Time: 10:00 a.m.<br>Location:    Courtroom of the<br>                  Hon. S. James Otero |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Ian V. Yanniello and Christine M. Ro, hereby files its Sentencing Position Regarding Defendant Daniel Flint.

//

//

//

This position is based upon the attached memorandum of points and authorities, the files and records in this case, the Presentence Investigation Report, and such further evidence and argument as the Court may permit.

Dated: June 21, 2019         Respectfully submitted,

NICOLA T. HANNA
United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division


        /s/
IAN V. YANNIELLO
CHRISTINE M. RO
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Defendant Daniel Flint defrauded Transportation Security Administration ("TSA") officers and evaded TSA security checkpoints in order to transport over $140,000 in cash to Los Angeles and through the Los Angeles International Airport ("LAX").  After a three-day jury trial, the jury found defendant guilty of intentionally evading airport security requirements, in violation of 49 U.S.C. §§ 46314(a), (b)(2).

The United States Probation Office ("USPO") filed its Presentence Investigation Report ("PSR"), concluding that: (1) defendant's base offense level is 4; (2) defendant's total offense level is 8; (3) defendant's criminal history category is I; and (4) defendant must pay a $100 mandatory special assessment.  (PSR ¶¶ 25, 37, 46, 92.)  The USPO also noted that an upward variance may be warranted given the nature and circumstances of the offense and the history and characteristics of the defendant (PSR ¶ 98) and the government agrees.

As discussed below, defendant should receive a three-level upward variance for a total offense level of 11.  With a total offense level of 11 and criminal history category of I, defendant's Guidelines' range is eight to 14 months.  For the reasons outlined below, the government submits that a 14-month custodial sentence, three years' supervised release, and a $100 special assessment is sufficient, but not greater than necessary, to achieve the goals of sentencing set forth in 18 U.S.C. § 3553(a).

**II.   STATEMENT OF FACTS AND RELEVANT CONDUCT**

   **A.   Offense Conduct**

On July 25, 2017, defendant entered a TSA security checkpoint at Chicago Midway International Airport ("Midway") and falsely identified himself as a diplomat. (PSR ¶ 13.) Specifically, defendant claimed he was a diplomatic courier for the "International Human Rights Commission" ("IHRC"), and that he was carrying a "diplomatic pouch" that was exempt from TSA screening. (Id.) This was false. Defendant is not and has never been a diplomat. Nor has the IHRC, a purported international organization based out of a P.O. Box in Pakistan, ever been recognized by the U.S. Department of State. As a result, neither the IHRC nor defendant has ever held <u>any</u> diplomatic privileges or immunities in the United States.

To facilitate his fraud, defendant presented several documents to TSA officers that purportedly supported his claim of diplomatic status, including a self-laminated[1] identification card stating that he was a "Diplomat" and "Legal Counsel & Diplomatic Courier" for the IHRC, and a purported diplomatic courier letter on IHRC letterhead. (PSR ¶ 14.) Defendant attempted to further bolster his false claim to diplomatic status by identifying himself as a diplomat and an attorney when he first made contact with the TSA officers at Midway. (Id.) In doing so, defendant presented three forms of identification to TSA officers: his Michigan driver's license, his attorney bar card issued by the Michigan State Bar, and the self-laminated IHRC card.

---

[1] During his interview with the Federal Bureau of Investigation ("FBI") Special Agents on July 25, 2017, defendant admitted that he caused the purported identification document to be laminated. It is unclear whether defendant also manufactured, or participated in the manufacturing, of the document itself.

2

At Midway, the TSA personnel defendant interacted with never encountered a diplomat or diplomatic pouch before, and they mistakenly permitted defendant to enter the secure area of the airport without submitting his pouch for full security screening. (Id.)

While defendant's flight was en route to LAX, TSA officials at Midway learned about the error and notified the FBI. (PSR ¶ 16.) FBI agents at LAX intercepted defendant when his plane landed. (Id.) Agents searched the purported diplomatic pouch and found $148,145 in U.S. Currency stuffed inside "Mariano's" and "Walmart" plastic shopping bags. (Id.) A Drug Enforcement Administration ("DEA") drug canine positively alerted to the funds, and the cash was thereafter seized by DEA. (Id.)

