**GREGORY NICOLAYSEN**
**State Bar No. 98544**
**27240 Turnberry Lane, Suite 200**
**Valencia, CA 91355**
**Cell: (818) 970-7247**
**Fax: (661) 252-6023**
**Email: gregnicolaysen@aol.com**

**Counsel For Defendant,**
**Daniel Flint**

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CR 17 - 00697 - 1 - SJO |
| ) | |
| Plaintiff, ) | **SENTENCING POSITION PAPER** |
| ) | **FILED BY DEFENDANT** |
| vs. ) | **DANIEL FLINT** |
| ) | |
| ) | **Date: September 16, 2019** |
| DANIEL FLINT, ) | **Time:  10:00 a.m.** |
| ) | **Court: The Hon. S. James Otero** |
| Defendant ) | |
| _____) | |

     Defendant Daniel Flint hereby submits his sentencing position paper, including any objections to the Presentence Report ("PSR").


**DATED: August 21, 2019**                    **Respectfully Submitted,**


By:_____/S/_____
                          **GREGORY NICOLAYSEN**
                          **Counsel for Defendant,**
                          **Daniel Flint**

## MEMORANDUM OF POINTS AND AUTHORITIES RE: SENTENCING

### I.

### INTRODUCTION

**A.      Opening Statement**

Defendant Daniel Flint, a 36-year old U.S. citizen[1] who is a licensed attorney in two states with an active practice; has a substantial amount of support from family and friends; and has complied fully with all bail conditions for the past two years, now comes before this Court for sentencing after having been convicted at trial on the one count Indictment charging him with entering an airport area in violation of security requirements, under 49 U.S.C. §§ 46314(a), (b)(2).

For the reasons discussed herein, Mr. Flint respectfully asks this Court to impose a sentence of probation that includes a condition of home detention, pursuant to an advisory guideline range of 0 - 6 months.[2]

**B.      Release Status**

On October 18, 2017, Mr. Flint made his initial appearance before the duty magistrate, at which time he was granted an unsecured appearance bond, which was posted the same day.[3]  He has been on bond since that date, a period of nearly two

---

[1]     PSR at page 3.

[2]     PSR at page 4 (advisory range is 0 - 6 months).

[3]     Pacer docket #5, 9.  The statute of conviction, 49 U.S.C. §§ 46314(a), (b)(2), carries a ten-year maximum.  As such, it is a Class C felony. 18 U.S.C. 3559(a)(3). This makes Mr. Flint eligible for a sentence of probation, which is precluded by statute only for Class A and B felonies, or where the statute of conviction expressly precludes probation. 18 U.S.C. 3561(a)(1), (2). The statute of conviction here does not by its terms preclude a sentence of probation.

1    years.  The PSR confirms that Flint has complied fully with conditions of bond.[4]

2

3                    **II.**

4             **OBJECTIONS AND CORRECTIONS**

5           **TO THE PRESENTENCE REPORT**

6

7    **Identifying Data**: PSR at page 3:

8          **1.**    The last four digits of the SSN are incorrect.  Correct as: 3537

9          **2.**    Home address is incorrect (outdated).  Correct as:  1508 Poolside

10                  Lane, Apt 208, Charlotte, NC 28208.  This correction should be

11                  made to both the "Legal Address" and "Residence Address"

12          **3.**    Alias section is incorrect.  Flint does not have any aliases.  The

13                  name Chappell is his middle name.  The PSR should remove

14                  references to any alias.

15

16    **Part A: The Offense**

17

18        **(A)**    **Offense Conduct Summary: par. 7, page 5, to par. 16, page 7:**

19        **1.**    **Par. 7, page 5**: Objection to the sentence: "Flint was not a

20    diplomatic courier nor has the IHRC (a purported international organization based

21    out of a P.O. Box in Pakistan) ever been recognized by the U.S. Department of State."

22                  **Objection #1 and motion to strike**: The word, "purported"

23    should be removed because the IHRC is an international organization. While the

24    documents presented by Mr. Flint at the airport may not have been bona fide

25    ───────────────

26

27    [4]    PSR at par. 5, page 5 ("According to Flint's supervising officer, Flint has been compliant

28    with the terms of his release.").

diplomatic instruments, the IHRC is an active organization with a web site located at: https://www.ihrchq.org/  Selected pages from the web site, including the home page, list of selected offices, and partial list of ambassadors, is attached hereto as Exhibit 1.

**Objection #2 and motion to strike**: the phrase, "based out of a P.O. Box in Pakistan" should be removed.  This remark is contradicted entirely by the IHRC web site which lists offices in multiple countries.

2.      **Footnote 1, page 6**: Objection to the sentence and motion to strike: "It is unclear whether Flint also manufactured, or participated in the manufacturing, of the document itself."  This sentence invites speculation and innuendo that Mr. Flint may have manufactured the subject documents.  He did not.  The government did not present any evidence at trial regarding manufacturing.  During his interview with the FBI, Flint admitted laminating one document.  That procedure is nothing more than covering the card with a plastic film to provide insulation.  Laminating is not the same as manufacturing.  But the government jumped on this innuendo in the PSR as an opportunity to argue that Flint did in fact manufacture documents, which is a clear misrepresentation of the evidence by the government.[5]

3.      **Par. 16, page 7 and motion to strike**: remove the sentence, "A Drug Enforcement Administration ("DEA") drug canine positively alerted to the funds, and the cash was thereafter seized by DEA."  There was no evidence of this at the trial, and it is irrelevant to the charge in the indictment.  This is not a narcotics prosecution.

