**GREGORY NICOLAYSEN**
State Bar No. 98544
27240 Turnberry Lane, Suite 200
Valencia, CA 91355
Cell: (818) 970-7247
Fax: (661) 252-6023
Email: gregnicolaysen@aol.com

**Counsel For Defendant,**
**Daniel Flint**

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                      Plaintiff,<br><br>vs.<br><br>DANIEL FLINT,<br><br>                      Defendant | CR 17 - 00697 - 1 - SJO<br><br>**DEFENDANT DANIEL FLINT'S PETITION FOR WRIT OF ERROR CORAM NOBIS OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL**<br><br>**Date: September 16, 2019**<br>**Time:   10:00 a.m.**<br>**Court: The Hon. S. James Otero** |

Defendant Daniel Flint, an attorney licensed in Michigan and North Carolina, has prepared the enclosed petition and exhibits and has requested his CJA counsel to file them and request a hearing date.  Counsel hereby files the enclosed and requests that the Court hear the petition on September 16, 2019 prior to the sentencing hearing.


DATED: August 23, 2019                    Respectfully Submitted,


                                          By:_____/S/_____

                                              **GREGORY NICOLAYSEN**
                                              **Counsel for Defendant,**
                                              **Daniel Flint**

Daniel Flint
525 N. Tryon, Suite 1600
Charlotte, NC 28202
(704) 904-8469
info@flint-law.com

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br><br>Plaintiff,<br><br>v.<br><br>DANIEL FLINT,<br><br>Defendant. | Case No. CR-17-00697-SJO |

## DEFENDANT'S PETITION FOR WRIT OF ERROR CORAM NOBIS *OR* MOTION FOR NEW TRIAL

NOW COMES Defendant, Daniel C. Flint ("Mr. Flint"), and for his *pro se* Petition for Writ of Error Coram Nobis or Motion for New Trial, Mr. Flint asks this Honorable Court to Grant his Petition for a Writ of Error Coram Nobis, vacate the Jury's guilty verdict, and dismiss all charges against him or grant an evidentiary hearing to address the issues presented.

In the alternative, Mr. Flint respectfully requests that this Honorable Court Grant his Rule 33 Motion, vacate the Jury's guilty verdict, and Order a new trial be held or grant an evidentiary hearing to address the issues presented.

In support, Mr. Flint relies upon the allegations, arguments, and authorities that are fully set forth in the Memorandum attached hereto.

<u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ...……………………………………………………...… ii

STATEMENT OF QUESTIONS PRESENTED …...……………………………….……… v

INDEX OF CONTROLING AUTHOIRTIES …………...……………...………….…….… vi

I.   STATEMENT OF FACTS   …………...…….....…………………………….....… 1

    a.   <u>Government Admits to Destruction of Evidence</u>   …...……………….…..… 1

    b.   <u>Audio-Forensic Expert Report Indicates Manipulation</u>  ………..…….…..…. 2

    c.   <u>Location of Manipulation Relates to Evidence Used at Trial</u> ..…………..…  5

    d.   <u>Analysis of Transcript Supports Finding of Manipulation</u>  ...…………..…… 5

    e.   <u>Defense Counsel Notified of Manipulation Before Trial and Failed to Act</u>.… 6

    f.   <u>Reason Expert Report was not Obtained Before Trial</u> ………..……….…... 7

    g.   <u>Affidavit of Forensic Audio Expert Douglas Carner</u>  ..……………….....… 8

II.   ARGUMENT AND LAW.………………………………….…………………….… 9

    a.   <u>Petition for Writ of Error Coram Nobi</u> …………..…...………………..…… 9

        i.   *Mr. Flint has "Sound Reason" for not Immediately Raising the Issues Brought in this Petition for Writ of Error Coram Nobis* …. 10

        ii.   *Coram Nobis Relief Should be Granted Before Sentencing* ….. … 10

        iii.   *Mr. Flint Satisfies all Requirements Necessitating Coram Nobis Relief*…………………………………………….....… 13

            1.   A more usual remedy is not available ……………………  13

            2.   Valid reasons for not attacking the conviction earlier ...…  14

            3.   Valid Article III case or controversy exists  …………...…14

            4.   The error is of the most fundamental character ……...…… 15

    b.   <u>Mr. Flint Received Ineffective Assistance of Counsel</u> ..………………..…  15

       *i.* *Defense counsel's performance fell below an objective standard of reasonableness*……………………………………………… 15

          1. Failing to investigate the audio, after Mr. Flint informed of the manipulation, was unreasonable ………………..…… 16

          2. Investigation would have resulted in a successful motion to suppress ………..………………..…………………………....18

              a. *The Government cannot establish the absence of material deletions or alterations because the original has been destroyed* ………………………………… 20

              b. *The Government cannot establish that the deletion or alteration was not part of a "relevant portion of the recording."* ……………………………..…… 21

              c. *The audio cannot be authenticated because the Government cannot identify who the relevant speakers are* …………………………..……… 23

          3. The FPD had no reasonable reason not to investigate Mr. Flint's allegations of manipulation …………………….... 24

       *ii.* *The deficiency in counsel's performance prejudiced Mr. Flint* ......... 24

          1. If the audio and transcript were suppressed, the probability of a different result is sufficient to undermine the confidence in the Jury's guilty ……………….…………………….... 25

          2. Mr. Flint is not required to submit evidence as to what was, in-fact, deleted ……………………………………….... 27

III.    RULE 33 MOTION FOR NEW TRIAL …..……………………….…………. 27

    a. *IN THE ALTERNATIVE*: A Rule 33 Motion For New Trial Should Be Granted Based Upon The New Evidence …..……………………………... 27

IV.    THE GOVERNMENT'S BAD FAITH …..……………………….…………. 29

    a. The Government's Intentional Interference with Mr. Flint's Right to Counsel and Seizure of Attorney Client Privileged Information ……..…… 29

    b. The Government's Intentional Misrepresentations to the Tribunal ……….. 30

      c.  <u>The Government Continued to Detain Mr. Flint for Two Days After This</u>
<u>Court Ordered his Release From Custody</u> …………………………..…… 33

V.     CONCLUSION  ………….….……………………………………..…….…..… 34

VI.    REQUEST FOR RELIEF ……………………………..…………….....… 35

<u>STATEMENT OF QUESTIONS PRESENTED</u>

1.   Whether Coram Nobis Relief is Appropriate Even Though Mr. Flint has not yet Been
     Sentenced.

     Plaintiff States: NO
     Defendant States: YES

2.   Whether Mr. Flint's Conviction Must be Vacated Pursuant to the Writ of Error Coram
     Nobis.

     Plaintiff States: NO
     Defendant States: YES

3.   Whether Mr. Flint was Given Ineffective Assistance of Counsel When Defense
     Counsel Refused to Investigate Information he Provided, Which Proves the
     Government Intentionally Manipulated Evidence and Used the Same at Trial.

     Plaintiff States: NO
     Defendant States: YES

4.   Whether a New Trial Should be Granted Based Upon New Evidence – i.e. an Expert
     Report Which Proves the Government Intentionally Manipulated Evidence and Used
     the Same at Trial.

     Plaintiff States: NO
     Defendant States: YES

## INDEX OF CONTROLING AUTHORITIES

CASES:

*Brown v. U.S.*, 68 F.3d 478 (8th Cir., 1995)   …………………………………………………12

*Blanton v. U.S.*, 94 F.3d 227 (6th Cir., 1996) …………………………………………………13

*Ellis v. Harrison*, 891 F.3d 1160 (9th Cir., 2018)   …………………………………………25

*Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, (1963) ..……………………………… 34

*Kayer v. Ryan,* (No. 09-99027) (9th Cir., May 13, 2019) ……………………………………… 15

*Strickland v. Washington,* 466 U.S. 668 (1984) …………………………….……… 15-17, 24, 27

*Rosario v. Ercole*, 601 F.3d 118 (2nd Cir., 2010)   …………………………………………25

*State v. Noorzai*, 292 Or App 248, 254: 423 P.3d 742 (Or. App., 2018)……………………….. 21

*Telink, Inc. v. U.S.*, 24 F.3d 42 (9th Cir., 1994) …………………………………………... 11

*Thomas v. United States,* 271 F.2d 500, 106 U.S.App.D.C. 234 (D.C. Cir., 1959)   …………12

*US v. David Nosal*, No. 18-10089 (9th Cir. 2018) (UNPUBLISHED)   ……………......…10-11