Defendant also participated in a voluntary interview with the FBI. Defendant claimed he was transporting money for the "Ambassador" of the IHRC, Robert Shumake. (PSR ¶ 19.) Defendant also identified a lawyer he previously worked with, Douglas Hampton, who defendant asserted was also a diplomat for the IHRC. (Id.) Defendant refused to answer numerous questions during the interview based on a claim of attorney-client privilege between defendant and Shumake. (Id.) FBI agents asked defendant whether he had ever been rejected from an airport when he presented his IHRC diplomatic credentials. (Id.) Defendant lied and denied that he had been previously rejected from an airport when he presented his IHRC diplomatic credentials and continued to assert that he was a bonafide diplomat.

**B. Relevant Conduct**

1. <u>Defendant Evaded Airport Security on July 20, 2017</u>

On July 20, 2017, five days before the offense, defendant attempted to pass through a TSA security checkpoint at Chicago O'Hare International Airport ("O'Hare") with a purported diplomatic pouch. (PSR ¶¶ 7-12.) As he did at Midway on July 25, defendant identified himself as a diplomat and a lawyer, and presented TSA officials with the self-laminated IHRC "diplomat" card, attorney bar card, and a purported diplomatic courier letter. (Id.) TSA officials, however, refused to let defendant enter with the unscreened bag because defendant did not have a diplomatic passport, which is a required identification document for the clearance of all diplomatic pouches. (Id.)

After being rejected by O'Hare, defendant immediately booked a new flight out of Midway and was at the TSA checkpoint there within an hour and a half. (Id.) Defendant still lacked a diplomatic passport, but he nonetheless convinced TSA personnel to permit him to enter with the unscreened pouch. (Id.) Defendant did not disclose to TSA officials that he had just been rejected from O'Hare because he did not have adequate diplomatic credentials. (Id.) As with Midway personnel who interacted with defendant on July 25, 2017, the TSA officers who interacted with him on July 20 had limited or no experience screening diplomats or diplomatic courier pouches. (Id.) Thus, defendant successfully evaded airport security and traveled to Los Angeles without the bag being screened. (Id.)

2. <u>Defendant Previously Lied About His Diplomatic Status</u>

Defendant also falsely asserted that he had "diplomatic immunity" to a law enforcement officer in Michigan in September 2016.

4

1  (PSR ¶ 44.) Specifically, on September 10, 2016, a sheriff's deputy
2  in Michigan stopped defendant's vehicle after observing an expired
3  registration tag. (Id.) During the encounter, defendant identified
4  himself as an attorney who had "diplomatic immunity" from arrest and
5  prosecution. (Id.) Defendant also falsely stated that he was "a
6  civil rights attorney for the United States." Despite defendant's
7  claim to "diplomatic immunity," he was subsequently arrested and
8  charged with two misdemeanor counts, and pled guilty to one.[2] (Id.)
9  Defendant did not mention the IHRC, or show the deputy any purported
10 diplomatic identification.

**III. THE PSR**

The government agrees with the USPO's calculations set forth in the PSR. The PSR calculated defendant's base offense level as 4 under USSG § 2B2.3.[3] (PSR ¶ 25.) The PSR applied a two-level increase under USSG § 2B2.3(b)(A)(iv) because the trespass occurred in a secure area of an airport (PSR ¶ 26) and a two-level increase because defendant abused his specialized skill and status as an attorney that significantly facilitated the commission or concealment of the offense (PSR ¶¶ 28-30). Defendant did not accept responsibility, therefore a reduction for acceptance of responsibility does not apply. (PSR ¶¶ 34-36.) With a total offense level of 8 and criminal history category of I, defendant's

---

[2] Defendant was convicted of the unlawful use of a license plate, a misdemeanor, in violation of Michigan Vehicle Code Section 257.256.