[5]   Government sentencing position at page 6, lines 6 - 7.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(B)      **Adjustment for Acceptance of Responsibility**

**Par. 19, page 7**: the PSR states, "Flint also identified a lawyer he worked with, Douglas Hampton (Hampton), who Flint asserted was also a diplomat for the IHRC."  While current CJA counsel was not present at the presentence interview because Mr. Flint was still being represented by the Federal PD Office at the time, there is no question that during the interview, Flint emphasized to the Probation Officer that Hampton was Flint's law professor who served as Flint's mentor and who personally recruited Flint to serve in the perceived diplomatic capacity.  This is a critical point that surprisingly has been omitted from the PSR.

Many of the letters submitted to this Court, which are discussed in the section 3553 portion of this brief, make reference to Hampton's role as Flint's mentor in law school and the disillusionment of finding out that Hampton had been the one to bring Flint into this venture.  The Court should therefore note that the summary of the presentence interview in this section of the PSR is lacking critical information that was provided by Flint during the interview.

**Footnote 4, page 8**: this entire footnote should be stricken, as it exceeds the evidence in the trial record and lacks foundation.

(C)      **Offense Level Computation**: par. 21, page 8, to par. 38, page 10:

**Adjustment For Role In The Offense**: pars. 28-30:.

Mr. Flint objects to the (+2) enhancement under the Abuse Of Trust guideline, USSG §3B1.3.  The enhancement is based on the notion that Flint "Flint abused his specialized skill and status as an attorney 'in a manner that significantly facilitated the commission or concealment of the offense.'"  (quoting the guideline section).  This is not the case.  While Flint did disclose that he was an attorney, the pivotal factor that influenced the TSA officials at both O'Hare and

Midway airports in Illinois in regard to whether Flint would be allowed to board the flight without undergoing security screening was the documentation that he provided purporting to be diplomatic credentials.  The bottom line is that the decisions were made entirely on the basis of the documentation, not whether he was an attorney.

At trial, the government called witness Christopher Kotula, a TSA security officer at O'Hare International Airport in Chicago.[6]  He testified about his interactions with Mr. Flint at the airport in July 2017, who presented the documentation at issue to TSA officials.  Mr. Kotula described his concerns regarding the inadequacy of Mr. Flint's documentation, including the fact that Flint did not have a diplomatic passport. Ultimately, Mr. Flint was rejected at O'Hare.  The entire thrust of the assessment made by TSA, including the intervention of Kotula's supervisor, which led to Flint's rejection at O'Hare, was the inadequacy of the documentation.  The fact that Flint was an attorney, which Flint mentioned to TSA, was inconsequential and was not at all referenced by Mr. Kotula as a pivotal factor in TSA's decision.

The government also called Mr. Clay Yoksas, a TSA supervisor at Midway airport, who interacted with Mr. Flint on July 20, 2017.[7]  Mr. Yoksas testified that Flint presented the documentation at issue, which TSA accepted on that date; and he was allowed to pass through security without undergoing screening. Mr. Yoksas' testimony did not indicate that Flint presented any identification as an attorney; only the documentation at issue, not that Flint identified himself as an attorney.  In short, TSA relied entirely on the documentation at issue at Midway airport on July 20, 2017.

In addition, the government called Ms. Raja Wondrasek, a TSA security

---

[6]    Mr. Kotula was the government's first witness, on the first day of trial (October 16, 2018). Attached hereto as Exhibit B are relevant portions from the transcript of Mr. Kotula's testimony. The transcript of Trial Day #1 is available on Pacer at docket #117.

[7]    Attached hereto as Exhibit C are relevant portions from the transcript of Mr. Yoksas' testimony from Trial Day #1.

manager at Midway airport at the time of the events, who interacted with Mr. Flint on July 25, 2017, the date when TSA at Midway allowed Flint to board the flight to LAX and subsequently notified the FBI, who met Flint upon his arrival and conducted the recorded interview with Flint at LAX.[8]  Ms. Wondrasek testified that on July 25, she consulted with her supervisor, Joe Stone, to jointly review the documentation provided by Flint regarding the pouch to determine if it met the requirements for diplomatic transport.   While Flint did present his bar card, the testimony by Ms. Wondrasek focused entirely on the issue of the adequacy of the documentation at issue.  During direct examination, Wondrasek described her actions with supervisor Stone as surveillance videotape from the airport was being played to the jury:[9]

> Q Can you generally describe what was going on in the last
> 20 seconds.
> A So I'm talking to Joe Stone, verifying that the numbers
> coincide with the numbers that are on the letter, the letters
> match up on the diplomatic pouch, and I was looking at his
> identification. So I'm just basically making sure that all -- he
> has all the documentation that was required.
> Q So is one of the things that TSA agents are trained in is to
> match to make sure different numbers line up with different
> forms of identification?
> A Correct.
> Q And to make sure that names are the same on different
> identification documents?