*USA v. Edwards*, 224 F.3d 1141 (9th Cir., 2000)   ………..……………………………………34

*U.S.A. v. Johnson*, 237 F.3d 751 (6th Cir., 2000)   ……………………………………………12

*U.S. v. King*, 587 F.2d 956, 961 (9th Cir., 1978)…………………………………….. 20, 22-24, 27

*United States v. Kwan*, 407 F.3d 1005 (9th Cir. 2005), abrogated on other grounds
in *Padilla v. Kentucky*, 559 U.S. 356 (2010)   …………………………………… 1, 9-10, 13-15

*United States v. Lopez*, 803 F.2d 969 (9th Cir.1986), cert. denied, 481 U.S. 1030,
107 S.Ct. 1958, 95 L.Ed.2d 530 (1987) …....……………………………………………… 28

*U.S. v. Monreal*, 301 F.3d 1127 (9th Cir., 2002)   …..…………………………………………11

*United States v. Morgan*, 346 U.S. 502, 74 S.Ct. 247 98 L.Ed. 248 (1954)   ……………...… 12

*U.S. v. Stewart*, 420 F.3d 1007 (9th Cir., 2005)   ……………………………..…………… 19

*U.S. v. Walgren*, 885 F.2d 1417 (9th Cir., 1989)   ……………………………………...…9, 11

*Zabel v. U.S. Attorney*, 829 F.2d 15 (8th Cir., 1987)  ……………………………………… 12

STATUTES:

28 U.S. Code § 2255 …………………………………………………………………………… 13

COURT RULES:

Federal Rule of Evidence 1002 …………….………………………………………………19

Federal Rule of Evidence 1003 …………….………………………………………………19

Federal Rule of Criminal Procedure 33 …………….………………………… 13-14, 27-29, 35

<u>**MEMORANDUM IN SUPPORT OF DEFENDANT'S PETITION**</u>
<u>**FOR WRIT OF ERROR CORAM NOBIS**</u>

"The writ of coram nobis provides a remedy for those suffering from the lingering collateral consequences of an unconstitutional or unlawful conviction based on errors of fact and egregious legal errors." *United States v. Kwan*, 407 F.3d 1005, 1009-1010 (9th Cir. 2005), abrogated on other grounds in *Padilla v. Kentucky*, 559 U.S. 356 (2010) (citations and quotations omitted).

## I.   STATEMENT OF FACTS

### a.   <u>Government Admits to Destruction of Evidence</u>

Mr. Flint's three-day jury trial began on October 16, 2019. At trial, evidence was submitted and received by the jury, which was intentionally manipulated by the United States government prior to its' admittance. (Forensic Expert Report, **Attached as Exhibit A**) Specifically, the government deleted relevant portions of Mr. Flint's FBI interview to make it appear as though he was intentionally attempting to evade TSA security requirements.

This manipulation was undoubtedly intentional, as the deletion occurred ***before*** the government submitted the audio recording for transcription. The government wanted to be sure there was no record of the deleted portions before it was admitted into evidence. This truth is solidified by the fact that the United States Prosecutor's Office has ***admitted*** it destroyed the original recording of Mr. Flint's interview. Although the reason why it destroyed the evidence is irrelevant, the government's explanation is as follows:

> "Air Marshall Williams recorded the Mirandized interview on his government-issued cell phone, and that phone was later returned to TSA because Mr. Williams was due for a phone upgrade. TSA legal counsel confirmed that old phones turned into TSA are cleared of all data and then returned to headquarters for disposal, and that is what we believe happened here." (Email from AUSA Ian Yanniello, p.1, **Attached as Exhibit B**.)

1

Despite destroying the original recording, on October 10, 2018, the government moved to admit the manipulated audio clip and transcript into evidence. In support, AUSA Christine M. Ro signed a Declaration asserting that:

> "Attached as **Exhibit D** is a true and correct copy of the audio clips that the government informed the defense it intends to use at trial. Attached as **Exhibit E** is a true and correct copy of the transcript for these audio [*sic*] clips." (Declaration of Christine M. Ro, ECF Doc. 83-1, **Attached as Exhibit C**).

Moreover, AUSA Ro "declared under penalty of perjury" that the above statements were "true and correct." (Id). However, as explained below, the government cannot deny that relevant portions of the Exhibits used at trail, including but not limited to, Trial-Exhibit 53 (Recorded Interview Clip 7) and Trial-Exhibit 53(A) (Transcript of Clip 7), were manipulated representations of the facts as they occurred. (List of Trial Exhibits, p.5, ECF Doc. 83-6, **Attached as Exhibit D**) Contrary to AUSA Ro's Declaration, there is now irrefutable evidence that the government intentionally deleted portions of Mr. Flint's interview with the FBI, in a flagrant (and successful) attempt at obstructing justice.

### b.  Audio-Forensic Expert Report Indicates Manipulation

On March 11, 2019, Mr. Flint retained "Audio-Video Enhancement and Authentication Forensic Expert" Doug Carner (the "Expert"), to determine "the integrity of the evidence provided and whether there are any signs of alteration or tampering of the audio contents within." (Expert Report, p.1).

As indicated in the Expert Report, Mr. Carner "is a certified Audio Video Forensic Analyst, Certified Forensic HiTech Investigator, Certified Computer Forensics Examiner, Certified Protection Professional. (He currently) maintains the following Forensic Positions: Audio, Video & Photo Analysis expert (Los Angeles Superior Court Panel of Experts – ICDA), Chair of the Forensic Working Group (American Society for Photogrammetry and Remote

Sensing), Digital and Multimedia Evidence subcommittee (American Society for Testing and Materials); Owner of 'Forensic – Audio Video Innovations and Solutions. [He is] a member of the American Academy of Forensic Sciences, Forensic Expert Witness Association, International Association for Identification, International Association of Forensic & Security Metrology, and Scientific Association of Forensic Examiners, (with) expertise in audio and video forensic enhancement, assessment, authentication, tamper detection, and audio and motion detection." (Id). In other words, Mr. Carner qualifies as an expert in every sense of the word.

While analyzing the audio, the Expert determined that "one amplitude-frequency inconsistency was found at 5:58.14465 into the playing time, hereafter referred to as the 'Event.'" (Id, p.2). The Expert further determined that the "noise ceiling increases during the Event … is maintained outside of the Event (and) occurs between utterances."(Id.) The Expert's final conclusions were as follows:

> "The Event (Exhibit A, Image #2) detected in the reviewed recording is ***not a natural occurrence***. The Event contains amplitude and spectral characteristics (Exhibit A, Image #1) that ***could not occur from normal file handling.*** The Event is unique within the reviewed recording and ***consistent with editing*** or an otherwise non-continuous recording. The Event occurs at five minutes and fifty-eight seconds into the reviewed recording's playing time.
>
> In summary, to a reasonable degree of expert confidence, ***the reviewed recording is found to*** be ***a manipulated representation of the facts as they occurred***." (Id) (emphasis added).

On May 30, 2019, in order to determine how the edit found by the Expert relates to the evidence admitted at trial, Mr. Flint retained the Expert to compare his audio analysis to the "verbatim transcription by the United States Department of Justice Federal Bureau of Investigation," which is the complete transcript of Mr. Flint's FBI interview. (Full Transcript,

**Attached as Exhibit E** and Supplemental Expert Report, **Attached as Exhibit F**). As indicated by the Expert's supplemental report:

> The "Spike Event occurs between utterances 'Before today?' and "[UI] and see if we can get this screened.' As defined by lines #17 and #19 respectively on page #23 of the Transcript." (Id, p.2).

In addition, the Expert reiterated the fact that the audio was, to a reasonable degree of expert certainty, manipulated – his final conclusions being:

> "The characteristics of the Event *cannot result from normal file handling or compression, nor result from an audible event*.
>
> There is *lost audio* spanning either the duration of the Event, or of some missing or out of sequence time duration spliced together, that resulted in the Event. Regardless of whether the Event is the result of recorder malfunction or human editing, the audio of the reviewed audio file is an *incomplete representation of the facts as they occurred*.
>
> The existence of the Event is fact, and its audio profile is inconsistent with known types of equipment malfunction. However, it is possible to create the Event audio profile through *audio editing manipulation*. Since I am unable to explain the Event by equipment malfunction, and the Event can be explained by editing manipulation, *an opinion of content manipulation is more likely* than that of questionable content.
>
> In summary, to a reasonable degree of expert confidence, *the reviewed recording is found to be a manipulated representation of the facts as they occurred.*" (Id) (emphasis added).