[3] Because the statute of conviction is not referenced in Appendix A of the Sentencing Guidelines, USSG § 2X5.1 applies. See USSG § 2X5.1. The government concurs with the USPO that the statute of conviction is most analogous to the trespass guideline in USSG § 2B2.3. (PSR ¶ 22-24.)

5

Guidelines' range is zero to six months' imprisonment. (PSR ¶¶ 37, 46.)

The USPO also identified certain aggravating factors that may warrant a sentence outside of the advisory guideline system. (PSR ¶ 98.) Specifically, the PSR noted that: defendant and others manufactured a purported diplomatic identification card (which defendant admitted he laminated), a diplomatic courier pouch, and a binder of documents that purported to support legitimize defendant's false claim of diplomatic status; during his FBI interview, defendant stated numerous times to the FBI that he researched the relevant law; and defendant sought to pass through TSA security with an unscreened bag based on false representations that he was working on behalf of a legitimate charitable organization. (Id.) These factors warrant an upward variance because defendant's conduct raises national security concerns as he and others developed a scheme to exploit a weakness in airport security to smuggle large amounts of cash though TSA checkpoints without screening on more than one occasion. (Id.)

**IV. A 14-MONTH PRISON TERM IS A REASONABLE SENTENCE**

Given defendant's history of repeated fraud to law enforcement officials and defendant's participation in this greater scheme to exploit airport security protocols, the need for substantial deterrence to have any effect on his behavior, and the significant danger that defendant posed to the community by flying on a commercial airline with unscreened luggage, the Court should impose no less than a sentence of 14 months' imprisonment.

    **A. The Nature and Circumstances of Defendant's Crimes and the Need to Reflect the Seriousness of the Crimes**

The government's recommended sentence reflects the seriousness

6

of defendant's criminal conduct and seeks a three-level upward variance. The sentencing guidelines range of zero to six months custody does not sufficiently account for the seriousness of the offense. Therefore, a three-level upward variance is justified because a custody range of 8 to 14 months better reflects the seriousness of this offense. Defendant exhibited a level of sophistication that compromised the security systems of various airports on more than one occasion as admitted by defendant in his interview with the FBI. And on July 25, 2018, defendant used the expertise he acquired from law school, his law practice, and his fraudulent schemes with Douglas Hampton and Robert Shumake to take advantage of an airport that was less familiar with diplomatic procedures. Defendant used lies and his specialized skill as an attorney to bypass airport security checkpoints to transport over $140,000 in cash undetected and unscreened. Defendant's actions show not only disdain for the law, but also serious disregard of the safety of the hundreds of thousands of individuals who travel by air. Such behavior warrants no less than a three-level upward variance and a sentence of 14 months' imprisonment.

        **B.    The Need to Promote Respect for the Law, Provide Just Punishment, and Avoid Unwarranted Sentence Disparities**

Similarly, defendant's conduct at every opportunity demonstrates a clear lack of respect for the law. Whether it was to bypass an airport security checkpoint or to get out of a traffic ticket, defendant has shown a flagrant disregard for the law by lying to law enforcement on numerous occasions. A term of imprisonment of at least 14 months is necessary to adequately promote respect for the law in the manner envisioned by 18 U.S.C. § 3553(a). It is also

necessary to provide just punishment and avoid unwarranted sentence disparities. See 18 U.S.C. § 3553(a)(6). Defendant's conduct was serious and is not fully captured by the Guidelines range. The Court should therefore impose a custodial sentence of 14 months' imprisonment for defendant's crime of conviction.

### C. Supervised Release

In addition to a 14 months' sentence of imprisonment, the Court should impose the maximum term of supervised release -- three years. Given defendant's tendencies to disregard the law, a three-year period of supervised release is necessary in order to provide defendant with oversight and supervision after his release from prison. See United States v. Johnson, 529 U.S. 53, 59 (2000) ("Congress intended supervised release to assist individuals in their transition to community life."); S. Rep. No. 98-225, at 124 (1983) (describing the "primary goal" of supervised release as providing "rehabilitation").

## V. CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court impose a sentence of: (1) 14 months' imprisonment; (2) a three-year period of supervised release; and (3) a mandatory special assessment of $100.