---

[8]   Attached hereto as Exhibit D are relevant portions from the transcript of Ms. Wondrasek's testimony from Trial Day #2.

[9]   Exhibit D at pages 39 - 40.

7

A Correct, yes.

Q Is that why you were -- is there something, I guess, specific
in the Standard Operating Procedures regarding diplomatic
pouches that require you to confirm all those numbers, or is
it something that you're just generally trained in?

A There is something in the SOP and also what we're trained
on. So anyone that has a diplomatic pouch, it has to be
annotated on the documentation. It has to say "Diplomatic
pouch." The number on the diplomatic pouch has to match
the same number on the courier letter, as well as I believe
there's another number that goes on there as well.

            \*     \*     \*

A So once I reviewed the documents one last time and Joe
and I agreed that everything was there, I proceeded to tell
Mr. Flint that he would have to go through screening, all of
his carry-ons, and we would hand him the diplomatic pouch
on the other side. That was the only thing that would not go
through screening.

     The testimony of Ms. Wondrasek clearly shows that what drove the decision by
TSA officials to allow Mr. Flint to bypass screening at Midway on July 25, 2017 was
the documentation at issue.  The reason TSA allowed the pouch to be taken aboard the
flight at Midway for LAX on July 25 without undergoing security screening was
because Ms. Wondrasek and her supervisor studied the documentation provided by
Flint, cross-checked it to their security regulations; and at that point in time, they were
satisfied the documentation was satisfactory.  They did not cut Flint any slack or take
any shortcuts in the assessment process due to Flint's status as an attorney.  Indeed,
Flint's status as an attorney had no bearing whatsoever on TSA's decision at Midway

1   on July 25.

2          **Accordingly, the enhancement for abuse of position of trust should not be**

3   **imposed.**

4          **The PSR misplaces reliance on <u>United States v. Christensen</u>, 828 F.3d 763 (9th**

5   **Cir. 2016), a case that went to trial before Judge Fischer in this district.  In that case,**

6   **defendant Christensen was a well-known attorney in Los Angeles who was charged in**

7   **in a scheme to utilize illegal wiretapping services by codefendant Anthony Pellicano.**

8   **The Ninth Circuit held that it was not clearly erroneous for the district court to impose**

9   **the abuse of position of trust enhancement where defendant Christensen utilized**

10   **Pellicano's illegal wiretapping services specifically in connection with Christensen's**

11   **service as an attorney for a client in a child custody dispute.**

12          **In upholding the enhancement, the Circuit expressly observed the crucial factor**

13   **of the attorney - client relationship in engaging the illegal services provided by**

14   **Pellicano, and thus the abuse of Christensen's role and position of trust as an attorney:**

15

16          **The motivation to wiretap Bonder was directly related to**

17          **Christensen's representation of Kerkorian in his child**

18          **support dispute with Bonder. Christensen directed Pellicano**

19          **based on what Christensen knew as Kerkorian's attorney in**

20          **that dispute. Payment to Pellicano's firm initially came from**

21          **Christensen's firm. Christensen's status as Kerkorian's**

22          **attorney and the commission of the offenses for which he**

23          **was convicted—one count of conspiracy to intercept and use**

24          **wire communications and one count of interception of wire**

25          **communications—were not coincidental. It seems likely that**

26          **the wiretapping of Bonder would not have occurred but for**

27          **Christensen's involvement as the attorney for Kerkorian,**

28          **and it is almost certainly the case that the conspiracy to**

1    intercept that included Christensen would not have

2    happened otherwise.

3  **Christensen**, *supra*, 828 F.3d at 817.

4        The facts of this case are clearly distinguishable from those in <u>Christensen</u>.

5  Here, the fact that Mr. Flint was an attorney was incidental to the assessment at

6  O'Hare and Midway airports as to whether the pouch would be allowed to bypass

7  security screening.  While Flint mentioned to TSA that he is an attorney, the focus of

8  their assessment, as reflected in the testimony referenced above, was on the adequacy

9  of the documentation in relation to TSA's standards for clearing diplomatic pouches

10  from security screening.

11        Therefore, this Court should sustain the objection to, and thereby reject, the 2-

12  level enhancement in the PSR for abuse of a position of trust.

13

14          <u>Defendant's Position Re: Adjusted Offense Level</u>

15        Based on the discussion above, Mr. Flint respectfully requests that the Court

16  find that the Adjusted Offense Level is 6. The defense agrees that the applicable

17  sentencing guideline section is USSG §2B2.3.[10]

18        The defense agrees with the following guideline calculations in the PSR:

19

20        Base Offense Level                    4

21        Secure area of airport              +2 [USSG §2B2.3(b)(A)(iv)]

22

23        Whereas par. 32, at page 8, of the PSR finds an Adjusted Offense Level 8, the

24  defense requests a Level 6.  Both levels carry the same 0 - 6 month advisory range.

25

26

27  _____

28    [10]   PSR at par. 25, page 9.

Part B: <u>Criminal History</u>: par. 39, page 8, to par. 51, page 11.