### c. <u>Location of Manipulation Relates to Evidence Used at Trial</u>

As indicated by the Supplemental Expert Report, the "Event" occurs between "lines #17 and #19 respectively on page #23 of the Transcript" – i.e. the audio which was deleted began exactly at page #23, line #18. (Id). With this regard, a side-by-side comparison of the transcript analyzed by the Expert and the transcript used at trial clearly indicates that the "Event" identified by the Expert occurs *immediately* after the conclusion of audio clip 7 (played twice at trial) and

the transcript of clip 7 (published to the jury). (Transcript of Audio Clip 7, **Attached as Exhibit G**). Below is the relevant portion of the transcript comparison, showing the exact moment the edit occurred. (Transcript Comparison, **Attached as Exhibit H**).

| PAGE 23 - FULL TRANSCRIPT (ANALYSIED BY EXPERT) | | | TRANSCRIPT OF CLIP 7 - EXHIBIT 53(A) ADMITED AT TRIAL | |
|---|---|---|---|---|
| Line No. | SPEAKER | TRANSCRIPTION | SPEAKER | TRANSCRIPTION |
| 2 | RM: | But you never, but wait--You've never been turned away from a screening checkpoint? | RM | But you never, but wait--You've never been turned away from a screening checkpoint? |
| 3 | DF: | For? | DF | For? |
| 5 | RM: | For not wanting your bag to be screened. | RM | For not wanting your bag to be screened. |
| 7 | DF: | Not that I recall. | DF | Not that I recall. |
| 9 | RM: | OK. | RM | Okay. |
| 11 | DF: | No. | DF | No. |
| 13 | RM: | When was the last time you tried to fly? | | |
| 15 | DF: | Today. | | |
| 17 | RM: | Before today? | | |
| 18 | | LOCATION OF "THE EVENT" AS DETERMINED BY AUDIO FORENSIC EXPERT | | |
| 19 | UM: | [UI] and see if we can get this screened. | | |

### d.  Analysis of Transcript Supports Finding of Manipulation

Careful analysis of the transcript further establishes the fact that the government intentionally manipulated the audio by deleting portions of Mr. Flint's interview. For example, line 19 on page 23 of the full transcript indicates the first recorded words after the "Event" are "and see if we can get this screened." In other words, the audio begins *in the middle of someone's sentence*. Clearly, this is evidence of the fact that a portion of the conversation has been deleted.

Furthermore, according to the transcript, Mr. Flint never answered Agent Marriott's question: "When was the last time you tried to fly?" "Before today?" – which was the last question asked prior to the deletion. With this regard, there are only two possibilities, either (1) Mr. Flint simply didn't answer the question, or (2) someone in the United States government did not like Mr. Flint's response (nor the discussions that presumably followed) and therefore took it upon themselves to obstruct justice and delete whatever portions of the interview they deemed

fit. Unless the FBI is in the practice of allowing interviewees to forgo answering their questions, the latter is the only true possibility.

### e.  Defense Counsel Notified of Manipulation Prior to Trial and Failed to Act

Mr. Flint notified the Federal Public Defender's Office ("FPD") of the fact that the audio recording was edited, ***more than once*** and ***before trial began***, yet the FPD failed to take any action what-so-ever. This fact is indisputable as Mr. Flint sent emails informing Craig Harbaugh, his defense counsel, of the manipulation:

On October 14, 2019, Mr. Flint sent the following message to Mr. Harbaugh:

> "hey Craig, I am in the air reading over the transcript. I am ***100 percent certain a portion of the questioning that was done is not included in the transcript***. Specifically, the portion relating to if I was ever turned away before. The portion that is missing can be found ***on page 23 of the transcript***. I will explain more when I see you. Just wanted to give you a heads up. maybe we can pull that tape and listen to it close." (Emails from Mr. Flint to Defense Counsel, p.1, **Attached as Exhibit I**) (emphasis added). [1]

In response, Mr. Harbaugh stated:

> "We have it. I was planning to have you listen to it today when you arrive." (Id).

This was not the only time Mr. Flint informed Mr. Harbaugh, that the evidence had been manipulated. The next day, Mr. Flint again emailed Mr. Harbaugh and stated "I was right about the transcript. You can hear that they cut the audio!" (Id, p.2). Thus, there is no question that, ***before trial began***, Mr. Flint notified the FPD that the government had intentionally deleted a portion of his interview. Likewise, there is no question that the FPD received Mr. Flint's emails, as they responded to the same. Yet – the FPD took no action what-so-ever.

---

[1] On an additional note, the fact that Mr. Flint indicated he was "100 percent certain" the government deleted a portion of the interview, ***before*** the Expert Report even existed, is further evidence in support of the absolute true conclusion that the government intentionally (and successfully) obstructed justice.

### f.   Reason Expert Report was not Obtained Before Trial

At the conclusion of trial, the attorneys for both prosecution and defense, together with Your Honor, spoke with the jury in the deliberation room. (Declaration of Daniel Flint, **Attached as Exhibit J**). Mr. Flint, obviously, waited in the courtroom for defense counsel to return. (Id). Upon his return, Mr. Harbaugh informed Mr. Flint that the Jury was asked why they convicted, to which they replied: "***Because of the audio.***" (Id). For obvious reasons, hearing this news infuriated Mr. Flint – and rightfully so – as he told his defense team prior to trial that the very same audio was manipulated.

On November 30, 2018, Mr. Flint personally contacted a forensic expert to discuss analysis of the audio. (Email Request for Expert Report, **Attached as Exhibit K**). In response, the company indicated that review of the audio would be worthwhile as "there was at least one area approximately half way through the clip that doesn't quite seem to fit." (Id). As a result, Mr. Flint forwarded this email to Mr. Harbaugh and Ms. Wakefield and, in no uncertain terms, stated:

> "We need to move forward with the audio clip. It is clearly edited. See below. I have not engaged anyone but I'm also ***not going to let this go.*** So let's make a game plan." (Id) (emphasis added).

Clearly, Mr. Flint was indicating to the FPD that, if they refused to act, he would. After months of informing the FPD that the audio was manipulated and must be analyzed, the FPD ***finally*** requested the original recording of the audio from the government. (Ex. B, p.3). In response, the government informed Mr. Harbaugh, for the first time, that it had destroyed the original recording. (Id).

Consequently, the reason the Expert Report was not obtained until after trial is, in part, because of (1) the FPD's refusal to listen to Mr. Flint when he informed them, before trial, of the

manipulation; (2) the FPD's failure to investigate, before trial, such allegations; and (3) Mr. Flint's unwavering position that the audio was manipulated and he was "not going to let this go." Importantly, it was this unwavering persistence that revealed the truth about the government's intentional obstruction of justice.

### g.  **Affidavit of Forensic Audio Expert Douglas Carner**

To prevent the government from arguing that Mr. Flint somehow edited the audio before sending the same to the Expert, Mr. Flint's lawyer (Gregory Nicolaysen) sent the audio given to him by the FPD's office directly to the Expert for analysis. (Forensic Expert Affidavit, **Attached as Exhibit N**). As indicated by the Affidavit, the Expert compared the audio given to him by Mr. Flint to the audio given to him by Attorney Nicolaysen and determined that they have "identical SHA1 values, thus proving that both Subject files are exact identical copies." (Ex. N, ¶6). In other words, Mr. Flint in no way altered the audio file prior to giving it to the Expert.

Furthermore, the Expert's Affidavit indicates that he concluded "to a reasonable degree of expert confidence" that the audio Event found is the result of "file manipulation." (Id. ¶7). The Expert further explains that, his "opinion cannot be elevated to an opinion of either a 'definitive' or 'high' degree of expert confidence due to the absence of a comparative recording, absent the audio Event denoted in [his] expert report." (Id).  In other words, the only way the Expert *could* say definitively (or with a high degree of confidence) that the audio was manipulated, is if he compared it to a recording that did not include the audio Event.

With this regard, the only recording that did not include the audio Event is the original recording of the interview, which was recorded on Air Marshal Williams' cell phone. However, the government has *admitted* that it destroyed this original recording. As a result, the government

has itself destroyed any possibility of Mr. Flint definitively (or with a high degree of certainty) proving that the audio was, in-fact, manipulated.

Regardless, and for the reasons explained below, when the Expert's report is considered together with the totality of the circumstances, the fact that the government intentionally deleted a portion of Mr. Flint's FBI interview, and then used the manipulated evidence at trial, becomes an absolute and definitive certainty.

## II.    ARGUMENT AND LAW

### a.    Petition for Writ of Error Coram Nobis

As explained by the Ninth Circuit:

> "[The Supreme Court has] held that coram nobis relief is available to vacate a conviction even when the defendant is no longer in custody. The writ provides a remedy for those suffering from the lingering collateral consequences of an unconstitutional or unlawful conviction based on errors of fact and egregious legal errors." *U.S. v. Walgren*, 885 F.2d 1417, 1420 (9th Cir., 1989) (citations and quotations omitted).