No objections.  The defense agrees that Mr. Flint is a Category I.[11]

Part C: <u>Offender Characteristics</u>: par. 62, page 13, to par. 92, page 17.

There are no objections to Part C of the PSR.

**III.**

**<u>A SENTENCE OF PROBATION WITH CONDITIONS</u>**

**<u>THAT INCLUDE HOME DETENTION AND</u>**

**<u>COMMUNITY SERVICE, IS SUFFICIENT,</u>**

**<u>BUT NOT GREATER THAN NECESSARY,</u>**

**<u>TO COMPLY WITH THE STATUTORY PURPOSES</u>**

**<u>OF SENTENCING UNDER 18 U.S.C. 3553(a)</u>**

<u>Section 3553(a)(1): Nature And Circumstances Of The Offense</u>

    (1)    <u>A Little-Known Statute With A Nominal Base Offense Level And</u>

           <u>No Links To Other Felony Statutes</u>

This case involves an arcane statute, 49 U.S.C. §§ 46314, that is rarely if ever seen in this district.[12]  The statute is entitled, "Entering aircraft or airport area in violation of security requirements," which states in pertinent part:

> "A person may not knowingly and willfully enter, in
> violation of security requirements prescribed under section .
> . . . an airport area that serves an air carrier or foreign air
> carrier."

---

[11]   PSR at par. 46, page 13.

[12]   The statute is enclosed as Exhibit E for the Court's convenience.

As the PSR makes clear, the applicable sentencing guideline for the statute carries a Base Offense Level 4, one of the lowest BOL's in the guideline manual.  This low BOL reflects the simple fact that the statute does not apply to national security offenses; nor narcotics trafficking offenses; nor money laundering offenses.  The government should not be allowed to bootstrap this statute into being something more serious than it is, which is exactly what they are trying to do in seeking an above-guidelines sentence.

If the government had evidence that the offense conduct directly related to another felony offense, then the government should have so charged the case.

> (2)     **Neither The Probation Office Nor Government Has Requested That The Court Apply The Cross-Referencing Provision In USSG 2B2.3 To Another Felony Guideline, Which Confirms That Flint's Offense Conduct Was Not Undertaken To Further Any Other Felony Offense**

Neither the PSR nor government has suggested that the offense conduct in this case was committed for the purpose of committing another felony offense, so as to invoke the application of the guideline for that other felony offense.  The government has no such evidence of any other applicable felony, and none was offered at trial.

In this context, it is important to note that neither the government nor the PSR make any suggestion to this Court that the cross-referencing provision in the applicable guideline, USSG 2B2.3, should be utilized to apply another guideline section that reflects another felony offense, so as to subject Mr. Flint to a higher offense level calculation.  The cross-referencing language in USSG 2B2.3 states:

1        (c)    **Cross Reference**

2        (1)    **If the offense was committed with the intent to**

3        **commit a felony offense, apply §2X1.1 (Attempt, Solicitation,**

4        **or Conspiracy) in respect to that felony offense, if the**

5        **resulting offense level is greater than that determined above.**

6

7        If the government had any evidence to link Mr. Flint's actions to another felony

8    offense such as money laundering, or conspiracy to further narcotics trafficking, then

9    the government should either have charged those offense — or at the very least,

10   invoked the cross-referencing provision of USSG 2B3.2.  Its failure to do so is no small

11   omission.  It is a clear admission by the government that this case stands alone as a

12   violation of the statute charged, 49 U.S.C. §§ 46314, and that the sentencing should

13   therefore remain squarely within the 0 - 6 range applicable to that statute.

14

15       (3)    **Mr. Flint Was Issued A CVB Violation Notice For A Misdemeanor**

16       **After The FBI Interview On July 25, 2017**

17       This case began with a misdemeanor Central Violations Bureau (CVB)[13]

18   violation issued to Mr. Flint on July 25, 2017 at the conclusion of the interview at LAX,

19   by FBI agent Rebecca Marriott, the same agent who conducted the interview.  The

20   violation notice, a copy of which is attached hereto,[14] cites Mr. Flint for violating 18

21   U.S.C. 1036,[15] a misdemeanor statute entitled, "Entry by false pretenses to any real

22   property, vessel, or aircraft of the United States or secure area of any airport or

23   seaport," carrying a maximum six month custody term.  While the statute has a felony

24   _____

25   [13]   The CVB web site is part of the U.S. Courts web sites and can be found at this address:

26   https://www.cvb.uscourts.gov/

27   [14]   Exhibit F.

28   [15]   A copy of 18 U.S.C.S. § 1036 is attached hereto as Exhibit G.

1  provision "if the offense is committed with the intent to commit a felony," the fact that
2  Flint was being issued a CVB notice clearly means that he was being cited for a
3  misdemeanor, as the CVB proceedings apply specifically to misdemeanors and are
4  conducted by Magistrates.

5      Thus, from the outset of this case, the government has never taken the position
6  that Flint's offense conduct was being undertaken with intent to commit a felony.