"Because a petition for writ of error coram nobis is a collateral attack on a criminal conviction, the time for filing a petition is not subject to a specific statute of limitations." *U.S. v. Kwan*, 407 F.3d 1005, 1012 (9th Cir., 2005) (citations and quotations omitted). "In lieu of a specific statute of limitations, courts have required coram nobis petitioners to provide valid or sound reasons explaining why they did not attack their sentences or convictions earlier." *Id.*

"While courts have not elaborated on what constitutes a 'sound' reason, [the Ninth Circuit's] review of coram nobis cases reveals that courts have denied relief on this ground where the [defendant] has delayed for no reason whatsoever, where the [government] demonstrates prejudice, or where the [defendant] appears to be abusing the writ." *U.S. v. Kwan*, 407 F.3d 1005, 1013 (9th Cir., 2005).

### i. Mr. Flint has "Sound Reason" for not Immediately Raising the Issues Brought in this Petition for Writ of Error Coram Nobis

Mr. Flint has sound reason for not attacking his conviction immediately after trial had concluded. That being the inherent conflict of interest the FPD had with raising an ineffective assistance of counsel argument against itself, for failing to investigate the audio. Indeed, this conflict was the entire reason the FPD's office could withdraw as counsel post-trial. (*see* ECF Doc. No. 149). More importantly, this conflict is undoubtedly a "valid or sound reason, explaining why [Mr. Flint] did not attack [his conviction] earlier." *Id.* at 1012.

In addition, the government cannot argue that it was prejudiced by any delay, nor that Mr. Flint is abusing the writ. (see *Id.* at 1013 where the Court found a "sound reason" for not attacking the conviction earlier because "Kwan has provided a reasonable explanation for not challenging his conviction earlier, the government has failed to demonstrate prejudice, and Kwan is not abusing the writ — he is not attempting to re-litigate claims or circumvent procedural bars.") Consequently, Mr. Flint has satisfied the "sound reason" requirement.

### ii. Coram Nobis Relief Should be Granted Before Sentencing

Before discussing the requirements of coram nobis relief, Mr. Flint anticipates the government will likely argue he may not petition for coram nobis relief before sentencing. Mr. Flint responds to this issue preemptively:

The government will likely cite the ***unpublished opinion*** of the Ninth Circuit in *US v. David Nosal*, No. 18-10089 (9th Cir. 2018), which incorrectly held that "coram nobis is not available until a petitioner 'already has fully served [his] sentence.'" Regardless of the fact that *Nosal* is an unpublished opinion, the Ninth Circuit's doctrine of coram nobis does ***not*** state that such relief is ***only*** available after sentencing. More importantly, neither has the United States Supreme Court.

In *Nosal,* the Ninth Circuit relied upon its previous decision in *Telink,* which held: "the writ of error coram nobis affords a remedy to attack an unconstitutional or unlawful conviction in cases when the petitioner already has fully served a sentence. *United States v. Walgren*, 885 F.2d 1417, 1420 (9th Cir.1989)." *Telink, Inc. v. U.S.*, 24 F.3d 42 (9th Cir., 1994) (***original citation included***). Thus, although *Telink* did hold that coram nobis applies to cases where the petitioner completed his or her sentence, it did ***not*** hold that such petition may ***only*** be brought under such circumstances.

Moreover, in support of its' decision in *Telink,* the Ninth Circuit cites page 1420 of its' previous decision in *Walgren,* which held:

> "[The Supreme Court has] held that coram nobis relief is available to vacate a conviction even when the defendant is no longer in custody." *United States v. Walgren*, 885 F.2d 1417, 1420 (9th Cir.1989)(citation omitted).

Once again, the Ninth Circuit in *Walgren* did ***not*** hold that a petition for coram nobis is ***only*** available to vacate a conviction after a defendant had served his sentence. Indeed, the *Walgren* court simply held that such relief is appropriate "even when the defendant is no longer in custody" – which Mr. Flint is not. It should also be noted that Mr. Flint was in custody prior to his arraignment and later released on bond.

Most importantly, in a ***published*** 2002 decision, the Ninth Circuit held that "coram nobis is an extraordinary writ that ***usually*** is available only to petitioners who have fully served their sentences." *U.S. v. Monreal*, 301 F.3d 1127, 1131-1132 (9th Cir., 2002) (citation omitted) (emphasis added). The word "usually" is of the utmost importance, as it clearly indicates it ***is possible*** to bring a petition for coram nobis before a sentence has been rendered – otherwise, the Ninth Circuit would have omitted "usually" and simply held that coram nobis is "only available to petitions who have served their sentence."

In addition, numerous other Circuits have allowed a petition for error coram nobis to be brought, even though the defendant had not even begun their sentence. For example, on at least two occasions, the Eighth Circuit has held that:

> "coram nobis lies only where the petitioner has completed his or her sentence and is no longer in federal custody, is serving a sentence for a subsequent state conviction, *or has not begun serving the* federal *sentence under attack*." see *Brown v. U.S.*, 68 F.3d 478 (8th Cir., 1995) and *Zabel v. U.S. Attorney*, 829 F.2d 15, 17 (8th Cir., 1987) (citations and quotations omitted)(emphasis added).

In addition, the Sixth Circuit has relied upon the above Eighth Circuit decisions when it explained that coram nobis is appropriate anytime a defendant "has not begun serving the federal sentence under attack." *U.S.A. v. Johnson,* 237 F.3d 751, 755 (6th Cir., 2000) (citation and quotation omitted). In doing so, the Sixth Circuit reasoned:

> "The filing of a coram nobis petition usually becomes possible only after the defendant has served his sentence and has been released from prison. That being so, there is no societal or individual interest in prompt adjudication of the petition while a prisoner is languishing in jail." *Id.* at 754.

Finally, the US Court of Appeals for the District of Columbia has rejected the government's argument that a defendant could not bring a petition for coram nobis because he had not yet begun serving his sentence. In doing so, the D.C. Circuit held: "[J]urisdiction lies under the doctrine of *United States v. Morgan*, 1954, 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248, regardless of whether petitioner is presently serving the sentences he attacks on the ground that they are based on coerced pleas of guilty." *Thomas v. United States,* 271 F.2d 500, 502; 106 U.S.App.D.C. 234 (D.C. Cir., 1959).

Thus, careful review of the Ninth Circuit precedent, and those of the other Circuits, clearly indicates that a petition for a writ of error coram nobis is appropriate when a defendant has not begun serving their sentence. It is noteworthy to point out that, a defendant who has not

yet begun to serve their sentence has, inherently, already been sentenced – which Mr. Flint has

not. However, the same is irrelevant for the simple fact that "the writ of error coram nobis is used

to vacate a federal sentence *or* conviction." *Blanton v. U.S.*, 94 F.3d 227, 231 (6th Cir., 1996)

(citations and quotations omitted) (emphasis added). In other words, it matters not that Mr. Flint

is attacking his conviction as opposed to a sentence, as the rule of coram nobis clearly applies to

both.

### iii. Mr. Flint Satisfies all Requirements Necessitating Coram Nobis Relief

"To qualify for coram nobis relief, four requirements must be satisfied. Those

requirements are: (1) a more usual remedy is not available; (2) valid reasons exist for not

attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to

satisfy the case or controversy requirement of Article III; and (4) the error is of the most

fundamental character." *Kwan*, 407 F.3d at 1011 (citation and quotation omitted).

In *Kwan*, the Ninth Circuit allowed a defendant to bring a petition for writ of error coram

nobis based upon an ineffective assistance of counsel argument. The *Kwan* decision was

abrogated on other grounds by *Padilla v. Kentucky*, 559 U.S. 356 (2010) and is therefore still

controlling on the coram nobis issue raised by Mr. Flint.

### 1. A more usual remedy is not available

In *Kwan*, the Ninth Circuit held that "Kwan satisfied the first requirement, that 'a more

usual remedy is not available' to him, by establishing that he is not in custody and, as a result,

not eligible for habeas relief or § 2255 relief." *Kwan*, 407 F.3d at 1012 (citation omitted).

Likewise, Mr. Flint is not in custody and not eligible for habeas relief or any § 2255 relief.

Furthermore, because more than 14 days have passed since trial, Mr. Flint does not have

a procedural right to bring his ineffective assistance of counsel argument pursuant to a Rule 33

motion for new trial. Although he may be able to establish excusable neglect, the fact remains, Mr. Flint's ineffective assistance argument cannot, as a procedural certainty, be raised under Rule 33. This is further evidence establising that a more usual remedy does not exist. Therefore, Mr. Flint, just like the defendant in *Kwan*, has satisfied the first requirement of coram nobis relief.