7

8      **(4)    Mr. Flint Told Agent Marriott During The July 25 Interview That**
9      **The Pouch Contained Cash.  He Therefore Knew That There Was**
10     **No Risk To Airline Safety In Allowing The Pouch To Bypass**
11     **Security Screening, And Thus No Risk To National Security**

12     Attached hereto are excerpts from the government's transcript of the recorded
13 interview that FBI agent Rebecca Marriott conducted with Mr. Flint at LAX after he
14 was escorted off the plane upon arriving on his flight from Chicago-Midway airport.[16]
15 In the interview, Flint expressly tells agent Marriott that the pouch contains cash.

16     Thus, this is a case in which Flint knew from the outset that he would not in any
17 way subject passengers, crew or the airline itself to any risk of harm if the pouch
18 bypassed security screening.

19     For the reasons discussed above, a sentence of probation with conditions of
20 home detention is consistent with Mr. Flint's offense conduct and the statutory
21 purposes of punishment under section 3553.

22

23

24

25

26

27

---

28  [16]     **Exhibit H.**

14

## Section 3553(a)(1): History And Characteristics Of The Individual

> (1)   **Mr. Flint Has Substantial Support From Family And Friends**
> **Which Speaks To His Excellent Character And Confirms That He**
> **Is Worthy Of A Non-Custodial Sentence**

Mr. Flint has received excellent support in connection with this sentencing proceeding. Attached hereto are letters attesting to the professional and intellectual respect, as well as the emotional support, that he is privileged to have. Each letter speaks to Mr. Flint's extraordinary kindness and selfless generosity, reflecting a recognition that Flint's offense conduct does not represent his true character and is truly aberrational. The letters also reveal the trauma that Flint and his family have suffered as the result of this prosecution. Relevant excerpts are quoted below.

Mr. Flint has the privilege of coming before this Court with strong support from his family. Both his mother (Gayle Flint) and father (Timothy Flint), who are divorced but nonetheless close partners in parenting within a tight-knit family, have supported Mr. Flint since his initial appearance before the duty magistrate nearly two years ago. In his letter, Timothy Flint, now retired from the Michigan Department of Agriculture after a career as the Deputy Director of the Pesticide and Plant Pest Management Division, attests to the strong moral foundation of the family and Flint's upbringing based on principles and standards:[17]

> Besides a close family, Danny grew up with men of character
> and integrity. From an early age, Danny was a participant
> in annual hunting, fishing and hiking adventures with my
> friends, men of integrity, some of whom have been together
> for over 40 years.

---

[17]   Exhibit I.

15

Reflecting the solemnity of a parent who has been deeply affected by the events of this case, the letter from Flint's father makes clear that Flint himself has suffered from this case and that there is no risk of recidivism, all the while the family maintaining its highest respect and confidence for Flint notwithstanding what has happened here:

> These past months have weighed heavily on Dan, and all his family and friends. Obviously, this situation will never happen again, and Dan's future efforts will be focused on reinstatement of his license to practice law in the hopes of moving forward with his life.

> What Dan will never lose, is the trust and support of his family and friends.

Like his father, Mr. Flint's mother speaks in detail of Mr. Flint's upbringing in a family of educators who maintained solid values and standards.  Aware that Flint was recruited into the "diplomatic courier" activity by one of his law school professors, Douglas Hampton, she states in her letter:[18]

> I watched as he studied hard in law school. I watched him as he spent endless hours preparing for the bar. I watched, and celebrated with him, as Douglas Hampton presented him to the judge to be sworn in as an attorney. I know that Daniel would never purposefully do anything to jeopardize his law license or law career.

---

[18]   Exhibit J.

1               It was an unfortunate lesson Daniel learned, but he is no

2               longer the young, trusting law student that he once was. An

3               occurrence like this will never happen again.

4

5        Mr. Flint's family support for this sentencing proceeding is widespread.  One of

6  his uncles, Edward Byrnes, who has known Mr. Flint his entire life, expresses praise

7  for Flint's dedication to develop a career as an attorney and the high level of respect

8  others have for him, together with the shock of what has happened in this case, as it is

9  entirely out of character with the values of his family and Flint's overall commitment

10  in life.  Mr. Byrnes' letter states in part:[19]

11

12               Dan has worked hard at his jobs and education to become

13               first a teacher and then a lawyer, everyone in the family is

14               proud of Dan. Dan is family oriented, his nieces, nephews,

15               aunts, uncles, and grandparents (when they were alive) love

16               and loved him. Dan's many friends also love and respect

17               him. Dan is a positive person, an upstanding citizen, he and

18               willing to help whenever help is needed. Dan is a very good

19               person and it would be very out of character for him to

20               knowingly break the law in any way.  It is so out of character

21               for Dan to be in any kind of trouble that his entire family,

22               I'm sure his friends too, were completely stunned when

23               informed of his unfortunate predicament.

24

25               I still find it hard to believe. Judge Otero, being in legal

26               trouble has never happened in our family. We have all been

27  ─────────────────────

28      [19]   Exhibit K.

brought up to value and respect the law. As a family, it is our
first nature and as a member of this family I believe it is the
top priority for Dan. Dan would not knowingly break the
law so I think he believed what he was doing was legal. I
believe he may have been misled by his employer and law
school mentor Douglas Hampton. Misplaced trust is always a
hard lesson and I know in my heart of hearts Dan has
learned and will remember what he has learned the rest of
his productive life. Dan has a lot to give and I believe he is
and will be a productive member of society.