### 2. Valid reasons exist for not attacking the conviction earlier

In *Kwan,* the Ninth Circuit found a valid reason existed for not attacking the conviction earlier, because "defense counsel had in fact erred and affirmatively misled him by advising him that there was 'no serious possibility' that his conviction would cause him to be deported." *Id.* at 1014. Kwan argued that he saw no reason to attack the conviction earlier because his criminal defense lawyer told him there was "no serious possibility" of deportation. As a result, *Kwan* argued his delay in attacking the conviction was the result of the ineffective assistance of counsel he received.

Likewise, Mr. Flint argues it was impossible for him attack the conviction earlier due to the inherent conflict of interest the FPD had with raising an ineffective assistance of counsel argument against itself. Indeed, this conflict was the reason the FPD could withdraw as Mr. Flint's counsel. Consequently, Mr. Flint has satisfied the second requirement of coram nobis relief because there is no question a valid reason existed for his failure to attack the conviction earlier.

### 3. Valid Article III case or controversy exists

In *Kwan*, the Ninth Circuit held that "it is undisputed that the possibility of deportation is an 'adverse consequence' of Kwan's conviction sufficient to satisfy Article III's case or controversy requirement." *Id.* (citation omitted). Likewise, it is undisputed that adverse

consequences of Mr. Flint's conviction exist, which satisfy Article III's case or controversy requirement, including: (1) incarceration between 0-6 months (according sentencing guidelines); (2) the loss or suspension of Mr. Flint's license to practice law (which has already occurred in Michigan); and (3) the loss of Mr. Flint's ability to vote, which a felony conviction would preclude him from doing. Thus, the third requirement of coram nobis relief is satisfied.

### 4. The error is of the most fundamental character

In *Kwan,* the Ninth Circuit held that "Kwan may satisfy the fundamental error requirement by establishing that he received ineffective assistance of counsel." *Id.* Likewise, Mr. Flint may satisfy the fundamental error requirement by establishing that he received ineffective assistance of counsel.

### b.   Mr. Flint Received Ineffective Assistance of Counsel

Just this year, the Ninth Circuit explained the Constitutional guarantees of the Sixth Amendment as they relate to assistance of counsel in a criminal proceeding:

> "The Sixth Amendment guarantees effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 686 (1984). A defendant is denied his or her right to effective assistance when counsel's representation fall below an objective standard of reasonableness and there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Kayer v. Ryan,* p. 46 (No. 09-99027) (9th Cir., May 13, 2019) (citations and quotations omitted).

### i.   *Defense counsel's performance fell below an objective standard of reasonableness*

In this case, there is no question that defense counsel's performance fell far below an objective standard of reasonableness. With this regard, it is an indisputable fact that Mr. Flint informed Mr. Harbaugh and the FPD, in writing and verbally, before trial, that the evidence the

government intended to admit had been manipulated and was not a true representation of the facts as they occurred. (Ex. J). Despite this truth, Mr. Harbaugh and the FPD's office failed to investigate Mr. Flint's adamant proclamations.

With this regard, the Ninth Circuit has held that "all criminal defense attorneys have a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* As explained by the Supreme Court in *Strickland,* "the reasonableness of counsel's actions may be determined or substantially influenced ***by the defendant's own statements or actions***." *Strickland v. Washington*, 466 U.S. 668, 691; 104 S.Ct. 2052; 80 L.Ed.2d 674 (1984) (citation omitted). "In particular, what investigation decisions are reasonable depends critically on such information...***inquiry into counsel's conversations with the defendant*** may be critical to a proper assessment of counsel's investigation decisions." *Id*.

### 1. Failing to investigate the audio, after Mr. Flint informed of the manipulation, was unreasonable

In *Strickland*, the Supreme Court makes one thing quite clear: "What investigation decisions are reasonable depends critically on [the defendant's own statements and actions]." *Id.* Consequently, the emails Mr. Flint sent to Mr. Harbaugh are critical in determining whether his failure to investigate the audio clip was reasonable.

With this regard, it must be noted that the language used by Mr. Flint is not that of an unresolved individual. To the contrary, Mr. Flint declares to Mr. Harbaugh that he is "***100 percent certain***" a portion of the interview was deleted. (Ex. I) (emphasis added). Furthermore, Mr. Flint tells Mr. Harbaugh the exact transcript page in which the omitted dialog was deleted. And yet, Mr. Harbaugh and the FPD did nothing.

In addition, not only did Mr. Flint raise these issues in writing, he verbally tried to get Mr. Harbaugh and others in the FPD to discuss the same on at least 10 different occasions

16

between October 14 and 15. (Ex. J). Each time, defense counsel simply brushed off Mr. Flint's assertions and failed to take any action what-so-ever.

At no point does Mr. Flint waiver on his position; for example, by using words like "I believe", "I think," or "might have." Instead, he uses the phrase "100 percent certain" and even emails Mr. Harbaugh again to proclaim: "I was right about the transcript. You can hear that they cut the audio!" (Ex. I). Giving careful consideration to the predestined nature of the language used by Mr. Flint, which is critical to our analysis under *Strickland*, it is undeniable that Mr. Harbaugh's decision not to investigate Mr. Flint's claims fell far below an objective standard of reasonableness.

This truth is further solidified by the fact that Mr. Flint specifically told Mr. Harbaugh that the edit occurred on page 23 of the transcript. (Id). With this regard, a simple reading of page 23 line 19 clearly indicates that the audio recorded at that moment ***begins in the middle of someone's sentence***. (Ex. E). Furthermore, the transcript makes painfully obvious the fact that Special Agent Marriott asked a very pertinent question ("When was the last time you tried to fly?" "before today?") and yet Mr. Flint's answer is inexplicably absent from the transcript. (Id).

Any objectively reasonable lawyer would have, at the very least, read page 23 of the transcript and determined that these facts indicate Mr. Flint was, in-fact, telling the truth. However, not one person from the FPD's office read page 23 of the transcript to determine if what Mr. Flint was saying had any merit, even after he specifically identified where the edit took place. (Ex. J). This performance falls far below that of an objective standard of reasonableness.

Finally, we need not speculate as to whether the FPD failed to investigate Mr. Flint's allegations before trial. The same is definitively established by Emails sent by Mr. Harbaugh to the US Prosecutor's office ***after*** trial. With this regard, on December 3, 2018, Mr. Harbaugh

sends an Email entitled "Discovery Request" to AUSA Ian Yanniello and specifically states: "The defense requests access to the original audio recording of Mr. Flint's Interrogation on July 25, 2017." (Ex. B, p.3).

If the FPD had investigated the audio prior to trial, there would be no need to request access to the audio *after* trial. More importantly, if the FPD requested access to the audio before trial, and such access was not allowed, you can be certain this fact would have been raised by the defense in a motion in limine. However, it was not, for the simple fact of the matter is – the FPD did no investigation into Mr. Flint's claims of manipulation until *after* the trial was over.

### 2.  Investigation would have resulted in a successful motion to suppress

If Mr. Flint had effective representation before trial, an investigation into whether the audio was manipulated would have occurred. In doing so, the following facts, which are now known, would have been known then:

> (1) The government deleted the original rerecording of the audio; (Ex. B)
>
> (2) Forensic analysis indicates that, to a reasonable degree of expert confidence, the evidence submitted at trial was "a manipulated representation of the facts as the occurred;" (Exs. A & F)
>
> (3) As indicated by the Expert's Affidavit, by deleting the original recording, the government made it impossible for the Expert to definitively (or with a high degree of certainty) prove that the audio was manipulated; (Ex. N)
>
> (3) Careful review of page 23 of the transcript supports the Expert's conclusion because line 19 indicates that the audio begins *in the middle of someone's sentence* and because Mr. Flint's answer to Agent Marriott's question is inexplicably gone; (Ex. E) *and*
>
> (4) The totality of the circumstances irrefutably establishes that the United States government *intentionally deleted* portions of Mr. Flint's FBI interview, *before* it was transcribed, and then *destroyed* the original.

Under such circumstances, it is inconceivable to believe that an objectively reasonable lawyer would choose ***not*** to file a motion to suppress. It is equally inconceivable to argue that a motion to suppress would be denied under these circumstances. Rule 1002 of the Federal Rules of Evidence ("FRE") states that, "an original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." (FRE 1002). With this regard, the government has ***admitted*** to destroying the original recording. Thus, it could not admit the audio or transcript under FRE 1002. Nor could the government admit the duplicate recording of the audio because, pursuant to FRE 1003, a duplicate recording will ***not*** be admissible if "a genuine question is raised about the original's authenticity."