The same praise and respect is reflected in the letter submitted by another
uncle, James Byrnes, who has also known Mr. Flint his entire life.  Echoing the letters
submitted by Mr. Flint's parents and Edward Byrnes, James Byrnes points to Flint's
good character as he was raised in a family of educators with solid values:[20]

I have two sons who are very close with Danny. He has been
a wonderful cousin and role model to them. He did well in
school and being the older cousin, always looked out for
them. To this day they remain very close. We are a family of
educators and just like my boys, Danny followed in the
family tradition. He went to Western Michigan University
and graduated with an education degree.

James Byrnes is among the many family members who has observed the
emotional turmoil and remorse that Flint has undergone as the result of this case:

_____

[20]   Exhibit L.

18

> I am very close with Danny and I can see the sorrow and
> remorse he has for putting his parents and the family
> through this. We are a tight nit family and have lived
> through this nightmare together.

Meghan DeCarlo, Mr. Flint's sister, who has followed in the family tradition of pursuing a career in teaching with a Masters Degree from Michigan State University and post-graduate credentials, speaks eloquently of the upbringing she and Mr. Flint received in a family of educators with solid values, and how Mr. Flint grew into a person of genuine character.  Like others, she sees this case as the result of misdirection at the hands of an unscrupulous law school professor who recruited Flint into the "diplomatic" project that led to this case.  Retaining her genuine faith in Flint's commitment to legal standards and principles, Ms. DeCarlo makes clear the impact this case has had on her brother and his remorse for his actions:[21]

> The losses Dan has experienced this year reach far beyond
> his days in court. He has expressed his deepest remorse over
> what happened and he wishes he would have investigated
> further; however, that is behind us now.

Echoing the respect the family has for Mr. Flint, Tim DeCarlo, the husband of Flint's sister, Meghan DeCarlo, speaks passionately about Flint's commitment to do good things in life and the family's enthusiasm for him when he became an attorney, knowing his character to help others:[22]

---

[21]   Exhibit M.

[22]   Exhibit N.

19

Over the years, I witnessed Dan as a young student in the
college of education at Western, to a law school student at
Oakland University, Detroit School of Law. The entire
family was so proud and supportive of him when he officially
became a practicing attorney and friend to many.

Likewise, many long-term friends of the family have submitted letters
acknowledging Mr. Flint's good character, dedication as a young attorney, remorse for
his actions, and the effects this case has had on him.  A good example is the lengthy
letter submitted by Keith Creagh, a now-retired former Director at the State of
Michigan's Dept of Natural Resources who has known Mr. Flint his entire life as a
friend of the family for over forty years.  Mr. Creagh's letter provides a detailed,
in-depth perspective on Mr. Flint's good character throughout his life, commenting on
good deeds Flint would do as a child that Creagh always found impressive:[23]

Even though he [Flint] was physically superior, there was no
sign of bullying or intolerance. I could trace his sound
character back to numerous dad/kid camping weekends
where he did his share and more around the campsite, or the
assistance he provided to others who needed help or his
experience cooking for the crew. You get to know a person
when you spend time together out in the natural resources
and appreciate what they value.

---

[23]   Exhibit O.

Mr. Creagh's positive comments apply equally to his views of Mr. Flint as a professional:

> I have also known Dan in the work setting. Dan was
> employed by the Michigan Department of Agriculture as a
> fruit and vegetable inspector. Dan's job was to verify the
> quantity and quality of fresh farm product as it entered the
> processing stream. In that job, he needed high standards of
> integrity and honesty. He was integral in the process to make
> sure farmers got fair compensation for their product. This
> job also helped him develop his facilitation and conflict
> resolution skills because there were differences of opinion on
> the net worth of the product. This position also demanded
> long hours and a need to show up and stay on the job until
> the work was completed. He did this all without direct
> on-site supervision.

Reflecting the views of others who have submitted letters, Mr. Creagh retains his high respect for Mr. Flint notwithstanding the events in this case:

> Regardless of how we got to where we are today, I can state
> with great confidence that Dan Flint has learned many
> tough, but evidently necessary, lessons. Don't trust people on
> face value, conduct your own due diligence, and always
> question the motives of others. Dan has privately expressed
> both remorse and dismay for the incident and court
> proceedings. I am certain that he will not find himself in a
> similar situation in the future. If the court could be open to

1    sentencing that would not further destroy a person of good
2    character, Dan Flint would be such an individual worthy of
3    such consideration.

4

5    Further recognition of Mr. Flint's good character and selfless generosity is
6    provided by William Schmidt, now retired from the Michigan Dept of Natural
7    Resources, the same agency as Keith Creagh, who has been a friend of Flint's father
8    since their college days over fifty years ago.  Mr. Schmidt speaks with warm praise for
9    Flint's character as he has "had the unique opportunity to watch Dan grow and
10   mature into adulthood(,)"  and speaks of Flint with a fatherly warmth:[24]

11

12   I am the father of a 36 year-old son, myself, and understand
13   the blessings children bring, as well as the fatherly
14   responsibility necessary to encourage proper behavior,
15   adherence to societal rules and regulations, the appreciation
16   of human relationships and the importance of providing
17   sound guidance and strong support during their growth into
18   adulthood. Subsequently, I know a 'good-kid' as opposed to
19   a 'not-so-good kid' by their behavior and the decisions they
20   make during various situations. Dan has always exhibited
21   confidence, capability, compassion and respect over the
22   course of our relationship. In short, he's a 'good-kid.'