In Mr. Flint's case, there is no question that the Expert Report is enough to create a genuine question as to the authenticity of the original recording. (see *U.S. v. Stewart*, 420 F.3d 1007 n.13 (9th Cir., 2005) where the Ninth Circuit upheld the admission of a duplicate pursuant to FRE 1003. Reasoning that "the defendant never presented an expert to suggest that the recording had been altered … and never suggested that the tape had been altered or fabricated" and therefore "there was no evidence presenting a 'genuine question' (as to whether) the duplicate recording was altered or otherwise tainted" – i.e. no question as to the original's authenticity.)

In our case, unlike *Stewart*, had Mr. Flint been afforded effective counsel, the facts above would have been raised at a motion to suppress, and would have unquestionably created a "genuine question (as to whether) the duplicate recording was altered or otherwise tainted" – thus precluding admittance of the audio and transcript at trial. *Id.* However, the above facts were not raised because they were not yet discovered due to the FPD's failure to investigate the information provided by Mr. Flint.

Furthermore, a motion to suppress would have undoubtably been granted for the simple fact that the government cannot authenticate the manipulated audio as required by FRE 901. With this regard, the Ninth Circuit has explained that the foundational requirements for the introduction of "recordings of conversations … differs widely" from FRE 901, which only requires "evidence sufficient to support a finding that the item is what its proponent claims it is." *U.S. v. King*, 587 F.2d 956, 961 (9th Cir., 1978) (emphasis added). To establish foundation of an audio recording, the government must prove, by clear and convincing evidence, "that the recording is accurate, authentic, and generally trustworthy." *Id.*

Although there is no "bright-line test" to determine if a recording is accurate, authentic, and generally trustworthy, the Ninth Circuit has explained that:

> "As a general rule, at least in the context of a criminal trial, this requires the prosecution to go forward with respect to the competency of the operator, the fidelity of the recording equipment, the ***absence of material deletions, additions, or alterations in the relevant portions of the recording, and the identification of the relevant speakers.***" *Id* (emphasis added).

In our case, it is a factual certainty that the government cannot the most important "general rules" listed above.

           a. ***The government cannot establish the absence of material deletions or alterations because the original has been destroyed.***

The government cannot establish "the absence of material deletions, additions, or alterations" for the simple fact that it destroyed the original copy of the audio. With this regard, AUSA Ro's declaration states:

> "On December 8, 2017, the government produced to counsel for defendant (Deputy Federal Public Defender Craig Harbaugh) three audio files containing the audio-recorded post-Miranda interview that defendant gave on July 25, 2017. Attached as Exhibit A, Exhibit

B, and Exhibit C are true and correct copies of these [audio] *sic* files
that were produced to the defense." (Ex. C).

At best, this declaration indicates that the government provided a true and accurate ***copy***

of the manipulated original, it does ***not*** indicate that the original recording was free from material

deletions, additions, or alterations.

Just last year, the Court of Appeals for Oregon dealt with this identical issue and

determined that "the state's reliance on the certificate of authenticity to establish that the

recording was an accurate copy of the 9–1–1 call fails because the certificate does not purport to

establish that." *State v. Noorzai*, 292 Or App 248, 254, 423 P.3d 742 (Or. App., 2018).

In *Noorzai*, the government argued that it had properly authenticated a recording of a 9-1-

1 audio by submitting a certificate of authenticity which stated that "the attached MP3 File is a

true and accurate copy of the original." *Id.* However, the Court of Appeals for Oregon did not

agree, reasoning that:

> "at most, that certification indicates that the MP3 file provided by
> [the state] is a true and accurate copy of the original recording held
> by [the state]. That does not, however, address the accuracy of the
> underlying recording of the 9–1–1 call.
>
> Stated differently, the certificate of authenticity may support the
> finding that the MP3 file is an accurate copy of the recording, ***but it
> does not support an inference that the recording itself is an
> accurate rendition of the 9–1–1 call that took place***. As a result, the
> certificate of authenticity did not provide a sufficient basis for the
> trial court to submit the issue of authenticity to the finder of fact."
> *Id* at 254-255 (emphasis added).

Although the *Noorzai* case is not precedential, the reasoning behind the decision is sound

and should be applied to our case.

> **b.  *The government cannot establish that the
> deletion or alteration was not part of a
> "relevant portion of the recording."***

As explained by the Ninth Circuit, to authenticate an audio recording played in a criminal trial, the general rule is that the government must first establish, by clear and convincing evidence, the absence of any manipulation in "the relevant portions of the recording" *King*, 587 F.2d at 961. With this regard, the government cannot argue that the deleted portion of the audio was not a "relevant portion of the recording."

As explained above, the Expert Report conclusively establishes that the "Event" begins *immediately* after the conclusion of audio clip 7 (played twice for the Jury) and clip 7's transcript (published to the Jury). (Ex. H). More importantly, the deleted audio began immediately after Agent Marriott's question, "When was the *last time you tried to fly*" "Before today?" With this regard, the audio and transcript used at trial included Mr. Flint's responses to Marriott's question: "have you ever been turned away from a screening checkpoint" – which is an event the government alleges occurred *the last time Mr. Flint flew*. (Id).

In other words, the government's admitted evidence was used to prove an event that allegedly occurred *the last time Mr. Flint flew* and the deleted portion of the audio included Mr. Flint's answers to Agent Marriott's question: "When was the *last time you tried to fly*." Consequentially, it is an undisputable fact that the deleted portions of the audio are profoundly relevant to the evidence and implications presented by the government at trial – including implications concerning Mr. Flint's attempt to intentionally evade security. Consequently, the manipulated portion of the audio unquestionably relates to a "relevant portion of the recording." In other words, the government cannot satisfy the general rule in *King*, which requires it to establish, by clear and convincing evidence, that all relevant portions of the audio are free from material deletions, additions, or alterations.

          **c.**    ***The audio cannot be authenticated because the government cannot identify who the relevant speakers are.***

In addition to being free from material deletions, additions, or alterations, the Ninth Circuit in *King* also created the general rule that requires the government to prove, by clear and convincing evidence, the identity of all relevant speakers before an audio recording may be admitted as evidence. *Id.*

It goes without saying that a speaker who is a party to a relevant conversation is, by that very fact, relevant themselves. Consequently, because Agent Marriott's question regarding Mr. Flint's last flight was a relevant question, whoever spoke the words recorded immediately after that question are themselves, inherently relevant. (Ex H). Therefore, to authenticate the audio, the government must be able to identify the individual who spoke those words – which it most certainly cannot.

We know the government cannot identify said speaker because its' own transcriber was unable to – as indicated on page 23 line 19 of the transcript, which identifies the speaker as "UM" or "***Unidentified*** Male." (Ex H). As a result, the government cannot satisfy the general rules necessary to authenticate the audio recording, as set forth by the Ninth Circuit in *King*. Nor can the government present any reason as to why an exception to the general rules set forth in *King* should be made.

To the contrary, the content of the transcript, the Expert Report, and the government's overall bad-faith (explained in detail below), establishes that the United States Government, ***intentionally deleted*** an unknown duration of the Mr. Flint's recorded interview, ***knowing*** it was relevant to evidence it would present at trial, ***intentionally destroyed*** the original recording and then ***presented the manipulated evidence to the jury.*** Such a flagrant (and successful) attempt at

obstructing justice surely would not warrant an exception to, and departure from, the general authentication rules set forth in *King*. Consequently, had Mr. Flint obtained effective counsel, a motion to suppress audio clip 7 and the transcript of the same would have been granted.

### 3. The FPD had no reasonable reason not to investigate Mr. Flint's allegations of manipulation.

As explained above, the deleted portions of the Mr. Flint's interview with the FBI are profoundly relevant to the evidence and implications presented by the government at trial – including implications concerning Mr. Flint's intent. For those same reasons, the FPD cannot argue that it was reasonable for them not to investigate Mr. Flint's allegations, nor can they argue that any deleted audio would have been immaterial to the case.

There is simply no situation in which an investigation into the audio would possibly produce information detrimental to Mr. Flint's case. Consequently, no objectively reasonable lawyer would choose not to investigate Mr. Flint's allegations of manipulation: The FPD's refusal to do so fell far below an objective standard of reasonableness.

### ii. The deficiency in counsel's performance prejudiced Mr. Flint

There is no question that FPD's performance, as described above, falls far below an objective standard of reasonableness. Thus, to prevail on his claim of ineffective assistance of counsel, Mr. Flint need only show that counsel's deficiency in performance caused him prejudice.

To establish prejudice, the Supreme Court in *Strickland* held that, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694; 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

More importantly, "a 'reasonable probability' is less than a preponderance of the evidence. A defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Ellis v. Harrison*, 891 F.3d 1160, 1164 (9th Cir., 2018) (citations and quotations omitted). "A revie wing court looks instead to whether the probability of a different result is sufficient to undermine confidence in the outcome of the proceeding." *Rosario v. Ercole,* 601 F.3d 118, 141 (2nd Cir., 2010) (citations and quotations omitted).