23

24   Like everyone else who has submitted a letter, knowing the offense conduct that
25   brings Flint before this Court for sentencing, Mr. Schmidt's letter reaffirms his respect
26   and confidence in Flint's good character:

27   _____

28   [24]   Exhibit P.

> Let the record show that I believe Dan to be honorable,
> diligent, law-abiding, competent, capable, cooperative and
> compassionate.

Mr. Schmidt's praise is echoed by Jack Knorek, a family friend who has known Flint since he was eleven years old and whose personal background includes serving as a Peace Corps volunteer.  Mr. Knorek's letter speaks with genuine warmth of Mr. Flint's good character:[25]

> It has been a genuine pleasure watching him grow, from
> adolescence through adulthood, into the fine young man he
> is today. He is kind and caring, with a quick wit that belies
> genuine compassion for his fellow man and a deep
> understanding of the human condition.

Mr. Knorek's letter reflects the shock expressed in many letters regarding the circumstances of this prosecution, and he highlights the deep remorse that Mr. Flint has felt in regard to his conduct and the consequences this has on his career as a lawyer:

> Danny takes full responsibility for his action, and he deeply
> regrets it, now knowing what he did was a violation of
> Federal law. He admits the worst part of this entire incident
> is he is no longer able to pursue his calling, to practice law
> and serve as an officer of the court.

---

[25]   Exhibit Q.

Another long-term friend of the family, Michael DiBernardo, who worked with Mr. Flint's father at the Michigan Dept of Agriculture where Flint himself had worked (see letter from Keith Creagh), praises Flint's personal character:[26]

> Dan is a great young man that is very connected to his friends and family, demonstrates honesty in all areas of his life, and became a lawyer to ensure justice for others.

Mr. DiBernardo likewise speaks with praise in regard to the way Flint conducted himself as a young attorney:

> I have had the opportunity to work with Dan on a professional level while I was the Economic Development Specialist for the Michigan Department of Agriculture. Dan contacted me to discuss a client that was interested in purchasing Michigan products and exporting these products to his client's country. During this time of gathering information and working within the Agri-businesses in Michigan, Dan always was professional, acted with the highest integrity, and upmost respect.

Lynne Hendricks, another long-term family friend who has known Mr. Flint his entire life, provides further affirmation of Flint's upbringing in a family of educators with solid values:[27]

---

[26]   Exhibit R.

[27]   Exhibit S.

24

I've had the pleasure as a family friend of watching Daniel
Flint grow and develop into a fine young man from birth to
today. Dan was raised in a loving family to be a good
Christian with a moral compass. He has always exhibited a
zest for life and a charismatic personality. I have found him
to be a kind and caring individual who wants to make a
difference in the world.

Moreover, Ms. Hendricks joins other family friends in affirming her respect for
Mr. Flint and confidence that he will lead a law-abiding and responsible life:

I have no doubt Dan has learned valuable life lessons from
this situation. In the future he will use due diligence to insure
that he is not violating any laws. He will be less trusting and
more vigilant. He has so much to offer others and I'm
confident he will find a way to do so.

Suzanne Steele, an educator who worked with Flint's mother as a teacher for
two decades, emphasizes her confidence in Flint's good character with these words:[28]

The Dan Flint I know would never knowingly do anything to
jeopardize his law license which he has worked so hard to
achieve. I know he would never intentionally hurt his family
or his reputation.

---

[28]   Exhibit T.

**Shirley Bergman,** a public school teacher who has known the family for over forty years and has known Flint his entire life as an "unofficial aunt," writes with unwavering confidence about Flint's good character despite the events in this case, concluding on a strong note:[29]

> Personal responsibility was always in the forefront. If something went wrong, his [Flint's] choice was to fix it, and in a positive way. I would trust Daniel C. Flint with my life.

The same confidence in Flint's ability to exercise good judgment in the future and maintain a responsible, law-abiding lifestyle is conveyed in the letter from Eric and Joyce Olson who, like many friends of the family, have known Mr. Flint his entire life and remain committed to their view of Flint as a man of good character and integrity, notwithstanding the events in this case:[30]

> When Dan realized that following the instructions he was given, was not within the law, he terminated his relationship [with his law professor]. Dan will not be so trusting again. He would never intentionally break the law.

> Dan should be allowed to continue to practice law. He will do so with integrity.

Taken together, the supporting letters attached hereto emphasize the uncharacteristic nature of Mr. Flint's offense conduct and underscore the essential

---

[29] Exhibit U.

[30] Exhibit V.

point that he is not a deceitful person.  Quite to the contrary, these letters confirm that the events of this case are situational in nature and do not reflect a fraudulent disposition.  The enduring support shown in the enclosed letters, coupled with Flint's excellent compliance on bond for these past two years, demonstrate that he is an excellent candidate to fulfill his commitments to the Court in a non-custodial sentence that includes home detention and community service.