In our case, the FPD's "unprofessional errors" include (1) their failure to listen to Mr. Flint when he informed them that the audio was manipulated, (2) their failure to investigate such allegations, and as a result (3) their failure to file a motion to suppress the audio.

### 1. If the audio and transcript were suppressed, the probability of a different result is sufficient to undermine the confidence in the Jury's guilty verdict

As explained above, "but for" the FPD's unprofessional errors, the audio and transcript would have unquestionably been suppressed. Thus, to determine if Mr. Flint was prejudiced from these errors, we must ask: Assuming the audio and transcript were suppressed, is the probability of a different result sufficient to undermine confidence in the outcome of the trial.

With this regard, there are only two *different* outcomes that are possible: (1) a hung jury, or (2) a not-guilty verdict. As a result, the question becomes: Assuming the audio and transcript were suppressed, is the probability of the Jury returning a not-guilty verdict *or* becoming a hung jury, sufficient enough to undermine confidence in the fact that the Jury found Mr. Flint guilty *after* listening to the manipulated audio.

To begin, the record indicates that, during deliberation, the Jury submitted a jury note that read: "We would like to hear the FBI interview 'Audio' between Flint and Special Agent Rebecca Marriott." (Jury Note, **Attached as Exhibit L**, ECF Doc. No. 125). In other words, it

cannot be denied that the Jury did, in-fact, give an extraordinary amount of weight to the audio. So much so, the Jury requested to listen to the audio at the exact time they were contemplating Mr. Flint's guilt or innocence. Consequently, if the manipulated audio was suppressed, the probability of a different outcome is sufficient to undermine the Jury's verdict.

Luckily, we need not speculate as to what the Jury would do in this case, as the Jury's own words establish that, absent the audio, it would *not* have convicted Mr. Flint. With this regard, we must consider the events that occurred immediately after the verdict was read, while the Jury was in the deliberation room speaking with the attorneys for both the prosecution and defense, as well as Your Honor. (Ex J). Specifically, we must consider the fact that, after being asked why they convicted, the Jury's response was: "***Because of the audio***." (Id).

This fact is more than critical to our analysis of whether Mr. Flint was prejudiced by the FPD's ineffective assistance of counsel – it is ***determinative*** of that analysis. The same is true because, to establish prejudice, Mr. Flint need only show that, if the audio was suppressed, the probability of ***our*** Jury returning a not-guilty verdict or becoming a hung jury is sufficient to undermine confidence in the fact that ***our*** Jury returned a verdict of guilt.

With this regard, we know for certain ***our*** Jury found Mr. Flint guilty "because of the audio." Take away the audio, and you take away the basis for our Jury's guilty verdict. This more than "undermines confidence" in the Jury's finding of guilt, it utterly destroys that confidence. As a result, Mr. Flint was prejudiced by the FPD's ineffective assistance of counsel because, had the audio and transcript been suppressed, the probability of a different result is sufficient to undermine confidence in the outcome of the proceedings.

In addition, although an evidentiary hearing would certainly establish these facts, this Honorable Court need not rely upon the testimony of any others, as Your Honor was present when the Jury informed the lawyers that they convicted Mr. Flint "because of the audio." (Ex. J).

### 2. Mr. Flint is not required to submit evidence as to what was, in-fact, deleted.

On a final note, a determination as to whether an audio recording satisfies the authentication requirements under *King* does *not* require a defendant to present evidence or testimony as to what was, in-fact, deleted from the recording. The same is necessarily true for the simple fact that it is ***the government's burden*** to prove "that the recording is accurate, authentic, and generally trustworthy." *King*, 587 F.2d at 961.

Likewise, Mr. Flint's ineffective assistance of counsel analysis under *Strickland* does ***not*** require evidence or testimony as to what was, in-fact, deleted. The same is necessarily true because, "whether [the FPD's] failures prejudiced [Mr. Flint] in a *Strickland* sense and thus violated his constitutional right to counsel depends on whether either a suppression motion or an objection would have been granted or sustained had it been made." *U.S. v. Oakley*, 827 F.2d 1023, 1025 (5th Cir., 1987).

## III.   RULE 33 MOTION FOR NEW TRIAL

### a. *IN THE ALTERNATIVE*: A Rule 33 Motion For New Trial Should Be Granted Based Upon The New Evidence

Mr. Flint is of the strong position that the Jury's guilty conviction must be vacated based upon the writ of coram nobis. If – and only if – this Honorable Court does not determine that coram nobis relief is appropriate, Mr. Flint requests that the court grant a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Per Rule 33; "upon the defendant's motion,

the court may vacate any judgment and grant a new trial if the interest of justice so requires."

(FRCP 33(a)).

"Any motion for a new trial grounded on newly discovered evidence must be filed within

3 years after the verdict or finding of guilty." FRCP 33(b)(1). As explained by the Ninth Circuit,

"the newly discovered evidence must be material to the issues involved, not merely cumulative

or impeaching, and must indicate that a new trial probably would produce an acquittal." *United*

*States v. Lopez*, 803 F.2d 969, 977 (9th Cir.1986), cert. denied, 481 U.S. 1030, 107 S.Ct. 1958,

95 L.Ed.2d 530 (1987) (citations and quotations omitted).

The new evidence in our case is the Expert Report related to the audio manipulation and

expert testimony related to the same. The government submitted the audio and transcript to

establish that Mr. Flint had knowledge of the security requirements on July 25, 2017 as it claims

he was previously "turned away from a screening checkpoint" before – allegedly– ***the last time***

***he flew***. (Ex. G). The government argues that this knowledge meant Mr. Flint was intentionally

evading security on July 25, 2017 – intent being the main element of the charged crime.

With this regard, the new evidence proves there is a deleted portion of the audio, which

begins immediately after Agent Marriott's question: "When was the ***last time you tried to fly***"

"Before today?" As a result, there is simply is no question that Mr. Flint's deleted-response to

Agent Marriott's question (including the discussions that presumably followed) are profoundly

relevant and material to the issues and implications presented by the government at trial –

including implications concerning Mr. Flint's intent.

This new evidence is enough that a Jury would very likely disregard the entire audio as

not credible. More importantly, as explained above, we know for certain that our Jury found Mr.

Flint guilty "because of the audio." Thus, take away the audio, and the Jury would undoubtably

acquit Mr. Flint. As a result, the requirements of Rule 33 are satisfied, and a new trial should be granted.

## IV.    THE GOVERNMENT 'S BAD FAITH

The fact that the government falsified evidence and presented the same to the Jury is not at all surprising considering it has subjected Mr. Flint to unethical, malicious, and illegal conduct from the time of his initial arrest. Although the manipulation and destruction of evidence used at trial is certainly the strongest indication of the government's bad faith, it is far from the only indication.

### a.   The government's Intentional Interference with Mr. Flint's Right to Counsel and Seizure of Attorney Client Privileged Information

At the time of his initial arrest, Mr. Flint lived in Charlotte, North Carolina, which is a 2,411.3-mile drive to Los Angeles, California. Thus, the government knew Mr. Flint would be required to fly to LA in order to appear at his initial arraignment. Armed with this knowledge, the government searched flight records and discovered that Mr. Flint purchased a flight that would be landing in LAX the day before his scheduled court date. It then waited at Mr. Flint's arrival gate and arrested him as soon as he stepped off the plane. This conduct unquestionably establishes the government's bad faith, as it used this tactic to obtain information otherwise protected by the attorney client privilege.

With this regard, the government was fully aware that Mr. Flint had contacted the Federal Public Defender's Office and was seeking their appointment as defense counsel *before* his initial appearance. This knowledge is established by the fact that, two days prior to his arraignment, Mr. Harbaugh emailed Mr. Flint and explained that: "The government is opposing our request for appointment and for your appearance by video." (Oct. 17, 2017 Email, **Attached as Exhibit M**). Even Mr. Harbaugh states he was "surprised by the government's position." Id.

Moreover, Mr. Harbaugh had informed the government that he would be seeking appointment as counsel at Mr. Flint's arraignment – i.e. the government knew Mr. Flint and Mr. Harbaugh would personally meet for the first time during the arraignment. Despite this knowledge, the government ***intentionally*** prevented Mr. Flint from meeting Mr. Harbaugh by arresting him as soon as he stepped off the plane at LAX.