(2)   **Mr. Flint Openly Disclosed To Family And Friends That He Had Been Appointed As A Diplomat, Which Raises Mitigating Considerations Regarding Mr. Flint's Naive And Misguided Belief Regarding The Legality Of His Actions**

Several of the letters from family and friends to this Court describe the moment in time when Flint announced that he had been appointed as a diplomatic courier (or so he thought), and how everyone was happy for him.  Query whether someone who actually believed he was committing a crime would have openly disclosed this, especially to family and friends who have known him for many years, or in some cases, all his life, and who themselves are deeply committed to moral standards.

For example, Mr. DiBernardo describes Flint's open enthusiasm about serving as a diplomatic courier, something that Flint openly shared with family and friends:[31]

---

[31]   Exhibit R.

On many occasions, Dan has expressed his excitement about
the opportunity that he was being appointed as a
"diplomatic courier and general counsel" for the
International Human Rights Commission. He stated he was
honored given this opportunity to work alongside his college
law professor, mentor, and friend Mr. Doug Hampton.

Similarly, Keith Creagh commented about the moment Mr. Flint made the announcement:[32]

I will not forget when we were "at camp" in the Upper
Peninsula of Michigan and Dan announced that he had
received diplomatic credentials. It was evident that he was as
proud of that achievement as we were of him.

Referencing the same camp event, the letter from William Schmidt echoes the comments by Mr. Creagh in the way everyone was pleased at Flint's announcement of his work for the IHRC:[33]

At more recent fishing and hunting camps, I, along with our
usual father/son crew members, were especially proud of
Dan's appointment/designation as a diplomat as part of his
duties relative to IHRC. We celebrated and applauded his
accomplishment for, in reality, his accomplishment was an
answer to my personal prayer for his success.

---

[32]   Exhibit O.

[33]   Exhibit P.

28

1    Flint made the announcement to his parents as well, as noted in the letter from

2 his father, Timothy Flint:[34]

3

4        When Danny received the diplomatic credential around the

5        time he was at camp with his and my friends, we were as

6        proud of Danny as he was.

7

8    The letter from Flint's mother, Gayle Flint, also reflects the announcement by

9 Flint:[35]

10

11       When I met Mr. Hampton, and the few occasions I was with

12       him, I found him to be friendly and charismatic. I really

13       knew about him mainly through conversations with Dan.

14       Daniel always spoke of Doug Hampton with the highest

15       regard beginning when he was a trusted teacher and mentor

16       and growing into a trusted colleague and friend. When the

17       International Human Rights Commission position was

18       offered, and accepted by Dan, it was one of the proudest

19       moments of both of our lives. Once again, Mr. Hampton

20       became a trusted teacher as Daniel performed his duties for

21       the IHRC-continuously reassuring him that everything he

22       did as a courier was within full compliance of the law.

23

24

25

26 ─────────────

27   [34]   Exhibit I.

28   [35]   Exhibit J.

29

The letter from Jack Knorek likewise recounts the time when Flint told him of the new position:[36]

> As such, and recalling my service as a Peace Corps
> Volunteer, I was pleased beyond description when he [Daniel
> Flint] told me he was working on a part-time basis for the
> International Human Rights Commission.

While the jury has spoken, and its verdict controls, the references quoted above to Flint's open and enthusiastic disclosures to family and friends regarding what he believed was a diplomatic assignment raises important questions as to what he genuinely believed at the time he undertook the activities involved in this case. Generally, one does not enthusiastically tell their family and close friends about a new venture if they believe in their heart of hearts that what they are doing is a crime, particularly in a family like Flint's which is anchored in strong moral values.

(3)    **Mr. Flint Faces Serious Collateral Consequences From His
       Conviction Insofar As He Will Likely Lose His Licenses To
       Practice Law In Michigan And North Carolina**

Mr. Flint has fulfilled his obligation to notify the state bars in Michigan and North Carolina, where he is licensed, regarding the conviction in this case. He will likely face disbarment proceedings. The shattering impact of losing one's legal career and having to start over in life, after having worked so hard for so many years, invites compassion at sentencing in favor of a probationary sentence. It is heart-wrenching to

---

[36]    Exhibit Q.

read the many letters submitted to this Court that speak to the family's pride in seeing Mr. Flint become an attorney, and their respect for his commitment to help others; only to see it lost as the result of the events in this case, particularly where the offense conduct falls under a criminal statute that is rarely applied by federal prosecutors.

The predictable loss of Mr. Flint's license should be factored into the totality of mitigating considerations that weigh strongly in favor of a probationary sentence.


IV.

CONCLUSION


For the reasons discussed herein, Mr. Flint respectfully asks this Court to impose a sentence of probation, with conditions of home detention and community service, as being sufficient, but not greater than necessary, to fulfill the statutory purposes of sentencing under 18 U.S.C. 3553.  As Mr. Flint has qualified for indigent representation by the FPD and CJA, fines should be waived.


DATED: August 21,  2019                    Respectfully Submitted,


By:_____/S/_____

GREGORY NICOLAYSEN
Counsel for Defendant,
Daniel Flint