What's worse, the government further violated Mr. Flint's constitutional rights by seizing attorney client privileged communications Mr. Flint intended to share with Mr. Harbaugh – including handwritten notes detailing numerous facts necessary to establish a defense of "good-faith." This conduct is a clear indication of the government's bad faith, as there is simply no justifiable reason for such an egregious violation of Mr. Flint's constitutional rights.

### b.   The government's Intentional Misrepresentations to the Tribunal

The government's unethical and unconstitutional actions did not stop at Mr. Flint's initial arrest. Quite the opposite, the government's actions during Mr. Flint's arraignment were even more egregious; as the US Prosecutor's office knowingly made false representations to the tribunal in an attempted to have Mr. Flint detained without bond and to prevent him from obtaining appointed counsel.

Regarding the latter, in support of its' claim that Mr. Flint could afford his own lawyer, the government ***falsely*** stated that Mr. Flint "even flew first class to his initial appearance." (Paraphrased). This statement was, in-fact, a ***verifiable lie***. However small it may seem, the truth remains, the government made a false statement to tribunal in connection with its' efforts to prevent Mr. Flint from obtaining appointed counsel.

Furthermore, in support of its' claim that Mr. Flint was a flight risk, the government argued that, the day before his arraignment in Los Angeles, Mr. Flint attempted to flee the

United States of America by boarding a flight that had a layover *in Los Angeles*, but a final destination in Canada. For the reasons explained below, the government made this representation to the tribunal *knowing* it was, in-fact, unequivocally *false*.

   To begin, Mr. Flint was not attempting to flee the county, he simply found his flight to LA on a well-known website called [www.skiplagged.com](http://www.skiplagged.com). This site allows consumers to book the cheapest flight to any destination, including flights that have a layover at the chosen destination, with a final destination at some other location. In other words, the passenger "skips" the second leg of their flight, as their chosen destination is, in-fact, the location of the layover. Thus, when Mr. Flint used skiplagged to search for his flight to LA, the cheapest flight had a layover in LA and a final destination in Canada. Had the government truly done it's "due-diligence," it would have known that Mr. Flint was not attempting to flee the country, but simply used skiplagged to find the cheapest flight to LA.

   Regardless, the government's knowledge that Mr. Flint was not attempting to flee the country, but instead attempting to fly to LA to attend his schedule court date, can be imputed on them by their very own words. With this regard, at his arraignment, the AUSA triumphantly proclaimed that it succeeded in preventing Mr. Flint from fleeing the country only after extensive "due diligence" allowed it to discover that Mr. Flint had purchased a ticket with a final destination in Canada. It follows then, this extensive "due diligence" must have caused the government to discover that Mr. Flint had also reserved a hotel in LA that very night and, more importantly, booked a return flight to Charlotte, *which departed LAX the very next day*.

   The government also *knew* Mr. Flint's first initial appearance was previously adjourned because *Mr. Flint was going to be out of the country*. In other words, the government argued

31

Mr. Flint was attempting to flee the country, despite knowing he had recently left the country, returned, and then booked a flight that landed in LAX the day before his new court date.

Furthermore, the government *knew* Mr. Flint had very strong community ties in Detroit, Michigan (his family and law firm are located near there), which is less than 90 miles from the Canadian border. It is entirely asinine to believe Mr. Flint would fly *over 2,000 miles* to LAX and then attempt to flee to Canada, when he lived and worked less than 90 miles from the same border for most of his life. Likewise, it is equally as asinine to believe Mr. Flint would wait until the day before his scheduled court date; *and* fly to the exact location of said court date, all in his attempt to flee to Canada.

The government also *knew* Mr. Flint had talked to Mr. Harbaugh prior to his flight to LA, and they *knew* Mr. Harbaugh would be seeking appointment as Mr. Flint's counsel. Thus, the government *knew* Mr. Flint had contacted the FPD's office and was seeking Mr. Harbaugh's appointment as his legal counsel. Despite this knowledge, the government still falsely claimed Mr. Flint was attempting to flee the country – a man attempting to flee the country does not seek to have counsel appointed in his case before he does so.

The government cannot deny its' knowledge of each of the above facts. As a result, there can be no question that the government has acted in bad faith by falsely representing to the tribunal that Mr. Flint had attempted to flee to Canada the day before his scheduled appearance date. Furthermore, if the government genuinely had a good-faith belief that Mr. Flint was a flight risk, it would have either arrested him at the departure gate of the plane actually flying to Canada or, (because it was an international flight) arrest him as he attempted to go through customs at LAX. The same is true for the simple fact that the government would have a *far* stronger argument that Mr. Flint was a flight risk had he taken additional overt acts in his alleged attempt

to flee to country. Indeed, the government's choice to arrest Mr. Flint immediately as he exited the plane at LAX is extremely telling, as it is indicative of an organization acting in bad faith and with ulterior motives.

The intentional misrepresentations made to this Honorable Court, by the government, have occurred at every stage in Mr. Flint's case – including his pending sentencing. With this regard, in its' sentencing brief, the government falsely claims that "the PSR noted that: defendant and others manufactured a purported diplomatic identification card …." (ECF Doc. 133 at p. 6, fn. 1). There is no question that this statement, just like many others the government has made, is a verifiable lie. The PSR does *not* indicate that Mr. Flint "manufactured" the diplomatic identification card he presented. The PSR expressly states that "it is *unclear* whether Flint also manufactured, or participated in the manufacturing, of the document itself." The government's statement that the PSR "noted" that Mr. Flint "manufactured" the diplomatic identification is blatant lie, a flagrant violation of Rule 3.3 of the ABA Rules of Professional Conduct (making false statements to the tribunal) and nothing less than a sanctionable attempt at manipulating the truth.

### c.  <u>The government Continued to Detain Mr. Flint for Two Days After Court Ordered his Release From Custody</u>

On the morning of October 18, 2017, this Court correctly determined that Mr. Flint was not a flight risk nor a danger to society and therefore Order his release from custody. Despite this fact, Mr. Flint remained in federal prison until the afternoon of October 20, 2017 – *two days after this Court ordered his release*. After numerous phone calls from both Mr. Flint's family and his defense counsel, the government finally released him from custody. The reason the government gave for the delay: "The paperwork from the Court got misplaced on the way to the

down to the prison." (Paraphrased). Yet again, the government's bad-faith simply cannot be denied – nor should it go unrecognized.

## V.   CONCLUSION

The circumstances of this case cry out for a finding that Mr. Flint's constitutional rights were substantially violated, the only remedy for which is to vacate his conviction. The government did not mistakenly delete a portion of Mr. Flint's audio interview, nor did it mistakenly destroy the original recording of the same. Such an obvious and intentional obstruction of justice cannot go unrecognized.  In the words of the Ninth Circuit: "The fact that the prosecutor tampered with a crucial piece of evidence in this case undermines the integrity of the verdict." *USA v. Edwards*, 224 F.3d 1141, 1147 (9th Cir., 2000).

Moreover, the Sixth Amendment ensures that all those accused of a crime enjoy the right "to have the Assistance of Counsel for his defense. This right, fundamental to our system of justice is meant to assure fairness in the adversary criminal process." *Gideon v. Wainwright,* 372 U.S. 335, 344, 83 S.Ct. 792, 796, 9 L.Ed.2d 799 (1963). Mr. Flint was not afforded this constitutionally guaranteed right. The FPD's failure to listen to Mr. Flint when he informed them, before trial, that the audio was manipulated, along with their failure to investigate the same, is conduct that falls far below an objective standard of reasonableness.

Effective counsel would have determined that the government deleted a portion of Mr. Flint's interview and would have thus succeeded in a motion to suppress the manipulated audio and transcript of the same. If the manipulated evidence was suppressed, there is no question that the proceeding would have been different. The same is true for the simple fact that the Jury itself explained that it found Mr. Flint guilty "because of the audio." This fact alone is sufficient to

undermine confidence in the Jury's guilty verdict. As a result, there is no question Mr. Flint was prejudiced by the ineffective assistance of counsel he received.

## VI.    REQUEST FOR RELIEF

**THEREFORE**, Defendant, Daniel C. Flint, respectfully asks this Honorable Court to Grant his Petition for a Writ of Error Coram Nobis, vacate the Jury's guilty verdict, and dismiss all charges against him or grant an evidentiary hearing to address the issues presented.

In the alternative, Defendant respectfully requests that this Honorable Court Grant his Rule 33 Motion, vacate the Jury's guilty verdict, and Order a new trial be held or grant an evidentiary hearing to address the issues presented.

Respectfully Submitted,

**The Law Offices of Daniel C Flint, P.C.**
Daniel C. Flint, Esq. (N.C. Bar #50,000)
525 N. Tryon, Suite 1600
Charlotte, NC 28202
(704) 904-8469

Dated:  August 16, 2019